No. 24-40792

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED
STATES, *et al.*,

*Defendants-Appellants*.

**DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR
STAY PENDING APPEAL**

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

DAMIEN DIGGS
  *United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
SOPHIA SHAMS
  *Attorneys, Appellate Staff
  Civil Division, Room 7624
  U.S. Department of Justice
  950 Pennsylvania Ave., NW
  Washington, DC 20530
  202-514-2495
  sophia.shams@usdoj.gov*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ...................................................................... 1

STATEMENT ......................................................................................................... 2

ARGUMENT ......................................................................................................... 7

I.     The CTA Falls Within Congress' Enumerated Powers .................................. 7

       A.     The CTA Is A Valid Exercise Of Congress's Commerce Power ......... 7

       B.     The CTA Effectuates The Foreign Affairs, Foreign Commerce, And Tax Powers ......................................................................... 12

II.    The Equitable Factors Overwhelmingly Favor A Stay ................................. 14

III.   The District Court's Remedy Is Overbroad .................................................. 17

CONCLUSION ..................................................................................................... 22

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# INTRODUCTION AND SUMMARY

The district court invalidated an Act of Congress that Congress deemed essential to the government's efforts to combat money laundering, terrorism financing, human and drug trafficking, and other criminal acts. The court acknowledged that the statute forms part of a scheme that regulates matters within Congress's authority, and that its logic is "unassailable." Add. A45. But the court nonetheless preliminary enjoined the statute's enforcement on the ground that Congress lacks authority to require corporations to provide basic information like the name, address, and identifying information of their beneficial owners.

To make matters worse, the court issued a nationwide injunction that cannot be reconciled with fundamental principles of equity. The balance of harms tips sharply in favor of the government and any injunction in any event should have been limited to the handful of companies who identified themselves before the district court.

An immediate stay is warranted. The Supreme Court has recognized a strong presumption that "Acts of Congress … should remain in effect pending a final decision on the merits" by the Supreme Court. *Turner Broadcasting System, Inc. v. FCC*, 507 U.S 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (quotation marks omitted). Indeed, in "virtually all" cases where a lower court has held a federal statute unconstitutional, the Supreme Court has "granted a stay if requested to do so by the Government." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers).

A stay is particularly appropriate in these circumstances. Although the statute was enacted in January 2021, plaintiffs did not institute this litigation until this year, causing the district court's injunction to take effect shortly before a reporting deadline of January 1, 2025, and at the height of the government's extensive outreach efforts to ensure that it obtains the information necessary for its enforcement efforts. Plaintiffs' harm, by contrast, is minimal: there is no fee for complying with the reporting requirement, and plaintiffs do not contest that a typical, simply-structured corporation will generally spend only ninety minutes to report, nor do they contend that this estimate is inapplicable to them.

The government respectfully requests a ruling on this motion as soon as possible, but in any event no later than December 27, 2024, to ensure that regulated entities can be made aware of their obligation to comply before January 1, 2025. The government proposes that plaintiffs' response be due December 19, 2024, and the government's reply be due December 23, 2024. Plaintiffs oppose this motion, but take no position on the government's proposed briefing schedule.

## STATEMENT

This case arises from the federal government's efforts to combat financial crime and protect national security.

**1.** Federal law has long prohibited harmful economic activities such as money laundering, *see* 18 U.S.C. §§ 1956–1957, providing financing for terrorism, *see id*. § 2339C, and evading taxes, *see* 26 U.S.C. § 7201. Financial crime is complex,

easily concealed, and facilitated by an interconnected financial system. "A person forming a corporation or limited liability company within the United States" typically "provides less information at the time of incorporation than is needed to obtain a bank account or driver's license." H.R. Rep. No. 116-227, at 2 (2019). That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in criminal activity. Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, tit. LXIV, § 6402(3), 134 Stat. 4547, 4604 (2021).

The absence of company-ownership information also threatens national-security and foreign-policy interests. "Russian elites, state-owned enterprises, and organized crime," and the Russian government have employed "shell companies to evade sanctions." 87 Fed. Reg. 59,498, 59,498 (Sept. 30, 2022). The Iranian government has likewise deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502. And illicit actors have used shell companies "to conceal proceeds from criminal acts … such as corruption, human smuggling, drug and arms trafficking, and terrorist financing." *Id.* at 59,500.

**2.** To address this enforcement gap, Congress enacted the Anti-Money Laundering Act of 2020, which adopts various provisions designed to "modernize" federal "anti-money laundering and countering the financing of terrorism laws." § 6002(2), 134 Stat. at 4547. Relevant here is the Corporate Transparency Act

(CTA), which "establish[es] uniform beneficial ownership information reporting requirements." § 6002(5), 134 Stat. at 4547.

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and to "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." § 6402(5), 134 Stat. at 4604. Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities," § 6402(6)(A), 134 Stat. at 4605, assist in improving "tax administration," 31 U.S.C. § 5336(c)(5)(B), and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," § 6402(5)(E), 134 Stat. at 4604.

At issue here is a requirement that certain businesses report information about their beneficial owners and applicants to the Financial Crimes Enforcement Network (FinCEN) within the Department of the Treasury. A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (establishing certain exceptions). And an "applicant" is an individual who files documents to register the corporate entity. *See id.* § 5336(a)(2). For each applicant and beneficial

4

owner, a covered business must report the individual's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number." *Id.* § 5336(a)(1), (b)(2)(A). Covered businesses must submit updated reports when ownership information changes. *Id.* § 5336(b)(1)(D). A person who willfully violates either the initial or ongoing reporting requirements is subject to civil and criminal penalties. *See* 31 U.S.C. § 5336(h). *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]." 31 U.S.C. § 5336(a)(11). That term generally includes any "corporation, limited liability company, or other similar entity that is" either "created" or, in the case of foreign entities, registered to do business in the United States "by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11)(A). But the reporting requirements do not apply to certain categories of businesses such as banks and other entities already subject to reporting or recordkeeping requirements, *see id.* § 5336(a)(11)(B), and certain domestically-owned entities no longer engaged in business, *id.* § 5336(a)(11)(B)(xxiii). The statute provides detailed criteria governing when reported information may be shared with federal, state, and local law enforcement. *Id.* § 5336(c)(2)(B).

The CTA directs FinCEN to implement certain aspects of the statute by regulation, *see* 31 U.S.C. § 5336(b)(5), and FinCEN has accordingly specified deadlines by which covered entities must submit initial reports. Businesses created

or registered before 2024 must comply by January 1, 2025; businesses created or registered during 2024 must comply within 90 days of formation; and businesses created or registered after 2024 will need to comply within 30 days of formation. 31 C.F.R. § 1010.380(a)(1).

**3.** Plaintiffs are five corporations subject to the CTA's reporting requirements, and one organization, National Federation of Independent Business (NFIB), that is suing on behalf of its member corporations. Relevant here, plaintiffs argued that the CTA exceeds Congress's enumerated powers. The district court granted plaintiffs' motion for a preliminary injunction and issued a nationwide injunction. It further stayed the January 1, 2025, compliance deadline under § 705 of the Administrative Procedure Act (APA).

The district court held that the CTA does not fall within Congress's Commerce Clause power because it "regulate[s] an entity's *existence*" rather than any preexisting activity. Add. A43–A46.[1] The court further held that the CTA would not fall within Congress's authority even if corporate existence was considered an activity. The court recognized that "it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce," but concluded that "Congress's commerce power cannot reach this far" because

---

[1] The district court amended its order to correct a typographical error. All citations refer to the order as amended.

6

corporate law and practice is primarily a creature of state law.  Add. A46–A53.  For similar reasons, the court also concluded that the CTA was not necessary and proper for executing Congress's foreign commerce powers, tax powers, or foreign affairs interests.  Add. A53–A73.  Lastly, even though neither party requested such relief, the district court concluded that NFIB's large membership meant that meaningful relief could not be rendered "without, in effect, enjoining the CTA and Reporting Rule nationwide."  Add. A77.

**3.**  The government moved in district court for a stay pending appeal on December 11, 2024.  We will promptly inform the Court if the district court acts on that motion.

## ARGUMENT

To obtain a stay pending appeal, the government must (1) make a "strong showing" that it "is likely to succeed on the merits," (2) that it will be "irreparably injured absent a stay," (3) that a stay will not "substantially injure the other parties," and (4) that a stay serves the "public interest."  *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).  Each factor supports the government.

### I.  The CTA Falls Within Congress's Enumerated Powers

#### A.  The CTA Is A Valid Exercise Of Congress's Commerce Power

**1.**  "[T]he power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; 'to foster, protect, control and restrain.'"  *NLRB v.*

*Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36–37 (1937) (citations omitted).

Congress's "broad authority" under the Commerce Clause is thus "well established."

*National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 549 (2012) (opinion

of Roberts, C.J.).

It is also well established that Congress can regulate activities that may

themselves not be interstate commerce but serve a broader economic regulatory

scheme. *Id.* at 19. This power comes from the Commerce Clause as well as the

Necessary and Proper Clause, which provides Congress broad power to enact laws

that are "'convenient, or useful' or 'conducive'" to specific federal authority. *United*

*States v. Comstock*, 560 U.S. 126, 133-34 (2010) (quoting *McCulloch v. Maryland*, 17

U.S. (4 Wheat.) 316, 413, 418 (1819)). Thus, Congress can "regulate purely local

activities that are part of an economic 'class of activities' that have a substantial

effect on interstate commerce." *Raich*, 545 U.S. at 17. A reviewing court "need not

determine whether [the regulated] activities, taken in the aggregate, substantially

affect interstate commerce in fact, but only whether a 'rational basis' exists for so

concluding." *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)); *see*

*also Comstock*, 560 U.S. at 134 (directing courts to examine whether a provision is

rationally related to implementing an enumerated power).

In assessing the breadth of Congress's authority, the Supreme Court has

distinguished between laws with an "apparent commercial character," *United States*

*v. Morrison*, 529 U.S. 598, 611 & n.4 (2000)—such as regulations addressing the

intrastate farming of wheat, *see Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942), and the intrastate manufacture and possession of marijuana for personal use, *see Raich*, 545 U.S. at 15— and laws that have "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms," *Lopez*, 514 U.S. at 561—such as prohibitions on possessing firearms in school zones and on gender-motivated violence, *see id.* at 567; *Morrison*, 529 U.S. at 613. The Court has also distinguished regulations of commercial activity from regulations that address inactivity by requiring a class of individuals unlikely to enter a particular market to engage in commercial transactions. *See NFIB*, 567 U.S. at 553 (opinion of Roberts, C.J.); *id.* at 652 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

**2.** The CTA falls squarely within Congress's authority. The statute imposes reporting requirements on corporations, which are entities authorized to engage in various economic transactions, such as "[m]ak[ing] contracts," "borrow[ing] money," "incur[ring] liabilities," and transferring "real or personal property." Del. Code Ann. tit. 8, § 122. The CTA thus effectively prohibits many anonymous economic transactions, and Congress's authority to do so under the Commerce Clause should be beyond dispute.

The district court's contrary conclusion elevates form over substance and would hamstring Congress's legitimate efforts to regulate interstate commerce. Its concern that one must "pile inference upon inference" to consider the CTA as a regulation of commerce ignores the commercial nature of corporations and the

CTA's place in a regulatory scheme aimed at combatting financial crime.  Add. A45 (quoting *Lopez*, 514 U.S. at 567).  Congress identified a "lack of transparency" involving corporate ownership as "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10.  The CTA directly addresses that concern by requiring corporate entities—whose entire purpose is engaging commercial transactions in their own name—to disclose the persons who created them and have authority to direct their operations.  The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations, which aids in the detection and prosecution of financial crimes.  § 6002(5)(A), 134 Stat. at 4547.

The CTA and its larger regulatory scheme thus address an economic matter— illicit financial activity—that is within Congress's authority to address, and it does so by targeting the very anonymous transactions that allow such financial crimes to occur.  Even the district court acknowledged that the CTA is "rationally related to the implementation" of valid prohibitions.  *Comstock*, 560 U.S. at 134; Add. A52 ("Nonetheless, it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce.").

**3.**  The district court mistakenly equated the reporting requirements with the statutory provision at issue in *NFIB*, which "requir[ed] that individuals purchase health insurance."  *NFIB*, 567 U.S. at 548 (opinion of Roberts, C.J.).  The Supreme

Court's Commerce Clause analysis in *NFIB* emphasized that the insurance requirement "primarily affects healthy, often young adults who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature." *Id.* at 556; *see also id.* at 652–53 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and command even those furthest removed from an interstate market to participate in the market, then the Commerce Clause becomes a font of unlimited power."). Here, by contrast, the CTA regulates a class of entities that is, by its nature, commercial.

The district court's reasoning thus places great emphasis on the difference between a statute that regulates entities engaging in commercial transactions and the more administrable scheme that Congress actually enacted, which regulates categories of entities whose defining feature is their authority and propensity to do so. But that is not a material difference, as this case exemplifies: plaintiffs acknowledge that they engage in commerce, and although NFIB claims to represent 300,000 members, plaintiffs have not identified a single corporation that refrains from any economic activity.

Exacerbating its error, the district court concluded that plaintiffs' facial challenge was likely to prevail—even though plaintiffs and their members regularly engage in commercial transactions, Add. A9–A13, and the statute is therefore plainly constitutional as applied to them. A "plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would

be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up).  The Supreme Court has imposed this "very high bar" because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (quotation marks omitted).  Here, not only have plaintiffs not established that the statute is unconstitutional as applied to them, but they have also failed to offer any concrete example of an unconstitutional application, which would require a corporation (or similar entity) not engaged in commerce.

Reliance on the hypothetical possibility that the law *could* apply to a corporation that declines to engage in commerce is the kind of "speculation about the law's coverage and its future enforcement" that the Supreme Court has warned against.  *NetChoice*, 603 U.S. at 723 (quotation marks omitted).  Courts have "never required Congress to legislate with scientific exactitude," *Raich*, 545 U.S. at 17, and "laws should not be invalidated by reference to hypothetical cases," *Sabri v. United States*, 541 U.S. 600, 608 (2004) (quotation marks omitted).

**B.     The CTA Effectuates The Tax, Foreign Affairs, And Foreign Commerce Powers**

The CTA is also necessary and proper for carrying into execution other powers, including the tax, foreign-affairs, and foreign-commerce powers.   Congress reasonably determined that the lack of ownership information allows criminals to obscure their income and assets and thus "facilitate[s] … serious tax fraud."

§ 6402(3), 134 Stat. at 4604, and that the reporting requirements would be "highly useful" in enabling investigators to detect financial crimes and improve tax administration. *See* § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5336(c)(5)(B); *see also Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) (Congress may enact legislation to facilitate tax collection).

Moreover, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), as well as national-security policy, *Ullmann v. United States*, 350 U.S. 422, 436 (1956). In this case, Congress found that the absence of reporting requirements facilitates "the financing of terrorism," "human and drug trafficking," and "proliferation financing" (that is, financing for the spread of nuclear, chemical, and biological weapons), and thus "harm[s] the national security interests of the United States." § 6402(3), 134 Stat. at 4604. Congress also found that the reporting requirements were needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," thereby aiding longstanding diplomatic efforts to strengthen the global financial system and encourage international cooperation on financial crime. § 6402(5)(E), 134 Stat. at 4604; *see* 87 Fed. Reg. at 59,528. The political branches thus consider the CTA "needed" to "protect vital Unite[d] States national security interests" and "facilitate important national security" activities. § 6402(5), (6), 134 Stat. at 4604–05; *see* 87 Fed. Reg. at 59,498. Congress also expressly recognized

that the CTA is "needed" to "protect … foreign commerce."  § 6402(5), 134 Stat. at 4604.

Finally, the Necessary and Proper Clause empowers Congress to carry into execution not only its own powers, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  This clause does not require a direct connection between a statute and "a single specific enumerated power."  *Comstock*, 560 U.S. at 147.  Here, the CTA facilitates the President's powers over foreign policy and national security by enabling the gathering of "intelligence," the protection of "national security," and the prevention of "terrorism," § 6402(5), 134 Stat. at 4604.

## II.    The Equitable Factors Overwhelmingly Favor A Stay

The district court's order threatens significant and irreparable harm to the government and public, *see Nken*, 556 U.S. at 435, which greatly outweighs any claimed injury to plaintiffs.

**1.**  There is a traditionally strong "presumption of constitutionality which attaches to every Act of Congress."  *Bowen v. Kendrick*, 438 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers).  Thus, in "virtually all" cases where a lower court has held a federal statute unconstitutional, the Supreme Court has "granted a stay if requested … by the Government."  *Id.*  As this Court has recognized, "any time a [government] is enjoined by a court from effectuating statutes enacted by

14

representatives of its people, it suffers a form of irreparable injury.'" *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam) (cleaned up). That is especially true here given that the CTA is a bipartisan effort by Congress to target financial crime and protect national security. The district court properly recognized the statute's utility in combatting money laundering and other criminal activity. *See* Add. A45 ("The notion that one may use a company to veil their illicit financial crimes is unassailable."). And the common-sense notion that anonymous transactions jeopardize law-enforcement efforts was well documented in statutory findings and the legislative history. *Supra* pp. 2–4. Moreover, the court recognized that "the Government has an interest in ferreting out financial crime, protecting foreign commerce and national security, and bringing the United States's money laundering laws into compliance with international standards." Add. A73–A74.

The injunction also disrupts the government's efforts to combat international financial crime, including the financing of terrorism. As a founding member of the Financial Action Task Force, the United States has a unique leadership role in encouraging countries to combat financial crime worldwide. The CTA was enacted as part of those leadership efforts related to international standards regarding transparency to address the enforcement gap of these financial crimes. The district court's injunction thus severely undermines our credibility among other nations and leadership in this area. Add. A91, ¶ 22.

**2.**  Balanced against these concrete and serious harms to the government's law-enforcement efforts is plaintiffs' alleged compliance costs.  The district court described those injuries as "concrete," Add. A74, but did not dispute that they are minimal.  FinCEN estimated that a typical, simple company would spend about ninety minutes (or the equivalent of about $85's worth of time) to complete and file the statute's required report, which may be filed for free.  87 Fed. Reg. at 59,573, 55,589, *cited in* Add. A19.  The plaintiff corporations do not contend that they have more complex structures that would require greater time or money; they merely offer general statements that "compliance costs" would be incurred.  Add. A167, ¶ 10; A170, ¶ 9; A179, ¶ 10; A181, ¶ 12; 186, ¶ 23; 188, ¶ 5.  NFIB and its members also do not meaningfully detail their compliance costs; in fact, they admit that the basic information required under the CTA is "readily available."  Add. A174.

The timing of the district court's injunction exacerbates the imbalance of harms.  Although the CTA was enacted in 2021, plaintiffs waited until 2024—nearly three years later—to bring this suit.  In addition to undermining their claim to serious irreparable harm, this leisurely approach has greatly increased the harms to the government.

FinCEN has engaged in a large-scale effort to inform and encourage as many corporations to report as possible.  Add. A87, ¶¶ 13–14.  That effort has recently prompted an exponential increase in reporting.  Add. A87, ¶ 15.  The district court's injunction irreparably disrupts the momentum of this effort and thus Congress's

regulatory scheme.  Add. A87, ¶ 18.  Much of the funds FinCEN has spent on its

outreach efforts cannot be recouped.

The injunction will also cause many corporations to believe they no longer

have to report, a belief that FinCEN must then expend more resources to correct if

the injunction is reversed.  Add. A89, ¶ 19.  This confusion would further hinder the

government's ability to establish the comprehensive database that Congress

envisioned.  FinCEN will essentially be forced to start over in its outreach efforts,

which will impose substantial costs and delay the government's efforts to combat

financial crime.  In short, the harms to the government greatly outweigh the limited

harms to the plaintiffs from complying with a simple reporting requirement.

## III.    The District Court's Remedy Is Overbroad

**1.**  The district court's issuance of a nationwide injunction runs contrary to

Article III and fundamental equitable principles, which provide that relief should be

limited to the parties.  Article III authorizes courts to entertain suits only by a

plaintiff who has suffered a concrete injury, and to grant relief only to remedy "the

inadequacy that produced [the plaintiff's] injury," *Gill v. Whitford*, 587 U.S. 48, 66

(2018) (quotation marks omitted).

Principles of equity reinforce that constitutional limitation.  A federal court's

authority is generally confined to the relief "traditionally accorded by courts of

equity" in 1789.  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,

527 U.S. 308, 319 (1999).  And it is a longstanding equitable principle that, at most,

injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, "courts of equity" historically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

Those principles are buttressed here by the APA's text and history. Section 705 explicitly incorporates limitations on non-party relief by permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Its legislative history likewise makes clear that Congress intended § 705 relief to be "equitable" and used only "to prevent irreparable injury," H.R. Rep. No. 79-1980, at 43 (1946), and that "[s]uch relief would normally, if not always, be limited to the parties complainant," *id.* And the APA explicitly reinforces that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702. The APA therefore requires courts to decline to enter nationwide relief, however styled, where other remedies would fully redress plaintiffs' injuries.

Nationwide relief also creates well-catalogued legal and practical problems. It circumvents the procedural rules governing class actions, which are designed to determine when absent parties' rights may be affected—favorably or unfavorably— by litigation. Fed. R. Civ. P. 23. It enables forum shopping and empowers a single district judge to effectively nullify the decisions of all other lower courts by barring

application of a challenged policy in any district nationwide. *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay). And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets." *See Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also United States v. Texas*, 599 U.S. 670, 702–04 (2023) (Gorsuch, J., concurring in the judgment).

In line with those principles, the Supreme Court recently stayed a universal injunction based on five Justices' explicit conclusion that such injunctions are likely impermissible. *Labrador v. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay). And on a separate occasion, three Justices recently admonished that "universal relief … strains our separation of powers" and advised that if "party-specific relief can adequately protect the plaintiff's interests," then "an appellate court should not hesitate to hold that broader relief is an abuse of discretion." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment). This Court has also recognized that universal "injunctions are not 'required or even the norm,' and that several justices on the Supreme Court have viewed them with conspicuous skepticism," along with "[s]cholars and judges from our sister circuits." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 953–54 (5th Cir. 2024) (footnote omitted) (quoting *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam)).

**2.** In light of these principles, the district court's nationwide injunction in this case is improper. The government argued that granting widespread relief to all of NFIB's members when they did not appear before the court would be inappropriate and akin to a nationwide injunction. The district court took that as a license to hold that nationwide relief was warranted.

Such broad relief goes beyond the ordinary and historical practice of granting only that relief which is necessary for the parties in the case. NFIB's 300,000 members is a far cry from the estimated 32.6 million corporations required to report by January 1. The district court's nationwide injunction thus sweeps beyond the parties in this case and disregards other pending challenges to the CTA, some of which have disagreed with the district court here. *See Becerra*, 20 F.4th at 263 (granting a stay with respect to an injunction's application to non-parties in part because "[o]ther courts are considering these same issues, with several courts already and inconsistently ruling"). At a minimum, the injunction should be narrowed to NFIB members at the time of the district court's decision.

But even the injunction's application to NFIB's members goes beyond the proper scope of relief. Equitable principles preclude granting relief to any member who has not been identified in district court and agreed to be bound by the judgment. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 401–02 (2024) (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members is "legally and historically dubious" (quotation marks

omitted)).  Restricting this type of broad relief would also promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional.  *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

Only two of NFIB's members appear as named plaintiffs and only four submitted statements in this case.  Extending relief to NFIB's absent members opens the door to improper duplication of individual members' claims as a member of NFIB could likely also be a member of another organization representing business interests, such as a small business association.  Such a result would improperly provide individual members of multiple organizations repeated bites at the apple as they would obtain relief so long as one organization's suit succeeds, even if many others' suits fail.  That scheme—embraced by the district court—undermines basic principles of preclusion and perpetuates the unfair asymmetry those precepts seek to guard against.  Indeed, given that NFIB has not identified all of its members, it is unclear whether one or more of its members have been plaintiffs in litigation challenging the CTA in which courts have concluded that the CTA is likely constitutional.  *See Firestone v. Yellen*, No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024); *Community. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024).

# CONCLUSION

For the foregoing reasons, the district court's order should be stayed pending appeal. In the alternative, the injunction should be narrowed to the companies that have been specifically identified in the district court or, at a minimum, to the members of NFIB.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

DAMIEN DIGGS
  *United States Attorney*

DANIEL TENNY
SOPHIA SHAMS

/s/ Steven H. Hazel
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave.,*
  *NW Washington, DC*
  *20530 202-514-2498*
  *steven.h.hazel@usdoj.gov*

DECEMBER 2024

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 13, 2024, I electronically filed the

foregoing motion with the Clerk of the Court by using the appellate CM/ECF

system. I further certify that the participants in the case are CM/ECF users and that

service will be accomplished by using the appellate CM/ECF system.

*/s/ Steven H. Hazel*
Steven H. Hazel
Counsel for Appellants

## 27(d) CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this motion complies with the type- volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,158 words according to the count of Microsoft Word. I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because it was preceded by telephone calls to the Clerk's Office and to the offices of opposing counsel on December 12, 2024, advising of the intent to file this emergency motion. I further certify that the facts supporting emergency consideration of this motion are true and complete.

*/s/ Steven H. Hazel*
Steven H. Hazel
Counsel for Appellants

**ADDENDUM**

# TABLE OF CONTENTS

Amended District Court Order, ECF 33 ........................................................A1

Declaration of Andrea Gacki, ECF 35-1  ....................................................A81

Complaint, ECF 1 .......................................................................................A92

Motion for Preliminary Injunction, ECF 6 .................................................A132

Response in Opposition to Motion for Preliminary Injunction, ECF 18........A198

Reply to Response to Motion for Preliminary Injunction, ECF 19...............A239

# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:24-CV-478 |
| | § | Judge Mazzant |
| MERRICK GARLAND, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants.* | § | |

## AMENDED MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Dkt. #6). Through it, Plaintiffs seek to enjoin the Government from enforcing the Corporate Transparency Act and its Implementing Regulations. Having considered the Motion, the arguments of counsel, and the applicable law, the Court concludes that the Motion should be **GRANTED.**

"Great nations, like great men, should keep their word." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142 (1960) (Black, J., dissenting). Ours is a written Constitution. The promises it makes to the People and the States alike are not hidden. The Court must enforce them. "The powers of the legislature are defined, and limited: and . . . those limits may not be mistaken, or forgotten, the [C]onstitution is written." *Marbury v. Madison*, 5 U.S. 137, 176 (1803). While the Court defers to Congress on matters of policy, interpretation of the Constitution is an area where Congress enjoys no authority. *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ("[I]t is not for [the Court] to substitute [its] view of . . . policy for the legislation which has been passed by Congress."); *Marbury*, 5 U.S. at 177. Legislative ingenuity, dispatched to meet

today's problems, is not measured by any other standard than our written Constitution. Modern problems may well warrant modern solutions, but modernity does not grant Congress a roving license to legislate outside the boundaries of our timeless, written Constitution. *See, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1032 (5th Cir. 2022) ("The Constitution is not abrogated[, even] in a pandemic."). The Constitution must stand firm.

In the matter before the Court, Plaintiffs challenge an unprecedented law known as the Corporate Transparency Act ("CTA"). It represents Congress's attempt to combat bad actors' ability to cloak their criminal activities in a veil of corporate anonymity. At its most rudimentary level, the CTA regulates companies that are registered to do business under a State's laws and requires those companies to report their ownership, including detailed, personal information about their owners, to the Federal Government on pain of severe penalties. Though seemingly benign, this federal mandate marks a drastic two-fold departure from history. First, it represents a Federal attempt to monitor companies created under state law—a matter our federalist system has left almost exclusively to the several States. Second, the CTA ends a feature of corporate formation as designed by various States—anonymity. For good reason, Plaintiffs fear this flanking, quasi-Orwellian statute and its implications on our dual system of government. As a result, Plaintiffs contend that the CTA violates the promises our Constitution makes to the People and the States. Despite attempting to reconcile the CTA with the Constitution at every turn, the Government is unable to provide the Court with any tenable theory that the CTA falls within Congress's power. And even in the face of the deference the Court must give Congress, the CTA appears likely unconstitutional. Accordingly, the CTA and its Implementing Regulations must be enjoined.

**BACKGROUND**

## I.   The Corporate Transparency Act

This case begins and ends with the CTA. The constitutionality of the CTA and its accompanying regulations is an issue of first impression in the Fifth Circuit. Thus, this case necessitates a robust explanation of the CTA. In January of 2021, Congress passed the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"). Pub. L. No. 116-283. Congress included the Anti-Money Laundering Act of 2020 ("AMLA") in the NDAA. Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021).

The AMLA's stated purposes are many. First, through the AMLA, Congress sought "to improve coordination and information sharing among the agencies tasked with administering anti-money laundering . . . requirements." *Id.* § 6002(1). Second, in passing the AMLA, Congress sought "to modernize anti-money laundering and countering the financing of terrorism laws." *Id.* 6002(2). Third, the AMLA seeks "to encourage technological innovation and the adoption of new technology by financial institutions to more effectively counter money laundering and the financing of terrorism." *Id.* § 6002(3). Fourth, Congress designed the AMLA to "reinforce that the anti-money laundering" and terrorism financing "policies, procedures, and controls of financial institutions shall be risk-based." *Id.* § 6002(4). Fifth, and most importantly as it relates to the CTA, Congress intended the AMLA "to establish uniform beneficial ownership information reporting requirements" to further four ends: (1) "transparency . . . concerning corporate structures and insight into the flow of illicit funds through those structures"; (2) "discourag[ing] the use of shell corporations[1] as a tool to disguise and move illicit funds"; (3) "assist[ing] national security,

---

[1] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners." 87 Fed. Reg. at 59

3

A3

intelligence, and law enforcement with the pursuit of crimes"; and (4) "protect[ing] the national security of the United States." *Id.* § 6002(5). The sixth and final stated purpose of the AMLA is to "establish a secure, nonpublic database at FinCEN[2] for beneficial ownership information." *Id.* § 6002(6).

Nestled between the 1,482 pages of the NDAA lays the CTA. 134 Stat. at 4604–625 (codified as amended at 31 U.S.C. § 5336). In short, the CTA requires a vast array of companies to disclose otherwise private stakeholder information to FinCEN. *See* 31 U.S.C. § 5336(b)(1). Congress compels these disclosures to control financial crime. Indeed, the CTA says as much. *See* NDAA § 6402. Because text reigns supreme in statutory interpretation, rather than summarize the CTA's purpose, it is wiser to grasp the CTA's objectives from its plain text. *See Carter v. United States*, 530 U.S. 255, 271 (2000). The CTA provides that "it is the sense of Congress" that:

(1) more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year;

(2) most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State;

(3) malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, including money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and the allies of the United States;

(4) money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection,

---

501. Thus, according to Congress, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement." *Id.*

[2] "FinCEN" is an abbreviation for the enforcement arm of the Department of the Treasury called the "Financial Crimes Enforcement Network."

and may layer such structures, much like Russian nesting "Matryoshka" dolls, across various secretive jurisdictions such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process;

(5) Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to—

    A. set a clear, federal standard for incorporation practices;

    B. protect vital United States national security interests;

    C. protect interstate and foreign commerce;

    D. better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and

    E. bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.

(6) beneficial ownership information collected under the amendments made by this title is sensitive information and will be directly available only to authorized government authorities, subject to effective safeguards and controls to—

    A. facilitate important national security, intelligence, and law enforcement activities; and

    B. confirm beneficial ownership information provided to financial institutions to facilitate the compliance of the financial institutions with anti-money laundering, countering the financing of terrorism, and customer due diligence requirements under applicable law.

NDAA § 6402.

In service of these admirable ends, the CTA regulates "reporting companies." 31 U.S.C. § 5336(b). Under the CTA, a "reporting company" is a "corporation, limited liability company, or other similar entity that is created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe or formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state

or a similar office under the law of a State or Indian Tribe." *Id.* § 5336(a)(11). The CTA's text excludes from the definition of "reporting companies" several types of entities, including but not limited to political organizations as defined in Section 527(e)(1) of the Internal Revenue Code. *See id.* § 5336(a)(11)(B). These reporting companies must "submit to FinCEN a report" that "identif[ies] each beneficial owner of . . . the reporting company . . . by full legal name, date of birth, current . . . residential or business street address, and [a] unique identifying number from an acceptable identification document or FinCEN identifier." *Id.* § 5336(b)(2).[3]

The CTA defines the term "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, exercises substantial control over the entity; or owns or controls not less than [twenty-five] percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A). The CTA excepts from "beneficial owner" status those who are minors, persons acting on behalf of another individual such as agents and custodians, employees, those whose only interest in the company is through a right of inheritance, and creditors. *Id.* § 5336(a)(3)(B). In turn, an "acceptable identification document" is a nonexpired: (1) United States Passport; (2) identification document issued by a State, local government, or Indian Tribe for purposes of identification; (3) driver's license issued by a State; or (4) a passport issued by a foreign government, if the individual in question does not have any of the previous forms of identification. *Id.* § 5336(a)(1). The term "unique identifying number" refers to "the unique identifying number from an acceptable identification document"—i.e., a passport number or the like. *Id.* § 5336(a)(13). Finally, while the CTA itself does not define "substantial control," the final rule implementing the CTA, (the "Reporting Rule") does. Under the Reporting

---

[3] Reporting companies can file BOI reports for free through FinCEN's website.

6

Rule, "substantial control" means: (1) serving as a "senior officer of the reporting company"; (2) having authority to hire and fire senior officers, the majority of the board of directors, or a similar body; or (3) directing, determining, or having substantial influence over "important decisions made by the reporting company." 31 C.F.R. § 1010.380(d)(1). Further, "any other form of substantial control over the reporting company" constitutes "substantial control," under the Reporting Rule, be it direct or indirect. *Id.* § 1010.380(d)(1)(i)(D), (d)(1)(ii).

The CTA delegates authority to the Secretary of the Treasury to establish an effective date for filing and updating beneficial ownership information reports and to promulgate regulations regarding these reports. *Id.* § 5336(b)(1). Pursuant to that authority, FinCEN's regulations state that "any domestic reporting company created before January 1, 2024, and any entity that became a foreign reporting company before January 1, 2024[,] shall file a report not later than January 1, 2025." Reports of Beneficial Ownership Information, 31 C.F.R. § 1010.380(a)(1)(iii) (2024). The remainder of FinCEN's regulations give teeth to the CTA as codified. *Compare* 31 U.S.C. § 5336 *with* 31 C.F.R. §1010.380.

Under the Reporting Rule, the content of a reporting company's beneficial owner report must include the legal name of the company, that company's trade names, the address of its principal place of business or primary location in the United States, the State, Tribal, or foreign jurisdiction of the company's formation, and the company's Internal Revenue Services Taxpayer Identification Number. 31 C.F.R. § 1010.380(b)(1)(i). Further, the report must include the full legal name of each beneficial owner of the company, their date of birth, their business or residential address, their unique identifying number from an approved identification document, and a

7

photograph of that document. *Id.* § 1010.380(b)(1)(ii). Covered entities have a continuing obligation to update their beneficial owner reports. *Id.* § 1010.380(b)(3).

FinCEN "shall . . . maintain[]" this information for at least five years after "the date on which the reporting company terminates." 31 U.S.C. § 5336(c)(1). The CTA permits FinCEN to disclose any beneficial ownership information upon request from state, local, federal, or international law enforcement entities. 31 U.S.C. § 5336(c)(2). The CTA also mandates that FinCEN take certain precautions with the beneficial ownership information to avoid inappropriate disclosure of that information. 31 U.S.C. § 5336(c)(2)(C).

Failure to comply with the CTA is fraught with peril. The CTA makes it illegal to: (1) "willfully provide, or attempt to provide, false or fraudulent beneficial ownership information"; and (2) "willfully fail to report complete or updated beneficial ownership information." 31 U.S.C. § 5336(h)(1). Any individual who is guilty of violating either provision is civilly liable and may be fined up to $500 a day for each day that "the violation continues or has not been remedied." *Id.* § 5336(h)(3)(A)(i). Further, any individual who is guilty of violating either provision may be incarcerated for up to two years and fined up to $10,000. *Id.* § 5336(h)(3)(A)(ii). The CTA also proscribes unauthorized disclosure of beneficial ownership information and subjects any person who knowingly discloses such information without authorization to criminal and civil penalties. *Id.* §§ 5336(h)(2), (h)(3)(B).

According to FinCEN, the CTA "will have a significant economic impact on a substantial number of small entities." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59550 (Sept. 30, 2022). "FinCEN estimates that there will be approximately 32.6

million existing reporting companies[,] and 5 million new reporting companies formed each year."

*Id.* at 59585. Further,

> [a]ssuming that all reporting companies are small businesses, the burden hours for filing BOI [(beneficial ownership information)] reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35 million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after.

*Id.* at 59585–86. Per company, "FinCEN estimates it would cost . . . approximately $85.14–$2,614.87 each to prepare and submit an initial report for the first year that the BOI reporting requirements are in effect." *Id.* at 59586. Finally, "FinCEN estimates it would cost approximately $37.84–$560.81 for entities to file updated BOI reports." *Id.* According to FinCEN, these estimates include "professional expertise that will be sought out to comply with the reporting requirements" such as lawyers and accountants. *Id.*

## II.    The Parties

There are six plaintiffs in this case, comprised of one private individual and five entities. First, Texas Top Cop Shop, Inc. ("TTCS") is a family-run, Texas corporation that maintains its principal place of business and all of its operations in Conroe, Texas (Dkt. #1 at p. 5). Since 2017, TTCS has sold equipment to first responders out of its single storefront in Conroe (Dkt. #1 at p. 16). In addition, TTCS is a licensed dealer of firearms (Dkt. #1 at p. 16). TTCS does not transact any business through the internet, nor does it sell its merchandise outside of Texas (Dkt. #1 at p. 16). Only four employees, including the owners, work at TTCS (Dkt. #1 at p. 16). Though TTCS has determined on its own that it is a reporting company under the CTA, to date, it has not filed a beneficial ownership report with FinCEN (Dkt. #1 at p. 17).

The second plaintiff, Data Comm for Business, Inc. ("Data Comm"), is a Delaware corporation that operates in both Illinois and Texas (Dkt. #1 at p. 17). It is also registered with the Illinois Secretary of State to engage in business as a foreign corporation (Dkt. #1 at p. 17). Data Comm provides small business, individuals, utility companies, and federal agencies with "technical support, information technology, and communications products" (Dkt. #1 at p. 17). It employs ten individuals (Dkt. #1 at p. 18). Like TTCS, while Data Comm has determined that it is a reporting company subject to the CTA's disclosure requirements, it has yet to file a beneficial ownership report with FinCEN (Dkt. #1 at p. 18). Further, Data Comm advocates for the repeal of the CTA as a corporation to protect the privacy of its beneficial owners (Dkt. #1 at p. 18).

The third plaintiff, Russel Straayer ("Straayer"), is an individual who resides in Conroe, Texas and is closely tied to Data Comm—the company for which he serves as Chief Executive Officer (Dkt. #1 at pp. 18–19). He has determined that he is a beneficial owner of Data Comm, though he is not the only beneficial owner of Data Comm (Dkt. #1 at p. 19). Straayer claims that he is a beneficial owner of additional reporting companies not involved in this case (Dkt. #1 at p. 19). Though Straayer is an outspoken opponent of the CTA, one of the reporting companies of which Straayer is a beneficial owner "does not wish to be associated with" his position against the CTA (Dkt. #1 at p. 19). Straayer has not filed a report with FinCEN (Dkt. #1 at p. 19).

The fourth plaintiff is Mustardseed Livestock, LLC ("Mustardseed") (Dkt. #1 at. p. 19). Mustardseed is a Wyoming limited liability company that has operated as a small dairy farm exclusively in Lingle, Wyoming since 2020 (Dkt. #1 at p. 19). It does not transact interstate business (Dkt. #1 at p. 20). While it generally produces dairy products for its own use, it "occasionally sells surplus raw milk" to Wyoming customers (Dkt. #1 at p. 20). In 2023,

Mustardseed's gross income from surplus milk sales did not exceed $30,000, and its projected income from all of its offerings will not exceed $50,000 (Dkt. #1 at p. 20). Though it has determined that it is a reporting company under the CTA, to date, it has not filed a beneficial ownership report (Dkt. #1 at p. 20). Like Data Comm, Mustardseed advocates for the repeal of the CTA as a corporate entity in to protect its beneficial owners' privacy (Dkt. #1 at p. 20).

The fifth plaintiff is the Libertarian Party of Mississippi ("MSLP") (Dkt. #1 at p. 21). MSLP dubs itself a "political organization," though it notes that it is not classified as such under § 527 of the Internal Revenue Code (Dkt. #1 at pp. 21–22). Therefore, by its own admission, it is a reporting company under the CTA (Dkt. #1 at pp. 21–22). MSLP is organized under Mississippi law and is registered with the Mississippi Secretary of State as a nonprofit corporation (Dkt. #1 at pp. 21, 23). It has no physical office (Dkt. #1 at p. 22). Instead, it relies on its members to conduct its activities (Dkt. #1 at p. 22). The members of MSLP "seek to advance the platform of the National Libertarian Party within the State of Mississippi" (Dkt. #1 at p. 21). Thus, MSLP and its members advocate for a plethora of positions on political issues and ideals (Dkt. #1 at p. 21). One such issue is the CTA, which MSLP advocates against (Dkt. #1 at p. 22). Because it operates as a political organization, individuals and entities alike donate to MSLP (Dkt. #1 at p. 22). In turn, MSLP uses those donations to promote its political agendas (Dkt. #1 at p. 22). MSLP has "less than $20,000 in assets," which are the product of donations used only for political expenditures (Dkt. #1 at p. 22). None of these expenditures promote activities out of the state of Mississippi, and MSLP does not engage in any economic activity outside of Mississippi (Dkt. #1 at p. 23). Like its co-plaintiffs, MSLP has not filed a beneficial owner report with FinCEN (Dkt. #1 at p. 23).

The sixth and final Plaintiff—the National Federation of Independent Business ("NFIB")—is distinct from its co-plaintiffs in that it is an organization suing on behalf of its members, who are not a party to this lawsuit (Dkt. #1 at p. 24). NFIB is a tax-exempt organization under § 501(c) of the Internal Revenue Code (Dkt. #1 at p. 24). Thus, the CTA does not compel it to file a report with FinCEN (Dkt. #1 at p. 24). Approximately 300,000 members comprise NFIB (Dkt. #1 at p. 24). TTCS and Data Comm—both of which are plaintiffs here—are members of NFIB (Dkt. #1 at p. 24). NFIB also notes that its members include companies like Grazing Systems Supply, Inc. ("Grazing Systems Supply") a Louisiana corporation with its principal place of business in Batesville, Indiana (Dkt. #1 at p. 24). Grazing Systems Supply is a family-run agricultural supply business with five employees that must comply with the CTA (Dkt. #1 at p. 24). NFIB and its members advocate against the CTA, and NFIB has publicly argued for its repeal on behalf of its members (Dkt. #1 at p. 24).

None of the five individual Plaintiffs here have filed beneficial ownership reports with FinCEN (Dkt. #1 at pp. 17–24). Further, each Plaintiff claims that if enforcement of the CTA is not enjoined, Plaintiffs' obligations under the CTA would compel them to incur compliance costs and would violate their constitutional rights (Dkt. #1 at pp. 17–24).

Defendants are comprised of several United States representatives and the governmental entities that they serve. First, Defendant Merrick Garland is the United States Attorney General who Plaintiffs sue in his official capacity, as he is responsible for the administration and enforcement of United States federal criminal law, including the CTA (Dkt. #1 at p. 6). Second, Defendant Janet L. Yellen is the United States Secretary of the Treasury, who Plaintiffs sue in her official capacity as the head of the U.S. Department of the Treasury (Dkt. #1 at p. 6). Plaintiffs also

sue Defendant U.S. Department of the Treasury, an agency under the Executive Branch that administers and enforces the CTA and its accompanying regulations (Dkt. #1 at p. 6). Fourth, Defendant Andrea Gacki is the Director of FinCEN, who Plaintiffs sue in her official capacity as the head of FinCEN (Dkt. #1 at p. 6). Finally, Plaintiffs sue Defendant FinCEN as a bureau of a federal agency that administers and enforces the CTA and its implementing regulations (Dkt. #1 at p. 6). Collectively, the Court refers to Defendants as "the Government."

### III.   Procedural History

On May 28, 2024, Plaintiffs initiated this lawsuit seeking a declaratory judgement that the CTA is unconstitutional and an injunction against its enforcement (Dkt. #1). On June 3, 2024, Plaintiffs moved the Court to enter a preliminary injunction against enforcement of the CTA and Reporting Rule (Dkt. #6). On June 26, 2024, Defendants responded, opposing the issuance of any injunctive relief (Dkt. #18). Plaintiffs replied, maintaining that a preliminary injunction is warranted (Dkt. #19). On September 24, 2024, Defendants notified the Court of supplemental persuasive authority: *Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192, (D. Or. Sept. 20, 2024) (Dkt. #22). After the Court set this matter for a hearing, the parties jointly filed stipulations that negated the need to call witnesses at the hearing (Dkt. #24). On October 9, 2024, the Court heard the arguments of counsel. Finally, on October 24, 2024, Defendants notified the Court of further supplemental persuasive authority: *Cmty. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E. D. Va. Oct. 24, 2024) (Dkt. #27).

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must

establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable harm absent injunctive relief; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not harm the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction . . . should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove his case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision of whether to grant a preliminary injunction lies within the sound discretion of the district court. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

Plaintiffs challenge the CTA on several grounds. Namely, Plaintiffs assert that the CTA is unconstitutional both facially and as applied because: (1) the CTA intrudes upon States' rights under the Ninth and Tenth Amendments; (2) the CTA compels speech and burdens Plaintiffs' right of association under the First Amendment; and (3) the CTA violates the Fourth Amendment by compelling disclosure of private information (Dkt. #1 at pp. 25–31). For each of these reasons, independently and collectively, Plaintiffs assert that FinCEN's Reporting Rule, which implements the CTA, is also unconstitutional and should be set aside under § 706 of the Administrative Procedure Act ("APA") (Dkt. #1 at p. 31).

Whether the CTA and the Reporting Rule are absolutely unconstitutional is a question for another day. Today, it is enough for the Court to determine whether Plaintiffs have demonstrated a substantial likelihood of success on the merits of any of their claims, in addition to satisfying the

three additional elements necessary for a preliminary injunction. *See Nichols*, 532 F.3d at 372. Before the Court can reach the merits of Plaintiffs' arguments, it must dispense with two threshold matters. Namely, the Court must perform a dual-pronged standing inquiry. First, it must assess whether the individual Plaintiffs have standing. Second, the Court must ensure that NFIB has associational standing to participate in this litigation on behalf of its members.

## I.     Standing

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). Though Defendants do not contest that Plaintiffs have standing, "it is well established that [the Court] has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Here, Plaintiffs consist of both individuals and an association. While an individual's standing is an independent legal inquiry, whether an organization has standing hinges in part on whether its members alone would have standing. *See Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 939 F.3d 533, 536 (5th Cir. 2019). Because two of the individual Plaintiffs here are members of NFIB, the associational standing inquiry builds off of the individual standing assessment to some extent. Thus, the Court first asks whether each individual Plaintiff has standing. Then, the Court will assess whether NFIB has standing. For the reasons that follow, the Court concludes that every Plaintiff has standing.

### A.     Individual Standing

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1993). Article III of the United States Constitution mandates that federal courts may only hear "Cases" and "Controversies." U.S. CONST. art. III, § 2. "The doctrine of standing gives meaning to these

15

constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Thus, Article III standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). A matter is only justiciable if a plaintiff establishes every element of standing. *See id.*

To establish standing, an individual plaintiff must satisfy the "familiar three-part test" under Article III. *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The plaintiff must have: "'(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Career Colls. & Schs. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (quoting *Gill*, 585 U.S. at 65); *Summers*, 555 U.S. at 493. These requirements "constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Lujan*, 504 U.S. at 560). The party invoking federal jurisdiction carries the burden of establishing that they have standing. *Id.* at 561. And because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 562. A court may only issue a preliminary injunction if the plaintiff makes a "clear showing that the plaintiff is entitled to such relief." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (quoting *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017)). Thus, at this stage, "[P]laintiffs must make a 'clear showing' of standing to maintain the injunction." *Id.* Plaintiffs have met that burden here.

### 1. *Injury in Fact*

The first element of standing is an injury in fact. *Gill*, 585 U.S. at 65. An alleged injury must meet three requirements to constitute an injury in fact. First, the injury must be "'concrete,' meaning that it must be real and not abstract." *FDA*, 602 U.S. at 381 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). Second, the injury must be "particularized." *Lujan*, 504 U.S. at 560, n.1. That is, "the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *FDA*, 602 U.S. at 381 (quoting *id.*). To demonstrate, the Supreme Court has noted that "[a]n injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take a few common examples." *Id.* Third and finally, the injury must be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S., 398, 420–22 (2013)). In cases such as this one, "when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

With this in mind, a plaintiff may challenge a federal statute before it has been enforced if they can "demonstrate a realistic danger of sustaining a direct injury [from the federal statute's] enforcement." *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 298, 298 (1979). This rule makes sense, as certainly, Article III's standing requirements do not require a plaintiff to "expose himself to actual arrest or prosecution to be entitled to challenge" the statute. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Thus, in cases involving pre-enforcement challenges, a plaintiff satisfies the injury-in-fact requirement if they "'intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Paxton v. Dettelbach*, 105 F.4th 708, 711 (5th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

17

Independently, "'an increased regulatory burden typically satisfies the injury[-]in[-]fact requirement.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015)). As the Fifth Circuit has recognized, where a "new Rule requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," the injury-in-fact requirement is satisfied. *Career Cols. & Schs. of Tex.*, 98 F.4th at 234 (internal citation omitted). This too makes sense, as "these are precisely the types of concrete injuries that [the Fifth Circuit] has consistently deemed adequate to provide standing in regulatory challenges." *Id.*

Here, each of the five individual Plaintiffs have met their burden to satisfy the injury-in-fact requirement for two reasons. *First*, Plaintiffs' Complaint and Declarations show that they "intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *See Susan B. Anthony List*, 573 U.S. at 159. Specifically, each individual Plaintiff has not filed a beneficial ownership information report with FinCEN and refuses to file such a report absent a judicial declaration that they must comply with the CTA (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). Plaintiffs recognize that the CTA compels them to tender a BOI report to FinCEN (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). Nonetheless, Plaintiffs refuse to do so because they contend that the CTA violates their rights under the First, Fourth, Ninth, and Tenth Amendments to the United States Constitution. (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). The parties agree that Plaintiffs' intended course of action subjects Plaintiffs to criminal and civil liability under the CTA (*See* Dkt. #6 at p. 2; Dkt. #18 at p. 5). And "there is no doubt that the CTA will be applied

with its full force." *NSBU v. Yellen*, 721 F. Supp. 3d 1260, 1271 (N.D. Ala. 2024). It is axiomatic that the Government does not defend the CTA in this litigation simply for the sake of litigating— the CTA and its implementing regulations would be aspirational were it not for its robust penalty provisions. *See* 31 U.S.C. § 5336(h). Thus, "the [P]laintiffs' fear of prosecution [is] not imaginary or wholly speculative." *See Susan B. Anthony List*, 573 U.S. at 160.[4] Accordingly, Plaintiffs have clearly established an injury in fact sufficient to satisfy this prong of the standing inquiry.

*Second*, the CTA's enforcement would require Plaintiffs to incur increased regulatory burdens, which alone are sufficient to confer standing. *See Contender Farms L.L.P.*, 779 F.3d at 266. The CTA and Reporting Rule, by FinCEN's own admission, will cause reporting companies to incur at least some compliance costs. "FinCEN estimates that it will cost the majority of the 32.6 million domestic and foreign reporting companies that are estimated to exist as of the January 2024 effective date approximately $85 apiece to prepare and submit an initial [beneficial owner information] report." 87 Fed. Reg. at 59550, 59562. FinCEN also estimates that it will take approximately twenty minutes to read a beneficial ownership report form and understand it, thirty minutes to collect information about a company's beneficial owners, and twenty minutes to fill out and file the report, resulting in a seventy-minute endeavor. *Id.* at 59569.[5] FinCEN acknowledges, however, that the more complex the reporting company's structure, the greater the costs. According to FinCEN, more complicated reporting companies may take at least 650 minutes to file a report and incur approximately $2,614.87 in compliance costs. *Id.* at 59473. Here, Plaintiffs confirm that they will incur such compliance costs, among others, if the CTA and Reporting Rule

---

[4] Straayer, as the only Plaintiff who is a natural person, also faces the CTA's criminal penalty provisions. *See* 31 U.S.C. § 5336(h).

[5] But the Court notes that as a practical matter, it takes far longer than seventy minutes simply to read the CTA and Reporting Rule alone.

are not enjoined (Dkt. #6 at p. 9). These costs are "precisely the types of concrete injuries that [the Fifth Circuit] has consistently deemed adequate to provide standing in regulatory challenges." *See Career Colls. & Schs. of Tex.*, 98 F.4th at 234. Thus, Plaintiffs have satisfied the injury-in-fact requirement because of the increased regulatory burden that the CTA and Reporting Rule imposes on Plaintiffs. *See id.*

### 2. *Causation & Redressability*

The second and third elements of standing—causation and redressability—"are often 'flip sides of the same coin.'" *FDA*, 602 U.S. at 380–81 (quoting *Spring Commc'ns Co. v. APCC Servs., Inc.*, 544 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* In cases such as this one, where Plaintiffs sue the Government seeking relief from one of its regulations, these two elements are "easy to establish." *Id.* at 382 (citing *Lujan*, 504 U.S. at 561–62; *Susan B. Anthony List*, 573 U.S. at 162–63). Indeed, "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy the . . . causation requirement[]." *Id.* Because the Government's statute (the CTA) and regulation (the Reporting Rule) aggrieve Plaintiffs, and because the Court's relief may redress Plaintiffs' alleged injuries, Plaintiffs have satisfied Article III's causation and redressability requirements. *See id.* Accordingly, the individual Plaintiffs here have standing to bring the instant lawsuit.

### B. Associational Standing

Having determined that the individual Plaintiffs in this lawsuit have standing, the Court now turns to the issue of whether NFIB has associational standing such that it may partake in this litigation on behalf of its members. As both the Supreme Court and Fifth Circuit have recognized, an association (such as NFIB) has standing to sue on behalf of its members when three elements

are satisfied. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). First, the association's members must "independently meet" Article III's standing requirements. *Hunt*, 432 U.S. at 343. Second, the interests the association "seeks to protect [must be] germane to the organization's purpose[.]" *Id.* Third, "neither the claim asserted nor the relief requested [may] require[] the participation of individual members in the lawsuit." *Id.* Here, all three elements are satisfied.

*First*, NFIB's members appear to independently satisfy Article III's standing requirements. Just like the individual Plaintiffs that filed this lawsuit, NFIB's members—among whom are TTCS and Data Comm—are reporting companies that fall subject to the CTA and Reporting Rule (Dkt. #6-7). One additional example is Grazing Systems Supply, which is a reporting company (Dkt. #6-7 at p. 2). Just like the individual Plaintiffs discussed above, *see supra* Section I.A, NFIB's members will incur compliance costs to comply with the CTA (Dkt. #6-7 at p. 2). Similarly, their grievance is against the CTA and the Reporting Rule, which are Government regulations (Dkt. #6-7). Thus, NFIB's members individually satisfy Article III's standing requirements. *See Hunt*, 432 U.S. at 343; *Ctr. for Biological Diversity*, 937 F.3d at 536; *FDA*, 602 U.S. at 382.

*Second*, the interests that NFIB seeks to protect through its participation in this litigation are certainly germane to NFIB's purpose. *See Hunt*, 432 U.S. at 343. NFIB's purpose, in large part, is to "advocate[] for small businesses" (*See* Dkt. #6 at p. 9). Accordingly, "NFIB and its members oppose the CTA, and NFIB has advocated publicly for its repeal on behalf of its members that must comply with the Act and its implementing regulations" (Dkt. #6-7 at p. 2; Dkt. #6-7, Exhibit A). The precise interest that NFIB seeks to protect through its participation in this litigation is to ensure its members do not need to comply with the CTA and the Reporting Rule—which NFIB

and its members contend is unconstitutional (*See* Dkt. #6-7 at p. 2; Dkt. #6-7, Exhibit A). That is pertinent to NFIB's purpose, especially as FinCEN notes the CTA will impact small businesses. *See* 87 Fed. Reg. at 59550. Thus, the second prong of associational standing is satisfied here. *See Hunt*, 432 U.S. at 343; *see also Assoc. of Am. Physicians & Surgeons, Inc.*, 627 F.3d 547, 551 n.2 (5th Cir. 2010) (noting that the germaneness prong is low and requires only a "mere pertinence" between the litigation at issue and the organization's purpose).

*Third* and finally, the Court asks whether the claim asserted, or the relief requested, would require NFIB's individual members to participate in the lawsuit. *See Hunt*, 432 U.S. at 343. This concern is not constitutional, but prudential. *Assoc. of Am. Physicians & Surgeons*, 627 F.3d at 550 (citing *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)). This final element concerns "matters of administrative convenience and efficiency." *Brown Grp.*, 517 U.S. at 555. In determine whether this prong of the standing analysis is satisfied, courts "examin[e] both the relief requested and the claims asserted." *Assoc. of Am. Physicians & Surgeons*, 627 F.3d at 551. While "'an association's action for damages running solely to its members would be barred for want of the association's standing to sue,'" where the association seeks declaratory or injunctive relief, the third prong is usually satisfied. *Id.* (quoting *Brown Grp.*, 517 U.S. at 546). Here, because NFIB seeks the equitable remedies of injunctive and declaratory relief, there is no need for its individual members to participate in the lawsuit. *See id.* Accordingly, NFIB has satisfied its burden to meet Article III's standing requirements. Thus, the Court may safely continue to the merits of the case.

## II.     Plaintiffs' Challenges to the Corporate Transparency Act and Reporting Rule

The Court now turns to the question of whether it should issue a preliminary injunction. The answer to that question turns on whether Plaintiffs have carried their burden to prove: (1) that

the CTA and Reporting Rule substantially threaten Plaintiffs with irreparable harm; (2) a substantial likelihood of success on the merits of any of their challenges; (3) that the threatened harm outweighs any damage the injunction might have on the Government; and (4) that preliminary injunctive relief will not harm the public. *See Nichols*, 532 F.3d at 372. The Government disputes that Plaintiffs have carried their burden to satisfy each element (Dkt. #5 at pp. 7, 10, 29). The Court addresses each element seriatim.

### A.    Substantial Threat of Irreparable Harm

Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm is "'harm for which there is no adequate remedy at law.'" *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). In the Fifth Circuit, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). That makes sense, as compliance costs may constitute irreparable injury "where they cannot be recovered in the ordinary course of litigation' *Rest. Law Ctr.*, 66 F.4th at 597. Such is the case in regulatory challenges and suits against the United States (like this one) because the federal government "generally enjoy[s] sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Thus, as the Fifth Circuit has recognized time over, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Rest. Law Ctr.*, 66 F.4th at 597 (quoting *Louisiana v. Biden*, 55 F.4th at 1034 (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)) (emphasis in original). To constitute irreparable harm, however, such compliance costs "must be more than 'speculative." *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Instead,

23

plaintiffs must have "'more than an unfounded fear'" of incurring such costs. *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Separately, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012))).

Here, Plaintiffs allege that the CTA and Reporting Rule, if not enjoined, will irreparably harm them in two ways. First, Plaintiffs contend simply that, absent an injunction, they will be forced to comply with the CTA and the Reporting Rule (Dkt. #6 at p. 29). As a result, Plaintiffs would have to "expend resources" and "spend time and effort to make the required filings" (Dkt. #6 at p. 29). In furtherance of their compliance efforts, Plaintiffs aver that they would also incur legal expenses (Dkt. #6 at p. 29). Every individual Plaintiff filed a Declaration in which they swore that they would incur these costs should the CTA and Reporting Rule remain in force (*See* Dkt. #6-2 at p. 2; Dkt. #6-3 at p. 2; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4). Similarly, NFIB filed a Declaration in which it swore that if the CTA and Reporting rule are not enjoined, its members would incur compliance costs and legal expenses associated with fulfilling its obligations under the CTA and Reporting Rule (Dkt. #6-7 at p. 2). The Government stipulated that the Plaintiffs would have testified to the same at the Court's October 9 hearing should they have testified (Dkt. #24).

The second manner that the CTA and Reporting Rule allegedly threaten Plaintiffs with irreparable harm is that the CTA and Reporting Rule violate their rights under the First, Fourth, Ninth, and Tenth Amendments to the Constitution (Dkt. #6 at p. 29). To Plaintiffs, "the mere

24

'threat'" of "revealing protected information on pain of criminal punishment" constitutes irreparable harm (Dkt. #6 at p. 29) (quoting *Book People, Inc.*, 91 F.4th at 341).

The Government sees it quite differently. According to it, neither of Plaintiffs' bases for irreparable harm are sufficient.[6] First, the Government contends that Plaintiffs cannot establish irreparable harm due to compliance costs (Dkt. #18 at p. 19). It argues that "the evidence Plaintiffs cite in support [of the compliance costs they would incur under the CTA and Reporting Rule] is wholly conclusory, consisting of a single statement in the non-associational Plaintiffs' declarations," it argues (Dkt. #18 at p. 19). Second, the Government submits that any compliance costs Plaintiffs would incur are *de minimis* (Dkt. #18 at p. 19). In support, the Government notes that Plaintiffs, by their own admissions, have already determined that they are reporting companies subject to the CTA and Reporting Rule (Dkt. #18 at p. 19). The beneficial ownership report form is free, and the information the Plaintiffs would have to disclose is, in the Plaintiffs' own words, "readily available," the Government argues (Dkt. #18 at p. 19). In essence, because the Government believes that the reporting process is simple, any costs Plaintiffs incur are *de minimis*, militating against a finding that Plaintiffs have proved they will suffer irreparable harm, so the argument goes (*See* Dkt. #18 at p. 19).

But the Fifth Circuit rejected both arguments wholesale just last year, characterizing them as "meritless." *See Rest. Law Ctr.*, 66 F.4th at 598. To demonstrate irreparable harm, Plaintiffs need not plead a specific dollar amount representing the total amount of compliance costs they

---

[6] Initially, the Government also argued that "Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief" (Dkt. #18 at p. 18). Accordingly, the Government suggested that Plaintiffs did not demonstrate the necessity of a preliminary injunction because there was enough time for the Court to resolve the case through dispositive motions (Dkt. #18 at p. 18). The Government advanced this argument when it filed its Response in late June of 2024. The Court's schedule, however, prevented it from being able to have a hearing prior to October of 2024. As a result, the Government abandoned this argument at the Court's October 9 hearing.

might incur. *Id.* at 600. "Stringently insisting on a precise dollar figure reflects an exactitude that our law does not require." *Id.* Thus, it is enough that each Plaintiff swore in their Declarations that they will incur compliance costs and legal costs should they have to comply with the CTA and Reporting Rule. *See id.* Further, the Government's assertion that NFIB—the associational Plaintiff in this matter—did not discuss compliance costs in its Declaration is demonstrably false and does not change this conclusion (*See* Dkt. #18 at p. 19). NFIB swore that its members would incur compliance costs should the CTA and Reporting Rule remain in force (*See* Dkt. #6-7 at p. 2). This too is sufficient. *See id.*

Moreover, the Court and the Government need not accept Plaintiffs' sworn word for it—FinCEN itself concedes that reporting companies will incur compliance costs of the same sort that Plaintiffs describe in their Declarations as a result of the CTA and Reporting Rule. *See* 87 Fed. Reg. at 59585–86 ("FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after."). This concession bolsters the Plaintiffs' belief that they will suffer irreparable harm. *See Rest. Law Ctr.*, 66 F. 4th at 600. It is ironic that the Government suggests that Plaintiffs must plead their compliance costs with greater specificity. Indeed, the Government itself only provides "estimates" in the form of broad ranges of compliance costs. *See* 87 Fed. Reg. at 59585–86. The Government seeks to hold the Plaintiffs to a standard that the law does not require. That Plaintiffs' Declarations do not include a specific dollar figure in no way reduces their showing of irreparable harm. *See id.*

The Court also disagrees with the Government's position that it would, in essence, be too easy for the Plaintiffs to comply with the CTA and Reporting Rule for their obligations to constitute irreparable harm. In support of its position that any harm Plaintiffs would incur is *de minimis*, the

Government directs the Court to the Northern District of Texas case, *Second Amend. Found., Inc. v. ATF* (Dkt. #18 at p. 19) (citing No. 3:21-cv-0116, 2023 U.S. Dist. LEXIS 202589, at \*48–49 (N.D. Tex. Nov. 13, 2023)). That case does nothing to suggest that the costs Plaintiffs face here are, in fact, *de minimis*. There, the Court noted that the record "simply [did] not illustrate the nature of [the plaintiff's] compliance costs, let alone that they [were] not more than *de minimis*." *Id.* Having no evidence to suggest that the regulation at issue there would actually force the plaintiff to suffer compliance costs, the district court concluded that the plaintiff did not show irreparable harm. *See id.* There, consistent with Fifth Circuit precedent, the district court did not define the contours of "*de minimis.*" *See id.*; *Rest. Law Ctr.*, 66 F.4th at 599–600 (declining to define a specific dollar amount for what constitutes more than *de minimis* compliance costs). Here, the record contains sufficient evidence to show that the compliance costs Plaintiffs face exceed some *de minimis* value.

The Court declines the Government's invitation to make a bright-line value judgement as to what quantum of pecuniary injury constitutes "more than *de minimis*" compliance costs. *See Louisiana v. Biden*, 55 F.4th at 1035. To be sure, the Plaintiffs' alleged compliance costs must be "more than *de minimis*" to rise to the level of irreparable harm. *Id.* But it would be inconsistent with precedent to define a specific dollar figure. The key inquiry here is "not so much the magnitude but the irreparability that counts." *Texas v. EPA*, 829 F.3d at 433–34. And in any event, deprivations of constitutional rights come a few dollars at a time. Setting a bright-line rule thus makes little sense in this context. Plus, FinCEN acknowledges that companies *will* incur compliance costs like those that Plaintiffs allege. *See* 87 Fed. Reg. at 59585–86. The Government

27

does not dispute that Plaintiffs cannot recover these costs (*See* Dkt. #18 at p. 19). *See also Wages & White Lion Invs.*, 16 F.4th at 1142. Thus, the Government's argument on this point is unavailing.

Next, the Government claims that compliance is not a heavy lift for the Plaintiffs (Dkt. #18 at p. 19). But that is not the standard. To reiterate, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Rest. Law Ctr.*, 66 F.4th at 597 (quoting *Louisiana v. Biden*, 55 F.4th at 1034 (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))) (emphasis in original). There is nothing in these facts or at law to suggest that the Court should treat this as an abnormal case not subject to this general rule. The compliance costs Plaintiff alleges are unrecoverable and more than *de minimis*. *See Rest. Law Ctr.*, 66 F.4th at 599–600. The costs are far more than speculative, as FinCEN itself acknowledges, and the Government wisely does not dispute. *See* 87 Fed. Reg. 59585–86. Thus, Plaintiffs have met their burden to show that, absent injunctive relief, they will suffer irreparable harm.

Despite having determined that Plaintiffs have met their burden to show impending irreparable harm in the form of compliance costs, for the avoidance of doubt, the Court will address Plaintiffs' second theory of irreparable harm. Plaintiffs alternatively alleged that they will suffer irreparable harm because the CTA and Reporting Rule putatively violate their constitutional rights (Dkt. #6 at p. 29). To the Government, however, an alleged constitutional violation alone will not suffice (Dkt. #18 at p. 19). The Government notes, "'the invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative injury.'" (Dkt. #18 at p. 19) (quoting *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016)). Hence, the Government argues, it would be improper to hold that Plaintiffs would suffer "irreparable harm solely [based on Plaintiffs'] allegation that [their] constitutional rights have been violated" (Dkt. #18 at p. 19).

In support, the Government cites two opinions. First, it points the Court to *Castro v. City of Grand Prairie*, an unpublished case (Dkt. #18 at p. 19) (citing No. 3:21-CV-885, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021)). There, a *pro se* plaintiff sought a temporary restraining order ("TRO") and brought claims under 42 U.S.C. § 1983. *Castro*, 2021 WL 1530303, at *1. The plaintiff, a candidate for political office, alleged that the city of Garland violated his rights under the First Amendment and Equal Protection Clause when a county sheriff threatened to remove the plaintiff's campaign signs across the county. *Id.* He further alleged that the city violated his rights when a county official removed his campaign signs that were placed on private property. *Id.* The district court denied emergency relief for two reasons. First, the plaintiff's "TRO Application consist[ed] of one page of conclusory assertions, and his Complaint [was] devoid of any allegations that would satisfy the requirements for liability under section 1983." *Id.* at *2. Second and as a result of his "conclusory" allegations, Plaintiff failed to prove that he faced a substantial threat of irreparable harm. *Id.*

The Government also relies on *Sheffield v. Bush* for the same proposition (Dkt. #18 at p. 19) (citing 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022)). There, two homeowners challenged an order issued by the Texas General Land Office that impacted the homeowners' property. *Id.* at 595. The homeowners sought a preliminary injunction against the order's enforcement and a declaratory judgment that the order amounted to an unconstitutional taking that also violated both the Fourth Amendment and the Due Process Clause. *Id.* The court denied the plaintiffs' motion for preliminary injunction for what appear to be two principal reasons, at least as relevant here. First, the court was "not yet convinced" that plaintiffs had shown a constitutional violation. *Id.* at 609. Second, the court found that "an allegation" of a constitutional violation, "taken alone," was not

sufficient to establish an irreparable injury. *Id.* In reaching this conclusion, the court recognized that in *Elrod v. Burns*, the Supreme Court held that "'the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The court noted that the Fifth Circuit had yet to apply *Elrod* to cases "outside of the First Amendment context." *Id.* (internal citation omitted).

But neither of these cases suggest that Plaintiff has not met their burden here. Whereas the court in *Castro* determined that the plaintiff had not shown irreparable harm because his allegations were "conclusory," that is not the case here. Rather, the record before the Court contains sufficient facts to indicate the CTA and the Reporting Rule may violate the Constitution. *Cf. Castro*, 2021 WL 1530303, at *2. The Court does not detect a deficiency in Plaintiffs' pleadings.

The Government's reliance on *Sheffield* is no more persuasive. First, the First Amendment is at issue in this case (*See* Dkt. #6 at pp. 19–25). Second, it appears that the Fifth Circuit *has* applied *Elrod*—or, at minimum, its undergirding principles—at least once outside of the context of the First Amendment. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (1981) (applying *Elrod* in the context of the right to privacy). There is no reason it should not apply here. Any other conclusion would render the Fifth Circuit's well-established position that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" a nullity. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)); *see also Book People, Inc.*, 91 F.4th at 340. Thus, "upon a showing that an 'alleged' fundamental right 'is either threated or in fact being impaired,' a movant is substantially threatened with irreparable injury that 'cannot be

undone by monetary relief.'" *Mock v. Garland*, 697 F. Supp. 3d 564, 577 (N.D. Tex. 2023), *appeal dismissed as moot sub nom. Watterson v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 23-11157, 2024 WL 3935446 (5th Cir. Aug. 26, 2024) (quoting *Opulent Life Church*, 697 F.3d at 295–97; *Deerfield Med. Ctr.*, 661 F.2d at 338).

Here, Plaintiffs claim that the CTA violates three fundamental rights. First, the right to be free from laws that Congress does not have authority to enact (Dkt. #6 at pp. 9–19). Second, Plaintiffs allege the CTA and Reporting Rule violate their rights under the First Amendment (Dkt. #6 at pp. 19–25). And third, Plaintiffs contend that the CTA and Reporting Rule violate their rights under the Fourth Amendment (Dkt. #6 at pp. 25–27). The invocation of these rights is not a "'substitute for the presence of an imminent, non-speculative injury'" as the Government points out (Dkt. #18 at p. 19) (quoting *Google, Inc.*, 822 F.3d at 228). But Plaintiffs must comply with the CTA and Reporting Rule by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii). The Government does not protest that impending deadline. And if Plaintiffs must comply with an unconstitutional law, the bell has been rung. Absent injunctive relief, come January 2, 2025, Plaintiffs would have disclosed the information they seek to keep private under the First and Fourth Amendments and surrendered to a law that they contend exceeds Congress's powers. That damage "cannot be undone by monetary relief." *See Deerfield Med. Ctr.*, 661 F.2d at 338. That harm is irreparable.

Because Plaintiffs have met their burden to show that they will suffer unrecoverable compliance costs absent emergency relief, they have met their burden to show that the CTA and Reporting Rule threaten substantial, imminent, non-speculative, and irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 598; *Texas v. EPA*, 829 F.3d at 433. Independent of the specter of compliance costs on the horizon, Plaintiffs have met their burden to show the threat of irreparable harm

because the CTA and Reporting Rule substantially threaten their constitutional rights. *See Deerfield Md. Ctr.*, 661 F.2d at 338; *Book People, Inc.*, 91 F.4th at 340.

### B.      Likelihood of Success on the Merits

The Court turns next to the merits of the case and asks whether Plaintiffs have carried their burden to show a substantial likelihood of success on the merits. In making this determination, the Court must carefully measure the CTA and the Reporting Rule against our written Constitution in an effort to resolve this matter of first impression in the Fifth Circuit. This inquiry requires extensive analysis and begins with a discussion of the type of challenges the Plaintiffs bring against the CTA and Reporting Rule.

Plaintiffs mount two types of attacks against the CTA. Plaintiffs contend that the CTA and Reporting Rule are unconstitutional both facially and as applied. "A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffel*, 415 U.S. at 474). Challenges of these sort against legislative acts are "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As-applied challenges are narrower and less burdensome. An as-applied attack requires the Court to decide "whether a statute is administered unconstitutionally against a particular plaintiff." *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 774 (N.D. Tex. 2018), *aff'd sub nom. Does 1-7 v. Abbott*, 945 F.3d 307 (5th Cir. 2019).

In cases such as this one, where "a litigant brings both as-applied and facial challenges, courts generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019). However, this general rule might change in the context of enumerated powers challenges. "By their very nature, almost all constitutional

challenges to specific exercises of enumerated powers, particularly the Commerce Clause, are facial." *Virginia ex rel. Cuccinelli v. Sebelius,* 728 F. Supp. 2d 768, 774 (E.D. Va. 2010), *vacated,* 656 F.3d 253 (4th Cir. 2011). "'When a federal statute is challenged as going beyond Congress's enumerated powers, under [Supreme Court] precedent, the Court first asks whether the statute is constitutional *on its face.*'" *Id.* (citing *Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting) (citing *United States v. Morrison*, 529 U.S. 598 (2000); *City of Boerne v. Flores*, 521 U.S. 507 (1997); *United States v. Lopez*, 514 U.S. 549 (1995) (emphasis in original)). If the statute survives that challenge, "the [C]ourt may . . . proceed to analyze whether the statute (constitutional on its face) can be validly applied to the litigant[s]." *Nevada Dept. of Human Res.*, 538 U.S. at 743 (Scalia, J., dissenting). Here, the first issue before the Court is whether Congress has the power to enact the CTA. Only if Congress had the authority to pass the CTA does it make sense for the Court to take up Plaintiff's as-applied challenge and their attacks on the CTA under the First and Fourth Amendments. Thus, in keeping with that logic, the Court takes up the facial attacks first, starting with Plaintiffs' enumerated powers challenge under the Tenth Amendment.

### 1.   *Whether Congress Exceeded its Authority in Passing the CTA*

This issue invites a return to first principles. Since our nascency, it has been "universally admitted" that our Government is "one of enumerated powers." *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819). Congress's powers are express and defined in our Constitution. U.S. CONST. art. I, § 8. Thus, Congress may only exercise those powers the Constitution expressly vests it with. *Id.* The States and the people retain the remainder. U.S. CONST. amend. X. "The enumeration of [these] powers is also a limitation of powers, because 'the enumeration presupposes something not enumerated.'" *NFIB v. Sebelius*, 567 U.S. 519, 534 (2012). "The Constitution's express conferral of some powers makes clear that it does not grant others." *Id.* Vast as Congress's powers may be,

"it still must show that a constitutional grant of power authorizes its actions." *Id.* at 535 (citing *United States v. Comstock*, 560 U.S. 126 (2010)).  Thus, the Federal Government is not equipped with a federal police power to regulate all aspects of public life. *United States v. Morrison*, 529 U.S. 598, 618–19 (2000). That power belongs to the states alone. *See Sebelius*, 567 U.S. at 535. This principle of federalism, rudimentary in our system, "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Obvious as these notions are, more than two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, so long as our system shall exist." *M'Culloch*, 17 U.S.  at 405. He was right. Some two-hundred and four years later, Plaintiffs' challenge to the CTA poses yet another iteration of this question. As our system has evolved, and the powers that the Government wields have ebbed and flowed, parties have turned to the judiciary to safeguard the promises of the Tenth Amendment. Plaintiffs call upon the Court to do so once more.

But a plea to the Court should not be misconstrued as an invitation for judicial activism. Assessing the constitutionality of a legislative act requires the Court to bear in mind its "limited role in policing th[e] boundaries" of the Government's power. *Sebelius*, 567 U.S. at 534. The Court does not wade into the treacherous waters of policy-making. Neither will the Court opine as to whether legislative action constitutes good governance or sound judgment. For these matters are "entrusted to the Nation's elected leaders." *Id.* at 532. Instead, the Court need only assess "whether Congress has the power under the Constitution to enact the challenged provisions." *Id.* Modest as this function is, judicial deference to a co-equal branch does not render the judicial function a nullity, nor does it gift Congress unbridled discretion to enact whatever legislation it

chooses. History is marked with occasions where Congress's good-faith exercise of its power has strayed too far, and where courts, acting in their unique and exclusive province, have restored the balance by striking down a law as beyond Congress's authority. Though our Constitution excludes the Court from governance and policy-making, the Court embarks alone on matters of legality and constitutionalism. "It is emphatically the province and duty of the judicial department to say what the law is," and sometimes, what the law cannot be. *Marbury*, 5 U.S. at 177. And if Congress lacks the power to enact a given law, that law is no law at all. *See id.* at 175–76.

Plaintiffs contend that the CTA simply cannot be a valid exercise of Congress's enumerated powers. The Government disagrees. It suggests that two provisions of the Constitution authorize the CTA: the Commerce Clause and the Necessary and Proper Clause. If the CTA is authorized by either, then the Court must reject Plaintiffs' facial attack under the Tenth Amendment as a failure to show that their challenge is likely to succeed on the merits. *See Salerno*, 481 U.S. at 745. The Court measures the CTA against each proffered Clause in turn.

**The Commerce Clause**

The Constitution vests Congress with the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several states." U.S. CONST. art. I, § 8, cl. 3. Chief Justice Marshall, writing for the Supreme Court in 1824, first defined commerce, stating:

> [c]ommerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.

*Gibbons v. Ogden*, 22 U.S. 1, 189 (1824). The Commerce Clause "is the power to regulate; that is, to prescribe the rule by which commerce is governed." *Id.* at 196. While the breadth of Congress's Commerce Power has waxed and waned over the years, ultimately resulting in Congress having

"broad" authority to regulate commerce, that power is not limitless. *See Lopez*, 514 U.S. at 557.

The Supreme Court has cautioned that the Commerce Clause "must be considered in light of our

dual system" and "may not be extended so as to . . . create a completely centralized government."

*Id.* (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Against this backdrop,

the Supreme Court has identified "three broad categories of activity that Congress may regulate

under its commerce power." *Id.* at 558. They are: (1) "the channels of interstate commerce,"

(2) "the instrumentalities of interstate commerce" and "persons or things in interstate

commerce," and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich*,

545 U.S. 1, 16–17 (2005). The Government incorrectly contends that each category independently

authorizes the CTA (*See* Dkt. #18 at pp. 15–19).

       *a.*      *The CTA does not regulate channels of, or instrumentalities in, commerce.*

The Court begins with the first two categories and handles them together. The

Government argues that the Commerce Clause authorizes the CTA because "it regulates the

channels of, and entities in interstate commerce" (Dkt. #18 at p. 29). In support of this theory, the

Government cites *American Power & Light Co. v. SEC*, arguing that "Congress, of course, has

undoubted power under the Commerce Clause to impose relevant conditions and requirements on

those who use the channels of interstate commerce so that those channels will not be conduits for

promoting or perpetuating economic evils" (Dkt. #18 at p. 29) (quoting 329 U.S. 90, 99 (1946)).

The Government also relies upon *North American Co. v. SEC* for the same proposition (Dkt. #18

at p. 29) (citing 327 U.S. 686 (1946)). It notes that the Supreme Court has said, "'to the extent

that corporate business is transacted through such channels, affecting commerce in more states

than one, Congress may act directly with respect to that business to protect what it conceives to be

the national welfare,' and 'it may prescribe appropriate regulations and determine the conditions

under which the business may be pursued'" (Dkt. #18 at p. 29) (quoting *Am. Power & Light Co.*, 329 U.S. at 99–100). Because some reporting companies use the "channels of interstate commerce, including telecommunications and electronic bank routing systems," the Government may regulate all reporting companies, so the argument goes (Dkt. #18 at p. 29). Further, the Government claims that Congress's commerce power permits it to regulate directly "those entities who seek to misuse those channels to commit economic crimes" (Dkt. #18 at p. 29).

These arguments misinterpret the scope of Congress's power to regulate channels of and instrumentalities in interstate commerce. The Supreme Court and Fifth Circuit alike define the "channels of interstate commerce" as "the interstate transportation routes through which persons and goods move." *United States v. Bailey*, 115 F.3d 1222, 1226 (5th Cir. 1997) (internal citations omitted); *Morrison*, 529 U.S. at 613 n.5. "This category extends beyond the regulation of highways, railroads, air routes, navigable rivers, fiber-optic cables and the like." *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 203 (5th Cir. 2000) (internal citations omitted). The Supreme Court affirmed that Congress may regulate in this category to "prohibit discrimination in public accommodations" and noted that Congress has used the Commerce Clause "to prevent illicit goods from traveling through the channels of commerce." *Id.* (citing *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 256 (1964)).

In contrast, the term "instrumentalities in interstate commerce," is understood to refer to the "planes, trains, and automobiles" of commerce, "along with the persons associated with them." *Hobby Lobby Distillers Ass'n v. ATF*, No. 4:23-CV-1221-P, 2024 WIL 3347841, at *13 (N.D. Tex. July 10, 2024) (citing *United States v. Ballinger*, 395 F.3d 1219, 1226 (11th Cir. 2005) (the instrumentalities of commerce are generally held to be the people and things themselves moving

in commerce, and the people who make commerce possible)); *Lopez*, 514 U.S. at 558 (defining "instrumentalities of interstate commerce" as "persons or things in interstate commerce"); *Bailey*, 225 F.3d at 1227 (defining "instrumentalities" as "persons or things moving in commerce . . . includ[ing] regulation or protection pertaining to instrumentalities or things as they move in interstate commerce") (internal citations omitted).

While the Government begins its argument with an assumption—that the CTA regulates companies that use channels or instrumentalities in interstate commerce—the Court starts the inquiry, as always, with the statute's text. *See Germain*, 503 U.S. at 254. The CTA regulates "reporting companies," which the Act defines as an entity "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). As a result of having so registered, the CTA requires those companies to divulge their beneficial ownership information to FinCEN on pain of civil and criminal punishment. *Id.* §§ 5336(b)(1)-(2)(A); 5336(h). The District Court for the Northern District of Alabama, faced with this definition, held that the CTA does not regulate, by its text, a channel or instrumentality of commerce. *NSBU v. Yellen*, 721 F. Supp. 3d at 1278.

The Court agrees with its sister court. "The word 'commerce' or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA." *Id.* And when examining the CTA's language, the Court "must presume that Congress 'says in a statute what it means and means in a statute what it says.'" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). Companies, generally, do not fit into either

category; they are not a "channel" or "instrumentality" of commerce. *See Lopez*, 514 U.S. at 558–59 (collecting cases indicating that channels and instrumentalities of commerce are the pathways of commerce and the items moving in commerce); *Ballinger*, 395 F.3d at 1226 (same). If they were, then Congress could regulate any company, in any way, all the time. There is no limiting principle in that, and precedent does not support acceptance of such a capacious construction of the words "channel" and "instrumentality." *See Lopez*, 514 U.S. at 558–59.

Though the CTA does not directly regulate channels or instrumentalities of commerce, the Government contends that Supreme Court precedent extends Congress's ability to regulate in this realm to companies *that use* channels and instrumentalities of commerce (*See* Dkt. #18 at p. 29). Indeed, it is "well-settled" that Congress can invoke its commerce power to regulate "those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral, or economic nature." *United States v. Orito*, 413, U.S. 129, 144 (1973). But this grant of power, too, does not write Congress a blank regulatory check. In *American Power & Light Co. v. SEC*, two public utility holding companies challenged the Public Utility Holding Act as outside of Congress's commerce power. 329 U.S. at 96–97. The Public Utility Holding Act authorized the SEC to require registered holding companies to "ensure" that the company's corporate structure "did not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders." *Id.* at 97. The Supreme Court upheld the Act, largely because Congressed aimed at "solely to public utility holding company systems that use[d] channels of interstate commerce." *Id.* at 100. But Congress did not include such an express aim in the CTA; it does not only regulate those companies that use channels or instrumentalities. *See* 31 U.S.C. § 5336. Instead, it assumes that every company *does*

use channels and instrumentalities of interstate commerce without a jurisdictional hook of any kind that would limit the CTA's reach to only those companies who do use those channels or instrumentalities. *See id.* As the district court in *NSBU v. Yellen* observed, that theory exceeds the boundaries of the Commerce Clause. *See* 721 F. Supp. 3d at 1280. Accordingly, the Government must seek to justify the CTA through a different avenue.

   *b.*   *The CTA does not regulate an activity—it creates one.*

  Because the CTA does not regulate the channels or instrumentalities of commerce, it may only be sustained under the third category of Congress's commerce power. That is, it must regulate an activity, which, in the aggregate, substantially impacts interstate commerce. *See Raich*, 545 U.S. at 16–17. This is the Government's last hope to justify the CTA as a bare exercise of Congress's power under the Commerce Clause. But before launching into this inquiry under Congress's third category of commerce power, there is a threshold issue which has, at times, foreclosed Congress's ability to legislate under the umbrella of this third category. In *NFIB v. Sebelius*, the Supreme Court drew attention to this initial hurdle. Simply put, legislation under the Commerce Clause must *regulate* an *existing* activity—not compel activity. *See Sebelius*, 567 U.S. at 551–53. "The power to *regulate* commerce presupposes the existence of commercial activity to be regulated. If the power to regulate something included the power to create it, many provisions in the Constitution would be superfluous." *Id.* at 551 (emphasis in original).

  Concomitant with this rule is nuance. At issue in *Sebelius* was the Affordable Care Act's individual mandate provision, which forced individuals to purchase health insurance to provide a minimum baseline of coverage. *Id.* at 530–31. In assessing whether Congress, under the Commerce Clause, had the power to enforce the individual mandate, the Supreme Court noted that all of its precedent "ha[d] one thing in common: They uniformly describe the power as reaching

40

'activity.'" *Id.* at 551 (citing *Lopez*, 514 U.S. at 560 ("where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained"); *Perez v. United States*, 402 U.S. 146, 154 (1971) ("where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class") (emphasis in original); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."); *Jones & Laughlin Steel*, 301 U.S. at 37 ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens or obstructions, Congress cannot be denied the power to exercise that control")). Thus, for Congress to properly exercise its power to "regulate commerce," it cannot force one to engage in an activity for the sole purpose of having something to regulate. *See id.* at 554.

The Supreme Court rejected the Government's theory that the Commerce Clause empowered Congress to enact the individual mandate precisely because it did not regulate a pre-existing activity—it created one of its own. *Id.* at 552. Rather than regulating a commercial activity, the Supreme Court reasoned, the individual mandate "compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.* (emphasis in original). But this, the Constitution does not permit. Any other holding "would effectively override" the Commerce Clause's limitations "by establishing that individuals may be regulated under the Commerce Clause whenever enough of them are not doing something the Government would have them do." *Id.* at 553.

Like the individual mandate, this is where the Government's proffered Commerce Clause justification of the CTA begins to unravel. Initially, Plaintiffs, consistent with separate litigation against the CTA occurring across the Nation, argued that the CTA "regulates the act of registration under state law" (Dkt. #15 at p. 15). *See, e.g.*, *Cmty. Assn's Inst. v. Yellen*, No. 1:23-CV-1597 (MSN/LRV), 2024 WL 4571412, at * 7 (E.D. Va. Oct. 24, 2024). But at the Court's October 9 hearing, Plaintiffs abandoned that characterization. Instead, Plaintiffs suggested that the CTA does not regulate an activity at all, but rather that the CTA regulates, on an ongoing basis, reporting companies and beneficial owners. In its Response, the Government did not articulate what, precisely, the activity is that Congress strives to regulate through the CTA (*See* Dkt. #18). The Government's Response does, however, tacitly dispute Plaintiffs' initial position, arguing that "the CTA does not purport to override or preempt any state-law incorporation provisions" (Dkt. #18 at p. 27). Still, this does not answer the narrow question, what is the "activity" the CTA regulates? Once more, the Court's hearing provided clarity. There, the Government stated that "the conduct that the CTA regulates is the anonymous existence and operation of corporations." The Government takes a substantially similar position in litigation involving enumerated powers challenges to the CTA in courts across the country. *See, e.g.*, *id.* ("The [G]overnment argues that the 'CTA does not, and does not purport to regulate corporate entity-formation . . . . Rather, the CTA governs the conduct of a covered entity *as an ongoing concern*.'") (emphasis in original).

The Court agrees with the Government's framing of the issue. That the CTA changes, in any way, the process of registration under any state law is a non sequitur. It adds nothing to, nor detracts in any way from, the registration process under State law. *See generally* 31 U.S.C. § 5336. Instead, it uses the act of registration as a triggering event for the CTA's applicability. *Id.*

42

§ 5336(a)(11). Thus, the Court agrees that the CTA does not regulate the act of registration, consistent with the District Court for the Eastern District of Virginia. *See Cmty. Ass'ns Inst.*, 2024 WL 4571412, at * 7. But that framing is fatal to the Government's position.

At first blush, "The anonymous existence and operation of corporations" might appear as an "activity." After all, "operation" is an action. *See Operation*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "operation" as "the state or condition of functioning or being in action."). But the CTA, by its text, does not appear to regulate operation at all. It does not forbid a company from doing anything except insofar as it forbids a reporting company's failure to file an updated BOI report. *See* 31 U.S.C. § 5336. Instead, by its text, it seems to only regulate an entity's *existence*, simply because reporting companies are, by their nature, anonymous. *See id.* And "anonymous existence" is not an activity at all. It is a state of being. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL NEW DICTIONARY (3d ed. 1986) (defining "existence" as "the state or fact of having being" and "the manner of being that is common to every mode of being."). It is the natural, idle state that any entity formed by registering with a secretary of state necessarily takes on by virtue of its registration. It is akin to a person simply being alive in their natural state, indistinguishable from an individual choosing to refrain from purchasing health insurance. That is not an activity. And the regulation of this natural state of being seems to be exactly what the Supreme Court rejected in *NFIB v. Sebelius*. *See* 567 U.S. at 552. So, the question arises: why would Congress seek to regulate the anonymous state of being that reporting companies assume as a consequence of their registration? The AMLA answers this question plainly:

> money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures, much like Russian nesting "Matryoshka" dolls, across various secretive jurisdictions such that each time an investigator obtains

ownership records for a domestic or foreign entity, the newly identified entity is
yet another corporate entity, necessitating a repeat of the same process.

NDAA § 6402. And absent something akin to the CTA, the Government claims that it faces great

difficulty in enforcing its financial crimes laws. *See id.* In other words, the CTA is a law

enforcement tool—not an instrument calibrated to protect commerce; an exercise of police power,

rather than a regulation of an activity which might impair commerce among the several states.

This the Commerce Clause will not tolerate. In rejecting a Commerce Clause justification

for the individual mandate in *NFIB v. Sebelius*, the Supreme Court held that it "compel[led]

individuals to *become* active in commerce by purchasing a product, on the ground that their failure

to do so affects interstate commerce." 567 U.S. at 552 (emphasis in original). Here, analogous

language explains the CTA. The CTA "compels" reporting companies to file a beneficial

ownership report with the Federal Government—an act that no state's registration laws

require—"on the ground that their failure to do so affects interstate commerce." *Id.* The

Government argues just this, though in fewer words, in its Response (*See* Dkt. #15 at p. 25). But

the Court need not reach the traditional aggregate effects inquiry because the CTA does not

regulate an activity within the meaning of the Commerce Clause. *See NFIB v. Sebelius*, 567 U.S. at

552. Indeed, "[c]onstruing the Commerce Clause to permit Congress to regulate individuals

precisely *because* they are doing nothing would open a new and potentially vast domain to

congressional authority." 567 U.S. at 552 (emphasis in original). In the same vein, construing the

Commerce Clause to permit Congress to regulate companies precisely because the Government

does not know who substantially benefits from their ownership would similarly "open a new and

potentially vast domain to congressional authority." *See id.* "Allowing Congress to justify federal

regulation by pointing to the effect of" the Government's lack of information about beneficial

owners on commerce would bring countless decisions a [company] could *potentially* make within the scope of federal regulation—and under the Government's theory—empower Congress to make those decisions for [it]." *See id* (emphasis in original). That cannot be so.

To be sure, as the Government points out, "[v]arious economic crimes are made easier to commit, and harder to discover[], through the formation of corporate entities that may conduct economic transactions in their own names without disclosure of beneficial ownership information" (Dkt. #18 at p. 22). The notion that one may use a company to veil their illicit financial crimes is unassailable. But the Commerce Clause does not justify regulating all companies based on nothing more than the fear that a reporting company *might* shelter a financial criminal. "The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds little support in [Supreme Court] precedent." *Id.* at 557. The Commerce Clause does not furnish Congress with police power or a "general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *See id.* It stands to reason then, that the Commerce Clause does not bless Congress with carte blanche to regulate all companies in perpetuity simply because they *might* engage in commerce, or one *might* use them to conceal criminal activity. *See id.* Any decision affirming the propriety of the Government's tenuous use of the Commerce Clause here would require the Court to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the state." *See Lopez*, 514 U.S. at 567. The Court will not interpret the Commerce Clause in such a lax manner. *See id.*

Perhaps this is why Congress has never before sought to regulate financial crimes in this way. But that alone raises judicial eyebrows at the constitutionality of the CTA. "[S]ometimes 'the

most telling indication of a severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *NFIB v. Sebelius*, 567 U.S. at 549 (quoting *Free Enters. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (cleaned up)). When faced with legislative acts that deviate from the historical status quo, courts, at the very least, must "'pause to consider the implications of the Government's arguments.'" *Id.* at 549–50 (quoting *Lopez*, 514 U.S. at 564). In taking that pause, it appears that sanctioning the CTA under the Commerce Clause would be to rubber-stamp a "new form of federal power." *See id.* But that power threatens the very fabric our system of federalism. *See id.* Because the CTA does not regulate a pre-existing activity, but instead compels a new one, the CTA exceeds Congress's commerce power. That should be the end of the matter. But, for the avoidance of doubt, assuming *arguendo* that the "the anonymous existence and operation of corporations" constitutes an "activity" for purposes of the Commerce Clause, the CTA still lays beyond Congress's commerce power.

> c. *Even if anonymous corporate existence and operation is an activity regulable under the Commerce Clause, the CTA fails to pass muster.*

Congress may not invoke the substantial effects doctrine to regulate future activities or no activity at all. Thus, the Court need not perform further analysis under the third category of commerce power—activities that, in the aggregate, substantially impact interstate commerce—to hold that, at this stage, Plaintiffs have satisfied their burden to show that the CTA falls outside the scope of the Commerce Clause. *See Raich*, 545 U.S. at 16–17. But to give the Government every benefit of the doubt, as the Court must, the Court no less will analyze whether Congress may regulate "anonymous corporate existence and operation" under this third category.

In its attempt to justify the CTA, the Government principally relies on *Gonzalez v. Raich*, arguing that "Congress may 'regulate activities that substantially affect interstate commerce'"

(Dkt. #18 at p. 20) (quoting 545 U.S. at 16–17). The Government continues to contend that when Congress legislates pursuant to its commerce power under this third category, it may "'regulate purely local activities that have a substantial effect on interstate commerce'" (Dkt. #18 at p. 20) (quoting *Raich*, 545 U.S. at 17). The Government suggests that the Court, in analyzing a legislative act's propriety in this category, need only determine "whether a 'rational basis' exists" for concluding that the regulated activity, taken in the aggregate, substantially impacts interstate commerce (Dkt. #18 at pp. 20–21) (quoting *Raich*, 545 U.S. at 22). But a close reading of *Raich* and its predecessors reveal that while the Government articulates the right standard, the CTA still fails constitutional scrutiny.

In *United States v. Lopez*, the Supreme Court aptly summarized the sum of Commerce Clause jurisprudence, which bears repeating as none of the Court's Commerce Clause cases "can be viewed in isolation." *Raich*, 545 U.S. at 15; *see Lopez*, 514 U.S. at 553–562. In *Jones & Laughlin Steel Corp.*, the Supreme Court addressed a challenge to the National Labor Relations Act, which regulated intrastate employment practices. 301 U.S. at 31–34. The Court held that Congress has the power to regulate those intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." *Lopez*, 514 U.S. at 555 (citing *Jones & Laughlin Steel Corp.*, 301 U.S. at 37). Thereafter, the Court upheld the Fair Labor Standards act in the face of a challenge under the Commerce Clause and stated:

> The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce.

*Id.* (quoting *United States v. Darby*, 312 U.S. 100, 118 (1941) (citing *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942) (Congress's power under the Commerce Clause "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.")).

Subsequently, in the landmark case of *Wickard v. Filburn*, the Supreme Court interpreted the Commerce Clause to permit Congress to regulate the production and consumption of homegrown wheat—an intrastate, non-economic endeavor. *Id.* at 556 (citing *Wickard*, 317 U.S. at 128–29. The Court observed, consistent with its holdings in *Darby*, *Jones*, and *Wrightwood*:

> Even if [the wheat farmer's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."

*Id.* (quoting *Wickard*, 317 U.S. at 125). The Supreme Court stressed that even though a single wheat farmer, growing wheat for himself, may have a "trivial" impact on the market for wheat, that reality alone was not "'enough to remove him from the scope of federal regulation where . . . his contribution, taken together with that of many others similarly situated, is far from trivial.'" *Id.* (quoting *Wickard*, 317 U.S. at 127–28).

These cases, the Supreme Court declared, "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." At that time, the limits the Court relied on in interpreting the contours of the Commerce Clause were the "dual system of government" and a well-founded, constitutionally rooted fear of creating a "completely centralized government." *Id.*

Enter *Lopez*. At issue in *Lopez* was the Gun-Free School Zones Act of 1990, through which Congress criminalized as a matter of federal law the knowing possession of a firearm in a school zone." *Id.* at 551. The Supreme Court struck down the Act as outside of Congress's power under the Commerce Clause. *Id.* In so holding, the Court first observed that the statute did not "contain[] a jurisdictional element which would ensure, through a case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 561. The Court also noted that because the statute was not part of a "larger regulation of economic activity[] in which the regulatory scheme would be undercut unless the intrastate activity were regulated," it could not stand under *Jones & Laughlin Steel Corp.*'s progeny. *Id.* at 561. But the Court in *Lopez* did not explicitly appear to require such a regulatory regime in all inquiries under the aggregate effects theory of Congress's commerce power. *See id.*

Further, the Supreme Court determined that there existed no rational basis for Congress to conclude that possession of a firearm in a school zone substantially impacted interstate commerce. *Id.* at 564–65. The Government argued that such a rational basis existed for two principal reasons. First, the Government submitted that "possession of a firearm in a school zone may result in violent crime" and "the costs of violent crime" are spread through the population through insurance. *Id.* at 564. Second, it argued that "the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment." *Id.* Consequently, the Government argued, the possession of firearms in school zones would result in a "less productive citizenry" that would impact the national economy. *Id.* The Supreme Court rejected these arguments as devoid of any limiting principle that would bulwark congressional

49

attempts to legislate in the realm of criminal law and education—arenas where States maintain sovereign status and historically legislate on such matters. *See id.*

The Supreme Court crystalized this framework further in *United States v. Morrison*, in which the Court considered the constitutionality of a provision of the Violence Against Women Act, which provided a civil remedy for victims of gender-motivated violence. 529 U.S. at 601–02. The Court struck down the provision as outside of Congress's commerce power, determining that the statute regulated a noneconomic activity (gender-motivated violence) without a jurisdictional hook that would tie gender-motivated violence to interstate commerce. *Id.* at 613. Additionally, the potential impact that gender-motivated violence might have on interstate commerce was far too attenuated to pass constitutional muster under an aggregate effects analysis. *Id.* at 615. Once more, upholding the statute would have invited Congress to invade the province of the States to exercise their police power as they see fit. *Id.* at 617–18. The Court did not analyze whether the statute's absence would undercut a regulatory regime.

In *Gonzales v. Raich*, the Supreme Court returned to the framework it espoused in *Lopez* and *Morrison*, further clarifying it. *Raich* concerned a challenge to the Controlled Substances Act ("CSA") "to the extent it prevent[ed] [plaintiffs] from possessing, obtaining, or manufacturing cannabis for their personal medicinal use" as was legal under California law. 545 U.S. at 7. Specifically, the plaintiffs argued that the "CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress's authority under the Commerce Clause." *Id.* at 15. The Court upheld the CSA, determining that the Commerce Clause permitted Congress to reach local, intrastate production and consumption of marijuana because it is a

"fungible commodity for which there is an established, albeit illegal, interstate market." *Id.* at 17. Thus, "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." *Id.* Further, it concluded that Congress's attempt to regulate the national (illicit) market for marijuana would have been hampered, if not fully undercut, if the Commerce Clause did not reach intrastate possession and consumption of marijuana. *Id.* at 19.

Given this precedent, two principal rules emerge, one relating to when Congress can regulate economic activity, the other relating to when Congress may regulate non-economic activity. First, Congress may regulate intrastate activity if the statute facially regulates an economic activity and the Court determines that a "rational basis" exists for Congress to conclude that that activity, aggregated with all its iterations "substantially affects interstate commerce." *Id.* at 22; *Lopez*, 514 U.S. at 557. Second, "while thus far in our Nation's history [the Supreme Court has] upheld . . . regulation of intrastate activity only where that activity is economic in nature," Congress may still regulate non-economic activity. *Taylor v. United States*, 579 U.S. 301, 306 (quoting *Morrison*, 529 U.S. at 613). Congress may do so if: (1) the Court concludes there is a rational basis for Congress to determine that the regulation of the activity substantially impacts interstate commerce; (2) the regulation serves a comprehensive regulatory regime; and (3) regulation of that non-economic activity is necessary to preserve that broader regulatory regime. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610; *see also NSBU v. Yellen*, 721 F. Supp. 3d at 1280–81. In this non-economic category of regulation, the Court also looks to whether the statute contains a jurisdictional hook, and whether Congress provided any findings regarding the impact the activity might have on commerce. *See Lopez*, 514 U.S. at 561–63; *Morrison*, 529 U.S.

614. In both inquiries, courts must consider the Commerce Clause through the lens of our dual system of government and cannot extend its reach to embrace activities that "would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 557 (internal quotations omitted).

Against this backdrop, the first question is whether the activity of "anonymous corporate existence and operation" constitutes an *economic* activity. Unlike possession of a firearm in a school-zone, *Lopez*, 514 U.S. at 561, or gender motivated violence, *Morrison*, 529 U.S. at 614, the anonymous existence and operation of corporations appears to have at least something to do with commerce. But not to the same extent as *Wickard* and *Raich*, both of which involved fungible commodities and actual markets for that good. *See Wickard*, 317 U.S. at 129; *Raich*, 545 U.S. at 19. Nonetheless, it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce. *See Raich*, 545 U.S. at 22; *Lopez*, 514 U.S. at 557. But, when considered in light of our dual system of government, Congress's commerce power cannot reach this far. If the Court were to sanction such an extension of legislative power today, then there is no telling how Congress would control companies tomorrow. The fact that a company is a company does not knight Congress with some supreme power to regulate them in all aspects—especially through the CTA, which does not facially regulate commerce. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1285. This is especially true when such regulations are generally entrusted to the States. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations."). Even when measured against *Wickard*, "the most far-reaching example of Commerce Clause authority over

interstate activity," the CTA fails. *See Lopez*, 514 U.S. at 560. There is no fungible good at issue in the CTA. *See* 31 U.S.C. § 5336. And unlike *Wickard*, the CTA does not aim to regulate some issue of supply and demand. *Compare id. with Wickard*, 317 U.S. at 127–28. The CTA regulates reporting companies, simply because they are registered entities, and compels the disclosure of information for a law enforcement purpose. *See* 31 U.S.C. § 5336. No such regulation has been sustained under the Commerce Clause. The Court sees no reason to expand centuries of precedent such that this case should yield a different result.[7] Upholding the CTA would require the Court to rubber-stamp what appears to be a substantial expansion of commerce power. This, the Court will not do.

**The Necessary and Proper Clause**

Having established that the Commerce Clause does not justify the CTA, the Court turns to the final arrow in the Government's quiver: the Necessary and Proper Clause—its "last, best hope." *See Printz v. United States*, 521 U.S. 898, 923 (1997). If the Necessary and Proper Clause does not authorize the CTA, then Plaintiffs have shown a substantial likelihood of success on the merits on their enumerated powers challenge, warranting issuance of injunctive relief.

Though our Constitution is written, and though our Government is of enumerated powers, "a government entrusted with such powers must also be entrusted with ample means for their execution." *Comstock*, 560 U.S. at 133 (internal quotations omitted). The Framers knew this. As a result, the Necessary and Proper Clause appears written in our Constitution, vesting Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution

---

[7] The Court sees no need to conduct an additional, alternative analysis assuming that the CTA regulates a non-economic activity, which would require the Court to analyze whether the CTA has a jurisdictional hook, Congress's findings in the CTA related to commerce, and whether the CTA is part of a comprehensive regulatory regime that might be undermined absent the CTA. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610; *see also NSBU v. Yellen*, 721 F. Supp. 3d at 1280–81. Still, it is worth noting that the CTA is devoid of any jurisdictional hook that would ensure its sweep would only apply to companies engaged in interstate commerce. *See* 31 U.S.C. § 5336; *NSBU v. Yellen*, 721 F. Supp. 3d at 1286.

[Congress's enumerated] Powers, and all other powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. This power gives the Legislative Branch "the authority to enact provisions 'incidental to [an] enumerated power, and conducive to its beneficial exercise.'" *NFIB v. Sebelius*, 567 U.S. at 559 (quoting *M'Culloch*, 17 U.S. at 418). While the Supreme Court has defined the contours of the Necessary and Proper Clause such that Congress may "legislate on that vast mass of incidental powers which must be involved in the [C]onstitution, it does not license the exercise of any 'great substantive and independent powers' beyond those specifically enumerated." *Id.* (quoting *M'Culloch*, 17 U.S. at 418). Indeed, courts are "responsibl[e] to declare unconstitutional those laws that undermine the structure of government established by the Constitution" as any such law does not constitute "proper means for carrying into execution Congress's enumerated powers." *Sebelius*, 567 U.S. at 559 (internal quotations omitted) (cleaned up).

To be effective, Congress must invoke the Necessary and Proper Clause in tandem with an enumerated power. Thus, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [the Court] look[s] to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock*, 560 U.S. at 134 (citing *Sbari v. United States*, 541 U.S. 600, 605 (2004)). This "means-end rationality" is not a high bar. As Chief Justice Marshall declared in an oft-quoted passage: "[l]et the end be legitimate, let it be within the scope of the [C]onstitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the [C]onstitution, are constitutional." *McCulloch*, 17 U.S. at 421. Thus, the Court has upheld statutes that are "convenient," "useful,"

or "conducive" to an enumerated power's "beneficial exercise." *Sebelius*, 567 U.S. at 559 (internal citations omitted). But this standard is a bar, no less. Deference given to Congress, once more, cannot become an abandonment of the judicial responsibility to strike down *ultra vires* congressional actions as "'mere[] acts of usurpation' which 'deserve to be treated as such." *Id.* (quoting *Printz*, 521 U.S. at 924).

Within this framework, the Government urges the Court to take one of three avenues to arrive at the conclusion that the CTA is within the reach of Congress's powers. Behind door number one: the Necessary and Proper Clause in service of Congress's power to regulate commerce (Dkt. #18 at p. 29). Behind door number two: The Necessary and Proper Clause in conjunction with Congress's power to regulate foreign affairs and further its national security interests (Dkt. #18 at p. 30–31). And behind the third door: the Necessary and Proper Clause in tandem with Congress's authority to lay and collect taxes (Dkt. #18 at p. 32). The Court opens each door in turn but shuts them all. The CTA finds no constitutional solace behind any door.

a.     *The Commerce Clause and the Necessary and Proper Clause*

The Court begins with Congress's power under the Commerce Clause and can dispose of it easily. As discussed, "the Constitution grants Congress to '*regulate* [c]ommerce.'" *NFIB v. Sebelius*, 567 U.S. at 549 (quoting U.S. CONST. Art. I., § 8, cl. 3) (emphasis in original). That regulatory power presumes the existence of a prerequisite activity. *Id.* Just as the Government's justification of the CTA as a raw exercise of commerce power would result in a severe expansion of Congress's power, the Government's logic under the Necessary and Proper Clause would justify a mandatory disclosure requirement "to solve almost any problem." *See id.* at 543. Requiring companies to disclose otherwise private information to the Government simply because those companies exist in their natural state does not derive from Congress's raw commerce power.

55

*See id.* at 560; *Comstock*, 560 U.S. at 134. It is "in no way an authority that is 'narrow in scope' or 'incidental' to the exercise of the commerce power. *See NFIB v. Sebelius*, 567 U.S. at 561 (citing *Comstock*, 560 U.S. at 148; *M'Culloch*, 17 U.S. at 418). The Court declines to authorize it as a necessary and proper use of Congress's commerce power precisely because to do so would be to ignore the crux of the Necessary and Proper Clause, which is not an exercise of any "great substantive and independent power." *See* 17 U.S. at 411.

The Government suggests that Congress's power under the Necessary and Proper Clause is even greater because the CTA covers *foreign* commerce (*See* Dkt. #18 at p. 29). That argument is not persuasive. While the Constitution grants Congress the power to "regulate [c]ommerce with foreign Nations," U.S. CONST. Art. I., § 8, cl. 3., that power is still regulatory in nature as a matter of the Constitution's plaint text. Thus, though "the 'founders intended the scope of the foreign commerce power to be . . . greater' than the interstate commerce power," that the CTA impacts foreign reporting companies as well as domestic ones does nothing to mollify the grave constitutional concern that the CTA does not regulate an activity at all (Dkt. #18 at p. 29) (quoting *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979)). *See NFIB v. Sebelius*, 567 U.S. at 561 (citing *Comstock*, 560 U.S. at 148; *McCulloch*, 17 U.S. at 418). Thus, the CTA cannot be upheld as a necessary and proper component of Congress's commerce power.

    *b.*       *Foreign Affairs Power and the Necessary and Proper Clause*

Next, the Court assesses whether the CTA falls within the scope of Congress's power to regulate foreign affairs as modified by the Necessary and Proper Clause. The Government proclaims that Congress has the authority to pass the CTA because it has "'broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs'" and pertaining to national security (Dkt. #18 at p. 30) (quoting *Kennedy v. Martinez*, 372 U.S. 144, 160

(1963)). Directing the Court to a slew of immigration-related cases, the Government asserts that the CTA is valid under the Necessary and Proper Clause because Congress may legislate to protect the Nation's national security interests and in furtherance of the President's power to execute the law (Dkt. #18 at pp. 30–31).

In further support, the Government leans on Congress's findings enumerated in the NDAA, which discuss the CTA's impact on foreign actors. As the Government notes, two of Congress's findings are salient to this inquiry (Dkt. #18 at p. 30). First:

> Malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, . . . harming the national security interests of the United States and the allies of the United States[.]

NDAA § 6402(3). Second, the Government calls attention to Congress's determination that:

> Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to . . . protect vital United States national security interests; better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.

NDAA § 6402(5) (cleaned up). According to the Government, the sum of these findings, Congress's foreign affairs powers, and the Necessary and Proper Clause bring the CTA within Congress's regulatory wingspan.

Plaintiffs, for their part, argue that the CTA is a "purely domestic statute, affecting only entities that are registered to do business domestically, and only requires that these entities file a report with the [F]ederal [G]overnment" (Dkt. #6 at p. 12). Plaintiffs also note that the CTA does not purport to serve a treaty or international agreement (Dkt. #6 at p. 12). Further, Plaintiffs argue

that, should the Court accept the "incidental" connection to international affairs the Government relies upon to make its argument, then the Court would run headlong into the warning the Supreme Court issued in *United States v. Bond*, through which the Court cautioned against allowing an alleged exercise of foreign affairs power to trammel upon states' police power. (Dkt. #6 at p. 12) (citing 572 U.S. 844 (2014)). As set forth below, Plaintiffs are correct.

The Court begins its analysis by determining whether the inquiry before it is truly one of foreign affairs. Only then can the Court turn to the authority the Government relies upon in its Response. Once more, first principles appear an appropriate place to begin. "Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald*, 468 U.S. 222, 242 (1984) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). That principle makes sense as these matters involve "decisions of a kind for which the Judiciary has neither the aptitude, facilities, nor responsibility and which have been long held to belong in the domain of political power." *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). But as with each inquiry performed in this case, the Court's "deference in matters of policy cannot, however, become abdications in matters of law." *NFIB v. Sebelius*, 567 U.S. at 538.

Congress's foreign affairs powers are not express in Article I of the Constitution, other than the clauses stating that Congress may "regulate commerce with foreign nations," "Establish an uniform Rule of Naturalization," "declare war," "raise and support armies," "provide and maintain a navy," and "make rules for the [G]overnment and regulation of the land and naval forces." U.S. CONST. art. I., § 8, cls. 3, 4, 11, 12, 13, 14. No less, "[a]lthough there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation

58

of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of our Nation. *Perez v. Brownell*, 356 U.S. 44, 57 (1958), *overruled on other grounds by Afroyim v. Rusk*, 387 U.S. 253 (1967). But that power is far from plenary and does not extend to purely domestic matters. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315–16 (1936). Further, as the District Court for the Northern District of Alabama observed in analyzing Congress's foreign affairs power as applied to the CTA, the precise contours of Congress's foreign affairs power need not be defined to determine that the CTA is in no way connected to whatever authority over foreign affairs Congress might have. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1273. This is because the CTA regulates internal matters—not foreign ones, negating an inquiry into a potential political question involving the CTA.

In matters involving foreign affairs, the Government is not limited by the Constitution's enumerated powers. *See id.* (citing *Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16). Indeed, the Supreme Court has made clear that "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect to our internal affairs." *Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16. This principle drove the Supreme Court to uphold a statute which gave the president the power to declare an embargo on foreign arms. *See id.* at 329. Here, that principle demands the Court answer the threshold question of whether the subject of the CTA's regulation—the anonymous existence and operation of reporting companies—is an internal (domestic) or external (foreign) matter. *See id.*

The CTA's text provides an answer. The CTA, by its very language, does not regulate any issue of foreign affairs. It regulates a domestic issue: anonymous existence of companies registered

to do business in a U.S. state and their potential conduct. *See* 31 U.S.C. § 5336. It bears repeating, a reporting company subject to the CTA is an entity that is either: (1) "created by the filing of a document with a secretary of state or similar office *under the law of a State or Indian Tribe*"; or (2) "formed under the law of a foreign country *and registered to do business in the United States* by the filing of a document with a secretary of state or a similar office *under the laws of a State or Indian Tribe*." *Id.* § 5336(a)(11) (emphasis added). These entities, though special under the CTA as reporting companies, remain "creatures of state law." *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977); *Cort v. Ash*, 422 U.S. 66, 84 (1975), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979); *see Standard Oil Co. of Tex. v. United States*, 307 F.2d 120, 127 (5th Cir. 1962); *NSBU v. Yellen*, 721 F. Supp. 3d at 1273. As the Court has already noted, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *NSBU v. Yellen*, 721 F. Supp. 3d at 1273 (quoting *CTS Corp.*, 481 U.S. at 89). History confirms that our Founding Fathers believed just the same. *Id.* ("Although the Founders 'were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy, they were more reluctant . . . to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose' to leave incorporation to the States.") (quoting Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L. J. 1037, 1041 (1986)) (cleaned up). Thus, here, Congress is bound by our written Constitution and the enumerated powers with which it provides Congress. *See Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16.

There is scant, if any, history or precedent to suggest that whatever foreign affairs powers Congress might possess under the Necessary and Proper Clause can reach the domestic issue of entities registered to do business under state law. The authority the Government does provide does nothing to bolster its argument. *Kennedy v. Mendoza-Martinez* involved the constitutionality of a statute that functioned to divest an American of his citizenship as a consequence for draft-dodging, which the Supreme Court struck down as failing to provide sufficient safeguards to comport with due process requirements. *See* 372 U.S. 144, 146 (1963). The Court did not grapple with Congress's power to enact those statutes, which facially appear to derive from Congress's enumerated power over citizenship. *See* U.S. CONST. art. I, § 8, cl. 4.

*Hernandez v. Mesa*, another case that the Government relies upon, involved a cross-border shooting. 589 U.S. 93, 96 (2020). There, the Court declined to create a damages remedy for a cross-border shooting by extending its prior precedent, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), which permitted a victim of unlawful arrest and search to assert a claim under the Fourth Amendment for damages in the absence of a statute authorizing this type of claim. *Id.* at 96. The Supreme Court defined a cross-border shooting as, "by definition an international incident." *Id.* at 104. That is very different than the monitoring of domestic entities, which is what the CTA does. *See* 31 U.S.C. § 5336. At any rate, *Hernandez* did not contemplate Congress's power to legislate, though it reaffirmed the notion that courts should not intrude upon matters of foreign relations. *See Hernandez*, 589 U.S. at 104.

Next, the Government cites *United States v. Di Re*, a case involving the constitutionality of a search of an individual convicted of possessing counterfeit gasoline coupons in violation of the Second War Powers Act of 1942—a matter inapplicable to this case. 332 U.S. 581, 582–83 (1948).

The Government relies on it, however, not as analogous, but in conjunction with *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), to say that a legislative act of Congress is presumed constitutional, and that that presumption is "heightened" where it involves matters of national security and foreign affairs (Dkt. #18 at p. 30). The Court does not dispute that premise. Instead, the Court notes that a heightened presumption does not apply simply because the Government says so. Neither does *Holder* suggest that it applies to the CTA, which the Court has already determined regulates a domestic matter. *Holder* involved constitutional challenges for vagueness and under the First Amendment to a statute criminalizing the provision of material support to terrorist organizations and delegating to the Secretary of State the authority to designate an entity a "foreign terrorist organization." *See* 561 U.S. at 7–9. There is no dispute that that the Court is not equipped to determine what constitutes a foreign terrorist organization. *See id.* at 33–34. But this case does not contemplate that question any more than it considers a foreign issue. The Court need not apply a heightened presumption to the CTA and Reporting Rule.

The final case the Government relies upon is *Curtiss Wright Exp. Corp.*, 299 U.S. at 318, to support its position that Congress may pass legislation that furthers its foreign affairs powers, as well as the President's (Dkt. #18 at p. 31). That case, as already established, removes the CTA from an inquiry under Congress's necessary and proper foreign affairs power as the CTA does not regulate a foreign issue. *See Curtiss Wright Exp. Corp.*, 299 U.S. at 299. Thus, the Court turns to the ultimate question of whether the CTA can be justified by Congress's power to regulate foreign affairs when the CTA only regulates a local matter. It cannot.

On this point, Plaintiffs direct the Court to *Bond v. United States*, a Supreme Court case that is not directly on point, but is helpful in analyzing the limiting principle of Congress's implied

power over foreign affairs (Dkt. #6 at p. 11–12) (citing 572 U.S. 844 (2014)). *See also NSBU v. Yellen*, 721 F. Supp. 3d at 1275 (applying *Bond* in the same context). Plaintiff suggests that *Bond* limits the scope of international legislation to exclude domestic issues (*See* Dkt. #6 at p. 11). The facts of *Bond* are these: First, in 1997, the United States ratified the International Convention on Chemical Weapons pursuant to the Federal Government's power to make treaties—an enumerated power. 572 U.S. at 848. Subsequently, in accordance with the United States's obligations under the treaty, Congress enacted the Chemical Weapons Convention Implementation Act of 1998, which "ma[d]e it a federal crime for a person to use or possess any chemical weapon, and . . . punishe[d] violators with severe penalties." *Id*. Thereafter, a microbiologist from Pennsylvania discovered that her husband had an extramarital affair with her close friend, resulting in the friend's pregnancy. *Id*. at 852. Seeking revenge, the microbiologist took several chemicals from her employer, a chemical manufacturer, and dispersed them on her friend's car door, mailbox, and doorknobs. *Id*. The friend suffered a "minor chemical burn on her thumb." *Id*. For this, the Government charged the microbiologist with violating the Chemical Weapons Convention Implementation Act. *Id*. at 852–53. After pleading guilty, the microbiologist appealed, arguing that the Implementation Act exceeded Congress's enumerated powers. *Id*.

The Supreme Court overturned her conviction and held that the Chemical Weapons Act did not "reach purely local crimes." *Id*. at 860, 866. In arriving at its holding, the Court relied on fundamental federalist principles, remarking that "[b]ecause our constitutional structure leaves local criminal activity primarily to the States, [the Court has] generally declined to read federal law as intruding on that responsibility" absent a clear indication from Congress. *Id*. at 848. The Court

also rejected an argument that the prosecution was a necessary and proper means of executing the National Government's enumerated power to make treaties. *Id.* at 855.

As the district court in *NSBU v. Yellen* correctly observed, *Bond* involved a matter of statutory interpretation, not constitutional interpretation. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1275. The Government attempts to distinguish *Bond* on this basis (Dkt. #18 at p. 31). But no less, *Bond*'s principle that foreign affairs powers generally may not reach local issues remains true and applicable to this case. The Government seeks to justify the CTA as reaching the local issue of companies who register to do business with a particular state. *See* 31 U.S.C. § 5336. Affirming the constitutionality of the CTA on the basis of foreign affairs would permit Congress to reach into the states and regulate whatever it wants simply by pointing to some vague nexus between the statute at issue and a potential foreign actor. That theory stretches the fabric of our dual system of government too thin to pass constitutional muster. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1275.

If the CTA is not a raw exercise of Congress's foreign affairs power, then the Government's only hope is the Necessary and Proper Clause. Once more, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute," the inquiry centers on "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally *enumerated* power." *Comstock*, 560 U.S. at 134 (emphasis added). The Government has yet to identify a single enumerated foreign affairs power that shares a nexus with the CTA. It notes that Congress believes the CTA is necessary to "'bring the United States into compliance with international anti-money laundering and countering financing of terrorism standards'" (Dkt. #18 at p. 30) (quoting NDAA § 6402(5)). But at the Court's hearing on October 9, the Court asked the Government whether the CTA was

linked to a treaty. The Government responded in the negative. And the Court pressed the parties

on which "international standards" the CTA would help the United States to comply with. Once

more, no party could offer an answer. In *Bond*, the Court declined to apply a law passed pursuant

to a treaty to a purely domestic issue. *See Bond*, 572 U.S. 855. Here, there is no treaty. *See* 31 U.S.C.

§ 5336. And while there is a passing reference to an "international standard" Congress may strive

to comply with, Congressional findings alone are insufficient to bring the CTA within Congress's

necessary and proper power. The Government has not provided any authority to the contrary.

There is simply no enumerated power the Government can identify that would justify the CTA,

barring the Court from affirming the CTA as justified by the Necessary and Proper Clause. *See*

*Comstock*, 560 U.S. at 134.

The Government has not provided any support—and there appears to be no support—for

the proposition that Congress may legislate in arenas traditionally controlled by the states simply

because it has made findings that make passing mention to an international impact. *See NSBU v.*

*Yellen*, 721 F. Supp. 3d at 1275. And while Congress's findings in the NDAA include reference to

"national security," "foreign affairs," and "international standards," Congress cannot invoke its

foreign affairs powers to regulate a domestic issue simply because it waves the magic wand of *ipse*

*dixit*. "Compliance with international standards may be good policy, but it is not enough to make

the CTA 'necessary' or 'proper.'" *Id.* at 1276. There does not appear to be a single enumerated,

foreign affairs power to which the CTA can legitimately be linked. That is fatal to the

Government's argument on this point. *See Comstock*, 560 U.S. at 134. Thus, the Court must turn

to the Government's final argument that the CTA is within Congress's enumerated powers.

## c.    Taxing Power and the Necessary and Proper Clause

Backed into the corner with one remaining card up its sleeve, the Government's final argument is that the CTA is a valid exercise of Congress's power to lay and collect taxes, as expanded by the Necessary and Proper Clause (*See* Dkt. #18 at p. 33). The Constitution confers upon Congress the power to "lay and collect taxes." U.S. CONST. art. I, § 8, cl. 8. The Government wisely concedes that the CTA—in no way, shape, or form—is a tax (Dkt. #18 at p. 33).[8] Instead, it argues that because the CTA is "in aid of a revenue purpose," that is, it helps to "facilitate tax collection," the CTA is constitutional as an exercise of Congress's power to enact laws necessary and proper to enforce its taxing scheme (Dkt. #18 at p. 32) (internal citations omitted). The Court disagrees. As the Sections below demonstrate, this final card does not arm the Government's hand with a royal flush to conquer Plaintiffs' arguments.

The Government notes that "Congress determined that the lack of beneficial ownership information allows criminals to obscure their income and assets and thus 'facilitates . . . serious tax fraud'" (Dkt. #18 at p. 32) (quoting NDAA § 6402(3)). Because Congress determined that the CTA's mandated beneficial ownership reports "would be 'highly useful' in detecting tax fraud and improving 'tax administration' generally," the CTA is a valid exercise of Congress's power to legislate in furtherance of and adjacent to its tax scheme under the Necessary and Proper Clause, so the argument goes (Dkt. #18 at p. 32) (quoting 31 U.S.C. §§ 5336(a)(11)(xxiv)(ii), (c)(5)(B)). Plaintiffs, in contrast, contend that the Government's hypothesis would result in a "'substantial

---

[8] The "essential feature" of a tax is that it "produces at least some revenue for the Government." *Sebelius*, 567 U.S. at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n.4 (1953)). On its face, the CTA does not create any revenue for the Government whatsoever. *See generally* 31 U.S.C. § 5336. Thus, the Government cannot reasonably seek to justify passage of the CTA through a contrary argument. Neither does the Government contend that the CTA's penalty provisions render the CTA a valid exercise of Congress's taxing power (*See* Dkt. #18 at p. 32). *See also NSBU v. Yellen*, 2024 WL 899372, at *20.

66

expansion of federal authority'" that breaks the boundaries of Congress's taxing and necessary and proper powers (Dkt. #6 at p. 17) (quoting *NSBU v. Yellen*, 2024 WL 899372, at *21)). The Court agrees with Plaintiffs.

The Court first turns to the four cases the Government cites in furtherance of its arguments on this point. But the authority the Government relies upon does little to justify the CTA as an act "derivative" of its power to lay and collect taxes such that the Necessary and Proper Clause can bridge the gap to constitutionality (*See* Dkt. #18 at p. 32). *Comstock*, 560 U.S. at 147. First comes *Sonzinsky v. United States*, which the Government cites for the proposition that Congress may legislate "in aid of a revenue purpose" (*See* Dkt. #18 at p. 32) (citing 300 U.S. 506, 513 (1937)). There, the Supreme Court upheld a law that imposed a special tax and registration requirement on dealers of firearms as authorized by Congress's taxing power. *Sonzinsky*, 300 U.S. at 511. True enough, the Supreme Court stated in dicta that *those* "registration provisions . . . [were] obviously in aid of a revenue purpose." *Id.* at 513. But it did not determine for the ages, as the Government suggests, that Congress can pass any regulation it wishes, so long as Congress can point to a "revenue purpose" it might serve. *See id.* Instead, *that* special excise tax—*which the statute created*—"on its face" was a taxing measure, with a consequential deterrent effect on the keeping of the particular type of firearm at issue in that case. *Id.* The Supreme Court held that a taxing measure is not outside of Congress's taxing power simply because it carries a consequential, deterrent effect. *Id.* And in coming to that determination, the Supreme Court did not consider the Necessary and Proper Clause. *See id.*

Second, the Government cites *Helvering v. Mitchell* for the same proposition, though that case too says nothing about the Necessary and Proper Clause (Dkt. #18 at p. 32) (citing 303 U.S.

391, 399 (1938)). *Helvering* involved the Revenue Act of 1928 as it related to deficiencies on income tax returns. 303 U.S. at 392. The Act provided that if an individual's tax returns were deficient due to fraud, then that individual must pay half of the amount of the deficiency (in addition to the deficiency). *Id.* The question before the Supreme Court was whether this provision imposed a criminal penalty such that payment on the deficiency would be barred by double jeopardy. *Id.* at 398–400. The Supreme Court answered in the negative and held that the provision was a tax. *Id.* at 402. Thus, as in *Sonzinsky*, a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure. *Id.* at 399–400. Like *Sonzinksy*, *Helvering* does not purport to suggest that Congress may legislate however it wants because such legislation might deter tax fraud. *See id.*

Next, the Government relies upon *CIC Servs., LLC v. IRS* and *California Bankers Ass'n v. Shultz* for the proposition that "Congress has given the 'IRS broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes'" (Dkt. #18 at p. 32) (quoting *CIC Servs., LLC*, 593 U.S. 209, 212 (2021)) (citing *California Bankers Ass'n*, 416 U.S. 21, 26 (1974)). Indeed, the Supreme Court in *CIC Servs., LLC* did say just that. 593 U.S. at 212. But once more, the context of that case does not render it dispositive on the CTA's constitutionality. There, plaintiffs challenged under the APA the enforcement of an IRS notice that would require taxpayers and material advisors to report information about a particular type of transaction. *Id.* at 213–15. The issue before the Court was whether the "Anti-Injunction Act bar[red] [the plaintiffs'] suit" under the APA. *Id.* at 216. The answer to that question does little to answer the one that now captivates the Court, other than to say that "information gathering . . . is a phase of tax administration that occurs before assessment or collection." *See CIC Servs., LLC*,

593 U.S. at 216 (internal quotations omitted). Therefore, information gathering is separate and apart from a tax itself. *See id.*; *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 8 (2015).

*California Bankers Ass'n v. Shultz*, which also does not concern the Necessary and Proper Clause, also does little to advance the Government's argument. At issue in *Shultz* was the constitutionality of the Bank Secrecy Act of 1970. 416 U.S. at 25. Part of that Act required "financial institutions to maintain records of the identities of their customers, to make microfilm copies of certain checks drawn on them, and to keep records of certain other items." *Id.* at 29. The Supreme Court noted that the purpose of these provisions was to compel the maintenance of reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations proceedings." *Id.* at 26. The Court did not address the Bank Secrecy Act's propriety under Congress's taxing power, but instead entertained challenges under the First, Fourth, and Fifth Amendments to the Constitution. *See id.* at 49–78. Again, this does not assist the Court in assessing the CTA as an ancillary exercise of Congress's taxing power.

The Government finally turns to *United States v. Matthews* for the proposition that a regulation need not be paired with a concurrent tax to be a valid exercise of Congress's power to lay taxes (Dkt. #18 at p. 32) (citing 438 F.2d 715, 717 (5th Cir. 1971)). But *Matthews* says just the opposite. The line to which the Government refers fully states that "[i]f the registration requirement was not offensive when coupled with a concurrent tax, it is not offensive when designed to aid the collection of tax on any future transfer of the registered item." *Matthews*, 438 F.2d at 717. To clarify the context in which this line appears, in *Matthews*, an individual had been convicted of unlawful possession of a firearm not registered to him in a national registry, as required under the Gun Control Act of 1968. *Matthews*, 438 F.2d at 715. He argued that the statute under

which he was convicted was not constitutional because it was not an "appropriate and necessary aid to the reasonable enforcement of a valid revenue measure." *Id.* at 716. To him, such a challenge made sense because the statute under which he was convicted did not carry with it a tax. *Id.* The Court disagreed, noting that there was, in fact, a tax levied against individuals who kept such firearms. *See id.* at 717. Once more, just as in *Helvering* and *Sonzinsky*, that case suggests that a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure. *See id.* at 716.

Even going beyond the authority the Government cites in its Response, precedent is consistent with these modest holdings. *See, e.g.*, *United States v. Doremus*, 249 U.S. 86, 92 (1919) (upholding Harrison Narcotic Drug Act that taxed sale of drugs to authorized individuals and stating that "[t]he Act may not be declared unconstitutional because its effect may be to accomplish another purpose *as well as* the raising of revenue") (emphasis added); *United States v. Kahriger*, 345 U.S. 22 (1953), *overruled on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968) (upholding Gambler's Occupational Tax provision of the Revenue Act of 1951 "which lev[ies] a tax on persons engaged in the business of accepting wagers and require[s] such persons to register with the Collector of Internal Revenue"); *United States v. Bolatete*, 977 F.3d 1022, 1034 (11th Cir. 2020) (National Firearms Act and the criminal penalty for violating it are justified by Congress's taxing power because a regulatory penalty, coupled with an underlying tax, has long been accepted as within the province of Congress's power to lay and collect taxes).

*In toto*, these cases stand for far humbler a proposition than the Government suggests: a tax, which necessarily generates revenue, is not unconstitutional simply because it may carry a regulatory, deterrent effect on conduct—even where the tax requires some form of registration.

The Government has not provided the Court with a single case that suggests Congress's taxing power, even when coupled with the Necessary and Proper Clause, can be used to regulate when the statute at issue does not, in some way, generate some revenue. Had the Government cited *United States v. Kahriger*, it may have parroted what the Supreme Court said in dicta:

> Nor do we find the registration requirements of the wagering tax offensive. All that is required is the filing of names, addresses, and places of business. This is quite general in tax returns. Such data is intimately related to the collection of the tax and are "obviously supportable as in aid of a revenue purpose."

345 U.S. at 515 (quoting *Sonzinksy*, 300 U.S. at 506). But even that would not persuade the Court that the CTA falls within the purview of its power to tax or do what is necessary and proper to give effect to its enumerated powers. The judiciary operates on the basis of *stare decisis*, not *stare dicta*. *Kahriger*, like *Sonzinsky*, does not purport to suggest that Congress may legislate in an unbridled manner simply because it might make some tax, someday, easier to collect. In each of the cases discussed above, the challenged statute imposed a tax and had some regulatory provision or consequence. The CTA does not impose any tax, whatsoever. *See* 31 U.S.C. § 5336.

While a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure, the inverse is not true. *Cf. Matthews*, 438 F.2d at 717. In other words, a regulation is not constitutional simply because it carries with it an incidental tax benefit. This is the category that the CTA falls under. The cases above all have one thing in common: the regulation being attacked is attached to an underlying tax. The same is not true of the CTA. *See* 31 U.S.C. § 5336. And what little connection the Government suggests the CTA has with the at-large taxing system imposed upon Americans is tenuous at best.

As Justice Frankfurter said:

> When oblique use is made of the taxing power as to matters which substantively are not within the powers delegated to Congress, the Court cannot shut its eyes to what is obviously, because designedly, an attempt to control conduct which the Constitution left to the States, merely because Congress wrapped the legislation in the verbal cellophane of a revenue measure.

*Kahriger*, 345 U.S. at 37 (Frankfurter, J. dissenting). And so, in the context of the Government's argument here, that Congress "sense[d]" that the CTA would be "highly useful" in detecting tax fraud and would "improve" tax administration in general do not render the CTA constitutionally valid. Thus, the cellophane that wraps the CTA is thin. Precedent indicates that "prior cases upholding laws under [the Necessary and Proper Clause] involved exercises of authority *derivative of, and in service to*, a granted power." *NFIB v. Sebelius*, 567 U.S. at 560 (emphasis added). The CTA is not "derivative of" the taxing power simply because the Government points to some potential tax purpose the CTA might serve someday. *See id.*; *cf. Helvering*, 303 U.S. at 392. Though it may be "in service to" taxation as a general matter, because the CTA does not derive from the taxing power, it is neither tightly linked,[9] nor rationally related to Congress's power to lay and collect taxes. *See Comstock*, 560 U.S. at 134.

To hold otherwise would be to unleash a slippery slope that could wreak havoc on the structure of our government. "It would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials to access that data." *NSBU v. Yellen*, 721 F. Supp. 3d at 1289 (quoting *NFIB v. Sebelius*, 567 U.S. at 560)). While the Government disputes Plaintiff's assertion that the

---

[9] "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Comstock*, 560 U.S. at 150 (Kennedy, J. concurring).

Necessary and Proper Clause "does not provide an independent source of power," its position stands in stark contrast to the Supreme Court's interpretation that it must be "narrow in scope," or "incidental" to an enumerated power (Dkt. #18 at p. 32). *Comstock*, 560 U.S. at 148.

Having determined that the CTA is not justified by the Commerce Clause nor the Necessary and Proper Clause in conjunction with some enumerated power, the Court concludes that Plaintiffs have met their burden to show a substantial likelihood of success on the merits of their Tenth Amendment Challenge. Thus, the Court need not assess Plaintiffs' as-applied challenges or their challenges under the First and Fourth Amendments. Thus, the Court must now determine whether the equities favor issuance of an injunction. They do.

### C.      Balance of Equities

The final step in the inquiry calls upon the Court to determine whether the balance of equities favors issuance of an injunction (the third and fourth factors). *Nichols*, 532 F.3d at 372. The third element is whether the harm posed by the CTA and Reporting Rule outweighs any damage injunctive relief might inflict on the Government. *See Nichols*, 532 F.3d at 372. The fourth is that injunctive relief will not harm public interest. *See id.* Where, as here, the Government is the defendant, these elements merge. *Nken v. Holder*, 556 U.S. 418, 420 (2009). On these facts, the Court determines that the threatened injury to Plaintiffs outweighs any potential harm to Defendants. Without an injunction, Plaintiffs will almost certainly incur substantial, incompensable monetary costs and constitutional harm.

"When a statute is enjoined, the [Government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Book People, Inc.*, 91 F.4th at 341. Certainly, the Court acknowledges that the Government seeks to serve admirable ends through the CTA and the Reporting Rule. Obviously, the Government has an interest in ferreting out financial

crime, protecting foreign commerce and national security, and bringing the United States's money laundering laws into compliance with international standards (whatever those standards may be). *See* 134 Stat. at 6402. The Government argues that, balancing these interests against the "speculative" nature of the harm that Plaintiffs face, the Government's interests should win the day (Dkt. #18 at p. 39). Not so. Plaintiffs' injuries are concrete. And "neither [the Government] nor the public has any interest in enforcing a regulation that violates federal law." *Id.* (internal quotations omitted). No matter how laudable its goals, Congress's actions must abide by our Constitution. This is in the public's best interest. *See id.* Indeed, "it is always in the public interest to prevent a violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 60 F.3d 448, 458 n.9 (5th Cir. 2014) (cleaned up). Because the CTA and Reporting Rule likely do not[10] pass muster under the Constitution, it is in the public's best interest to prevent the Government from enforcing the CTA and Reporting Rule. Due to the fast-approaching deadline for reporting companies to file BOI reports, the Court cannot render a meaningful decision on the merits before Plaintiffs suffer the very harm they seek to avoid. A preliminary injunction will preserve the constitutional status quo. Thus, the balance of equities favors issuance of an injunction.

Accordingly, the Court determines that the Plaintiffs have satisfied all elements required for the issuance of a preliminary injunction against the CTA and the Reporting Rule.

### D.      Scope of Injunction

Finally, given that an injunction is appropriate, the Court must determine its scope. Plaintiffs seek injunctive relief on behalf of the individual Plaintiffs, as well as all of NFIB's

---

[10] The word "not" was added as an amendment to fix a typographical error. The Court's analysis and holding are unchanged.

members (*See* Dkt. #6). The Government characterizes Plaintiffs' request as one for a "nationwide injunction" (Dkt. #18 at p. 17). At the Court's hearing, Plaintiffs suggested that they sought an injunction on behalf of only the Plaintiffs before the Court, including the approximately 300,000 members of NFIB. The Government responded that if the Court were to enjoin the CTA and Reporting Rule, the scope of which included NFIB's members, then the Court would, in practical effect, enter a nationwide injunction. The Court agrees with the Government's point. A nationwide injunction is appropriate in this case.

A preliminary injunction is an "extraordinary equitable remedy." *Currier*, 760 F.3d at 452. The Constitution vests district courts with "the judicial power of the United States." U.S. CONST. art. III, § 1. "That power is not limited to the district wherein the [C]ourt sits but extends across the country. It is not beyond the power of a court, in the appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (upholding nationwide injunction in immigration context) (citing *Earth Island v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2006) (upholding nationwide injunction after concluding it was "compelled" by the text of Section 706 of the APA), *aff'd in part and rev'd on other grounds by Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 659 F.2d 695, 705–06 (5th Cir. 1981) (instructing district court to enter nationwide injunction); *Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818, 826 (5th Cir. 1972) ("[C]ourts should not be loathed to issue injunctions of general applicability . . . 'the injunctive processes are a means of effective general compliance with national policy as expressed by Congress, a public policy judges must too carry out—actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium'" (quoting *Mitchell v. Pidcock*, 299 F.3d 281, 287 (5th Cir. 1962))).

But simply because the Court may issue a nationwide injunction does not mean it should in all cases. As the Supreme Court has held, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the Plaintiffs in the class." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). The relief the Court fashions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* at 702. The Fifth Circuit has approved nationwide injunctions in cases involving immigration and the APA. *See, e.g.*, *Texas v. United States*, 809 F.3d at 187–88; *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 955 n.122 (5th Cir. 2024). It has also held that it is appropriate for a district court to enter a nationwide injunction when a plaintiff challenges a federal regulation under the APA. *See, e.g.*, *Career Colls. & Schs. of Tex.*, 98 F.4th at 255 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.")); *Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022); *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998).

Nonetheless, the Government highlights the controversy regarding nationwide injunctions (*See* Dkt. #18 at p. 40). Nationwide relief is a subject of ongoing debate. *See, e.g.*, *Texas v. United States*, 515 F. Supp. 3d 627, 637–38 (S.D. Tex. 2021) (collecting authority on both sides). One concern is that nationwide injunctions curtail the percolation of legal debate among lower courts. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021); *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 260 (4th Cir. 2020). Thus, the Government urges the Court to tailor relief only to the parties before it because at this very moment, the Eleventh Circuit is considering the constitutionality of

the CTA and Reporting Rule. *See NSBU v. Yellen*, No. 24-10736 (11th Cir.). But this Court's decision will not trench upon the Eleventh Circuit's authority to render a decision, nor will it stop further consideration of the constitutionality of the CTA.

The Court determines that the injunction should apply nationwide. Both the CTA and the Reporting Rule apply nationwide, to "approximately 32.6 million existing reporting companies." *See* 87 Fed. Reg. at 59585. NFIB's membership extends across the country. And, as the Government states, the Court cannot provide Plaintiffs with meaningful relief without, in effect, enjoining the CTA and Reporting Rule nationwide. The extent of the constitutional violation Plaintiffs have shown is best served through a nationwide injunction. *See Califano*, 442 U.S. at 705; *Career Colls. & Schs. of Tex.*, 98 F.4th at 256. Given the extent of the violation, the injunction should apply nationwide.

Plaintiffs also urge the Court to enjoin the Reporting Rule under § 706 of the APA (Dkt. #6 at p. 28), which instructs courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right[s]." 5 U.S.C. § 706(2)(B). Such vacatur is the "default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023).[11] But § 706 is not the proper vehicle to protect Plaintiffs from irreparable harm at this juncture. The Court has determined that the CTA and Reporting Rule are *likely* unconstitutional for purposes of a preliminary injunction. It has not made an affirmative finding that the CTA and Reporting Rule are contrary to law or that they amount to a violation of the Constitution. Thus, the Court determines that the Government should

---

[11] The Government recognizes that the Fifth Circuit has held that § 706(2) of the APA requires vacatur in certain instances (Dkt. #18 at p. 40). Nonetheless, the Government contends that § 706(2) is "merely a rule of decision directing the reviewing court to disregard unlawful action in resolving the case before it" rather than a rule that "dictate[s] a[] particular remedy" (Dkt. #18 at p. 40). For this proposition, the Government relies on secondary authority. But this Court is bound by Fifth Circuit precedent to the contrary. *See, e.g.*, *Career Colls. & Schs. of Tex.*, 98 F.4th at 255. Nonetheless, the Court does not set aside the Reporting Rule under § 706 as, at this preliminary stage, the Court has not determined that the Reporting Rule is *actually* unconstitutional.

be enjoined from enforcing the Reporting Rule and the January 1, 2025, compliance deadline under the Reporting Rule should be stayed under § 705 of the APA.

Under § 705 of the APA, "the reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable injury." 5 U.S.C. 705. *See also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury.'" (quoting § 705)). The Fifth Circuit has interpreted this provision of the APA as akin to a preliminary injunction. *See Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1135 (citing *Nken*, 556 U.S. at 426). Thus, the Court may grant relief under § 705 using the same four-pronged test as the Court uses for a traditional preliminary injunction. *Id.* at 1136. Having determined that Plaintiffs have satisfied each of the four elements for a preliminary injunction, a stay of the Reporting Rule's compliance deadline pending further order of the Court is appropriate. Just as the injunction against enforcement of the CTA should apply nationwide, a stay of the Reporting Rule should apply nationwide. "Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited" to the parties before the Court. *Career Colls. & Schs. of Tex.*, 98 F.4th at 255. "Instead . . . the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' unlawful agency action." A stay, coupled with an injunction against enforcement of the CTA and Reporting Rule, will maintain the status quo and protect the parties from irreparable harm.

## CONCLUSION

Plaintiffs have satisfied all prerequisites for a preliminary injunction. The Court has authority to issue the injunction Plaintiffs seek under Federal Rule of Civil Procedure 65(d). The CTA is likely unconstitutional as outside of Congress's power. Because the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons. The Court has not addressed the issue of the CTA's constitutionality as applied to these Plaintiffs or Plaintiffs' challenges under the First and Fourth Amendments. Having determined that Plaintiffs have carried their burden, the Court **GRANTS** Plaintiff's Motion for a Preliminary Injunction. Therefore, the CTA, 31 U.S.C. § 5336 is hereby enjoined. Enforcement of the Reporting Rule, 31 C.F.R. 1010.380 is also hereby enjoined, and the compliance deadline is stayed under § 705 of the APA. Neither may be enforced, and reporting companies need not comply with the CTA's January 1, 2025, BOI reporting deadline pending further order of the Court.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The Fifth Circuit has held that district courts have discretion to "require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). After considering the facts and circumstances of this case, the Court finds that security is unnecessary and exercises its discretion to not require Plaintiffs to post security.

It is therefore **ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. #6) is hereby **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED this 5th day of December, 2024.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

|  |  |
|---|---|
| TEXAS TOP COP SHOP, INC., *et al.*,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>     *Defendants*. | No. 4:24-cv-478-ALM |

## DECLARATION OF ANDREA GACKI

I, Andrea Gacki, declare the following to be a true and correct statement of facts:

1.     I am the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury ("Treasury"). I have held that position since September 2023. I previously served in several other leadership roles within Treasury. Prior to joining FinCEN, I served as the Director of the Office of Foreign Assets Control, another component of Treasury (within Treasury's Office of Terrorism and Financial Intelligence), for approximately five years and, from January 2021 to December 2021, I performed the duties of the Under Secretary for Terrorism and Financial Intelligence. In my official capacity as the Director of FinCEN, I supervise all aspects of FinCEN's operations, including FinCEN's implementation of the Corporate Transparency Act ("CTA").

2.     Due to the nature of my official duties, I am familiar with FinCEN's implementation of the CTA's requirements, including FinCEN's development of implementing regulations as well as

A82

FinCEN's promulgation of guidance regarding the CTA and its implementing regulations.  I am also familiar with FinCEN's expansive campaign to spread public awareness of the CTA's requirements.

3.    I make this declaration in support of a motion to stay the district court's order pending appeal.  The statements I make in this declaration are based on my personal knowledge, on information made available to me in my official capacity, and on conclusions reached and determinations made in accordance therewith.

4.    FinCEN was created in 1990 and became a bureau of Treasury by virtue of the USA PATRIOT Act of 2001, Pub. L. 107-56.  The Director of FinCEN is appointed by the Secretary of the Treasury and reports to Treasury's Under Secretary for Terrorism and Financial Intelligence.

5.    FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.  FinCEN primarily exercises regulatory functions under the legislative framework commonly referred to as the "Bank Secrecy Act" ("BSA"),[1] which includes the Currency and Foreign Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001, the Anti-Money Laundering Act of 2020 (including the CTA) and other legislation.  The BSA is the nation's first and most comprehensive federal anti-money laundering and countering the financing of terrorism ("AML/CFT") statute.  The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations.  *See* Treasury, Treasury Directive 180-01 (Jan. 14, 2020).

---

[1] The BSA is codified at 12 U.S.C. §§ 1829b, 1951-1960 and 31 U.S.C. §§ 5311-5314, 5316-5336, including notes thereto. Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

2

A83

6.    The CTA, enacted as part of the Anti-Money Laundering Act of 2020 in the National Defense Authorization Act for Fiscal Year 2021 and codified, in relevant part, at 31 U.S.C. § 5336, amended the BSA to, among other things, require certain entities to report information to FinCEN about their beneficial owners and the individuals who created or registered them.  The CTA—enacted on an overwhelming and bipartisan basis in 2021—is vital to protecting the U.S. and international financial systems from illicit finance threats, such as terrorist financing, corruption, human smuggling, drug and arms trafficking, and money laundering.  Congress designed the CTA to advance important national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, tax evasion, and other illicit activity through information-sharing.  Specifically, access to beneficial ownership information ("BOI") reported under the CTA would significantly aid efforts to impede illicit actors' ability to use legal entities to conceal proceeds from criminal acts that undermine U.S. national security and foreign policy interests and to protect the U.S. financial system from illicit use by, for example, adding critical data to financial analyses in law enforcement and tax investigations and providing essential information to the intelligence and national security professionals who work to prevent terrorists and other illicit actors from raising, hiding, or moving money in the United States through anonymous shell or front companies.  Broadly, and critically, BOI is crucial to identifying linkages between potential illicit actors and opaque business entities, including shell companies.  Implementing the law has been a central pillar of the United States' anti-corruption strategy, as well as ongoing efforts to raise the United States up to international standards for corporate transparency.

7.    The CTA directed FinCEN to implement its reporting requirements and certain other aspects of statute by regulation.  In September 2022, FinCEN issued a final rule implementing

3

A84

the reporting requirements of the CTA. *See* 87 Fed. Reg. 59,498 (codified at 31 C.F.R. § 1010.380, as amended by 88 Fed. Reg. 83,499). That rule describes who must file a BOI report, what information must be reported, and when a report is due. Specifically, the rule requires reporting companies to file reports with FinCEN that identify two categories of individuals: (1) the beneficial owners of the entity; and (2) the applicants of the entity. The rule, as later amended, also establishes the deadlines by which reporting companies must comply with the CTA's reporting requirements. For businesses created or registered before 2024, compliance is required by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii). For businesses created or registered during 2024, compliance is required within 90 days of their formation. *See id.* § 1010.380(a)(1)(i)(A). However, for businesses created or registered after 2024, compliance will be required within 30 days of their formation. *See id.* § 1010.380(a)(1)(i)(B).[2]

8.      FinCEN began accepting such BOI reports on January 1, 2024. As of December 2, 2024, FinCEN had received nearly 10 million BOI reports. In parallel, FinCEN began providing authorized government agencies with access to BOI reported under the CTA for law enforcement purposes.

9.      On December 3, 2024, the district court in this matter issued an order preliminarily enjoining—nationwide—the CTA, including, expressly, enforcement of the CTA and its reporting requirements, as well as staying all associated reporting deadlines. By curtailing FinCEN's CTA implementation efforts at this juncture, the district court's order fundamentally undermines U.S.

---

[2] In December 2023, FinCEN issued a final rule implementing the CTA's access procedures and safeguards, 88 Fed. Reg. 88732, with an effective date of February 20, 2024. That rule describes the circumstances under which BOI may be disclosed to authorized recipients (*e.g.*, Federal agencies engaged in national security, intelligence or law enforcement activity and state, local and tribal law enforcement agencies with court authorization) and how it must be protected.

anti-corruption efforts. The CTA and its implementing regulations require most covered entities—an estimated 32.6 million businesses nationwide—to file their BOI reports under the CTA by January 1, 2025. Treasury has devoted significant resources in advance of this deadline to raise awareness about that obligation and promote compliance. Treasury's efforts have been bearing fruit, with exponential growth in reporting rates in the weeks leading up to the injunction. The order voids this deadline for all entities, nullifies the filing obligations mandated under the CTA and its implementing regulations, and broadly enjoins any enforcement of the law. It thereby cripples Treasury's efforts to implement the law and sows confusion among entities regarding their reporting obligations. If the order is not stayed, the resulting harms to U.S. anti-corruption efforts—and, ultimately, the U.S. financial system as a whole—would likely be severe.

### FinCEN's CTA Implementation and Outreach Efforts

10. On December 8, 2021, building on an earlier advance notice of proposed rulemaking, FinCEN published a Notice of Proposed Rulemaking ("NPRM"), 86 Fed. Reg. 69920, to give the public an opportunity to review and comment on a proposed rule implementing the CTA's provisions requiring entities to report to FinCEN information about their beneficial owners and the individuals who created or registered the entities. FinCEN's final rule implementing these requirements, 87 Fed. Reg. 59498, was published September 30, 2022, and became effective January 1, 2024.

11. On December 22, 2023, FinCEN published a final rule implementing the CTA's access procedures and safeguards, 88 Fed. Reg. 88732, with an effective date of February 20, 2024. The CTA also requires FinCEN to amend certain existing customer due diligence regulations,

5

A86

codified at 31 C.F.R. § 1010.230, to bring them into conformance with the CTA. FinCEN anticipated publishing an associated NPRM in 2025.

12.    FinCEN has also published a range of guidance materials to assist the public with complying with the CTA's reporting requirements. These materials may be accessed through FinCEN's website at https://www.fincen.gov/boi, a webpage that has been viewed over 14 million times. Among other resources, these materials include a small entity compliance guide (available in more than 10 languages), an education and outreach toolkit, instructional videos, and over one hundred answers to frequently asked questions ("FAQs"). These FAQs are found at https://www.fincen.gov/boi-faqs. In addition, FinCEN has a dedicated Beneficial Ownership Contact Center that has resolved over 200,000 inquiries relating to the CTA's reporting requirements.

13.    FinCEN has also engaged in over 200 outreach events regarding the CTA's obligations, including meetings, conferences, and webinars with members of the public, as well as through industry associations, secretaries of state's offices, and partner agencies. I have participated in many of these events. Through these outreach events, FinCEN has responded to questions from a variety of stakeholders, including industry and trade groups, congressional offices, professional communities of interest, business owners, and the general public.

14.    Additionally, FinCEN has engaged in an expansive public service announcement ("PSA") campaign to increase public awareness about the CTA's reporting obligations, including highlighting the January 1, 2025, deadline. Since September 2023, FinCEN has invested over 4.3 million dollars in that campaign. Tens of millions of Americans have seen, heard, or read these PSAs across television, radio, newspaper, direct mail, and digital media. FinCEN has also prepared

6

A87

roughly 1.5 million postcards to mail directly to businesses across five states with lagging reporting rates to remind them of their CTA obligations.

15.     FinCEN has estimated that roughly 32.6 million companies are required to file BOI reports by January 1, 2025, under its regulations.  As of the date of the district court's order, nearly ten million reports had been filed with FinCEN.  The pace of filing, however, had recently increased.  In the last two months, FinCEN has more than doubled the number of BOI reports it had received over the prior eight months, with nearly one-third of all reports submitted in the three weeks preceding the injunction, with continued growth in the filing rate expected through the January 1, 2025, deadline for companies created or registered before 2024, *i.e.*, most companies required to report under the CTA.

16.     FinCEN had also begun providing access to BOI reported under the CTA to federal law enforcement agencies, with FinCEN itself and five federal law enforcement agencies receiving access as of the date of the injunction, and numerous other agencies engaged in law enforcement, intelligence, and national security activities had expected to receive access in the near future.

<u>**Harm to Treasury's Anti-corruption Efforts
and the U.S. AML/CFT Regime from the Court's Order**</u>

17.     The district court's order significantly disrupts FinCEN's implementation of the CTA in advance of its January 1, 2025, reporting deadline, and FinCEN would not be able to fully remediate that disruption even if the injunction were lifted at the conclusion of the appeal.

18.     FinCEN has expended significant resources over the past year—and particularly last few months—to educate previously established companies of the new reporting requirement.  As described above, FinCEN has been engaged in a multimedia, nationwide PSA campaign, including obligating more than $4.3 million in PSAs—money that cannot now be recouped—that has

informed tens of millions of people about their CTA obligations. FinCEN officials have dedicated thousands of hours at over more than 200 outreach events and through a dedicated contact center to addressing questions from potential filers. These efforts have been successful, with an exponential increase in reporting since the multimedia campaign began, increasing the filing rate to nearly one million reports filed per week in recent weeks. The district court's injunction negates those outreach efforts three weeks before the January 1, 2025, reporting deadline.

19.    Even if the injunction were ultimately overturned on appeal, the harm it would cause while in effect could not be fully remediated. The injunction has already created—and will continue to engender—widespread confusion among the public, including regulated parties. Such confusion harms the public and FinCEN. Reporting companies must clearly understand and have certainty about their compliance obligations for a reporting regime to be effective. On-again, off-again reporting requirements would significantly sink compliance rates; halting efforts just as there has been a significant increase in compliance would undermine the long-term success of the CTA and the BOI reporting program. If CTA implementation is suspended for a significant length of time, FinCEN would have substantial practical difficulty resuming implementation, re-educating the public about the reporting requirements, and effectively enforcing compliance.

20.    The injunction also prevents the United States from fulfilling international AML/CFT standards. The United States is currently preparing for its upcoming Financial Action Task Force ("FATF") mutual evaluation, with its written technical submission currently due mid-2025. The United States is a founding member of FATF, which is the leading international, inter-governmental task force whose purpose is the development and promotion of international standards and the effective implementation of legal, regulatory, and operational measures to combat

8

A89

money laundering, terrorist financing, the financing of proliferation, and other related threats to the integrity of the international financial system.  Among other things, FATF has established standards on transparency and BOI of legal persons, intended to deter and prevent the misuse of corporate vehicles.

21.    FATF last issued a mutual evaluation report on the United States in December 2016 and identified the lack of beneficial ownership information reporting requirements at that time as one of the fundamental gaps—due to the scale of misuse of legal entities by criminals in the United States and acting from overseas—in the U.S. AML/CFT regime, with the United States rated as non-compliant with these requirements.  Earlier this year, FATF upgraded the United States' rating on the FATF standard related to transparency and beneficial ownership of legal persons, frequently referencing the CTA in its follow-up report.  By enjoining enforcement of the CTA, the injunction risks causing the United States to receive negative ratings on related portions of its upcoming FATF evaluation.  Such ratings, reflecting a failure by the United States to address what FATF has identified as the United States' most fundamental gap in its AML/CFT regime for nearly a decade after the last mutual evaluation of the United States, could damage U.S. national and security interests in two ways.  First, the ratings would increase the chances that the United States could be added to the FATF grey list, a public list of countries with significant failings in their AML/CFT regimes.  Second, they would undermine the United States' ability to push other countries to make fundamental reforms to their AML/CFT regimes (in order to protect the global financial system) when the United States has failed to rectify significant deficiencies in its own regime, thereby damaging U.S. credibility and its ability to impact positive reforms in other nations.

22.    In sum, the CTA is a critical component of FinCEN's efforts to combat corruption, terrorist financing, money laundering, and other criminal activities.  It is a linchpin of the U.S. AML/CFT regime and needed to enable the United States to comply with international AML/CFT standards.  FinCEN, and Treasury more broadly, have devoted major resources over several years to ensure the CTA is implemented effectively, in particular by educating the public about its requirements through guidance materials, outreach events, PSAs, and other methods in recent months in preparation for the January 1, 2025, filing deadline.  If the injunction remains in place for any significant length of time, these resources will have been largely squandered, and the U.S. AML/CFT regime may never fully recover from the resulting public confusion about the CTA's beneficial ownership reporting requirements.  In FinCEN's judgment, the Court's order thus risks causing significant and irreparable harm to U.S. anti-corruption efforts and broader AML/CFT regime and thereby to the U.S. financial system as a whole.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 11, 2024.

Andrea Gacki
Director
Financial Crimes Enforcement Network

10

A91

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC.; DATA COMM FOR BUSINESS, INC.; RUSSELL STRAAYER; MUSTARDSEED LIVESTOCK, LLC; LIBERTARIAN PARTY OF MISSISSIPPI; and NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., | Case No: 4:24-cv-478 |
| *Plaintiffs*, | **COMPLAINT** |
| v. | |
| MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES; JANET L. YELLEN, SECRETARY OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK, | |
| *Defendants*. | |

## INTRODUCTION

Corporate formation, whether employed by a profit-making corporation, a small partnership, or an advocacy association, is a critical aspect of modern American law. "The corporate form is now the foundation of the modern market economy. Its benefits are well appreciated: permanent capital grants an autonomous and indefinite life, and a capacity for long-term investment." Giuseppe Dari-Mattiacci, Oscar Gelderblom, Joost Jonker & Enrico C. Perotti, *The Emergence of the Corporate Form*, 33 J.L. Econ. & Org. 193, 225 (2017).

The corporate form also serves critical social goals. "Political speech is indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Citizens United v. FEC*, 558 U.S. 310, 349 (2010) (citation omitted). Indeed, modern advocacy invariably relies on the corporate form to magnify its impact on public discourse. *See id.* And other aspects of the corporate form, including "identity shielding[,] is foundational to the very existence of many business enterprises that benefit society at large, including the supply of desirable products and services for consumers. Identity shielding particularly has a potential to unlock innovation because it may encourage the flow of capital and human collaboration for enterprises that may foster critical perspective about the status quo. Anonymity in the financing of business enterprises is also intimately connected to personal autonomy, such as safeguarding personal reputations and, in some cases, the physical safety of business owners." William J. Moon, *Anonymous Companies*, 71 DUKE L.J. 1425, 1433–34 (Apr. 2022).

As important as these corporate functions are to a free and flourishing society, it is a unique feature of our federalist system that the national government has no constitutional authority over general corporate formation. Instead, the several States have competed amongst themselves in their creation and supervision of corporate forms. "Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 OHIO ST. L.J. 1037, 1037–38 (1986).

At the founding, corporations were almost always "agencies of government . . . for the furtherance of community purposes." Pauline Maier, *The Revolutionary Origins of the American Corporation*, 50 WM. & MARY Q. 51, 55–56 (1993). As corporate forms began to evolve and the use of private corporations grew, often through state-chartered enterprises engaged in transportation and finance, the States maintained exclusive control over governance and formation. Brian Phillips Murphy, *Building the Empire State: Political Economy in the Early Republic* 12 (2015).

It is unsurprising, therefore, that the Framers both implicitly understood that the federal constitution lacked any control over state corporate law and even explicitly rejected a call for such authority. At the 1787 Constitutional Convention, James Madison proposed to grant Congress an enumerated power to charter federal corporations. Madison sought a general power "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 *The Records of the Federal Convention of 1787* 615 (Max Farrand ed., 1911) (Madison's notes). Rufus King of Massachusetts and George Mason of Virginia immediately protested that the States would not stand for it. *See id.* at 615–16. Madison's enlargement of congressional authority was soundly rejected and did not even get a vote. *See id.* at 616. Thus, "[t]he delegates were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy. They were more reluctant, however, to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose this course." Boyer, *supra* at 1041.

The national government was delegated certain enumerated powers that may be used to regulate specific activities of individuals and corporations that are created under state law—for instance, when such entities issue securities in interstate commerce or generate income subject to

federal tax. But the national government lacks any general power over corporate governance or control over how corporations operate. Indeed, this understanding has continued well into the modern era, with federal law forming an "overlay" on corporate conduct that deals "with the transfer of interests in those business entities" in interstate commerce, but never addressing corporate formation or governance itself. *See id.* at 1056. "The era of Populism, Theodore Roosevelt, and Woodrow Wilson, which produced the Sherman and Clayton Acts, the Pure Food and Drug Act, and the Federal Trade Commission, considered the matter, but ultimately chose to leave corporation law under state authority." *Id.* at 1050. Or, as the Supreme Court put it: "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987).

And yet, buried within almost 1500 pages of statutory text as a part of an end-of-the-year budget bill, the Corporate Transparency Act (CTA or Act) threatens to upend these time-honored principles. The Act seeks to federalize the internal affairs of tens of millions of entities, whether they constitute for-profit commercial enterprises, political advocacy organizations, or even religious groups, while compelling invasive disclosures to federal regulators for the express purpose of criminal investigation. By so doing, the Act threatens cherished privacy and associational interests in those entities, upsets the careful balance between state and federal actors, and imposes chilling criminal consequences for millions of presumptively innocent people.

In short, the Act is an unconstitutional affront to the individual rights of Americans. This Court should therefore enter a declaratory judgment and permanent injunction prohibiting defendants from enforcing the Act and vacating its implementing regulations.

## PARTIES

1.      Texas Top Cop Shop, Inc., is a Texas corporation, registered with the Texas Secretary of State, with all operations and its principal place of business in Conroe, Texas.

2.      Plaintiff Data Comm for Business, Inc. (Data Comm), is a Delaware corporation with operations in Illinois and Texas. Data Comm is registered to do business as a foreign corporation with the Illinois Secretary of State. Data Comm's principal place of business is in Collin County, Texas.

3.      Plaintiff Russell Straayer is an individual residing in Collin County, Texas.

4.      Plaintiff Mustardseed Livestock, LLC (Mustardseed), is a Wyoming limited liability company registered with the Wyoming Secretary of State. Mustardseed's principal place of business is Lingle, Wyoming, and each of its members reside in Wyoming.

5.      Plaintiff Libertarian Party of Mississippi (MSLP) is a non-profit corporation organized under the laws of Mississippi and registered to do business with the Mississippi Secretary of State. MSLP's principal place of business is in Biloxi, Mississippi.

6.      Plaintiff National Federation of Independent Business, Inc. (NFIB) is the nation's leading small business advocacy organization. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. It represents approximately 300,000 independent business owners located throughout the United States and in a wide variety of industries. NFIB is a nonprofit corporation headquartered in Tennessee.

7.      Plaintiffs Texas Top Cop Shop and Data Comm are members of NFIB.

8.      Defendant Merrick Garland is the Attorney General of the United States and is sued in his official capacity as the chief law enforcement officer of the United States.

9.      AG Garland is responsible for the uniform administration and enforcement of federal criminal law in the United States, including the offenses created by the CTA.

10.     Defendant Janet L. Yellen is the United States Secretary of the Treasury and is sued in her official capacity as the head of the U.S. Department of the Treasury.

11.     Defendant U.S. Department of the Treasury is an executive agency of the United States tasked with administration and enforcement of the CTA and its implementing regulations.

12.     Defendant Andrea Gacki is the Director of the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of the Treasury, and is sued in her official capacity as head of FinCEN.

13.     Defendant Financial Crimes Enforcement Network is a bureau of a federal agency tasked with administration and enforcement of the CTA and its implementing regulations.

14.     Throughout this Complaint, Defendants are referred to jointly as the United States or Treasury except where otherwise specified.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

16.     This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706(2).

17.     Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1), because a defendant resides in this district, certain plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and in this division.

## STATEMENT OF FACTS

### I. LEGAL BACKGROUND

### A. The Corporate Transparency Act

18.     On January 1, 2021, the Corporate Transparency Act (CTA or Act) was enacted as Section 6401 of the William M. (Mac) Thornberry National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. 116-283.

19.     Section 6402(5) of the NDAA provided the "sense of Congress that" "Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to— (A) set a clear, Federal standard for incorporation practices; (B) protect vital Unites (sic) States national security interests; (C) protect interstate and foreign commerce; (D) better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards."

20.     Section 6403 created new "beneficial ownership information reporting requirements" codified at 31 U.S.C. § 5336.

21.     "In accordance with regulations prescribed by the Secretary of the Treasury," the CTA provided that "each reporting company shall submit to FinCEN a report" "identify[ing] each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by" "full legal name," "date of birth," "current, as of the date on which the report is delivered, residential or business street address," and "unique identifying number from an acceptable identification document" or "FinCEN identifier." 31 U.S.C. §§ 5336(b)(1)(A), (b)(2)(A).

A98

22.     "Acceptable identification" is a nonexpired passport, or an identification document issued by a U.S. state, local government, or Indian Tribe, or a U.S. state driver's license. *Id.* at § (a)(1).

23.     For "existing entities," *i.e.*, "any reporting company that has been formed or registered before the effective date of the regulations prescribed under" the CTA, their reports must be filed in "accordance with regulations prescribed by the Secretary of the Treasury," and not later than 2 years after the effective date of regulations prescribed by the Secretary. *Id.* at § (b)(1)(B).

24.     "In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN" relevant reports. *Id.* at § (b)(1)(C).

25.     Reporting companies must file "updated report[s] for changes in beneficial ownership" in "accordance with regulations prescribed by the Secretary of the Treasury," "and not later than 1 year after the date on which there is a change" in relevant information. *Id.* at § (b)(1)(D).

26.     An entity's "applicant" is the person who filed relevant organizing documents with the state secretary, and this person must also be identified in the FinCEN report regardless of whether he or she is also a "beneficial owner" of the entity. *See id.* §§ (a)(2), (b)(2)(A).

27.     "The term 'reporting company'—[] means a corporation, limited liability company, or other similar entity that is—(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe[.]" *Id.* at § (a)(11)(A).

28.     However, the CTA statutorily exempts 23 types of entities from this definition, including:

      a.   issuers of securities,

b.   government entities,

c.   banks,

d.   credit unions,

e.   bank holding companies,

f.   money transmitting businesses,

g.   brokers or dealers of securities,

h.   securities exchanges or clearing agencies,

i.   any other entity registered with the Securities and Exchange Commission,

j.   registered investment companies,

k.   investment advisers,

l.   insurance companies,

m.   insurance producers,

n.   entities registered with the Commodity Futures Trading Commission,

o.   public accounting firms,

p.   public utilities,

q.   financial market utilities,

r.   pooled investment vehicles,

s.   organizations with an active tax-exempt status under section 501(c) or 527(a) of the Internal Revenue Code, or trusts described in section 4947(a) of the Internal Revenue Code,

t.   certain holding companies related to those tax-exempt entities,

u.   any entity that "employs more than 20 employees on a full-time basis in the United States," had "more than $5,000,000 in gross receipts or sales in the aggregate," in

its last tax year and "has an operating presence at a physical office within the United States,"

v.   entities that own or control exempt entities, and

w.   dormant entities – those "in existence for over 1 year," "not engaged in active business," "not owned, directly or indirectly, by a foreign person" "that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest)" and "that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity." 31 U.S.C. §§ 5336(a)(11)(B)(i)-(xxiii).

29.   The CTA also delegates to the Secretary of the Treasury the discretion to exempt additional classes of entities when filing requirements "would not serve the public interest" and "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id.* at § (a)(11)(B)(xxiv).

30.   The term "beneficial owner" in the Act—"means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at § (a)(3).

31.   The Act's coverage is both wildly over- and under-inclusive of the entities that are arguably important to serve the Act's stated purposes. It is over-inclusive because the Act's coverage

formula is extraordinarily broad with respect to the approximate 32.6 million existing small entities that it captures in its dragnet. And yet, the Act is under-inclusive of large corporations and especially financial institutions that would seem to be prime targets for those engaging in knowing or unwitting money laundering—given that these institutions succeeded in securing exemptions from coverage when the Act was added to the NDAA legislation.

32.     And yet, no further exemptions have been granted under the constitutionally questionable delegation of lawmaking power to determine who is and is not subject to potential criminal liability. Thus, the Act covers countless millions of small entities, with or without commercial or international trade activities, that bear proportionally higher compliance costs than larger corporations (assuming they are even aware of the Act's existence).

33.     Once reports are filed, FinCEN must retain the information for "not fewer than 5 years after the date on which the reporting company terminates," and "may disclose" the information upon request "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity" or "from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation." 31 U.S.C. §§ 5336(c)(1), (2)(B).

34.     FinCEN may also disclose beneficial ownership information upon certain requests from foreign entities, "financial institution[s] subject to customer due diligence requirements," or "a Federal functional regulator or other appropriate regulatory agency." *Id.* at § (c)(2)(B).

35.     Willful failures "to report complete or updated beneficial ownership information," or willfully "provid[ing], or attempt[ing] to provide, false or fraudulent beneficial ownership information" is unlawful, and punishable by "a civil penalty of not more than $500 for each day

that the violation continues or has not been remedied" and criminal penalties of a fine of "not more than $10,000," or a sentence of imprisonment "for not more than 2 years, or both." *Id.* at §§ (h)(1)-(3).

36.    Beneficial ownership information is also presumptively "confidential," and disclosure except as authorized by the Act is likewise subject to civil and criminal penalties. 31 U.S.C. § 5336(h)(2).

37.    There is significant evidence that the CTA was intended, at least in part, to compel disclosures of the identities of political donors. The original version of the Act was introduced in 2017, and its co-sponsor Senator Sheldon Whitehouse was explicit about his goals. In a speech Senator Whitehouse gave on the Senate floor in 2017, he explained that a beneficial ownership reporting regime would provide a means of stopping what he saw as the "unprecedented dark money flow into our elections from anonymous dark money organizations, groups that we allow to hide the identities of their big donors," such as "American dark money emperors, like the Koch brothers." Congressional Record, Vol. 163, No. 101 at S3468 (Senate, June 14, 2017). Senator Whitehouse blamed this perceived problem on "the *Citizens United* decision," which "permit[ed] big money to flow through dark money channels." *Id.* Requiring disclosures of "beneficial ownership" information was the antidote to anonymous political donations. *Id.* By tracking "the actual owners of companies" law enforcement could stop entities from "funneling money into our elections through faceless shell companies," and allow the government to determine "the identities behind big political spending." *Id.* at S3469. Since the Act was passed, it has even been hailed by commentators because it "can shine light on dark money in U.S. elections." Devon Himelman, *How the Corporate Transparency Act Can Shine Light on Dark Money in U.S. Elections*, Global Anticorruption            Blog          (April           15,          2022),          *available          at*

https://globalanticorruptionblog.com/2022/04/15/how-the-corporate-transparency-act-can-shine-light-on-dark-money-in-u-s-elections/.

### B. Implementing Regulations

38.     On September 30, 2022, Treasury and FinCEN issued implementing regulations, Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498 (Sept. 30, 2022) (Reporting Rule).

39.     According to Treasury: "These regulations implement Section 6403 of the Corporate Transparency Act (CTA), enacted into law as part of the National Defense Authorization Act for Fiscal Year 2021 (NDAA), and describe who must file a report, what information must be provided, and when a report is due. These requirements are intended to help prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity, while minimizing the burden on entities doing business in the United States." Reporting Rule, 87 Fed. Reg. at 59498.

40.     The Reporting Rule mostly tracked the CTA's statutory language, and set out comprehensive requirements at 31 C.F.R. Part 1010.

41.     The Reporting Rule also provided that any "reporting company created on or after January 1, 2024 shall file a report within 30 calendar days of the earlier of the date on which it receives actual notice that its creation has become effective or the date on which a secretary of state or similar office first provides public notice . . . that the [] reporting company has been created." 31 C.F.R. §§ 1010.380(a)(1)(i), (ii).

42.     "Any domestic reporting company created before January 1, 2024 and any entity that became a foreign reporting company before January 1, 2024 shall file a report not later than January 1, 2025." *Id.* at § (a)(1)(iii).

43.     Corrected or updated information must be filed "within 30 calendar days" of changes of reportable information. *Id.* at §§ (a)(2), (3).

44.     The Reporting Rule further defined a beneficial owner's "substantial control" in non-exhaustive terms, including where an individual: "(A) Serves as a senior officer of the reporting company; (B) Has authority over the appointment or removal of any senior officer or a majority of the board of directors (or similar body); (C) Directs, determines, or has substantial influence over important decisions made by the reporting company, including decisions regarding: (1) The nature, scope, and attributes of the business of the reporting company, including the sale, lease, mortgage, or other transfer of any principal assets of the reporting company; (2) The reorganization, dissolution, or merger of the reporting company; (3) Major expenditures or investments, issuances of any equity, incurrence of any significant debt, or approval of the operating budget of the reporting company; (4) The selection or termination of business lines or ventures, or geographic focus, of the reporting company; (5) Compensation schemes and incentive programs for senior officers; (6) The entry into or termination, or the fulfillment or non-fulfillment, of significant contracts; (7) Amendments of any substantial governance documents of the reporting company, including the articles of incorporation or similar formation documents, bylaws, and significant policies or procedures; or (D) Has any other form of substantial control over the reporting company." 31 C.F.R. § 1010.380(d)(1)(i).

45.     The Reporting Rule adopts a similarly expansive definition of "direct or indirect exercise of substantial control," providing that an "individual may directly or indirectly, including as a trustee of a trust or similar arrangement, exercise substantial control over a reporting company through: (A) Board representation; (B) Ownership or control of a majority of the voting power or voting rights of the reporting company; (C) Rights associated with any financing arrangement or

interest in a company; (D) Control over one or more intermediary entities that separately or collectively exercise substantial control over a reporting company; (E) Arrangements or financial or business relationships, whether formal or informal, with other individuals or entities acting as nominees; or (F) any other contract, arrangement, understanding, relationship, or otherwise." *Id.* at § (d)(1)(ii).

46.     The Reporting Rule also declined to create additional categories of exemptions; instead, it merely set out the 23 categories found in the statute. *See id.* at § (c)(2).

47.     With respect to exemptions for tax-exempt entities, the rule adopts the statutory exemption verbatim. *See id.* at § (c)(2)(xix). FinCEN also pointedly rejected the argument that the exemption extend to "entities that had applied to the IRS for tax-exempt status but were still awaiting a determination" or other "nonprofits . . . that did not qualify for tax-exempt status under section 501(c) of the Internal Revenue Code." Reporting Rule, 87 Fed. Reg. at 59541. Instead, FinCEN relied on "concerns raised about potential exploitation of this exemption as well as the following exemption for entities assisting tax-exempt entities." *Id.* at 59541–42.

## II. THE EFFECT ON PLAINTIFFS

48.     As FinCEN recognized, the Act and its Reporting Rule "will have a significant economic impact on a substantial number of small entities." *Id.* at 59549.

49.     "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59584.

50.     "Assuming that all reporting companies are small businesses, the burden hours for filing [beneficial ownership information] BOI reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35

million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585–86.

51.    Plaintiffs are just some of those affected entities.

### A. Texas Top Cop Shop, Inc.

52.    Plaintiff Texas Top Cop Shop, Inc., is a corporation organized under the laws of Texas and registered with the Texas Secretary of State since 2017.

53.    Texas Top Cop Shop is a family-run business that operates a single retail storefront in Conroe, Texas, which sells uniforms and equipment for first responders, such as police officers and emergency services personnel.

54.    Texas Top Cop Shop sells its merchandise locally and does not sell any items out of state or through the internet.

55.    Texas Top Cop Shop has four employees, including its owners.

56.    Texas Top Cop Shop is a licensed dealer of firearms. To obtain such a license, its owners were thoroughly investigated and determined to be law-abiding U.S. citizens.

57.    Texas Top Cop Shop has designated a registered agent and office location with the State of Texas, but has not disclosed the identities of each of its officers, shareholders, and beneficial owners.

58.    Under Texas law, "[a] corporation is presumed to be a separate entity from its officers and shareholders. As a result, the corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations." *Durham v. Accardi*, 587 S.W.3d 179, 184 (Tex. App.—Houston [14th Dist.] 2019) (citations omitted).

59.     While a corporation must register with the Texas Secretary of State, it need not disclose the identities of all of its beneficial owners. *See* Texas Business Organizations Code § 20.001 (filing requirements).

60.     As a pre-existing corporation registered with the Texas Secretary of State, Texas Top Cop Shop would be required to comply with the CTA and must file beneficial ownership reports with FinCEN before January 1, 2025.

61.     Texas Top Cop Shop would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

62.     Texas Top Cop Shop has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Texas Top Cop Shop objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

63.     Texas Top Cop Shop advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

**B. Data Comm for Business, Inc.**

64.     Plaintiff Data Comm for Business, Inc., is a Delaware corporation with operations in Illinois and Texas. Data Comm is registered to do business as a foreign corporation with the Illinois Secretary of State.

65.     Data Comm is a small business that provides technical support, information technology, and communications products and services to other small businesses and individuals, as well as utility companies and federal agencies.

66.     Data Comm conducts many of its operations in Illinois, but several of its officers, directors, and owners reside in Texas. Its principal place of business is in Plano, Texas.

67.     Data Comm has 10 employees.

68.     As a Delaware corporation, Data Comm is a distinct legal entity from its officers, directors, and owners. *See Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973) (discussing corporate veil).

69.     Data Comm is not required to disclose the identities of its beneficial owners as a condition of registering to do business in Illinois. *See* 805 ILCS 5/13.05 (filing requirements for foreign corporations).

70.     As a pre-existing corporation registered with the Illinois Secretary of State, Data Comm would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

71.     Data Comm would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

72.     Data Comm has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Data Comm objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

73.     Data Comm advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### C. Russell Straayer

74.     Plaintiff Russell Straayer is an individual residing in Collin County, Texas.

75.     Straayer is a "beneficial owner" of multiple "reporting companies" as those terms are defined by the CTA.

76.     For example, Straayer is a beneficial owner and officer of Data Comm, where he serves as Chief Executive Officer.

77.     Straayer is not the only beneficial owner of Data Comm, however.

78.     Straayer is also a beneficial owner of other reporting companies that are not a party to this litigation.

79.     Straayer has been a vocal opponent of the CTA, and has publicly stated his individual opposition to the Act.

80.     One of the reporting companies for which Straayer is a beneficial owner, does not take a public stance on the validity or wisdom of the CTA, and does not wish to be associated with Straayer's advocacy.

81.     Straayer has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose all of his beneficial ownership interests in various entities (as defined by the CTA) absent a judicial declaration that he is required to comply with the CTA and the Reporting Rule, because he objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

### D. Mustardseed Livestock LLC

82.     Plaintiff Mustardseed Livestock LLC is a limited liability company organized under the laws of Wyoming and registered with the Wyoming Secretary of State since 2020.

83.     Mustardseed operates a small dairy farm in Lingle, Wyoming, and does business only in the State of Wyoming.

84.     Mustardseed operates primarily as a small family farm and does not engage in interstate commercial activities.

85.     Mustardseed consumes most of its production on its own property, but it occasionally sells surplus raw milk directly to customers in Wyoming.

86.     In 2023, Mustardseed's gross income from milk sales did not exceed $30,000.

87.     Mustardseed's gross income for all sources in 2024 is not expected to exceed $50,000.

88.     Mustardseed has designated a registered agent and registered office, but has not disclosed to the State of Wyoming the identities of each of its members.

89.     A Wyoming LLC "is an entity distinct from its members," and "may have any lawful purpose regardless of whether for profit." Wyo. Stat. §§ 17-29-104(a),(b).

90.     Wyoming law "governs . . . [t]he internal affairs of a limited liability company[.]" Wyo. Stat. § 17-29-106.

91.     Wyoming state law permits anonymous ownership in LLCs, and requires only that an LLC disclose a registered agent, who may or may not have an ownership interest in the company, and a registered office within the state where it will accept service of process. *See* Wyo. Stat. §§ 17-28-106 (registration requirements generally), 17-29-113(a) (rules for LLCs).

92.     As a pre-existing LLC registered with the Wyoming Secretary of State, Mustardseed would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

93.     Mustardseed would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

94.     Mustardseed has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Mustardseed objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

95.     Mustardseed advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### E. Libertarian Party of Mississippi

96.     MSLP is a political organization, whose members seek to advance the platform of the National Libertarian Party within the State of Mississippi, through advocacy and elections for state and local office.

97.     MSLP is organized under the laws of the State of Mississippi, and is currently registered with the Mississippi Secretary of State.

98.     MSLP is committed to individual liberty and personal responsibility, a free-market economy of abundance and prosperity, and a foreign policy of non-intervention, peace, and free trade. MSLP further seeks a world of liberty; a world in which all individuals control their own lives and are never forced to compromise their values or sacrifice their property.

99.     MSLP espouses and promotes a robust separation of the state and federal government, and believes that individual liberty can best be protected by a strictly-limited federal governmentthat does not interfere with or restrict the rights of individuals.

100.    MSLP espouses and advocates for the adoption of the National Libertarian Party's platform within Mississippi state and local government.

101.    MSLP specifically advocates for the promotion and protection of individual privacy and government transparency. MSLP is committed to ending the government's practice of spying on everyone. MSLP supports the rights recognized by the Fourth Amendment to be secure in our persons, homes, property, and communications. MSLP believes that protection from unreasonable searches and seizures should include records held by third parties, such as email, medical, and library records.

102.    MSLP also advocates and supports the right to liberty of speech and action—accordingly it opposes all attempts by government to abridge the freedom of speech and press, as well as government censorship in any form.

103.    MSLP has publicly advocated for the repeal of the CTA because its obligations impermissibly intrude on state sovereignty, it subjects law-abiding people to unconstitutional restrictions on free speech and association, and unlawfully intrudes into citizens' private papers and effects.

104.    MSLP is not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code, and thus is required to comply with the CTA.

105.    MSLP has no physical office, instead conducting its activities through its members.

106.    MSLP is a political organization that receives donations from individuals and entities, which it uses to promote political candidates for office in Mississippi and policies affecting the residents of the state.

107.    MSLP has less than $20,000 in assets, which it derived from donations, and which it uses solely for political expenditures for local candidates for office in the State of Mississippi, or state and local public policy issues affecting the residents of Mississippi.

108.    MSLP does not engage in economic activities outside of the State of Mississippi, and does not make political expenditures for candidates or issues outside of the state.

109.    MSLP has designated a registered agent and registered address with the State of Mississippi, but has not disclosed the identities of each of its members, officers, delegates, volunteers, major donors, or others who have beneficial ownership interests or substantial control over MSLP.

110.    MSLP's bylaws control its corporate operations, and provide for governance by officers, each of whom must be a member of the state party and chosen by party members as officers, as well as appointment of governing committees, and voting delegates.

111.    MSLP's bylaws require that a majority of its executive committee, which is comprised of state party officials, must authorize the expenditure of any party money.

112.    MSLP's bylaws also provide for amendment of the bylaws at the suggestion of any member of the state party, and will be enacted by a 2/3 majority of voting delegates, which are registered members of the state party.

113.    Mississippi law regards MSLP as a distinct legal entity, separate from its members, and does not require disclosure of its members, officers, beneficial owners or control persons. *See* Miss. Code §§ 79-11-105 (requirements for filing of documents); 79-11-181 (liability of members).

114.    Mississippi also specifically forbids use and disclosure of "a membership list or any part thereof" of a nonprofit corporation, without the consent of the board. *See* Miss. Code § 79-11-291.

115.    As a pre-existing nonprofit corporation registered with the Mississippi Secretary of State, MSLP would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

116.    MSLP would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

117.    MSLP has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because MSLP objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

118.    MSLP advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### F. NFIB and Its Members

119.    The National Federation of Independent Business, Inc., is a tax-exempt organization under section 501(c) of the Internal Revenue Code and is exempt from the CTA and the Reporting Rule.

120.    While NFIB is exempt from the CTA, significant numbers of its approximately 300,000 members would be required to comply with the Act. These members include:

a.   Plaintiffs Texas Top Cop Shop and Data Comm; and

b.   Grazing Systems Supply, Inc., which is an Indiana corporation, registered to do business with the Indiana Secretary of State, with its principal place of business in Batesville, Indiana. Grazing Systems Supply, Inc. is a family-owned and family-run business. Started in 1989 as a part time business, it has successfully grown to a full-time agricultural supply business specializing in seed and fencing sales. Grazing Systems Supply, Inc. has five total employees. Because Grazing Systems Supply, Inc. has fewer than 20 full-time employees, it must comply with the reporting requirements of the CTA.

121.    NFIB's members would be forced to incur compliance costs should they file the required reports, including the cost of legal services related to reviewing relevant records and filings.

122.    NFIB and its members oppose the CTA, and NFIB has advocated publicly for its repeal on behalf of its members that must comply with the Act and the Reporting Rule.

123.    As an example of NFIB's advocacy, on April 30, 2024, NFIB sent a letter on behalf of its members to the U.S. House Committee on Small Business, urging Congress to repeal the CTA. (Exhibit A).

124.    Individual NFIB members, including Plaintiff Data Comm and Grazing Systems Supply, Inc., likewise advocated on their own behalf for the CTA's repeal in an NFIB-led letter to the U.S. House Committee on Small Business. (Exhibit A at 5-6). Data Comm and Grazing Systems Supply, Inc., advocated for the CTA's repeal through their corporate entities in part to protect the associational privacy interests of their beneficial owners.

## COUNT I—VIOLATION OF U.S. CONSTITUTION
### The CTA Exceeds Congress's Authority Over the States
### (U.S. Const. Art. I, amends. IX, X)

125.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

126.    The federal government is one of limited, enumerated, powers.

127.    The Tenth Amendment confirms that the federal Constitution reserves all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," "to the States respectively, or to the people."

128.    An individual plaintiff may challenge federal action as exceeding Congress's limited, and enumerated, powers. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete,

particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

129.    "Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Boyer, *supra* at 1037–38.

130.    For the first time in our nation's history, however, Congress has attempted to "set a clear, Federal standard for incorporation practices" using the CTA. 31 U.S.C. § 5336 note (5)(A).

131.    The CTA thus displaces state control over corporate formation and internal affairs, regardless of whether a local entity engages in any interstate or national conduct.

132.    "The Corporate Transparency Act is unconstitutional because it cannot be justified as an exercise of Congress' enumerated powers." *Nat'l Small Bus. United v. Yellen*, --- F.Supp.3d ---, No. 5:22-cv-1448-LCB, 2024 WL 899372, at *21 (N.D. Ala. Mar. 1, 2024), *appeal filed* at No. 24-10736 (11th Cir.).

133.    This is because the Act, on its face, requires "reporting companies" to create records and file them with the federal government, regardless of whether those companies engage in *any activity* that is within the scope of Congress's enumerated powers, such as interstate or foreign commerce or incurring federal tax liability. Instead, the Act improperly compels action merely because an entity has been formed as a matter of state law. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Congress may "anticipate the effects on commerce of an economic activity," but it has never been "permitted . . . to anticipate that activity itself in order to regulate individuals not currently engaged in commerce.").

134.     As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

**COUNT II—VIOLATION OF U.S. CONSTITUTION**
**The CTA Improperly Compels Speech and Burdens Association**
**(U.S. Const. amend. I)**

135.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

136.     The First Amendment prohibits Congress from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

137.     The Supreme Court has "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United v. FEC*, 558 U.S. 310, 343 (2010) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783).

138.     Implicit in the First Amendment's protections is the right of anonymous association. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–08 (2021) (*AFP*) (plurality op.). Indeed, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

139.     "Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFP*, 594 U.S. at 608. "Under that standard, there must be a substantial

A118

relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. at 607 (cleaned up). Further, "a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 611.

140.    The CTA compels disclosure of "beneficial ownership" information to FinCEN, and potentially to state and local law enforcement and federal regulators—but those "beneficial owners" include individuals who "indirectly" "exercise[] substantial control over the entity," even when that control might not be formalized. 31 U.S.C. § 5336(a)(3)(A). Even the Act recognizes that beneficial ownership is presumptively "confidential" Information. *Id.* at § 5336(c)(2)(A).

141.    This means that key employees, directors, indirect beneficiaries, and significant donors must disclose their identities. *Id*.; *accord* 31 C.F.R. § 1010.380(d)(1)(ii).

142.    Furthermore, the Congressional record affirms that the Act was intended to allow the government to determine "the identities behind big political spending." Congressional Record, Vol. 163, No. 101 at S3469.

143.    Plaintiffs have engaged in expressive association through their corporate entities, such as advocating for the repeal of the Act.

144.    Plaintiffs have a protected interest in maintaining the anonymity of their beneficial owners (as defined by the Act), because they have chosen to engage in expressive advocacy through their corporate forms.

145.    The Act's stated goals are to "(A) set a clear, Federal standard for incorporation practices; (B) protect vital Unites (sic) States national security interests; (C) protect interstate and foreign commerce; (D) better enable critical national security, intelligence, and law enforcement efforts to

counter money laundering, the financing of terrorism, and other illicit activity; and (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards."

146.   The Act is not narrowly tailored to any of its goals, however, as applying the statute to every state corporation or limited liability company, such as Plaintiffs, no matter an entity's size or purpose, and even when they lack any assets at all, does not advance any of these aims.

147.   Likewise, the fact that the statute exempts large corporations and 22 other types of entities, almost all of which are primarily or even exclusively involved in financial transactions, shows that the statute is not narrowly tailored to investigating and preventing financial crimes. *See* 31 U.S.C. § 5336(a)(11)(B). Indeed, FinCEN rejected calls to narrow the statutes reach, because of its dubious insistence that there remains the remote possibility that any charity may still be involved in illicit transactions. *See* Reporting Rule, 87 Fed. Reg. at 59541–42.

148.   As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT III—VIOLATION OF U.S. CONSTITUTION
### The CTA Unconstitutionally Compels Disclosure of Private Information
### (U.S. Const. amend. IV)

149.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

150.   The Fourth Amendment protects the right of the people to be secure in their "persons, houses, papers, and effects" against unreasonable searches and seizures.

151.   "[A]n order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment." *Hale v. Henkel*, 201 U.S. 43, 76 (1906). The "compulsory production of private papers," is both a search and seizure. *Id*. The "papers" protected

by the Fourth Amendment include business records. *See id.* 76–77 (subpoena for "all understandings, contracts or correspondence" between corporation and others and "reports made and accounts rendered by such companies from the date of the organization" was unreasonable under the Fourth Amendment).

152.    The CTA compels disclosure of "sensitive" and "confidential" information to the government for the express purpose of criminal investigation.

153.    Plaintiffs have protected interests in their beneficial ownership information, including interests in the anonymity of their members for expressive purposes, and have protected the information subject to CTA disclosures.

154.    Under the Act, however, a reporting company cannot refuse to disclose private information to the government and can face criminal penalties for noncompliance.

155.    The Act requires disclosure without any particularized suspicion of wrongdoing and without any precompliance review process where a reporting company can challenge the Act's requirements. The Act also authorizes disclosure of private, personal information to foreign governments, federal regulators, and regulatory agencies for the purposes of law enforcement, without any court authorization or specific requirements regarding those agencies' need for the information.

156.    The CTA's mandatory reporting requirements violate the Fourth Amendment's protections against unreasonable searches and seizures. *See City of L.A. v. Patel*, 576 U.S. 409, 419–20 (2015).

157.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## COUNT IV—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### The Reporting Rule Is Not In Accordance With Law And Is Contrary to Constitutional Right
### (5 U.S.C. § 706(2))

158.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

159.    The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" any agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

160.    The Reporting Rule is "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

161.    The Reporting Rule, issued after notice and comment rulemaking, marks the consummation of Treasury's decision-making process concerning the implementation of the CTA.

162.    The Reporting Rule also determines rights and legal obligations, as it purports to establish filing deadlines, including the time to file initial reports and corrected reports, and sets out criteria for determining what information must be reported.

163.    The Act's reporting requirements exceed Congress's power, and violate First and Fourth Amendment protections. Thus the Reporting Rule is constitutionally invalid.

164.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring Defendants from enforcing the Reporting Rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i) The issuance of an injunction prohibiting Defendants from enforcing the Corporate Transparency Act and the Reporting Rule pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, invalidating the Corporate Transparency Act and holding unlawful and setting aside the Reporting Rule;

(iii) An award of attorneys' fees and costs to Plaintiffs; and

(iv) Any other relief as the Court deems just, equitable and proper.

May 28, 2024

Respectfully submitted,

*/s/ John C. Sullivan*
John C. Sullivan
Texas Bar No. 24083920
**S|L Law PLLC**
610 Uptown Blvd, Suite 2000
Cedar Hill, TX 75104
T: 469.523.1351
F: 469.613.0891
john.sullivan@the-sl-lawfirm.com

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg*
Todd Gaziano*
**Center for Individual Rights**
1100 Connecticut Ave. NW
Suite 620
Washington, DC, 20036
kruckenberg@cir-usa.org
gaziano@cir-usa.org

*Counsel for Plaintiffs*

*Motion for Admission *Pro Hac Vice* Pending

A124

Exhibit A



555 12th St NW, Suite 1001
Washington, D.C. 20004

1-800-552-5342
NFIB.com

April 30, 2024

The Honorable Roger Williams                    The Honorable Nydia Velazquez
Chairman                                        Ranking Member
Committee on Small Business                     Committee on Small Business
U.S. House of Representatives                    U.S. House of Representatives
Washington, D.C. 20515                          Washington, D.C. 20515

Dear Chairman Williams and Ranking Member Velazquez,

On behalf of NFIB, the nation's leading small business advocacy organization, I write regarding the hearing entitled, "Under the Microscope: Examining FinCEN's Implementation of the Corporate Transparency Act." NFIB's nearly 300,000 small businesses appreciate the opportunity to discuss their concerns with the burdensome beneficial ownership reporting requirement and the need for Congress to repeal the poorly written, ambiguous Corporate Transparency Act (CTA).

On January 1, 2021, the CTA was signed into law as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.[1] In doing so, Congress imposed one of the most expansive small business regulations in history as an amendment to an unrelated and must-pass bill.

For many years, NFIB opposed Congressional efforts to impose these vague and arbitrary reporting requirements on the smallest businesses. However, Congress ultimately ignored the concerns of small businesses and rammed through a burdensome law that affects 32.6 million small businesses in 2024 and 5 to 6 million small businesses every year thereafter. According to FinCEN, the regulatory costs of the CTA is a whopping $22.7 billion in 2024 and $5.6 billion every year after.[2]

---

[1] TITLE LXIV—ESTABLISHING BENEFICIAL OWNERSHIP INFORMATION REPORTING REQUIREMENTS, William M. ( Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Public Law 116-283, January 1, 2021, https://www.congress.gov/116/plaws/publ283/PLAW-116publ283.pdf
[2] Beneficial Ownership Information Reporting Requirements, Final Rule, Financial Crimes Enforcement Network, September 30, 2022, https://www.regulations.gov/document/FINCEN-2021-0005-0461.

A126

According to a recent survey, 83 percent of NFIB members are not familiar with the beneficial ownership reporting requirements that went into effect on January 1, 2024.[3] However, if these businesses fail to comply with a law they overwhelmingly don't know exists, they could face up to a $10,000 fine and 2 years in prison.

Through the CTA, Congress has subjected tens of millions of law-abiding small business owners across the country to criminal penalties for simple paperwork violations. Members of Congress often talk about reducing red tape for small businesses. However, Congress largely ignores this massive new burden on small businesses it created in 2021.

As more business owners become aware of these requirements and the penalties for noncompliance, the calls to repeal the CTA will increase. Thankfully, Senator Tommy Tuberville and Representative Warren Davidson's *Repealing Big Brother Overreach Act* will repeal the vague and burdensome law. Senator Tuberville and Representative Davidson understand this is not an agency implementation problem, it is a problem with the law that gave the government a new, broad data collection and enforcement authority.

By introducing this legislation, Senator Tuberville and Representative Davidson have heard the concerns of small business owners and are taking action. Small businesses are grateful for their leadership and hope the members of this Committee will cosponsor the legislation to repeal the CTA. To further highlight the need to repeal the CTA, please see the stories of small business owners that are included with this statement.

NFIB appreciates your leadership to eliminate red tape for small businesses and encourages you to repeal the Corporate Transparency Act. We look forward to working with you on ways to provide small businesses relief during the remainder of the 118th Congress.

Sincerely,

Josh McLeod
Director, Federal Government Relations
NFIB

---

[3] Holly Wade, *Financing Sales Survey*, NFIB Research Center, December 2023, https://strgnfibcom.blob.core.windows.net/nfibcom/Financing-Sales-Survey.pdf.



**Company Name:** Rendex, Inc.T/A Integrated Services Group and Events
**Location:** North Haledon,  NJ
**Number of Employees:** 2
**Beneficial Ownership Impact:**

I am a micro business owner serving other small business owners.

I help my clients with any administrative forms or requests they RECEIVE from the state, IRS, their insurance companies, etc.

Unfortunately, none of us _received_ a notification of this new requirement. One of my clients learned about it on TIKTOK?!

When I began researching this registration, there were two forms.  I couldn't determine which one to complete.  I began contacting FINCEN by email, asking for a phone number, help and/or an explanation of each form.

I only received form letter responses, no phone number and no assistance to complete a form asking for information it seems is readily available from any state or federal tax return or incorporating documents. AND, now there seems to only be one form.

My clients can barely afford to pay me, especially since the government obliteration of small business during COVID, now,  we are expected to find time and money to complete this redundant registration that we found accidentally.

Hasn't small business been through enough? We can't afford employees with the increase in minimum wage, supplies, taxes and insurance, and now we spend  our day filling out reports. Why wasn't this better communicated? Why was it only advertised on TikTok? Why didn't businesses receive a professional letter in the mail? Learning about it the way I did made me think it was a scam or is this a way to purposely keep businesses owners uniformed so that they end up paying a fine?  Who will help and why is it necessary? Why isn't there a phone number to reach someone to answer questions and assist with complying with this new order? Lastly, in searching for more information, I read that in March, it was [correctly] deemed unconstitutional. So, is it still required?

A128

**Company Name:** Brady's Plant Ranch, LTD
**Location:** Idaho
**Number of Employees:**17
**Beneficial Ownership Impact:**

We are a small family farm.

We already report and pay taxes, corporate taxes, unemployment taxes, payroll taxes, sales taxes, corporate filings, state licenses, insurance premiums, etc. We have no accountants or lawyers on retainer. They help on an as-needed basis. We just don't have the money for such.

Here is another level of bureaucracy trying to essentially put us out of business. We employ more stay-at-home moms, teenagers, and entry-level people than any other business in our local area. This BOI reporting is literally a slap in the face, if not an uppercut, to a little business trying to provide a community service.

We are seriously approaching the "straw that breaks the camel's back" so to speak. And what is magic about 20 employees? Please give us a break. Thank you.



**Company Name:** Data Comm for Business, Inc.
**Location:** Illinois, Texas
**Number of Employees:** 12
**Beneficial Ownership Impact:**

The BOI is duplicative, expensive, burdensome, unnecessary. The BOI reporting requirement is a disincentive to creating a business. Just one more thing to distract a business from doing its business.

The BOI requirement is duplicative of information available in personal and corporate tax returns, FinCEN from 104 reporting, publicly available incorporation information.

The BOI requirement for a new FinCEN ID (12-digit number) is duplicative of FEIN and SSN numbers.

The website for BOI has the insulting implication in its heading of assumption of guilt. The heading is "FINANCIAL CRIMES ENFORCEMENT NETWORK".

The Federal Register reporting costs to corporations initially and annually totals billions of dollars and are understated in the analysis.  The FinCEN estimate of $85.14 to prepare and submit an initial BOI report is grossly understated. The Q&A at this web link (https://www.fincen.gov/boi-faqs#D_1) requires a man-day to read and digest. There are 98 points A to O each elaborated with hundreds of words of text, tables, and flow charts. The Federal Register comments alone are 100 pages plus about 446 footnotes. A man-week to just understand this is a more reasonable estimate of cost.

A130



**Company Name:** *Grazing Systems Supply, Inc.*
**Location:** Batesville, Indiana
**Number of Employees:** 4
**Beneficial Ownership Impact:**

As a part-time Agriculture Supply Business humbly beginning 35 years ago it quickly turned into our full-time occupation. We continue to supply customers and do community service. We, like the majority of small businesses, are making a living but far from being rich.  We work more hours per week than any Federal Government employee, pay our bills, pay our taxes, play by the rules and follow the law.  We battle the competition, the economy, the markets, the weather and the out-of-control Federal Government regulations.

Concerning Beneficial Ownership Information Reporting (BOIR), what's "*Beneficial*" to small businesses or the American public about having another federal regulation to deal with?  And **NOW** a small business with two locations located in two small towns in Indiana with 4 employees and one bank account needs to be over-seen by the Financial Crimes Enforcement Network of the U.S. Dept. of the Treasury.  BOIR isn't about bad actors, ill-gotten gains, shell companies or money laundering because the IRS already knows that information by accessing our tax returns and bank records.  This **IS** all about <u>government control</u> and <u>the destruction of small businesses</u>.  95% of the small business community has neither the resources, lawyers, accountants or time to deal with it all.

My final thought about BOIR comes from a sentence taken from our Declaration of Independence.  The writers were referring to the King of Great Britain as "He".  But substituting "our Federal Government" in place of "He", I quote: "He has erected a multitude of new offices and sent hither swarms of officers to harass our people and eat out their substance."

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>　　　Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.,<br>　　　Defendants. | CIVIL ACTION NO.: 4:24-CV-00478<br><br>**<u>MOTION FOR PRELIMINARY<br>INJUNCTION</u>** |

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs move for a preliminary injunction, prohibiting Defendants[1] from enforcing the Corporate Transparency Act, 31 U.S.C. § 5336, and its implementing regulations, 31 CFR § 1010.380, pending further proceedings. The Act and regulations are likely unconstitutional for three reasons. First, the federal government lacks the power to regulate entities organized under state law merely because they have registered with their home state. Congress has no enumerated power to regulate state corporate organization and other purely local activities that have always been regulated exclusively by the states. Second, the Act restricts associational rights protected by the First Amendment because it forces entities to disclose the identities of individuals associated with the entity's expressive activities. Finally, the Act violates the Fourth Amendment because it mandates invasive disclosures on pain of criminal punishment without any particularized suspicion or precompliance review from a neutral party. Despite these constitutional defects, the Act and associated regulations require Plaintiffs to file reports with the U.S. Department of Treasury prior to January 1, 2025. Unless Defendants are enjoined, Plaintiffs must incur substantial compliance costs prior to that filing deadline in service of an unconstitutional statute. This Court should therefore enter an injunction as soon as possible.

---

[1] Defendants are collectively the federal officers and agencies responsible for enforcing the Act and its regulations.

1

## FACTS AND LEGAL BACKGROUND

On January 1, 2021, Congress enacted the Corporate Transparency Act (CTA), 31 U.S.C. § 5336, which was a federal attempt to regulate in an area of traditional state control. The CTA mandated that any "reporting company," file with the Financial Crimes Enforcement Network (FinCEN) reports of all its "beneficial ownership information." 31 U.S.C. § 5336(b)(1)(A).

A "reporting company" is "a corporation, limited liability company, or other similar entity that is" "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe;" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* at § 5336(a)(11). The CTA exempts large companies (those employing more than 20 people and generating more than $5,000,000 per year in gross revenue), all publicly-traded companies, and essentially all businesses involved in finance. *See id.* at § (a)(11)(B). A non-profit is exempt only if it has an active exemption under section 501(c) of the Internal Revenue Code or if it is a "political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code." *Id.* at § (a)(11)(B)(xix).

Both pre-existing and newly formed entities are required to identify each "beneficial owner" of the entity, by providing the "full legal name," "date of birth," and current address of every natural person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at §§ (a)(3), (b)(1). Each beneficial owner must also provide a non-expired photo identification to FinCEN to prove their identity. *Id.* at § (a)(1). Entities must update this information regularly if it changes. *Id.* at § (b)(1)(D). Failures to file reports or update reports can be criminally enforced. *Id.* at § (h)(3).

2

FinCEN must disclose this information when requested "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity" or "from a State, local, or Tribal law enforcement agency," if authorized by a court. *Id.* at § (c)(2)(B). The CTA also delegates to the Secretary of Treasury the discretion to authorize additional disclosures "to financial institutions and regulatory agencies." *Id.* at § (c)(2)(C).

There is significant evidence that the CTA was intended, at least in part, to compel disclosures of the identities of political donors. The original version of the Act was introduced in 2017, and its co-sponsor Senator Sheldon Whitehouse was explicit about his goals. In a speech Senator Whitehouse gave on the Senate floor in 2017, he explained that a beneficial ownership reporting regime would provide a means of stopping what he saw as the "unprecedented dark money [that] flow into our elections from anonymous dark money organizations, groups that we allow to hide the identities of their big donors," such as "American dark money emperors, like the Koch brothers." Congressional Record, Vol. 163, No. 101 at S3469 (Senate, June 14, 2017). By tracking "the actual owners of companies" law enforcement could stop entities from "funneling money into our elections through faceless shell companies," and allow the government to determine "the identities behind big political spending." *Id.* Since the Act was passed, it has even been hailed by commentators because it "can shine light on dark money in U.S. elections." Devon Himelman, *How the Corporate Transparency Act Can Shine Light on Dark Money U.S. Elections*, Global Anticorruption Blog (April 15, 2022) *available at* https://globalanticorruptionblog.com/2022/04/15/how-the-corporate-transparency-act-can-shine-light-on-dark-money-in-u-s-elections/.

FinCEN has issued regulations implementing the CTA. *See* 31 CFR § 1010.380. Every non-exempt corporate entity in the United States must register its beneficial ownership information

A134

with FinCEN prior to January 1, 2025. *See id.* at § (a)(1). Once filed, reports must be updated within 30 days for any change in reported information. *Id.* at § (a)(2). FinCEN rejected the argument that the exemption for tax-exempt entities should extend to "entities that had applied to the IRS for tax-exempt status but were still awaiting a determination" or other "nonprofits ... that did not qualify for tax-exempt status under section 501(c)." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59542 (Sept. 30, 2022) (Reporting Rule). Instead, FinCEN pointed to "concerns raised about potential exploitation of this exemption as well as the following exemption for entities assisting tax-exempt entities." *Id.* at 59542-43.

### The Effect on Plaintiffs

As FinCEN recognized, the CTA and its Reporting Rule "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. at 59550. "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59585. "Assuming that all reporting companies are small businesses, the burden hours for filing BOI [beneficial ownership information] reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35 million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585-86. Plaintiffs are just some of those affected entities.

Texas Top Cop Shop, Inc., is an existing Texas corporation, which operates as a family-run retail storefront in Conroe, Texas, selling uniforms and equipment for first responders, such as police officers and emergency services personnel. Ex. A at ¶¶ 3-4 (Schneider Decl.). It sells its merchandise locally and does not sell any items out of state or through the internet. *Id.* at ¶ 5. It has four employees, including its owners. *Id.* at ¶ 6. It is also a member of the National Federation

of Independent Business (NFIB). *Id.* at ¶ 3. Texas Top Cop Shop is a reporting company under the CTA, and must file its initial report with FinCEN before 2025. *Id.* at ¶ 9.

Texas Top Cop Shop is also licensed dealer of firearms. *Id.* at ¶ 7. To obtain such a license, its owners were thoroughly investigated and determined to be law-abiding U.S. citizens. *Id.*

Data Comm for Business, Inc., is an existing Delaware Corporation, registered in Illinois, with its principle place of business in Plano, Texas. Ex. B at ¶¶ 3, 5 (Data Comm Decl.). Data Comm is a small business that provides technical support, information technology, and communications products and services to other small businesses and individuals. *Id.* at ¶ 4. Data Comm has 10 employees, and is a member of NFIB. *Id.* at ¶¶ 3, 6. Data Comm is a reporting company under the CTA and must file initial BOI reports before 2025. *Id.* at ¶ 8.

Russell Straayer is an individual who resides in Collin County, Texas, and is a "beneficial owner" of multiple "reporting companies" as those terms are defined by the CTA. Ex. C at ¶¶ 2-3 (Straayer Decl.). Straayer is both a part owner and serves as the Chief Executive Officer of Data Comm, although he is not the only beneficial owner. *Id.* at ¶¶ 4-5. He is also a beneficial owner of other reporting companies that are not a party to this litigation. *Id.* at ¶ 6.

Straayer has been a vocal opponent of the CTA, and has publicly stated his individual opposition to the Act. *Id.* at ¶ 7. One of the reporting companies for which Straayer is a beneficial owner does not take a public stance on the validity or wisdom of the CTA, and does not wish to be associated with Straayer's advocacy. *Id.* at ¶ 8.

Mustardseed Livestock, LLC, is a limited liability company registered in Wyoming, which operates as a small dairy farm in Lingle, Wyoming. Mustardseed is a family farm that sells raw milk directly to consumers in Wyoming (and no other state). Ex. D at ¶¶ 3-6 (Goulart Decl.). It does not have a permanent storefront. *Id.* at ¶ 6. Its typical gross revenue for milk sales is less than

$50,000 annually. *Id.* at ¶¶ 7-8. Mustardseed is a reporting company under the CTA, and must file its initial report with FinCEN before 2025. *Id.* at ¶ 11.

The Libertarian Party of Mississippi is a political organization that is registered as an entity with the State of Mississippi. Ex. E at ¶¶ 3-4 (Lewis Decl.). MSLP is not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code, and thus is required to comply with the CTA. *Id.* at ¶¶ 11, 22.

MSLP is a political organization that receives donations from individuals and entities, which it uses to promote political candidates for state office and policies affecting Mississippi residents. *Id.* at ¶ 13. MSLP has no physical office or employees, instead conducting its activities through its volunteer members. *Id.* at ¶ 12. It has less than $20,000 in assets, which it derived from donations, and which it uses solely for political expenditures for local candidates for office in the State of Mississippi, or state and local public policy issues affecting Mississippi residents. *Id.* at ¶ 14. MSLP does not engage in economic activities outside of Mississippi, and does not make political expenditures for candidates or issues outside of the state. *Id.* at ¶ 15.

MSLP is an existing entity that must comply with the CTA before 2025. *Id.* at ¶ 22. Under its bylaws, no individual owns the entity or its assets, but it is controlled by its members, officers, delegates, volunteers, and major donors. *Id.* at ¶¶ 17-19. Its bylaws authorize MSLP to make expenditures only with the authorization of its executive committee, or at the direction of 2/3 of its voting delegates, which are registered members of the state party. *Id.*

The National Federation of Independent Business, Inc. is a membership organization that advocates on behalf of nearly 300,000 member businesses. Ex. F at ¶¶ 4, 6 (Milito Decl.). While NFIB is exempt from the CTA, large numbers of its members must comply, including Texas Top Cop Shop and Data Comm. *Id.* at ¶ 4.

A137

NFIB has advocated publicly for the CTA's repeal on behalf of its members. *Id.* at ¶ 6. For example, on April 30, 2024, NFIB sent a letter on behalf of its members to the U.S. House Committee on Small Business, urging Congress to repeal the CTA. *Id.* at ¶ 7. Several members, including Data Comm, and non-party member Grazing Systems Supply, Inc., also sent letters to the Committee on their own behalf, also advocating for the CTA's repeal. *Id.* at ¶ 8.

All of the plaintiffs oppose the CTA, and wish to protect the relevant information from disclosure. Each objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and intrusion into matters protected by the Fourth Amendment. Each corporate plaintiff has also advocated for the repeal of the CTA as an entity, in part, to protect the associational privacy interests of its beneficial owners. None have filed BOI reports with FinCEN.

## DISCUSSION

For a preliminary injunction, "a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022)

## A. PLAINTIFFS HAVE STANDING TO CHALLENGE THE CTA

"At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020). An association has standing when: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (citation omitted). A member must have "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 585 U.S. 48, 65 (2018).

"An increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (citation omitted). If a "new Rule requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," this is sufficient to permit a pre-enforcement challenge. *Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (citation omitted). Moreover, when challenging a law or regulation imposing such burdens, an injunction blocking the law or regulation typically satisfies the traceability and redressability tests. *See id.*

Separately, a plaintiff has standing to raise a pre-enforcement challenge to a law or regulation if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably ... proscribed by a statute," and (3) "the threat of future enforcement of the [challenged] statute is substantial." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014) (citations omitted).

But the rules for standing are relaxed in the First Amendment context. A "First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself. It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc.*, 979 F.3d at 331 (citation omitted). Moreover, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 335 (citation omitted).

Plaintiffs have standing, first, because the CTA and the Reporting Rule result in increased compliance obligations. Each individual plaintiff is required to comply with the CTA and the Reporting Rule, and thus they are all within the 32.6 million existing entities that FinCEN estimated will face "significant economic impact[s]" from the Act. Reporting Rule, 87 Fed. Reg. at 59550, 59585. In fact, FinCEN says "that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585-86. Each has confirmed that they will incur such costs unless the Act is enjoined. *See* Ex. A at ¶ 10, Ex. B. at ¶ 9, Ex. C at ¶ 10, Ex. D at ¶ 12, Ex. E at ¶ 23, Ex. F at ¶ 5.

Even without considering the increased compliance issues, Plaintiffs have standing to raise constitutional rights that are threatened by future enforcement. As discussed below, the Act encroaches on constitutional interests, including infringing First Amendment interests in refusing to make these disclosures. The CTA's "mere existence risks chilling First Amendment rights" and thus enables a pre-enforcement challenge. *See N.C. Right to Life, Inc.*, 168 F.3d at 710.

NFIB also has associational standing to sue on behalf of its members. It has identified several of its members who must comply with the CTA and the Reporting Rule, including Plaintiffs Texas Top Cop Shop and Data Comm, and NFIB member Grazing Systems Supply, Inc. Ex. F. at ¶ 4. This challenge to the CTA is also plainly germane to NFIB's purposes, as it regularly advocates for small businesses. *Id.* at ¶ 6. The claim and the requested relief don't require participation of individual members, even though several are participating in this suit.

## B. THE CTA IS LIKELY UNLAWFUL IN SEVERAL WAYS

### 1. THE CTA EXCEEDS CONGRESS' ENUMERATED POWERS

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533

(2012). The Tenth Amendment confirms that the federal Constitution reserves all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," "to the States respectively, or to the people." An individual plaintiff may challenge federal action as exceeding Congress's limited, enumerated, powers. *See Bond v. United States*, 564 U.S. 211, 222 (2011). But, as one district court has already ruled, "the CTA exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary or proper means of achieving Congress' policy goals." *Nat'l Small Bus. United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205, at *4 (N.D. Ala. Mar. 1, 2024), *appeal filed* at No. 24-10736 (11th Cir.).

In that other case, the Government unsuccessfully offered three sources of constitutional authority: (1) the foreign affairs power, (2) the commerce clause, and (3) the necessary and proper clause combined with the taxing power. *Id.* at *18-19. None passed muster. *Id.* at *59.

### a. The States Have Always Had Exclusive Control Over Corporate Formation and Registration

"Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L.J. 1037, 1037-1038 (1986).

Even as the Court recognized an increasing role for Congress to regulate interstate commerce, the Supreme Court emphasized that "state law governs in the corporate area. Federal law forms an overlay, significant but secondary, upon state law. It does not provide for business organization, nor does it define or create trusts, partnerships, or corporations. It deals only with the transfer of interests in those business entities." *Id.* at 1056. As the Supreme Court said, "No

principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987).

### b. The CTA Is Not an Exercise in Foreign Affairs

The "foreign affairs powers" are not enumerated in the Constitution, but are inferred as a necessary aspect of a unified federal government. *See Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). More precisely, this authority is comprised of "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations[.]" *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). On the latter point, it is typically presumed that the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [relevant] policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.

Not everything implicates foreign affairs or threatens war with foreign nations merely because it has an international element. Thus, when confronted with a statutory reading of an international treaty that threatened to "dramatically intrude[] upon traditional state criminal jurisdiction," the Supreme Court unanimously adopted a narrow interpretation to avoid such constitutional doubt. *Bond v. United States*, 572 U.S. 844, 859-60 (2014). As Justice Scalia wrote in a concurring opinion, "to interpret the Treaty Power as extending to every conceivable domestic subject matter—even matters without any nexus to foreign relations—would destroy the basic constitutional distinction between domestic and foreign powers." *Id.* at 883.

The CTA is not an exercise of some ill-defined, yet plenary, foreign affairs power, as it applies *exclusively* to entities that register "with a secretary of state or a similar office under the law of a State or Indian Tribe." *See* 31 U.S.C. § 5336(a)(11). It is a purely domestic statute, affecting only entities that are registered to do business domestically, and only requires that these

11

A142

entities file reports with the federal government. *See id*. It has no extraterritorial reach and does not purport to be premised on a treaty or implement an international agreement to which the United States is a party. *See id.* Its only incidental connection to international affairs is that certain entities "formed under the law of a foreign country" must comply if and only if they are "registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.*[2] This case raises the Court's precise concern in *Bond* that the purported exercise of foreign affairs would improperly intrude into state police power. *See* 572 U.S. at 859-60; *accord Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 579 (5th Cir. 2010) (issues "within the realm of traditional state responsibilities" not barred by deference on issues of foreign affairs). The CTA cannot be justified as an exercise of the federal power to conduct foreign affairs.

### c. The CTA Is Not a Valid Exercise of the Commerce Power

"Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *55.

Article 1, Section 8, Clause 3 of the U.S. Constitution gives Congress the power "to regulate commerce ... among states." The Court has articulated "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e.,

---

[2] More obliquely, the Act provides the "sense of Congress," which pointed to a desire to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," but this is simply a goal of conforming to policies adopted by other countries, not an invocation of any specific relations with a foreign state, much less an obligation imposed by a formal treaty. *See* 31 U.S.C. § 5336 note § 5(E).

those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (cleaned up).

The Commerce Clause "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536. After all, "The founding generation understood the term 'commerce' to mean only 'trade or exchange of goods.'" William J. Seidleck, *Originalism and the General Concurrence*, 3 U. PA. J. L. & PUB. AFFS. 263, 269 (2018).

With respect to the first two categories, the text of the CTA does not regulate the channels and instrumentalities of interstate commerce. The CTA applies to "reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document" "with a secretary of state or a similar office under the law of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id*. § 5336(b)(1)-(2)(A). The word "commerce," or references to any channel or instrumentality thereof, are nowhere to be found in the CTA. *See* 31 U.S.C. § 5336.

Merely "filing [] a document" with a state registrar is not a sufficient use of the means or instrumentalities of *interstate* commerce to justify the Act. Indeed, the Government conceded as much in prior litigation. *See NSBU*, 2024 U.S. Dist. LEXIS 36205, at *39 ("The Government wisely ... concedes that '[i]t is the activities of these entities, not the mere fact that they submitted documents to a Secretary of State, that implicates the Commerce Clause and permits Congress to exercise its authority.'"). Similarly, it is insufficient that the CTA mandates filing with FinCEN, as Congress can't engineer the relevant interstate nexus by demanding conduct that would not otherwise occur. *See NFIB*, 567 U.S. at 549.

The CTA also cannot be justified by purported aggregate effects on interstate commerce. When a statute relies on this third category the question is whether the statute regulates "an

economic class of activities" or "non-economic activity." *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011). When "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute" does not deprive Congress of the ability to regulate that activity. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). This is true only if the regulated activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.*

If, however, the class of activities is *non*-economic, then aggregation is impermissible, and intrastate conduct is beyond the reach of Congress. *See Taylor v. United States*, 579 U.S. 301, 306 (2016) ("While this final category is broad, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). In *United States v. Morrison*, 529 U.S. 598, 613 (2000), the Court rejected aggregation because the statute at issue, which punished "[g]ender-motivated crimes of violence," did "not, in any sense of the phrase, [target] economic activity." The *Raich* decision upheld this "pattern of analysis," noting that the statute in *Morrison* was "unconstitutional because . . . it did not regulate economic activity." 545 U.S. at 25; *accord Lopez*, 514 U.S. at 567 (The "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.").

A class of *future* economic activity is also not subject to aggregation. "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *NFIB*, 567 U.S. at 557. The Court has always required "preexisting economic activity." *Id.*; *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (federal vaccine mandate "likely exceeds the federal government's

authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power"), *aff'd* 142 S.Ct. 661 (2022).

The CTA does not regulate an "economic class of activity." It regulates the act of registration under state law, irrespective of the presence or absence of any commercial activity. *See* 31 U.S.C. § 5336(a)(11). No goods are sold, no services are provided. The Act applies to non-profit entities, even if they have no assets whatsoever, and even if they don't engage in *any activity*, commercial or otherwise. As FinCEN noted, "nonprofits ... that did not qualify for tax-exempt status under section 501(c)" must still file reports, regardless of their activities. *See* 87 Fed. Reg. at 59542. The government has even admitted in other litigation that the mere act of registering with a state is not economic. *See NSBU*, 2024 U.S. Dist. LEXIS 36205, at *39.

Nor is the CTA a comprehensive regulatory scheme over commerce. "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18. The regulatory scheme should, however, "directly regulate economic, commercial activity." *See id*. at 26.

The CTA is not part of a larger regulatory scheme, and Congress did not identify any such regulatory scheme in passing it. A vague goal of "protecting commerce" or "deterring money laundering" is not such a scheme. The CTA's organization also disproves Congress' pretense. Congress chose to require all entities to file reports once they registered with a state, regardless of their activities or non-economic purposes, and then created exemptions that broadly, and irrationally, excluded businesses that were the most likely culprits of international money laundering, such as money transmitters, public companies and large private businesses. *See* 31 U.S.C. § 5336(a)(11)(B). Many non-profits or entities with no assets or activities must still file

15

reports. This structure makes one thing perfectly clear—the CTA's vague goals would not be undermined if the Act couldn't reach entities engaged in *no* commercial activity and with *no* assets.

Reading *Raich* as a justification for the CTA would bless federal control of every person and entity in the country. Everyone registers with a state or local government at some time in their life—when they attend school, pay taxes, obtain identification, etc. If Congress can use that as a means to prop up a vast federal regulatory scheme, then what could possibly be beyond reach? *Morrison* spoke of "the but-for causal chain from" isolated activities "to every attenuated effect upon interstate commerce" as being impermissible. 529 U.S. at 615. The Court in *Lopez* also warned that courts may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." 514 U.S. at 567. The Court in *NFIB* likewise said, "No matter how inherently integrated" the activity actually regulated (or mandated) by the law is with commerce in the abstract, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. 567 U.S. at 558. A court should look to the face of the law at issue, and should require, at least, some level of "proximity and degree of connection" between the statute and commerce at large. *Id.* There is no such direct link between filing a document in a state and the CTA's broad concern with international money laundering and illicit finance, and there is indeed, no direct link with registration and any commercial activity that can be extrapolated on a grand scale. The "connection between incorporation and criminal activity is far too attenuated to justify the CTA." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *41.

### d. The CTA Is Not a Legitimate Exercise of the Taxing Power

The taxing power also does not justify the CTA. The federal government has the enumerated power to "lay and collect Taxes." U.S. Const., Art. I, § 8, cl. 1. But that power only

allows the government to impose "exaction[s]" that "produces at least some revenue for the Government." *NFIB*, 567 U.S. at 564. The CTA imposes no such taxes, though, so it cannot be justified as a direct exercise of that power. *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *56-57.

This means that the CTA could only be upheld if it was "necessary and proper for carrying into Execution" the taxing power. *See* U.S. Const., Art. I, § 8, cl. 18. But the Necessary and Proper Clause will not justify an act of Congress unless it "involve[s] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. Rather than provide an independent source of power, the clause merely allows execution of existing powers, and, at most, forgives borderline questions concerning "individual *applications* of a concededly valid statutory scheme." *See id.* (citing *Raich*, 545 U.S. at 72). "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring); *but see* Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 186 (2003) (the Founders believed the Clause "did not go 'a single step beyond the delegated powers.'").

The connection between the taxing power and the CTA is far too attenuated to pass scrutiny. "It would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *58 (quoting *NFIB*, 567 U.S. at 560). That kind of unfettered legislative power "is in no way an authority that is 'narrow in scope,' or 'incidental' to the exercise of the [taxing] power." *See NFIB*, 567 U.S. at 560 (citations omitted). Indeed, "even if" the CTA's provisions were "necessary," "such an expansion of federal power is not a 'proper' means for making those [policy goals] effective." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *58.

### e. The CTA Is Invalid As-Applied to Certain Plaintiffs

Even if the CTA could be upheld for certain entities with significant interstate commercial activities, as applied to other entities with no meaningful interstate commercial ties, particularly MSLP and Mustardseed, the CTA likely falls outside of the scope of any enumerated power. MSLP is a political party that can only operate within the State of Mississippi, and it can only do so to support local candidates for political office and local issues. Ex. E at ¶¶ 13-15. Moreover, it has very few assets, which it only uses to make local political expenditures. *Id.* Certainly, the federal government has no foreign affairs interests in regulating a state political party. Nor does it have any conceivable basis to use its commerce powers over the MSLP, as deeming its activities to be sufficiently commercial for federal control would require this Court to imaginatively aggregate some non-economic factor to such a degree that it is impossible to conceive of any entity that would be out of federal reach. Nor does the taxing power justify the CTA, as MSLP's tax obligations are well-established and the federal government already has significant, yet tailored, authorities to investigate the party and its finances.

Similarly, Mustardseed is a family dairy farm in the very center of our nation, thousands of miles from any foreign state, engaged in minimal economic activity, all of it completely local. Ex. D at ¶¶ 4-8. It is absurd to think that the federal government has a compelling international interest that would allow it to mandate the CTA's filing regime, much less a national economic interest in regulating the corporate entity itself, divorced from the farm's meager economic activity, or some overriding, yet totally obscured, interest in exacting federal taxes. Instead, MSLP and Mustardseed both demonstrate the extremity of the CTA's intrusion into state affairs.

18

### 2. The Act Impermissibly Burdens Anonymous Association

"[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (collecting cases). This includes a right to do so anonymously. *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373, 2382-83 (2021) (plurality op.). "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

"To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The "First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Id.*

Expressive association can come in myriad forms. When any "level" of an "organization ha[s] taken public positions on a number of diverse issues ... [like] civic, charitable, lobbying, fundraising, and other activities," these are all "worthy of constitutional protection under the First Amendment." *Jaycees*, 468 U.S. at 626-27 (citations omitted). Members involved in such endeavors are generally protected in expressing the "views that brought them together." *Id.* at 623. In this vein, the Supreme Court has recognized the expressive association rights of members of organizations that advocate for political, social, and cultural issues, see, e.g., *NAACP*, 357 U.S. at 462, political parties and organizations, see, e.g., *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), and non-profit organizations of all types, see, e.g., *AFP*, 141 S. Ct. at 2383, *Boy Scouts*, 530 U.S. at

656, and *Jaycees*, 468 U.S. at 612. But groups need not engage in political advocacy in order to be protected. *See Boy Scouts*, 530 U.S. at 648. The organization need only have some "conception of the good life," such as advocating that a particular "reform is a good or bad idea." *McDonald v. Longley*, 4 F.4th 229, 245 n.20 (5th Cir. 2021). Furthermore, "[t]he membership is part of the message" when an organization takes such a stance, which means that individual members are free to refuse to associate with the message or conceal their association with it. *See id.* at 245-46.

Moreover, a *for-profit* corporate entity still has the same right to expressive association as any other speaker. "[T]he Government may not suppress political speech on the basis of the speaker's corporate identity." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010). And this applies equally to "nonprofit or for-profit corporations." *Id.* Thus, in *303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2316 (2023), the Court held that a single-member company, engaged in expressive "commercial" activity, had precisely the same expressive rights as any other entity, and thus could refuse to associate its commercial products with ideas it did not share.

"Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association." *Boy Scouts*, 530 U.S. at 648. "Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFP*, 141 S.Ct. at 2383.[3] "Under that standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. Further, "a reasonable assessment

---

[3] This part of Justice Roberts' opinion was only joined by Justices Kavanaugh and Barrett. *Id.* However, a majority of the Court called for *at least* this level of scrutiny. Justice Thomas concurred that the statute was unlawful and argued that the correct standard was strict scrutiny. *Id.* at 2389-90 (Thomas, J., concurring). Justice Alito, joined by Justice Gorsuch, agreed that the statute violated the First Amendment under either standard, but believed it unnecessary to articulate which applied. *Id.* at 2392 (Alito, J., concurring).

of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 2385.

In applying this standard, the Court recently concluded that a law mandating that charitable organizations disclose the names and addresses of donors who had contributed more than $5,000 in a tax year violated the First Amendment. *Id*. Even though the disclosures were non-public, the Court held that the "disclosure requirement imposes a widespread burden on donors' associational rights. And this burden cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." *Id*. at 2389. Because the statute chilled protected conduct, even though it was undoubtedly lawful in certain contexts, the Court held that it was facially invalid. *Id*.

Plaintiffs are engaged in expressive activities, and thus have First Amendment interests in maintaining anonymity of their members. MSLP, of course, is a political party that advocates positions on a wide range of public issues, including the protection of constitutional rights threatened by the CTA, see Ex. E at ¶¶ 3, 5-10, which is the paradigmatic example of an expressive association. *See Kusper*, 414 U.S at 57. As a corporation that makes expenditures that are purely political, it obviously also has an interest in maintaining the privacy of its officers, directors, beneficiaries of its ownership (whoever that might be), and significant donors who exert control over the local party and its platform. It also, unquestionably, has the right to refuse to disclose the identities of its members. *See NAACP*, 357 U.S. at 462.

The other plaintiffs have also been engaged in advocacy targeted at the CTA itself, using the corporate form. While it is itself exempt from the CTA's registration requirements, NFIB has lobbied Congress to repeal the CTA on behalf of its hundreds of thousands of affected members. Ex. F at ¶¶ 6-8. It presents a united voice on political issues affecting small businesses everywhere.

When an organization like NFIB takes such a stance, individual members are free to refuse to associate with the organization or conceal their association. *See McDonald*, 4 F.4th at 245-46.

Texas Top Cop Shop and Data Comm are examples of NFIB's members that have adopted NFIB's advocacy concerning the CTA as their own, see Ex. A at ¶¶ 3, 9, 12, Ex. B at ¶¶ 3, 11-12, meaning that their "membership is part of the message." *See id*. at 245. Further, each business has also publicly advocated for the repeal of the CTA, and Data Comm even sent a letter of its own to a Congressional Committee. Ex. A at ¶¶ 9, 12, Ex. B at ¶¶ 11-12. All are expressive acts, and all could be threatened if the members of each business were required to reveal their identities. *See McDonald*, 4 F.4th at 245-46 (opinion on whether "a reform is a good or bad idea").

While ostensibly neutral, the CTA still demands information that implicates the right to anonymous speech and association and must pass exacting scrutiny. Every reporting company, including charitable or advocacy organizations like MSLP, must disclose to FinCEN, and potentially to state and local law enforcement and federal regulators, its beneficial owners. And those "beneficial owners" include individuals who "indirectly" "exercise[] substantial control over the entity," even when that control might not be formalized. 31 U.S.C. § 5336 (a)(3)(A). Thus, each of the plaintiffs, regardless of their mission, would be required to not only disclose the names of any 25% owners, but also their directors, officers, influential members, or even donors. The Reporting Rule makes this clear, mandating disclosures for senior officers, any person with "substantial influence over important decisions," major expenditures or investments, "[a]mendments of any substantial governance documents of the reporting company, including the articles of incorporation or similar formation documents, bylaws, and significant policies or procedures," or even the scope of operations. 31 C.F.R. § 1010.380(d)(1)(i). This would mean that the plaintiffs would all be required to disclose significant information about their activities, and,

since all have been involved in direct political advocacy, most especially MSLP, they would need to disclose the identities of those people who made the decision to advocate at all. Indeed, because MSLP's bylaws can be amended at the urging of any single state party member, and adopted by a 2/3 majority of voting members, MSLP would need to disclose the identity of each of its registered members, Ex. E at ¶¶ 17-19, even though the Court struck down a law demanding disclosure of "the names and addresses" of NAACP "members" and "agents" more than 60 years ago. *See NAACP*, 357 U.S. at 453. Much less invasive laws have triggered exacting scrutiny. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1366 (11th Cir. 1999) (applying exacting scrutiny to "a provision that requires corporate applicants for adult business licenses to disclose the names of 'principal stockholders'"); *Buckeye Inst. v. IRS*, No. 2:22-cv-4297, 2023 U.S. Dist. LEXIS 201628, at *12 (S.D. Ohio Nov. 9, 2023) (holding that exacting scrutiny applied to federal law requiring disclosure of "substantial donors" for 501(c)(3) tax exemption).

The CTA fails exacting scrutiny. Like the statute in *AFP*, the CTA purports to thwart financial malfeasance, and specifically money laundering using shell companies. *See* 31 U.S.C. § 5336 note. In FinCEN's words, "These requirements are intended to help prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity, while minimizing the burden on entities doing business in the United States." Reporting Rule, 87 Fed. Reg. at 59498. But applying the statute to every entity registered with a state, no matter their size or purpose, and even when they lack any assets at all, is obviously a poor fit for that aim. Likewise, the fact that the statute exempts large corporations and more than a dozen other entities, almost all of which are primarily or even exclusively involved in financial transactions, shows that the statute is not narrowly tailored to investigating and preventing financial crimes. *See* 31 U.S.C. § 5336(a)(11)(B). Indeed, FinCEN rejected calls to narrow the statute's reach, because of its dubious

insistence that there remains the remote possibility that any charity may still be involved in illicit transactions. *See* 87 Fed. Reg. at 59542-43. If that's true, however, it's not clear why federally exempt organizations need not comply with the CTA, while others, like MSLP who could potentially qualify for federal exemption but still lack that status, must file reports. The Congressional record provides an answer—the Act was intended in part to allow the government to determine "the identities behind big political spending." *See* Congressional Record, Vol. 163, No. 101 at S3469. While that might be the real reason behind the Act, it is also an unconstitutional objective. *See AFP*, 141 S.Ct. at 2389. The CTA's exemption of the most obvious candidates for financial misconduct at the expense of local entities proves its lack of narrow tailoring.

MSLP once again drives this point home. It is virtually indistinguishable from the advocacy groups in *AFP*, but the federal government's interest is even weaker. Neither Congress nor FinCEN asserted a legitimate interest in policing political donations, claiming instead a broad need to investigate *everyone* including advocacy organizations, against "money laundering, terrorist financing, corruption, tax fraud, and other illicit activity." *See* 87 Fed. Reg. at 59498. But there is no rational reason why a party in charge of around $20,000 in local donations should be made to give up its expressive interests on the purely theoretical notion that it could possibly be involved in financial crimes. *See* Ex. E at ¶¶ 13-15. Applied in this context, the justification for the CTA bears a striking resemblance to the illegitimate excuses used by the State of Alabama in the 1950s: "The exclusive purpose was to determine whether [the NAACP] was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question." *NAACP*, 357 U.S. at 464. The other small businesses, particularly Texas Top Cop Shop, which has already been thoroughly vetted as it acquired a federal firearms license, Ex. A at ¶ 7, and Mustardseed, with its minimal income and

purely local reach, Ex. D at ¶¶ 4-8, are also highly unlikely culprits for international money laundering and terrorist financing. Indeed, the large number of NFIB members that must comply with the CTA, all small businesses, comprise a whole class of entities that are the *least likely* culprits for international money laundering. Given the intrusion into protected association, the CTA's vague goals, and the poor fit between the two, the CTA is facially unconstitutional.

### 3. THE ACT IS FACIALLY INVALID UNDER THE FOURTH AMENDMENT

"[A]n order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment." *Hale v. Henkel*, 201 U.S. 43, 76 (1906); *see also Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (*en banc*) ("The 'papers' protected by the Fourth Amendment include business records like those at issue here.") *aff'd* 576 U.S. 409 (2015). The "compulsory production of private papers," is both a search and seizure. *Hale*, 201 U.S. at 76. The "papers" protected by the Fourth Amendment include business records. *See id.* 76-77 (subpoena for "all understandings, contracts or correspondence" between corporation and others and "reports made, and accounts rendered by such companies from the date of the organization" was unreasonable under the Fourth Amendment). Thus, when a law mandates that a business compile private information and disclose it upon demand by law enforcement, this constitutes a "search." *See City of L.A. v. Patel*, 576 U.S. 409, 421 (2015).

The Fourth Amendment also has a strong preference for warrants. Thus, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *Id.* at 419 (cleaned up). "This rule applies to commercial premises as well as to homes." *Id.* at 419-20 (citation omitted).

In some circumstances, a warrantless "administrative search" may be permissible "where the primary purpose of the searches is distinguishable from the general interest in crime control." *Id*. at 419 (cleaned up). Even still, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id*. And when administrative searches create criminal consequences for noncompliance, "[a]bsent an opportunity for precompliance review," there is an "intolerable risk" that such searches will be abused. *Id*.

In addition to the need for pre-compliance review, the government is obligated to demonstrate some level of individualized suspicion before it can demand a business entity's private papers. *See Patel*, 738 F.3d at 1064 ("The government may ordinarily compel the inspection of business records only through an inspection demand 'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'") (quoting *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1945)). Thus, while subpoenas for corporate records are usually permitted on a showing of need less than probable cause, judicial process is still required to determine that "the charge [against the target] is proper and the material requested is relevant," and that the subpoena not be "too indefinite," has not "been issued for an illegitimate purpose, [and is not] unduly burdensome." *McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017); *see also See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.").[4]

---

[4] Similarly, courts have "recognized the existence of a constitutionally protected interest in the confidentiality of personal financial information," which can only "be overcome by a sufficiently weighty government purpose." *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999); *see also NASA v. Nelson*, 562

The blanket requirement that all reporting companies provide beneficial ownership information with no precompliance process and no individualized suspicion violates the Fourth Amendment. On one side of the equation, the CTA's broad disclosure requirements certainly implicate privacy concerns. Indeed, the Act itself recognizes that beneficial ownership information "shall be confidential and may not be disclosed" by FinCEN except in carefully limited ways. *See* 31 U.S.C. § 5336(c)(2)(A). And courts have recognized a "constitutionally protected interest in the confidentiality of personal financial information." *See Statharos*, 198 F.3d at 322-23 (collecting cases). Moreover, as discussed above, the reporting requirements implicate information protected by the First Amendment against disclosure. MSLP has an obvious First Amendment interest in this information, but so too do NFIB's members, including the named plaintiffs, because all have engaged in protected advocacy relying on their corporate forms. In a variety of ways, the CTA's disclosure requirements are therefore significantly more intrusive than a hotel's guest lists, which were protected by the Court in *Patel*, 576 U.S. at 419.

On the other hand, the CTA provides *no* limitations. The Act applies to at least 32.6 million existing entities, including those entities with no assets and no operations, and regardless of whether the entity is likely to have committed a crime. Its express purpose is crime control, and the mandated reports are to be used by law enforcement simply to look for potential criminality. There is also no opportunity for precompliance review by *anyone*, yet refusing to file mandated reports comes with criminal liability. The CTA is thus facially invalid.

---

U.S. 134, 138 (2011) ("We assume, without deciding, that the Constitution protects a privacy right[.]"); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (recognizing constitutional protections related to "individual interest in avoiding disclosure of personal matters," and "independence in making certain kinds of important decisions"); *Nat'l Treasury Emps. Union v. United States Dep't of the Treasury*, 25 F.3d 237, 242 (5th Cir. 1994) (recognizing the "individual interest in avoiding disclosure of personal matters ... which is properly called the right to confidentiality"). While the contours of this latter right are somewhat unclear, the Second Circuit has noted that mandatory financial disclosure laws for "heavily regulated" businesses must still pass "intermediate scrutiny" to be valid. *Statharos*, 198 F.3d at 323.

### 4. The Reporting Rule Must Be Vacated As Well

As discussed, the CTA imposes multiple unconstitutional requirements on Plaintiffs. The Reporting Rule implements these same unconstitutional provisions while also setting out compliance deadlines. *See* 31 C.F.R. § 1010.380(a)(1)(iii). The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right[s]." 5 U.S.C. § 706(2)(B). Thus, a "Final Rule is invalid to the extent it implements [] unconstitutional statutory provisions." *Brackeen v. Haaland*, 994 F.3d 249, 425 (5th Cir. 2021) (*en banc*) *overruled in part on other grounds by Haaland v. Brackeen*, 599 U.S. 255 (2023*); see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (explaining "unlawful" agency action "includes unconstitutional action"). Because the Reporting Rule implements the CTA's unconstitutional provisions, this Court should also enjoin the rule.

## B. PLAINTIFFS FACE IRREPARABLE HARM ABSENT AN INJUNCTION

"An irreparable harm is one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (citation omitted). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)). Indeed, the Supreme Court has said that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, when a law or regulation "threatens" First Amendment rights, a plaintiff suffers an irreparable injury. *See Book People Inc.*, 91 F.4th at 341.

Separately, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023). "Even purely economic costs may count as irreparable harm where they cannot be

recovered in the ordinary course of litigation," such as in regulatory challenges under the APA. *Id.* (citation omitted). Further, such costs need not be significant or reach "a specific dollar amount," and an agency's own estimation of compliance costs can satisfy this showing. *See id.* at 597-98.

Plaintiffs will suffer irreparable harm from the CTA unless this Court enjoins it and its implementing regulations prior to January 1, 2025. First, because the named plaintiffs (as well as large numbers of NFIB's other members) will be required to comply with the filing requirements, and must expend resources to do so, these "nonrecoverable compliance" costs constitute irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 597. Not only have plaintiffs each averred that they would need to spend time and effort to make the required filings, but they would also need to incur legal expenses to review their obligations and assist with the filings. *See* Ex. A at ¶ 10, Ex. B. at ¶ 9, Ex. C at ¶ 10, Ex. D at ¶ 12, Ex. E at ¶ 23, Ex. F at ¶ 5. This is something FinCEN itself recognized would affect the estimated 32.6 million small entities like the plaintiffs, resulting in an estimated burden of 126.3 million hours in the first year of the reporting requirement, for a total cost of approximately $22.7 billion in the first year. Reporting Rule 87 Fed. Reg. at 59585-86.

Second, because the CTA and the Reporting Rule infringe Plaintiffs' constitutional rights, including their First Amendment associational rights, the mere "threat[]" of such infringement causes them irreparable harm. *See Book People Inc.*, 91 F.4th at 341. As discussed above, each Plaintiff faces the unconstitutional threat of revealing protected information on pain of criminal punishment. This independently constitutes irreparable harm.

## C. THE EQUITIES FAVOR AN INJUNCTION

The third and fourth factors, "harm to the opposing party and weighing the public interest ... merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009) (discussing identical factors for a stay). And whatever legitimate interest the government might

have in a challenged law or regulation, "neither [the government] nor the public has any interest in enforcing a regulation that violates federal law. Indeed, injunctions protecting First Amendment freedoms are always in the public interest." *Book People, Inc.*, 91 F.4th at 341 (cleaned up). If a plaintiff is likely to succeed in showing that a law or regulation is invalid, then the public interest accords with an injunction. *See id.*

Whatever legitimate interests the Government might have in deterring money laundering or other financial crimes, those cannot outweigh the constitutional invalidity of the CTA. Because the CTA and its implementing regulations are unlawful, the equities favor an injunction.

## CONCLUSION

This Court should preliminarily enjoin Defendants from enforcing the CTA and its implementing regulations.

DATED:  June 3, 2024.

Respectfully submitted,

*/s/ John C. Sullivan*
**JOHN C. SULLIVAN**
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Blvd, Suite 2000
Cedar Hill, TX 75104
T: 469.523.1351
F: 469.613.0891
john.sullivan@the-sl-lawfirm.com

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***
**Center for Individual Rights**
1100 Connecticut Ave. NW
Suite 625
Washington, DC, 20036
T: 202.833.8400
kruckenberg@cir-usa.org

*Attorneys for Plaintiffs*

\*Admitted *Pro Hac Vice*

A162

### CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

\*Admitted *Pro Hac Vice*

### CERTIFICATE OF CONFERENCE

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h); and that the motion is opposed. Counsel for Plaintiffs conferred with Counsel for Defendants, Faith E. Lowry and Stuart J. Robinson, regarding the relief requested and the grounds raised by Plaintiffs on June 3, 2024. Despite good faith efforts by counsel, the motion is opposed.

Respectfully,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

\*Admitted *Pro Hac Vice*

A163

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>        Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.,<br>        Defendants. | CIVIL ACTION NO.: 4:24-CV-00478<br><br>**[PROPOSED] ORDER FOR<br>PRELIMINARY INJUNCTION** |

Having considered Plaintiffs' Motion for Preliminary Injunction and Defendants' response thereto, pursuant to Fed. R. Civ. P. 65(a), the Court GRANTS the motion and ORDERS that Defendants shall be preliminarily enjoined from enforcing the Corporate Transparency Act, 31 U.S.C. § 5336, and its implementing regulations, 31 CFR § 1010.380, pending further proceedings.

Plaintiffs have established a substantial likelihood of success on the merits of their underlying challenge to the Act and regulations. The Act and regulations are likely unconstitutional for three reasons. First, the federal government lacks the power to regulate entities organized under state law merely because they have registered with their home state. Congress has no enumerated power to regulate state corporate organization and other purely local activities that have always been regulated exclusively by the states. Second, the Act restricts associational rights protected by the First Amendment because it forces entities to disclose the identities of individuals associated with the entity's expressive activities. Finally, the Act violates the Fourth Amendment because it mandates invasive disclosures on pain of criminal punishment without any particularized suspicion or precompliance review from a neutral party. Because the regulations implement the unconstitutional statute, they are also enjoined.

A164

Plaintiffs also face a substantial threat of irreparable harm absent the injunction, as they must incur substantial compliance costs in service of an unconstitutional statute prior to Jan. 1, 2025.

Finally, the equities favor an injunction as Defendants have no legitimate interest in enforcing an unlawful statute and regulations.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>            Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.<br>            Defendants. | CIVIL ACTION NO.:<br><br>**DECLARATION OF LINDA<br>SCHNEIDER** |

**DECLARATION OF LINDA SCHNEIDER**

I, Linda Schneider, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.      I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.      I am the Corporate Representative of Texas Top Cop Shop, Inc. ("Texas Top Cop Shop"), one of the plaintiffs in this action.

3.      Texas Top Cop Shop is a corporation organized under the laws of Texas and registered with the Texas Secretary of State since 2017.  Texas Top Cop Shop is a member of the National Federation of Independent Business, Inc. ("NFIB").

4.      Texas Top Cop Shop is a family-run business that operates a single retail storefront in Conroe, Texas, which sells uniforms and equipment for first responders, such as police officers and emergency services personnel.

5.      Texas Top Cop Shop sells its merchandise locally, does not sell any items out of state or through the internet.

1

6.  Texas Top Cop Shop has four employees, including its owners.

7.  Texas Top Cop Shop is a licensed dealer of firearms.  To obtain such a license, its owners were thoroughly investigated and determined to be law-abiding U.S. citizens.

8.  Texas Top Cop Shop has designated a registered agent and office location with the Texas Secretary of State, but has not disclosed the identities of each of its shareholders and beneficial owners.

9.  As a pre-existing corporation registered with the Texas Secretary of State, Texas Top Cop Shop would be required to comply with the Corporate Transparency Act ("CTA"), and must file beneficial ownership reports with the Financial Crimes Enforcement Network ("FinCEN") before January 1, 2025.

10.  Texas Top Cop Shop would be forced to incur compliance costs should it file the required reports, including the cost of legal services related to reviewing relevant records and filings.

11.  Texas Top Cop Shop has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and its implementing regulations, because Texas Top Cop Shop objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

12.  Texas Top Cop Shop advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

2

A167

Executed on May 24, 2024

Linda Schneider

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>          Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.<br>          Defendants. | CIVIL ACTION NO.:<br><br><br>**DECLARATION OF RUSSELL<br>STRAAYER AS CHIEF EXECUTIVE<br>OFFICER OF DATA COMM** |

**DECLARATION OF RUSSELL STRAAYER AS
CHIEF EXECUTIVE OFFICER OF DATA COMM**

I, Russell Straayer, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.       I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.       I am the Chief Executive Officer of Data Comm for Business, Inc. ("Data Comm"), one of the plaintiffs in this action.

3.       Data Comm is a Delaware corporation with operations in Illinois and Texas.  Data Comm is registered to do business as a foreign corporation with the Illinois Secretary of State. Data Comm is a member of the National Federation of Independent Business, Inc. ("NFIB").

4.       Data Comm is a small business that provides technical support, information technology, and communications products and services to other small businesses and individuals.

5.       Data Comm conducts many of its operations in Illinois, but several of its officers, directors and owners all reside in Texas, and its principal place of business is in Plano, Texas.

1

A169

6.      Data Comm has 10 employees.

7.      Data Comm is not required to disclose the identities of its beneficial owners as a condition of registering to do business in Illinois.

8.      As a pre-existing corporation registered with the Illinois Secretary of State, Data Comm would be required to comply with the Corporate Transparency Act ("CTA"), and must file beneficial ownership reports with the Financial Crimes Enforcement Network ("FinCEN") before January 1, 2025.

9.      Data Comm would be forced to incur compliance costs should it file the required reports, including the cost of legal services related to reviewing relevant records and filings.

10.     Data Comm has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and its implementing regulations, because Data Comm objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

11.     Data Comm advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

12.     Under leadership of the NFIB, Data Comm sent a letter to the U.S. House Committee on Small Business advocating for the repeal of the CTA.  A true and correct copy of that letter is attached hereto as Exhibit A.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

    Executed on May 24, 2024

_Russell A. Straayer_
Russell Straayer

2

A170

# EXHIBIT A



555 12th St NW, Suite 1001
Washington, D.C. 20004

1-800-552-5342
NFIB.com

April 30, 2024

The Honorable Roger Williams
Chairman
Committee on Small Business
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Nydia Velazquez
Ranking Member
Committee on Small Business
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Williams and Ranking Member Velazquez,

On behalf of NFIB, the nation's leading small business advocacy organization, I write regarding the hearing entitled, "Under the Microscope: Examining FinCEN's Implementation of the Corporate Transparency Act." NFIB's nearly 300,000 small businesses appreciate the opportunity to discuss their concerns with the burdensome beneficial ownership reporting requirement and the need for Congress to repeal the poorly written, ambiguous Corporate Transparency Act (CTA).

On January 1, 2021, the CTA was signed into law as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.[1] In doing so, Congress imposed one of the most expansive small business regulations in history as an amendment to an unrelated and must-pass bill.

For many years, NFIB opposed Congressional efforts to impose these vague and arbitrary reporting requirements on the smallest businesses. However, Congress ultimately ignored the concerns of small businesses and rammed through a burdensome law that affects 32.6 million small businesses in 2024 and 5 to 6 million small businesses every year thereafter. According to FinCEN, the regulatory costs of the CTA is a whopping $22.7 billion in 2024 and $5.6 billion every year after.[2]

---

[1] TITLE LXIV—ESTABLISHING BENEFICIAL OWNERSHIP INFORMATION REPORTING REQUIREMENTS, William M. ( Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Public Law 116-283, January 1, 2021, https://www.congress.gov/116/plaws/publ283/PLAW-116publ283.pdf
[2] Beneficial Ownership Information Reporting Requirements, Final Rule, Financial Crimes Enforcement Network, September 30, 2022, https://www.regulations.gov/document/FINCEN-2021-0005-0461.

According to a recent survey, 83 percent of NFIB members are not familiar with the beneficial ownership reporting requirements that went into effect on January 1, 2024.[3] However, if these businesses fail to comply with a law they overwhelmingly don't know exists, they could face up to a $10,000 fine and 2 years in prison.

Through the CTA, Congress has subjected tens of millions of law-abiding small business owners across the country to criminal penalties for simple paperwork violations. Members of Congress often talk about reducing red tape for small businesses. However, Congress largely ignores this massive new burden on small businesses it created in 2021.

As more business owners become aware of these requirements and the penalties for noncompliance, the calls to repeal the CTA will increase. Thankfully, Senator Tommy Tuberville and Representative Warren Davidson's *Repealing Big Brother Overreach Act* will repeal the vague and burdensome law. Senator Tuberville and Representative Davidson understand this is not an agency implementation problem, it is a problem with the law that gave the government a new, broad data collection and enforcement authority.

By introducing this legislation, Senator Tuberville and Representative Davidson have heard the concerns of small business owners and are taking action. Small businesses are grateful for their leadership and hope the members of this Committee will cosponsor the legislation to repeal the CTA. To further highlight the need to repeal the CTA, please see the stories of small business owners that are included with this statement.

NFIB appreciates your leadership to eliminate red tape for small businesses and encourages you to repeal the Corporate Transparency Act. We look forward to working with you on ways to provide small businesses relief during the remainder of the 118th Congress.

Sincerely,

Josh McLeod
Director, Federal Government Relations
NFIB

---

[3] Holly Wade, *Financing Sales Survey*, NFIB Research Center, December 2023, https://strgnfibcom.blob.core.windows.net/nfibcom/Financing-Sales-Survey.pdf.



**Company Name:** Rendex, Inc.T/A Integrated Services Group and Events
**Location:** North Haledon,  NJ
**Number of Employees:** 2
**Beneficial Ownership Impact:**

I am a micro business owner serving other small business owners.

I help my clients with any administrative forms or requests they RECEIVE from the state, IRS, their insurance companies, etc.

Unfortunately, none of us _received_ a notification of this new requirement. One of my clients learned about it on TIKTOK?!

When I began researching this registration, there were two forms.  I couldn't determine which one to complete.  I began contacting FINCEN by email, asking for a phone number, help and/or an explanation of each form.

I only received form letter responses, no phone number and no assistance to complete a form asking for information it seems is readily available from any state or federal tax return or incorporating documents. AND, now there seems to only be one form.

My clients can barely afford to pay me, especially since the government obliteration of small business during COVID, now,  we are expected to find time and money to complete this redundant registration that we found accidentally.

Hasn't small business been through enough? We can't afford employees with the increase in minimum wage, supplies, taxes and insurance, and now we spend  our day filling out reports. Why wasn't this better communicated? Why was it only advertised on TikTok? Why didn't businesses receive a professional letter in the mail? Learning about it the way I did made me think it was a scam or is this a way to purposely keep businesses owners uniformed so that they end up paying a fine?  Who will help and why is it necessary? Why isn't there a phone number to reach someone to answer questions and assist with complying with this new order? Lastly, in searching for more information, I read that in March, it was [correctly] deemed unconstitutional. So, is it still required?

**Company Name:** Brady's Plant Ranch, LTD
**Location:** Idaho
**Number of Employees:** 17
**Beneficial Ownership Impact:**

We are a small family farm.

We already report and pay taxes, corporate taxes, unemployment taxes, payroll taxes, sales taxes, corporate filings, state licenses, insurance premiums, etc. We have no accountants or lawyers on retainer. They help on an as-needed basis. We just don't have the money for such.

Here is another level of bureaucracy trying to essentially put us out of business. We employ more stay-at-home moms, teenagers, and entry-level people than any other business in our local area. This BOI reporting is literally a slap in the face, if not an uppercut, to a little business trying to provide a community service.

We are seriously approaching the "straw that breaks the camel's back" so to speak. And what is magic about 20 employees? Please give us a break. Thank you.



**Company Name:** Data Comm for Business, Inc.
**Location:** Illinois, Texas
**Number of Employees:** 12
**Beneficial Ownership Impact:**

The BOI is duplicative, expensive, burdensome, unnecessary. The BOI reporting requirement is a disincentive to creating a business. Just one more thing to distract a business from doing its business.

The BOI requirement is duplicative of information available in personal and corporate tax returns, FinCEN from 104 reporting, publicly available incorporation information.

The BOI requirement for a new FinCEN ID (12-digit number) is duplicative of FEIN and SSN numbers.

The website for BOI has the insulting implication in its heading of assumption of guilt. The heading is "FINANCIAL CRIMES ENFORCEMENT NETWORK".

The Federal Register reporting costs to corporations initially and annually totals billions of dollars and are understated in the analysis.  The FinCEN estimate of $85.14 to prepare and submit an initial BOI report is grossly understated. The Q&A at this web link (https://www.fincen.gov/boi-faqs#D_1) requires a man-day to read and digest. There are 98 points A to O each elaborated with hundreds of words of text, tables, and flow charts. The Federal Register comments alone are 100 pages plus about 446 footnotes. A man-week to just understand this is a more reasonable estimate of cost.



**Company Name:** *Grazing Systems Supply, Inc.*
**Location:** Batesville, Indiana
**Number of Employees:** 4
**Beneficial Ownership Impact:**

As a part-time Agriculture Supply Business humbly beginning 35 years ago it quickly turned into our full-time occupation. We continue to supply customers and do community service. We, like the majority of small businesses, are making a living but far from being rich.  We work more hours per week than any Federal Government employee, pay our bills, pay our taxes, play by the rules and follow the law.  We battle the competition, the economy, the markets, the weather and the out-of-control Federal Government regulations.

Concerning Beneficial Ownership Information Reporting (BOIR), what's "*Beneficial*" to small businesses or the American public about having another federal regulation to deal with?  And **NOW** a small business with two locations located in two small towns in Indiana with 4 employees and one bank account needs to be over-seen by the Financial Crimes Enforcement Network of the U.S. Dept. of the Treasury.  BOIR isn't about bad actors, ill-gotten gains, shell companies or money laundering because the IRS already knows that information by accessing our tax returns and bank records.  This **IS** all about <u>government control</u> and <u>the destruction of small businesses</u>.  95% of the small business community has neither the resources, lawyers, accountants or time to deal with it all.

My final thought about BOIR comes from a sentence taken from our Declaration of Independence.  The writers were referring to the King of Great Britain as "He".  But substituting "our Federal Government" in place of "He", I quote: "He has erected a multitude of new offices and sent hither swarms of officers to harass our people and eat out their substance."

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., Plaintiffs, <br><br> v. <br><br> MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, ET AL. <br> Defendants. | CIVIL ACTION NO.: <br><br> **DECLARATION OF RUSSELL STRAAYER AS AN INDIVIDUAL PLAINTIFF** |

**DECLARATION OF RUSSELL STRAAYER AS AN INDIVIDUAL PLAINTIFF**

I, Russell Straayer, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.      I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.      I am one of the plaintiffs in this action.  I reside in Collin County, Texas.

3.      I am a "beneficial owner" of multiple "reporting companies" as those terms are defined by the Corporate Transparency Act ("CTA").

4.      For example, I am a beneficial owner and officer of Data Comm for Business, Inc. ("Data Comm"), where I serve as the Chief Executive Officer.

5.      I am not the only beneficial owner of Data Comm, however.

6.      I am also a beneficial owner of other reporting companies that are not a party to this litigation.

7.      I have been a vocal opponent of the CTA, and have publicly stated my individual opposition to the Act.

1

A178

8.      One of the reporting companies for which I am a beneficial owner does not take a public stance on the validity or wisdom of the CTA, and does not wish to be associated with my advocacy.

9.      I have not filed any beneficial ownership reports with the Financial Crimes Enforcement Network ("FinCEN"), and do not intend to disclose all of my beneficial ownership interests in various entities (as defined by the CTA) absent a judicial declaration that I am required to comply with the CTA and its implementing regulations, because I object to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

10.      If forced to file reports with FinCEN, I would incur costs associated with compiling and reviewing records, including costs for legal services.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 24, 2024

*Russell A. Straayer*

Russell Straayer

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>     Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.<br>     Defendants. | CIVIL ACTION NO.:<br><br>**DECLARATION OF TONY GOULART** |

## DECLARATION OF TONY GOULART

I, Tony Goulart, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.     I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.     I am the President of Mustardseed Livestock, LLC ("Mustardseed"), one of the plaintiffs in this action.

3.     Mustardseed is a limited liability company organized under the laws of Wyoming and registered with the Wyoming Secretary of State since 2020.

4.     Mustardseed operates a small dairy farm in Lingle, Wyoming, and does business only in the State of Wyoming.

5.     Mustardseed operates primarily as a small family farm, and does not engage in interstate commercial activities.

6.     Mustardseed consumes most of its production on its own property, but it occasionally sells surplus raw milk directly to customers in Wyoming.

7.      In 2023, Mustardseed's gross income from milk sales did not exceed $30,000.

8.      Mustardseed's gross income for all sources in 2024 is not expected to exceed $50,000.

9.      Mustardseed has designated a registered agent and registered office, but has not disclosed to the State of Wyoming the identities of each of its members.

10.     Wyoming state law permits anonymous ownership in LLCs, and requires only that an LLC disclose a registered agent, who may or may not have an ownership interest in the company, and a registered office within the state where it will accept service of process.

11.     As a pre-existing LLC registered with the Wyoming Secretary of State, Mustardseed would be required to comply with the Corporate Transparency Act ("CTA"), and must file beneficial ownership reports with the Financial Crimes Enforcement Network ("FinCEN") before January 1, 2025.

12.     Mustardseed would be forced to incur compliance costs should it file the required reports, including the cost of legal services related to reviewing relevant records and filings.

13.     Mustardseed has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and its implementing regulations, because Mustardseed objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

14.     Mustardseed advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

A181

Executed on May 24, 2024

Tony Goulart

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., <br>          Plaintiffs, <br><br> v. <br><br> MERRICK GARLAND, ATTORNEY <br> GENERAL OF THE UNITED STATES, <br> ET AL. <br>          Defendants. | CIVIL ACTION NO.: <br><br><br> **DECLARATION OF GLEN LEWIS** |

## DECLARATION OF GLEN LEWIS

I, Glen Lewis, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.      I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.      I am the Chairman of the Libertarian Party of Mississippi ("MSLP"), one of the plaintiffs in this action.

3.      MSLP is a political organization, whose members seek to advance the platform of the National Libertarian Party within the State of Mississippi, through advocacy and elections for state and local office.

4.      MSLP is organized under the laws of the State of Mississippi, and is currently registered with the Mississippi Secretary of State.

5.      MSLP is committed to individual liberty and personal responsibility, a free-market economy of abundance and prosperity, and a foreign policy of non-intervention, peace and free

1

trade. MSLP further seeks a world of liberty; a world in which all individuals control their own lives and are never forced to compromise their values or sacrifice their property.

6. MSLP espouses and promotes a robust separation of the state and federal government, and believes that individual liberty can best be protected by a strictly-limited federal government, which does not interfere with or restrict the rights of individuals.

7. MSLP espouses and advocates for the adoption of the National Libertarian Party's platform within Mississippi state and local government.

8. MSLP specifically advocates for the promotion and protection of individual privacy and government transparency. MSLP is committed to ending government's practice of spying on everyone. MSLP supports the rights recognized by the Fourth Amendment to be secure in our persons, homes, property, and communications. MSLP believes that protection from unreasonable search and seizure should include records held by third parties, such as email, medical, and library records.

9. MSLP also advocates and supports the right to liberty of speech and action – accordingly it opposes all attempts by government to abridge the freedom of speech and press, as well as government censorship in any form.

10. MSLP has publicly advocated for the repeal of the Corporate Transparency Act ("CTA") because its obligations impermissibly intrude on state sovereignty, it subjects law-abiding people to unconstitutional restrictions on free speech and association and unlawful intrusions into their private papers and effects.

11. MSLP is not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code, and thus is required to comply with the CTA.

12. MSLP has no physical office, instead conducting its activities through its members.

2

A184

13.     MSLP is a political organization that receives donations from individuals and entities, which it uses to promote political candidates for office in Mississippi and policies affecting the residents of the state.

14.     MSLP has less than $20,000 in assets, which it derived from donations, and which it uses solely for political expenditures for local candidates for office in the State of Mississippi, or state and local public policy issues affecting the residents of Mississippi.

15.     MSLP does not engage in economic activities outside of the State of Mississippi, and does not make political expenditures for candidates or issues outside of state.

16.     MSLP has designated a registered agent and registered address with the State of Mississippi, but has not disclosed the identities of each of its members, officers, delegates, volunteers, major donors, or others who have beneficial ownership interests or substantial control over MSLP.

17.     MSLP's bylaws control its corporate operations, and provide for governance by officers, each of whom must be a member of the state party and chosen by party members as officers, as well as the appointment of governing committees, and voting delegates.

18.     MSLP's bylaws require that a majority of its executive committee, comprised of state party officials, must authorize the expenditure of any party money.

19.     MSLP's bylaws also provide for amendment of the bylaws at the suggestion of any member of the state party, and will be enacted by a 2/3 majority of voting delegates, which are registered members of the state party.

20.     Mississippi law regards MSLP as a distinct legal entity, separate from its members, and does not require disclosure of its members, officers, beneficial owners or control persons.

3

A185

21.     Mississippi also specifically forbids use and disclosure of "a membership list or any part thereof" of a nonprofit corporation, without the consent of the board.

22.     As a pre-existing nonprofit corporation registered with the Mississippi Secretary of State, MSLP would be required to comply with the CTA, and must file beneficial ownership reports with the Financial Crimes Enforcement Network ("FinCEN") before January 1, 2025.

23.     MSLP would be forced to incur compliance costs should it file the required reports, including the cost of legal services related to reviewing relevant records and filings.

24.     MSLP has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and its implementing regulations, because MSLP objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

25.     MSLP advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May __, 2024

Glen Lewis

4

A186

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>         Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.<br>         Defendants. | CIVIL ACTION NO.:<br><br><br>**DECLARATION OF ELIZABETH<br>MILITO** |

**DECLARATION OF ELIZABETH MILITO**

I, Elizabeth Milito, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.      I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.      I am the Executive Director of the Small Business Legal Center for the National Federation of Independent Business, Inc. ("NFIB"), one of the plaintiffs in this action.

3.      NFIB is a tax-exempt organization under section 501(c) of the Internal Revenue Code and is exempt from the Corporate Transparency Act ("CTA") and its implementing regulations.

4.      While NFIB is exempt from the CTA, significant numbers of its members would be required to comply with the Act.  These members include:

       a.      Texas Top Cop Shop, Inc. and Data Comm for Business, Inc. ("Data Comm"), both of which are plaintiffs in this action; and

1

    b.  Grazing Systems Supply, Inc., which is an Indiana Corporation, registered to do business with the Indiana Secretary of State, with its principal place of business in Batesville, Indiana.  Grazing Systems Supply, Inc. is a family-owned and family-run business.  Started in 1989 as a part time business, it has successfully grown to a full-time agricultural supply business specializing in seed and fencing sales.  Grazing Systems Supply, Inc. has five total employees.  Because Grazing Systems Supply, Inc. has fewer than 20 full-time employees, it must comply with the reporting requirements of the CTA.

  5.  NFIB's members would be forced to incur compliance costs should they file the required reports, including the cost of legal services related to reviewing relevant records and filings.

  6.  NFIB and its members oppose the CTA, and NFIB has advocated publicly for its repeal on behalf of its members that must comply with the Act and its implementing regulations.

  7.  As an example of NFIB's advocacy, on April 30, 2024, NFIB sent a letter on behalf of its members to the U.S. House Committee on Small Business, urging Congress to repeal the CTA.  A true and correct copy of that letter is attached hereto as Exhibit A.

  8.  Individual NFIB Members, including Data Comm and Grazing Systems Supply, Inc., likewise advocated for the CTA's repeal in an NFIB-led letter to the U.S. House Committee on Small Business.  Both Data Comm and Grazing Systems Supply, Inc., also sent letters to the Committee on their own behalf, advocating for the repeal of the CTA.  True and correct copies of their letters are attached hereto as Exhibit B.  Data Comm and Grazing Systems Supply, Inc., advocated for the CTA's repeal through their corporate entities in part to protect the associational privacy interests of their beneficial owners.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 28th, 2024

Elizabeth Milito

3

# EXHIBIT A



555 12th St NW, Suite 1001
Washington, D.C. 20004

1-800-552-5342
NFIB.com

April 30, 2024

The Honorable Roger Williams
Chairman
Committee on Small Business
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Nydia Velazquez
Ranking Member
Committee on Small Business
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Williams and Ranking Member Velazquez,

On behalf of NFIB, the nation's leading small business advocacy organization, I write regarding the hearing entitled, "Under the Microscope: Examining FinCEN's Implementation of the Corporate Transparency Act." NFIB's nearly 300,000 small businesses appreciate the opportunity to discuss their concerns with the burdensome beneficial ownership reporting requirement and the need for Congress to repeal the poorly written, ambiguous Corporate Transparency Act (CTA).

On January 1, 2021, the CTA was signed into law as part of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021.[1] In doing so, Congress imposed one of the most expansive small business regulations in history as an amendment to an unrelated and must-pass bill.

For many years, NFIB opposed Congressional efforts to impose these vague and arbitrary reporting requirements on the smallest businesses. However, Congress ultimately ignored the concerns of small businesses and rammed through a burdensome law that affects 32.6 million small businesses in 2024 and 5 to 6 million small businesses every year thereafter. According to FinCEN, the regulatory costs of the CTA is a whopping $22.7 billion in 2024 and $5.6 billion every year after.[2]

---

[1] TITLE LXIV—ESTABLISHING BENEFICIAL OWNERSHIP INFORMATION REPORTING REQUIREMENTS, William M. ( Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Public Law 116-283, January 1, 2021, https://www.congress.gov/116/plaws/publ283/PLAW-116publ283.pdf
[2] Beneficial Ownership Information Reporting Requirements, Final Rule, Financial Crimes Enforcement Network, September 30, 2022, https://www.regulations.gov/document/FINCEN-2021-0005-0461.

According to a recent survey, 83 percent of NFIB members are not familiar with the beneficial ownership reporting requirements that went into effect on January 1, 2024.[3] However, if these businesses fail to comply with a law they overwhelmingly don't know exists, they could face up to a $10,000 fine and 2 years in prison.

Through the CTA, Congress has subjected tens of millions of law-abiding small business owners across the country to criminal penalties for simple paperwork violations. Members of Congress often talk about reducing red tape for small businesses. However, Congress largely ignores this massive new burden on small businesses it created in 2021.

As more business owners become aware of these requirements and the penalties for noncompliance, the calls to repeal the CTA will increase. Thankfully, Senator Tommy Tuberville and Representative Warren Davidson's *Repealing Big Brother Overreach Act* will repeal the vague and burdensome law. Senator Tuberville and Representative Davidson understand this is not an agency implementation problem, it is a problem with the law that gave the government a new, broad data collection and enforcement authority.

By introducing this legislation, Senator Tuberville and Representative Davidson have heard the concerns of small business owners and are taking action. Small businesses are grateful for their leadership and hope the members of this Committee will cosponsor the legislation to repeal the CTA. To further highlight the need to repeal the CTA, please see the stories of small business owners that are included with this statement.

NFIB appreciates your leadership to eliminate red tape for small businesses and encourages you to repeal the Corporate Transparency Act. We look forward to working with you on ways to provide small businesses relief during the remainder of the 118th Congress.

Sincerely,

Josh McLeod
Director, Federal Government Relations
NFIB

---

[3] Holly Wade, *Financing Sales Survey*, NFIB Research Center, December 2023, https://strgnfibcom.blob.core.windows.net/nfibcom/Financing-Sales-Survey.pdf.

2

# EXHIBIT B



**Company Name:** Rendex, Inc.T/A Integrated Services Group and Events
**Location:** North Haledon,  NJ
**Number of Employees:** 2
**Beneficial Ownership Impact:**

I am a micro business owner serving other small business owners.

I help my clients with any administrative forms or requests they RECEIVE from the state, IRS, their insurance companies, etc.

Unfortunately, none of us _received_ a notification of this new requirement. One of my clients learned about it on TIKTOK?!

When I began researching this registration, there were two forms.  I couldn't determine which one to complete.  I began contacting FINCEN by email, asking for a phone number, help and/or an explanation of each form.

I only received form letter responses, no phone number and no assistance to complete a form asking for information it seems is readily available from any state or federal tax return or incorporating documents. AND, now there seems to only be one form.

My clients can barely afford to pay me, especially since the government obliteration of small business during COVID, now,  we are expected to find time and money to complete this redundant registration that we found accidentally.

Hasn't small business been through enough? We can't afford employees with the increase in minimum wage, supplies, taxes and insurance, and now we spend  our day filling out reports. Why wasn't this better communicated? Why was it only advertised on TikTok? Why didn't businesses receive a professional letter in the mail? Learning about it the way I did made me think it was a scam or is this a way to purposely keep businesses owners uniformed so that they end up paying a fine?  Who will help and why is it necessary? Why isn't there a phone number to reach someone to answer questions and assist with complying with this new order? Lastly, in searching for more information, I read that in March, it was [correctly] deemed unconstitutional. So, is it still required?

**Company Name:** Brady's Plant Ranch, LTD
**Location:** Idaho
**Number of Employees:** 17
**Beneficial Ownership Impact:**

We are a small family farm.

We already report and pay taxes, corporate taxes, unemployment taxes, payroll taxes, sales taxes, corporate filings, state licenses, insurance premiums, etc. We have no accountants or lawyers on retainer. They help on an as-needed basis. We just don't have the money for such.

Here is another level of bureaucracy trying to essentially put us out of business. We employ more stay-at-home moms, teenagers, and entry-level people than any other business in our local area. This BOI reporting is literally a slap in the face, if not an uppercut, to a little business trying to provide a community service.

We are seriously approaching the "straw that breaks the camel's back" so to speak. And what is magic about 20 employees? Please give us a break. Thank you.

4



**Company Name:** Data Comm for Business, Inc.
**Location:** Illinois, Texas
**Number of Employees:** 12
**Beneficial Ownership Impact:**

The BOI is duplicative, expensive, burdensome, unnecessary. The BOI reporting requirement is a disincentive to creating a business. Just one more thing to distract a business from doing its business.

The BOI requirement is duplicative of information available in personal and corporate tax returns, FinCEN from 104 reporting, publicly available incorporation information.

The BOI requirement for a new FinCEN ID (12-digit number) is duplicative of FEIN and SSN numbers.

The website for BOI has the insulting implication in its heading of assumption of guilt. The heading is "FINANCIAL CRIMES ENFORCEMENT NETWORK".

The Federal Register reporting costs to corporations initially and annually totals billions of dollars and are understated in the analysis.  The FinCEN estimate of $85.14 to prepare and submit an initial BOI report is grossly understated. The Q&A at this web link (https://www.fincen.gov/boi-faqs#D_1) requires a man-day to read and digest. There are 98 points A to O each elaborated with hundreds of words of text, tables, and flow charts. The Federal Register comments alone are 100 pages plus about 446 footnotes. A man-week to just understand this is a more reasonable estimate of cost.



**Company Name:** *Grazing Systems Supply, Inc.*
**Location:** Batesville, Indiana
**Number of Employees:** 4
**Beneficial Ownership Impact:**

As a part-time Agriculture Supply Business humbly beginning 35 years ago it quickly turned into our full-time occupation. We continue to supply customers and do community service. We, like the majority of small businesses, are making a living but far from being rich.  We work more hours per week than any Federal Government employee, pay our bills, pay our taxes, play by the rules and follow the law.  We battle the competition, the economy, the markets, the weather and the out-of-control Federal Government regulations.

Concerning Beneficial Ownership Information Reporting (BOIR), what's "*Beneficial*" to small businesses or the American public about having another federal regulation to deal with?  And **NOW** a small business with two locations located in two small towns in Indiana with 4 employees and one bank account needs to be over-seen by the Financial Crimes Enforcement Network of the U.S. Dept. of the Treasury.  BOIR isn't about bad actors, ill-gotten gains, shell companies or money laundering because the IRS already knows that information by accessing our tax returns and bank records.  This **IS** all about <u>government control</u> and <u>the destruction of small businesses</u>.  95% of the small business community has neither the resources, lawyers, accountants or time to deal with it all.

My final thought about BOIR comes from a sentence taken from our Declaration of Independence.  The writers were referring to the King of Great Britain as "He".  But substituting "our Federal Government" in place of "He", I quote: "He has erected a multitude of new offices and sent hither swarms of officers to harass our people and eat out their substance."

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., *et al.*,<br><br>           Plaintiffs,<br><br>     v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES, *et al.*,<br><br>           Defendants. | Civil Action No. 4:24-cv-00478 (ALM) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director
Federal Programs Branch

STUART J. ROBINSON
Senior Counsel
FAITH E. LOWRY
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (415) 436-6635
Email: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................2

    I.      Statutory Background .............................................................................................2

    II.    FinCEN's Rulemaking ..........................................................................................6

    III.   This Litigation .......................................................................................................6

LEGAL STANDARD ..........................................................................................................7

ARGUMENT .......................................................................................................................7

    I.      Plaintiffs Fail to Demonstrate Irreparable Harm .................................................7

    II.    Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Claims
          .............................................................................................................................10

          A.    Congress Has Broad Authority to Enact Economic Regulations...................10

          B.    The CTA Permissibly Effectuates Prohibitions on Harmful Economic
               Activities ........................................................................................................11

          C.    The CTA's Disclosure Requirements Do Not Violate the First Amendment
               .......................................................................................................................23

          D.    The CTA Does Not Violate the Fourth Amendment....................................26

    III.   The Balance of Equities and the Public Interest Disfavor a Preliminary Injunction .29

    IV.   Plaintiffs' Proposed Injunction Is Improper ......................................................29

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Ala. State Fed'n of Tchrs., AFL-CIO v. James*,
    656 F.2d 193 (5th Cir. 1981) ................................................................................25

*Am. Co. v. SEC*,
    327 U.S. 686 (1946) .............................................................................................19

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) ..............................................................................................19

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) .......................................................................................22, 23

*Anyadike v. Vernon Coll.*,
    No. 7:15-cv-00157, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ...................8

*Aransas Project v. Shaw*,
    775 F.3d 641 (5th Cir. 2014) .................................................................................8

*Bond v. United States*,
    572 U.S. 844 (2014) .............................................................................................21

*Book People Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ..................................................................................9

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) ...............................................................................23

*BST Holdings, L.L.C. v. OSHA*,
    17 F.4th 604 (2021) .............................................................................................18

*BuzzBallz, LLC. v. JEM Beverage Co., LLC*,
    No. 3:15-cv-588, 2015 WL 3948757 (N.D. Tex. June 26, 2015) ..........................8

*Cal. Bankers Ass'n v. Shultz*,
    416 U.S. 21 (1974) ........................................................................................*passim*

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) .............................................................................................30

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) .................................................................................8

*Cargill v. Garland*,
    57 F.4th 447 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023) ...........................30

*Castro v. City of Grand Prairie*,
  No. 3:21-CV-885, 2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ........................................9

*Cent. & S.W. Servs., Inc. v. EPA*,
  220 F.3d 683 (5th Cir. 2000) .........................................................................................30

*Chamber of Commerce of United States v. SEC*,
  85 F.4th 760 (5th Cir. 2023) .........................................................................................24

*CIC Servs., LLC v. IRS*,
  593 U.S. 209 (2021) .....................................................................................................22

*Citizens United v. FEC*,
  558 U.S. 310 (2010) .....................................................................................................25

*City of Los Angeles v. Patel*,
  576 U.S. 409 (2015) .....................................................................................................28

*Data Mktg. P'ship LP v. U.S. Dep't of Labor*,
  45 F.4th 846 (5th Cir. 2022) .........................................................................................30

*Davis v. Pension Benefit Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ....................................................................................29

*Def. Distributed v. U.S. Dep't of State*,
  838 F.3d 451 (5th Cir. 2016) .........................................................................................29

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ...................................................................................................30

*Donovan v. Lone Steer, Inc.*,
  464 U.S. 408 (1984) .....................................................................................................26

*Duarte v. City of Lewisville*,
  136 F. Supp. 3d 752 (E.D. Tex. 2015), *aff'd* 858 F.3d 348, (5th Cir. 2017) ..........................8

*Dunbar v. Seger-Thomschitz*,
  615 F.3d 574 (5th Cir. 2010) ................................................................................... 21, 22

*Elec. Bond & Share Co. v. SEC*,
  303 U.S. 419 (1938) .....................................................................................................18

*GDF Realty Invs., Ltd. v. Norton*,
  326 F.3d 622 (5th Cir. 2003) .........................................................................................15

*Gill v. Whitford*,
  585 U.S. 48 (2018) .......................................................................................................29

*Gonzales v. Raich,*
   545 U.S. 1 (2005) ....................................................................................*passim*

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ...................................................................9

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson,*
   234 F.3d 192 (5th Cir. 2000) ...........................................................11, 12

*Helvering v. Mitchell,*
   303 U.S. 391 (1938) ...............................................................................22

*Hernandez v. Mesa,*
   589 U.S. 93 (2020) .................................................................................20

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.,*
   452 U.S. 264 (1981) ...................................................................13, 14, 15

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ...................................................................................20

*Japan Line, Ltd. v. Cnty. of Los Angeles,*
   441 U.S. 434 (1979) ...............................................................................20

*Jinks v. Richland Cnty.,*
   538 U.S. 456 (2003) ...............................................................................22

*Jordan v. Fisher,*
   823 F.3d 805 (5th Cir. 2016) ...................................................................7

*Justin Indus., Inc. v. Choctaw Secs., L.P.,*
   920 F.2d 262 (5th Cir. 1990) ...................................................................8

*Kennedy v. Mendoza-Martinez,*
   372 U.S. 144 (1963) ...............................................................................20

*Klayman v. Obama,*
   805 F.3d 1148 (D.C. Cir. 2015) .............................................................28

*Lady J. Lingerie v. City of Jacksonville,*
   176 F.3d 1358 (11th Cir. 1999) ..............................................................24

*Laird v. Tatum,*
   408 U.S. 1 (1972) .............................................................................25, 27

*Leaf Trading Cards, LLC v. Upper Deck Co.,*
   No. 3:17-CV-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ....................8

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .................................................................................................................29

*Maryland v. King*,
  567 U.S. 1301 (2012) ..............................................................................................................29

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
  447 F. Supp. 3d 522 (N.D. Tex. 2020) ...................................................................................29

*M'Culloch v. State*,
  17 U.S. (4 Wheat.) 316 (1819) ...............................................................................................23

*Monumental Task Comm., Inc. v. Foxx*,
  157 F. Supp. 3d 573 (E.D. La. 2016), *aff'd*, 678 F. App'x 250 (5th Cir. 2017)............... 7, 8

*Munaf v. Geren*,
  553 U.S. 674 (2008) ...................................................................................................................7

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ...........................................................................................................24, 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................................. 10, 11, 18, 23

*Nat'l Small Bus. United v. Yellen*,
  No. 5:22-cv-1448, 2024 WL 899372, (N.D. Ala. Mar. 1, 2024),
  *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024)......................................................14, 23

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................................................................29

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) .....................................................................................................................10

*RJ Reynolds Tobacco Co. v. FDA*,
  96 F.4th 863 (5th Cir. 2024).....................................................................................................24

*Second Amend. Found., Inc. v. ATF*,
  No. 3:21-CV-0116, 2023 U.S. Dist. LEXIS 202589 (N.D. Tex. Nov. 13, 2023) ...................9

*Second Amend. Found. v. ATF*,
  No. 3:21-cv-0116, 2023 WL 4304760 (N.D. Tex. June 30, 2023)..........................................30

*Sheffield v. Bush*,
  604 F. Supp. 3d 586 (S.D. Tex. 2022) .......................................................................................9

*Shenzhen Tange Li'An E-Commerce, Co. v. Drone Whirl LLC*,
  No. 1:20-CV-738-RP, 2020 WL 5237267 (W.D. Tex. Sep. 2, 2020) ........................................8

*Skinner v. Ry. Lab. Execs.' Ass'n,*
    489 U.S. 602 (1989) ................................................................................................28

*Sonzinsky v. United States,*
    300 U.S. 506 (1937) .......................................................................................... 22, 23

*Tee & Bee, Inc. v. City of W. Allis,*
    936 F. Supp. 1479 (E.D. Wis. 1996) .....................................................................24

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018)............................................................................................30

*Ullmann v. United States,*
    350 U.S. 422 (1956)................................................................................................20

*United States v. Bolatete,*
    977 F.3d 1022 (11th Cir. 2020)..............................................................................23

*United States v. Brigham,*
    382 F.3d 500 (5th Cir. 2004)..................................................................................28

*United States v. Comstock,*
    560 U.S. 126 (2010) ......................................................................... 11, 14, 22, 23

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936)................................................................................................21

*United States v. Darby,*
    312 U.S. 100 (1941)................................................................................................11

*United States v. Di Re,*
    332 U.S. 581 (1948)................................................................................................20

*United States v. Goodwin,*
    141 F.3d 394 (2d Cir. 1997) ...................................................................................12

*United States v. Gordon,*
    No. 14-CR-10304, 2016 WL 11668976 (D. Mass. Aug. 30, 2016)........................28

*United States v. Lopez,*
    514 U.S. 549 (1995) ......................................................................................... 11, 18

*United States v. Matthews,*
    438 F.2d 715 (5th Cir. 1971)..................................................................................22

*United States v. McClaren,*
    13 F.4th 386 (5th Cir. 2021)...................................................................................12

*United States v. Morrison,*
   529 U.S. 598 (2000) ............................................................................................... 11, 18

*United States v. Salerno,*
   481 U.S. 739 (1987) ......................................................................................................10

*Univ. of Texas v. Camenisch,*
   451 U.S. 390 (1981) .................................................................................................... 8, 9

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24,*
   751 F.2d 721 (5th Cir. 1985) .........................................................................................30

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ........................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) .................................................................................................... 7, 29

*Worthy v. United States,*
   328 F.2d 386 (5th Cir. 1964) .........................................................................................21

*Zauderer v. Office of Disciplinary Counsel of Supreme Court,*
   471 U.S. 626 (1985) ......................................................................................................24

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ......................................................................................................20

## **Statutes**

5 U.S.C. § 701(a) ...............................................................................................................28

5 U.S.C. § 702(2) .................................................................................................................7

5 U.S.C. § 706(2) ...............................................................................................................30

8 U.S.C. § 1324a ................................................................................................................26

15 U.S.C. § 1 ......................................................................................................................19

15 U.S.C. § 45 ....................................................................................................................19

18 U.S.C. § 1001 .................................................................................................................2

18 U.S.C. § 1341 .................................................................................................................2

18 U.S.C. § 1343 .................................................................................................................2

18 U.S.C. § 1956 ............................................................................................................ 2, 12

18 U.S.C. § 1957 ........................................................................................................ 2, 12

18 U.S.C. § 2339C ..................................................................................................... 2, 12

26 U.S.C. § 6012 ...................................................................................................... 18, 26

26 U.S.C. § 7201 ........................................................................................................ 2, 12

29 U.S.C. § 201 ............................................................................................................... 19

31 U.S.C. § 5311 ....................................................................................................... *passim*

31 U.S.C. § 5313 .............................................................................................................. 26

31 U.S.C. § 5336 ....................................................................................................... *passim*

52 U.S.C. § 30104 .................................................................................................... 18, 26

Anti-Money Laundering Act of 2020 ("AMLA"),
  Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547 (2021) ................................... 2

## Legislative Authorities

*Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency:*
*Hearing before the Senate Judiciary Comm.,*
  115th Cong. (2018) ...................................................................................................... 20

166 Cong. Rec.  S7310 (2020) ................................................................................. 19, 20

166 Cong. Rec.  H6932 (2020) ................................................................................. 19, 20

H.R. Rep. No. 116-227 (2019) ............................................................................... 2, 12, 13

U.S. Const. art. I, § 8, cl. 3 ....................................................................................... 10, 19

U.S. Const. art. I, § 8, cl. 18 ..................................................................................... 11, 21, 22

## Regulations

31 C.F.R. § 1010.230(a) ................................................................................................ 14

31 C.F.R. § 1010.312 .................................................................................................... 26

31 C.F.R. § 1010.605(e) ................................................................................................ 14

*Beneficial Ownership Information Reporting Requirements*
  87 Fed. Reg. 59,498 (Sept. 30, 2022) ................................................................. *passim*

## <u>Other Authorities</u>

*Multiple Chancellors: Reforming the National Injunction*,
    131 Harv. L. Rev 417 (2017)..................................................................................................30

FinCEN FAQ B.3,
    https://perma.cc/LE24-SVRB...............................................................................................8

MSLP,
    https://perma.cc/UZY8-KV3X.............................................................................................29

Press Release, U.S. Beneficial Ownership Information Registry Now Accepting Reports (Jan. 1,
2024),
    https://perma.cc/6NRG-CTZB ...............................................................................................9

# INTRODUCTION

For decades, Congress has legislated to curb money laundering and terrorist financing. As illicit actors find new ways to circumvent those laws, Congress has responded to ensure that the government possesses the information to counteract such evolving threats. Most recently, these threats come from the exploitation of legal entities such as corporations to facilitate illicit activity that imperils the national security and foreign policy of the United States. Criminals can easily create these entities under state laws and may generally do so without disclosing their involvement. As a result, the United States has become a popular jurisdiction for criminals to create legal entities that facilitate and further fraud, human smuggling, corruption, drug trafficking, and terrorist financing.

To address these harms, Congress passed the Anti-Money Laundering Act of 2020, which includes the Corporate Transparency Act ("CTA"). This legislation requires certain domestic and foreign companies to report information concerning their beneficial owners and those individuals filing certain entity-creation forms to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury. Congress assessed that this information—including a beneficial owner's name, address, date of birth, and a unique identifier such as a driver's license number—will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat posed by criminals, terrorists, and others undermining U.S. interests.

Plaintiffs challenge the constitutionality of the limited reporting requirements established by the CTA. But they have not shown a likelihood of success on the merits of these claims because the CTA (1) falls well within Congress's power, amplified by the Necessary and Proper Clause, to regulate commerce, ensure national security, and lay and collect taxes; (2) accords with the First Amendment; and (3) does not unreasonably invade any Fourth Amendment privacy interests. Nor does consideration of the remaining preliminary injunction factors favor Plaintiffs. The Court should deny Plaintiffs' motion for preliminary injunction.

# BACKGROUND

## I.    Statutory Background

Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, financing terrorism, *see id.* § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and a number of other harmful economic activities, *see*, *e.g.*, 18 U.S.C. §§ 1001, 1341, 1343.  According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year.  *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 (Sept. 30, 2022).[1]  Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement.  *See*, *e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (discussing Bank Secrecy Act of 1970, 31 U.S.C. § 5311 *et seq.*).

Despite these efforts, there remained a significant gap in the government's ability to detect and prosecute financial crime.  Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to report "information about the[ir] beneficial owners." Anti-Money Laundering Act of 2020 ("AMLA"), Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547, 4604 (2021).[2]  "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license."  H.R. Rep. No. 116-227, at 2 (2019).  That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud."  NDAA § 6402(3).

Congress and the Executive Branch identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10.  When investigators trace illicit funds to a corporation, they often cannot identify the corporation's owners

---

[1] Internal quotations marks and citations are omitted throughout this brief, unless noted.
[2] The AMLA and CTA were enacted as part of the National Defense Authorization Act ("NDAA").

from available sources because ownership records "do not exist." 87 Fed. Reg. at 59,504. Instead, investigators must pursue "human source information, grand jury subpoenas, surveillance operations, witness interviews, search warrants, and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies[.]" *Id.* The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious." *Id.* at 59,505. And because criminals may "layer" multiple shell companies, even the most thorough investigation may not yield results. NDAA § 6402(4).

Criminals routinely exploit this enforcement gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." 87 Fed. Reg. at 59,503. Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national-security and foreign-policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions[.]" *Id.* at 59,498; *see id.* at 59,502 (discussing use of shell companies by the Government of Iran). And more broadly, the absence of company-ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice for those wishing to create shell companies that hide their ultimate beneficiaries" and "a weak link in the integrity of the global financial system." *Id.* at 59,506. Because it did not collect ownership information, the United States fell out of "compliance with international anti-money laundering and countering the financing of terrorism standards." NDAA § 6402(5)(E).

For similar reasons, criminals can use the government's lack of information about the

ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." NDAA § 6402(3).  A "[Department of the] Treasury study based on a statistically significant sample of adjudicated [IRS] cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud."  87 Fed. Reg. at 59,503.

To address this enforcement gap, Congress enacted beneficial ownership reporting requirements.  The AMLA adopts various provisions designed to "modernize" federal laws concerning money laundering and terrorism financing.  NDAA § 6002(2).  Among those is the CTA, which aims to ensure that the United States uniformly collects beneficial ownership information notwithstanding the disparate corporate formation requirements imposed by states.  *Id.* § 6002(5).

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity[.]"  *Id.* § 6402(5).  Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities[,]" *id.* § 6402(6)(A), assist in improving "tax administration[,]" 31 U.S.C. § 5336(c)(5)(B), and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" NDAA § 6402(5)(E).  And Congress described the reported information as "highly useful to national security, intelligence, and law enforcement agencies and Federal functional regulators."  *Id.* § 6402(8)(C).

The CTA accordingly requires that certain businesses report information about their beneficial owners and applicants to FinCEN.  A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity."  31 U.S.C. § 5336(a)(3)(A).  *But see id.* § 5336(a)(3)(B) (establishing certain exceptions).  And

an "applicant" is an individual who files documents to form or register the corporate entity.  *See id.* § 5336(a)(2).  For each applicant and beneficial owner, a covered business must report the individual's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number[.]"  *Id.* § 5336(a)(1), (b)(2)(A).

In addition to providing that covered businesses file reports when they first become subject to the CTA, the statute also requires that those businesses submit updated reports when ownership information changes.  In particular, when "there is a change with respect to any" ownership information, a covered business must "submit to FinCEN a report that updates the information relating to the change."  *Id.* § 5336(b)(1)(D).  A person who willfully violates either the initial or ongoing reporting requirements is subject to civil and criminal penalties.  *See id.* § 5336(h).  *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]."  *Id.* § 5336(a)(11).  That term generally includes any "corporation, limited liability company, or other similar entity that is" either "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe[,]" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe[.]"  *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements 23 categories of legal entities, such as banks, public accounting firms, and other businesses already subject to reporting or recordkeeping requirements.  *Id.* § 5336(a)(11)(B).  It excludes certain domestically owned entities no longer engaged in business.  *Id.* § 5336(a)(11)(B)(xxiii).  It also excludes certain trusts, political organizations, and non-profits.  *Id.* § 5336(a)(11)(B)(xix).

Consistent with Congress's purposes, the CTA generally contemplates that reported information be used to facilitate the investigation and prosecution of financial crimes, among other

things.  For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity[.]" *Id.* § 5336(c)(2)(B)(i)(I).  FinCEN may share the same information with state and local law enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation[.]" *Id.* § 5336(c)(2)(B)(i)(II).

## II.     FinCEN's Rulemaking

The CTA directs FinCEN to implement certain aspects of the statute by regulation.  *See id.* § 5336(b)(5).  FinCEN issued its final rule on beneficial ownership information reporting in September 2022.  87 Fed. Reg. at 59,509.  As relevant here, the rule, as amended, establishes the deadlines by which covered entities must comply with the statute.  For businesses created or registered before 2024, compliance is required by January 1, 2025.  *See* 31 C.F.R. § 1010.380(a)(1)(iii).

## III.    This Litigation

Plaintiffs filed this action on May 28, 2024.  Compl., ECF No. 1.  Plaintiffs consist of two corporations whose principal place of business is in Texas (Texas Top Cop Shop, Inc. and Data Comm for Business, Inc.), an individual residing in Texas (Russell Straayer), a Wyoming limited liability company (Mustardseed Livestock, LLC), a Mississippi non-profit corporation (Libertarian Party of Mississippi ("MSLP")), and a Tennessee non-profit organization (National Federation of Independent Business ("NFIB")).  Compl. ¶¶ 1-6.  They allege that Texas Top Cop Shop, Data Comm for Business, Mustardseed, and MSLP are subject to the CTA's reporting requirements by January 1, 2025, *id.* ¶¶ 60, 70, 92, 115; Mr. Straayer is a beneficial owner of Data Comm for Business and "has been a vocal opponent of the CTA," *id.* ¶¶ 76, 79; and NFIB is exempt from the CTA but brings this claim on behalf of its members, *id.* ¶ 120.  Plaintiffs first claim that the CTA exceeds Congress's powers under the Constitution.  *Id.* ¶¶ 126-34.  Second, Plaintiffs assert that the reporting requirements of the CTA compel disclosure of information in violation of the First Amendment.  *Id.* ¶¶ 136-48.  Third, in

Plaintiffs' view, the CTA constitutes an unreasonable search and seizure in violation of the Fourth Amendment. *Id.* ¶¶ 150-57. And fourth, Plaintiffs allege that FinCEN's final rule on reporting requirements contravenes the Administrative Procedure Act, 5 U.S.C. § 702(2). *Id.* ¶¶ 159-64.

Despite the fact that no Plaintiff must comply with the CTA until January 2025, Plaintiffs moved for a preliminary injunction on June 3, 2024. ECF No. 6 ("Pls.' Mot."). They seek a nationwide injunction prohibiting enforcement of the CTA and its implementing regulations. ECF No. 6-1.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff must show (1) "a substantial threat of irreparable injury[,]" (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.*

## ARGUMENT

## I.   Plaintiffs Fail to Demonstrate Irreparable Harm

As discussed below, Plaintiffs have not shown a likelihood of success on the merits of any of their claims. Their request that this court preliminarily enjoin an Act of Congress fails at the threshold, however, because Plaintiffs do not demonstrate any irreparable harm.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582-83 (E.D. La. 2016), *aff'd*, 678 F. App'x 250 (5th Cir. 2017). "To constitute irreparable harm, an

injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (Mazzant, J.), *aff'd*, 858 F.3d 348, (5th Cir. 2017), and must also be "future or continuing," *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014).  Plaintiffs must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

As an initial matter, Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief.  "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015).  "[A]nywhere from a three-month delay to a six-month delay [is] enough to militate against issuing injunctive relief."  *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases).  Here, the bipartisan CTA was enacted in 2021, more than three years before Plaintiffs filed the instant suit.  And FinCEN has been accepting beneficial ownership reports for more than six months, since January 1, 2024.  *See* FinCEN FAQ B.3, https://perma.cc/LE24-SVRB.  Plaintiffs' actions "suggest[] a lack of urgency that militates against a finding of irreparable injury." *Shenzhen Tange Li'An E-Commerce, Co. v. Drone Whirl LLC*, No. 1:20-CV-738-RP, 2020 WL 5237267, at *4 (W.D. Tex. Sep. 2, 2020); *see BuzzBallz, LLC. v. JEM Beverage Co., LLC*, No. 3:15-cv-588, 2015 WL 3948757, at *6 (N.D. Tex. June 26, 2015).

And regardless of their delay, Plaintiffs have not demonstrated that a preliminary injunction is necessary because "the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  No Plaintiff is required to comply with the CTA until January 1, 2025.  The parties therefore have more than six months to resolve this case through dispositive motions before any injury could be deemed imminent.

Plaintiffs nonetheless attempt to establish irreparable harm by refencing alleged compliance costs associated with the CTA's reporting requirements.  But the evidence Plaintiffs cite in support is wholly conclusory, consisting of a single statement in the non-associational Plaintiffs' declarations. *See*, *e.g.*, Decl. of Russell Straayer ¶ 9, ECF No. 6-3.  Plaintiffs have already, by their own admissions, determined that they are subject to the reporting requirements.  *E.g.*, *id.*  The form itself is simple and free.  Press Release, U.S. Beneficial Ownership Information Registry Now Accepting Reports (Jan. 1, 2024), available at https://perma.cc/6NRG-CTZB.  The information requested is, as Plaintiffs' exhibits describe it, "readily available."  ECF No. 6-3 at p.6; *see also* 87 Fed. Reg. at 59,573.  Because Plaintiffs have already determined that they are subject to the reporting requirements and given the evidence reflecting the simplicity of the form itself, Plaintiffs have not shown that their own alleged compliance costs are more than *de minimis*.  *See Second Amend. Found., Inc. v. ATF*, No. 3:21-cv-0116, 2023 U.S. Dist. LEXIS 202589, at *48-49 (N.D. Tex. Nov. 13, 2023) (plaintiff failed to show irreparable harm where the record did not reflect compliance costs that were more than *de minimis*).

Plaintiffs next attempt to establish irreparable harm by arguing that "the CTA and the Reporting Rule infringe Plaintiffs' constitutional rights, including their First Amendment associational rights," citing *Book People Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024).  Pls.' Mot. at 29.  But the "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."  *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).  Courts have thus declined to find irreparable harm based solely on a plaintiff's allegation that his constitutional rights have been violated.  *E.g.*, *Castro v. City of Grand Prairie*, No. 3:21-CV-885, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022).  And, as explained below, Plaintiffs have not shown a likelihood of success on the merits of their claims.

Plaintiffs therefore fail to establish imminent, irreparable harm, and their motion for preliminary injunctive relief should be denied for this reason alone.

## II.     Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Claims

The CTA falls within Congress's authority for two independent reasons.  First, the statute regulates commercial entities and is thus directly authorized by the commerce power.  Second, corporate ownership reporting requirements effectuate a number of powers vested in the federal government, including the commerce, tax, and national-security powers, and are therefore authorized by the Necessary and Proper Clause.  Either of these bases suffices to defeat Plaintiffs' challenge, and Plaintiffs have failed to "establish that no set of circumstances exists under which the Act would be valid."  *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (op. of Roberts, C.J.) ("*NFIB*").  Because Plaintiffs have not "clearly demonstrated" that Congress lacked the constitutional authority to pass the CTA, *see NFIB*, 567 U.S. at 538, Plaintiffs fall well short of establishing a likelihood of success.

### A.  Congress Has Broad Authority to Enact Economic Regulations

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "[T]he power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' . . . ; to adopt measures 'to promote its growth and insure its safety' . . . ; 'to foster, protect, control and restrain.'"  *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937); *see NFIB*, 567 U.S. at 549 (op. of Roberts, C.J.).  In addition to regulating the "channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce[,]" Congress may "regulate activities that substantially affect interstate commerce."  *Gonzales v. Raich*, 545 U.S. 1, 16-17, 34 (2005).  When Congress acts in this third category, it has the power to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."  *Id.* at 17.  And "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class."  *Id.*  A court "need not determine whether [the regulated] activities, taken in the aggregate,

substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at 22 (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)).

The Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other enumerated powers and the powers vested in the Executive Branch, U.S. Const. art. I, § 8, cl. 18, also "grants Congress broad authority to enact federal legislation[,]" *United States v. Comstock*, 560 U.S. 126, 133 (2010).  It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134; *see United States v. Darby*, 312 U.S. 100, 121 (1941).

In assessing the breadth of Congress's authority to regulate activities that substantially affect interstate commerce, the Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000), and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613.  The Court has also distinguished regulations of commercial activity from regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage.  *NFIB*, 567 U.S. at 553 (op. of Roberts, C.J.).  Supreme Court precedent thus "provides two recognized and historically rooted means of congressional regulation under the commerce power: (1) whether the activity is any sort of economic enterprise, however broadly one might define those terms; or (2) whether the activity exists as an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 205 (5th Cir. 2000).

## B.  The CTA Permissibly Effectuates Prohibitions on Harmful Economic Activities

1.      The CTA's reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime.   "[M]oney laundering is a quintessential economic activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997).  The same is true of fraud, drug

trafficking, and other financial crimes targeted by the CTA.  *See United States v. McClaren*, 13 F.4th 386, 402 (5th Cir. 2021) (drug trafficking is economic activity); *see also Groome Res. Ltd.*, 234 F.3d at 208 (discussing breadth of "economic activity").  "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Goodwin*, 141 F.3d at 399.  Plaintiffs cannot dispute that Congress may, pursuant to the Commerce Clause, prohibit these harmful forms of economic activity.  18 U.S.C. §§ 1956, 1957 (prohibiting money laundering); *id.* § 2339C (terrorism financing); 26 U.S.C. § 7201 (tax evasion).

Various economic crimes are made easier to commit, and harder to discovery, through the formation of corporate entities that may conduct economic transactions in their own names without disclosing beneficial ownership information.  NDAA § 6402(2).  By definition, a corporate entity has legal authority to conduct economic transactions in its own name, including by "[m]ak[ing] contracts," "borrow[ing] money[,]" "incur[ring] liabilities," and transferring "real or personal property." *E.g.*, Del. Code Ann. tit. 8, § 122.  But state law generally does not require "corporations, limited liability companies, [and] other similar entities" to report "information about the[ir] beneficial owners." NDAA § 6402(2); *see* Compl. ¶¶ 59, 69, 91.  As Congress determined, "malign actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection.  NDAA § 6402(3).  "This lack of transparency" has been "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. 116-227, at 10; *see* 87 Fed. Reg. at 59,504-05.  Many criminals, both foreign and domestic, exploit this knowledge gap.  *E.g.*, 87 Fed. Reg. at 59,503.

Congress passed the AMLA in response to these concerns.  The AMLA, of which the CTA is a part, aims "to modernize" existing federal legislation seeking to combat "money laundering and counter[] the financing of terrorism," among other financial crimes.  NDAA §§ 6001, 6002(2), 6401. The CTA fills an important gap in Congress's comprehensive regime to prevent money laundering by facilitating the uniform collection of beneficial ownership information.  *Id.* § 6002(5).  In particular,

the statute requires legal entities—that is, those entities that have the ability to engage in commercial transactions in their own name—to disclose the identities of the individuals who created the entities and have authority to direct their operations.  The statute contemplates that the reported information will be used for law enforcement and related activities.  31 U.S.C. § 5336(c)(2).  For instance, FinCEN may share information with federal agencies when it would be "in furtherance" of "national security, intelligence, or law enforcement activity," *id.* § 5336(c)(2)(B), and with state or local agencies when a court "has authorized the law enforcement agency to seek the information in a criminal or civil investigation," *id.*  The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations and thus detect and prosecute financial crimes.  NDAA § 6002(5)(A).

Congress thus determined that this information "is needed" to "protect interstate and foreign commerce" and "counter money laundering, the financing of terrorism, and other illicit activity[.]" NDAA § 6402(5).  Congress further determined such information would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes."  *Id.* § 6002(5).  These findings rest on an extensive record demonstrating that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information."  H.R. Rep. 116-227, at 2; *see also Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276 (1981).  By contrast, failure to include the CTA in the AMLA would have left a "gaping hole" in Congress's efforts to curb illicit financial activity.  *Raich*, 545 U.S. at 22.

As these provisions illustrate, the CTA effectuates legitimate prohibitions on harmful forms of economic activity.  The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations and thus to detect and prosecute financial crimes.  NDAA § 6002(5)(A).  The CTA is therefore "rationally related to the implementation" of valid prohibitions, *Comstock*, 560 U.S. at 134, and it accordingly falls within the established scope of Congress's authority

13

under both the Commerce and Necessary and Proper Clauses.

Defendants recognize that one district court has concluded that the CTA is not an essential part of Congress's comprehensive, anti-money laundering regulatory regime.  *See Nat'l Small Bus. United v. Yellen* ("*NSBU*"), 2024 WL 899372, at *17 (N.D. Ala. Mar. 1, 2024), *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024).[3]  Defendants respectfully submit that the district court's order and opinion, from which the government has appealed, erred in concluding that the CTA was an isolated, "single-subject statute" such that the "'comprehensive regulatory scheme' framework" did not apply, *id.* at *17, particularly given the CTA's role as an important part of the AMLA.  Further, the *NSBU* court erred in holding that the "CTA is far from essential" on the basis that some financial institutions are required to retain certain beneficial owner information about their customers pursuant to a 2016 rule.  *See id.* (citing 31 C.F.R. § 1010.230(a)).  Rather, two aspects of that rule led Congress to reasonably determine, on an extensive record, that the CTA's disclosure requirements were "needed" to combat economic crimes, notwithstanding the 2016 rule.  NDAA § 6402(5); *see also* 87 Fed. Reg. at 59,548 (explaining how Congress addressed relationship between the CTA and the 2016 rule).  First, the 2016 rule applies only to entities that choose to become customers of a comparatively narrow set of financial institutions.  *See* 31 C.F.R. § 1010.605(e).  Second, the rule required those institutions to retain, but not transmit to the government for law enforcement purposes, certain customer information.  The elected Branches determined that the CTA is critical to the government's larger efforts to combat financial crime, and there is no basis for second-guessing that judgment.  *See Hodel*, 452 U.S. at 283.

Nor can Plaintiffs advance their argument by asserting, without any supporting authority, that "[t]he CTA is not part of a larger regulatory scheme, and Congress did not identify any such regulatory scheme in passing it."  Pls.' Mot. at 15.  Congress in fact did so by making the CTA part of the AMLA.

---

[3] In another case challenging the constitutionality of the CTA, a district court has denied a motion for preliminary relief.  Order, *Small Bus. Ass'n of Mich. v. Yellen*, No. 1:24-cv-00314 (Apr. 26, 2024).

14

A221

Plaintiffs contend that "[a] vague goal of 'protecting commerce' or 'deterring money laundering' is not such a scheme."  Pls.' Mot. at 15.  But the Fifth Circuit has never required the incantation of certain words before finding that a statute survives a Commerce Clause challenge.  *See GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 638-41 (5th Cir. 2003) (upholding Endangered Species Act provision regulating Cave Species).  Moreover, Congress plainly identified the regulatory scheme as one aimed at curbing illicit financial activity and incorporated it into the government's signature anti-money laundering statute.  NDAA §§ 6001, 6002(2), 6401.[4]

2.     The CTA is separately authorized by the Commerce Clause because it regulates economic activity with a substantial effect on interstate commerce.  After all, the CTA applies to corporations and other entities legally authorized to conduct commercial transactions, and it excludes from its reach many non-profits and domestically owned entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets."  31 U.S.C. § 5336(a)(11)(xix), (xxiii).

Plaintiffs allege that the CTA impermissibly applies to corporate entities "irrespective of the presence or absence of any commercial activity."  Pls.' Mot. at 15.  This assertion misconstrues the CTA as having nothing to do with commercial activity, as if the act of incorporation bears no rational connection to such activity.  But it is hardly speculative that entities that incur the trouble and expense of filing papers to obtain authority to conduct commercial transactions in their own name go on to engage in commercial activity.  This point is illustrated by the reporting companies at issue here.  Texas Top Cop Shop is a retail commercial enterprise, selling equipment, uniforms, and firearms.  Decl. of Linda Schneider ¶¶ 4, 7, ECF No. 6-2  Data Comm for Business "provides technical support, information technology, and communications products and services to other small businesses and individuals."  Decl. of Russell Straayer ¶ 4, ECF No. 6-3.  Mustardseed operates a dairy farm and sells

---

[4] Congressional focus on this class of commercially organized entities to report information under the CTA is far afield of Plaintiffs' suggestions that validating the CTA here would mean any person who ever registered with the government for any reason could be regulated by Congress.  Pls.' Mot. at 16.

"directly to customers[.]"  Decl. of Tony Goulart ¶ 6.  And even MSLP—which leaves unclear why it does not qualify for an exemption from the definition of "reporting company" as a tax-exempt political organization, *see* 31 U.S.C. § 5336(a)(11)(B)(xix)(II)—holds assets in its own name and transfers money derived from donations.  Decl. of Glen Lewis ¶¶ 14-15, ECF No. 6-6.[5]

In light of the documented misuse of anonymous corporations to facilitate money laundering and similar activities, the CTA reasonably applies to a class of entities that can be used to conduct and conceal illicit transactions.  *See* 31 U.S.C. § 5336(a)(11).  The universe of entities subject to the CTA's reporting requirements—which excludes many trusts, political organizations, and non-profits, as well as many entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets," *id.* § 5336(a)(11)(B)(xix), (xxiii)—confirms that the statute is a constitutional, commercial regulation.  The reporting requirements thus govern entities with both the power and the purpose of conducting the types of commercial transactions that concerned Congress.

Plaintiffs improperly focus on edge cases and possible exceptions.  Pls.' Mot. at 15.  The Supreme Court has "never required Congress to legislate with scientific exactitude."  *Raich*, 545 U.S. at 17.  Rather, "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'"  *Id.*  That is especially so where, as here, the "'total incidence' of a practice"—the formation of entities that may engage in commercial activity while hiding the identities of their beneficial owners—"poses a threat to a national market[.]"  *Raich*, 545 U.S. at 17; *see id.* at 23 ("[W]e have often reiterated that 'where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"); *see also* 87 Fed. Reg. 59,501.

---

[5] For these and other reasons, Plaintiffs' "as-applied" challenge fails.  Pls.' Mot. at 18 (incorrectly suggesting that Commerce Clause reaches only "entities with *significant* . . . commercial activities" or more than "very few assets[,]" and acknowledging Plaintiffs' economic activity) (emphasis added).  Further, Plaintiffs appear to concede that the statute may be constitutional as applied to other entities, *see id.*, thus dooming their facial challenge.

Finally, Plaintiffs argue that the CTA improperly "regulates the act of registration under state law[.]" Pls.' Mot. at 15.  But the CTA does not purport to override or preempt any state-law incorporation provisions.  The reporting requirements apply to "corporation[s]" and "similar entit[ies]" authorized to do business in the United States, without regard to where, when, or how those businesses are incorporated.  31 U.S.C. § 5336(a)(11)(A).  For example, reporting companies that were formed or registered before the effective date are subject to the reporting requirements.  *See id.* § 5336(b)(1)(B).  Requiring a decades-old business to report its ownership at the time the CTA takes effect bears no resemblance to regulating the act of incorporation.

The same understanding is confirmed by other provisions of the CTA.  Businesses subject to the CTA must report changes in ownership on an ongoing basis, without regard to whether they take any new action relating to incorporation.  *See id.* § 5336(b)(1)(D).  And some businesses covered by the CTA never incorporate in the United States at all: a business incorporated in a foreign country is subject to the CTA if it is "registered to do business in the United States."  *Id.* § 5336(a)(11)(A)(ii).  Conversely, the reporting requirements do not extend to various categories of businesses—such as banks, insurers, and certain utilities—that are incorporated but are subject to other federal reporting requirements or are otherwise less likely to be used for financial crimes.  *See id.* § 5336(a)(11)(B).[6]

In short, Congress prevented certain anonymous transactions by requiring entities with the capacity to engage in commerce to identify the natural persons behind the corporate form.  Had Congress defined the relevant class of entities in terms of their capacity to engage in commercial transactions in their own name, presumably Plaintiffs would not argue this burdened state corporate organization.  Congress's decision to identify those entities in a precise and administrable way, in terms of the incorporation or registration that is a prerequisite to engaging in such transactions, does not

---

[6] This fact refutes Plaintiffs' claim that the CTA "irrationally[] excluded business . . . such as money transmitters, public companies and large private businesses."  Pls.' Mot. at 15.

transform the CTA into a regulation of incorporation or registration.

3.      The CTA is thus a fundamental part of Congress's regulation of commerce and bears no resemblance to the enactments that the Supreme Court has held to exceed Congress's authority. *See* Pls.' Mot. at 14, 16.  Unlike in *Lopez* or *Morrison*, "inference upon inference" are not needed to connect the CTA with commerce.  *Lopez*, 514 U.S. at 561, 567; *Morrison*, 529 U.S. at 613.  And unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation[.]"  *Raich*, 545 U.S. 1 at 39 (Scalia, J., concurring in the judgment).  The reporting requirements also differ from the statutory provision at issue in *NFIB*, which "requir[ed] that individuals purchase health insurance."  *NFIB*, 567 U.S. at 548 (op. of Roberts, C.J.).  That requirement "primarily affects healthy, often young adults[,] who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature."  *Id.* at 556.  Here, however, the CTA regulates a class of entities—primarily active, for-profit businesses—whose defining feature is their ability to conduct commercial transactions without disclosing their real parties in interest.  For the same reason, Plaintiffs' reliance on *BST Holdings, L.L.C. v. OSHA*, is misplaced.  *See* 17 F.4th 604, 617 (2021) (discussing vaccine mandate).

Unlike where Congress asserts unprecedented and "extraordinary" powers, *NFIB*, 567 U.S. at 560 (op. of Roberts, C.J.), "[r]egulation requiring the submission of information" is a "familiar category" of federal legislation, *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938); *see, e.g.*, 26 U.S.C. § 6012 (tax returns); 31 U.S.C. § 5311 (bank reports about transactions); 52 U.S.C. § 30104 (political campaign contributions).  And more generally, the CTA continues Congress's long and extensive history of regulating businesses.  *E.g.*, 15 U.S.C. § 1 et seq. (Sherman Act); 29 U.S.C. § 201 et seq. (FLSA); 15 U.S.C. § 45 (FTCA); *see N. Am. Co. v. SEC*, 327 U.S. 686, 706 (1946).  The CTA's reporting requirements are thus a conventional legislative response to enforcement challenges.

4.      The CTA is further authorized by the Commerce Clause because it regulates the channels of, and entities in, interstate commerce.  "Congress, of course, has undoubted power under the [C]ommerce [C]lause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils."  *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99 (1946); *see also N. Am. Co.*, 327 U.S. at 705-06.  "Thus to the extent that corporate business is transacted through such channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare[,]" and "[i]t may prescribe appropriate regulations and determine the conditions under which that business may be pursued."  *Am. Power & Light Co.*, 329 U.S. at 99-100.  Entities constituting CTA reporting companies utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems.  NDAA §§ 6002, 6402; 166 Cong. Rec. at S7310 (statement of Sen. Brown); 166 Cong. Rec. at H6932 (statement of Rep. McHenry).  As the foregoing cases explain, Congress's power to regulate interstate commerce extends beyond directly regulating such networks, and includes the power to regulate those entities who seek to misuse those channels to commit economic crimes.  The CTA's reporting requirements are thus an authorized use of Congress's power.

5.      The CTA is also necessary and proper for carrying into execution other powers.  First, the CTA effectuates Congress's power "[t]o regulate Commerce with foreign Nations."  U.S. Const. art. I, § 8, cl. 3.  "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established."  *Shultz*, 416 U.S. at 59.  The "Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power.  *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979).  Congress expressly found that the CTA "is needed to . . . protect . . . foreign commerce."  NDAA § 6402(5)(C).  The legislative record also confirms that foreign actors are engaging in illicit activity by exploiting lax

19

beneficial ownership reporting requirements within the United States.  *E.g.*, 166 Cong. Rec. at S7310 (statement of Sen. Brown); 166 Cong. Rec. at H6932 (statement of Rep. McHenry); *Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency: Hearing before the Senate Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Grassley).

The CTA additionally aids the enforcement of prohibitions designed to protect U.S. foreign policy and national security interests.  "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs."  *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963); *see also Hernandez v. Mesa*, 589 U.S. 93, 103-04 (2020).  The same is true of matters pertaining to national security, which "is the prerogative of the Congress and President."  *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Ullmann v. United States*, 350 U.S. 422, 436 (1956).  The already "strong presumption of constitutionality due to an Act of Congress," *United States v. Di Re*, 332 U.S. 581, 585 (1948), is heightened where a statute "implicates sensitive and weighty interests of national security and foreign affairs[,]" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).

Congress found that "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, . . . harming the national security interests of the United States and allies of the United States[.]"  NDAA § 6402(3).  And Congress concluded that collecting beneficial ownership information "is needed to . . . protect vital Unite[d] States national security interests"; "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity"; and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" *id.* § 6402(5).  The Executive Branch agrees with that assessment.  *See*, *e.g.*, 87 Fed. Reg. at 59,498.  The elected Branches' foreign affairs and national security powers, as amplified by the Necessary and Proper Clause, thus authorize the CTA.

Plaintiffs' argument to the contrary largely depends on the incorrect premise that the CTA

intrudes on states' authority to regulate corporate formation.  Pls.' Mot. at 11-12.  Moreover, the Necessary and Proper Clause empowers Congress to carry into execution not only the powers delineated in Article I, but also "all other Powers vested by this Constitution in the Government of the United States," including "Powers vested . . . in any Department or Officer."  U.S. Const. art. I, § 8, cl. 18.  That includes Congress's powers over foreign affairs and national security, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936), as well as the President's powers to conduct "law enforcement[,]" gather "intelligence," prevent "terrorism," and safeguard "national security," NDAA § 6402(5)(D).  Nor can Plaintiffs support their theory by citing *Bond v. United States*, 572 U.S. 844 (2014), Pls.' Mot. at 11-12, which is far afield.  First, *Bond* involved statutory interpretation, and did not involve the constitutional question of Congress's broad foreign affairs and national security powers.  *See id.* 572 U.S. at 856.  Second, *Bond* involved a "purely local crime" (theft), described by the Supreme Court as an "unremarkable local offense."  *See id.* at 848.  Here, as Congress explained in enacting the AMLA, the CTA is necessary to prevent interstate and international money laundering, terrorism financing, and tax evasion.

Plaintiffs fare no better in complaining about the scope of the CTA.  Insofar as it regulates a corporate entity "formed under the law of a foreign country," 31 U.S.C. § 5336(a)(11)(A)(ii), it is not "a purely domestic statute," Pls.' Mot. at 11, and in any event, Congress can regulate U.S. persons in furtherance of national security and foreign policy interests, *Worthy v. United States*, 328 F.2d 386, 393 (5th Cir. 1964) (recognizing congressional authority "to require passports and to impose reasonable restrictions upon foreign travel").  Nor can Plaintiffs rely on *Dunbar v. Seger-Thomschitz*, 615 F.3d 574 (5th Cir. 2010), cited in Pls.' Mot. at 12; that case not only involved a preemption claim (not present here), but also affirmed the importance of allowing the political branches to effectuate U.S. foreign policy.  *Dunbar*, 615 F.3d at 579.  Finally, Plaintiffs' "as-applied" challenge incorrectly assumes that Congress's exercise of its foreign affairs powers must be grounded in a "compelling international

interest[,]"*see* Pls.' Mot. at 18; rather, Congress may enact laws rationally related to this power and need not show that every entity subject to the law poses a threat to national security.

The reporting requirements are also a necessary and proper exercise of the government's authority to lay and collect taxes.  U.S. Const. art. I, § 8, cl. 1.  Pursuant to that authority, Congress may pass laws "in aid of a revenue purpose[,]" *see Sonzinsky v. United States*, 300 U.S. 506, 513-14 (1937), and to facilitate tax collection, *see Helvering v. Mitchell*, 303 U.S. 391, 399 (1938).  Indeed, Congress has given the IRS "broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021); *see Shultz*, 416 U.S. at 26.  The reporting need not be "coupled with a concurrent tax" but can be "designed to aid the collection of tax [in the] future." *United States v. Matthews*, 438 F.2d 715, 717 (5th Cir. 1971).  Here, Congress determined that the lack of beneficial ownership information allows criminals to obscure their income and assets and thus "facilitate[s] . . . serious tax fraud."  NDAA § 6402(3).  Congress found that the new reporting requirements would be "highly useful" in detecting tax fraud, 31 U.S.C. § 5336(a)(11)(xxiv)(ii), and improving "tax administration" generally, *id.* § 5336(c)(5)(B).  The requirements are thus authorized by Congress's authority to take all steps necessary and proper to preserve the government's ability to lay and collect taxes.  *See Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003) (statute need not be "absolutely necessary" to regulatory regime); *Comstock*, 560 U.S. at 133-34 (sufficient if law is "convenient, or useful").

The extent of Plaintiffs' misunderstanding of controlling cases is exemplified by their claim that the Necessary and Proper Clause does not "provide an independent source of power" and instead "merely allows [the] execution of existing powers, and, at most, forgives borderline questions concerning 'individual applications of a concededly valid statutory scheme.'"  Pls.' Mot. 17 (quoting *Raich*, 545 U.S. at 72).  To the contrary, the Supreme Court has long recognized that the Clause vests Congress with broad authority to adopt measures to effectuate its powers.  *See M'Culloch v. Maryland*,

17 U.S. (4 Wheat.) 316, 421 (1819).  The Court has accordingly upheld many significant exercises of federal authority under the Necessary and Proper Clause, including the creation of a national bank, the establishment of the federal prison system, and the enactment of large portions of the federal penal code.  With those benchmarks in mind, the limited reporting requirements at issue here represent a particularly appropriate exercise of Congressional authority under the Clause.

Nor can Plaintiffs contend that the CTA is an invalid exercise of the tax power because it permits the same information to also be used for other non-tax purposes.  "[A] law does not stop being a valid tax measure just because it also serves some other goal."  *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020); *see Sonzinsky*, 300 U.S. at 513-14.  Here, ownership reporting requirements play a significant role in preventing tax evasion.  That they further other important government objectives supports, rather than undermines, Congress's power to enact them.  Plaintiffs' "as-applied" challenge likewise fails, Pls.' Mot. at 18, as individualized suspicion is not needed to require tax reporting, and Congress reasonably determined that existing tax laws were not adequate.[7]

### C.  The CTA's Disclosure Requirements Do Not Violate the First Amendment

Plaintiffs next assert that the CTA, on its face, unduly burdens "expressive associational right[s]."  Pls.' Mot. at 19.  Here, Plaintiffs appear to present an "overbreadth" First Amendment challenge, pursuant to which Plaintiffs must show that "a substantial number of [the CTA's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

But the limited ownership reporting requirements at issue here raise no First Amendment concern.  As an initial matter, the CTA does not restrict the expression of any entity.  Instead, it merely requires that certain businesses report their applicants and beneficial owners to FinCEN.  The

---

[7] Count I of Plaintiffs' Complaint appears to assert a claim under the Tenth Amendment.  Compl. ¶¶ 127-28.  As Plaintiffs do not brief this claim in their motion, Defendants do not respond to it here. *Cf. Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003).

government routinely requires entities to report similar information.  For example, taxpayers must disclose detailed information on their tax returns, *see* 26 U.S.C. § 6012; political campaigns must report contributions and expenditures, *see* 52 U.S.C. § 30104; and corporations involved in federal litigation must generally disclose their owners, *see*, *e.g.*, Fed. Reg. Civ. P. 7.1(a).  These and other disclosure requirements have long been understood as constitutional, and Plaintiffs identify no basis for treating the CTA differently.  That is fatal to their First Amendment claim.

Fifth Circuit case law also confirms that the CTA readily passes muster under the First Amendment.  As the court recently reaffirmed, requirements that regulated entities disclose "factual and uncontroversial" information at most implicate a "deferential standard of review, under which the [disclosures] must be 'reasonably related to the State's interest' and not 'unjustified or unduly burdensome.'"  *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024); *see also Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 767 (5th Cir. 2023) (SEC's stock buy-back rationale disclosure requirement did not impermissibly compel speech).  There can be no dispute that the disclosures at issue here, which involve basic information regarding an entity's beneficial owners, are "factual and uncontroversial."  *RJ Reynolds*, 96 F.4th at 882.  And Plaintiffs make no attempt to argue that the "deferential standard" applicable to factual and uncontroversial information would not be satisfied here.  That is unsurprising given Congress's finding that the CTA is needed to advance law enforcement and national security interests of the highest order, *see* NDAA § 6402(5), and the CTA's tailored focus on those entities that can be used to perpetrate financial crimes.

The cases Plaintiffs cite only serve to underscore that their First Amendment claim is meritless.  In *NAACP v. Alabama ex rel Patterson*, 357 U.S. 449, 463 (1958), the Court invalidated a state statute that compelled an advocacy group to disclose its members "because NAACP members faced a risk of reprisals if their affiliation with the organization became known" and because the government "had demonstrated no offsetting interest 'sufficient to justify'" the disclosure.  *Bonta*, 594 U.S. at 606-607

(summarizing *NAACP*).  Here, the CTA does not require the disclosure of individuals who are merely associated with regulated entities through run-of-the-mill membership; rather, it only requires the disclosure of those "beneficial owners" who own or control regulated entities.   31 U.S.C. § 5336(a)(3)(A).  Nor do Plaintiffs assert—let alone show—that they face any "risk of reprisal" as a result of the CTA's reporting requirements.  *Bonta*, 594 U.S. at 606-07.

Plaintiffs offer no evidence that someone would hesitate to become an owner of a company because the fact of their ownership would become known to the federal government, and the government may later use that information for a limited set of legitimate purposes.  Their speculative, conclusory assertions that their companies' advocacy "could be threatened if the members of each business were required to reveal their identities," Pls.' Mot. at 22, are insufficient, *see Citizens United v. FEC*, 558 U.S. 310, 370 (2010); *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *Ala. State Fed'n of Tchrs., AFL-CIO v. James*, 656 F.2d 193, 197 (5th Cir. 1981).  Indeed, the record is to the contrary: Data Comm for Business has both disclosed the identity of its leadership and publicly advocated for the repeal of the CTA.  Straayer Decl. ¶¶ 2, 11.  So have Mustardseed and MSLP.  Goulart Decl. ¶¶ 2, 14; Lewis Decl. ¶¶ 3, 10.  Plaintiffs have not "made [any] showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *NAACP*, 357 U.S. at 462.  There is no reason to credit Plaintiffs' conclusory assertion that confidentially reporting information in accordance with the CTA would chill expressive conduct.

Nor can Plaintiffs advance their argument by highlighting MSLP, "a political party[.]"  Pls.' Mot. at 21.   Again, MSLP's Executive Committee is publicly available online, https://perma.cc/UZY8-KV3X, undercutting the notion that disclosure to FinCEN would chill any of MSLP's advocacy work.  And although MSLP states that (but does not explain why) it is "not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code,"

Lewis Decl. ¶ 11; Pls.' Mot. at 22 (MSLP "could potentially qualify for federal exemption"), the CTA provides an exemption for such entities, 31 U.S.C. § 5336(a)(11)(B)(xix)(II), further detracting from Plaintiffs' ability to show that the CTA would likely chill protected speech or association.[8]

### D.  The CTA Does Not Violate the Fourth Amendment

Plaintiffs' Fourth Amendment claim is equally meritless.  The Supreme Court has long-recognized that reporting requirements of the kind at issue here raise no Fourth Amendment concern.  In *Shultz*, the Court upheld a statute requiring banks to report transactions over a specified dollar amount to the government.  416 U.S. at 67; *see* 31 U.S.C. § 5313.  For each covered transaction, a bank must disclose the "name," "address," and "social security or taxpayer identification number" of "the individual presenting [the] transaction."  *See e.g.*, 31 C.F.R. § 1010.312.  Congress explained that this information would be "highly useful" in "criminal, tax, or regulatory investigations."  31 U.S.C. § 5311(1). Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable and therefore sustained them under the Fourth Amendment.  *Shultz*, 416 U.S. at 67.  That conclusion reflects the well-established principle that where the government does not seek to make "non-consensual entries into areas not open to the public," and instead merely requires regulated entities to divulge certain records, the Fourth Amendment is more readily satisfied.  *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, Congress has routinely enacted reporting requirements.  For example, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-60; employers to collect and make available information about new

---

[8] Indeed, given all of the activities it says it engages in (soliciting and accepting donations, and providing donations to political candidates, Lewis Decl., ¶¶ 13, 14), it is unclear why the MSLP is not registered as a political organization with the IRS.  Its decision not to do so, when the choice is available to it, should not be held against FinCEN.

employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104.  As the Supreme Court has explained, "reporting requirements are by no means *per se* violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States."[9]  *Shultz*, 416 U.S. at 59-60.

The CTA falls comfortably within the category of reasonable reporting requirements that have long been understood to be constitutional.  As with the statute at issue in *Shultz*, the CTA directs the disclosure of information that Congress identified as "highly useful" to combatting serious crimes.  *See* NDAA § 6402(8)(C); 31 U.S.C. § 5311(1).  And with respect to the CTA in particular, Congress found that corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital United States national security interests."  NDAA § 6402(5)(B), (D).  The CTA therefore serves government interests of the highest order.

Any asserted privacy interest would in any event be minimized by detailed statutory safeguards that Plaintiffs do not address.  When FinCEN receives beneficial ownership information, it can only disclose that information to law enforcement and other entities in specified circumstances that sometimes require court authorization.  *See* 31 U.S.C. § 5336(c)(2).  And entities that receive ownership information from FinCEN must restrict access, implement security measures, and comply with many similar protocols.  *See id.* § 5336(c)(3).  Any individual who violates those protocols is subject to criminal and civil penalties.  *See id.* § 5336(c)(4).  Moreover, Congress exempted 23 types of entities from the beneficial ownership reporting requirements.  *See supra* at 5.  Thus, Plaintiffs are simply

---

[9] Tellingly, Declarant Russell Straayer is publicly identified on Illinois's Business Entity Search system in connection with Data Comm for Business.  And Data Comm for Business concedes that the information sought by the beneficial owner reporting requirement "is duplicative of information available in personal and corporate tax returns, FinCEN from Form 104 reporting, [and] publicly available incorporation information."  ECF No. 6-3 at p.8.  Plaintiffs thus cannot demonstrate either a subjective or objective expectation of privacy in this information.

incorrect to say that the "CTA provides no limitations."  Pls.' Mot. at 27.

Plaintiffs make no attempt to reconcile their Fourth Amendment argument with *Shultz* or with the many reporting requirements that have long been understood as constitutional.  Instead, Plaintiffs insist that there exists an ironclad requirement for a warrant or "opportunity to obtain pre-compliance review before a neutral decisionmaker" prior to disclosure.  *See* Pls' Mot. at 26.  This type of requirement is out of step with the Supreme Court's admonition that "'[t]he touchstone of the Fourth Amendment is reasonableness.'"  *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). Under this theory, vast swathes of state and federal law would be subject to Fourth Amendment challenges, and *Shultz* itself would be wrongly decided.  That is fatal to Plaintiffs' argument.  But rather than grapple with cases addressing reporting requirements, Plaintiffs chiefly rely (Pls.' Mot. 25-27) on *City of Los Angeles v. Patel*, which addressed an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked, 576 U.S. 409, 421 (2015).  This case casts no doubt on the constitutionality of a statute that requires certain businesses to self-report their beneficial owners.

Alternatively, even as to cases that establish a warrant requirement in some contexts, the CTA falls within the "special needs" exception to such a requirement.  *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989).  The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc). The compelling need to address threats to "U.S. national security and foreign policy interests," 87 Fed. Reg. at 59,500, outweighs any privacy interest in the limited disclosures required by the CTA.  *Cf. United States v. Gordon*, 2016 WL 11668976, at *3 (D. Mass. Aug. 30, 2016).[10]

---

[10] Insofar as Plaintiffs' APA claim simply recasts their constitutional challenges, Pls.' Mot. at 28, it fails for the reasons discussed above.  Defendants reserve the right to argue that the APA challenge fails

### III.     The Balance of Equities and the Public Interest Disfavor a Preliminary Injunction

The remaining two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party" and weigh sharply in Defendants' favor.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  As an initial matter, because Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *see Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 535 (N.D. Tex. 2020).

But even if Plaintiffs could satisfy one or both of the first two factors, the remaining factors tip decisively in Defendants' favor.  The speculative risk of harm to Plaintiffs' asserted interests must be weighed against the obstruction of legitimate government functions that could result if the Court entered Plaintiffs' proposed injunction.  *See Winter*, 555 U.S. at 24; *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016).  Indeed, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).  An injunction would interfere with Congress's judgment about how best to combat "money laundering," "the financing of terrorism," and "serious tax fraud," and its ability to do so.  NDAA § 6402(3).  These compelling interests weigh heavily against granting an injunction.

### IV.     Plaintiffs' Proposed Injunction Is Improper

Even if the Court disagrees with Defendants' arguments, any preliminary relief granted must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765

---

on other grounds, including that the rule constitutes agency action committed to agency discretion by law, 5 U.S.C. § 701(a), or involves a foreign affairs function of the United States, *id.* § 553(a)(1).

(1994) (citation omitted).  The Court should, therefore, decline Plaintiffs' invitation to enjoin the CTA's reporting requirements across the board.[11]  "Both the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances." *Second Amend. Found. v. ATF*, No. 3:21-cv-0116, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023)). "Because plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018).  This concern is particularly acute where, as here, the Eleventh Circuit is simultaneously considering the legality of the same challenged provisions.  *See Nat'l Small Bus. United, et al. v. U.S. Dept. of the Treasury, et al.*, No. 24-10736 (11th Cir.).  This Court should therefore follow the Fifth Circuit's mandate "to avoid rulings which may trench upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985), and decline to issue the broad relief that Plaintiffs request.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

---

[11] Plaintiffs first state that the "Reporting Rule Must Be Vacated As Well," but conclude by saying that "this Court should also enjoin the rule."  Pls.' Mot. at 28.  Regardless of how Plaintiffs seek to set aside the rule, any relief afforded by the Court should be limited in accordance with the APA and equitable principles, including that the "relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir.) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *cert. granted*, 144 S. Ct. 374 (2023); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand).  Although Defendants recognize that the Fifth Circuit has previously accepted the argument that 5 U.S.C. § 706(2) authorizes vacatur of an agency action, *see Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022), Defendants respectfully contend that it does not. Section 706(2) is merely a rule of decision directing the reviewing court to disregard unlawful agency action in resolving the case before it; it does not dictate any particular remedy.  *See* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev 417, 451-52 (2017); *see id.* at 438, n. 121.  The Court should thus not issue any preliminary relief that extends beyond Plaintiffs.

Dated: June 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director
Federal Programs Branch

*/s/ Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
FAITH E. LOWRY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (415) 436-6635
Email: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On June 26, 2024, I electronically submitted this document to the clerk of court of the U.S. District Court for the Eastern District of Texas using the court's electronic case filing system.  I certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/Stuart J. Robinson*
STUART J. ROBINSON

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>          Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF<br>THE UNITED STATES,<br>ET AL.<br>          Defendants. | CIVIL ACTION NO.: 4:24-CV-00478-ALM<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION<br>FOR PRELIMINARY INJUNCTION** |

**I. PLAINTIFFS FACE IRREPARABLE HARM ABSENT THE INJUNCTION**

Unless Defendants are enjoined from enforcing the CTA, Plaintiffs will soon suffer irreparable injuries from nonrecoverable compliance costs and injury to constitutional rights. *See* Pl. Br. at 28. In response, though, the Government says, "Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief," on *the same page* that it says the request is *premature* because "[n]o Plaintiff is required to comply with the CTA until January 1, 2025." Def. Br. at 8. Both cannot be true. This pre-enforcement challenge has been brought as soon as practicable and before the looming deadline.

Without mentioning *Rest. Law Ctr. v. DOL*, 66 F.4th 593 (5th Cir. 2023), the Government next says, "Plaintiffs have not shown that their own alleged compliance costs are more than *de minimis*," because they rely on "wholly conclusory" declarations. Def. Br. at 9. But in *Rest. Law Ctr.* the Fifth Circuit rejected the same argument as "meritless." 66 F.4th at 598. That case also involved a preliminary challenge to a federal regulation, and the plaintiffs had argued they suffered irreparable injuries from unrecoverable compliance costs. *Id.* at 597. The plaintiffs "point[ed] out that the Department concedes that some businesses will incur ongoing costs to comply with the rule," and "produced uncontested evidence that ... project precisely those kinds of ongoing management costs." *Id.* at 597-98. Even though "Plaintiffs did not convert each allegation of harm into a specific dollar amount," they had amply shown irreparable harm. *Id.* at 599-600.

The proof presented here is of the same type involved in that case, and likewise demonstrates significant costs that cannot be recovered. The Government incorrectly says that the only evidence presented by Plaintiffs "consist[s] of a single statement in the non-associational Plaintiffs' declarations." Def. Br. at 9. In fact, Plaintiffs presented six declarations in which each of the plaintiffs averred that they would need to spend time and effort to make the required filings, and incur legal costs in the process. *See* Pl. Br., Ex. A-F.

While the Government glibly says that the compliance costs won't be significant, Def. Br. at 9, just as in *Rest. Law Ctr.*, the Government ignores the points made by each plaintiff as well as FinCEN's own analysis. As each declarant averred, the compliance costs include not only filing the reports, but the cost of legal services to make sure that the information is comprehensive and accurate. *See* Pl. Br. at 9. FinCEN itself estimated the *initial* burden on entities like Plaintiffs would be 126.3 million hours, for a total cost of

approximately $22.7 billion. *See* 87 Fed. Reg. 59498, 59585-86. These costs arise for filing initial reports, reviewing information, and complying with ongoing duties to update them when information changes. *Id*. at 59581. FinCEN also recognized that entities face different regulatory burdens depending on their "beneficial ownership structure," with "simple," "intermediate" and "complex" structures facing differing obligations, with the burden on each filer to file *initial* reports as $85.14, $1,350, and $2,614.87 respectively, and the burden to *update* the reports for each filer as $37.84, $299.33, and $560.81. *Id.* at 59574, 59576. Thus, FinCEN says that each named plaintiff, assuming they are the simplest of filers, would incur more than $100 in compliance costs in the first year; if any were complex, that number rises to well over $3,000 each. *See id.* Many of the plaintiffs, such as the Libertarian Party of Mississippi (MSLP), have complex structures that make compliance difficult. *See, e.g.*, Ex. E at ¶¶ 16-20. The National Federation of Independent Business (NFIB)'s significant number of members range from very complex to very simple structures, each requiring some level of compliance costs. Ex. F at ¶¶ 5-7. This Court should therefore accept FinCEN's concession that the CTA "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. at 59550.

## II. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS

In its response, the Government first applies the wrong standard to the relevant claims, saying that Plaintiffs "have not 'clearly demonstrated' that Congress lacked the constitutional authority to pass the CTA," and that they failed to "establish that no set of circumstances exists under which the Act would be valid." Def. Br. at 10 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012)). But neither presents the correct standard.

At this stage, Plaintiffs need only show "a substantial likelihood of success" on one merits argument. *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022). The *Salerno* "no set of circumstances" language "is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Club Madonna Inc. v. Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). Each claim must pass "the relevant constitutional test," and the Government cannot simply "conjure up just one hypothetical factual scenario" to justify its position. *Id.*; *see also Am. for Prosp. v. Bonta*, 594 U.S. 595, 615-16 (2021) (rejecting *Salerno* in facial First-Amendment challenge because of overbreadth that created *risk* of chilled speech).

2

**A. The CTA Exceeds Congress' Enumerated Powers**

The CTA is unlawful because it exceeds the limited, enumerated, powers given to the federal government.[1] The Government's attempts to justify the statute under the federal commerce power, augmented by the Necessary and Proper Clause, must fail. *See* Def. Br. at 10-11.

There are "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).

The CTA applies to "reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document" "with a secretary of state or a similar office." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id*. § 5336(b)(1)-(2)(A). The CTA thus applies irrespective of financial or commercial activity, much less interstate or international activity. The Government even conceded in prior litigation that the Act's application to merely "filing [] a document" with a registrar is not a direct regulation of interstate commerce, and it has not disavowed that concession here. *See NSBU v. Yellen*, No. 5:22-cv-1448-LCB, 2024, U.S. Dist. LEXIS 36205, at *39 (N.D. Ala. Mar. 1, 2024). "Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity." *Id.* at *55.

The Government insists that the CTA is justified by all three categories from *Lopez*. But its argument concerning the first two categories is obviously wrong. The Government says that the CTA lawfully regulates "the channels of, and entities in, interstate commerce," but then only asserts that "[e]ntities constituting CTA

---

[1] The Government feigns confusion on this issue, noting that "Plaintiffs' Complaint appears to assert a claim under the Tenth Amendment," but then insisting that "Plaintiffs do not brief this claim in their motion." Def. Br. at 23 n. 7. As Plaintiffs argued in their opening brief, though, "The Tenth Amendment *confirms* that the federal Constitution reserves all 'powers not delegated to the United States by the Constitution, nor prohibited by it to the States,' 'to the States respectively, or to the people'" and, "[a]n individual plaintiff may challenge federal action as exceeding Congress's limited, enumerated, powers." Pl. Br. at 10 (citing *Bond v. United States*, 564 U.S. 211, 222 (2011)) (emphasis added).

3

reporting companies utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems." *See* Def. Br. at 19. It doesn't say that *Plaintiffs* do so, it simply argues that *some* corporations do. The Government then says, "Congress's power to regulate interstate commerce extends beyond directly regulating such networks, and includes the power to regulate those entities who seek to misuse those channels to commit economic crimes." *Id.* But the CTA does not *regulate* channels or instrumentalities, and it applies regardless of whether an entity uses them. Accordingly, it cannot be justified by the first two classes of permissible commerce regulation. *See Lopez*, 514 U.S. at 549. Even a cursory review of the examples the Court gave in *Lopez* of regulating "channels" and "instrumentalities" (*id.* at 558-59) demonstrate that the CTA simply cannot be shoehorned into those regulatory categories.

The Government thus attempts to justify the CTA as a means to "effectuate[] legitimate prohibitions on harmful forms of economic activity," Def. Br. at 13, rather than a direct regulation of interstate commerce. In other words, the Government says the CTA is valid "because it regulates economic activity with a substantial effect on interstate commerce." Def. Br. at 15.

When a statute relies on the third *Lopez* category the question is whether the statute regulates "an economic class of activities" or "non-economic activity." *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011). Only when the regulated activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce," may a court consider their aggregate interstate consequences. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

The Government assumes the CTA regulates economic activity, and accuses Plaintiffs of "improperly focus[ing] on edge cases and possible exceptions." Def. Br. at 16. But the CTA doesn't regulate an economic class of activity *at all* because filing a paper with a state to create an entity is not an economic activity, even if some of the entities will eventually engage in commerce. *See* Pl. Br. at 15. Regulating the filing of a paper is not an "edge" case, but the very essence of the CTA.

The Government says that Plaintiffs' argument "misconstrues the CTA as having nothing to do with commercial activity, as if the act of incorporation bears no rational connection to such activity." Def. Br. at 15. A "connection" is not enough or the result in *Lopez* and *Morrison* would have been different. The statute must *regulate* commercial activity. The Government can't aggregate *non-economic* activity simply because many

regulated parties might also engage in commercial conduct. *See Taylor v. United States*, 579 U.S. 301, 306 (2016). For instance, the Government insists that MSLP's wholly intrastate activities are similar to interstate commerce, because the party "holds assets in its own name and transfers money derived from donations," Def. Br. at 16, even though the CTA does nothing to regulate the small sums it uses for political expenditures within Mississippi. *See* Ex. E at ¶¶ 14-15. If the Government was correct, then it could regulate any person in any manner, simply because that person will likely engage in interstate commerce in other instances throughout his life. *Cf. NFIB*, 567 U.S. at 557 ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

The Government's further reliance on findings about money laundering and international terrorism errs. The Government points to lofty statements made by Congressional committees that a "'lack of transparency' [in state law] has been 'a primary obstacle to tackling financial crime in the modern era,'" and Congressional findings in the Act's preamble suggesting that "[v]arious economic crimes are made easier to commit, and harder to discover, through the formation of corporate entities that may conduct economic transactions in their own names without disclosing beneficial ownership information." Def. Br. at 12. Tellingly, the Government omits the operative language of the CTA and its operation broadly to a class of noneconomic activity—the filing of a document with a state registrar. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614. Whatever the goals, "No matter how inherently integrated" an activity regulated (or mandated) by a law is with commerce, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. *NFIB*, 567 U.S. at 558.

The Government next says the CTA forms "a critical part of the federal government's comprehensive anti-money laundering regime" because it "is a part" of the Anti-Money Laundering Act of 2020 (AMLA), and that "failure to include the CTA in the AMLA would have left a 'gaping hole' in Congress's efforts to curb illicit financial activity." Def. Br. at 11-13. The CTA was one of hundreds of laws rolled into an end-of-year defense budget statute. *See* National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. 116-283. AMLA was divided into divisions within the NDAA, with four sections amending the Bank Secrecy Act, and the final

constituting the CTA. *See id.*, Section 6002. The CTA was the only stand-alone statute, and there is nothing to indicate it is "integral" to the rest of the omnibus law or AMLA. *See id.*

To be sure, "Congress can regulate purely intrastate activity that is not itself 'commercial,' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the [relevant] interstate market." *Raich*, 545 U.S. at 18. But *Raich*'s lesson was that the historical regulation of the entire market of illicit drugs might be undermined by individual exemptions for home-grown marijuana. *See id*. at 41-42. FinCEN's role in combatting financial crime in no way *depends* on the *upcoming* CTA registration regime. (If it did, it is hard to understand why Congress made it effective four years after passage; money laundering has not been on hiatus during the interim.) The CTA isn't constitutional just because it might make things easier for FinCEN as a financial regulator. Nor can Congress issue any law with no apparent connection to an enumerated power simply because it has already entered a permissible subject area. If that were the case, then Congress' longstanding regulation of the healthcare market would have authorized the Affordable Care Act under the commerce power. *Cf. NFIB*, 567 U.S. at 560 ("No longer would Congress be limited to regulating under the Commerce Clause those who by some preexisting activity bring themselves within the sphere of federal regulation. Instead, Congress could reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it.").

The Government finally relies upon the Necessary and Proper Clause, which the Supreme Court has labelled the "last, best hope of those who defend *ultra vires* congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). Specifically, it leans on Congress' ability to conduct foreign affairs and lay and collect taxes, and while never directly claiming these enumerated powers support the CTA, it insists that the statute is a necessary and proper means of effectuating them. *See* Def. Br. at 19-23.

The Clause "does not license the exercise of any great substantive and independent powers beyond those specifically enumerated." *NFIB*, 567 U.S. at 559. So, even though it might prefer not to, the Government must still show the CTA is both "necessary" *and* "proper" to serve an enumerated power. *Id.* at 560.

Neither the power over foreign affairs nor the taxing power justify the CTA. For the former, the Government insists, vaguely, that "the CTA is necessary to prevent interstate and international money laundering, terrorism financing, and tax evasion." Def. Br. at 21. Yet foreign entities wishing to do business

in this country are only a small subset of the entities that must register under the CTA. *See* 31 U.S.C. § 5336(a)(11). A *possible* international application of a domestic statute is not a magic escape valve for all limits on federal authority. *See Bond*, 572 U.S. at 883 (Scalia, J., concurring).

The taxing power likewise fails, because the CTA is not a "tax," which is an "exaction" that "produces at least some revenue for the Government." *See NFIB*, 567 U.S. at 564. Allowing Congress to rely on the taxing power here, through some derivative application of the Necessary and Proper Clause, would mean that any act that could conceivably lead the federal government to someday gather revenue would be permissible. Such broad federal power is hardly "narrow in scope" or "incidental" to the taxing power, and thus cannot justify the CTA. *See NFIB*, 567 U.S. at 560.

### B. The CTA Impermissibly Chills Protected First Amendment Activities

The Court's decision in *Americans for Prosperity v. Bonta*, 594 U.S. 595 (2021) shows that the CTA violates First Amendment scrutiny. There, as here, a law mandating disclosure of the identities of people who influence the actions of expressive associations violated exacting First Amendment scrutiny. Running headlong into this precedent, the Government insists, however, that the CTA is constitutional because it doesn't implicate expressive interests at all and isn't subject to *any* constitutional scrutiny. Def. Br. at 23-24.

But the CTA mandates disclosure of the identities of members of organizations that engage in expressive activities. *See* Pl. Br. at 21-22. The relevant threshold question is thus whether Plaintiffs engage in "expressive association." *See McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021).

Despite the Government's flippant view that the CTA's mandates are insubstantial, the statute sweeps expressive conduct into its orbit, such as the identities of those associated with the political advocacy of NFIB (such as Data Comm for Business, Inc.) and the identities of MSLP's control persons. *See* Pl. Br. at 21-23. The Government also does not dispute that the CTA was intended in part to allow the government to determine "the identities behind big political spending." *See* Congressional Record, Vol. 163, No. 101 at S3469.[2] The CTA thus plainly applies to expressive association.

---

[2] Perhaps because it realizes that MSLP has such profound expressive interests at stake, the Government insists that the MSLP has no basis to complain about the CTA's burdens because the CTA provides an exemption for *other* political parties. *See* Def. Br. at 25-26. It does not dispute that MSLP must comply.

The Government ignores each of the expressive activities outlined by Plaintiffs, choosing instead to note that the regimes in *AFP* and *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), differed somewhat from the CTA's. *See* Def. Br. at 25. As the CTA's disclosures implicate expressive concerns, the Government's point speaks only to the application of constitutional scrutiny.

As the Court said in *AFP*, "disclosure requirement imposes a widespread burden on donors' associational rights. And this burden cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." 594 U.S. at 618. Ignoring the relevant test, the Government never explains why there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *See id.* at 611. But the CTA fails scrutiny in part because it applies to Plaintiffs' expressive activities while it exempts many other entities involved in financial transactions. *See* 31 U.S.C. § 5336(a)(11)(B).

The Government's arguments next focus on whether the Act censors protected speech, saying that "Plaintiffs offer no evidence that someone would hesitate to become an owner of a company because the fact of their ownership would become known to the federal government[.]" Def. Br. at 25. The Government also claims that none of Plaintiffs' expressive interests are meaningful, because some information about some of the plaintiffs is already publicly available. *Id.*

These arguments are both irrelevant and incorrect. The CTA's unlawful demands "*might* chill association." *See AFP*, 594 U.S. at 615 (emphasis added). Plaintiffs need not "show[] that [individuals connected to a] substantial number of organizations will be subjected to harassment and reprisals," because the *risk* of chilled association outweighs the Government's interest in its overbroad regime. *Id.* at 617. Plaintiffs have also averred that they have yet to comply with the CTA because of its intrusion into protected interests. *See* Pl. Br. at 6-7. And while some associational information has already been disclosed by some of the plaintiffs, much more undisclosed information relates to expressive concerns. *See id.*

### C. The CTA Invades Fourth Amendment Interests with Insufficient Oversight

The decision in *City of L.A. v. Patel*, 576 U.S. 409, 421 (2015), demonstrates that the CTA facially violates the Fourth Amendment. Faced with this precedent, the Government relies heavily on *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), to justify its widespread practice. *See* Def. Br. 26-27.

8

A careful examination of *Shultz*, which dealt with mandated reports from banks to the government about their customers' transactions, shows the limits of that case. *See* 416 U.S. at 25-26, 66-67. The Court held that the "requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves." *Id.* at 66. As to a more significant challenge raised by the accountholders, the Court avoided the issue because of the third-party doctrine—customers had voluntarily disclosed this information and given up their privacy interests in it. *Id.* at 69. But Plaintiffs have done no such thing here, as they must compile and disclose the relevant information because of the CTA. As the Government does not contest, Plaintiffs also have a reasonable expectation of privacy in the information at issue because it is concededly confidential and reveals information that touches on associational rights. *See* Pl. Br. at 27.

As more recent cases have explained, the outcome in most Fourth Amendment cases relies on the presence or absence of a reasonable expectation of privacy in the target of a search. *See Carpenter v. United States*, 585 U.S. 296, 310 (2018). While *Shultz* showed that the "government may require businesses to maintain records and make them available for routine inspection when necessary to further a legitimate regulatory interest," that holding was tempered by the requirements that the demand be "'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Patel v. City of L.A.*, 738 F.3d 1058, 1064 (9th Cir. 2013) (en banc) (citing *Shultz*, 416 U.S. 21, 45-46, and quoting *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1945)), *aff'd* 576 U.S. 409 (2015). The Court has since explained that *Shultz* was a case involving "requests for evidence implicating diminished privacy interests or for a corporation's own books," and rejected the view that "the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Carpenter*, 585 U.S. at 317-18, 318 n. 5.[3]

*Shultz*, as well as *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984), actually demonstrate the flaw in the CTA. Both cases applied the *Oklahoma Press* standard for government demands for private records. *See Donovan*, 464 U.S. at 414; *Shultz*, 416 U.S. at 67. That was the same standard at issue in *Patel*,

---

[3] The Government's invocation of other disclosure laws that it claims might be threatened by limits on the CTA falls flat. *See* Def. Br. at 27. These laws are not at issue here, and demand much different information from much different entities, often implicating the third-party doctrine. Anyway, just because they have long been "understood to be constitutional" by the Government, and apparently not challenged in court, this is not proof that they are valid. *See id.*

which imposes two requirements: (1) individualized suspicion and (2) precompliance review. *See Donovan*, 464 U.S. at 415; *Patel*, 738 F.3d at 1064. Both safeguards are absent in the CTA.

The Government argues that the Supreme Court's decision in *Patel* is inapposite, because it involved "an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked," rather than the CTA's "reporting requirement," Def. Br. at 28, but it otherwise makes no attempt to address that case's broader application. The decision in *Patel* makes clear that if a government cannot force a hotel to compile information about its guests and disclose it on demand absent specific precompliance measures and targeted suspicion, the government surely cannot force Plaintiffs to compile even more invasive information and be forced to disclose it without even being asked.[4]

The Government next says, "Any asserted privacy interest would in any event be minimized by detailed statutory safeguards that Plaintiffs do not address." Def. Br. at 27. The Fourth Amendment limits government *collection* of information, so Defendants' reliance on safeguards that deal with how it will use the information it has already collected is completely irrelevant. *See Patel*, 576 U.S. at 421.

Finally, the Government says that there is no constitutional problems because "the CTA falls within the 'special needs' exception." Def. Br. at 28. The Court already rejected that argument in *Patel*, concluding that even if the exception applied, without precompliance review, mandatory disclosure rules would not "provide a constitutionally adequate substitute for a warrant," which is required even in closely-regulated industries. 537 U.S. at 426 (citation omitted).[5]

## CONCLUSION

This Court should preliminarily enjoin Defendants from enforcing the CTA and its implementing regulations.[6]

---

[4] Of course, Plaintiffs also addressed reporting statutes in their opening brief, noting that some courts have reviewed such laws under the Due Process Clause under "intermediate scrutiny." *See* Pl. Br. at 26 n. 4 (citing *Statharos v. NYC Taxi & Limo. Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999)). The Government doesn't bother to address that authority or show the CTA meets that level of scrutiny. The CTA thus likely violates due process, if nothing else.

[5] Moreover, the Fifth Circuit has said, "Because this exception is narrow, federal courts must not define the industry at issue at too high a level of generality[,]" and has refused to create new exceptions absent extremely pervasive regulation. *Mexican Gulf Fishing Co. v. DOC*, 60 F.4th 956, 968 (5th Cir. 2023). The CTA's novel application to every industry, including political parties like MSLP, family farms like Mustardseed Livestock LLC, or any of the hundreds of thousands of small businesses comprising NFIB's members, is not a mere extension of pervasive oversight of a discrete and uniquely dangerous industry.

[6] The Government insists that any injunction should be limited to the parties in this case. *See* Def. Br. 29-30. But Defendants are the only entities who could enforce the CTA, so the requested relief hardly threatens to bind non-parties.

DATED:  July 3, 2024.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***
Center for Individual Rights
1100 Conn. Ave. N.W., Suite 625
Washington, D.C. 20036
DC Bar No. 1617890
202-833-8401
kruckenberg@cir-usa.org
*Lead Attorney for Plaintiffs*


\*Admitted *Pro Hac Vice*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

\*Admitted *Pro Hac Vice*