No. 24-40792

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

TEXAS TOP COP SHOP, INC., *ET AL.*,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *ET AL.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
No. 4:24-CV-478, The Honorable Amos L. Mazzant, Judge Presiding

---

*AMICUS CURIAE* BRIEF OF EAGLE FORUM EDUCATION & LEGAL
DEFENSE FUND IN SUPPORT OF PLAINTIFFS-APPELLEES AND IN
OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY
MOTION FOR STAY PENDING APPEAL

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
(908) 934-9207 (fax)
aschlafly@aol.com

Counsel for *Amicus Curiae*
Eagle Forum Education & Legal Defense Fund

## CERTIFICATE OF INTERESTED PERSONS

The case number here is No. 24-40792, *Texas Top Cop Shop v. Garland.*

*Amicus Curiae* Eagle Forum Education & Legal Defense Fund is a non-profit corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Pursuant to the fourth sentence of Circuit Rule 28.2.1, the undersigned counsel of record certifies that the parties' and amici's list of persons and entities having an interest in the outcome of this case is complete, to the best of the undersigned counsel's knowledge, with the following additions:

*Amicus Curiae* Eagle Forum Education & Legal Defense Fund,

Andrew L. Schlafly, counsel for *Amicus Curiae*

These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

|  |  |
|---|---|
|  | /s/ Andrew L. Schlafly |
|  | Andrew L. Schlafly |
| Dated:  December 16, 2024 | *Counsel for Eagle Forum Education &* |
|  | *Legal Defense Fund* |

# TABLE OF CONTENTS

**Pages**

Certificate of Interested Persons ................................................................ ii

Table of Contents ................................................................................... iii

Table of Authorities ............................................................................... iv

Identity, Interest and Authority to File ..................................................... 1

Summary of Argument ............................................................................ 2

Argument ............................................................................................... 6

I.      The Only Irreparable Harm is to the American People If the
        Injunction Is Stayed; There Is No Harm to the Government ............... 8

II.     The Government Is Likely to Lose on the Merits, Which
        Requires Denying Its Motion for a Stay ........................................ 11

        A. The CTA Is Beyond the Enumerated Powers of Congress ............ 12

        B. The CTA Violates the First Amendment ................................... 14

        C. The CTA Violates the Fourth Amendment ................................. 15

        D. The CTA Violates the Fifth Amendment ................................... 16

III.    Government Already Has the Tools It Needs to Combat Money
        Laundering and the Financing of Terrorism ................................... 18

Conclusion ........................................................................................... 20

Certificate of Service ............................................................................ 20

Certificate of Compliance ...................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024) ............................................3

*Brown v. Texas*, 443 U.S. 47 (1979) ...............................................................16

*Coates v. Cincinnati*, 402 U.S. 611 (1971) ..................................................18

*Connally* v. *General Construction Co.*, 269 U.S. 385 (1926) ...............................18

*Gilbert v. Donahoe*, 751 F.3d 303 (5th Cir. 2014) ................................................11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...........................................18

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ..............................................13

*United States v. Alvarez*, 40 F.4th 339 (5th Cir. 2022) ...........................................16

*United States v. Lopez*, 514 U.S. 549 (1995) ....................................................5

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................................1

*United States v. Williams*, 553 U.S. 285 (2008) ...........................................18

*Valentine v. Collier,* 956 F.3d 797 (5th Cir. 2020) ..................................................9

**Statutes and Rules**

18 U.S.C. § 922(g)(1) ...............................................................................15

18 U.S.C. § 924(a)(8) ..............................................................................15

31 U.S.C. § 5336(a)(3)(A) ..........................................................................17

31 U.S.C. § 5336(b)(2)(A)(iii) .....................................................................11

Corporate Transparency Act, as contained in the Anti-Money Laundering Act
    of 2020, Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021) .........................2

Violence Against Women Act of 1994, § 40302, 108 Stat. 1941-1942 ...................1

31 C.F.R. § 1010.380(b)(1)(ii)(C) ..............................................................11

31 C.F.R. § 1010.380(d)(1)(i)(D) ..............................................................17

"Beneficial Ownership Information Reporting Requirements,"
    87 Fed. Reg. 59498 (Sept. 30, 2022)
    (codified at 31 C.F.R. pt. 1010) ............................................7, 17, 19

