# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 24-40792

TEXAS TOP COP SHOP, INC., *ET AL.*,

      PLAINTIFFS-APPELLEES,

V.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *ET AL.*,

      DEFENDANTS-APPELLANTS.

---

## PLAINTIFFS-APPELLEES' RESPONSE IN OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

———————————————

ON INTERLOCUTORY APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
4:24-CV-478
HON. AMOS L. MAZZANT

———————————————

December 17, 2024

CALEB KRUCKENBERG
CHRISTIAN CLASE
Center for Individual Rights
1100 Conn. Ave. N.W., Suite 625
Washington D.C. 20036

ANDREW M. GROSSMAN
Baker Hostetler
Washington Square, 1050 Conn. Ave. N.W., Suite 1100
Washington D.C. 20036

Counsel for Plaintiffs-Appellees

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees and Counsel:**

Texas Top Cop Shop, Inc.,
Russell Straayer
Mustardseed Livestock, LLC,
Libertarian Party of Mississippi
National Federation of Independent Business, Inc.,
Data Comm for Business, Inc.
Elizabeth Milito

Caleb Kruckenberg
Christian Clase
Center for Individual Rights
1100 Connecticut Avenue, NW Suite 625
Washington, D.C. 20036

Andrew Grossman
Baker Hostetler
1050 Connecticut Ave, NW Suite 1100
Washington, D.C. 20036

John Clay Sullivan
S|L Law PLLC
610 Uptown Boulevard, Suite 2000
Cedar Hil, TX 75104

**Defendants-Appellants and Counsel**

United States Department of Treasury
Financial Crimes Enforcement Network
Janet Yellen, United States Secretary of Treasury
Andrea Gacki, Director of Financial Crimes Enforcement Network
Merrick Garland, United States Attorney General

Faith Lowry
Stuart Robinson
Daniel Bentele Hahs Tenny
Steven H. Hazel
Sophia Shams
U.S. Department of Justice
950 Penn. Ave., N.W.
Washington D.C. 20530

**_Amici_ and Counsel**

**The State of Texas**

Christina Cella
Office of the Texas Attorney General
300 W. 15th Street, Sixth Floor
Austin, TX 78701

**Eagle Forum Education and Legal Defense Fund**

Andrew L. Schlafly
Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931

Respectfully,

_/s/ Caleb Kruckenberg_
**Caleb Kruckenberg**
Counsel for Plaintiffs-Appellees

# TABLE OF CONTENTS

Contents

CERTIFICATE OF INTERESTED PERSONS ........................................ii

TABLE OF CONTENTS ..........................................................iv

STATEMENT OF THE CASE ................................................... 4

    A. Legal Background ........................................................ 4

    B. The CTA's Burden on the Public and Plaintiffs .......................... 5

    C. Proceedings Below ....................................................... 6

ARGUMENT ................................................................... 9

    A.The Government Fails to Make a "Strong Showing" of Likelihood of Success on the Merits .................................................. 10

        1. The Commerce Power Does Not Support the CTA .............. 10

        2. The CTA Is Not a Necessary and Proper Means to Further Other Enumerated Powers ............................................. 15

    B. The Equitable Factors Weigh Heavily Against Reinstating the CTA's Burdens and Compliance Deadline With Only Days To Go .. 19

        1.The Government's Claims of Injury Are Overblown ........... 19

        2.A Stay Would Irreparably Injure Plaintiffs and Others Subject to the CTA's Reporting Mandate ......................... 22

    C. The Scope of the Injunction Is Appropriate ............................ 24

CONCLUSION ................................................................ 27

Exhibit A (Hearing Transcript)
Exhibit B (Clase Declaration and Attachments)
Exhibit C (Order Denying Stay)

The Court should refuse the government's late-in-the-day request to throw much of the Nation's private sector into chaos.

The district court enjoined the initial compliance date of the Corporate Transparency Act (CTA) because this statute relies on the same faulty constitutional justification condemned by the Supreme Court in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), and because allowing it to take effect would irreparably injure the rights of the plaintiffs, including the National Federation of Independent Business and its approximately 300,000 members, as well as tens of millions other business entities subject to its sweeping mandate. After waiting a week to seek a stay in the district court, the government barreled ahead to seek the same relief from this Court on a timeline that, if it prevailed, would leave regulated parties as little as a single business day in the middle of the holiday season to comply with a never-before-implemented reporting regime that the government recognizes presents enormous compliance challenges. Indeed, those challenges were the government's own justification for pushing back the compliance deadline **for more than three years** from the earliest possible date, forgoing the

same putative benefits that the government now contends threaten it with irreparable injury.

The government comes nowhere near justifying its request. On the merits, the government's own justification for the CTA—that it "imposes reporting requirements on corporations" because they could "engage in various economic transactions," Gov. Mot. at 9—parallels the government's failed argument that Congress's Commerce Clause power authorized imposing an insurance requirement on individuals merely because they could "engage in a health care transaction" in the future. *See NFIB*, 567 U.S. at 557. As the district court held, regulation based on mere "existence," whether people or entities, is "exactly what the Supreme Court rejected." A41. The government's fallback merits arguments are equally untenable.

The equities are also not close. The district court's preliminary injunction serves to preserve the status quo against imposition of a never-before-implemented reporting regime. It prevents irreparable injury to Plaintiffs in the forms of compliance costs and injury to their rights under the First and Fourth Amendments—claims the district court did not reach at this stage. It similarly preserves the district court's jurisdiction

to decide all of those claims, which may otherwise be mooted if Plaintiffs are forced to submit to the CTA's unlawful mandate and their injuries are thereby consummated. By contrast, preserving the status quo threatens no meaningful injury to the government, based on its own representations in setting compliance deadlines that years-long delays in CTA implementation were warranted. Finally, the tens of millions of other business entities subject to the CTA would be ill-served by a last-minute reinstatement of a reporting deadline that the media and the government have widely reported is off. There is no good reason for this Court to unleash chaos in the last business days of 2024.

Finally, the government's complaints about the scope of the injunction are misplaced. The court below entered a nationwide injunction after the government suggested that it would be infeasible to provide relief solely for Plaintiffs, including NFIB's members, without the equivalent of a nationwide injunction. That was a sound exercise of the district court's equitable discretion, warranted by the facts, and independently justified as "appropriate process to postpone the effective date," 5 U.S.C. § 705, of the CTA's implementing regulation. The requested stay should be denied.

## STATEMENT OF THE CASE

### A.    Legal Background

Congress enacted the Corporate Transparency Act (CTA), 31 U.S.C. § 5336, on January 21, 2021. The CTA mandated that any "reporting company," file with the Financial Crimes Enforcement Network (FinCEN) reports of all its "beneficial ownership information." 31 U.S.C. § 5336(b)(1)(A).

A "reporting company" is an entity "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* at § 5336(a)(11). The CTA exempts large companies (those employing more than 20 people and generating more than $5,000,000 per year in gross revenue), publicly traded companies, most businesses involved in finance, and many nonprofits. *Id.* at § (a)(11)(B).

Reporting companies are required to identify, and provide photo identification of, their "beneficial owners," which includes every natural person who "directly or indirectly, through any contract, arrangement,

understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at §§ (a)(1), (a)(3), (b)(1). Entities must update this information if it changes. *Id.* at §§ (a)(2), (b)(1)(D). Violations of the reporting mandate are subject to substantial civil and criminal penalties. *Id.* at § (h)(3).

FinCEN's implementing regulations (the "Reporting Rule") require preexisting reporting companies to report their beneficial ownership information by January 1, 2025. 31 CFR § 1010.380(a)(1).

## B. The CTA's Burden on the Public and Plaintiffs

As FinCEN recognized, the CTA and Reporting Rule "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. 59498, 59550 (Sept. 30, 2022). "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59585. Compliance in the first year alone would take 126.3 million hours and impose costs of $22.7 billion. *Id.* at 59585-86.

Plaintiffs are among those affected. *See* ECF No. 6-2 at ¶¶ 3-4 (Schneider Decl.); ECF No. 6-3 at ¶ 4 (Data Comm Decl.); ECF No. 6-4 at

¶¶ 2-3 (Straayer Decl.); ECF No. 6-5 at ¶¶ 3-6 (Goulart Decl.); ECF No. 6-6 at ¶¶ 3-4 (Lewis Decl.). One plaintiff, the National Federation of Independent Business, Inc., is a membership organization with nearly 300,000 member businesses. ECF No. 6-7 at ¶¶ 4, 6 (Milito Decl.). While NFIB is exempt from the CTA, most of its members, including plaintiffs Texas Top Cop Shop, Inc. and Data Com For Business, Inc., must comply. *Id.* at ¶ 4.

### C.    Proceedings Below

Plaintiffs sued in May 2024, alleging that the CTA and Reporting Rule violate the Tenth Amendment, burden associational rights in violation of the First Amendment, and violate the Fourth Amendment by compelling disclosure of private information. ECF No. 1. They quickly moved for a preliminary injunction of all enforcement of the CTA and Reporting Rule. ECF Nos. 6, 6-1. In response, the government argued that Plaintiffs' motion was *premature* because "[t]he parties [] have more than six months to resolve this case through dispositive motions before any injury could be deemed imminent." ECF No. 18, at 8. At an October 9, 2024, hearing on Plaintiffs' motion, Plaintiffs proposed, as an alternative to a nationwide injunction, a limited injunction extending

only to Plaintiffs and NFIB's members. Ex. A at 3 (hearing transcript). The government, however, argued that relief would infeasibly "frustrate the goals and aims of the CTA" and amount to "effective nationwide relief." Ex. A at 54.

On December 3, 2024, the district court enjoined the CTA and Reporting Rule and stayed the Rule's "compliance deadline" under APA § 705. ECF No. 30 at 79. It determined that the "CTA is likely unconstitutional as outside of Congress's power. Because the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons." *Id.* At the same time, Plaintiffs "met their burden to show that they will suffer unrecoverable compliance costs absent emergency relief, they have met their burden to show that the CTA and Reporting Rule threaten substantial, imminent, non-speculative, and irreparable harm" and "because the CTA and Reporting Rule substantially threaten their constitutional rights." *Id.* at 31-32.

The injunction was widely covered in the news and law-firm client alerts informing regulated parties that the January 1 deadline was off. *See* Ex. B (Clase Decl.). FinCEN itself published a notice stating that

"reporting companies are not currently required to file [CTA reports] and are not subject to liability if they fail to do so[.]" *Id.*

Although the government was quick to file a notice of appeal, ECF No. 35, it waited over a week to seek a stay from any court, filing a motion with the district court after hours on December 11 and demanding a ruling within two days, without apprising the district court of that fact. *See* Order, ECF No. 36. Without giving Plaintiffs time to respond or the district court to rule, the government then proceeded to seek a stay from this Court on December 13th, requesting a ruling "no later than December 27, 2024"—one business day before the January 1 deadline it seeks to reinstate. Gov. Mot. at 4.

On December 17, 2024, the district court denied the requested stay in a 9-page opinion. Ex. C. Among other things, the court concluded that the equities did not warrant a stay, as "any interest the Government has in preserving its efforts in furtherance of the CTA are superseded by the CTA's grave constitutional flaws." *Id.* at 8-9.

## **ARGUMENT**

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). For a stay pending review, this Court considers four factors: (1) whether the requester makes a "strong showing" that it's likely to succeed on the merits; (2) whether the requester will be irreparably injured without a stay; (3) whether other interested parties will be irreparably injured by a stay; and (4) where the public interest lies. *Id.* at 426. "The first two factors are the most critical." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

The government's admission that it must make a "strong showing" on the merits and irreparable injury, Gov. Mot. at 7, belies its suggestion that a lower standard applies where a federal statute has been enjoined, *id.* at 3. It is irrelevant that the Supreme Court has sometimes applied a heightened standard to injunction requests, see *Turner Broadcasting System, Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers), on the basis (inapplicable here) that a "significantly higher" standard than ordinarily "required for a stay" is warranted for it to "grant judicial intervention that has been withheld by lower courts," *Lux v.*

*Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) (citation omitted). Nor is it relevant to this Court's review that the Supreme Court has sometimes granted stays in cases subject to direct appeal under its non-discretionary jurisdiction, without the benefit of appeals-court review. *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers); *cf. Reno v. ACLU*, 521 U.S. 844, 862, 885 (1997) (affirming preliminary injunction of Communications Decency Act).

The government cannot carry its burden. The district court correctly held that the CTA and Reporting Rule are likely unconstitutional. And the equities cut hard against the government's push to implement a first-of-its-kind reporting regime, with all of the harms it poses, on a breakneck schedule.

## A. The Government Fails to Make a "Strong Showing" of Likelihood of Success on the Merits

The CTA is unlawful because it exceeds the federal government's limited, enumerated powers.

### 1. The Commerce Power Does Not Support the CTA

The CTA's unprecedented scope crosses a line long reserved for the states by regulating a business entity's *status* instead of its *actions*. In

*NFIB v. Sebelius*, the Supreme Court rejected a Commerce Clause justification for the Affordable Care Act's individual mandate, holding that it "compel[led] individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." 567 U.S. at 552 (emphasis in original). The CTA suffers the same defect—it "compels" reporting companies to file beneficial ownership reports with the Federal Government "on the ground that their failure to do so affects interstate commerce." *See id.* The district court correctly concluded that "construing the Commerce Clause to permit Congress to regulate companies precisely because the Government does not know who substantially benefits from their ownership would similarly 'open a new and potentially vast domain to congressional authority.'" A44 (quoting *NFIB*, 567 U.S. at 552).

That the CTA regulates no activity is apparent on its face. It defines a class of "reporting companies," 31 U.S.C. § 5336(a)(11), and then requires them, based on their mere existence, to file reports, *id.* § 5336(b)(1)(A). It does not, as the government claims (at 9–10), regulate or prohibit any transaction; it does not even refer to or describe any

transaction, which is why the government is unable to quote any statutory language doing so.

In regulating inactivity based on mere existence, the CTA's reporting mandate is indistinguishable from the ACA's insurance mandate. The insurance mandate compelled the uninsured to purchase health insurance, which the government justified "on the ground that their failure to do so affects interstate commerce." 567 U.S. at 551. Specifically, the ACA required "*individuals who are not exempt* and do not receive health insurance through a third party" to purchase "'minimum essential' health insurance coverage." *Id.* (citing 26 U.S.C. § 5000A) (emphasis added). Likewise, the CTA requires non-exempt entities to disclose beneficial-ownership information to the federal government, on the ground that their failure to do so affects interstate commerce. *See* Gov. Mot. at 10 (arguing as much). But *NFIB* squarely rejects the proposition that Congress may "justify federal regulation by pointing to the effect of inaction on commerce." 567 U.S. at 552; *see also id.* at 657 (joint dissent).

*NFIB* also forecloses the government's argument (at 10–11) it is enough that corporations are "authorized to engage in various economic

transactions" and may have "the propensity to do so." That argument runs headfirst into *NFIB*'s rejection of the "proposition that Congress may dictate the conduct of an individual today because of prophesied future activity." *Id*. at 557. After all, it was taken as given that every individual would "engage in a health care transaction" at some point, but "that does not authorize Congress to direct them" into action. *Id*. "Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *Id*. That applies specifically in this context: "Every State in this country has enacted laws regulating corporate governance," but *federal* power reaches only "transactions" that implicate federal interests. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89-90 (1987).

To the extent the government argues that the effect on commerce of not disclosing beneficial ownership information supports the CTA under a combination of the Commerce Clause and Necessary and Proper Clause, that too is contrary to *NFIB*. The power to regulate inactivity, it reasoned, would give Congress "the extraordinary ability to create the necessary predicate to the exercise of an enumerated power." *NFIB*, 567 U.S. at 560; *see also id*. at 657 (joint dissent). And that is anything but

"incidental" to the exercise of the Commerce power and therefore not a "proper" means of executing it. *Id*. at 560. For the same reason, the government's defense (at 10) of the CTA as part of a "larger regulatory scheme" also fails. *See id*. at 560-61 (distinguishing *Gonzales v. Raich*, 545 U.S. 1 (2005), on that basis). The premise is also wrong: unlike prohibiting home non-commercial intrastate cultivation of marijuana, which facilitated the interstate-commerce ban in *Raich*, the CTA is in no way integral to various other statutory schemes that predated its enactment by years or decades. Confirming as much is FinCEN's years-long delay in implementing the CTA's reporting requirement, which is at odds with the claim that inability to mandate that reporting would "frustrate" any other statutory scheme. *See Raich*, 545 U.S. at 19.

At bottom, the government's arguments boil down to a vague assertion that Congress may exercise plenary authority, irrespective of the limits of its enumerated powers, in any field it has legitimately entered. If that were so, then Congress's longstanding regulation in the healthcare field would have supported the ACA's insurance mandate. Of course, it did not.

## 2. The CTA Is Not a Necessary and Proper Means to Further Other Enumerated Powers

As a fallback, the government leans on the Necessary and Proper Clause, the "last, best hope of those who defend *ultra vires* congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). It insists that the CTA facilitates Congress's "tax, foreign-affairs, and foreign-commerce powers." Gov. Mot. at 12. What these theories share in common is that they brook no limiting principle: if the CTA's sweeping reporting mandate is necessary and proper to exercise of any of these powers, then there is no limit to the information that the government could demand citizens report. That is fatal, because the Clause is confined to "incidental powers" and "does not license the exercise of any great substantive and independent powers beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (cleaned up).

**a.** The government proffers the vague suggestion that "the reporting requirements would be 'highly useful'" to "tax administration." Gov. Mot. at 13. Because the CTA imposes no tax, it cannot be justified as an exercise of the taxing power.

Nor is it "necessary and proper for carrying into Execution" the taxing power. "When the inquiry is whether a federal law has sufficient

links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring). Here, there is no chain, because the government fails to identify any tax to which the CTA connects. As below, the government cannot cite a single case upholding a regulatory measure on this basis "when the statute at issue does not, in some way, generate some revenue." ECF No. 31 at 71. And it is difficult to imagine, if the CTA passes muster, what information the government could not demand citizens disclose: their assets, friends and romances, travel, and more—all would prove "highly useful" to the tax collector. Yet, as with the information demanded by the CTA, none of these are in service of any particular tax. And the power to compel such disclosure is by no means an "incidental" one—to the point that it implicates the Fourth Amendment.

**b.** The government's cursory "foreign affairs power" argument (at 13) is similarly unbounded, assuming that any domestic matter that happens to implicate foreign policy or diplomatic interests is within

Congress's power. The CTA implicates foreign affairs no more than any other domestic measure.

The "powers of external sovereignty" are truly international, including the power "to declare and wage war, to conclude peace, to make treaties, [and] to maintain diplomatic relations with other sovereignties." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316, 318 (1936). This Court has distinguished between permissible state laws that "are well within the realm of traditional state responsibilities" and those that have improperly "infringed on any exclusive federal powers." *Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 579 (5th Cir. 2010).

The foreign affairs power does not *enlarge* federal power over domestic matters. The "Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Thus, when confronted with a statutory reading of an international treaty that threatened to "dramatically intrude[] upon traditional state criminal jurisdiction," the Supreme Court unanimously adopted a narrow interpretation to avoid such constitutional doubt. *Bond v. United States*, 572 U.S. 844, 857, 859-60 (2014); *see also Dunbar*, 615 F.3d at 579 (issues "within the realm of

traditional state responsibilities" are not barred by deference on issues of foreign affairs)

The CTA applies *exclusively* to entities that register "with a secretary of state or a similar office under the law of a State or Indian Tribe." *See* 31 U.S.C. § 5336(a)(11). Its only incidental connection to international affairs is that certain entities "formed under the law of a foreign country" must comply if and only if they are "registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* More obliquely, the Act provides the "sense of Congress," which pointed to a desire to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," but this is simply a goal of conforming to policies adopted by other countries, not an invocation of any specific relations with a foreign state. *See* 31 U.S.C. § 5336 note § 5(E).

With its complete lack of international nexus, the CTA thus does not implicate any of the reasons animating the implied powers over foreign affairs, much less the danger that a court's scrutiny or a state's laws might upset a unified federal position with foreign states. *See Hines*

*v. Davidowitz*, 312 U.S. 52, 63 (1941). A *possible* international application of a domestic statute is not a magic escape valve for all limits on federal authority. *See Bond*, 572 U.S. at 883 (Scalia, J., concurring).

**c.** The CTA does not "effectuate" the foreign commerce power for the same reason it does not effectuate the Commerce Clause: the constitutional language "regulate commerce," on its own or in combination with the Necessary and Proper Clause, does not reach inactivity.

## B. The Equitable Factors Weigh Heavily Against Reinstating the CTA's Burdens and Compliance Deadline With Only Days To Go

### 1. The Government's Claims of Injury Are Overblown

The government cannot be deprived of the benefits of a law that is not yet effective. Conflating the CTA's hoped-for benefits with entitlements, the government contends (at 14–15) that the injunction "threatens significant and irreparable harm to the government and public," and "disrupts the government's efforts to combat international financial crime, including the financing of terrorism." But the district court's injunction could not "disrupt" anything because it merely delayed an *upcoming* effective date and thereby *preserved* the status quo.

In any event, the government's dire claims of injury are belied by its own delay in implementing the CTA's reporting requirement. The CTA was enacted in 2021 and directed FinCEN to promulgate implementing regulations within a year that would require compliance within two years of becoming effective. 31 U.S.C. § 5336(b)(5), (b)(1)(B). Under ordinary rulemaking timelines, FinCEN could have required compliance as early as mid-2021 or as late as January 1, 2026, given that the Reporting Rule took effect on January 1, 2024. *See* 87 Fed. Reg. at 59511.

The agency chose to delay the compliance deadline for over three years. It did so based on its weighing of "the benefit to law enforcement and national security agencies" against "the burdens imposed on reporting companies." *Id.* And even then it left the door open to providing further "extensions to the filing periods for initial, updated, or corrected reports." *Id.*; *see also* 88 Fed. Reg. 83499, 83500 (Nov. 30, 2023) (justifying 90-day extension of related CTA reporting deadline based on compliance burdens). This outright contradicts the government's assertion (at 15) that a relatively short delay while the courts resolve the CTA's constitutionality would "jeopardize" anything.

The CTA's timing provisions also vitiate the government's claim (at 14–15) that the injunction causes it special injury by preventing it from "effectuating" a statute. By FinCEN's own reading, the statute doesn't require the reporting mandate to kick in for another year. 87 Fed. Reg. at 59498.

