No. 24-40792

─────────────────────────────────

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

─────────────────────────────────

TEXAS TOP COP SHOP, INC., *ET AL.*, *PLAINTIFFS-APPELLEES,*

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *ET AL.*, *DEFENDANTS-APPELLANTS*

─────────────────────────────────

**On appeal from the United States District Court for the Eastern District of Texas (No. 4:24-CV-478) (The Honorable Amos L. Mazzant, presiding)**

─────────────────────────────────

## AMICI CURIAE BRIEF OF THE PRIVATE INVESTOR COALITION, INC., AND S CORPORATION ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES' OPPOSITION TO GOVERNMENT'S EMERGENCY MOTION TO STAY

─────────────────────────────────

John C. Neiman, Jr.
C. William Courtney
MAYNARD NEXSEN PC
1901 Sixth Ave. N,
Ste. 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardnexsen.com
wcourtney@maynardnexsen.com

**Attorneys for Amici The Private Investor Coalition, Inc. and S Corporation Association**

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record for movants certifies that the following additional persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici:**

1. The Private Investor Coalition, Inc.

2. S Corporation Association

**Counsel:**

1. Maynard Nexsen P.C.

2. C. William Courtney

3. John C. Neiman, Jr.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), movants are non-profit organizations that provide compliance resources for private investors and closely held corporations. No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any parties to this filing.

/s/ *John C. Neiman, Jr.*
John C. Neiman Jr.
Attorney of record for *Amici Curiae*

# TABLE OF CONTENTS

Supplemental Statement of Interested Persons.......................................i

Table of Authorities ................................................................ iv

Statement of Interest of Amici................................................. 1

Argument ........................................................................... 3

    I.    Plaintiffs will succeed on the merits......................................... 3

    II.   The injunction does not unduly prejudice the Government ...... 7

    III.  A stay would unduly prejudice Amici and be contrary to
         the public interest .................................................................. 11

Conclusion........................................................................... 14

Certificate of Compliance...................................................... 16

# TABLE OF AUTHORITIES

## JUDICIAL DECISIONS

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015)...................................................................... 4

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981)..................................................... 12

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985)....................................................... 9

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022)..................................................... 12

*Maryland v. King*,
    567 U.S. 1301 (2012)..................................................................... 7

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012)........................................................................ 5

*National Small Business United v. Yellen*,
    721 F. Supp. 3d 1260 (N.D. Ala. 2024) ..................................... 4

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................3, 11

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015)........................................................ 8

*United States v. Pugh*,
    90 F.4th 1318 (11th Cir. 2024)..................................................... 4

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020)........................................................ 7

## STATUTES AND ACTS OF CONGRESS

12 U.S.C. § 3401.................................................................. 13

26 U.S.C. § 6103.................................................................. 14

31 U.S.C. § 5336..............................................................8, 13

5 U.S.C. § 552a................................................................... 13

## REGULATIONS AND ADMINISTRATIVE MATERIALS

Anti-Money Laundering Regulations for Residential Real Estate Transfers,
  89 Fed. Reg. 12,424 (Feb. 16, 2024)............................................5, 6

Beneficial Ownership Information Access and Safeguards,
  88 Fed. Reg. 88,732 (Dec. 22, 2023)............................................. 13

Beneficial Ownership Information Reporting Requirements,
  87 Fed. Reg. 59,498 (Sept. 30, 2022)...........................................8, 12

Customer Due Diligence Requirements for Financial Institutions,
  81 Fed. Reg. 29,398 (May 11, 2016)............................................. 11

Financial Information Task Force,
  *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation, The FATF Recommendations* (November 2023)............................................. 10

## CONGRESSIONAL CORRESPONDENCE

Letter from Lisa McClain et al. to Janet Yellen et al.,
  Nov. 5, 2024 ..................................................................... 9

## STATEMENT OF INTEREST OF AMICI[1]

Amici are associations that represent the interests of thousands of law-abiding companies and individuals who, if the Corporate Transparency Act goes into effect, would be required to report sensitive personal information to FinCEN for its criminal law-enforcement database, even though the Government does not have any suspicion that they have committed crimes. Many of Amici's members—in reliance on the District Court's injunction—have not yet filed Beneficial Ownership Information ("BOI") reports. Amici have a strong interest in ensuring that the CTA does not go back into effect before the now-enjoined January 1, 2025 filing deadline.

