No. 24-40792

# In the United States Court of Appeals for the Fifth Circuit

TEXAS TOP COP SHOP, INC. ET AL.,

*Plaintiffs-Appellees,*

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States of America, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
(USDC No. 4:24-cv-478, Hon. Amos L. Mazzant)

## BRIEF OF HAMILTON LINCOLN LAW INSTITUTE AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL

HAMILTON LINCOLN LAW INSTITUTE
Neville S. Hedley
1629 K Street, NW, Suite 300
Washington, DC 20006
(312) 342-6008

*Counsel for* Amicus Curiae
*Hamilton Lincoln Law Institute*

# Rule 28.2.1 Statement

Case No. 24-40792

*Texas Top Cop Store, Inc., et al. v. Merrick Garland, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

## <u>Plaintiffs-Appellees and Counsel</u>

Texas Top Cop Shop, Inc.,

Russell Straayer,

Mustardseed Livestock, LLC,

Libertarian Party of Mississippi,

National Federation of Independent Business, Inc.,

Data Comm for Business, Inc.

Center for Individual Rights

       Caleb Kruckenberg
       Christian Clase
       Center for Individual Rights
       1100 Connecticut Avenue, NW Suite 625
       Washington, D.C. 20036

National Federation of Independent Business

> Beth Milito
> Rob Smith
> National Federation of Independent Business
> 555 12th Street, NW
> Washington, D.C. 20004

Baker Hostetler

> Andrew Grossman
> Baker Hostetler
> 1050 Connecticut Ave, NW Suite 1100
> Washington, D.C. 20036

S|L Law PLLC

> John Clay Sullivan
> S|L Law PLLC
> 610 Uptown Boulevard, Suite 2000
> Cedar Hil, TX 75104

## **Defendants-Appellants and Counsel**

United States Department of Treasury

Financial Crimes Enforcement Network

Janet Yellen, United States Secretary of Treasury

Andrea Gacki, Director of Financial Crimes Enforcement Network

Merrick Garland, United States Attorney General

United States Department of Justice

> Faith Lowry
> Stuart Robinson

Daniel Bentele Hahs Tenny
Steven H. Hazel
Sophia Shams

**_Amici_ and Counsel**

The State of Texas

Christina Cella
Office of the Texas Attorney General
300 W. 15th Street, Sixth Floor
Austin, TX 78701

Eagle Forum Education and Legal Defense Fund

Andrew L. Schlafly
Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931

The *amicus curiae* Hamilton Lincoln Law Institute is a nonprofit corporation. It does not issue stock, and is neither owned by nor is the owner of any other corporate entity, in part or in whole. It has no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. The corporation is operated by a volunteer Board of Directors.

December 18, 2024          */s/ Neville S. Hedley*
                          Neville S. Hedley

                          Attorney of record for *amicus curiae*
                              Hamilton Lincoln Law Institute

# Table of Contents

**Rule 28.2.1 Statement**.......................................................................i

Table of Contents..........................................................................iv

Table of Authorities ......................................................................v

Interest of *Amicus Curiae* ..............................................................1

Summary of the Argument.............................................................1

Argument .......................................................................................2

I.    The district court was correct in holding that the CTA exceeds Congress's authority under the Commerce Clause. ......................................2

II.    The CTA violates the Fourth Amendment because it is an unreasonable intrusion by the government. Thus, maintaining the injunction is critical to prevent such an illicit intrusion. ................................................4

    A.    The CTA infringes upon plaintiff-appellees' security interests. ............4

    B.    Plaintiff-Appellees have a reasonable expectation of privacy in the data the CTA requires to be disclosed directly to the government, even in instances when there has been limited disclosure to third parties. .........8

    C.    The CTA is ripe for the type of abuse that the Fourth Amendment is designed to prevent. ................................................10

Conclusion ...................................................................................12

Proof of Service ...........................................................................14

Certificate of Compliance ............................................................15

# Table of Authorities

Cases

*Boyd v. United States,*
116 U.S. 616 (1886) ...............................................................8, 9

*Camara v. Municipal Court of City & Cnty of San Francisco,*
387 U.S. 523 (1967) ..................................................................5

