No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL
OF THE UNITED STATES, *et al.*,

*Defendants-Appellants*.

# BRIEF AMICUS CURIAE OF THE
# NEW CIVIL LIBERTIES ALLIANCE
# OPPOSING EMERGENCY MOTION FOR
# STAY PENDING APPEAL

December 18, 2024

Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
sheng.li@ncla.legal

*Counsel for* Amicus Curiae

# CERTIFICATE OF INTERESTED PERSONS

No. 24-40792

TEXAS TOP COP SHOP, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,

*Defendants-Appellants*.

The undersigned counsel for *amicus curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees and Counsel**:

Texas Top Cop Shop, Inc.,
Russell Straayer
Mustardseed Livestock, LLC,
Libertarian Party of Mississippi
National Federation of Independent Business, Inc.,
Data Comm for Business, Inc.
Elizabeth Milito

Caleb Kruckenberg
Christian Clase
Center for Individual Rights
1100 Connecticut Avenue, NW Suite 625
Washington, D.C. 20036

Andrew Grossman
Baker Hostetler
1050 Connecticut Ave, NW Suite 1100

Washington, D.C. 20036

John Clay
Sullivan S|L Law PLLC 610
Uptown Boulevard, Suite 2000
Cedar Hil, TX 75104

**Defendants-Appellants and Counsel**

United States Department of Treasury
Financial Crimes Enforcement Network
Janet Yellen, United States Secretary of Treasury
Andrea Gacki, Director of Financial Crimes Enforcement Network
Merrick Garland, United States Attorney General

Faith Lowry
Stuart Robinson
Daniel Bentele
Hahs Tenny
Steven H. Hazel
Sophia Shams
U.S. Department of Justice
950 Penn. Ave., N.W.
Washington D.C. 20530

*Amicus*: The New Civil Liberties Alliance is a not-for-profit corporation exempt from income tax under section 501(c)(3) of the Internal Revenue Code. It does not have a parent corporation, and no publicly held company has a 10% or greater ownership interest in it.

*Counsel for Amicus*: Sheng Li of the New Civil Liberties Alliance.

*/s/ Sheng Li*
Sheng Li

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... iii
TABLE OF CONTENTS.................................................................................. iii
TABLE OF AUTHORITIES ............................................................................. iv
STATEMENT OF INTEREST.............................................................................1
SUMMARY OF ARGUMENT ............................................................................2
ARGUMENT ..................................................................................................4
    I.    COMMERCE CLAUSE REGULATIONS MUST TARGET ECONOMIC ACTIVITY ...........................................................................................4
    II.   THE CTA DOES NOT REGULATE PREEXISTING ECONOMIC ACTIVITY ............8
CONCLUSION ..............................................................................................12
CERTIFICATE OF SERVICE ...........................................................................13
CERTIFICATE OF COMPLIANCE ....................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gonzales v. Carhart*,
　550 U.S. 124 (2007) ............................................................................................. 11

*Gonzales v. Raich*,
　545 U.S. 1 (2005) ................................................................................................... 7

*Hodel v. Virginia Surface Min. & Reclamation Ass'n*,
　452 U.S. 264 (1981) ............................................................................................. 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
　567 U.S. 519 (2012) .............................................................................. 2, 7, 8, 11

*United States v. Lopez*,
　514 U.S. 549 (1995) .............................................................................. 2, 4, 8, 10

*United States v. Morrison*,
　529 U.S. 598 (2000) ......................................................................... 2, 4, 6, 8, 10

*United States v. Wrightwood Dairy Co.*,
　315 U.S. 110 (1942) ............................................................................................... 9

*Wickard v. Filburn*,
　317 U.S. 111 (1942) ................................................................................. 4, 5, 6, 9

**Statutes**

31 U.S.C. § 5336(a)(11) ............................................................................................. 9

Corporate Transparency Act,
　Pub. L. No. 116-283, 134 Stat. 4604 (2021) ....................................................... 2

## STATEMENT OF INTEREST

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil rights organization dedicated to defending constitutional freedoms from the depredations of the administrative state.[1] The "civil liberties" referenced in the organization's name include rights at least as old as the U.S. Constitution itself, such as the right to a jury trial, due process of law, and the right to have laws made by the nation's elected lawmakers through constitutionally prescribed channels (*i.e.*, the right to self-government).

