No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.*,

    *Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,

    *Defendants-Appellants*.

## BRIEF OF *AMICI CURIAE* NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS AND JOB CREATORS NETWORK FOUNDATION IN SUPPORT OF PLAINTIFFS-APPELLEES

Grady J. Block
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
gblock@mslegal.org
*Attorney for Amici Curiae*

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, National Association of Wholesaler-Distributers and the Job Creators Network Foundation submit this supplemental certificate of interested persons to fully disclose all those with an interest in this motion and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus Curiae*: National Association of Wholesaler-Distributers is a 501(c)(6) non-profit trade association. It has no parent corporation or subsidiary, it does not issue shares or securities, and no publicly held corporation owns 10% or more of its stock.

*Amicus Curiae*: Job Creators Network Foundation is a 501(c)(3) non-profit organization. It has no parent corporation or subsidiary, it does not issue shares or securities, and no publicly held corporation owns 10% or more of its stock.

*/s/ Grady J. Block*  
Grady J. Block

# TABLE OF CONTENTS

|  | Page |
|---|---|
| SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS..... | i |
| TABLE OF CONTENTS................................................................. | ii |
| TABLE OF AUTHORITIES .......................................................... | iii |
| INTEREST OF AMICI CURIAE..................................................... | 1 |
| SUMMARY OF THE ARGUMENT ............................................... | 2 |
| ARGUMENT ................................................................................. | 2 |
| I. THE DISTRICT COURT PROPERLY CONCLUDED THAT THE CTA IS LIKELY UNCONSTITUTIONAL................................ | 2 |
| II. "ENJOINING THE INJUNCTION" WOULD CAUSE IRREPARABLE HARM TO BUSINESSES............................... | 8 |
| III. PUBLIC INTEREST AND EQUITABLE FACTORS FAVOR DENIAL OF A STAY. .................................................. | 11 |
| CONCLUSION ............................................................................. | 13 |
| CERTIFICATE OF SERVICE ....................................................... | 14 |
| CERTIFICATE OF COMPLIANCE .............................................. | 15 |

# TABLE OF AUTHORITIES

**Case**                                                                                          **Page(s)**

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987) ................................................................................. 3

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ................................................................................... 4

*M'Culloch v. Maryland*,
   17 U.S. 316 (1819) ................................................................................. 5

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ............................................................................... 6, 7

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................... 4, 5

*Texas Top Cop Shop, Inc. v. Garland*,
   2024 WL 5049220 (E.D. Tex. 2024) ..................................................... 2

*United States v. Comstock*,
   560 U.S. 126 (2010) ............................................................................... 5

*United States v. Lopez*,
   514 U.S. 549 (1995) ............................................................................... 3

*Wickard v. Filburn*,
   317 U.S. 111 (1942) ............................................................................... 4

**Statutes**

31 U.S.C. § 5336(b)(1)(D) ............................................................................. 9

**Rules**

Fed. R. App. P. 26.1 ....................................................................................... i

Fed. R. App. P. 32(a)(5)(A) ........................................................................... 15

Fed. R. App. P. 32(a)(6) ................................................................................. 15

Fed. R. App. P. 32(a)(7)(B) ............................................................................ 15

Fed. R. App. P. 32(f) .............................................................................. 15

**Regulations**

*Beneficial Ownership Information Reporting Requirements*,
  87 Fed. Reg. 59,569 (Sept. 30, 2022) .................................................... 8

# INTEREST OF *AMICI CURIAE*[1]

National Association of Wholesaler-Distributors (NAW) is an employer and a non-profit, non-stock, incorporated trade association that represents the wholesale distribution industry—the essential link in the supply chain between manufacturers and retailers as well as commercial, institutional, and governmental end users. NAW is made up of direct-member companies and a federation of national, regional, and state associations across 19 commodity lines of trade which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation. The overwhelming majority of wholesaler-distributors are small-to-medium-size, closely held businesses. As an industry, wholesale distribution generates more than $8 trillion in annual sales volume providing stable and well-paying jobs to more than 6 million workers.

The Job Creators Network Foundation (JCNF) is a 501(c)(3) nonpartisan organization founded by entrepreneurs committed to educating employees of Main Street America about government policies that harm economic freedom. JCNF's Legal Action Fund defends against government overreach to ensure that America's free market system is not only protected but allowed to thrive. *Amici* file this brief

---

[1] All parties consented in writing to the filing of this brief, no party's counsel authored this brief in part or in whole, and no person other than *amici* and their counsel made any monetary contribution to fund its preparation or submission.

1

on their own behalf and on behalf of their members' companies, whose operations and employees are placed at risk by the Corporate Transparency Act (CTA).