Customer Due Diligence (CDD) Rule,
    81 Fed. Reg. 29398 (May 11, 2016) ...........................................................19

Fed. R. App. P. 29(a)(4)(E) ........................................................................1

**Other**

Cynthia S. Butera, et al., "Accountants' Role in the Beneficial Ownership
    Reporting Requirement Under the Corporate Transparency Act," *The
    National Law Review* (Mar. 13, 2024)
    https://natlawreview.com/article/accountants-role-beneficial-ownership-
    reporting-requirement-under-corporate .......................................................19

Dickinson Wright, "Nonprofit Organizations and the Corporate
    Transparency Act."
    https://www.dickinson-wright.com/news-alerts/client-alert-nonprofits-
    and-the-cta.............................................................................................. 17-18

Sheri J. Engelken, "Majoritarian Democracy In A Federalist System: The Late
    Chief Justice Rehnquist And The First Amendment," 30 Harv. J.L. &
    Pub. Pol'y 695, 695-696 (Spring 2007)..........................................................9

Holland & Knight, https://tinyurl.com/yjdbnh2v.....................................................19

Christine Shaw, "Apparent swatting call at Rep. Marjorie Taylor Greene's Georgia
    home leads to deadly car accident," FoxNews (Dec. 10, 2024)
    https://www.foxnews.com/politics/apparent-swatting-call-rep-marjorie-
    taylor-greenes-georgia-home-deadly-car-accident........................................12

Alexis de Tocqueville, *Democracy in America* (London: 1835)
    https://gutenberg.org/files/815/815-h/815-h.htm ...........................................4

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Eagle Forum Education & Legal Defense Fund ("Eagle Forum ELDF") was founded in 1981 by Phyllis Schlafly, and for more than two decades has filed many appellate briefs in federal and state courts. Eagle Forum ELDF has long advocated against power grabs by the federal government at the expense of individual rights, and the sovereign authority of states. For example, Eagle Forum ELDF as represented by Phyllis Schlafly filed an amicus brief in the landmark case of *United States v. Morrison*, 529 U.S. 598 (2000), successfully urging the U.S. Supreme Court to invalidate the civil remedy provision, Section 13981, of the Violence Against Women Act of 1994, § 40302, 108 Stat. 1941-1942, for being beyond congressional authority under the Commerce Clause and any other enumerated power.

Eagle Forum ELDF has a strong interest in opposing overreach by the federal government beyond the enumerated powers of Congress, in infringement on individual rights as presented in this case.

---

[1] All parties have stated through their counsel of record that they do not oppose the filing of this brief by *Amicus curiae* Eagle Forum ELDF. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: counsel for the *Amicus* Eagle Forum ELDF authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity – other than *Amicus* Eagle Forum ELDF, its members, and its counsel – contributed monetarily to this brief's preparation or submission.

# SUMMARY OF ARGUMENT

The federal government insists on an unrealistic deadline in two weeks that would make felons out of millions of Americans for failing to comply with an unconstitutional, onerous reporting requirement to the Financial Crimes Enforcement Network (FinCEN). Suddenly, it is somehow an "emergency" for the government to collect personal data when it set the collection date for four years after the enacting of an omnibus bill that contained this provision. Perhaps the real emergency by the government here is to act before the incoming new administration takes power on January 20, with its commitment to deregulation, but that is not a legitimate emergency requiring immediate action by this Court.

The district court properly enjoined the Corporate Transparency Act (CTA)[2] to preserve the status quo during this litigation. The injunction below is expressly based on its finding of irreparable harm to First and Fourth Amendment rights:

> Absent injunctive relief, come January 2, 2025, Plaintiffs would have disclosed the information they seek to keep private under the First and Fourth Amendments …. Independent of the specter of compliance costs on the horizon, Plaintiffs have met their burden to show the threat of irreparable harm because the CTA and Reporting Rule substantially threaten their constitutional rights.

---

[2] The CTA is contained in the Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021).

(Govt. Mot. Add. A31-32). The district court cited, *inter alia*, this Court's First Amendment precedent in *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024).