The government presents no authority for its strange argument (at 16–17) that its publicity campaign weighs in favor of staying an injunction of a likely unconstitutional statute. The government's claim of urgency is contradicted by its leisurely pace in waiting eight days to seek a stay. *See Daily Instruments Corp. v. Heidt*, 998 F.Supp. 2d 553, 570 (S.D. Tex. 2014) ("Absent a good explanation, a substantial period of delay militates against" an injunction.). In any event, the injunction does not prevent any reporting company from filing based on the government's publicity campaign. And perhaps more would have had the government been forthcoming about its plan to seek a stay, rather than broadcast to the public that companies "are not currently required to file beneficial ownership information with FinCEN[.]" FinCEN, *Beneficial Ownership Information*, fincen.gov, https://www.fincen.gov/boi.

The government's argument also loses sight of the principle that the "historical purpose of a preliminary injunction…is to maintain the status quo pending litigation." *Louisiana v. United States Dep't of Educ.*, No. 24-30399, 2024 U.S. App. LEXIS 17886, at *6 (5th Cir. July 17, 2024) (unpublished). That weighs heavily in favor an injunction that preserves the status quo by delaying the implementation date of a novel measure. *Id.*

## 2. A Stay Would Irreparably Injure Plaintiffs and Others Subject to the CTA's Reporting Mandate

Even as it conjures fantastical claims of injury for itself, the government largely overlooks the obvious irreparable injuries that a stay would impose on Appellees. Those include not only non-recoupable compliance costs, but also deprivation of constitutional rights and potential mootness of their legal claims. And then there is the prospect of utter chaos if the January 1 deadline springs back into force with only days for regulated parties, including Plaintiffs, to comply.

**a.** "An irreparable harm is one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (citation and quotation marks omitted). The "nonrecoverable costs of complying with a putatively invalid regulation typically constitute

irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

The district court correctly found that Plaintiff-Appellees will suffer irreparable harm because they must expend unrecoupable resources to comply with the CTA on January 1. Not only have the plaintiffs each averred that they would need to spend time and effort to make the required filings, but they would also need to incur legal expenses. *See* Ex. A at ¶ 10, Ex. B. at ¶ 9, Ex. C at ¶ 10, Ex. D at ¶ 12, Ex. E at ¶ 23, Ex. F at ¶ 5. These "nonrecoverable compliance" costs constitute irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 597.

**b.** Compliance will infringe Plaintiffs' constitutional rights, including their First Amendment associational rights, which also causes them irreparable harm. *Book People Inc.*, 91 F.4th at 341. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* at 340-41 (quotation marks omitted). And when a law or regulation even "threatens" First Amendment rights, a plaintiff suffers an irreparable injury. *Id.*

**c.** A stay pending appeal risks mooting Plaintiffs' First and Fourth Amendment claims because it would compel them to make the disclosures that form the basis of these claims. The injunction properly serves "to preserve the court's ability to render a meaningful decision on the merits," *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985), and a stay would only undermine that.

**d.** The government has not wrestled with the practical consequences of *suddenly reinstating* the compliance deadline with just days left to comply. Tens of millions of business entities are subject to the CTA's reporting mandate, and the injunction and its effect have been widely publicized by the media and FinCEN itself. *See* Ex. B. If the deadline springs back into force with just a few business days remaining in the middle of the holiday season, the result will be utter chaos, as those responsible for reporting scramble to understand and fulfill obligations that the government informed them only weeks ago had been postponed.

## C. The Scope of the Injunction Is Appropriate

The district court properly entered a nationwide injunction after the government suggested that it was infeasible to provide relief only to only Plaintiffs and NFIB's members without the equivalent of a

nationwide injunction. The district court was not wrong to take the government at its word, and the scope of its injunction is supported by two independent bases: (1) its inherent equitable authority, as exercised commensurate with the need to provide the plaintiffs relief, and (2) the Administrative Procedure Act, which provides a firm basis to postpone the filing deadline imposed by the Reporting Rule.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The equities of this case clearly support the district court's injunction. Having found the CTA likely violated Plaintiffs rights and that compliance would cause them irreparable harm, the district court entered the equitable relief necessary to prevent that harm and preserve the status quo, based on the government's position the district court "cannot provide Plaintiffs with meaningful relief without, in effect, enjoining the CTA and Reporting Rule nationwide." A77. The government further argued that even an injunction limited to NFIB's membership "would totally frustrate the goals and aims of the CTA and its compliance standards," because of

inconsistent application. Ex. A at 54. In raising the stakes, the government made an "all-or-nothing" bet and lost.

The injunction is also justified under the APA, which authorizes courts to "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right[s]," 5 U.S.C. § 706(2)(B), and to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," *id*. § 705. The reporting deadline was set by the Reporting Rule, 87 Fed. Reg. at 59592, and the district court therefore had unquestionable authority to "postpone" it. That it did so as to all filers was justified by APA Section 705 itself, the government's suggestion that narrower relief was infeasible, and the court's determination that the Rule would likely be subject to the APA's "set aside" remedy. *See Airlines for Am. v. DOT*, 110 F.4th 672, 677 (5th Cir. 2024) (postponing airline-fee-disclosure rule's effective date notwithstanding that not all airlines appeared as petitioners).

The government's arguments (at 20–21) against the application of standard principles of associational standing and remedies recognized by decades of precedent, *e.g., Warth v. Seldin*, 422 U.S. 490, 511 (1975), are

misplaced in this Court and at this stage and can only be understood as an act of desperation.

## CONCLUSION

The government's request for a stay should be denied.

December 17, 2024

Respectfully,
*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Christian Clase
CENTER FOR INDIVIDUAL RIGHTS
1100 Conn. Ave. N.W., Suite 625
Washington, D.C., 20036
(202) 833-8401
kruckenberg@cir-usa.org
clase@cir-usa.org

Andrew M. Grossman
BAKER HOSTETLER
Washington Square, 1050 Conn. Ave.
N.W., Suite 1100
Washington D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Federal Rule of Appellate Procedure 27(d). It is printed in Century Schoolbook, a proportionately spaced font, and includes 4984 words, excluding items enumerated in Rule 32(f). I relied on my word processor, Microsoft Word, to obtain the count.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**

## CERTIFICATE OF SERVICE

I hereby certify that, on December 17, 2024, this document was electronically filed using the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**

# EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3    TEXAS TOP COP SHOP, INC.,      | DOCKET 4:24-CV-478
      ET AL                          |
 4                                   | OCTOBER 9, 2024
      VS.                            |
 5                                   | 9:00 A.M.
      ATTORNEY GENERAL MERRICK       |
 6    GARLAND, ET AL                 | SHERMAN, TEXAS

 7    ------------------------------------------------------------

 8           VOLUME 1 OF 1, PAGES 1 THROUGH 67

 9         REPORTER'S TRANSCRIPT OF MOTION HEARING

10       BEFORE THE HONORABLE AMOS L. MAZZANT, III,
                 UNITED STATES DISTRICT JUDGE
11    ------------------------------------------------------------

12


13
      FOR THE PLAINTIFFS:      CALEB KRUCKENBERG
14                             CHRISTIAN CLASE
                               THE CENTER FOR INDIVIDUAL RIGHTS
15                             1100 CONNECTICUT AVENUE NW,
                               SUITE 625
16                             WASHINGTON, DC 20036

17
      FOR THE DEFENDANTS:      FAITH LOWRY
18                             DEPARTMENT OF JUSTICE - CIVIL
                               1100 L STREET
19                             WASHINGTON, DC 20005

20
      COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RDR
21                             FEDERAL OFFICIAL REPORTER
                               101 EAST PECAN
22                             SHERMAN, TX 75090

23


24
          PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
25     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1          (Open court, all parties present.)

2          THE COURT:  Good morning.  Please be seated.

3          We're here in case 4:24-cv-478, *Texas Top Cop*

4  *Shop, et al versus Garland, et al*.

5          And for the Plaintiffs?

6          MR. KRUCKENBERG:  Good morning, your Honor.  Caleb

7  Kruckenberg for the Plaintiffs.  I'm joined by my

8  colleague, Christian Clase.  And I'll just note that I'm

9  joined by Russell Straayer, who's one of the named

10 Plaintiffs, and he's at the table beside me.

11         THE COURT:  Okay.  Very good.

12         And for the Defense?

13         MS. LOWRY:  Good morning, your Honor.  Faith Lowry

14 for the Defendants.

15         THE COURT:  And where did you -- where did y'all

16 come from?

17         MS. LOWRY:  I am now down in San Antonio, so it

18 was a short flight up to Love.

19         THE COURT:  Not too bad.

20         MR. KRUCKENBERG:  And, your Honor, I'm coming from

21 Washington, DC.

22         MR. CLASE:  I'm coming from Nashville, Tennessee.

23         THE COURT:  Okay.  Well, welcome to Sherman.  I

24 assume it's your first time here.

25         MS. LOWRY:  It is.  It's a beautiful courthouse.

1  Happy to be here.

2         THE COURT:  Yeah.  It's the oldest courthouse

3  being used in the Fifth Circuit, so -- opened in 1907.

4         Well, here's my thoughts, is I have a number of

5  questions, and so we'll start with the Plaintiffs, if you

6  want to take the podium.  And I thought I'd ask my

7  questions that I have, and then you can say whatever else

8  you want to say, so -- and I'll do that for both sides.

9         MR. KRUCKENBERG:  Yes, your Honor.

10        THE COURT:  So are you doing slides or something,

11 or no?

12        MR. KRUCKENBERG:  No, your Honor.  I just have my

13 notes on my laptop.

14        THE COURT:  No, that's fine.

15        So let me start off and ask.  You don't explicitly

16 say you're asking for a nationwide injunction and -- but

17 the Government, I think, characterizes that's what you're

18 asking.  And so are you asking for a nationwide injunction

19 in terms of what the relief is, or is it just for the

20 parties before the Court?

21        MR. KRUCKENBERG:  Your Honor, we are asking -- I

22 think there are sort of two ways to look at it, but we're

23 really only asking for preliminary relief for the parties.

24 And when we say that, we mean the named Plaintiffs and also

25 the associational members of NFIB.

1          There is -- you know, obviously, if we're looking

2    at eventual relief or ultimate relief, there are issues

3    about the Administrative Procedure Act and *vacatur* and

4    things like that.

5          But I think for simplicity's sake, we can just say

6    for the preliminary injunction the only request we're

7    making is with respect to the Plaintiffs.

8          THE COURT:  Okay.  I just wanted to clear it up.

9    I wasn't sure, so --

10          MR. KRUCKENBERG:  Yes.

11          THE COURT:  Okay.  And then, of course, we've had

12    two District Judges, you know, address this in the country

13    so far.  Why do you think that the *Firestone-Yellen* case is

14    wrong, and does that change anything in your argument,

15    what -- what's happened there?

16          MR. KRUCKENBERG:  Yes, your Honor.  So there's --

17    in my mind, there's a few issues with the District of

18    Oregon case, the *Firestone* case.  And I think probably the

19    most obvious issue is that, you know, A, there are

20    different claims at issue.  And I think one of the

21    distinguishing factors there is that the District Court

22    said that there was no showing of injury.

23          And while that may have been acceptable under

24    Ninth Circuit precedent, I don't think that kind of holding

25    could possibly be valid here under binding Fifth Circuit

1 precedent.

2          One of the things the District Court in *Firestone*

3 said was -- and this is on page 26 of the opinion -- quote,

4 Plaintiffs offer no evidence, only speculation of injury.

5          And there the Court was talking about compliance

6 costs and potential constitutional injuries, and I don't

7 think there's any kind of dispute here that the Plaintiffs

8 must comply with the Corporate Transparency Act, the

9 Plaintiffs here.

10          There are compliance costs associated.  Those have

11 been calculated by FinCEN.  And Fifth Circuit is very clear

12 that compliance costs on administrative regulation, that

13 can constitute irreparable injury if the underlying

14 regulation is unlawful.  So I don't think that issue is in

15 play here in the same way.

16          On the merits, I think one of the critical

17 errors -- just talking about enumerated powers and the

18 First Amendment, the Court -- with respect to the First

19 Amendment, the Court didn't cite to the *Americans for*

20 *Prosperity* case at all.

21          And one of the issues there was that the District

22 Court in *Firestone* concluded that, again, there was no

23 evidence of chill or that anyone had refrained from

24 expressive conduct because of the fear of the CTA, but that

25 was dealt with in the *AFP* decision.  The Court said we

1  don't have to have evidence like that in exactly this

2  concept -- context.

3          So I think that was an error that the District

4  Court made in *Firestone*.

5          And on the commerce issue, I think the Court there

6  essentially made the mistake that the United States has

7  encouraged this Court to make, and that is to equate

8  registry of a business entity with the act of commerce.

9  And those are not the same thing, and I think the proof is

10  pretty obvious.  A corporate entity can be forced to

11  register even if they have no economic activity, even if

12  they have no assets, even if they have no activities

13  whatsoever.

14          And to say that that is commerce *per se* I think is

15  in error.  Those are just not the same things.  They're --

16  instead, they're -- I think it is up to the United States

17  to demonstrate a clear connection, which is absent.

18          THE COURT:  And I have a bunch of these general

19  questions, and then we'll go into each of the topics.

20          But why exactly is the statute unconstitutional as

21  applied to MSLP, which is a political organization that is

22  not exempt under the CTA because it's not considered a

23  political organization under the Tax Code?

24          MR. KRUCKENBERG:  Well, I think that is a clear

25  example of the inartful drafting of the Corporate

1  Transparency Act, and that's why there's a First-Amendment

2  problem.

3          Yes, some corporations will not have these kinds

4  of interests.  But clearly, a political party, like MSLP,

5  can and does, and they still have to register.  And it's

6  not because of some realistic concern that MSLP is uniquely

7  involved in money-laundering activity but just, by virtue

8  of sort of the quirk in the IRS regulations, they have to

9  register.  They don't have an active exemption under

10  501(c).  They're not actively recognized as a political

11  organization.

12          But that doesn't mean they're a commercial entity.

13  That just means that they don't have this distinct tax

14  status and they have to register here.  And if they have to

15  register, I don't think there is any doubt under *AFP versus*

16  *Becerra* that they have to disclose information that has

17  First-Amendment protections.

18          So the question is:  Is the justification given by

19  the Government under the Corporate Transparency Act

20  sufficient to force a political party like MSLP to disclose

21  their donors, their control persons, and put it on a

22  federal registry?

23          And, I mean, these are the same interests at issue

24  in *AFP*.  And if there the integrity of political donations

25  was not enough, I -- I fail to see how this very abstract

1  sense of money laundering in general is sufficient to say

2  we can invade this interest of a political organization.

3         But I also think even if we're talking about the

4  other Plaintiffs, the ones that are not directly involved

5  in political advocacy, they also have First-Amendment

6  interests that I don't think we can discount or ignore,

7  because -- I mean, one of the things that we saw is that

8  several of the Plaintiffs engaged in direct corporate

9  advocacy.

10        And we actually have an issue where not everyone

11 associated with those corporate entities wants to associate

12 with that advocacy, as is their right, and -- and one

13 of DataComm's beneficial owners says, "I don't want to be

14 associated with that.  I don't want to be disclosed for

15 fear of being associated with your political message."  And

16 that is exactly the kind of First-Amendment interest we're

17 normally talking about in this context.

18        THE COURT:  Now, your brief suggests that the CTA

19 is unconstitutional as applied because the five Plaintiff

20 companies don't have substantial assets and don't engage in

21 interstate commerce.

22        But the Government responded that nothing in the

23 CTA narrows the application to the companies that have

24 substantial ties to interstate commerce.  What would be

25 your response to that?

1          MR. KRUCKENBERG:  That's essentially saying some

2   companies do engage in commerce; therefore, we can regulate

3   anything as long as some participants eventually engage in

4   business.

5          And essentially what they're saying is, well, lots

6   of businesses are in business.  It's good enough.  But

7   that -- I think the Supreme Court has been very clear with

8   us.  You have to have some principle.

9          And the concern here is there is no limiting

10  principle on what is the difference between a business

11  entity that has no interstate activities, no economic

12  activities, and interstate commerce in general.

13         And I think when we're considering the analysis,

14  it's very helpful to look at the case out of Alabama, and I

15  think the District Court made a very cogent observation

16  there.  If we just look at the statute, the triggering

17  event for federal jurisdiction is the filing of a document

18  with a state registrar.  That's it.  That is the triggering

19  event.

20         And the Government's entire theory is lots of

21  people who file documents with state registrars eventually

22  end up in interstate commerce.  But that's the same kind of

23  reasoning that everybody has to buy health insurance as a

24  matter of interstate commerce because they eventually will

25  be participants in the market.  And the Court in *NFIB* said

1    that that is not sufficient.

2         THE COURT:  Why isn't MSLP and Mustardseed

3    basically like the farmer in the *Wickard* case or the

4    marijuana growers in *Raich* -- I'm not sure I'm pronouncing

5    that right -- but *Gonzales versus Raich*.

6         MR. KRUCKENBERG:  Right.

7         And the distinction there is the Court in *Raich*

8    said we have to distinguish between economic classes of

9    activity and noneconomic classes of activity.  And if we

10   have a comprehensive regulatory regime over economic

11   classes of activity, then we can reach these edge cases,

12   these individual Plaintiffs or entities that don't have

13   interstate activity.

14        In the illicit marijuana market, that makes a lot

15   of sense.  There is a federal prohibition on marijuana.

16   Growing marijuana for personal use affects that commercial

17   market.  That makes sense.

18        Here, there is no comprehensive federal regulatory

19   regime for corporate registry.  Quite the opposite.  There

20   has never been one in the nation's history.

21        There is no federal regulatory regime that is in

22   existence that depends on capturing in these kinds of edge

23   cases.  Instead, we are creating a brand-new one that's not

24   yet taken effect.  And so the whole idea in *Raich* was if we

25   can't capture this type of activity, the existing laws

 1    won't work.

 2           This is a new regime that it claims to solve a

 3    problem that goes unaddressed and says to be able to work,

 4    we have to bring in everything, even if it's economic or

 5    not.  And that's just not consistent, I think, with what

 6    the Court was saying in *Gonzales and Raich*.

 7           THE COURT:  Now, you agree that the fact the

 8    Supreme Court has acknowledged that corporate formation is

 9    generally an issue left to the states doesn't foreclose the

10    possibility of Congress regulating what companies do.  You

11    agree with that, don't you?

12           MR. KRUCKENBERG:  Absolutely.

13           THE COURT:  And so why is this not just an

14    extension of that?

15           MR. KRUCKENBERG:  Well, I think the Court has been

16    very clear in the corporate sphere throughout its history

17    with what the dividing line is and some of the court's

18    earlier cases, particularly in the 1930s and '40s where

19    they're dealing with the first efforts to nationalize

20    corporate regulation with the Securities Exchange Act.  And

21    the Court said, look, what makes this different, what makes

22    this a federal issue is the interstate aspect of corporate

23    transactions.

24           And it's not an accident that the Securities and

25    Exchange Act -- each offense under the Securities and

1   Exchange Act has an element of interstate commerce that

2   must be proven by the Securities and Exchange Commission.

3   Federal jurisdiction is -- I mean, we're used to this.

4   It's common.  Wire fraud, money-laundering statutes, all of

5   the substantive offenses have an interstate element.  And

6   suddenly the federal government has said we don't need that

7   anymore for the Corporate Transparency Act.

8        And as the court recognized in Alabama, that's the

9   problem.  It's such a simple fix for the Government.  They

10  could say as long as these entities are engaged in

11  interstate commerce.

12       That's what they should have done and we could

13  solve that problem very easily, but they didn't.  And as

14  we've seen with the Plaintiffs, because they didn't, they

15  claim that it attaches to everybody, no matter what, and

16  there is no limit on the federal jurisdiction.

17       THE COURT:  So you believe that would be the most

18  tenable ground for Congress to have done that, is what you

19  just indicated?

20       MR. KRUCKENBERG:  I think that would have been a

21  very simple legal solution.  I think the Court has been

22  very clear that that -- that's essentially all Congress has

23  to do.  But it's very important that they didn't and it's,

24  I think, very telling that they didn't.  And so we can

25  maybe envision a constitutional statute, but it doesn't

1  save the CTA.

2          THE COURT:  Now, why is there insufficient nexus

3  for Congress to legislate pursuant to the Necessary and

4  Proper Clause?  Because doesn't the law -- the law imposes

5  a very low bar for Congress to use the Necessary and Proper

6  Clause.  Why isn't that met here?

7          MR. KRUCKENBERG:  So, I think this is where we're

8  seeing the slippage of language.  And what I mean by that

9  is in the United States' briefing they use phrases like

10  "this information is useful," "this information would

11  benefit the federal government."

12          Sure.  That's not necessary and proper, and that

13  is a distinct kind of an idea.

14          And the Supreme Court in *NFIB*, when they were

15  talking about both the Commerce Clause and the Necessary

16  and Proper Clause -- and they rejected both justifications

17  for the Affordable Care Act -- the Court was very clear in

18  saying that there is a limit.  And it goes to the class of

19  activity, economic/noneconomic.

20          And it was insufficient in that case for the

21  Government to say everybody will eventually participate in

22  the insurance market.  That is close enough to commercial

23  activity that under the Necessary and Proper Clause, we can

24  get there.

25          And I think a similar kind of argument is being

1  made here.  Yes, these entities are not engaged in

2  business.  Yes, not every entity that has to register is

3  commercial.  But some of them are, and so that gets us

4  close enough.

5         And that is not the appropriate constitutional

6  analysis.  You have to look at what the law actually does

7  and whether or not that is a direct connection.

8         THE COURT:  So let me turn -- I have some

9  questions regarding -- more specific on the Commerce

10 Clause.

11        In listening to the *Yellen* -- the oral argument

12 before the Eleventh Circuit, the term that kept coming up

13 multiple times is the comment "There's nothing more

14 economic than companies."

15        So -- that seems true, so why doesn't the Commerce

16 Clause not authorize passage of the CTA based on some of

17 the arguments made there at the Eleventh Circuit?

18        MR. KRUCKENBERG:  I dispute the premise.  I don't

19 think there's anything economic about a company, and I

20 think that is a -- that's an erroneous kind of a shorthand

21 reasoning.  That's where we're --

22        THE COURT:  So, is that because it doesn't deal --

23 in your mind, it doesn't deal with companies or the act of

24 registration is --

25        MR. KRUCKENBERG:  Either one.  But certainly not

1    the act of registration, because, again, there doesn't even

2    have to be a company that does anything.  It just has to

3    register before the CTA is implicated.