The first Amicus on this brief, The Private Investor Coalition, Inc. ("PIC"), is a coalition of dozens of single-family offices and many more individual investors and business owners who share a common interest in public-policy issues impacting the single-family-office community. PIC monitors legislative and regulatory developments in Washington and

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amici curiae or their counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

serves as the primary resource for timely information and guidance related to compliance topics specific to single family offices. Each year, PIC's members form numerous entities—whether LLCs, corporations, or other entities—and would be subject to the CTA's reporting requirements, whether or not these entities and individuals ever engage in commercial transactions.

The second Amicus on this brief, S Corporation Association, represents companies organized as S corporations and the trade associations that have them as members, acting as the "eyes and ears" for America's S corporation community in Washington. Its mission is to protect America's individually and family-owned businesses from excessive taxes and government mandates while working to ensure America's most popular corporate structure remains competitive in the Twenty-First Century. Many of the Association's members will be required to report sensitive personal information to FinCEN, whether or not those entities engage in commercial transactions and even though those entities are not suspected of wrongdoing.

With the deadline for reporting to FinCEN's criminal law-enforce-ment database looming on January 1—and with millions of affected indi-viduals and entities lacking resources to bring their own lawsuits to en-join the enforcement of this unprecedented and unconstitutional stat-ute—the District Court issued a preliminary injunction that applies to all affected persons in the United States. The Government wrongly con-tends that the factors under *Nken v. Holder*, 556 U.S. 418 (2009), call for it to be allowed to collect sensitive information from tens of millions of individuals during its appeal despite the invalidity of this law. As Plain-tiffs have argued, just the opposite is true.

## I.    Plaintiffs will succeed on the merits

Amici agree that Plaintiffs are "likely to succeed on the merits" of the Government's appeal. *Id.* at 426 (internal quotation marks omitted). Thorough analyses of the CTA's invalidity have been provided by Judge Mazzant in the opinion under review and, before him, Judge Liles Burke of the Northern District of Alabama in *National Small Business United*

*v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024). The Government's arguments in various forums only highlight the indefensibility of this statute and the need for a nationwide injunction.

1. The Government has all but conceded the CTA's incompatibility with the Commerce Clause in its motion to this Court. As one of the members of the panel that heard oral argument on the Government's CTA-related appeal to the Eleventh Circuit has written, a statute's Commerce Clause validity must be assessed with reference to the instances "'in which it actually authorizes or prohibits conduct.'" *United States v. Pugh*, 90 F.4th 1318, 1326 (11th Cir. 2024) (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015)). In this Court, the Government's motion confirms that the CTA does not regulate commercial conduct—or, indeed, conduct of *any* kind. The Government pays lip service to the notion that the CTA "effectively prohibits many anonymous economic transactions," but it is evident that the statute does not address economic transactions at all. Mot. 9. The CTA instead, as the Government later admits, simply applies to entities as "a class." *Id.* at 11. It is keyed not on their conduct, but their existence—because they, in the Government's own words, have

the "*authority and propensity*" to engage in commerce. Mot. 11 (emphasis added).

That rationale runs headlong into the Supreme Court's holding in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 549 (2012). On the Government's theory, Congress could pass a statute requiring disclosures not only from reporting companies, but from every individual person in the United States, because every person has "authority and propensity" to engage in commercial transactions, too. Mot. 11.

2. FinCEN also confessed Congress's error when justifying a recently proposed rule on Residential Real Estate Transfers—a rule that is not premised on the CTA—when it explained:

> *In contrast to the beneficial ownership requirements outlined in the CTA*, this proposed rule is a tailored reporting requirement that would capture *a particular class of activity* that Treasury deems high-risk and that warrants reporting on a *transaction-specific* basis.

Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12,424, 12,447 (Feb. 16, 2024) (emphasis added). FinCEN further explained that the Residential Real Estate Transfer rule

was needed because the CTA's reporting requirements are triggered by an entity's existence, not its conduct:

> While beneficial ownership information collected under the CTA may be available, that information concerns *the ownership composition* of a given entity *at a given point in time*. As such reporting does not dynamically extend to include information *on the market transactions* of the beneficially owned legal entity, it *would not alert law enforcement officials focused on reducing money laundering that [a transaction] had been conducted*.

*Id.* (emphasis added).