*Carpenter v. United States,*
585 U.S. 296 (2018) ........................................................5, 7, 10

*City of Indianapolis v. Edmond,*
531 U.S. 32 (2000) ....................................................................8

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ...............................................................6, 7

*Competitive Enter. Inst. v. FCC,*
970 F.3d 372 (D.C. Cir. 2020) .................................................1

*CTS Corp. v. Dynamics Corp. of Am.,*
481 U.S. 68 (1987) ....................................................................4

*Gonzalez v. Raich,*
545 U.S. 1(2005) ......................................................................2

*Illinois v. Lidster,*
540 U.S. 419 (2004) ...............................................................7, 8

*Katz v. United States,*
389 U.S. 347 (1967) ..................................................................8

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ...............................................................2, 4

*[REDACTED] Memorandum Opinion and Order,*
Slip Opinion (FISA Ct. Oct. 18, 2018) ...................................11

*[REDACTED] Memorandum Opinion and Order,*
     Slip Opinion (FISA Ct. Apr. 21, 2022) ............................................ 11

*Riley v. California,*
     573 U.S. 373 (2014) ....................................................................... 10

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press,*
     489 U.S. 749 (1989) ....................................................................... 10

*United States v. Di Re,*
     332 U.S. 581 (1948) ......................................................................... 7

*United States v. Lopez,*
     514 U.S. 549 (1995) ......................................................................... 2

*United States v. Morton Salt Co.,*
     338 U.S. 632 (1950) ......................................................................... 5

Rules and Statutes, and Constitutional Provisions

31 U.S.C. § 5336(b)(1)-(2) ............................................................... 6

31 U.S.C. § 5336(c)(5) ...................................................................... 6

50 U.S.C. § 1881a............................................................................ 11

U.S. Const., art. I, sec. 8................................................................ 1, 2, 3

U.S. Const., amend. IV ....................................... 1, 4, 5, 6, 7, 8, 10, 11, 12

Other Authorities

Freiwald, Susan, & Stephen Wm. Smith,
     *The* Carpenter *Chronicle: A Near-Perfect Surveillance*, 132
     HARV. L. REV. 205 (2018) ............................................................... 10

Richards, Neil,
  *The Third-Party Doctrine and the Future of the Cloud*, 94
  WASH. U. L. REV. 1441 (2017)............................................................5

Rutledge, Thomas E. & Robert R. Keatinge,
  *LLPs Are Not CTA Reporting Companies*, BUSINESS LAW
  TODAY (Oct. 2024) .............................................................................3

Slobogin, Christopher,
  *Panvasive Surveillance, Political Process Theory, and the
  Nondelegation Doctrine*, 102 GEO. L. REV. 1721 (2014) ...................5

United States House of Representatives,
  *Financial Surveillance in the United States: How Federal
  Law Enforcement Commandeered Financial institutions to
  Spy on Americans*, Interim Staff Report, Committee on the
  Judiciary and Select Subcommittee on Weaponization of the
  Federal Government (Mar. 6, 2024) .............................................. 12

## Interest of *Amicus Curiae*

*Amicus curiae* Hamilton Lincoln Law Institute ("HLLI") files this brief with the consent of the parties. HLLI is a 501(c)(3) public-interest law firm committed to, among other things, defending the constitutional separation of powers and principles of limited government against executive-branch abuse. *E.g.*, *Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020). This case presents critical issues concerning the limits of Congress's authority under the Commerce Clause as well as serious Fourth Amendment issues.

Under FRAP 29(a)(4)(E), *amicus* states that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.

## Summary of the Argument

This brief seeks to aid the Court through adding important context of why the district court was correct in concluding that Congress exceeded its authority under the Commerce Clause when it passed the CTA. And also why it is critical to maintain the injunction because of the serious Fourth Amendment implications if it is lifted and reporting companies are compelled to submit sensitive Personal Identifying Information ("PII") and Beneficial Ownership Information ("BOI") that will populate the FinCEN database.

# Argument

## I. The district court was correct in holding that the CTA exceeds Congress's authority under the Commerce Clause.

This Court should deny the government's motion because the district court correctly determined that the CTA exceeds Congress's authority under the Commerce Clause.