NCLA is concerned by the Government's expansive interpretation of the Commerce Clause to authorize an administrative agency the power to regulate and obtain sensitive information from over 30 million for-profit and nonprofit corporate entities, irrespective of any connection to economic activity that affects interstate commerce. Such an interpretation would transform the Commerce Clause into a grant of general police power—a power the federal government does not possess and that belongs to the States.

---

[1] No counsel for a party authored any part of this brief. And no one other than the *amicus curiae*, its members, or its counsel contributed money that was intended to finance the preparation or submission of this brief. All parties have consented to the filing of this *amicus* brief.

## SUMMARY OF ARGUMENT

Justice Antonin Scalia warned that "if every person comes within the Commerce Clause power of Congress to regulate by the simple reason that he will one day engage in commerce, the idea of a limited Government power is at an end." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 657 (2012) ("NFIB") (Scalia, J., dissenting). Fortunately, the Supreme Court has drawn a bright line limiting the Commerce Clause's reach to only economic activities that have a substantial effect on national markets. Non-economic activities, such as violent crimes that may nonetheless impact commerce, fall outside of Commerce Clause powers. *See United States v. Morrison*, 529 U.S. 598 (2000); *United States v. Lopez*, 514 U.S. 549 (1995). Nor can a person's anticipated future economic activities be a basis for regulation. *NFIB*, 567 U.S. at 557.

The Government's request to stay the preliminary injunction of the Corporate Transparency Act (CTA), Pub. L. No. 116-283, 134 Stat. 4604 (2021) (codified at 31 U.S.C. § 5336), and its implementing regulation, ignores this important limitation. According to the Government, Congress may regulate the creation and continued existence of corporate persons based on the theory that such entities will one day engage in economic activities that impact interstate commerce. *See* Government Mot. at 9–11. This Court should deny the stay request because it is

based on a boundless interpretation of the Commerce Clause that is utterly incompatible with limited government.

The CTA mandates that any entity "created by the filing of a document" for incorporation under state law must submit detailed reports that include sensitive information to the U.S. Department of the Treasury (Treasury). *See* 31 U.S.C. § 5336(a)(11) (defining "reporting company" under the Act). Failure to comply, whether by omission or by submission of false information, results in civil and criminal penalties. These requirements are not tethered to commercial transactions nor to any other sort of economic activity. Nor are they limited to for-profit corporations but also apply to certain nonprofits, such as Plaintiff-Appellee the Libertarian Party of Mississippi.

The only "activity" that triggers CTA's reporting requirements is the entity being created by the filing of incorporation paperwork with the appropriate state official. Such mere filing is not an economic activity regulable under the Commerce Clause because it does not involve the production, consumption, or exchange of any good or service for which there is a national market. Nor can the Government anticipate future economic activity that a corporate person will one day engage in to justify regulating its birth and continued existence under the Commerce Clause.

The Government is unlikely to succeed on the merits in showing that the CTA falls within Congress's Commerce Clause power, so the Court should deny Defendants-Appellants' emergency request for a stay.

## ARGUMENT

I. **COMMERCE CLAUSE REGULATIONS MUST TARGET ECONOMIC ACTIVITY**

Congress's power under the Commerce Clause is broad but not boundless. "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 560. But the regulated activity must be economic in nature to begin with. *Id.* at 567. Hence, non-economic activities that affect commerce—such as violent crime—fall outside the ambit of the Commerce Clause. *Id.; see also Morrison*, 529 U.S. at 617.

Even *Wickard v. Filburn*, 317 U.S. 111 (1942), the "most far reaching example of Commerce Clause authority," involved the regulation of inherently economic activity. *Lopez*, 514 U.S. at 560. There, the Court upheld the Agricultural Adjustment Act's limits on wheat production. Filburn grew wheat for his own use beyond those limits, obviating the need to purchase wheat from the market. The existence of such a national market for wheat was central to the Court's holding that he violated the Act: "[T]he power to regulate commerce includes the power to regulate the prices at which commodities in that commerce are dealt in and practices affecting such prices. One of the primary purposes of the Act in question was to

4

increase the market price of wheat and to that end to limit the volume thereof that could affect the market." *Wickard*, 317 U.S. at 128 (internal footnote omitted). But for excess cultivation of wheat for personal use, Filburn would have purchased from the national market, thus (marginally) increasing demand and the price of wheat nationwide. *Id.* at 125–27. Because Filburn engaged in economic activity that affected the nationwide market, his conduct was a permissible subject of Commerce Clause regulation under current law.