## SUMMARY OF THE ARGUMENT

The district court's well-reasoned injunction against enforcement of the CTA rests on solid constitutional ground, recognizing that the statute's invasive reporting requirements likely exceed Congress's enumerated powers, infringe upon protected privacy and associational rights, and impermissibly intrude upon traditional areas of state authority. The government's request to "stay" the injunction disregards the government's own serious legal deficiencies in its argument while downplaying the immense and irreparable harm that small businesses, including wholesaler-distributors, will suffer under the CTA's burdensome mandates. When weighed against the government's speculative law enforcement justifications, the balance of equities and the public interest decisively favor preserving the injunction pending a thorough adjudication of the CTA's constitutionality.

## ARGUMENT

**I. THE DISTRICT COURT PROPERLY CONCLUDED THAT THE CTA IS LIKELY UNCONSTITUTIONAL.**

The district court's conclusion that the CTA "appears likely unconstitutional," *Texas Top Cop Shop, Inc. v. Garland*, No. 4:24-CV-478, 2024 WL 5049220 (E.D. Tex. Dec. 5, 2024), is premised on a rigorous application of controlling constitutional principles. The CTA's reporting mandates represent a "drastic two-

step departure" from the foundational precepts of federalism that undergird our system of dual sovereignty. *Id*. The Constitution's allocation of authority between the federal government and the States reserves the power to regulate the formation and internal governance of business entities to the States. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations[.]"). By attempting to arrogate to the federal government an unprecedented degree of control over this quintessentially local domain, Congress has violated the boundaries that the Framers delineated in the Constitution and encroached upon the sovereign prerogatives of the States.

The government's invocation of the Commerce Clause cannot absolve the CTA's constitutional infirmities. While the commerce power undoubtedly endows Congress with broad regulatory authority, it is not a license to "pile inference upon inference" to manufacture a nexus to interstate commerce where none exists. *United States v. Lopez*, 514 U.S. 549, 567 (1995). The attenuated connection between the CTA's reporting requirements and commercial activity falls far short of the "substantial relation" to **interstate** commerce necessary to justify federal intrusion into areas of traditional state concern. *Id*. at 559.

The CTA's regulatory scheme bears little resemblance to the comprehensive economic regulations that have been upheld under the Commerce Clause. Unlike the

statutes at issue in cases such as *Wickard v. Filburn*, 317 U.S. 111 (1942), and *Gonzales v. Raich*, 545 U.S. 1 (2005), the CTA does not target a specific commercial activity or seek to regulate a fungible commodity that flows through ***interstate*** markets. Rather, it indiscriminately conscripts state-created business entities into a federal reporting apparatus, irrespective of those entities' participation in interstate commerce. This approach, divorced from any meaningful consideration of the entities' actual economic footprint, stretches the Commerce Clause too far.

The district court's conclusion that the CTA exceeds Congress's authority under the Commerce Clause fits Supreme Court precedent, most notably the Court's decision in *NFIB v. Sebelius*, 567 U.S. 519 (2012). There, the Court invalidated the individual mandate provision of the Affordable Care Act, holding that Congress cannot "regulate individuals precisely because they are doing nothing." *Id.* at 552 (opinion of Roberts, C.J.) (upholding the ACA on other grounds).

The CTA contravenes this fundamental constitutional precept. Rather than regulating preexisting economic activity, the statute manufactures an artificial and unconstitutional reporting obligation—the disclosure of beneficial ownership information—and then purports to let the federal government regulate the very same disclosure that it wrongly compels. This bootstrapping logic is irreconcilable with *NFIB*'s central teaching: Congress cannot conjure commercial activity into existence as a pretext for expanding the federal government's control over private (or at least,

non-federal) activities. The Commerce Clause is not an infinitely elastic fount of federal power, it is only a limited grant of authority to Congress constrained by the structural boundaries of federalism.

Sanctioning the CTA's approach to Commerce Clause authority would yield a federal government of limitless reach, empowered to regulate every aspect of life. Congress is turning a State issue into a supposed "interstate" issue just so that Congress can purport to extend its own power; but State registration of businesses is not an "interstate" issue, and Congress has no right to regulate it.

Nor can the CTA's constitutionally flawed provisions be salvaged by resorting to the Necessary and Proper Clause. While that clause empowers Congress to enact laws that are "convenient, or useful" to exercise its enumerated powers, it is not an independent wellspring of federal authority. *See NFIB*, 567 U.S. 519, 560 (2012) ("Each of our prior cases upholding laws under that Clause involved exercises of authority derivative of, and in service to, a granted power."). The CTA's gratuitous imposition of onerous reporting burdens on small businesses can be characterized as neither "narrow in scope" per *United States v. Comstock*, 560 U.S. 126, 148, (2010) nor an "incidental" addition, *M'Culloch v. Maryland*, 17 U.S. 316, 365, (1819), to a valid federal regulatory scheme. Rather, it represents a sweeping expansion of federal power into a domain historically reserved to the States, untethered from any intelligible limiting principle.