Yet the government does not contest this holding or distinguish this precedent in its motion here, and the government thereby waives this central, dispositive point. There is irreparable harm in the violation of First (and Fourth) Amendment rights, the government thereby concedes, and thus the injunction below to prevent this harm should not be stayed. Nothing more is needed to deny the government's motion and thereby allow the injunction to remain in place.

Nor could the government plausibly contest the infringement by the Corporate Transparency Act (CTA) on First and Fourth Amendment rights. The CTA burdens and interferes with law-abiding Americans' associating with each other as commonly done under state law since the beginning of our country. Indeed, local associations have been a foundation of American prosperity and happiness since at least the days of Alexis de Tocqueville, who famously observed:

> In no country in the world has the principle of association been more successfully used, or more unsparingly applied to a multitude of different objects, than in America. Besides the permanent associations which are established by law under the names of townships, cities, and counties, a vast number of others are formed and maintained by the agency of private individuals. …
>
> The right of association with these views is very analogous to the liberty of unlicensed writing; but societies thus formed possess more authority than the press. … An association unites the efforts of minds which have a tendency to

diverge in one single channel, and urges them vigorously towards one single end which it points out.

Alexis de Tocqueville, *Democracy in America*, Chapter XII (London: 1835).[3]

The interference by the CTA with this longstanding American right and tradition of association is not merely the CTA's intrusive $22.7 billion cost of compliance burden on 32.6 million Americans, along with its draconian punishment of two years' incarceration for those who decline to comply. It is also this vast expansion in the equivalent of a new federal police power over everyday local, including political, activities. Millions of Americans lack the time, particularly around New Year's Eve as the government demands in its motion, or the desire to subject themselves to this new federal investigatory and prosecutorial power based merely on volunteer participation in small local organizations. Americans have First and Fourth Amendment rights not to be monitored, burdened, and indeed harassed in this manner by the federal government.

The preliminary injunction below is not an objectionable "nationwide injunction," because it blocked enforcement of a law that infringes on First and Fourth Amendment rights. It would be incoherent for a court, after finding irreparable First Amendment harm as the district court did below, then to allow the illegality to continue and thereby cause irreparable harm to millions more Americans. *See, e.g.*,

---

[3] https://gutenberg.org/files/815/815-h/815-h.htm (viewed Dec. 15, 2024).

*United States v. Lopez*, 514 U.S. 549 (1995) (invalidating a federal law as beyond the scope of the Commerce Clause, and thereby ending its enforcement against everyone, not merely the criminal defendant in that case). Moreover, the district court found that government violated the Administrative Procedure Act (Govt. Mot. Add. A78), which requires fully enjoining the violation such that all are protected against the administrative illegality.

The government itself delayed its effective date for most Americans until four years after the enactment of the CTA, so it is a bit rich for the government to demand immediate action by this Court over the Christmas holidays so that 32.6 million Americans can be compelled to drop everything on New Year's Eve to deal with the stress of complying with a confusing reporting requirement carrying a penalty of two years' incarceration. Many Americans are obviously traveling or welcoming visiting family members at this special time, and the government itself failed to mail notices of this new obligation. The potential two-year incarceration has the impact of depriving every violator of his Second Amendment rights under another statute, regardless of what the actual CTA penalty imposed may be. The injunction against this overreach by the federal government should remain in place to preserve the status quo during this ongoing litigation here and elsewhere.

## ARGUMENT

The government demands that the injunction be stayed by December 27, which would give Americans only two business days, December 30 and New Year's Eve, to avoid potentially becoming felons subject to two years of federal incarceration, which carries an automatic loss of Second Amendment rights. For the millions of Americans who are active in many local organizations, it is a substantial burden to figure out which of their local entities must report to FinCEN, and what information about which participants must be reported. Some accountants are refusing to provide advice about this, either because they do not want to be viewed as practicing law or because they do not want the exposure to liability. While the government suggests this is a burden of merely a few hundred dollars per entity, that is based on the government's unrealistic assumption of a professional fee at less than $60 per hour (while many attorneys charge ten times that much). By the government's own estimate this burden is in fact thousands of dollars for those involved in multiple entities and a very stressful problem. The inconsiderate insensitivity of the federal government to the timing and weight of this burden on millions of ordinary, law-abiding Americans is, frankly, appalling.