4            But as we've seen with MSLP, that is a company,

5    that is a business entity or a corporate entity.  It's not

6    a business, though.  It doesn't engage in commerce, and

7    it's not a for-profit venture.  It is a political

8    organization that spins on political matters.  That's it.

9            And there are lots of instances.  There are --

10   every nonprofit is a company.  There are so many LLPs,

11   LLCs, corporations, all these entities.  They exist for

12   lots of different reasons.

13           Business is a common one, but it's not the only

14   one.  And it is not true to say that every business or

15   every entity -- every corporate entity is engaged in

16   business or will one day engage in business.  It's

17   demonstrably false.

18           THE COURT:  So I guess I'm trying to understand

19   the idea of CTA.  Does it regulate, you know, entity

20   formation at all under state law, and does it subtract or

21   add anything to the registration process in terms of the

22   CTA?

23           I understand this is typically a state function,

24   but in terms of Congress trying to pass laws that involve

25   interstate commerce, why is that not the case?  Because --

1    I guess could it be more accurate to say the CTA is

2    regulating companies because they're the ones who engage in

3    interstate commerce, financial crimes, which has been what

4    the goal of the CTA was to deal with?

5           MR. KRUCKENBERG:  Well, existing rules capture the

6    problem that the Government is claiming they need to get

7    to because -- I mean, think about money laundering.  It's

8    clearly federally illegal already, and there's an

9    interstate element to that.

10          So the idea that we need the CTA to get at

11   something, well, what is it that you need to get at?  I

12   think that's a suggestion.  They say we need to get to

13   something that's less interstate.

14          But if I'm looking at just as a function of law

15   what this does, probably the easiest example is MSLP.

16   There are Mississippi statutes -- and we've cited in the

17   Complaint and in the briefing -- that say things like you

18   cannot force a political entity like this to disclose their

19   members.  There's -- there are state protections built in

20   as a part of the registration process for a business entity

21   like MSLP.

22          This preempts those, or claims to.  And this says

23   notwithstanding those protections, notwithstanding that

24   anonymity that you're normally guaranteed under state law,

25   we're making you tell us anyway and register with FinCEN.

1  This is a new activity that is preempting contrary state

2  law in a number of jurisdictions.

3         And so that, I think, is really where the concern

4  comes up, because it's changing the entire game.  It's

5  changing the way that corporations have identified -- or

6  have registered, have disclosed information to the public,

7  and this is completely new.

8         THE COURT:  Well, isn't the potential -- or isn't

9  that the potential to engage in kind of preexisting illegal

10  market sufficient under the *Gonzales/Raich* case?

11         MR. KRUCKENBERG:  Sure.  And that's why -- that's

12  why money laundering can be prosecuted.

13         But, again, we're sort of -- if I can think of an

14  analogy, it's almost like the Government is saying lots of

15  cars use roads; so, therefore, anybody who uses a road is a

16  car.

17         And that is not -- that's not a logically

18  consistent kind of an argument, but that's what they're

19  saying.  They're saying, well, lots of businesses engage in

20  commerce and some businesses engage in money laundering;

21  therefore, we must regulate every entity.  And that's

22  clearly just not the case.

23         And I think also what proves the lie in the

24  reasoning is the list of exemptions.  So if this is really

25  about money laundering -- I mean, we can debate why or why

1  not they think the existing remedies are inadequate, but

2  they also exempted most of the likely culprits from the

3  CTA.

4          And, yes, some are registered with the SEC or

5  other regulators, but some are not.  I mean, an entity that

6  has $5 million in revenue and 20 employees is exempt just

7  because.  And I don't think that is logically consistent

8  with their idea of it's really about money laundering.

9          THE COURT:  Now, what's your response -- you know,

10  the Government takes position of using channels of

11  interstate commerce and that the reporting companies use

12  the phones, Internet, other things that are in commerce.

13  What's your response to that in terms of why it's not

14  authorized by the CTA because they use these channels of

15  commerce?

16          MR. KRUCKENBERG:  Well, your Honor, if that was

17  the case, then we have officially crossed the line that the

18  limits on federal jurisdiction are truly meaningless.  I

19  doubt there's a human being alive who has not --

20          THE COURT:  So, in your view, under that theory

21  every -- there would be nothing that couldn't be regulated,

22  then?

23          MR. KRUCKENBERG:  Every person in the United

24  States has used the instrumentalities or channels of

25  interstate commerce at some point in their life.  I used a

1  number of them this morning.

2       If that is sufficient, just because a business

3  entity will some day predictably use the channels of

4  interstate commerce -- because, again, it's not an element

5  of the registration statute -- then there is absolutely no

6  limit.

7       I'll also point out that the United States has

8  conceded in other litigation, the Alabama case

9  particularly, that the filing of a document, the triggering

10 event for federal jurisdiction -- they've said, well, okay,

11 we concede that that is not the use of the channels of

12 interstate commerce sufficient to justify the act, which I

13 think is a wise concession because that comes from the *NFIB*

14 case, again, which is you can't tell people they have to do

15 something that then triggers a federal obligation.

16       THE COURT:  Now, this case is different than the

17 *Morrison* case, is it not?  That -- and regulating necessary

18 commercial potential conduct is not a noneconomic activity

19 like gender-motivated crimes that was in the *Morrison* case.

20 Do you agree with that?

21       MR. KRUCKENBERG:  Yes, your Honor.  And I think if

22 we're -- and *Morrison* and *Lopez*, I think, very clearly

23 present the other side of this, that there is a line where

24 we look at the actual statute and the essential purpose of

25 the statute.

1          And, yes, gender-motivated crime, that is not

2    commercial activity, the same as incorporating a nonprofit

3    political party is not commercial activity.

4          THE COURT:  And do you acknowledge that a

5    jurisdictional hook is not necessary for Congress to

6    legislate pursuant to the Commerce Clause?

7          MR. KRUCKENBERG:  I do.  It's not always

8    necessary.

9          But, again, I think that's where we're in the very

10   limited *Raich versus Gonzales* universe where we have a

11   legitimate federal regulatory framework that does have a

12   jurisdictional hook.

13         And what the Court says is in those cases we can

14   still encompass certain local activity within the

15   framework.  But that is, I think, very different than

16   saying we never have to have a jurisdictional hook and we

17   can regulate wholly local activity anyway.  Those are -- I

18   think those are very sort of subtly different ideas.  And

19   that, frankly, is what the Government is trying to raise

20   here, they're trying to defend the CTA based on.

21         THE COURT:  So what is the basis for your

22   conclusion that CTA is not part of an integrated statutory

23   scheme?

24         MR. KRUCKENBERG:  So the question is what

25   statutory scheme and what comprehensive regulatory

1    framework?

2              So if we're saying, well, the CTA, which does not

3    yet exist, that's -- I mean, we're assuming our conclusion,

4    right?

5              And the way I read *Raich* is what the Court is

6    really talking about is we have to have a legitimate

7    regulatory framework and the local coverage has to be,

8    quote, essential to that larger framework.

9              THE COURT:  But wouldn't financial crimes -- they

10   would be economic activities, wouldn't they?

11             MR. KRUCKENBERG:  So you -- yes, you can always --

12   you can always take it out to this level of abstraction

13   where we're saying, well, it's financial crimes in general.

14   But that's not --

15             THE COURT:  But Congress already has preexisting

16   regulatory schemes in place to target that, right?

17             MR. KRUCKENBERG:  Sure.  And those are

18   constitutional because they're different.  Because, like I

19   said, if we look at money laundering, there is a

20   jurisdictional element.  If there are tax-reporting

21   obligations, those typically arise from financial

22   institutions, not -- under a completely different

23   regulatory regime.

24             And this -- I mean, the framers of --

25             THE COURT:  Isn't that one of the goals of the

1    CTA, is -- a scheme that's already there, they're still

2    trying to ferret out any kind of nefarious motive by other

3    companies, and isn't that one of the goals?

4            MR. KRUCKENBERG:  Yes, and that's the problem.

5            So we have an existing money-laundering reporting

6    framework, the Bank Secrecy Act, that entire framework,

7    which applies almost exclusively to outward-facing monetary

8    transactions or interstate activities.  There is a lot of

9    reporting obligations there.  That's the existing

10   framework.

11           What Congress said is we don't think that's good

12   enough because we don't like the existing framework, so

13   we're going to come up with a new framework, a new registry

14   obligation to do something different.  It's not essential

15   to the existing scheme; it's a new scheme.

16           And if we're reading *Raich* to say we can do

17   anything federally as long as it serves a useful function,

18   then, again, we've taken whatever limits exist and we've

19   destroyed them.  I mean, there's no limiting principle to

20   say, like, well, yeah, of course, the Government thinks

21   this is useful.  That's why they passed it.  Doesn't mean

22   it's constitutional.

23           THE COURT:  And Congress doesn't actually have to

24   identify the regulatory scheme in the CTA, does it?

25           MR. KRUCKENBERG:  I don't think they do.  But,

1  again, we have to look at what is it.

2          And if we look in context and we look particularly

3  at what the CTA says and it claims to be amending part of

4  the Bank Secrecy Act, then I think it best -- if it's part

5  of the regulatory scheme, we have to place it within the

6  Bank Secrecy Act.

7          And then we have to say does this -- is this an

8  essential component of the success of the existing Bank

9  Secrecy Act, or is this something different?  And I think

10  everything indicates this is something very different.

11  Nothing like this has ever been passed before.

12          THE COURT:  And to make sure I understand, what is

13  the -- what is -- in your view, what does the CTA regulate?

14          MR. KRUCKENBERG:  The CTA regulates any person

15  once they file a state incorporation document.  And I say

16  "incorporation," but partnership agreement, whatever.

17          As soon as they register with a state entity, the

18  CTA comes in and it says you must create and produce

19  records and file them with us on our dates and if you do

20  not, there is a presumption of criminal liability.

21          So every Plaintiff here has been directed to

22  comply before the end of the year.  If they don't file

23  anything, it is a federal felony.  They have been informed

24  of their obligation, and they decided not to.

25          And the only triggering event, the only thing that

1    they have done to incur that obligation is registering --

2    is preexisting registration with their state entities.  All

3    the entities filed their registration statements before the

4    CTA even took effect.  It's not like they have even done

5    anything since the act was passed.  Instead, they have just

6    been registered under state law.

7         THE COURT:  So to make sure -- I'm still trying to

8    make sure I understand.  So, in your mind, the CTA just

9    regulates -- it's -- you don't view it as regulating

10   registration?

11        MR. KRUCKENBERG:  No.  And I think if we look at

12   the specific requirements -- so registration under state

13   law -- and let me just use an example from one of the

14   clients.

15        If I think of Texas Top Cop Shop, they registered

16   in Texas as a corporation.  They had to identify a

17   registered representative.  That's it.  They don't have to

18   identify the officers, the directors, the shareholders,

19   anything like that.

20        Now, because of the CTA, they have to identify the

21   beneficial owners.  That, yes, includes the actual owner,

22   the 25 percent or more.  That includes people with

23   substantial control, formally or informally.  That includes

24   a lot of other entities that do not have to be disclosed,

25   and they have to create those records.

1          They have to chase down the ownership interests,

2    the control -- the informal control interests, and then

3    they have to identify those and create those records, file

4    those records, have photocopies of identification of each

5    individual identified, have their current address, their

6    date of birth.  And they have to file it all with FinCEN

7    before the end of the year, and every Plaintiff has to do

8    that.

9          And according to FinCEN, at least 32 million other

10   small businesses nationwide, existing ones, have to do all

11   of those activities before the end of the year and then

12   probably 5 million new ones each additional year

13   thereafter.

14         So this is not just registry; this is an ongoing

15   reporting requirement.  You have an ongoing obligation to

16   update information that changes.

17         And this is very invasive information.  I mean,

18   this is your photocopy of your driver's license, your

19   birthday.

20         THE COURT:  Now switching gears.  Aside from

21   *Yellen*, what is your best case for the proposition that

22   Congress cannot invoke the Necessary and Proper Clause to

23   assist in collecting taxes?

24         MR. KRUCKENBERG:  Your Honor, that, again, is *NFIB*

25   *versus Sebelius*.  And I think the Court there -- when we

 1 | talked about the taxing and spending power, laying and
 2 | assessing taxes, we have to create revenue.  The Court was
 3 | clear.  So we have to have some kind of revenue generation.
 4 |         THE COURT:  But isn't that case very different?  I
 5 | mean, that dealt with a case of requiring someone to
 6 | purchase health care, which is very different than
 7 | requiring disclosure, who's in charge of a company or owns
 8 | a company.
 9 |         MR. KRUCKENBERG:  Right.
10 |         So the tax premise that the Court rejected in *NFIB*
11 | was we can buy -- we can make people buy health care or
12 | impose a tax penalty upon them if they choose not to.
13 | That's the mechanism, right?
14 |         And so the Government said there, well, we would
15 | be raising revenue by taxing them for not participating.
16 | That's a taxing power.
17 |         The Court rejected it, and they said that is too
18 | attenuated a revenue-generating measure under the taxing
19 | power and the Necessary and Proper Clause.  It's just too
20 | attenuated from revenue generation.
21 |         Here, where's the revenue coming from?  It's not
22 | from the CTA; it's through this theoretical enforcement.
23 | They are saying once we have all this information about all
24 | these companies, we might be able to catch cheating and
25 | that's maybe gonna raise revenue.

1          That's -- I mean, in the Affordable Care Act

2    situation, we at least knew who was gonna have to pay taxes

3    and we knew what they were going to have to pay.  And here,

4    it's just this theoretical possibility, well, we're

5    certainly going to catch something in our massive database

6    of information just to, sort of, hunt around for the hope

7    of crime.  I mean, that's very different, and I think

8    that's a very concerning kind of a position to take from

9    the Government.  I mean, that's why we have the

10   Fourth-Amendment argument.

11         THE COURT:  Switching gears again.  The CTA and

12   the Government reference that the U.S. is out of step with

13   international standards for corporate disclosures.  Are you

14   aware of what that standard is?

15         MR. KRUCKENBERG:  Your Honor, there -- this has

16   been a debate for a long time.  And as a matter of state

17   law and as a matter of state policy, every state has taken

18   the view that anonymity in corporate affairs or anonymity

19   in corporate ownership is a worthwhile interest.  And there

20   are lots of legitimate business reasons for anonymity and

21   also protected interests, like First-Amendment

22   associations.  The states have all recognized that.

23         Some federal policy makers disagree and other

24   countries disagree, but that really has nothing to say

25   about what our Constitution says is appropriate.

1          And, frankly, if the federal government wants to

2     change the standards, they could have done so in a way that

3     at least didn't have the kind of commerce problems.  But

4     then, of course, we still have First- and Fourth-Amendment

5     concerns.

6          And so I guess with due respect to my European

7     colleagues, they don't have the same constitutional

8     protections.  And that's why we're out of step, because we

9     actually protect different kinds of liberties.

10          THE COURT:  Now, I know you rely upon *Bond* and --

11     how is that applicable to this case?  Because it seems like

12     the facts of *Bond* are just so distinguishable from what we

13     have here.

14          MR. KRUCKENBERG:  I think *Bond* is useful in a --

15     constitutional avoidance in a statutory interpretation

16     analysis.

17          And, essentially, the argument here is if we take

18     the United States at its word -- and this really is

19     justified under the foreign affairs power -- then there's

20     nothing really concerning going on.

21          And I think what Justice Scalia's concurrence in

22     *Bond* really got at is that would upset -- if we're reading

23     these kinds of powers to say anything is international

24     because we say it is, then that upsets normal understanding

25     of jurisdiction, normal understanding of federalism, and

 1  we're not willing to risk it as a Court.  I mean, that's

 2  what the Court said.  We're just not gonna go there if

 3  there's any plausible interpretive off-ramp.

 4          I don't think we have to get there because there

 5  is no international element here.  The only international

 6  element --

 7          THE COURT:  But don't you -- I mean, you agree

 8  that it's not purely a domestic statute.  Foreign companies

 9  also have to comply, correct?

10          MR. KRUCKENBERG:  Sure.  But that doesn't mean any

11  law that has some international application is justified

12  under the foreign affairs doctrine.  I mean, the foreign

13  affairs doctrine is about truly national decisions

14  interacting with international actors.

15          And the rationale for the foreign affairs

16  doctrine -- I mean, it's implied from the Constitution.

17  And the idea is that, well, we have to have some national

18  consensus; otherwise, individual actors might risk

19  political relationships with foreign countries.

20          That, obviously, is very different from here

21  where, yes, some of the 32 million businesses might have

22  international contact, maybe, but maybe not.  We don't

23  know.  That's merely an assumption.

24          THE COURT:  But isn't that a national security

25  concern, that you have foreign companies that you're

1  figuring out whether they're -- are they doing terrorism

2  financing, things like that?

3          MR. KRUCKENBERG:  Sure.  And that's why money

4  laundering and international financing of terrorism and

5  material support for terrorism are all prohibited, and

6  they're all legitimately prohibited under foreign affairs

7  powers when they have an international element.

8          But it's not enough to just say that those are

9  important concerns; therefore, anything that could possibly

10 serve them must also be valid.

11         THE COURT:  And then other than *Bond*, what's your

12 best case for the proposition that Congress cannot

13 legislate in this arena with its foreign affairs and

14 necessary and proper power?  Do you have another case other

15 than *Bond*?

16         MR. KRUCKENBERG:  Well, your Honor, if we go to

17 any of -- and so, first of all, I would just rely on the

18 briefing.  I don't have it in front of me.  But if we look

19 at any of the foreign affairs doctrine cases -- so *Bond*

20 talks -- and, obviously, *Bond* was not resolved on

21 constitutional grounds, but *Bond*, as I said, was about

22 constitutional avoidance.

23         But if we look at the origins of the doctrine,

24 every time it's invoked it's about not binding the United

25 States or not allowing a state to change our relationship

1  with our foreign adversaries or some sort of international

2  activity.  And that is a very, very different kind of a

3  relationship.

4          And if we're implying this power, it has to be

5  actually and directly related in some way to international

6  affairs.

7          THE COURT:  So those are the questions I had for

8  you.

9          Now, I -- if you have other things you want to

10 talk about, you certainly can or we can switch over to the

11 Government and -- and to be candid, I mean, we can talk

12 about constitutional claims, but if I get to -- if you

13 don't win on the things I've already asked about, then I

14 don't think the constitutional claims are strong.  So I

15 think your better arguments are the other claims, so that's

16 the reason why I really don't feel -- that's why I'm not

17 asking any questions about -- generally about going

18 specifically to your constitutional claims.

19         But you're welcome to say anything you want to say

20 about those.  I'm just -- I'm trying to be as open as

21 possible about -- I think your -- if you win this case, at

22 least at this preliminary stage, it's going to be on these

23 other matters, probably not the constitutional claims,

24 based on my looking at everything.

25         But that doesn't mean that -- you know, if you

1  lose on the first part, doesn't mean -- I'll be forced at

2  the second so --

3         MR. KRUCKENBERG:  Well, and, your Honor, I --

4  obviously, I appreciate -- I appreciate your frankness with

5  this.  But I do want to talk about the First-Amendment

6  claim because I think it is easy to overlook in the context

7  of everything that's happening.

8         And as I said at the outset, the *Firestone* opinion

9  from Oregon I think really does a disservice to the

10  First-Amendment issue, and part of that was because those

11  Plaintiffs had different claims and they had different

12  interests.

13         But here, we have unequivocal, expressive conduct

14  that is within the scope of the statute.  There's --

15  there -- the disclosure requirements for all of the

16  Plaintiffs, not just MSLP, implicate expressive conduct.

17  But, obviously, MSLP is the most extreme example.  I mean,

18  these are the inner workings of a state political party,

19  about who funds them, about who's making decisions about

20  how to spend money, political money for political purposes.

21  That is core expressive activity.  And the CTA is forcing

22  them to disclose that information to the Secretary of

23  Treasury for his review for crime -- criminal investigative

24  purposes.

25         That is more invasive than the regime in *AFP*

1  *versus Becerra*.  I mean, that was a situation where

2  donors -- or nonprofits had to say who gave them donations

3  in a registry to the state secretary, Becerra, and those

4  were nonpublic.  Those could not be -- it was the same

5  thing.  It was to check with compliance.  And the Court

6  said that failed exacting scrutiny.

7          And I don't see any principled way to distinguish

8  what's happening in *AFP versus Becerra* versus what's

9  happening here with the CTA to the Libertarian Party of

10  Mississippi.  I don't think there's even a good argument

11  that those are distinguishable.  And that raises a

12  constitutional problem, and particularly in a preliminary

13  injunction context.

14          And, again, *Becerra* said this.  We don't have to

15  say -- we don't to have actual evidence that people are

16  chilled from their exercise of free speech or association.

17  It's enough that their behavior is arguably proscribed by

18  the statute.  That creates a presumption of a

19  First-Amendment chill, and that is enough for preliminary

20  injunction.

21          And so I would just urge this Court to consider

22  that issue because I think that is -- it's one that the

23  United States has not argued very much but is one that I

24  think the Supreme Court has been very clear on.

25          THE COURT:  Thank you.

1         MR. KRUCKENBERG:  And, your Honor, just to finish

2    up, I do want to touch very briefly on the Fourth-Amendment

3    issue.

4         And I know we've talked about this a little bit,

5    but even if we're looking at this under *Patel* and under the

6    sort of lesser reasonable -- or the lesser test we might

7    apply for a subpoena, even then this fails.

8         And one thing that I would point out that we've

9    argued in the briefing is that our clients actually have

10   reasonable expectations of privacy in the information at

11   issue.  I mean, the CTA says this information is private,

12   which is kind of a tell.  But it's also -- again, it

13   implicates First-Amendment interests in some cases, I mean,

14   with the MSLP.

15        If there's a reasonable expectation of privacy,

16   the Court has said, in *Carpenter,* that this

17   Schultz (phonetic) analysis that the Government relies on,

18   that doesn't even apply.  You have to have a warrant if

19   there's a reasonable expectation of privacy.  Not even the

20   third-party doctrine applies there.

21        But even if we don't have a reasonable expectation

22   of privacy, even if we reject that, under the *Oklahoma*

23   *Press* standard that we usually use for subpoenas, as the

24   Court made clear in the *Patel* case, you have to at least

25   have an option of precompliance challenge.

1          So think about IRS subpoenas.  This is where it

2    comes up all the time.  This is similar kinds of

3    information.  If the IRS subpoenas you because they suspect

4    you of tax fraud, you have to produce information.  The IRS

5    still has to subpoena you, and you can go to Federal Court

6    and challenge the subpoena and that is your precompliance

7    effort to challenge the inquiry.