As FinCEN's statements acknowledge, the CTA does not target commercial activity or commercial information. It targets "entit[ies]" and their "owner[s]" instead. *Id.* What is more, the CTA does not collect this sensitive personal information for the purposes of regulating "transactions." *Id.* It instead does so, by FinCEN's admission, for "law enforcement" purposes—purposes that are unjustified as to the overwhelming majority of law-abiding citizens forced to comply with this statute. *Id.* These considerations take the CTA outside the Commerce power and justify the District Court's decision to forbid the statute's application to any entity or individual until this litigation has run its course.

**II.    The injunction does not unduly prejudice the Government**

Amici also concur with Plaintiffs that the Government will not "be irreparably injured absent a stay" or narrowing of this injunction. *Nken*, 556 U.S. at 434. Neither of the purported injuries cited by the Government justifies its requested emergency relief.

1.  The Government is wrong when it asserts that "any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." Mot. 14–15 (alteration adopted) (internal quotation marks omitted). This Court finds irreparable harm when "'a *State* is enjoined'" from effectuating a democratically enacted statute. *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (emphasis added) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). The Government alters that quotation in an attempt to extend the rule to cover "a [government]," not merely a State. Mot. 14 (internal quotation marks omitted).

But the fact that the *federal* Government is prevented from enforcing *federal* law by a *federal* court does not establish irreparable injury. The rule that an injunction against the enforcement of state law gives rise to irreparable injury reflects principles of comity and federalism.

Those concerns are absent when a federal court enjoins enforcement of federal law. As this Court has recognized, the federal government cannot "demonstrate[] that it will be irreparably injured" by simply claiming that a federal court's "injunction" against a federal law "offends separation of powers and federalism." *Texas v. United States*, 787 F.3d 733, 767 (5th Cir. 2015) (internal quotation marks omitted). In federal cases about federal law, "it is the resolution of the case on the merits, not whether the injunction is stayed pending appeal, that will affect those principles." *Id.* at 768.

The Government's attempt to invoke the sanctity of "statutes enacted by representatives of [the] people" also fails on its own terms. Mot. 14–15 (internal quotation marks omitted). In enacting the CTA, Congress called for a reporting deadline of "not later than 2 years after the effective date of the regulations" for existing entities. 31 U.S.C. § 5336(b)(1)(B). Those regulations became effective on January 1, 2024. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498 (Sept. 30, 2022). In Congress's view, the need to gather beneficial-ownership information was not so pressing as to necessitate a deadline earlier than January 1, 2026. Accordingly, 44 Members of Congress recently

urged FinCEN to push back its shortened January 1, 2025 filing dead-line, citing the CTA's two-year timeframe to explain that "[a] delay of the year-end filing deadline" would be "in line with Congressional intent." Letter from Lisa McClain et al. to Janet Yellen et al., Nov. 5, 2024, https://perma.cc/Y59V-PUPU.

2. The Government also has failed to support its assertions that a stay is needed because the CTA was enacted as part of the United States' "leadership efforts" as "a founding member of the Financial Action Task Force." Mot. 15. "Speculative injury is not sufficient" to establish irrepa-rable harm. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). The Government's citation to the FinCEN Director's dec-laration does not establish a sufficient likelihood of a risk to the United States' "credibility among other nations." Mot. 15 (citing Add. A91, ¶ 22 (Declaration of Andrea Gacki)).

If the Government's concern is based on the United States' mem-bership in the Financial Action Task Force ("FATF"), that concern is mis-placed. The FATF's international standards do not require anything so stringent as the CTA. The FATF Recommendations take as their "essen-tial foundation" a "risk-based approach" that "ensure[s] that measures to

prevent or mitigate money laundering and terrorist financing are commensurate with the risks identified." Financial Information Task Force, *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation, The FATF Recommendations*, at 10 (November 2023), https://perma.cc/4Z2K-6LLD. The FATF Recommendations therefore explain that "[i]n determining the reasonableness of the identity verification measures, regard should be had to the money laundering and terrorist financing risks posed by the customer and the business relationship." *Id.* at 67 n. 35.

But as noted above, by FinCEN's own admissions, the CTA has no risk-assessment feature. *See supra* at 5-6. It applies to every non-exempt entity whether engaged in commerce or not. The CTA affirmatively rejects the philosophy behind the FATF Recommendations in favor of sweeping as broadly as possible.