Congress's authority under the Commerce Clause is broad, but it is not limitless. *See NFIB v. Sebelius*, 567 U.S. 519, 549-50 (2012). The Supreme Court has held that the Commerce Clause permits three categories of activity: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce, … i.e., those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). It is under the third prong that the Commerce Clause may reach purely intrastate or even non-economic activity when the statute is part of a comprehensive regulatory scheme and the regulation of intrastate or non-economic activity is necessary to preserve the scheme. *Id.* at 561; *see also Gonzales v. Raich*, 545 U.S. 1, 36 (2005). The district court correctly concluded that the CTA fails to meet all three of the criteria. ECF No. 33 at 36, 40.

To illustrate this point, consider the following hypothetical: Law Firm A and Law Firm B both exclusively do real estate closing work in North Carolina and their attorneys are licensed only to practice in the state, so their commercial activity is exclusively intrastate. They both use the same instrumentalities of commerce (phones, internet, bank wires). Neither would be considered a channel of commerce. In every respect, Firm A and B are identical with an identical commercial or economic footprint. The only difference between the two is that Firm A is formed as a Limited Liability Company while Firm B is a traditional partnership. But only Firm A is within the scope of the CTA, subject to its reporting requirements and enforcement penalties.[1] This would be true even if Firm B employed attorneys licensed in both North and South Carolina, did business in both states, and specifically targeted out-of-state clients interested in purchasing vacation or rental property, thereby affirmatively engaging in commercial or economic activity that is *interstate* in nature. Accordingly, it is not commercial activity that

_____

[1] This may also be true if Firm B is a Limited Liability Partnership ("LLP"). It is an open question whether LLPs are within the scope of the CTA. FinCEN regulations seem to indicate that LLPs are in scope. But some jurisdictions do not require a filing with a Secretary of State's office to create a LLP, thereby removing LLPs from the statutory definition of reporting company. *See generally* Thomas E. Rutledge & Robert R. Keatinge*, LLPs Are Not CTA Reporting Companies,* BUSINESS LAW TODAY (Oct. 2024).

triggers the CTA, but rather the filing paperwork with a Secretary of State. Such an action has never been part of a comprehensive federal regulatory scheme, but instead has been an area traditionally reserved for states to administer. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 68, 89 (1987); *NFIB v. Sebelius*, 567 U.S. at 560 (Roberts, C.J., concurring) (rejecting expansion of federal commercial regulatory reach into matters traditionally reserved for states). Thus, the district court was correct when it held that the CTA exceeded Congress's power under the Commerce Clause.

## II. The CTA violates the Fourth Amendment because it is an unreasonable intrusion by the government. Thus, maintaining the injunction is critical to prevent such an illicit intrusion.

The district court's order only touched on Fourth Amendment issues in passing and did not rule on the substantive argument that the CTA violates the Fourth Amendment. ECF No. 33 at 31, 79. Nonetheless, the CTA has serious Fourth Amendment implications that warrant the injunction.

## A. The CTA infringes upon plaintiff-appellees' security interests.

The Fourth Amendment states that the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable

searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. This protection extends "to the orderly taking under compulsion of process" including disclosures compelled by statute or regulation. *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

The drafters of the Constitution specifically included the Fourth Amendment to address one of the most pernicious practices of the Crown that the Founders found so objectionable—the use of general warrants or writs of assistance. "One thing about which every Fourth Amendment scholar agrees … is that the Fourth Amendment was meant to prohibit 'general warrants.'" Christopher Slobogin, *Panvasive Surveillance, Political Process Theory, and the Nondelegation Doctrine*, 102 GEO. L. REV. 1721 (2014). "[T]he original purpose of the Fourth Amendment was not so much privacy as it was to place substantive limitations on the scope of government power" and the guarantee of this right against such power "was central to the ultimate ratification of the Constitution." Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1450 (2017); *see also Carpenter v. United States*, 585 U.S. 296, 303 (2018) ("The 'basic purpose of this Amendment … is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" (quoting *Camara v. Municipal Court of City and Cnty of San Francisco,* 387 U.S. 523, 528 (1967))).