While the existence of a national market for the regulated activity will sustain a Commerce Clause regulation, the lack of such a market is fatal because the regulated activity would be inherently non-economic. *Lopez* held that the Commerce Clause could not sustain a federal statute criminalizing firearm possession in school zones because gun possession does not "involve[] economic activity" like the cultivation of a product for which there is a national market in *Wickard*. 514 U.S. at 560. The Court rejected the Government's "cost of crime" argument, which was based on gun violence negatively impacting commerce, as a boundless interpretation of the Commerce Clause incompatible with limited government. *Id.* at 564. If Congress could regulate any activity that has an impact on commerce, the Court reasoned, it would be "hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id*. Indeed, virtually all human activity "related to the economic productivity of individual citizens" and even "family law

5

(including marriage, divorce, and child custody), for example" would become a permissible subject of federal regulation. *Id.* The Court drew a bright line between economic and non-economic activities, holding that firearm possession was in "no sense an *economic* activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567 (emphasis added).

The absence of economic activity likewise doomed a provision of the Violence Against Women Act of 1994, which created a federal civil remedy for gender-motivated violence. *Morrison*, 529 U.S. at 601, 617. In enacting that provision, Congress found that gender-motivated violent crimes negatively impact interstate commerce. That is undoubtedly so: violent crimes of all sorts are bad for commerce. But the Court nonetheless struck down the challenged provision because, notwithstanding their economic impact, "[g]ender-motivated crimes of violence [were] not, in any sense of the phrase, *economic* activity." *Id.* at 613 (emphasis added). *Morrison* thus "reject[ed] the argument that Congress may regulate noneconomic … conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617.

*Lopez* and *Morrison* recognized that certain activities by their nature are economic—and thus could be regulated under the Commerce Clause if they impact interstate commerce—while other activities are non-economic in nature and cannot be so regulated. In upholding the Controlled Substances Act's ban on cultivating

marijuana for personal medicinal use, *Gonzales v. Raich* crystallized the line between economic and non-economic activities. 545 U.S. 1, 17 (2005). Distinguishing *Lopez* and *Morrison*, *Raich* explained that "[t]he Act [at issue in *Lopez*] did not regulate any economic activity" and "[d]espite congressional findings that [gender-motivated violence] had an adverse impact on interstate commerce, [*Morrison*] held the [Violence Against Women Act of 1994] unconstitutional because, like the statute in *Lopez*, it did not regulate economic activity." *Id.* at 23, 25. By contrast, Raich was "cultivating, for home consumption, a fungible commodity for which there is an established, albeit illegal, interstate market." *Id.* at 18. Even though gun- and gender-based violent crimes undoubtedly impact commerce, they are not "economic" activities because they are not connected to any interstate market for goods or services. Conversely, the "production, distribution, and consumption of commodities" for which an interstate market exists—even for personal use—is "quintessentially economic" activity. *Id.* at 25–26.

Economic activity that Congress may regulate under the Commerce Clause must be preexisting. *See NFIB*, 567 U.S. 519. *NFIB* held that the Affordable Care Act's individual mandate to purchase qualified health insurance could not be sustained under the Commerce Clause because the "power to regulate commerce presupposes the existence of commercial activity to be regulated" and the individual mandate did not "regulate existing commercial activity." *Id.* at 550, 552 (cleaned

7

up). The majority rejected the Government's argument that Congress's Commerce Clause power could rest on regulated entities' future economic activity. *Id.* at 556. While "Congress can anticipate the *effects* on commerce of [preexisting] economic activity," it may not "anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *Id.* at 557 (emphasis in original). That is so even where, as the dissent pointed out, such economic activity in question "is virtually certain to occur" in the near future. *Id.* at 606 (Ginsburg, J., dissenting in relevant part).

At bottom, a law that does not regulate economic activity cannot be upheld under the Commerce Clause. *See NFIB*, 567 U.S. at 557; *Morrison*, 529 U.S. at 617; *Lopez*, 514 U.S. at 567. Economic activity must currently exist, not be anticipated to occur in the future. *NFIB*, 567 U.S. at 557; *id.* at 657 (Scalia, J., dissenting).