The CTA's constitutional shortcomings go beyond its disregard for the structural boundaries of federalism. The statute's indiscriminate disclosure mandates also encroach upon individual rights secured by the First and Fourth Amendments. By requiring small-business owners to divulge a wealth of sensitive personal information—ranging from home addresses to government-issued identification numbers—the CTA works a profound intrusion into the sphere of constitutionally protected privacy. This wholesale abrogation of the right to confidentiality in one's personal affairs cannot be reconciled with the Fourth Amendment's protection against unreasonable searches and seizures.

Equally troubling are the CTA's implications for associational freedom. The compelled disclosure of ownership and control structures threatens to chill individuals' exercise of their First Amendment rights to associate for political, religious, or expressive purposes. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("This Court has recognized the vital relationship between freedom to associate and privacy in one's associations."). This concern is heightened when the disclosure requirements apply to organizations with expressive or political purposes, such as fundraising, as compelled identification of beneficial owners can deter individuals from associating or supporting such groups, chilling political engagement and free association.

The district court's skepticism of the CTA's beneficial ownership reporting

scheme is further buttressed by the critique offered in the testimony presented to Congress. *See* Harned, Karen, Testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, 116th Cong. (June 20, 2019)[2] at 6. As Ms. Harned explained, FinCEN Director Kenneth Blanco has candidly acknowledged the agency's inability to independently verify the accuracy of the beneficial ownership information collected under the CTA. *Id*. Blanco's admission lays bare a fundamental defect in the CTA's design: the statute compels the disclosure of sensitive personal data while offering no meaningful mechanism to ensure the integrity of the information unconstitutionally obtained.

Compelled disclosure of associational ties, the Supreme Court has held, must be justified by a compelling governmental interest and narrowly tailored to achieve that end. *See NAACP,* 357 U.S. 449, 462 (1958). Here, Congress's inability to ensure the accuracy of the reported information severely undermines the government's asserted interests in the CTA's supposed beneficial-ownership database. A repository of unverified, potentially inaccurate personal data is of dubious, at best, utility to the government's financial crime enforcement efforts and reinforces the district court's conclusion that the CTA's indiscriminate reporting requirements cannot withstand exacting scrutiny.

---

[2] https://www.banking.senate.gov/imo/media/doc/Harned%20Testimony%206-20-19.pdf

Measured against the Constitution, the CTA simply cannot withstand scrutiny. It impermissibly aggrandizes federal power at the expense of state sovereignty, transgresses the outer boundaries of Congress's enumerated powers, and impinges upon individual rights. The district court properly recognized that this expansion of federal authority into the realm of corporate transparency is not likely to succeed on the merits. Its decision to enjoin enforcement of the CTA pending adjudication makes sense.

## II. "ENJOINING THE INJUNCTION" WOULD CAUSE IRREPARABLE HARM TO BUSINESSES.

The government's motion disregards the extensive record showing the severe and irreparable harm that the CTA will inflict on small businesses. For the enterprises that make up *amici*'s membership, the costs of compliance—financial, operational, and constitutional—will be immense and unrecoverable.

As the district court found, and as corroborated by FinCEN's own economic assessments, the CTA imposes a draconian regulatory burden on reporting companies. Even under the most conservative estimates, small businesses will be compelled to spend between $85 and $2,615 per beneficial ownership report, solely to ascertain their obligations and assemble the requisite information. *See Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,569, 59,585 (Sept. 30, 2022). The financial toll will undoubtedly be greater for businesses with more complex ownership structures.

And these are not one-time expenditures but rather perpetual drains on business resources. The CTA imposes an ongoing reporting requirement, mandating the filing of updated beneficial ownership information following any change in reportable data. *See* 31 U.S.C. § 5336(b)(1)(D). For dynamic enterprises with evolving ownership structures, this obligation will cause continuous diversion of capital and manpower from productive economic activities to the deciphering of opaque regulatory commands. The related opportunity costs—foregone growth, hiring, and investment—are inevitable and substantial.

The CTA's injury to small businesses, however, transcends financial metrics. By compelling the disclosure of sensitive personal information, the statute works an extraordinary intrusion into the protected privacy and associational interests of small-business owners. The mandated reporting of residential addresses, birth dates, and copies of drivers' licenses tears away the presumptive confidentiality of personal data and exposes individuals to a panoply of risks, ranging from inadvertent disclosure to targeted misappropriation. Such intimate details, once relinquished to the federal government, cannot readily be reclaimed. No ultimate adjudication on the merits can restore the privacy interests compromised by premature disclosure.