As explained in Point I below, the government concedes the irreparable harm to the American people if the injunction is stayed, and that is enough to defeat its motion. The government's bald assertion of irreparable harm to itself

from the injunction runs afoul of what the government fundamentally is, as made clear in the Gettysburg Address: government by the people and for the people, such that there is no irreparable harm to the government independent of the people. Moreover, the government's speculation about a perception by unnamed foreign governments of the United States as a reason to stay this injunction is frivolous.

In Point II below, *Amicus* Eagle Forum ELDF explains that the government is likely to lose on the merits, which requires denying its motion for a stay. Affirmance of the injunction below can be on any grounds, and the infringement by the CTA on First and Fourth Amendment rights reinforce the need for the injunction. In particular, the "Beneficial Ownership Information Reporting Requirements," 87 Fed. Reg. 59498 (Sept. 30, 2022) (codified at 31 C.F.R. pt. 1010) (the "Rule") promulgated under the CTA goes beyond the statute by requiring disclosure of the home addresses of participants in political organizations not exempt from the CTA, which subjects them to potentially deadly swatting.

Finally, Point III below explains that the government already has the tools it needs to combat its cliché stated goals of combatting money laundering and the financing of terrorism, pretextual purposes that the U.S. Supreme Court rejected 9-0 when the same House of Representatives tried to obtain the financial records of Trump family members. Much of the government's motion relies on boilerplate, conclusory assertions about combatting crime or protecting national security,

without mentioning that the government already uses a more effective law for tracing financial transactions to reduce illegality in connection with them. As to the government's only examples of possibly helpful applications of the CTA to reduce crime, they are superficial references to Russian and Iranian nationals who could simply be prohibited from setting up companies in the United States. It is unjustified to burden, punish, and infringe on the constitutional rights of 32.6 million American citizens to address isolated misconduct by a few foreigners.

**I.  The Only Irreparable Harm is to the American People If the Injunction Is Stayed; There Is No Harm to the Government.**

The government concedes, or at least does not contest, the finding below that there is irreparable harm to those subject to the CTA due to its infringement on First and Fourth Amendment rights, if the injunction were not in place. (Govt. Mot. Add. A31-32). This undisputed harm is enough to deny the government's motion to stay the injunction. Moreover, the government concedes (while trying to minimize) the financial burdens of trying to comply, which obviously cannot be recouped.

The government devotes only 3 pages of its motion (14-17) to this central issue of irreparable harm, and cites to only two outdated chambers' opinions (which of course have no precedential value) and an easily distinguished decision by the Fifth Circuit. The two single-Justice chambers' opinions are more than 30 years old and have never been cited favorably by this Circuit. Their author Chief

Justice Rehnquist was on the dissenting side of many First Amendment cases, often favoring government interference with that right contrary to the holdings of a majority of the Court:

> Chief Justice Rehnquist is probably best remembered in the First Amendment arena for the many opinions in which he found no protection afforded by the First Amendment. Rehnquist is also well-known for opinions holding that, if the First Amendment conferred any rights, they were overborne by government interests that the Chief Justice found weightier and more imperative.

Sheri J. Engelken, "Majoritarian Democracy In A Federalist System: The Late Chief Justice Rehnquist And The First Amendment," 30 Harv. J.L. & Pub. Pol'y 695, 695-696 (Spring 2007). The government's only other authority on this issue, *Valentine v. Collier,* stayed an injunction that replaced a Texas statute with a detailed set of judicially created rules for the prison system during Covid. 956 F.3d 797 (5th Cir. 2020). The rationale there was that "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Id.* at 803 (inner quotations omitted). That same rationale is against FinCEN's interference with the traditionally state regulation of corporate entities here.

Lacking precedential support, the government rather creatively argues for novel assertions of irreparable harm that no court has ever embraced, nor would any. The government insists that it suffers irreparable harm in how the injunction

supposedly "*severely* undermines our **credibility among other nations** and leadership in this area." (Govt Mot. 15, emphasis added) This argument by the government is even worse than insisting that a federal court comply with foreign law. Here, the federal government is asking this Court to stay an injunction based on how unidentified foreign nations might feel about the injunction. In addition to being absurdly speculative, this argument by the government should not be a consideration here anymore than it would be in the context of construing Second Amendment rights based on how other countries might feel about them.