8          Here, there's nothing.  There is a presumption of

9    disclosure of all information, no matter what, for every

10   person, for all 32 million-plus existing entities, must be

11   filed for the explicit purpose of criminal investigation,

12   and there is no opportunity for review from a neutral

13   party.  That is too far.

14         And, your Honor, I'm more than happy to answer any

15   other questions but, otherwise, we would urge this Court to

16   preliminarily enjoin the statute.

17         THE COURT:  Okay.  Thank you.  I appreciate it.

18         MR. KRUCKENBERG:  Thank you.

19         MS. LOWRY:  Good morning, your Honor.

20         THE COURT:  Good morning.

21         Let me start off and ask you, your response argues

22   that the Plaintiffs' delay in seeking relief weighs against

23   the idea that they suffer any kind of irreparable injury.

24   But the FinCEN has not been accepting beneficial ownership

25   reports long before the Plaintiffs actually filed the suit.

1  So what about that?

2         MS. LOWRY:  I think there are three relevant dates

3  that we can use to measure Plaintiffs' delay against.

4         First, there is the passage of the CTA in 2021.

5         Second is the finalizing of the final rule for the

6  Beneficial Ownership Interest reporting requirement at the

7  end of 2022.

8         And then you see the opening of the -- of FinCEN

9  saying we'll now take those Beneficial Ownership Interest

10  filings starting at the beginning of this year.

11         Regardless of which date you use, the Plaintiffs

12  in this case either waited several months or several years

13  to initiate this lawsuit.  And if delay in seeking a

14  preliminary injunction is going to mean anything, those six

15  months, over a year, back to two years of delay are going

16  to weigh against the finding of irreparable harm.

17         THE COURT:  Now, at the same time, you know, you

18  say that there's plenty of time to render a meaningful

19  decision on the merits.  So on the one hand, you say they

20  waited too long, but on the other hand, you say they didn't

21  wait long enough for a preliminary injunction to be

22  warranted.  Which is it?

23         MS. LOWRY:  I think that is just the nature of the

24  inquiry for irreparable harm, that you need this -- the

25  urgent need and that you did not delay in seeking it.  That

1    goes to whether the Plaintiffs have created the urgency of

2    the situation.  Had they filed at any of these earlier

3    times, that urgency wouldn't exist.

4              I would concede, though, your Honor, we're now

5    into October.  That argument was made several months ago

6    when the briefing was filed.  I would take that off the

7    table at this point.  We're, obviously, now in a shorter

8    time frame.

9              THE COURT:  Okay.  Thank you.

10             Now, do you disagree that the costs Plaintiffs

11   will incur by complying constitutes irreparable harm?

12             MS. LOWRY:  I do, your Honor, at least as

13   supported by the evidence attached to the briefing.

14             While compliance costs can be competent evidence

15   of irreparable harm, here the Plaintiffs haven't specified

16   what those compliance costs are.  And FinCEN's compliance

17   cost estimates were, at least the large numbers that

18   Plaintiffs cite, in the aggregate.

19             As to the individual Plaintiffs and parties, I

20   believe the estimate was as low as something like $85.

21   That would be a *de minimis* compliance cost.  Because the

22   Plaintiffs haven't actually supported what those costs are

23   going to be, I think that shows that they haven't

24   demonstrated that those costs would be more than

25   *de minimis*.

1           THE COURT:  Well, how are compliance costs

2    *de minimis*?

3           MS. LOWRY:  I believe this was the bump stocks

4    case in front of Judge O'Connor, a finding that $200 or

5    less in compliance costs are *de minimis*, so that there is

6    some -- it's not a single dollar of compliance cost is

7    sufficient to demonstrate irreparable harm.  There actually

8    has to be a more than *de minimis* amount.

9           I think the Courts come down somewhere in the 100

10   to $200 range.  We just don't have evidence that the

11   compliance costs here are going to exceed that.

12          THE COURT:  And then the *Yellen* case, isn't that

13   totally different because you didn't have -- you had

14   unverified complaint and there were no declarations like we

15   have here?

16          MS. LOWRY:  Yes.  That is a distinguishing feature

17   of *Yellen*.  That is why the evidence was not competent in

18   that case and not sufficient in that case.

19          Ours is -- rather than having, you know,

20   unverified and no evidence whatsoever -- is just

21   conclusory.

22          THE COURT:  And then what is your response to the

23   Plaintiffs' argument that the Fifth Circuit case, *Rest. Law*

24   *Center versus DOL,* forecloses the argument that Plaintiffs

25   have not shown irreparable harm through their declarations

1  that demonstrate their compliance costs?

2       MS. LOWRY:  I don't know the specific -- how I

3  would specifically distinguish that case, only to say that

4  the allegations of compliance costs here are entirely

5  conclusory.  There are no specifics as to what those

6  compliance costs are going to be.

7       When we look, for example, at Mustardseed, we have

8  what appears to be a relatively small operation, selling

9  milk.  I don't understand the complication with their

10 filing that would justify more than *de minimis* compliance

11 costs.

12      THE COURT:  And then don't the penalty provisions

13 of the CTA suggest Congress isn't regulating companies as

14 much as regulating individuals?

15      MS. LOWRY:  The criminal penalties -- whether that

16 shows regulation at the individual level or the corporate

17 level?  Is that the question?

18      THE COURT:  Yes.

19      MS. LOWRY:  Yeah, I think that the criminal

20 penalties most relevant here are as applicable to -- under

21 the Anti-Money Laundering Act.  That is the regulatory

22 scheme that we should be looking at.

23      And individuals can be prosecuted for their

24 participation through companies and activities that they

25 engage in through companies in addition to, you know, the

1   corporate forums.

2        THE COURT:  Okay.  Now, switching to the Commerce

3   Clause, you seem to argue that CTA regulates either

4   companies as instrumentalities of commerce or future

5   possible conduct.  What exactly is the activity the CTA

6   regulates, and where in the statute can you draw that from?

7        MS. LOWRY:  I believe that the conduct that the

8   CTA regulates is the anonymous existence and operation of

9   corporations.

10       And here we need to separate the "who" from the

11  "what."  When you look at -- your Honor addressed, like,

12  the *Gonzales* cases, guns in school zones or violence

13  against women.  Those laws applied to everyone, right?

14  That was the "who."  When the Court did the Commerce Clause

15  analysis, it looked at the "what," guns in school zones,

16  violence against women.

17       Here, the "who" isn't everyone.  It's not every

18  person in the United States.  It's defined through the

19  filing with the Secretary of State and the ability to do

20  business in your own name.  That helps inform our "what,"

21  right, but the "what" is really the anonymity at issue,

22  which was the harm and the problem that Congress was

23  seeking to address.

24       THE COURT:  And how do you look at that as purely

25  a state function?  I mean, states have determined that

1  being anonymous is a goal and a desire.  And so this idea

2  that they're doing channels of commerce to try to overstep

3  the states in that regard seems like that would give you

4  carte-blanche authority to do anything under the Commerce

5  Clause.

6         MS. LOWRY:  Well, I think there is the

7  channels-and-instrumentalities inquiry, but our primary

8  arguments looked at either direct regulation of interstate

9  activity or, in the sort of *Raich* realm, intrastate

10 activities that have substantial effects on interstate

11 commerce or the comprehensive regulatory scheme, which we

12 see through the Anti-Money Laundering Act.

13        THE COURT:  So what do you think is your best

14 argument under the Commerce Clause, then?

15        MS. LOWRY:  I believe the best argument under the

16 Commerce Clause is the substantial effects on interstate

17 commerce, even to the extent that the activities are purely

18 intrastate.

19        And here, we have the findings from the agency

20 which were articulated through Congress that money

21 laundering and tax evasion create 300 billion, with a B,

22 dollars of profit annually and that the Government does not

23 have the tools that they need to address that problem.

24        The Plaintiffs here have conceded the Anti-Money

25 Laundering Act has the interstate nexus.  Then we look

 1  if -- if the -- the question should be does the corporate

 2  anonymity problem have a substantial impact on interstate

 3  commerce.  Yes.  That is why Congress passed this law.

 4          And Congress didn't say -- I believe the

 5  Plaintiffs, in the Plaintiffs' argument, said it would be

 6  useful or it would benefit the Government to have this

 7  information.

 8          Congress said this information is needed.  That is

 9  the Section 6402(5) of the Act.  This information is

10  necessary to address this problem, and that is sufficient

11  under the Commerce Clause and, in particular, because the

12  Court's inquiry is not really to judge anew the policy

13  interests of Congress in this area but to ask whether

14  Congress had a basis for concluding that that connection

15  exists.  That is apparent on the face of the statute, and

16  that's enough to survive the Commerce Clause challenge.

17          THE COURT:  Now, is your argument -- are we

18  assuming that these companies are violating some criminal

19  statute just because -- you're requiring everyone to do

20  this registration, and so that's why I'm struggling with

21  this idea that -- does that mean that you're assuming

22  everyone is somehow in violation of the law?

23          MS. LOWRY:  No, your Honor.  It's recognition of

24  the difficulty of the problem.  You already have these

25  anonymous corporations and businesses for which you cannot

1  identify any real human person.  I don't think it would be

2  effective to then ask this anonymous person that you can't

3  find, even through subpoena and warrant powers, when you go

4  through these very in-depth investigations, "Can you please

5  disclose yourself?  We would like you to register with

6  FinCEN."

7          What has been determined is that there is this

8  comprehensive regulatory framework and what is needed is

9  this information so that the bad apples can be identified.

10         THE COURT:  But, you know, I -- I have

11 money-laundering and wire-fraud cases -- criminal cases all

12 the time, so there's mechanisms for that already.  It seems

13 like you're adding on and basically requiring everyone to

14 register that -- casting this wide net.  And I guess I'm

15 just trying to understand where does that stop, then?

16         MS. LOWRY:  I would have two responses.

17         One here, your Honor, is to acknowledge that

18 Plaintiffs are bringing a facial challenge under the

19 Commerce Clause, and they have argued that we are applying

20 the inappropriate standard under *Salerno* to say that they

21 need to show that there would be no constitutional

22 applications to satisfy that facial challenge.  Your Honor

23 said you listened to the Eleventh Circuit argument.  This

24 was heavily featured there in the questions by the judges

25 on the panel.

1          The Supreme Court clarified that that is the

2    appropriate test just this term in *Rahimi*, which was a

3    Second-Amendment challenge.  So, again, a constitutional

4    claim, a facial challenge outside of the First-Amendment

5    context affirming that *Salerno* is the proper standard.

6          So Plaintiffs, I believe, cite an Eleventh -- at

7    least out-of-circuit authority, the *Club Madonna* Eleventh

8    Circuit case from 2022.  That can't overcome *Rahimi* now,

9    2024, saying that this is the "most difficult challenge to

10   mount successfully" because it requires the Plaintiff to

11   "establish no set of circumstances exists under which the

12   Act would be valid."

13         So we don't need to look for the most fringe

14   cases, you know, businesses that truly have no nexus to

15   interstate commerce in any fashion, to deny the facial

16   challenge and say there are clear cases of businesses

17   operating in interstate commerce on their own.

18         I think here the *NFIB* Plaintiff is the most

19   problematic for Plaintiff.  There are 300,000 business

20   members of NFIB.  They are not members of a trade

21   organization because they have no business, hold no assets,

22   and are not engaged in any commerce.  They can't show there

23   are no constitutional applications even as to the named

24   Plaintiffs among them, and they -- for that reason alone,

25   they can't satisfy their burden.

 1          THE COURT:  And then I know you touched on this,

 2   but how is the CTA part of a broader regulatory scheme?

 3          MS. LOWRY:  The broader regulatory scheme is the

 4   Anti-Money Laundering Act, which itself was originally

 5   passed sort of through the Bank Secrecy Act.  We're now

 6   looking at more like, you know, 30 and 50 years of history.

 7   But the Corporate Transparency Act itself was Section 6400

 8   going down but as part of the 6000 division, which is the

 9   Anti-Money Laundering Act.  It was the Anti-Money

10   Laundering Act that directs Treasury to collect this

11   information.  Then when you get down to 6400, you see what

12   types of information it's being directed to collect.

13          THE COURT:  So what is your authority for -- just

14   because Congress has legislated against these financial

15   crimes -- that the CTA is part of a broader regulatory

16   scheme?

17          MS. LOWRY:  That, I believe, is the sort of *Raich*

18   and related tests, that you can regulate interstate

19   activity that is -- if a comprehensive regulatory scheme

20   would be undermined by failing in the absence of these

21   means, I think the $300 billion of money-laundering and

22   tax-evasion profits, while the anti-money laundering

23   statute has been on the books for years and years,

24   demonstrates that -- or at least supports Congress' finding

25   of that need.

1          THE COURT:  And are you still asserting the

2    channels of commerce argument that you make in the briefs?

3          MS. LOWRY:  Yes.  Yes, your Honor.  And that is

4    because I don't hear Plaintiffs to be disputing that their

5    Plaintiffs use the channels of interstate commerce.

6          And this is the --

7          THE COURT:  I don't think they deny that either,

8    but the issue really is under that kind of argument, where

9    does it stop?  I mean, why is that not just a general

10   police power to do whatever Congress wants to do?  That

11   seems a bridge too far.

12         MS. LOWRY:  I think that it is in the rational

13   relations test of Congress' power.  And you need to also

14   have, you know -- I really think the answer is, your Honor,

15   here for the facial challenge we, again, aren't looking at

16   the very edges of the case and the concern of how broad the

17   limiting principle at issue.  We need to look for the clear

18   cases in the middle.  That's what *Rahimi* specifically

19   addresses.  We don't need to look at hypotheticals at the

20   fringe; we need to look at the center of the power.

21         THE COURT:  And switching to the taxing power --

22   and did you want to talk about anything else about -- I

23   asked my questions regarding Commerce Clause, but did you

24   have anything else you wanted to add on that or --

25         MS. LOWRY:  I do just very briefly, your Honor.  I

1    was taking a couple notes.

2            In addition to the *Firestone* opinion, we did also

3    have one additional case with a denial of a P.I. -- request

4    for a preliminary injunction related to the Corporate

5    Transparency Act.  That was the *SBA* case, 1:24-cv-315,

6    Western District of Michigan.

7            THE COURT:  Would you give that cite again?

8            MS. LOWRY:  Yes.  It's 1:24-cv-315, Western

9    District of Michigan.

10           That P.I. was denied from the bench.  Summary

11   judgment is now fully briefed.  But just kind of looking at

12   the full balance there, we do have the two denials, the one

13   grant up on appeal.

14           THE COURT:  There is not a written opinion on

15   that?

16           MS. LOWRY:  No written opinion, correct.

17           THE COURT:  Okay.

18           MS. LOWRY:  Looking at my notes.

19           Plaintiffs, again, have focused a lot in their

20   commerce power argument on the idea that there are

21   businesses that do no commerce.  I just want to highlight

22   that that does not apply to even the named Plaintiffs in

23   this lawsuit.

24           Texas Top Cop Shop, obviously, is engaged in

25   commerce.  They have employees.  They are a -- hold a

 1   federal firearms license which requires them to report

 2   their responsible persons, at least as it pertains to their

 3   gun sale business.

 4          DataComm, according to their declarations, does

 5   business with public utilities and federal -- not their

 6   declarations, excuse me.  It's paragraph 65 of the

 7   Compliant.  They do business with federal agencies and

 8   public utilities.

 9          The parties in this case are not even the fringe

10   cases that Plaintiffs are using to support their argument

11   that we're outside the commerce power.

12          I am ready to move past that if you are, your

13   Honor.

14          THE COURT:  Okay.  That's fine.  I just have a

15   couple of other questions.

16          But the CTA is in no way a tax, right?  I mean, I

17   don't see how that's a tax.

18          MS. LOWRY:  No.  The CTA is not itself a tax, your

19   Honor; it is a tool for ensuring that proper taxes are

20   collected given -- and justified by the volume of the

21   problem of tax evasion as found by Congress.

22          THE COURT:  And so how does the CTA somehow help

23   the administration of taxes aside from identifying tax

24   fraud?

25          MS. LOWRY:  It doesn't even itself, your Honor,

1  identify tax fraud.  It ensures that -- the information of

2  who the beneficial owners are, who the flesh-and-blood

3  people making decisions at these corporate entities is, so

4  that if you have, you know, cause and suspicion of tax

5  fraud, there are records in existence that you can use when

6  investigating those crimes.

7          It is not -- so it's a tool in the toolbox to

8  ensure that those records even exist in the first place

9  based on Congress' finding and the agency experience in

10 investigating these types of crimes, that you often go

11 through these exhaustive investigations and you still turn

12 nothing up.

13         THE COURT:  So it's not a tax.  I'm just trying to

14 understand how we have authority under this clause to

15 actually support the CTA.

16         MS. LOWRY:  Well, I think it's the Necessary and

17 Proper Clause as applied to the taxing power.

18         And then we're looking at the necessary and proper

19 cases and case law that really do give Congress the breadth

20 and means to effectuate the powers that it has, which here

21 includes the taxing power.

22         THE COURT:  Right.  But it has to be related to

23 the taxing power, and it's not a tax.  And isn't that a

24 stretch to use the Necessary and Proper Clause which,

25 again, goes back to the core power, which is taxing, and

1    there's no taxing here?

2          MS. LOWRY:  I think it is just a straightforward

3    application of the Necessary and Proper to achieve the

4    taxing power itself.  That would be our argument.

5          THE COURT:  So what is the limit, then, to using

6    the Necessary and Proper Clause of -- on the issue of

7    taxing?  There has to be a limit somewhere.

8          MS. LOWRY:  Sure?

9          THE COURT:  Where do we draw the line?

10         MS. LOWRY:  I think the line to be drawn is from

11   the cases themself in *Comstock* and whether Congress had a

12   rational basis for drawing this connection between the

13   means and the ends.

14         THE COURT:  And then for foreign affairs power,

15   where do you perceive the national security interest that's

16   involved in the CTA?

17         MS. LOWRY:  I think this is the findings by

18   Congress that there are foreign corporations who are using

19   the anonymity that they can maintain in the United States

20   to commit crimes here.

21         And we -- your Honor, we can look at the language

22   of the corporate transparency itself, 6402(4), where

23   Congress provides:  "Money launderers intentionally conduct

24   transactions through corporate structures in order to evade

25   detection and may layer such structures, much like Russian

1    nesting 'Matryoshka' dolls, across various secretive

2    jurisdictions such that each time an investigator obtains

3    ownership records for a domestic or foreign entity, the

4    newly identified entity is yet another corporate entity,

5    necessitating a repeat of the same process."

6           But even beyond the sort of rabbit hole of

7    continuous corporate formation -- the language of the final

8    rule -- when investigators trace illicit funds to a

9    corporation or similar entity, they often find that

10   corporate ownership records are not attainable, quote,

11   because they do not exist.  This, quote, lack of

12   transparency has been a primary obstacle to tackling

13   financial crime in the modern area.  That's the House

14   report and the final rule.

15          So then we have, to that end -- this is language

16   from the Anti-Money Laundering Act, and that's where I'm

17   saying that is the comprehensive scheme of which the

18   Corporate Transparency Act is just one part.

19          Requiring the Treasury Department to establish

20   uniform beneficial ownership information reporting

21   requirements to, (A), improve transparency for national

22   security, intelligence, and law enforcement agencies and

23   financial institutions; (B), discourage the use of cell

24   corporations as a tool to disguise and move illicit funds.

25          We have in-depth and specific findings for why

1  this requirement is necessary, not merely convenient, to

2  battle what Plaintiffs concede is interstate activity, here

3  criminal activity in the form of money laundering.

4          THE COURT:  And then is there any kind of treaty

5  in play in this case?

6          MS. LOWRY:  I am not aware of one as I stand here

7  today, your Honor.  I -- if we cited one in our brief, I'm

8  just -- it's not coming to my mind.

9          THE COURT:  That's fine.

10          And then -- and I'll check the briefs on that.

11          What is the international standard the U.S. has

12  fallen out of step with?

13          MS. LOWRY:  I do not know the answer to that, your

14  Honor.  I would be happy to address it in further briefing.

15  Only that that is the findings of Congress, that we have

16  fallen out of step with international money-laundering

17  standards.

18          THE COURT:  And then what is your view -- what are

19  the guardrails on the foreign affairs power that

20  Congress -- there has to be some kind of guardrails.  So

21  what is -- in your view, what is the guardrails for how we

22  look at that?

23          MS. LOWRY:  I believe, again, the guardrails are

24  the findings of Congress and the availability of the Court

25  to review, even on a deferential standard, whether Congress

1  had a basis for concluding that the means justify the ends.

2  The necessary and proper test is still going to be the

3  bounds on that power.

4        THE COURT:  And then -- and I was going to ask you

5  in the beginning and I didn't ask that, but -- because it

6  was really I think your briefing that indicated or implied

7  that they were seeking a nationwide injunction, which they

8  said they are not.

9        My question, though, for the Government is let's

10  say the Court grants some kind of injunction for these

11  parties.  How does that impact anybody else going forward?

12  I mean --

13        MS. LOWRY:  I would have two responses, your

14  Honor.

15        I think there are two totally dissimilar

16  categories of Plaintiffs here.  You have the sort of

17  individual businesses, and we can even include MSLP there.

18  Then you have NFIB, which everyone agrees is exempt from

19  the CTA already.  They do not have to file.

20        Plaintiffs are seeking injunctive relief on behalf

21  of their 300,000 members, which really is nationwide

22  injunctive relief.  Those parties are not before the Court.

23  I think they totally defeat the facial challenge here

24  because they demonstrate real business is taking place.

25  There are 300,000 of them who decided to be members in this

1 trade association.

2          So for all practical purposes, the limit that they

3 have offered here before the Court is a concession, and one

4 we welcome, but their brief sought to enjoin the CTA,

5 period, full stop.  And if they were granted relief as to

6 NFIB's members who have not even been named or disclosed,

7 that would be effective nationwide relief.

8          I think the -- to your Honor's latter point, that

9 would be a significant harm to the public interest in this

10 case because that would be 300,000 businesses excluded from

11 the reporting requirements -- which, you know, to be

12 effective, there has to be participation.  We're talking

13 about excluding unnamed companies in a way that would

14 totally frustrate the goals and aims of the CTA and its

15 compliance standards.

16          THE COURT:  Well, but, you know, if the Court

17 would ever -- it gets to the point of saying Congress

18 exceeded their authority, shouldn't there be some kind of

19 relief like that anyways?