The Government hints that the risk to its "credibility" and "leadership" has some relationship to its ability "to combat international financial crime." Mot. 15. But the Government stops well short of arguing that the injunction creates a risk of irreparable harm to its law-enforcement interests, and with good reason. Even without the CTA, FinCEN collects

volumes of BOI under its Customer Due Diligence Rule—a Rule that, unlike the CTA, is tied to commercial activity. Since 2018, the Rule has required "covered financial institutions" like banks, broker-dealers, and mutual funds to "identify and verify the identity of the beneficial owners of all legal entity customers" by virtue of their economic activity in opening financial accounts. Customer Due Diligence Requirements for Financial Institutions, 81 Fed. Reg. 29,398 (May 11, 2016). The District Court's injunction thus will not prevent the Government from obtaining any BOI needed for legitimate law-enforcement purposes.

## III. A stay would unduly prejudice Amici and be contrary to the public interest

Plaintiffs also are correct when they argue that a stay or narrowing of the injunction "will substantially injure the other parties interested in the proceeding," including Amici, and be contrary to "the public interest" in numerous respects. *Nken*, 556 U.S. at 434 (internal quotation marks omitted).

1. The Government tries to demean the harm Amici's members will suffer, asserting that any injuries will be limited to "alleged compliance costs" it claims to be "minimal." Mot. 16. But "FinCEN estimates that the

total cost of filing BOI reports is approximately $22.7 billion in the first year," a figure that could only be deemed "minimal" in the Government's eyes. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498, 59,585–86 (Sept. 30, 2022). In any event, "when determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (alteration adopted) (internal quotation marks omitted). Under this Court's precedents, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Id.*

2. The harm also includes the CTA's invasion of Amici's privacy rights, which amounts to "irreparable injury" because "once an infringement has occurred it cannot be undone." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). While the Government may dismiss the CTA's invasion of privacy as just another information-collection regime, the CTA stands alone in critical respects.

The CTA compels law-abiding persons to share sensitive personal information for a criminal-law enforcement database that is shared with various federal, foreign and international agencies. *See* 31 U.S.C.

§ 5336(c)(2)(B). Under FinCEN's Access Rule, FinCEN may disclose BOI to federal, state, tribal, and even foreign law-enforcement agencies, as well as federal regulators and financial institutions. *See* Beneficial Ownership Information Access and Safeguards, 88 Fed. Reg. 88,732, 88,733 (Dec. 22, 2023). The CTA permits disclosures for law-enforcement purposes without any suspicion that individuals or entities have violated the law, and without providing safeguards against the abuse of the disclosed information.

No other federal information-collection statute presents comparable privacy risks. Other kinds of personal information given to the federal government are protected by the Privacy Act of 1974, which generally precludes the Government from using information collected for one reason for incompatible purposes. *See* 5 U.S.C. § 552a. Personal information given to federally regulated financial institutions is likewise protected under the Right to Financial Privacy Act of 1978, which generally requires the Government to obtain a warrant, subpoena, or other form of process before it can access a citizen's personal information without their consent. *See* 12 U.S.C. § 3401 *et seq*. Tax information collected by the

Government is protected under the Internal Revenue Code, which generally requires a court order before the IRS may share information with non-tax enforcement agencies. *See* 26 U.S.C. § 6103.

The CTA provides no similar panoply of protections. If the Government obtains a stay or a narrowing of the District Court's injunction, the Amici's members and millions of other American citizens and businesses will be forced to hand over private information for a criminal-investigation database that can be accessed by any federal agency and many foreign, state, and local governments and their agencies. The privacy bell will be incapable of being un-rung.

3. Any narrowing of the injunction during the appeal will be contrary not only to the interests of the Amici but the public as a whole. The District Court was right to conclude that FinCEN's partial and selective enforcement of the statute would be incompatible with the rule of law. Staying the injunction immediately before the filing deadline would only cause additional confusion among regulated entities.

## CONCLUSION

This Court should deny the Government's motion to stay or narrow the injunction during its appeal.

Respectfully submitted,

/s/ John C. Neiman, Jr.
One of the Attorneys for Appellants

OF COUNSEL:

John C. Neiman, Jr.
C. William Courtney
MAYNARD NEXSEN PC
1901 Sixth Ave. N,
Ste. 1700
Birmingham, Alabama 35203
T: (205) 254-1000
jneiman@maynardnexsen.com
wcourtney@maynardnexsen.com

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the font and word limitations of Rules 27(d) and 32(a)(7). According to the word count function in Microsoft Word, the pertinent parts of this document contain 2,565 words. This document uses Century Schoolbook font in 14-point type.

s/ John C. Neiman, Jr.
OF COUNSEL