The CTA incorporates features of general warrants that the Founders found so objectionable. The CTA requires a "reporting company" to disclose the personal information of its "beneficial owners" and "applicants" including legal names, birthdates, current addresses, and identification numbers to FinCEN without any individualized suspicion of wrongdoing. 31 U.S.C. § 5336(b)(1)-(2). The purpose is to allow FinCEN to build a financial-intelligence database that domestic and foreign law enforcement agencies may access to investigate suspected financial crimes. Treasury employees have carte blanche to access the database. 31 U.S.C. § 5336(c)(5).

While the Supreme Court has not had cause to address a statute of such dramatic sweep, its decision in *City of Los Angeles v. Patel,* 576 U.S. 409 (2015) provides the best guidance. That case addressed a city ordinance the required hotels to collect and make available to police on demand a "guest's name and address" and other sensitive information. *Id.* at 412.

The Court assumed that the ordinance authorized searches for purposes other than for conducting criminal investigations, but still held that the Fourth Amendment warrant requirement applied. 576 U.S. at 420 (subject of even an administrative search "must be afforded an opportunity to obtain pre-compliance review before a neutral decisionmaker"). The CTA transgresses the Fourth Amendment more

blatantly than the ordinance in *Patel*. The purpose of the CTA is to conduct criminal investigations. It compels reporting companies to collect and disclose PII and BOI to FinCEN, and any person who fails to turn over the required information—not just the reporting companies—is subject to penalties. If a non-criminal local ordinance requiring involuntary disclosure of sensitive information fell short of Fourth Amendment requirements, it stands to reason that the CTA also falls short and should not be enforced.

The state's power to deprive an individual of his liberty is limited not only by the presumption of innocence and the reasonable doubt standard for conviction, but also the right to be free from police monitoring unless there is probable cause that the individual committed a crime. The Court has emphasized "that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)).

The Court's rare approval of mass *ex ante* searches is limited to circumstances not applicable to the broad sweep of the CTA. In *Illinois v. Lidster* the Court upheld as reasonable a specific instance of mass search and seizure without individualized suspicion or probable cause. 540 U.S. 419, 425-26 (2004). One week after a fatal hit-and-run, police implemented a road checkpoint to solicit public assistance from motorists

who regularly traveled that road at the time of the accident. The checkpoint was not "primarily for general crime control purposes, *i.e.*, 'to detect evidence of ordinary criminal wrongdoing.'" *Id.* at 423. (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 41 (2000)). Rather, the checkpoint was aimed at investigating a specific crime and "interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." *Id.* at 427. The mandatory disclosure of sensitive data required by the CTA, by contrast, is not targeted at a specific crime—or any crime—and constitutes an unavoidable *ex ante* dragnet sweeping up the sensitive data of all individuals who are associated with the ownership of a state-chartered business entity.

**B.    Plaintiff-Appellees have a reasonable expectation of privacy in the data the CTA requires to be disclosed directly to the government, even in instances when there has been limited disclosure to third parties.**

The CTA also oversteps the limits imposed by the Fourth Amendment because it represents an intrusion on the plaintiffs' "reasonable expectation of privacy." *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). In the landmark decision of *Boyd v. United States*, the Court acknowledged the importance of privacy interests when it held that "compulsory production of a man's private papers to establish a criminal charge against him … is within the scope of the Fourth Amendment." 116 U.S. 616, 622 (1886). Like the CTA, the

statute at issue in *Boyd* compelled individuals to disclose personal business records to the government for purposes of investigating evasion of customs duties. The Court summarized the history of colonial-era general warrants and writs of assistance and concluded that the statute in question was at odds with a practice the Founders "so deeply abhorred." *Id.* at 630. "It is not the breaking of his doors, and the rummaging of his drawers, that constitute the offense; but it is the invasion of his indefensible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offence." *Id.*

The parallels between the statue in *Boyd* and the CTA are plain. But at least in *Boyd* an individual knew the government had targeted him for investigation. By contrast, the CTA allows government agents unfettered discretion to probe sensitive information with no reasonable suspicion or notice. The CTA includes statutory protocols and requires FinCEN to draft regulations related to the who, what, when and how a government agency may access the BOI database. But notably absent is any requirement that there be any showing of reasonable suspicion, much less probable cause, nor is there any opportunity for independent judicial review or notice to an individual targeted by the government. Such broad and imprecise guidelines fall short of the right of individuals to be secure in their persons, property, or papers. "[T]he Founders did not

fight a revolution to gain the right to government agency protocols." *Riley v. California*, 573 U.S. 373, 398 (2014). Rather, they were concerned about excessive government power to intrude on individual liberty and imposed strict limitations to preserve that hard-fought liberty.