## II. THE CTA DOES NOT REGULATE PREEXISTING ECONOMIC ACTIVITY

The CTA cannot be sustained under the Commerce Clause because it does not regulate preexisting economic activity. The Act does not, as the Government contends (at 10), "target[] the very anonymous transactions that allow … financial crimes to occur." Nowhere does the Act impose financial reporting requirements on monetary transactions of any kind. Rather, the only "activity" of any sort that the CTA regulates is the "filing of a document" to incorporate under state law. 31 U.S.C. § 5336(a)(11). The Act notably does not limit the reporting requirements to those

8

actively engaging in commercial transactions or economic activity. For example, a newly formed entity that has not yet engaged in economic activity must still comply with the Act's reporting requirements. *See id.* (defining a "reporting company" as one "created by the filing of a document with a secretary of state").

The Act thus does not regulate financial transactions nor participation in any other market activity. Rather, reporting requirements are triggered solely by the filing of incorporation paperwork, and they persist throughout the corporate entity's continued existence. But a corporate entity's mere existence is no activity at all, let alone economic activity that Congress may regulate. Nor is the creation of a corporation by filing incorporation papers inherently economic because it bears no connection to the production, consumption, or exchange of goods or services for which there is a national market. Even the Agricultural Adjustment Act at issue in *Wickard*, a case representing the outer limit of the Commerce Clause's scope, regulated the production and introduction of a commodity into the market where increased supply could affect the national market for that commodity. 317 U.S. at 125–28. The same is true for the Court's other Commerce Clause decisions upholding statutes. *See, e.g.*, *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 116, 120 (1942) (upholding price regulations on "milk and certain other commodities"); *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264,

268, 281 (1981) (upholding Congress's regulations on coal because coal was a "commodity" and producing coal locally affects interstate commerce).

Like the Gun-Free School Zones Act and Violence Against Women Act, the CTA regulates non-economic activity. The filing of incorporation papers is in "no sense an economic activity that might, through repetition elsewhere, substantially affect … interstate commerce." *Lopez*, 514 U.S. at 567. For example, an entity filing for incorporation in Texas will not impact the availability or desirability of a Louisiana entity doing the same in its state. Like imposing liability for gender-motivated crimes of violence, imposing reporting requirements based on such filings is "not, in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613. Nor does the corporate person's continued existence after incorporation—without entering any transactions—affect commerce anywhere. Similar to gun possession or gender-motivated violence, there is no production, consumption, or exchange of goods and services for which there is a national market involved in the mere creation and continued existence of a corporate person.

The Government tellingly does not claim that the filing of incorporation paperwork is itself inherently economic in nature. Nor does it argue that coming into existence is an economic activity. Rather, it argues that most corporate persons that come into existence will engage in future economic activity. Government Mot. at 9–11. But so will all naturally born persons. That does not mean, however, that the

Commerce Clause confers general police power to regulate non-economic aspects of human life, including birth. *Cf. Gonzales v. Carhart*, 550 U.S. 124, 169 (2007) (reserving the question of whether federal partial-birth-abortion ban exceeds Commerce Clause powers) (Thomas, J., concurring). To the contrary, the Court has made clear that Congress's Commerce Clause power reaches only "preexisting economic activity." *NFIB*, 567 U.S. at 557. It thus cannot justify regulation based on anticipated future economic activity, such as the possible subsequent production or consumption of goods and services after filing for incorporation—or being born. *Id.* at 557; *see also id.* at 657 (Scalia, J., dissenting).

The CTA simply cannot withstand scrutiny under the Commerce Clause. On its face, the Act's provisions clearly target and regulate the mere act of entity incorporation. The Act establishes reporting requirements to the federal government, solely based on whether an entity was created by filing for incorporation under state law. It requires no production, consumption, or exchange of goods or services before the reporting requirements apply. Because of this omission, the CTA does not regulate economic activity. Every one of the Supreme Court's prior cases has required "preexisting economic activity" to precede regulation under the Commerce Clause. *NFIB*, 567 U.S. at 557. This case should be no different.

# CONCLUSION

For the foregoing reasons and those offered by the Appellees, this Court should deny the Government's emergency motion for a stay pending appeal.

Respectfully submitted,

*/s/ Sheng Li*
Sheng Li
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA 22203
(202) 869-5210
sheng.li@ncla.legal

December 18, 2024

*Counsel for* Amicus Curiae

# CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, an electronic copy of the foregoing brief *amicus curiae* was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF filing system and that service upon counsel for the parties will be accomplished using the CM/ECF system.

*/s/ Sheng Li*
Sheng Li

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it has 2,460 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

*/s/ Sheng Li*
Sheng Li