The persistent ambiguity surrounding the scope of the CTA's requirements will only make these problems worse. The contours of the statute's conceptions of "beneficial ownership" and "substantial control"—the essential triggering

9

conditions for the reporting obligation—remain elusive. Yet the consequences of noncompliance are severe, exposing even inadvertent missteps to civil and criminal sanctions. Ensnared in this statutory thicket, many business owners will have no choice but to overcorrect, erring on the side of **overreporting** at the price of confidentiality. That is not what our Constitution requires of small businesses.

Further worsening the potential for irreparable harm is Congress's startling lack of awareness about the CTA's requirements among the small-business community. As a recent survey reveals, nearly half of small-business owners are entirely unaware of their new reporting obligations under the CTA.[3] This dearth of knowledge, coupled with the immediacy of the statutory compliance window, sets the stage for a wave of inadvertent violations by small-business owners acting in good faith. The CTA's penalties, which accrue by hundreds of dollars each day, will rapidly transform unsuspecting entrepreneurs into unwitting criminals, subject to enterprise-crippling fines and even imprisonment. There is simply no way the Founders of this Nation were hoping to trick small-business owners into becoming criminals.

The government's assurance that "FinCEN has engaged in a large-scale effort

---

3 Charles Mirabile & Sandra Feldman, New Survey – Half of Small Business Owners Are Unaware of the Corporate Transparency Act, WOLTERS KLUWER (Apr. 14, 2023), https://www.wolterskluwer.com/en/expert-insights/new-survey-half-of-small-business-owners-are-unaware-of-the-corporate-transparency-act.

to inform and encourage as many corporations to report as possible" scarcely alleviates these irreparable harms. Brief of Defendants-Appellants at 16. Indeed, FinCEN's "outreach" serves only to compound the constitutional injury by inducing the premature disclosure of sensitive information in the face of legal uncertainty. The government's professed concern that a stay will cause "many corporations to believe they no longer have to report," *id*. at 17, gets the whole thing completely backward. An unconstitutional reporting obligation cannot be bootstrapped into a justification for its own enforcement simply because regulated entities will otherwise default to the status quo.

The government's attempt to downplay the real-world hardships confronting small businesses under the CTA withers under scrutiny. *Amici*'s members, and entrepreneurs across the Nation, stand on the precipice of a fast-approaching compliance deadline that threatens to unleash a cascade of economic and constitutional harms. The district court has erected a critical bulwark against this gathering storm. Lifting that protection now, before the CTA's validity can be definitively adjudicated, would prematurely expose law-abiding enterprises to irremediable injuries. There is no good reason to "enjoin" the injunction.

## III. PUBLIC INTEREST AND EQUITABLE FACTORS FAVOR DENIAL OF A STAY.

Beyond the manifest threat of irreparable harm to regulated businesses, the public interest in preserving the Constitution's structural safeguards against federal

overreach weighs heavily in favor of keeping the injunction in place. The Constitution's carefully reticulated system of checks and balances, its diffusion of authority between federal and state governments, and its codification of inviolable individual rights represent a collective societal patrimony. When Congress oversteps the boundaries of its enumerated powers or tramples on protected liberties, all Americans suffer injury—not just the directly regulated parties.

The government's talismanic insistence that "enjoining" the district court's injunction will advance the public interest in "target[ing] financial crime and protect[ing] national security," Brief of Defendants-Appellants at 15, underlines the government's failure to demonstrate that the CTA's dragnet is necessary to the achievement of those objectives. There is no direct and meaningful nexus between ownership transparency and the government's asserted interests.

Finally, the government's request to "enjoin" the district court's injunction would pull the rug out from under businesses that have structured their affairs in reliance on the injunction. Since the court's order issued, *amici*'s members have allocated their limited resources and charted their operational plans against the backdrop of a legal status quo that does not include the CTA's onerous mandates. "Enjoining" the district court's injunction would overturn those settled expectations ***on the eve*** of the statutory reporting deadline, and doing so would thrust these businesses into a state of intolerable uncertainty, suddenly forced to fulfill costly,

unconstitutional obligations. The predictability of the business environment is itself a public good, one that is ill-served by the yo-yoing of CTA compliance requirements.

## CONCLUSION

For the foregoing reasons, NAW and JCNF respectfully urge this Court to deny the government's motion for a stay pending appeal.

DATED this 18th day of December, 2024.

Respectfully submitted,

*/s/ Grady J. Block*
Grady J. Block
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Fax: (877) 349-7074
gblock@mslegal.org

# CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Grady J. Block
Grady J. Block
Attorney for *Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 2,608 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

> */s/ Grady J. Block*
> Grady J. Block
> Attorney for *Amicus Curiae*