As to FinCEN's alleged harm to itself in losing "momentum" due to the injunction (Gov't Mot. 16), in fact FinCEN's alleged outreach to inform the public has been minuscule: merely $4.3 million without any indication of any effectiveness in that spending. (Gov't Add A87 ¶ 14) This is paltry compared with an obligation that imposes many billions of dollars in new costs by FinCEN's own estimate. Even less impressive is how the government asserts that FinCEN has prepared 1.5 million postcards for mailing to businesses in merely 5 states, but it is merely two weeks from the filing deadline and apparently those postcards have not yet been mailed. *See id.* With the traditionally slow delivery during the holidays and the time needed for compliance, that is nowhere near the kind of notice that Americans deserve for an obligation enforced by two years in federal prison. The only irreparable harm here is that inflicted by the CTA against the American

people, who face a New Year's Eve dilemma of cancelling their holiday plans or face becoming a potential felon for failing to comply with the federal government's unconstitutional demands.

## II. The Government Is Likely to Lose on the Merits, Which Requires Denying Its Motion for a Stay.

As to the merits, the government is likely to lose on not just one but four independent constitutional grounds: (A) Enumerated Powers, (B) First Amendment, (C) Fourth Amendment, and (D) Fifth Amendment. Of course this Court can affirm a decision below on any basis: "we may affirm on any ground supported by the record." *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) (cleaned up).

At the outset, it is worth emphasizing that the Rule goes beyond what Congress required in the CTA, such that FinCEN forces millions of Americans to disclose their ***home*** addresses under the Rule. This highly personal disclosure is allowed but not required by the CTA itself. 31 C.F.R. § 1010.380(b)(1)(ii)(C); 31 U.S.C. § 5336(b)(2)(A)(iii). In the current political climate of swatting and even the assassination of private citizens, having to disclose one's home address is a significant deterrent for controversial or outspoken Americans as a condition of engaging in law-abiding associative activities. Recently, for example, a false bomb report was emailed to the local police about Rep. Marjorie Taylor Greene's

11

residential mailbox, and the response to this type of swatting was that an innocent person was struck and killed by an emergency vehicle rushing to the scene. Christine Shaw, "Apparent swatting call at Rep. Marjorie Taylor Greene's Georgia home leads to deadly car accident," FoxNews (Dec. 10, 2024) (Rep. Greene observed that she has been "swatted at least nine times.").[4]

**A. The CTA Is Beyond the Enumerated Powers of Congress.**

The government relies heavily on the Commerce Clause while also, through the Necessary and Proper Clause, on national security and tax powers, as a basis for the CTA.

The CTA itself does not cite the Commerce Clause for authority, in contrast with most commerce-based federal legislation, yet Defendants failed to address this glaring omission. Instead, the government repeats jargon overused by Capitol Hill staffers to try to bolster expansions in federal power, such as combatting "money laundering" and "financing of terrorism." But laws pre-existing the CTA fully track that activity, see *infra* Point III, and the CTA's federal monitoring of participants in millions of lawful small state entities, including many non-exempt political entities, does nothing to advance the tracking of illicit monetary transactions.

---

[4]    https://www.foxnews.com/politics/apparent-swatting-call-rep-marjorie-taylor-greenes-georgia-home-deadly-car-accident (viewed Dec. 16, 2024).

This Court should reject the government's overuse of superficial anti-crime jargon, as the House of Representatives used the same amorphous terminology to justify its politically motivated subpoenas for financial records of President Trump and his family members and the U.S. Supreme Court unanimously rejected it. "The House asserts that the financial information sought here—encompassing a decade's worth of transactions by the President and his family—will help guide legislative reform in areas ranging from *money laundering and terrorism* to foreign involvement in U. S. elections." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 853 (2020) (emphasis added). The Democrat-controlled House even passed a resolution to lay the groundwork for subpoenaing the private financial records of President Trump and his family: "The House also invokes the oversight plan of the Financial Services Committee, which stated that the Committee intends to review banking regulation and 'examine the implementation, effectiveness, and enforcement' of laws designed *to prevent money laundering and the financing of terrorism*. H. R. Rep. No. 116-40, p. 84 (2019)." *Id.* at 855 (emphasis added). Every justice of the U.S. Supreme Court rejected this approach, as this Court should likewise reject it here.