20          And there's a mechanism if a Court grants an

21 injunction.  The Government can appeal and, you know -- I

22 get it -- i have a lot of appeals go to the Fifth Circuit,

23 and so I'm not -- and then they can determine whether or

24 not I was right or wrong if I grant any kind of relief.

25          But, I mean, it seems to me that the idea that it

1    would thwart the goal of the CTA -- I understand that, but

2    they only get there if -- if the Court is convinced that

3    they have a likelihood of success on the merits is a good

4    one, well, there should be relief, you know.

5         So that's why I asked the question to them,

6    because of what you said in your brief.  And I'm going to

7    have them come back and answer this question about although

8    they only asked for the parties, the 300,000 members is a

9    legitimate issue.  Is it, in effect, giving nationwide

10   relief in a way?  But I'll ask him that question.

11        MS. LOWRY:  Yes, your Honor.  I mean, I,

12   obviously, acknowledge there are always potential appeal

13   rights.  There is a process to go through.  We have argued

14   there's no likelihood of success.  If you find there is a

15   likelihood of success, we turn to the other elements.

16        We would still argue that the equities favor the

17   Government here versus -- for individual businesses filing

18   their BOI information versus, you know, enjoining duly

19   enacted law of Congress.

20        But I take your Honor's point.  If you find that

21   it exceeded the power, you're obviously going to find that

22   the interest the Government has in the policy is decreased.

23        THE COURT:  And then if you want to address -- I

24   know he discussed a couple of the constitutional claims.

25   Again, I didn't ask a lot of questions -- although I have

 1  questions in those areas, I didn't ask them just because I
 2  just -- I try to be as candid and open as possible to
 3  attorneys.  I don't think that's their best argument in
 4  terms of it -- in terms of their attempt to get relief, so
 5  that's the reason I didn't do that.
 6        But you're welcome to respond to that or anything
 7  else you want to say.  I have asked all these questions,
 8  but I still want to give you the opportunity if you have
 9  some other points on issues that I've already addressed or
10  even any amendments.  That's up to you.
11        MS. LOWRY:  Thank you, your Honor.  It feels like
12  an area where I'm likely to do more harm than good for
13  myself, given those caveats.  I would just, though,
14  highlight the *NetChoice* --
15        THE COURT:  You know, it's funny you say that
16  because, you know, one of the hardest things I do is
17  sentencings all the time and I just had a sentencing
18  yesterday where I was prepared to give a person a downward
19  variance, and then he started on the allocution saying, "I
20  didn't intentionally do this."
21        And I stopped him right away and said, "You're
22  going down a path that may do more harm."
23        Ultimately, I gave him -- I did -- he talked to
24  his counsel and, you know, got it together, and I gave him
25  a break.  But anyhow -- sorry, that's a total aside.

1           MS. LOWRY:  Yes.

2           THE COURT:  I understand.

3           MS. LOWRY:  Only --

4           THE COURT:  Again, I'm giving you the opportunity

5    to say anything you want to say.

6           MS. LOWRY:  Only, then, to highlight the *NetChoice*

7    case this term from the Supreme Court, because I don't

8    believe it was addressed in our briefing, addressed the

9    standard for these overbreadth facial challenges and said

10   the choice to litigate these cases as facial challenges,

11   quote, comes at a cost.  This Court has made facial

12   challenges hard to win.  So in the singular context, even a

13   law with a plainly legitimate sweep may be struck down in

14   its entirety only if the law's unconstitutional

15   applications substantially outweigh its constitutional

16   ones.

17          So because it was not addressed in the briefing,

18   relatively new this case -- this term case, I would put

19   *NetChoice* before the Court.  And besides that, I would rest

20   on our briefs.

21          THE COURT:  Thank you.

22          And I will tell you that, you know, if for some

23   reason -- and I just don't know yet because I don't -- I'll

24   take this matter under advisement.  I don't have an answer.

25   It's very challenging questions, and I know more about the

1    Commerce Clause than I thought I ever would know.  And I've

2    been on the bench for a while, but I haven't had to deal

3    with Commerce Clause issues.

4           And so that's been the majority of my focus in

5    preparation for today, so -- but I will tell you -- and I

6    will give the parties an opportunity and we'll do it by

7    telephone.  If for some reason I need to turn to the

8    constitutional claims, I do have -- I probably will have

9    some questions about that.

10          But if we did that, I'd follow up with another

11   supplemental hearing just via telephone.  So I just wanted

12   to -- because I know I don't want to -- I'm not trying

13   to -- I don't mean give short shrift to those claims.  My

14   review, it just seems like the better claims were what I

15   concentrated my time on, but I don't -- if I need to reach

16   those claims, because if I find relief on the part -- first

17   part, I don't have to -- I won't address the constitutional

18   claims.

19          But if I find that the Commerce Clause and those

20   claims -- those aren't going to work, I'm going to have to

21   address the constitutional claims.  And if that happens, I

22   will give you -- everyone an opportunity to argue that and

23   we'll do it via telephone.

24          Okay.  I just wanted to say that so --

25          MS. LOWRY:  Thank you, your Honor, for -- we,

1    obviously, welcome that invitation.

2          For the reasons I've said here today and for the

3    reasons in our brief, we would ask that Plaintiffs' motion

4    for a preliminary injunction be denied in its entirety.

5          THE COURT:  Okay.  Thank you.

6          MS. LOWRY:  Thank you, your Honor.

7          THE COURT:  Just a couple of things we want to

8    address, and, of course, then you can also decide to

9    respond to anything that's been said.

10          I would like to address the issue of the

11   irreparable harm.  The Government's response is, you know,

12   declarations are conclusory and that's not enough.  They

13   cite Judge O'Connor's case.  So I'll give you a chance to

14   respond to that.

15          MR. KRUCKENBERG:  Your Honor, I think the Fifth

16   Circuit's analysis in the --

17          THE COURT:  Is your mic -- it's dropped down or --

18          MR. KRUCKENBERG:  My apologies.

19          All right.  Hopefully, that's better.

20          Your Honor, the Fifth Circuit's analysis in the

21   *Restaurant Center* case -- I forget the actual name of

22   the -- it's the one we cited in our brief -- I think

23   decides the issue of irreparable harm just on compliance

24   costs.

25          In that case, that was the issue, *de minimis* harm

1   versus proof of harm in a regulation that was -- had

2   already calculated the costs.  And the Fifth Circuit said

3   that's enough.

4          And in some sense, it's because we take the

5   Government at their word.  If they say there are compliance

6   costs and there are substantial compliance costs, that

7   probably means that that's at least true that there are

8   some compliance costs.

9          And each of the Plaintiffs has said we have to

10  gather this information at cost to us.  It's -- I mean,

11  FinCEN has calculated the hourly rate as several hundred

12  dollars.  I think they've even calculated the individual

13  compliance costs as greater than $1,200.  That's something

14  we put in our brief.

15         And I think this kind of hair splitting, well,

16  $200 may be enough, 100 isn't, I don't think we have to get

17  there.  I think the Fifth Circuit has been very clear on

18  this.

19         And, again, because these are constitutional

20  claims, that gets us there as well.  And the Fifth Circuit

21  has also been very clear.  A deprivation of any

22  constitutional right is irreparable harm if there's no

23  remedy.  And there's no remedy.

24         So it doesn't matter which way you look at it.  I

25  think there is very clearly an irreparable harm facing the

 1  Plaintiffs.  They have to do something.  They're -- they
 2  have -- they're looking at the compliance date.  And once
 3  they file, they have an ongoing obligation to update, to
 4  maintain, to -- if any information changes.

 5          So I think it is very hard for them to say there's
 6  no irreparable harm, assuming this is invalid, which is
 7  what this Court has to do when assessing that factor.

 8          THE COURT:  And then what about -- what's your
 9  response on the issue of the 300,000 members?  You're not
10  seeking nationwide injunction, but the Government says in
11  practicality you kind of are because the one member has
12  300,000 members.  What do you say to that?

13          MR. KRUCKENBERG:  Your Honor, I take the
14  conceptual concern with nationwide injunctions applying to
15  nonparties at face value.  And assuming that is a problem,
16  that's not a problem this Court has to deal with because we
17  have parties before the Court.  And it is a fundamental
18  aspect --

19          THE COURT:  Well, that doesn't answer the
20  question, though.  I mean --

21          MR. KRUCKENBERG:  Yeah.

22          THE COURT:  -- is it true that one client has
23  300,000 members that, in effect, would -- or could be --
24  you know, although not called a nationwide injunction, it
25  has that same impact?

1          MR. KRUCKENBERG:  Well, it has on the parties

2    before the Court because NFIB is here in a

3    representation -- in a representative capacity for its

4    members, which includes some of the named Plaintiffs but

5    obviously not all of them.

6          I mean, if the United States' position is we have

7    to list them as Plaintiffs to be able to make them parties,

8    I mean, that's just not true.  That's not the way our legal

9    system considers multiple Plaintiffs or these sort of

10   complicated cases.

11         And if it's a matter of practicality, we can

12   certainly file a membership list as of the time of the

13   injunction with the Court under seal.  I mean, obviously,

14   we have concerns about privacy, and that's part of the

15   lawsuit.  But there is a way to deal with that.

16         THE COURT:  That's not the concern the Court has.

17   It's -- I'm just trying to determine, although you say

18   you're not asking for a nationwide injunction, could that

19   be the impact if the Court grants you relief to just the

20   Plaintiffs?

21         MR. KRUCKENBERG:  I mean, effectively, the members

22   are nationwide, yes.  There are members in every state.

23   But they are parties to this case, and they are in front of

24   this Court.

25         And so if the concerns are about the Court's

1 equitable powers, which is what this debate usually centers

2 on, there is no doubt that NFIB's members are before this

3 Court.  They are within this Court's jurisdiction.  The

4 United States is within this Court's jurisdiction.  And so

5 I don't see an issue.

6           THE COURT:  And then address the Government's

7 response to the -- looking at the various equities that she

8 asserts side with the Government or weigh with the

9 Government in terms of granting any kind of injunction.

10           MR. KRUCKENBERG:  Well -- and, again, I would rely

11 on the Fifth Circuit.  I mean, this lives and dies in a lot

12 of ways on the merits because the Fifth Circuit, I think,

13 has been very clear.  When we have a regulatory obligation

14 like this, if it's invalid -- the Government has no

15 interest in maintaining invalid law and making people

16 follow an invalid law and incurring costs to do so.

17           And in the preliminary injunction context, I mean,

18 that is the appropriate -- this is the appropriate

19 mechanism.  We're saying this law shouldn't take effect.

20 This is a time-out, so you don't have to incur these

21 potentially unlawful compliance obligations and, here,

22 potentially unconstitutional obligations.  And so I think

23 the Fifth Circuit has just been very clear on that.

24           THE COURT:  And then her argument in terms of --

25 her best argument on the Commerce Clause was substantial

 1  effects on interstate commerce.  If you want to respond to

 2  that?

 3          MR. KRUCKENBERG:  Yes, your Honor.

 4          And, actually, just to back up one second -- I

 5  very much want to address that point, but I also want to

 6  address this no-set-of-circumstances, facial versus

 7  as-applied argument.

 8          With respect to the Commerce Clause -- because I

 9  think what the Government has tried to do is they've tried

10  to treat all constitutional claims equally and apply this

11  *Salerno* test to all three.  And that's not what the Court

12  has indicated, and that's not what the *NetChoice* case

13  indicated.  I mean, that was a Second Amendment case -- or,

14  I mean, sorry, the *Rahimi* case that we're talking about.

15          THE COURT:  Which case -- that case helps give the

16  Court a little more clarity.  I've had a lot of those gun

17  cases, so it's --

18          MR. KRUCKENBERG:  Yes, your Honor.  And --

19          THE COURT:  There are still some percolating so --

20          MR. KRUCKENBERG:  And, obviously, there's a

21  different analysis for different constitutional rights.

22          And if we're -- we're thinking about the commerce

23  either as applied or facially.  I mean, we've pled both

24  because it's unclear.

25          If you look at *Morrison*, that was an individual

1  litigant who raised a facial challenge to the federal

2  statute, and the United States Supreme Court struck down

3  the federal statute because it didn't apply to *Morrison*.

4  So, essentially, they have applied an overbreadth kind of

5  analysis in commerce challenges.

6       So if truly this *Salerno* no-set-of-circumstances

7  test applied to commerce challenges, *Morrison* and *Lopez*

8  could not possibly have come out that way.  There are

9  plenty of instances where those could have been

10  constitutional prosecutions or where somebody engaged in

11  interstate commerce that was within the reach of those

12  statutes.

13       And so I think what the lesson there is, we look

14  at the statute.  Does the statute reach commercial activity

15  or not?  And that, I think, gets into the *Gonzales versus*

16  *Raich* argument and the substantial effects test.  And

17  reading *Gonzales*, they are very clear.  It has to be an

18  economic class of activities.  That's what must be

19  regulated to reach the intrastate conduct.

20       This is not an economic class of activities if we

21  look at the statute.  The statute applies when you file a

22  registration document.  That is not economic.  That is a

23  registry.  That is a noneconomic activity that just so

24  happens to be one that lots of businesses engage in, and

25  that is not substantial effect on interstate commerce.

1           And, your Honor, just to address the foreign

2    affairs issue, I just wanted to answer a question that you

3    asked me earlier about the authorities we're relying on.

4           I just want to direct the Court to one of the

5    cases we mentioned in our briefing.  It's *Dunbar versus*

6    *Seger-Thomschitz*.  It's a Fifth Circuit case.  The reason I

7    point that out is it talks about the foreign affairs powers

8    and how Courts look at them.  And the Court there said --

9    the Fifth Circuit said that when something is within the

10   realm of traditional state responsibilities, it's not -- it

11   does not implicate the foreign affairs powers.

12          And I think that is -- rings true in this case

13   because, again, we have -- the federal government tried to

14   displace the state regulatory system on this national level

15   even though this is a traditional state interest.

16          And I would also just point out the CTA doesn't

17   apply internationally.  Any international entity to have to

18   register has to have a presence in the U.S., so they have

19   to register to do business with a state.

20          So, again, this kind of idea that it's

21   international, yes, it may incidentally effect some

22   international interests.  That's not the sweep of the

23   statute, and we have no idea how often that might even come

24   up.  It may never come up.  That's clearly not enough to

25   justify this entire regime.

1        And if the Court has no other questions, we'll

2   rest on our briefing.

3        THE COURT:  Okay.  Very good.

4        Well, thank y'all both for your arguments.  I

5   enjoyed those immensely, and I will take the matter under

6   advisement.  I understand the time constraints, and I will

7   try to make a decision, you know, as quick as I can.

8        So -- and I will -- well, I don't want to promise

9   anything in terms of a date or anything, but we will work

10  on it diligently and get you an answer in plenty of time.

11       I have issued two nationwide injunctions -- now,

12  the one wasn't my fault.  I got a lot of criticism for it

13  by parties because they didn't file their request for

14  injunctive -- not by the parties but by the public years

15  ago.  But the motion for injunction came, like, right

16  before the deadline so -- for the rule to go into effect,

17  so it wasn't my fault.  But you've brought this in plenty

18  of attention -- plenty of time for the Court to resolve it,

19  and I will get it resolved in plenty of time so --

20       But, otherwise, we'll be in recess.  Thank y'all.

21       (Proceedings concluded, 10:31 a.m.)

22  COURT REPORTER'S CERTIFICATION

23       I HEREBY CERTIFY THAT ON THIS DATE, DECEMBER 16,
    2024, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD
24  OF PROCEEDINGS.

25            /s/
              CHRISTINA L. BICKHAM, CRR, RDR

# **EXHIBIT B**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., <br> Plaintiffs, <br><br> v. <br><br> MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, ET AL., <br> Defendants. | FIFTH CIRCUIT DOCKET NO.: 24-40792 <br> DISTRICT COURT NO.: 4:24-CV-478 <br><br> <u>**DECLARATION OF CHRISTIAN CLASE**</u> |

<u>**DECLARATION OF CHRISTIAN CLASE**</u>

I, Christian Clase, make the following declaration under penalty of perjury pursuant to the laws of the United States:

1.  I am over the age of 18, am under no legal disability, and am competent to testify. If called as a witness, I would and could testify competently to the facts set forth in this declaration based on my personal knowledge.

2.  I am an attorney licensed in Tennessee.

3.  After the injunction was issued, FinCEN posted a notice on its website that the January 1, 2025, reporting date was no longer in effect.  Ex. A.

4.  Exhibit "A" is a screenshot of FinCEN's website, that I took on December 17, 2024, that shows the notice FinCEN posted in response to the injunction.

5.  Since this Court preliminarily enjoyed the CTA, I have observed extensive media coverage concerning the CTA in both traditional news publications and legal blogs.  These articles explain, to a wide audience, that the CTA and its reporting rule were enjoined by a federal court, and that reporting companies are no longer required to submit beneficial ownership information on January 1, 2025.  Ex.'s B, C, D, & E.

6.  Exhibits "B" "C," "D," and "E" are true and correct PDF copies of online news articles, and in their respective order, were published on the websites of Reuters, the United States Chamber of Commerce, Bloomberg Tax, and the Wall Street Journal.

7.  Since the CTA was enjoined, many law firms have advised their clients about the injunction, and I have seen several firm-wide communications and mass mailing efforts concerning the injunction.  Ex.'s F, G, H & I.

8.  Exhibits "F," "G," "H," and "I" are true and correct PDF copies of articles law firms have posted on their own websites discussing the CTA's injunction, and, in their respective order, these articles appeared on the websites of Gibson Dunn; Skadden, Arps Slate, Meagher & Flom LLP; Holland and Knight; and Baker Hostetler.

9.  I have also been contacted by other attorneys and members of the business community seeking information about the effect of the preliminary injunction on their clients', or their own, reporting obligations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 17, 2024:

/S/   Christian Clase
Christian Clase

# ADDENDUM

# EXHIBIT A





**Small Business Resources**

**Reference Materials**

**BOI Newsroom**

**Get FinCEN News Updates**

Stay Informed with FinCEN Updates

[Subscribe]

**Beneficial Ownership Questions?**

[Contact FinCEN]

About FinCEN

## BENEFICIAL OWNERSHIP INFORMATION

Many companies are required to report information to FinCEN about the individuals who ultimately own or control them. FinCEN began accepting reports on January 1, 2024. Learn more about reporting deadlines.

### Prepare
 How do I file?

How do I qualify for an exemption?

How do I get a FinCEN ID?

### File
 File a report using the BOI E-Filing System

Create a FinCEN ID (optional)

FAQ **Need More Information? View our FAQ page.**

**Need More Information? Chat With Us Here.**

 **Stay Informed. Subscribe to FinCEN Updates.**

🔺 **Alert:** Impact of Ongoing Litigation – Deadline Stay – Voluntary Submission Only

*In light of a recent federal court order, reporting companies are not currently required to file beneficial ownership information with FinCEN and are not subject to liability if they fail to do so while the order remains in force. However, reporting companies may continue to voluntarily submit beneficial ownership information reports.*

---

The Corporate Transparency Act (CTA) plays a vital role in protecting the U.S. and international financial systems, as well as people across the country, from illicit finance threats like terrorist financing, drug trafficking, and money laundering. The CTA levels the playing field for tens of millions of law-abiding small businesses across the United States and makes it harder for bad actors to exploit loopholes in order to gain an unfair advantage.

On Tuesday, December 3, 2024, in the case of *Texas Top Cop Shop, Inc., et al. v. Garland, et al.*, No. 4:24-cv-00478 (E.D. Tex.), a federal district court in the Eastern District of Texas, Sherman Division, issued an order granting a nationwide preliminary injunction that: (1) enjoins the CTA, including enforcement of that statute and regulations implementing its beneficial ownership information reporting requirements, and, specifically, (2) stays all deadlines to comply with the CTA's reporting requirements. The Department of Justice, on behalf of the Department of the Treasury, filed a Notice of Appeal on December 5, 2024.

*Texas Top Cop Shop* is only one of several cases in which plaintiffs have challenged the CTA that are pending before courts around the country. Several district courts have denied requests to enjoin the CTA, ruling in favor of the Department of the Treasury. The government continues to believe—consistent with the conclusions of the U.S. District Courts for the Eastern District of Virginia and the District of Oregon—that the CTA is constitutional.

While this litigation is ongoing, FinCEN will comply with the order issued by the U.S. District Court for the Eastern District of Texas for as long as it remains in effect. Therefore, reporting companies are not currently required to file their beneficial ownership information with FinCEN and will not be subject to liability if they fail to do so while the preliminary injunction remains in effect. Nevertheless, reporting companies may continue to voluntarily submit beneficial ownership information reports.

# EXHIBIT B


# Texas judge blocks anti-money laundering law's enforcement nationwide

By **Nate Raymond**

December 4, 2024 11:39 AM CST · Updated 13 days ago



A bronze seal for the Department of the Treasury is shown at the U.S. Treasury building in Washington, U.S., January 20, 2023. REUTERS/Kevin Lamarque/File Photo Purchase Licensing Rights ↗

Dec 4 (Reuters) - A federal judge in Texas has issued a nationwide injunction blocking the enforcement of an anti-money laundering law that requires corporate entities to disclose to the U.S. Treasury Department the identities of their real beneficial owners.

U.S. District Judge Amos Mazzant in Sherman, Texas, on Tuesday sided ↗ with the National Federation Of Independent Business and several small businesses and non-profits by

Report this ad

concluding the 2021 Corporate Transparency Act was likely unconstitutional.

Advertisement · Scroll to continue

Report this ad

The decision marked the second time a judge has deemed the law unconstitutional. An Alabama federal judge reached a similar conclusion in March in response to a separate challenge to the law but issued a narrower injunction, blocking its enforcement as applied to the parties before him, including the National Small Business Association.

Mazzant said the law was an "unprecedented" attempt by the federal government to legislate in an area traditionally left to the states by monitoring companies created pursuant to state law and ending the anonymity various states provide in the formation of corporations.

Advertisement · Scroll to continue

Report this ad

Report this ad

"For good reason, Plaintiffs fear this flanking, quasi-Orwellian statute and its implications on our dual system of government," Mazzant wrote.

He said Congress had no authority under its powers to regulate commerce, taxes and foreign

affairs to adopt such a law and that it likely violated states' rights under the U.S. Constitution's Tenth Amendment.

The Justice Department declined to comment on Wednesday.

The bipartisan measure was enacted as part of an annual defense spending toward the end of Republican President-elect Donald Trump's first term in early January 2021, after Congress overrode a veto Trump issued for unrelated reasons.

Supporters of the legislation said it was designed to address the country's growing popularity as a venue for criminals to launder illicit funds by setting up entities like limited liability companies under state laws without disclosing their involvement.