Further, even if some of the BOI has been previously disclosed to a third party, Appellees still retain a reasonable expectation of privacy in the data. In *Carpenter*, the Court held that there were limits to the doctrine of third-party disclosures, particularly considering the advent of newer technology. 585 U.S. at 310. "A person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Id.* Indiscriminate and "all-encompassing" collection of personal information "poses the danger of government fishing expeditions through database, just as the British had threatened the security of the Founders with the abusive general warrants and writs of assistance that originally inspired the Fourth Amendment." Susan Freiwald & Stephen Wm. Smith*, The* Carpenter *Chronicle: A Near-Perfect Surveillance*, 132 Harv. L. Rev. 205, 220 (2018) (citing *Carpenter*, 585 U.S. at 311).

C.     **The CTA is ripe for the type of abuse that the Fourth Amendment is designed to prevent.**

In *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press* the Supreme Court recognized the privacy interests associated with aggregated sensitive personal information and recognized that there

were legitimate privacy concerns with such centralized clearinghouses. 489 U.S. 749, 764 (1989). Those concerns are even more applicable when it is the government that demands production of the data and then has unfettered access to that aggregated sensitive personal information.

The need to maintain the stay is unfortunately highlighted by recent examples of government abuse of aggregated sensitive personal data at its disposal. In May 2023, the Foreign Intelligence Surveillance Court unsealed an opinion that detailed abuse by the FBI using Section 702 of the Foreign Intelligence Surveillance Act ("FISA"). 50 U.S.C. § 1881a. *[REDACTED] Memorandum Opinion and Order*, Slip Op. at 49 (FISA Ct. Apr. 21, 2022) (released to public May 18, 2023). The level of abuse was extreme: "the FBI illegally accessed a database containing communications … more than 278,000 times, including searching for communications of people arrested at protests of police violence and people who donated to a congressional candidate." Electronic Frontier Foundation, *Newly Public FISC Opinion is The Best Evidence For Why Congress Must End Section 702*, (May 23, 2023). And an earlier FISC opinion from October 2018 found that the FBI's querying and minimization procedures under Section 702 fell short of Fourth Amendment requirements. *See [REDACTED] Memorandum Opinion and Order*, Slip Op. at 2-3, 92 (FISA Ct. Oct. 18, 2018).

More recently, Congress has explored allegations that FinCEN prompted various banks to pursue specific searches regarding customer financial transactions that "keyed on terms and specific transactions that concerned core political and religious expression protected by the Constitution." *Financial Surveillance in the United States: How Federal Law Enforcement Commandeered Financial Institutions to Spy on Americans*, Interim Staff Report, Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, U.S. House of Rep. (Mar. 6, 2024).

The CTA is tailor-made for similar abuses and infringements upon civil liberties. Thus, the injunction should be maintained to prevent such egregious violations of the Fourth Amendment.

## Conclusion

For these reasons, this Court should deny the government's motion.

Dated:  December 18, 2024          Respectfully submitted,

*/s/ Neville S. Hedley*
Neville S. Hedley
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (312) 342-6008
Email: ned.hedley@hlli.org

*Counsel for Amicus Curiae*
*Hamilton Lincoln Law Institute*

**Proof of Service**

I hereby certify that, on December 18, 2024, I electronically filed this brief with the Clerk of the Court by using the appellate CM/ECF system. I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

December 18, 2024                    */s/ Neville S. Hedley*
                                     Neville S. Hedley

# Certificate of Compliance

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) and 32(c)(1) because:

In reference to Fed. R. App. P. 29(b)(4) this brief in opposition to the defendants' emergency motion to stay contains 2580 words according to the count of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Schoolbook font.

Executed on December 18, 2024.

*/s/ Neville S. Hedley*
Neville S. Hedley