"National security" as a pretextual, improper justification for expanding federal power is not new, and is not credible. The raid on President Trump's residence at Mar-a-Lago was supposedly for the purpose of national security,

13

which the American people and U.S. District Judge Aileen Cannon properly rejected. Similarly, "national security" is not a valid justification for the CTA and its Rule to demand home addresses. Likewise, there is no legitimate justification for the CTA under the taxing authority of Congress.

Most foreign governments do not have the extensive monitoring that CTA and its Rule seek to impose on Americans for the first time on January 1, 2025. Moreover, the United States has survived just fine for nearly 240 years without this type of a comprehensive federal police power.

**B. The CTA Violates the First Amendment.**

The CTA and its Rule force millions of law-abiding Americans to submit to federal authority for purely local activities, exposing them to costly federal investigation and potential prosecution. The chilling effect by this on freedom of association can hardly be doubted.

The government's motion fails to confront the chilling effect that a mandate to disclose highly personal information including home address, birthdate, and driver's license number, plus submission to federal investigation, has.

This chilling effect is magnified by how a harmless violation of the CTA causes a loss of the person's right to bear arms, due to the interplay of a federal gun control statute with the draconian two-year incarceration under the CTA. Even though the actual punishment may often be minimal, a CTA violation becomes a

lifetime ban on possessing a firearm due to this maximum potential sentence. *See* 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person—(1) who has been convicted in any court of, a crime ***punishable by*** imprisonment for a term exceeding one year … to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition.") (emphasis added). Suddenly millions of Americans lose their right to bear arms under the combination of the CTA and 18 U.S.C. § 922(g)(1), and even become subject to ***fifteen*** years imprisonment if found in possession of a firearm or ammunition after being found in violation of the CTA. 18 U.S.C. § 924(a)(8). This deprivation of Second Amendment rights deters gun owners – *i.e.*, a third of Americans – from exercising their First Amendment rights.

The CTA and its Rule thereby significantly burdens Americans for merely engaging in local associative entities, and that burden on First Amendment rights is unconstitutional.

### C. The CTA Violates the Fourth Amendment.

The CTA unjustifiably converts nearly every American into a criminal suspect by requiring disclosure of highly personal information for the purpose of law enforcement, without any reasonable basis or a warrant.

The Supreme Court holding in *Brown v. Texas* is conceptually identical to the FinCEN requirement, and in *Brown* the Court invalidated baseless demands for identification:

> Even assuming that [valid] purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.

443 U.S. 47, 52 (1979) (a case arising from Texas). This *Brown* decision has been repeatedly applied by this Circuit to protect against Fourth Amendment infringements. *See, e.g.*, *United States v. Alvarez*, 40 F.4th 339, 343 (5th Cir. 2022).

Yet the CTA is a high-tech version of what *Brown* prohibits: a demand for personal identification by the federal government, for law enforcement purposes, of Americans who have done nothing wrong and about whom there is no reasonable basis for suspecting any wrongdoing. The Fourth Amendment prohibits this.

### D. The CTA Violates the Fifth Amendment.

The CTA and its Rule are impermissibly vague and ambiguous under the Fifth Amendment. Terms that are inadequately defined by the CTA and the Rule include "beneficial owner," "substantial control," "applicant," "understanding," and "relationship." These are not terms commonly used under state law with respect to the formation or participation in local entities. The CTA vaguely

requires that an individual who "indirectly" by any "understanding" "exercises substantial control" over an entity must be reported as a "beneficial owner." 31 U.S.C. § 5336(a)(3)(A). But the Rule defines "beneficial ownership" using ambiguous language including "understanding," "arrangement," and "relationship," and even "otherwise."

The Rule vaguely defines "substantial control" in the following circular manner:

> *Definition of substantial control.* An individual exercises substantial control over a reporting company if the individual: …
>
> Has any other form of substantial control over the reporting company.

31 C.F.R. § 1010.380(d)(1)(i)(D).

Many commenters on the Rule objected to how the Rule imposes a significant expense merely to determine what the CTA requires, which FinCEN rejected inadequately:

> Given the many points raised by commenters on this topic, FinCEN assessed and included a cost for hiring professionals to comply with the requirements in the RIA [regulatory impact analysis].