## Sponsored Content

Dianomi ▷



**Start a Schwab financial plan today and help get more from your money.**

Sponsored by
Charles Schwab



**Uncover ETF trends and build stronger portfolios with active insights**

Sponsored by
J.P. Morgan Asset Management



**Attention Options Pros: Is This Your Next Power Move?**

Sponsored by
TradeStation | Born To Trade

Report this ad

Under the law, corporations and LLCs were required to report information concerning their beneficial owners to the Treasury Department's Financial Crimes Enforcement Network, which collects and analyzes information about financial transactions to combat money laundering and other crimes.

The lawsuit was filed in May by lawyers at the Center for Individual Rights on behalf of five small

entities and the National Federation of Independent Business, a 300,000-member trade group that represents small businesses.

Mazzant is one of two judges assigned to hear cases in Sherman, Texas. He was appointed to the bench by Democratic former President Barack Obama as part of a deal with Texas' two Republican senators on a group of judicial nominees in the state and is known for ruling in favor of conservative litigants.

He blocked the law's enforcement ahead of a Jan. 1 deadline for companies to comply with its requirements.

Caleb Kruckenberg, the center's litigation director, said Mazzant's preliminary injunction would provide small businesses "a reprieve while the courts, and likely the Supreme Court, can consider the constitutional issues further."

The case is Texas Top Cop Shop v. Garland, et al, U.S. District Court for the Eastern District of Texas, No. 4:24-cv-00478.

For the National Federation Of Independent Business: Caleb Kruckenberg of the Center for Individual Rights

For the U.S.: Stuart Robinson and Faith Lowry of the U.S. Department of Justice

> Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up here.

Our Standards: **The Thomson Reuters Trust Principles.** 

Suggested Topics: Government

      **Purchase Licensing Rights**



**Nate Raymond**
Thomson Reuters

 

Nate Raymond reports on the federal judiciary and litigation. He can be reached at nate.raymond@thomsonreuters.com.

## Read Next / Editor's Picks

‹ ›

Government
**Biden's stalled appeals court nominee calls appointment process 'broken'**

**FTC bans hidden junk fees in hotel, event ticket prices**

World
**Two charged over deadly Iran-linked drone strike on US troops in Jordan**

US Su...
**US S... leav... lieut... corr...**

# EXHIBIT C



Topics / Small Business /

# Corporate Transparency Act Requirements Halted by Federal Court

Unless and until an appellate court overrules or narrows the injunction, no small businesses are obligated to comply with the reporting requirements.



**Judge Halts Implementation CTA GUIDE**

[ Download ]

**Updated**
December 04, 2024

**Published**
November 15, 2024

**Share**

A federal court in Texas halted the implementation of the Corporate Transparency Act's (CTA) beneficial ownership reporting requirements, holding that the CTA is likely unconstitutional, the court issued a preliminary injunction barring the government from enforcing the CTA or its reporting requirements against anyone.

Prior to the ruling, small businesses that met certain criteria would have had to file reports with the Department of the Treasury by January 1, 2025, or risk fines and criminal penalties.

The preliminary relief will remain in effect until the conclusion of legal proceedings, at which point the court may enter a permanent injunction. In the meantime, the government will likely appeal the preliminary injunction.

Unless and until an appellate court overrules or narrows the injunction, no businesses are obligated to comply with the reporting requirements.

## Background on the CTA

The CTA was enacted by Congress on January 1, 2021, as part of the National Defense Authorization Act. The CTA included significant reforms to anti-money laundering laws and is intended to help prevent and combat money laundering, terrorist financing, corruption, and tax fraud.

Under the act, small businesses in the United States need to file beneficial ownership information reports (BOIR) with the Department of the Treasury by January 1.

Failure to submit the new paperwork by the deadline puts small business owners at risk of criminal penalties, imprisonment, and fines up to $10,000.

Download our guide to get updates on any legal developments on the CTA.

**Judge Halts Implementation CTA GUIDE**

[ Download ]

**Topics**

SMALL BUSINESS

## Recommended



SMALL BUSINESS

### A Majority of Small Businesses Say Regulations Hinder Growth

Taxes and recordkeeping are the top regulatory compliance issues small businesses report spending time on. Confidence in revenue, investment, and hiring plans was driving across the board.

By Thaddeus Swanek



SMALL BUSINESS

### Meet the Top 10 Small Businesses on the U.S. Chamber CO—100 List

By Lillian Chase



### Small Business Outlook: Confidence Continues to Rise

By Thomas M. Sullivan



SMALL BUSINESS

### Small Businesses Talk Taxes with Capitol Hill

By Rachel Ledbetter



SMALL BUSINESS

### Shop Small: Everything You Need to Know About Small Business Saturday

By Lindsay Cates

U.S. Chamber of Commerce

All Programs
Major Initiatives
Events
About Us
Leadership
Contact Us
Twitter
LinkedIn
Facebook
Instagram
Give with 1O—
Local Chamber Finder

**Featured Topics**

Economy
State of American Business
Small Businesses
Workforce
Digital Trade

View all topics

**Cookie Notice**

By clicking "Accept All", you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts.

[ Review Settings ]  [ Accept All ]

# EXHIBIT D

**Daily Tax Report ®**

A Texas court on Tuesday struck down a federal law requiring to report business owners' identities.
Photographer: Nathan Howard/Bloomberg

December 3, 2024, 5:41 PM CST

# Corporate Transparency Act Blocked Nationwide by Texas Court


**John Woolley**
Reporter
✉ 𝕏

Index
Print
Email

Share To:
Facebook
LinkedIn
𝕏

- Law invalidated less than one month before reporting deadline
- Court says requirements exceed Congress's commerce authority

The Corporate Transparency Act and its implementing regulations, which require US business entities to report stakeholder information to the Treasury Department, were preliminarily blocked nationwide by a Texas federal court on Tuesday.

Judge Amos L. Mazzant III of the US District Court for the Eastern District of Texas issued the injunction at the request of a family-run firearms and tactical gear retailer, called Texas Top Cop Shop Inc., among other co-plaintiff businesses and the Libertarian Party of Mississippi. Their lawsuit alleged that the CTA falls outside of Congress's powers to regulate interstate and foreign commerce because it regulates incorporated entities regardless of whether they engage in commercial activity.

"For good reason, Plaintiffs fear this flanking, quasi-Orwellian statute and its implications on our dual system of government," Mazzant wrote.

The CTA required that an estimated 32.6 million existing business entities disclose their beneficial owners to the Treasury Department's Financial Crimes Enforcement Network before 2025. The government argued that the law's function—to crack down on anonymous shell companies and deter money laundering, terrorism financing, and other illicit economic activity—falls within Congress's regulatory duties.

But the CTA still fails to pass muster, even if anonymous corporate operations can be regulated by Congress, because the Constitution's Commerce Clause can't be leveraged to compel the disclosure of information for law enforcement purposes, the court's opinion said.

"The fact that a company is a company does not bright Congress with some separate power to regulate them in all aspects—especially though the CTA, which does not facially regulate commerce," Mazzant said.

The Justice Department didn't immediately respond to an emailed request for comment.

SJ L Law PLLC and the Center for Individual Rights represent the plaintiffs.

The case is Texas Top Cop Shop, Inc. v. Garland, E.D. Tex., No. 4:24-cv-00478, 12/3/24.

To contact the reporter on this story: John Woolley in Washington at jwoolley@bloombergindustry.com

To contact the editor responsible for this story: Amy Lee Rosen at arosen@bloombergindustry.com

Documents
- Opinion
- Docket

Related Stories
**Corporate Pushback Mires US Anti-Money Laundering Disclosures**
July 30, 2024, 3:45 AM CDT

🔍 Search by Topic
- Commerce Clause
- Injunctions
- Beneficial Ownership
- Money Laundering
- Terror Financing

---

**Learn About Bloomberg Tax**

From research to software to news, find what you need to stay ahead.

[Learn more]

**Already a subscriber?**

Log in to keep reading or access research tools.

[Log in]

---

## More from Bloomberg Tax

**Most Read Stories in Daily Tax Report ®**


**Life Insurance Policies for the Rich Targeted in Wyden Tax Bill**
Ultra-wealthy investors' life insurance policies face new taxes under draft legislation unveiled Monday by Senate Finance Committee Chair Ron Wyden, the Oregon Democrat's latest effort to expose the decades-old inheritance strategy to IRS oversight.


**Supreme Court Narrows Review in Catholic Charities Tax Case**
The US Supreme Court on Monday amended a recent order, announcing it will review whether Wisconsin violated a religious organization's First Amendment right by denying a tax exemption. The clarification means the high court won't examine the burden of proof issue also presented to it for review in the appeal.


**Murphy Oil Wins $4 Million Tax Refund at Arkansas Supreme Court**
A Murphy Oil subsidiary is entitled to a nearly $4 million tax refund because it properly allocated certain interest expenses related to a corporate spin-off to its domicile state of Arkansas, the state's high court said.

**Latest Stories in Daily Tax Report ®**


**Life Insurance Policies for the Rich Targeted in Wyden Tax Bill**
Ultra-wealthy investors' life insurance policies face new taxes under draft legislation unveiled Monday by Senate Finance Committee Chair Ron Wyden, the Oregon Democrat's latest effort to expose the decades-old inheritance strategy to IRS oversight.


**Week in Insights: NY's One-Time Checks Are a Weak Inflation Fix**
This week, experts analyzed rules for private charitable foundations, areas targeted for tax justice efforts, and more.


**Federal Tax Developments Tracker Hiatus During Week of Dec. 23**
The Federal Tax Developments Tracker will be on hiatus during the week of Dec. 23. Updates will resume on Dec. 30.

Browse More Stories in Daily Tax Report ®

---

**Bloomberg Tax**

𝕏  in  ⬤  f  ▶

Submit A News Tip
About Us
Contact Us
pro.bloombergtax.com
Do Not Sell Or Share My Personal Information

24/7 BLAW® HELP DESK
888.560.2529
help@bloomberglaw.com

Terms of Service   Privacy Policy   Copyright   Accessibility        © 2024 Bloomberg Industry Group, Inc. All Rights Reserved

# EXHIBIT E

OPINION REVIEW & OUTLOOK Follow

# *Repeal the Corporate Transparency Act*

A judge has enjoined this burden on small business, and Congress can act.

By The Editorial Board
Dec. 16, 2024 at 5:38 pm ET

Save 103 Listen (2 min)

TAP FOR SOUND
Brian Thompson, in front

Wonder Land: A New York City jury decision could be the start of a long-overdue social correction. Photo: John Lamparski/Getty Images

Politicians prattle on endlessly about their love for small business, as opposed to the corporate giants it's easy to denounce. Yet when they get the chance, they saddle small business with laws like the Corporate Transparency Act. A federal court in Texas has handed Donald Trump and the Republican Party an opportunity by imposing a nationwide injunction on the CTA's reporting mandate.

OPINION: POTOMAC WATCH
The Drone Panic and Public Mistrust in Government
19:45 1x
SUBSCRIBE
Explore Audio Center

In 2020 Congress tucked the CTA into the National Defense Authorization Act in the last days of the Trump Administration and it passed over Mr. Trump's veto. The intent was to combat money launderers and drug dealers. But the result, says the National Federation of Independent Business, is a bill that imposes another compliance burden, makes confidential business data less secure, and does little to deter real criminals.

The law took effect last Jan. 1. It requires corporations or limited liability companies of fewer than 20 employees and $5 million or less in revenue to disclose details about their beneficial owners to the Treasury Department's Financial Crimes Enforcement Network (FinCEN). Failure to comply can result in up to two years in prison and a $10,000 fine.

The law defines a beneficial owner as any person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." FinCEN estimates the law applies to 32.6 million small businesses and associations.

But the Dec. 3 order by federal Judge Amos Mazzant enjoins FinCEN from enforcing the law as well as its implementing regulations. The judge calls the law "unprecedented" as a federal attempt to monitor companies created under state law and because it ends the anonymity many states designed as a feature of their corporate formation. The plaintiffs, he wrote, are likely to succeed on their claim that the law is unconstitutional.

What's next? The Biden Administration has asked the Fifth Circuit Court of Appeals for a stay of Judge Mazzant's injunction. It also wants the appellate court to rule by Dec. 27, so that businesses would still have to meet the reporting deadline of Dec. 31.

The Fifth Circuit could throw out the CTA on grounds Judge Mazzant lays out, but other courts are split. A federal judge in Alabama has ruled the CTA unconstitutional, while federal judges in Oregon and Virginia made preliminary rulings going the other way. The cases could go to the Supreme Court.

But Congress needn't wait for courts to remove this looming burden from millions of small businesses. This is the kind of unnecessary regulation that Republicans campaigned to stop. A one-year delay is already under consideration as an amendment to the year-end spending bill being debated in Congress. Congress can adopt this amendment, deliver relief to small business, and give the courts the time they need to resolve this mess.

BOI BENEFICIAL OWNERSHIP INFORMATION
Prepare
File

Treasury Secretary Janet Yellen receives a briefing during a visit to the Financial Crimes Enforcement Network (FinCEN) in Vienna, Va., Jan. 8, 2024. PHOTO: ASSOCIATED PRESS

SHOW CONVERSATION (103)

## MOST POPULAR NEWS

1. Ukraine Says It Killed Senior Russian General in Moscow Scooter Bombing
2. 'What Is That Thing?' Tiny Trucks Are Causing Big Fights.
3. Wisconsin School Shooting Leaves Two People Dead
4. The New Frontier for Drone Warfare Is Deep Underwater
5. Vaccines, Drones, Pardons: Seven Takeaways From Trump's News Conference

## MOST POPULAR OPINION

1. Opinion: Drones and the Cost of Lost Trust
2. Opinion: Trump Is Back, This Time Without Disdain
3. Opinion: A GOP Gift for Randi Weingarten
4. Opinion: Justin Trudeau Nears the End in Canada
5. Opinion: A Question for Jerome Powell: Why Cut Interest Rates Now?

RECOMMENDED VIDEOS

## What to Read Next

OPINION
### Opinion: Trump Will Want to 'Confess Error'

His administration can use the 'rule against pretext' to rescind Biden's wrongfully issued regulations.

Continue To Article

OPINION
### Opinion: Why the U.S. Economy Is Trouncing Europe's

Americans do worse in education scores, but the Continent lacks the U.S. risk-taking culture.

Continue To Article

OPINION
### Opinion: Assad's Fall Is a Chance to Back the Kurds

They are among the few allies who share American values, and they know how to win.

Continue To Article

OPINION
### Opinion: The Great RFK Jr. Charade

Why won't the Senate take an opportunity to save Trump from a bad political deal?

Continue To Article

OPINION
### Opinion: Growth Must Be the GOP's Priority

It gets late early during budget negotiations. Lawmakers waited too long to cut taxes in 2017.

Continue To Article

OPINION
### Opinion: European Regulators Make a Power Grab

And the Biden-Harris administration fails to resist, despite the cost to U.S. companies.

Continue To Article

OPINION
### Opinion: Almost Everybody Agrees on Trump's Mandate

Even the "resistance" crowd may see a benefit in holding him to a hard-money standard.

Continue To Article

OPINION
### Opinion: In Praise of Christopher Wray

He earned the respect of FBI agents and their families.

Continue To Article

Videos

Copyright ©2024 Dow Jones & Company, Inc. All Rights Reserved

Thanks for reading WSJ. Subscribe to get unlimited digital access. SUBSCRIBE

# EXHIBIT F

# CTA Update: U.S. Government Moves for Stay of Nationwide Preliminary Injunction, Which Could Reinstate January 1 Deadline

Client Alert | December 16, 2024

The Department of Justice has filed emergency motions for a stay pending appeal of a recent district court order that preliminarily enjoined enforcement of the Corporate Transparency Act (CTA).[1] The government has asked for a ruling by December 27, 2024. *If the district court or Fifth Circuit Court of Appeals issues a stay before January 1, 2025 reporting deadline could become enforceable once again.*

*An update on case developments since our December 9, 2024 Client Alert can be found immediately below. For additional background information, please refer to the remainder of this Client Alert or our Client Alerts issued on December 5 and December 9, 2024.*

On December 11, the Department of Justice, on behalf of the Financial Crimes Enforcement Network (FinCEN), filed a motion in the U.S. District Court for the Eastern District of Texas requesting that the court stay its preliminary injunction pending the government's appeal to the Fifth Circuit Court of Appeals.[2] The district court ordered the plaintiffs to respond to that stay motion by December 16.

In the meantime, on December 13, the government also filed a motion in the Fifth Circuit asking that court to stay the district court's order pending appeal or, in the alternative, to narrow the scope of the court's injunction to cover only the members of plaintiff National Federation of Independent Business (NFIB) rather than every reporting entity in the country.[3] The government argued that it was likely to succeed on the merits of its appeal, asserting that the CTA is a valid exercise of Congress's commerce power because it regulates corporations, which engage in commerce and activity.[4] At a minimum, the government argued, the district court erred in enjoining the CTA nationwide because the plaintiffs have not shown that the statute lacks legitimate applications.[5] The government also argued that the injunction improperly harms its interests in fighting financial crime, and that the court's nationwide remedy is overly broad because it extends beyond the plaintiffs.[6]

The government has filed a motion with the Fifth Circuit to set an accelerated briefing schedule calling for a response from the plaintiffs by December 17 and a reply from the government by December 19.

## What the Stay Motion Means for Entities Subject to the CTA

As we previously described[7] given the possibility of the district court's order being stayed pending appeal, reporting entities' legal obligations are subject to change on short notice. Either the district court or the Fifth Circuit could grant the government's stay request before the end of the year. If the Fifth Circuit denies the government's stay request, the government could request that relief from the Supreme Court. If the district court's injunction is stayed pending appeal, the CTA's beneficial ownership (BOI) Reporting Rule will once again.

The government's stay applications in the district court and Fifth Circuit signal that if it succeeds in winning a stay of the district court's injunction, there is a possibility that the government might try to enforce the January 1, 2025 reporting deadline for companies created or registered to do business in the United States before January 1, 2024 — and detailing what information must be reported to FinCEN.[8]

Entities that believe they may be subject to the Reporting Rule should closely monitor this matter, and consult with their CTA advisors as necessary, to understand when, if at all, they need to comply with the Reporting Rule's requirements and to strive for sufficient lead time to prepare BOI reports in advance of any filing deadline that may be re-established (with or without adjustment) in the future.

## Additional Background

The CTA, enacted in 2021, requires corporations, limited liability companies, and certain other entities created (or, as to non-U.S. entities, registered to do business in any U.S. state or tribal jurisdiction to file a "BOI" report with FinCEN identifying, among other information, the natural persons who are beneficial owners of the entity.[9] A regulation, the Reporting Rule, helps implement the CTA by specifying compliance deadlines—including a January 1, 2025 deadline for companies created or registered to do business in the United States before January 1, 2024 — and detailing what information must be reported to FinCEN.[10]

### The December 3, 2024 Ruling

On December 3, 2024, in ruling on a lawsuit challenging the constitutionality of the CTA and Reporting Rule on various grounds, Judge Amos L. Mazzant of the U.S. District Court for the Eastern District of Texas granted plaintiffs' motion for a preliminary injunction.[11] Unlike another court that had held the CTA unconstitutional,[12] Judge Mazzant preliminarily enjoined enforcement of the CTA and Reporting Rule nationwide.[13] Moreover, the court invoked its power under the Administrative Procedure Act's stay provision, 5 U.S.C. § 705, to "postpone the effective date of" the Reporting Rule.[14]

### Government's Initial Response[15]

On December 5, the Department of Justice, on behalf of the Department of the Treasury, filed a notice of appeal from the court's opinion and order to the U.S. Court of Appeals for the Fifth Circuit.[16]

FinCEN also posted a statement to its website.[17] In sum, FinCEN noted that, because of the court's order, "reporting companies are not currently required to file their beneficial ownership information with FinCEN and will not be subject to liability if they fail to do so while the preliminary injunction remains in effect. Nevertheless, reporting companies may continue to voluntarily submit beneficial ownership information reports." FinCEN also noted the appeal filed by the Department of Justice.

[1] A prior alert by Gibson Dunn explaining the district court's ruling is available at https://www.gibsondunn.com/corporate-transparency-act-enforcement-preliminarily-enjoined-nationwide.

[2] Texas Top Cop Shop, Inc. et al. v. Garland et al., No. 4:24-CV-478, Dkt. 30 (E.D. Tex. Dec. 11, 2024).

[3] Texas Top Cop Shop, Inc. No. 24-40792, Dkt. 27 (5th Cir. Dec. 13, 2024).

[4] Id. at 9–11.

[5] Id. at 11–12.

[6] Id. at 14–21.

[7] Id. at 2.

[8] See https://www.gibsondunn.com/corporate-transparency-act-enforcement-preliminarily-enjoined-nationwide. https://www.gibsondunn.com/us-government-appeals-and-fincen-issues-guidance-about-nationwide-preliminary-injunction-of-corporate-transparency-act-enforcement.

[9] See William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, Div. F, § 6403 (adding 31 U.S.C. § 5336). For more from Gibson Dunn explaining the Corporate Transparency Act are available at https://www.gibsondunn.com/12-developments-in-anti-money-laundering-enforcement-in-2023 https://www.gibsondunn.com/the-impact-of-finance-beneficial-ownership-regulation-on-investment-funds. https://www.gibsondunn.com/the-corporate-transparency-act-summary-and-key-updates-including-finan-sis-take-2-blue.

[10] 31 C.F.R. § 1010.380.

[11] Texas Top Cop Shop, Inc. et al. v. Garland et al., No. 4:24-CV-478, Dkt. 30 (E.D. Tex. Dec. 3, 2024).

[12] Nat'l Small Business United v. Yellen, 721 F. Supp. 3d 1260 (N.D. Ala. 2024) see https://www.gibsondunn.com/corporate-transparency-act-declared-unconstitutional-what-it-means-for-you.

[13] Id. at 75.

[14] Id. at 76.

[15] See Gibson Dunn's December 9 Client Alert describing the government's initial response to the district court ruling, available at https://www.gibsondunn.com/us-government-appeals-and-fincen-issues-guidance-about-nationwide-preliminary-injunction-of-corporate-transparency-act-enforcement.

[16] Texas Top Cop Shop, Inc. et al. v. Garland et al., No. 4:24-CV-478, Dkts. 32, 34 (E.D. Tex. Dec. 5, 2024).

[17] https://fincen.gov/boi.