87 Fed. Reg. 59498, 59555. Among many of the continuing ambiguities in the CTA and its Rule is its vagueness over whether an entity intending to obtain designation by the IRS as a tax-exempt under Section 501(c)(3) must still initially make disclosures to FinCEN under the CTA. *See* Dickinson Wright, "Nonprofit

Organizations and the Corporate Transparency Act."[5]

These ambiguities in a law that imposes a two-year prison sentence are untenable under the Due Process Clause of the Fifth Amendment. As the U.S. Supreme Court has repeatedly held, a law is unconstitutional when "'men of common intelligence must necessarily guess at its meaning.'" *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (quoting *Connally* v. *General Construction Co.*, 269 U.S. 385, 391 (1926)). *See also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Even if legal experts could divine what the CTA really requires – and they cannot – this law would still be defective because ordinary Americans cannot figure it out. Statutes that "tied criminal culpability to ... wholly subjective judgments" are unconstitutional for vagueness. *United States v. Williams*, 553 U.S. 285, 306 (2008). The CTA is "so standardless that it authorizes or encourages seriously discriminatory enforcement," *id.*, and thus violates the Fifth Amendment.

### III. Government Already Has the Tools It Needs to Combat Money Laundering and the Financing of Terrorism.

The government omits from its motion how it uses another regulatory scheme that fully tracks financial transfers which might sometimes constitute money laundering or the financing of terrorism, and the CTA adds nothing to the monitoring of these crimes. The existing Customer Due Diligence (CDD)

---

[5] https://www.dickinson-wright.com/news-alerts/client-alert-nonprofits-and-the-cta (viewed Dec. 17, 2024).

regulation, 81 Fed. Reg. 29398 (May 11, 2016), requires those who process

financial transactions to collect all the information the government legitimately

needs: "With respect to the information that the CDD and the CTA collect about

entities, the information ***is generally the same, with minor variances***."[6]

The primary difference between the CTA and the CDD is how the CTA

vastly expands federal prosecutorial power over local matters, requiring a stringent

certification that "the [report to FinCEN] is true, correct, and complete," without

any qualifier such as to the best of the certifier's knowledge as requested by many.

87 Fed. Reg. 59498, 59514. This may be one reason why many accountants are

declining to help on compliance with the CTA. FinCEN denied requests for

leniency for mistakes in good faith certifications. *Id.* "[A]ccountants should heed

the considerations discussed herein before proceeding into currently uncharted

waters. For now, practitioners should stick with what they know, and avoid taking

on these new and uncertain compliance obligations on behalf of their clients …."

Cynthia S. Butera, et al., "Accountants' Role in the Beneficial Ownership

Reporting Requirement Under the Corporate Transparency Act," *The National*

*Law Review* (Mar. 13, 2024).[7]

---

[6] Holland & Knight, https://tinyurl.com/yjdbnh2v (emphasis added, viewed Dec. 16, 2024).

[7] https://natlawreview.com/article/accountants-role-beneficial-ownership-reporting-requirement-under-corporate (viewed Dec. 16, 2024).

## CONCLUSION

The government's emergency motion for a stay should be entirely denied.

Respectfully submitted,

/s/ Andrew L. Schlafly

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
Phone: (908) 719-8608
Fax: (908) 934-9207
Email: aschlafly@aol.com

Dated: December 16, 2024      *Counsel for Amicus Curiae Eagle Forum*
*Education & Legal Defense Fund*

## CERTIFICATE OF SERVICE

I hereby certify that, on Dec. 16, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the CM/ECF system, which I understand serves all the counsel of record.

/s/ Andrew L. Schlafly
Andrew L. Schlafly

## CERTIFICATE OF COMPLIANCE

1. This brief has been prepared using Times New Roman 14-point, proportionately spaced, serif typeface, in Microsoft Word.

2. This brief complies with FED. R. APP. P. 29(a)(5) and 32(a)(7)(B) because it contains a total of 4,349 words, excluding material not counted under Rule 32(f).

Dated: December 16, 2024      /s/ Andrew L. Schlafly
Andrew L. Schlafly
*Counsel for Amicus Curiae Eagle*
*Forum ELDF*