---

The following Gibson Dunn lawyers assisted in preparing this update: Kevin Bettsteller, Stephanie Brooker, Matt Gregory, Justin Newman, Dave Ware, Sam Raymond, Chris Jones, and Connor Mui.

Gibson Dunn has deep experience with issues relating to the Bank Secrecy Act, other AML and sanctions laws and regulations, and challenges to Congressional statutes and administrative regulations.

For assistance navigating white collar or regulatory enforcement issues, please contact the authors, the Gibson Dunn lawyer with whom you usually work, or any leader or member of the firm's Anti-Money Laundering, Administrative Law & Regulatory, Investment Funds, Real Estate, or White Collar Defense & Investigations practice groups.

Please also feel free to contact any of the following practice group leaders and members and key CTA contacts:

**Anti-Money Laundering:**
Stephanie Brooker – Washington, D.C. (+1 202.887.3559, sbrooker@gibsondunn.com)
M. Kendall Day – Washington, D.C. (+1 202.955.8220, kday@gibsondunn.com)
David Ware – Washington, D.C. (+1 202.887.3652, dware@gibsondunn.com)
Ella Capone – Washington, D.C. (+1 202.887.3511, ecapone@gibsondunn.com)
Sam Raymond – New York (+1 212.351.2499, sraymond@gibsondunn.com)
Chris Jones – Los Angeles (+1 213.229.7786, crjones@gibsondunn.com)

**Administrative Law and Regulatory:**
Stuart F. Delery – Washington, D.C. (+1 202.955.8515, sdelery@gibsondunn.com)
Eugene Scalia – Washington, D.C. (+1 202.955.8673, escalia@gibsondunn.com)
Helgi C. Walker – Washington, D.C. (+1 202.887.3599, hwalker@gibsondunn.com)
Matt Gregory – Washington, D.C. (+1 202.887.3635, mgregory@gibsondunn.com)

**Investment Funds:**
Kevin Bettsteller – Los Angeles (+1 310.552.8566, kbettsteller@gibsondunn.com)
Shannon Errico – New York (+1 212.351.2448, serrico@gibsondunn.com)
Greg Merz – Washington, D.C. (+1 202.887.3637, gmerz@gibsondunn.com)

**Real Estate:**
Eric M. Feuerstein – New York (+1 212.351.2323, efeuerstein@gibsondunn.com)
Jesse Sharf – Los Angeles (+1 310.552.8512, jsharf@gibsondunn.com)
Lesley V. Davis – Orange County (+1 949.451.3848, ldavis@gibsondunn.com)
Anna Korbakis – Orange County (+1 949.451.3808, akorbakis@gibsondunn.com)

**White Collar Defense and Investigations:**
Stephanie Brooker – Washington, D.C. (+1 202.887.3559, sbrooker@gibsondunn.com)
Winston Y. Chan – San Francisco (+1 415.393.8362, wchan@gibsondunn.com)
Nicola T. Hanna – Los Angeles (+1 213.229.7269, nhanna@gibsondunn.com)
F. Joseph Warin – Washington, D.C. (+1 202.887.3609, fwarin@gibsondunn.com)

© 2024 Gibson, Dunn & Crutcher LLP. All rights reserved. For contact and other information, please visit us at www.gibsondunn.com.

Attorney Advertising: These materials were prepared for general informational purposes only based on information available at the time of publication and are not intended as, do not constitute, and should not be relied upon as, legal advice or a legal opinion on any specific facts or circumstances. Gibson Dunn (and its affiliates, attorneys, and employees) shall not have any liability in connection with any use of these materials. The sharing of these materials does not establish an attorney-client relationship with the recipient and should not be relied upon as an alternative for advice from qualified counsel. Please note that facts and circumstances may vary, and prior results do not guarantee a similar outcome.

Download PDF
Share

### Related People
Kevin Bettsteller
Stephanie Brooker
Matt Gregory
Justin Newman
Stuart F. Delery
Sam Raymond
Chris R. Jones

## Related Capabilities

Anti-Money Laundering

Administrative Law and Regulatory Practice

Investment Funds

Real Estate

White Collar Defense and Investigations

**Get to Know Us**
About
Careers
Insights
Alumni

**Resources**
Terms of Use and Legal Notices
Privacy Statement
Manage Cookies

**Connect with Us**
Contact
Subscribe
Client Extranet

GIBSON DUNN


Gibson Dunn uses cookies which are essential for our website to function. With your consent, we also use non-essential cookies to collect information about your browsing activities and improve the content, functionality and performance of our website. By clicking "Accept All", you consent to the use of all cookies on our website as set out in our Cookie Notice. You can reject all non-essential cookies by clicking "Reject All". Choose "Manage Cookies" to view and customize your cookie settings.

Manage Cookies   ACCEPT ALL   REJECT ALL

# EXHIBIT G



# After Nationwide Injunction of Corporate Transparency Act, FinCEN Suspends Reporting Requirements as Four Circuits Grapple With Act's Constitutionality

December 13, 2024

Skadden Publication

Shay Dvoretzky Parker Rider-Longmaid Amy E. Heller Adam J. Cohen Alessio D. Evangelista Eytan J. Fisch Jeremy Patashnik Nicole Welindt

The Corporate Transparency Act (CTA) and its implementing regulations (Regulations) require entities within its scope (reporting companies) to disclose information, including about their beneficial owners, to the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN).

The Regulations set a reporting deadline of January 1, 2025, for initial reports to be filed by reporting companies formed before 2024 and require reporting companies formed beginning in 2024 to file within specified time periods following their formation (within 90 days for entities formed during 2024 and within 30 days for entities formed after 2024).

Plaintiffs throughout the country have challenged the CTA's constitutionality. In *Texas Top Cop Shop, Inc. v. Garland*, No. 4:24-cv-478 (E.D. Tex. Dec. 3, 2024), the court enjoined the CTA nationwide and stayed the Regulations' reporting deadlines. This injunction comes on the heels of three district court decisions handed down earlier this year, reaching different conclusions about the CTA's constitutionality.

In deciding that plaintiffs were likely to succeed on the merits of their constitutional challenge,

the court in *Texas Top Cop Shop* agreed with an earlier decision from a district court in the Northern District of Alabama, which held that the CTA is not a valid exercise of Congress's power under the Commerce Clause or of Congress's taxing and foreign-relations powers under the Necessary and Proper Clause. By contrast, district courts in the District of Oregon and the Eastern District of Virginia have held that plaintiffs were not likely to succeed on the merits of their arguments that the CTA exceeded Congress's powers. All four cases are now on appeal — to the Fourth, Fifth, Ninth, and Eleventh Circuits.

The nationwide injunction prevents the government from enforcing the reporting requirements of the CTA and the Regulations, and on December 6, 2025, FinCEN suspended reporting while the injunction remains in effect. But reporting companies should stay attuned to further developments. The Department of Justice (DOJ) has appealed *Texas Top Cop Shop* to the Fifth Circuit and has asked for a stay of the injunction pending the appeal. If the nationwide injunction is dissolved or stayed, then reporting companies may have to comply with the CTA and the Regulations on short notice. And if the Supreme Court ultimately takes up the question whether Congress had the constitutional authority to enact the CTA, then the Court could issue one of the most consequential decisions on Congress's enumerated powers since *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012).

# The Corporate Transparency Act

Congress enacted the CTA as part of the Anti-Money Laundering Act of 2020. Congress noted that, under state law, companies are generally not required to disclose information about their "beneficial owners" — that is, the individuals who ultimately control the entities. National Defense Authorization Act of 2021, Pub. L. No. 116-283 §66402(2). Thus, Congress found, "malign actors" are able to "conceal their ownership of corporations" and use those effectively anonymous corporations for "money laundering," "the financing of terrorism," and "serious tax fraud." *Id*. §66402(3).

To address that concern, the CTA requires any "reporting company" to submit to FinCEN a report containing information about the company and its "beneficial owners." 31 U.S.C. §5336(b). A "beneficial owner" under the CTA is "an individual who, directly or indirectly … exercises substantial control over the entity" or "owns or controls not less than 25 percent of

the ownership interests of the entity," with various exceptions. *Id*. §5336(a)(3). And the CTA defines a "reporting company" as "a corporation, limited liability company, or other similar entity" that is either "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States." *Id*. §5336(a)(11)(A).

But the CTA exempts from its disclosure requirements several categories of entities, including banks, companies registered with the Securities Exchange Commission under the Securities Exchange Act of 1934, and certain companies that have more than 20 full-time employees in the United States. *Id*. §5336(a)(11)(B). The CTA also authorizes the Secretary of the Treasury, in consultation with other officials, to exempt additional "class[es] of entities" if "requiring beneficial ownership information" from those entities "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id*. §5336(a)(11)(B)(xxiv).

Willful violations of the CTA's disclosure requirements carry civil and criminal penalties. For example, any person that willfully provides false or fraudulent beneficial ownership information or fails "to report complete or updated beneficial ownership information to FinCEN" may receive a $500 per day civil penalty and up to $10,000 in fines and two years in federal prison. *Id*. §5336(h)(1), (3)(A). And any person who knowingly discloses or uses beneficial ownership information without authorization may receive a $500 per day civil penalty, along with a $250,000 fine and five years in federal prison. *Id*. §5336(h)(2), (3)(B).

# A Nationwide Injunction and Other Challenges to the CTA

Plaintiffs have challenged the CTA's constitutionality, to mixed results, in federal district courts around the country. Most recently, a judge in the Eastern District of Texas enjoined the CTA and the Regulations nationwide, concluding that Congress lacked the constitutional authority to adopt the CTA. The four district courts to have considered the constitutionality of the CTA have divided on important constitutional questions.

The courts have split on whether the CTA likely is a valid exercise of Congress's power

under the Commerce Clause, with federal judges in Oregon and Virginia holding that it is and judges in Texas and Alabama holding it is not. The courts have also split on whether the CTA likely is authorized by the Necessary and Proper Clause, combined with Congress's foreign-affairs or taxing powers, with a judge in Oregon holding that it is, and judges in Texas and Alabama holding that it is not.

## A judge in the Eastern District of Texas issued a nationwide injunction

On December 3, 2024, a federal judge granted plaintiffs' motion for a preliminary injunction in *Texas Top Cop Shop*. The court held that plaintiffs were likely to succeed on their constitutional challenge to the CTA and thus enjoined the government from enforcing the CTA or the Regulations and stayed the Regulations' reporting deadlines. As a result, reporting companies need not file reports required by the CTA or the Regulations for as long as the injunction — which the government has appealed — remains in effect.

In issuing the injunction, the court concluded that plaintiffs had shown a substantial likelihood of success on the merits of their claims that Congress exceeded its authority in passing the CTA.

First, the court agreed with plaintiffs that Congress likely lacked the power under the Commerce Clause to enact the CTA. The court explained that the CTA does not regulate the channels or instrumentalities of interstate commerce because nothing in the statute's text limits its reach to only companies engaged in interstate commerce. Slip Op. 36-40. The court acknowledged Supreme Court precedent holding that Congress may regulate activity under the Commerce Clause if "a 'rational basis' exists for concluding that the regulated activity, taken in the aggregate, substantially impacts interstate commerce." *Id*. at 47 (quoting *Gonzales v. Raich*, 545 U.S. 1, 22 (2005)). But the court nonetheless concluded that the CTA fails that test, because the law "does not regulate a pre-existing activity, but instead compels a new one." *Id*. at 40-46.

The court also explained why Congress could not enact the CTA under the Constitution's Necessary and Proper Clause. As an initial matter, the court held that Congress may use the Necessary and Proper Clause only in tandem with one of its enumerated powers. And none of the enumerated powers the government relied on gave Congress authority to enact the CTA. The court held that the CTA falls outside Congress's power to regulate foreign affairs because the law regulates a domestic issue, not a foreign one: "anonymous existence of

companies registered to do business in a U.S. state." *Id*. at 56-60. The court further held that the CTA falls outside Congress's taxing power because the connection between the CTA and the collection of taxes is "tenuous at best." *Id*. at 71.

Having concluded that plaintiffs were likely to succeed on the merits, the court also held that plaintiffs had satisfied the other preliminary injunction factors. The court explained that the costs of complying with a regulation later held to be invalid constitute irreparable harm. And the balance of the equities supported plaintiffs because, in the court's view, a preliminary injunction was necessary to preserve the constitutional status quo.

## A judge in the Northern District of Alabama had previously held that the CTA is unconstitutional

Nine months before the court in the Eastern District of Texas issued its injunction, the district court in *National Small Business United v. Yellen*, No. 5:22-cv-01448 (N.D. Ala. Mar. 1, 2024), had held that the CTA is unconstitutional and granted summary judgment to the plaintiffs in their challenge to that law. That is the only case in which a district court has decided the ultimate merits of the CTA's constitutionality (as opposed to ruling in a preliminary-injunction posture), though that decision does not have nationwide effect and provides relief only to the plaintiffs.

The district court's analysis in *National Small Business* resembles the court's reasoning in *Texas Top Cop Shop*. First, the court held that Congress does not have power under the Commerce Clause to enact the CTA. Second, the court held that Congress's foreign-affairs powers could not justify its enactment of the CTA because the CTA regulates "the purely domestic arena of incorporation." Slip Op. 23. Third, the court held that the CTA is not a necessary and proper exercise of Congress's taxing power, because there was not a sufficiently close relationship between that power and the CTA's disclosure provisions.

## Judges in the District of Oregon and the Eastern District of Virginia have denied preliminary injunctions, concluding the CTA is likely constitutional

Courts in the District of Oregon and the Eastern District of Virginia have reached different conclusions about the likelihood that the CTA is constitutional.

In *Firestone v. Yellen*, No. 3:24-cv-1034 (D. Or. Sept. 20, 2024), the court denied a

preliminary injunction, holding that plaintiffs failed to show a likelihood of success on the merits of their constitutional challenge.

The court first held that the CTA is likely a valid exercise of Congress's power under the Commerce Clause. The court noted that it need determine "only whether a 'rational basis' exists" for concluding that "the regulated activities, taken in the aggregate, substantially affect interstate commerce." Slip Op. 12-13 (quoting *Raich*, 545 U.S. at 22). The CTA likely satisfied that test, in the court's view, because Congress "sought to deter money laundering, the financing of terrorism, and other illicit economic transactions." *Id*. at 14.

The court also held that the CTA is likely constitutional under the Necessary and Proper Clause, given that "Congress has broad authority to effectuate the government's powers over national security and foreign affairs and to lay and collect taxes." *Id*. at 12. As to Congress's taxing power, the court reasoned that Congress determined that corporate ownership reporting requirements are useful in combatting tax fraud and tax evasion. And as to Congress's foreign-affairs powers, the court explained that Congress rationally concluded that the disclosure requirement is necessary to protect national security and promote U.S. interests abroad.

The district court in *Community Associations Institute v. Yellen*, No. 24-cv-01597 (E.D. Va. Oct. 24, 2024), similarly denied plaintiffs' motion for a preliminary injunction, concluding that plaintiffs were not likely to show that the CTA was an invalid exercise of Congress's commerce power. The court did not address whether the CTA was likely valid under Congress's foreign-affairs or taxing powers.

# Next Steps and Implications

The government has appealed the nationwide injunction issued in *Texas Top Cop Shop* to the Fifth Circuit. And with the other district court decisions currently on appeal in the Ninth, Fourth, and Eleventh Circuits, any disagreement among the courts of appeals in resolving these issues would tee up possible Supreme Court review.

The government has asked for a stay of the injunction pending the *Texas Top Cop Shop* appeal, given the Regulations' previous reporting deadline of January 1, 2025. Thus, for as long as that injunction remains in effect, companies do not face reporting deadlines under

the CTA or the Regulations. That could change, however, if the Fifth Circuit or Supreme Court reverses the district court's decision or if a court stays the district court's injunction pending further proceedings.

Meanwhile, appeals from the other three cases are further along. Plaintiffs have filed their opening briefs in the Ninth and Fourth Circuits, in appeals from the district courts' denials of their motions for preliminary injunctions. *See Firestone v. Yellen*, No. 24-6979 (9th Cir.); *Community Association Institute v. Yellen*, No. 24-2118 (4th Cir.). And in *National Small Business United v. Yellen*, No. 24-10736 (11th Cir.), a three-judge panel of the Eleventh Circuit (Judges Jordan, Newsom, and Brasher) heard oral argument in September 2024 in the government's appeal from the district court's summary judgment ruling holding the CTA unconstitutional.

The Supreme Court would likely grant certiorari and review any court of appeals decision that holds on the merits that the CTA is unconstitutional. It is also possible that the Supreme Court would weigh in on this question earlier, through its emergency docket, if the lower courts deny the government's motion for a stay of the injunction in *Texas Top Cop Shop* and the government makes that request to the Supreme Court. If the Supreme Court ultimately reaches the merits of whether the CTA is a valid exercise of Congress's commerce power, that could be one of the most significant Commerce Clause decisions since *National Federation of Independent Business*, 567 U.S. 519, where the Court held that the Affordable Care Act was a valid exercise of Congress's taxing and spending powers, but not its commerce power.

# Conclusion

The district courts that have addressed the issue have disagreed about whether Congress had the constitutional authority to enact the CTA. The nationwide injunction recently entered in *Texas Top Cop Shop* prevents the government from enforcing the CTA and the Regulations until further order from that district court or a higher court. Thus, entities otherwise subject to the CTA do not have to make filings under the CTA while that injunction remains in effect. But those entities should closely follow legal developments to determine their compliance requirements. If the Fifth Circuit or Supreme Court reverses the district court's injunction, or if a court stays the injunction pending further proceedings, these entities

would find themselves required to comply with the CTA and the Regulations. And, more broadly, a decision from the Supreme Court striking down the CTA would have profound implications for the scope of Congress's constitutional powers.

*This memorandum is provided by Skadden, Arps, Slate, Meagher & Flom LLP and its affiliates for educational and informational purposes only and is not intended and should not be construed as legal advice. This memorandum is considered advertising under applicable state laws.*

## Related Capabilities

Anti-Corruption Investigations and Compliance  //  Anti-Money Laundering  //  Anti-Money Laundering Enforcement  //  Corporate Compliance  //  Corporate Governance  //  Economic Sanctions  //  Economic Sanctions Enforcement  //  Litigation  //  Private Clients/Trusts and Estates  //  Private Equity  //  Supreme Court and Appellate Litigation  //  Tax  //  White Collar Defense and Investigations

# EXHIBIT H

DECEMBER 19, 2024

# Corporate Transparency Act: Fast-Moving Judicial Developments in *Texas Top Cop Shop* Case

Holland & Knight Alert

Alan Winston Granwell | Michael L. Titens | Louis T.M. Conti | Ira B. Reimer | Jonathan R. Halpern

The U.S. Department of Justice (DOJ) on Dec. 13, 2024, filed an emergency motion with the U.S. Court of Appeals for the Fifth Circuit to stay the nationwide preliminary injunction that was issued by the U.S. District Court for the Eastern District of Texas in *Texas Top Cop Shop, Inc. et al. v. Garland, et al.* The district court's order, issued on Dec. 3, 2024, assumed enforcement of the Corporate Transparency Act (CTA), including its beneficial ownership information (BOI) reporting rules and reporting deadlines. The emergency motion was filed pending the DOJ's appeal of the district court's order.

On the same day that the emergency motion was filed, the Fifth Circuit, on its own initiative, accelerated the briefing schedule the DOJ had proposed so that the appellate court would be able to fully consider the issues by Dec. 19.

As a result of the accelerated briefing schedule, the Fifth Circuit is well positioned to issue a ruling by Dec. 31 or shortly thereafter. Its decision could encompass a stay of the entire order, a partial stay – e.g., with respect to the nationwide application of the preliminary injunction – or a denial of the stay altogether.

In view of the foregoing fast-moving developments, the CTA's reporting deadline for pre-2024 reporting companies of Jan. 1, 2025, could well be reinstated. Accordingly, pre-2024 reporting companies, that have not yet finalized their BOI reports should take steps to be ready to file if the Fifth Circuit were to stay the entire order of the district court or restrict the order only to the plaintiffs in *Texas Top Cop Shop*.

## Events

The fast-moving developments related to *Texas Top Cop Shop* are set forth below. (See Holland & Knight's previous alerts, "Corporate Transparency Act Reporting Dec. 3, 2024, and Developments in the Texas Top Cop Shop Case Impact Corporate Transparency Act," Dec. 9, 2024.)

- **Dec. 3, 2024** — *Texas Top Cop Shop*, the Eastern District of Texas issued an order granting a nationwide preliminary injunction that enjoins enforcement of the CTA, including the implementing regulations concerning BOI reporting requirements and reporting deadlines.

- **Dec. 5, 2024** — The DOJ filed a Notice of Appeal.

- **Dec. 11, 2024** — The U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN) announced on its BOI webpage, in light of a recent federal court order, reporting companies are not currently required to file beneficial ownership information with FinCEN and are not subject to liability if they fail to do so while the order remains in force. However, reporting companies may continue to voluntarily submit beneficial ownership information reports.

- **Dec. 13, 2024** — The DOJ filed with the district court "Defendants' Motion to Stay Injunction Pending Appeal." In its motion, the DOJ asserted that it "intends to seek relief from the Fifth Circuit on Thursday, December 13, or Friday, December 13 if this Court (the district court) has not granted relief by then, in order to allow the motion to be fully briefed in time for the Fifth Circuit to resolve it, and will report to the Fifth Circuit if this Court rules (and the government's motion is pending there)." With respect to the nationwide injunction, the DOJ stated "[A] nationwide injunction is not warranted. Given the defendant's expressed by multiple motions above the managing pendent practice of nationwide injunctions, and the court's order is extraordinary and sweeping effect this Court should at a minimum stay the impact of its injunction beyond the same parties or identified members of the Plaintiff organizations. And again, such a stay is warranted to ensure that the relief does not exceed the Plaintiffs' own request."

- **Dec. 13, 2024** — The district court denied the government for having disregarded the local rule requirements for filing an application that sought emergency relief and directed the plaintiffs to file their response to the motion by noon on Dec. 16.

- **Dec. 13, 2024** — The DOJ filed with the Fifth Circuit an "Emergency Motion for Stay Pending Appeal." The government proposed a briefing schedule and requested "a ruling on this motion as soon as possible, but in any event no later than December 27, 2024, to ensure that regulated entities can be made aware of their obligation to comply before January 1, 2025." The government argued that the district court's reversal of a nationwide injunction is warranted, assess beyond the period in the case's four years and required by the plaintiffs' claims. In making its argument, the government argued that "the district court's order should be stayed pending appeal. In the alternative, the injunction should be narrowed to the companies that have been specifically identified in the district court (or, at a minimum, to the members of the Business associations)."

- **Dec. 13, 2024** — On the same day that it secured the emergency motion to stay, the Fifth Circuit advised counsel to expedite the plaintiffs of an accelerated briefing schedule. This letter will serve to advise the Appellees that the court has established a deadline for the plaintiffs to file their response to the motion by Dec. 19, 2024, by 5:00 PM. The Appellants are then requested to file a reply to the response on or before December 19, 2024, by 12:00 NOON."

## Comments

- Where do things stand? The government has brought two motions in rapid succession to stay the order of the district court. First, it did so with the same district court that issued the preliminary injunction. Second, without having received the immediate relief from that district court, it petitioned the appellate court for similar relief. Under the Federal Rules of Appellate Procedure, a party is required to the government's Emergency Motion for Stay Pending Appeal by 5 p.m. ET on Dec. 27, and the government then has until noon ET Dec. 19 to reply. In essence, the party has the opportunity to present its appeal to the Fifth Circuit did so, arguing that the court should deny the defendants' request for a stay pending appeal and are awaiting the district court's decision on the stay.

- Regardless of how the district court responds, it is possible that by Dec. 31 or even thereafter the Fifth Circuit will rule to stay the nationwide preliminary injunction on enforcement of the CTA and the implementing regulations, including the BOI reporting rules, particularly the deadline of Jan. 1, 2025, for reporting companies formed prior to Jan. 1, 2024, or the then-BOI reports.

- Subject to a prevailing decision by the Fifth Circuit – and a possible subsequent ruling by the U.S. Supreme Court in the event of an emergency application – pre-2024 reporting companies that have not yet completed their BOI initial reports should take steps to gather relevant information, finalize their BOI reports for filing and be ready to file by Jan. 1, 2025, if the Fifth Circuit were to stay the order of the district court.

For more information or questions please contact the authors.

**Notes:**


The plaintiffs argue that the merits and the equities strongly favor the plaintiffs.

Information contained in this alert is for the general education and knowledge of our readers. It is not designed to be, and should not be used as, the sole source of information when analyzing and resolving a legal problem, and it should not be substituted for legal advice, which relies on a specific factual analysis. Moreover, the laws of each jurisdiction are different and are constantly changing. This information is not intended to create, and receipt of it does not constitute, an attorney-client relationship. If you have specific questions regarding a particular fact situation, we urge you to consult the authors of this publication, your Holland & Knight representative or other competent legal counsel.

## Related Insights

**Developments in the Texas Top Cop Shop Case Impact Corporate Transparency Act**
DECEMBER 9, 2024

**Corporate Transparency Act Reporting**
DECEMBER 4, 2024

**The Corporate Transparency Act: Time Is Running Out (Part 3)**
DECEMBER 9, 2024

**Important Reminder: Corporate Transparency Act Reporting Deadline Jan. 1, 2025**
NOVEMBER 14, 2024

**A Look at One of the CTA's Subsidiary Exemption as Applied to CHBE Special Purpose Entities**
NOVEMBER 25, 2024

**Financial Crimes Enforcement Network Releases Guide Clarifying Beneficial Ownership Reporting Requirements**
DECEMBER 2024

**The Corporate Transparency Act: Time Is Running Out!**
NOVEMBER 13, 2024

**Impact of the Corporate Transparency Act on Business Aviation and Fast-Approaching Deadlines**
OCTOBER 2, 2024

**FinCEN Issues Additional Helpful Guidance on How to Report a Dissolution of a Company**
SEPTEMBER 12, 2024

View More >

### Related Practices
Corporate Transparency Act
Tax
Public Companies and Securities
White Collar Defense and Investigations
Compliance Services
Financial Services Regulations
Private Wealth Services
International Private Client Group

### Related Industry Services
Financial Services

Subscribe to Updates and Events

Click to Sign Up

Holland & Knight

Subscribe to Publications
Client Login
Alumni

The full team of Holland & Knight's success has always been and continues to be legal work of the highest quality, performed by well-prepared lawyers who stand firm for their profession and are devoted to their clients.

Attorney Advertising. Copyright © 1996-2024 Holland & Knight LLP. All rights reserved.

Legal Information    Privacy

By clicking "Accept All Cookies," you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts. Holland & Knight Cookie Notice

Cookies Settings    Reject All    Accept All Cookies

# EXHIBIT I

Insights

# FinCEN Seeks Immediate Stay of Nationwide CTA Injunction

12/13/2024  |  4 minute read

## Key Takeaways

- On Dec. 3, 2024, a federal district court in Texas issued a preliminary injunction that applied nationwide, temporarily halting the implementation of the Corporate Transparency Act (CTA).

- On Dec. 11, 2024, the U.S. government filed a motion requesting an immediate stay of the preliminary injunction, indicating it would promptly seek relief from the Fifth Circuit.

- The Financial Crimes Enforcement Network (FinCEN) previously confirmed that reporting companies had no obligation to comply with the CTA "for as long as [the injunction] remains in effect." Therefore, if the stay is granted, the Jan. 1, 2025, deadline would technically be back on, unless it is extended by the appellate court order or FinCEN. However, agencies usually provide a grace period in such situations.

On Dec. 11, 2024, the U.S. government filed a motion requesting an immediate stay of the preliminary injunction recently issued last week by a federal district court in Texas that temporarily halted the implementation of the CTA.

The government argued it will be "irreparably harmed" absent an immediate stay because, among other reasons, (i) the injunction disrupts compliance at "a critical juncture in implementation" where a complex range of requirements are increasingly exponentially as the year-end initial filing deadline nears; and (ii) the injunction's breadth — and will continue to engender widespread confusion among the public.

The move comes as a bit of a surprise given the timing. A party seeking this relief would typically try to file its motion as soon as possible after the district court's ruling (or, in the same day or within just a few days after). Here, the government waited more than a week to file its motion. This delay is curious because, as the government's motion and the district court's ruling highlight, the calendar is tight and the need to act quickly is apparent. Still, FinCEN confirmed the government's appeal but gave no indication that it would be seeking an immediate stay of the decision. Given the anticipated reporting of the nationwide injunction over the past week, an immediate stay at this stage would seem to risk only compounding the current public confusion.

The motion also stated that the government would seek relief from the Fifth Circuit if the district court did not issue a ruling within one or two days after the motion.

On Dec. 11, 2024, the district court issued an order declining to rule on the government's motion within that requested timeline. The court reasoned that it must give the plaintiffs a reasonable opportunity to respond to the motion and ordered the plaintiffs to submit their response by noon CT on Monday, Dec. 16, 2024. In addition, the court noted that the government's motion appeared to seek emergency relief but that it failed to meet several of the procedural requirements of an "emergency motion."

## Next Steps

1. **The district court will likely deny the government's motion to stay the injunction early next week, perhaps by late Monday or Tuesday.**
   - As mentioned above, the plaintiffs' response is due on Monday, Dec. 16, 2024.
   - After that, the district court may make a quick decision. In its order today, the court acknowledged that it understands the time constraints relating to this case.
   - The district court is unlikely to grant the stay. The government's arguments in favor of the stay are the same ones this court already rejected in granting the preliminary injunction.

2. **The government indicated that it intends to file a similar motion with the Fifth Circuit today (Dec. 13, 2024).**
   - As mentioned above in its motion, the government stated it would seek relief directly from the Fifth Circuit by Dec. 13, 2024, if the district court did not grant a stay by then.
   - The government will presumably seek expedited briefing on its motion.

3. **Once a motion is in front of the Fifth Circuit, there is no clear timetable for a decision.**
   - In its district court motion, the government noted that it is seeking relief quickly "in order to allow the motion to be fully briefed in time for the Fifth Circuit to resolve it," suggesting that it will seek a ruling by the Fifth Circuit in advance of the January 1 deadline.

4. **If the stay is granted, the Jan. 1 deadline would technically be back on, unless it is extended by the appellate court order or FinCEN. However, agencies usually provide a grace period in such situations.**
   - Most likely, the court would issue any grace period prior to FinCEN rather than mandate it through an order.
   - In similar situations, agencies have almost always provided for some kind of grace period to avoid confusion and to allow for the orderly implementation of the law.
   - However, FinCEN has yet to give any indication — either in its motion to stay the injunction or its public statement on the ruling — of any plan to delay the compliance deadline (or at least to issue guidance confirming that it would exercise discretion to not seek enforcement against any "late" filings made through a certain date after the original deadline).

5. **If the Fifth Circuit denies the stay, the government would either continue with the original appeal or seek relief from the Supreme Court.**

## Recommendations

The government seeking an immediate stay of the request without providing any assurances that the deadline would be equitably tolled creates at least some risk that the injunction could be lifted with little to no grace period. Accordingly, we would generally recommend that reporting companies at least be prepared to file promptly if the event that reporting companies may also voluntarily file at any time if that is their preference.

We will continue to provide updates regarding any further developments as they arise.

## Related Services

## Contacts



**Samuel F. Toth**
Counsel
Cleveland
T +1 216.861.6119
Email



**Peter W. Van Keuren III**
Partner
Cleveland
T +1 216.861.7586
Email



**Andrew W. Grossman**
Partner
Washington, DC
T +1 202.861.1697
Email

## Featured Insights

**2024 DSIR Report Deeper Dive**
2024 DSIR Deeper Dive: Comprehensive...
12/17/2024 | 11 minute

News
**Lee Rosebush Comments on Obesity Drug Shortages for...**
12/17/2024 | 1 minute read

Data Counsel
**Terms of User 10 Things You Agree to When Visiting a...**
12/17/2024 | 3 minute read

News
**Ronald Baumgarten Appears on IDFA Podcast "The Dairy...**
12/16/2024 | 1 minute read

— See All Insights

2024 © Baker & Hostetler LLP  |  Privacy Policy  |  Service Terms  |  California Privacy Notice  |  Contact Us

# EXHIBIT C

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:24-CV-478 |
| | § | Judge Mazzant |
| MERRICK GARLAND, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35). Having considered the Motion, the pleadings, and the applicable law, the Court concludes that the Motion should be **DENIED.**

## BACKGROUND

On May 28, 2024, Plaintiffs filed suit against Defendants, various representatives of the Federal Government and Government entities (collectively, "the Government"), seeking a declaratory judgment that the Corporate Transparency Act ("CTA") and its implementing regulations (the "Reporting Rule") are unconstitutional and an injunction against their enforcement (Dkt. #1). On June 3, 2024, Plaintiffs sought a preliminary injunction against the CTA and Reporting Rule (Dkt. #6). The Government filed a Response (Dkt. #18), Plaintiffs replied (Dkt. #19), and on October 9, 2024, the Court held a hearing on the matter. On December 3, 2024, the Court entered an Order enjoining enforcement of the CTA and Reporting Rule nationwide (Dkt. #30). The Government appealed (Dkt. #32). The Court amended its Order to correct a

minor error that did not impact the Court's analysis or holding (Dkt. #33). The Government filed an Amended Notice of Appeal (Dkt. #34).

At 8:05 p.m. CST on December 11, 2024, the Government filed the instant Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35). In the Motion, the Government asserted that if the Court did not grant a stay of its Order enjoining the CTA and Reporting Rule by December 12 or 13, 2024, the Government would move for a stay of the Order in the Fifth Circuit Court of Appeals (Dkt. #35 at p. 1). Because Plaintiffs had not yet had an opportunity to file a response, the Court Ordered Plaintiffs to respond to the Government's Motion by December 16, 2024, at 12:00 p.m. CST (Dkt. #36). On December 13, 2024, the Government filed a Motion to stay the Court's Order enjoining enforcement of the CTA and Reporting Rule in the Fifth Circuit Court of Appeals. Defendants-Appellants' Emergency Motion for Stay Pending Appeal, *Texas Top Cop Shop v. Garland*, No. 24-40792 (5th Cir. Dec. 13, 2024), ECF No. 21. On December 16, 2024, at 8:08 a.m. CST, Plaintiffs timely filed their Response in Opposition to the Government's Motion to Stay Preliminary Injunction (Dkt. #37). On December 17, 2024, the Government filed its Reply (Dkt. #38). The Court now takes up the Government's Motion (Dkt. #35).

## LEGAL STANDARD

"A stay pending appeal is extraordinary relief for which [the movant] bear[s] a heavy burden." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 372 (5th Cir. 2023) (internal quotations omitted). "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotations omitted). A stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the

circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34 (internal quotations omitted).  Where "there is even a fair possibility that the stay . . . will work damage to someone else[,]" the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis v. N. Am. Co.*, 299 U.S. at 248, 255 (1936); *see Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) (internal quotations omitted) ("'A stay is not a matter of right, even if irreparable injury might otherwise result.' It is instead an exercise of judicial discretion, and the 'party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.'").

In determining whether to grant a stay, district courts must consider four factors (known in the Fifth Circuit as the "*Nken* factors"): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Plaquemines Par.*, 84 F.4th at 373 (quoting *Nken*, 556 U.S. at 434). The Supreme Court and Fifth Circuit alike have made clear that "'[t]he first two factors . . . are the most critical.'" *Id.* (quoting *Nken*, 556 U.S. at 434). In articulating this standard, the Fifth Circuit has stated that it is "important[]" to recall that:

> on motions for stay pending appeal the movant need not always show a "probability" of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities ***weighs heavily*** in favor of granting the stay.

*Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A 1981)). With these principles in mind, the Court addresses each factor in turn.

## ANALYSIS

### I.  Likelihood of Success on the Merits

As the Court has acknowledged, this case involves a novel constitutional question of first impression in the Fifth Circuit (Dkt. #33 at p. 3). Though Plaintiffs brought an array of challenges against the CTA and Reporting Rule, to date, the Court has only addressed Plaintiffs' argument that the CTA exceeds Congress's enumerated powers (Dkt. #33 at p. 79). As discussed in detail by the Court's Order enjoining the CTA and Reporting Rule (Dkt. #33), both are likely unconstitutional; Plaintiffs have thus carried their burden to show a substantial likelihood of success on the merits. The Government has not.

The Government urges that the Court reconsider its conclusion on the merits but reiterates arguments that the Court has already rejected. For example, in the context of the Commerce Clause, the Government has still not articulated what *activity* the CTA regulates (*See* Dkt. #35 at p. 6). Similarly, in the context of the Necessary and Proper clause, the Government has yet to offer a viable argument that the CTA derives from one of Congress's enumerated powers and is a proper exercise of that power, as it must (*See* Dkt. #35). *See United States v. Comstock*, 560 U.S. 126, 147 (2010). Broadly, the Government has not offered any tenable explanation for how the CTA and Reporting Rule align with our dual system of government. The Government also argues that the Court did not apply the proper standard for a facial challenge (Dkt. #35 at p. 6). But at this juncture, there appears "no set of circumstances" under our written Constitution in which Congress would have the power to enact the CTA. *See United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Government further argues that the Court erred in "not giv[ing] sufficient weight" to Congress's findings (Dkt. #35 at p. 7). But the Government does not cite any authority for the notion that Congress's findings alone may authorize it to legislate however it so wishes. In fact,

countless cases discussing Congress's constitutional limits provide the exact opposite. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 614 (2000) ("[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation.") (quoting *United States v. Lopez*, 514 U.S. 549, 557 n.2 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not make it so.")). The Court gave Congress its due deference but acted as it must to fulfill its judicial responsibility.

Further, while the Government contends that the Court erred simply because it disagreed with the reasoning in *Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024) and *Cmty. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024), the Government overlooks the reasoning in *Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024) ("*NSBU v. Yellen*"). The Court believes that the reasoning in *NSBU v. Yellen* is persuasive and correct. This disagreement among the district courts is not enough to suggest that this Court erred.

The Government finally submits that the Court erred in enjoining the CTA and Reporting Rule nationwide (Dkt. #35 at pp. 7–8). Once more, the Court stands behind its Order (Dkt. #33). The Government is right to point out the concerns with nationwide injunctions (*See* Dkt. #35 at p. 7). The Court acknowledges those concerns. The Court enjoined enforcement of the CTA and Reporting Rule nationwide because it appears appropriate under the law and the facts of this case.[1] The Government's Reply argues that "Defendants did not concede that [nationwide] relief was

---

[1] Ironically, the Declaration the Government filed in support of its Motion shows why anything short of nationwide relief would be impracticable. Though, of course, the scope of an injunction does not turn on practicalities alone. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Declaration of Andrea Gacki states that "[r]eporting companies must clearly understand and have certainty about their compliance obligations for a reporting regime to be effective" (Dkt. #35-1 at p. 9). After all, the AMLA sought "to establish *uniform* beneficial ownership information reporting requirements." Pub. L. No. 116-283, div. F. 134 Stat. 4547, § 6002(5) (2021) (emphasis added).

necessary or appropriate" (Dkt. #38 at p. 1). The Court agrees, which is why the Court did not categorize the Government's statement that enjoining enforcement of the CTA and Reporting Rule only against Plaintiffs, including NFIB's members, was "'effectively' a form of nationwide relief" as a concession (Dkt. #38 at p. 1–2; Dkt. #33 at p. 75). This does not change the practical effect of Plaintiffs' request, nor does it persuade the Court that the scope of the injunction is inappropriate under the facts and circumstances of this case.

As the Court has decided, the merits favored Plaintiffs when the Court issued its injunction. Today is no different. The Government has not "made a strong showing that [it] is likely to succeed on the merits." *See Plaquemines Par.*, 84 F.4th at 373. Accordingly, the first *Nken* factor weighs against issuance of a stay.

## II.     The Equities

Turning to the remaining factors (the "equities"), the Court determines that a stay is not warranted. As the Court has concluded and as precedent indicates, the public interest lies in protecting the public from laws that are likely unconstitutional, and Plaintiffs will face irreparable harm if the Court were to grant a stay (which would effectively nullify its prior Order) (*See* Dkt. #33). Thus, the third and fourth *Nken* factors weigh against issuance of a stay.

Accordingly, the Court turns to the Second *Nken* factor—the risk of the Government suffering irreparable harm (the only remaining factor). *Plaquemines Par.*, 84 F.4th at 373. The Government contends that the burdens that it has undertaken to achieve compliance with the CTA constitute irreparable injury if the Court does not permit the CTA and Reporting Rule to become effective once again by issuing a stay. The Government advances two broad arguments under this factor. First, the Government argues that an injunction against laws "enacted by representatives of [the] people" constitutes irreparable harm (Dkt. #35 at p. 3) (internal quotation omitted).

Indeed, as the Fifth Circuit has stated, "[w]hen a statute is enjoined, the [Government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024).

Second, the Government argues that "the injunction would significantly disrupt FinCEN's implementation of the CTA, and FinCEN would not be able to fully remediate that disruption even if the injunction were lifted at the conclusion of the appeal" (Dkt. #35 at p. 3). In support of this point, the Government notes that FinCEN has engaged in nationwide media outreach in an attempt to achieve compliance with the CTA and it has expended $4.3 million dollars to date in furtherance of those efforts (Dkt. #35 at p. 4). The Government also argues that the injunction would "prevent the United States from fulfilling international standards for countering money laundering and terrorist financing" (Dkt. #35 at p. 5). That is a familiar argument that the Court addressed in its Order (*See* Dkt. #33 at pp. 56–65).

But for the first time in the life of this case, the Government has offered more than a threadbare claim that the CTA helps the United States comply with international standards. The Declaration of Andrea Gacki, the Director of FinCEN, which the Government attached as an exhibit to its Motion to Stay states:

> The United States is currently preparing for its upcoming Financial Action Task Force ("FATF") mutual evaluation, with its written technical submission currently due mid-2025. The United States is a founding member of FATF, which is the leading international, inter-governmental task force whose purpose is the development and promotion of international standards and the effective implementation of legal, regulatory, and operational measures to combat money laundering, terrorist financing, the financing of proliferation, and other related threats to the integrity of the international financial system. Among other things, FATF has established standards on transparency and BOI [(Beneficial Ownership Information)] of legal persons, intended to deter and prevent the misuse of corporate vehicles.

(Dkt. #35-1 at pp. 9–10). The Declaration also states that FATF rated the United States "non-compliant" with FATF's "requirements" (Dkt. #35-1 at p. 10). According to Andrea Gacki's Declaration, the injunction "risks causing the United States to receive negative ratings on related portions of an upcoming FATF evaluation" (Dkt. #35-1 at p. 10). A lower rating, according to the Declaration, could result in the United States being "added to the FATF grey list, a public list of countries with significant failings in their AML/CFT [(anti-money laundering and countering the financing of terrorism)] regimes" (Dkt. #35-1 at p. 10). That, the Declaration argues, "would undermine the United States' ability to push other countries to make reforms to their AML/CFT regimes . . ." (Dkt. #35-1 at p. 10). Finally, the Declaration notes that, for "nearly a decade," FATF has identified the lack of BOI reporting as the "most fundamental gap" in the United States's AML/CFT regime (Dkt. #35-1 at p. 10). Though Plaintiffs did not stipulate to the factual contentions in the Declaration, their Response does not dispute those statements.

The efforts that FinCEN has made to increase compliance with the CTA since the Reporting Rule have gone into effect appear to be significant by their terms and, of course, in service of a laudable end. FinCEN has been collecting BOI reports since January 1, 2024 (Dkt. #35-1 at p. 5). And while Plaintiffs have not provided the Court with any reason to suggest that the Government could completely remediate any harm as a result of the injunction, the law is clear that "it is always in the public interest to prevent a violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Moreover, irreparable injury is not dispositive in deciding whether to grant a stay. *Ind. State Police Pension Tr.*, 556 U.S at 961. Accordingly, any interest the

Government has in preserving its efforts in furtherance of the CTA are superseded by the CTA's grave constitutional flaws. Thus, on balance, the factors do not favor issuance of a stay.

Notwithstanding this four-factor analysis, the Court is mindful of the Fifth Circuit's statement in *Ruiz v. Estelle* that, at this stage, the movant "need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities ***weighs heavily*** in favor of granting the stay." *Plaquemines Par.*, 84 F.4th at 373 (quoting *Ruiz*, 650 F.2d at 565). This case, no doubt, presents a serious legal question. Given the Court's prior reasoning (Dkt. #33), it does not appear that the Government has a "substantial case on the merits," at least as to Plaintiffs' enumerated powers challenge. But even assuming *arguendo* that the Government does have a substantial case on the merits, the equities here do not "weigh heavily" in favor of granting a stay. *See id.* Accordingly, the Court will not stay its Order enjoining enforcement of the CTA and Reporting Rule (Dkt. #33).

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35) is hereby **DENIED.**

**IT IS SO ORDERED.**

 **SIGNED this 17th day of December, 2024.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE