No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., et al.,

Plaintiffs-Appellees,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

# REPLY IN SUPPORT OF EMERGENCY MOTION
# FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

DAMIEN DIGGS
  *United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.h.hazel@usdoj.gov*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1 as appellants are all governmental parties.

*s/Steven Hazel*
Steven Hazel

**TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................1

ARGUMENT .................................................................................................1

I.     The CTA falls within Congress's constitutional authority............................1

II.     The remaining factors favor a stay............................................... 7

CONCLUSION ..............................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# INTRODUCTION

Plaintiffs' filing and the district court's recent denial of a stay pending appeal only confirm the points made in our motion: there is no basis for any injunction against an Act of Congress, much less a universal injunction. On the merits, plaintiffs rely almost exclusively on a case holding that Congress may not regulate a class of individuals defined by their inactivity, but the statute at issue here regulates a class of entities defined by their propensity to engage in commercial transactions. On the equities, plaintiffs steadfastly refuse to quantify their compliance costs or even to assert that they are substantial, and the district court has now recognized that the government's harms are real and significant and cannot be remediated if the injunction is later vacated. And on the scope of relief, plaintiffs rely almost entirely on supposed concessions by the government that the district court has now disclaimed and that are belied by the record.

# ARGUMENT

## I. The Corporate Transparency Act is a valid exercise of Congress's enumerated powers.

The CTA is authorized by Congress's commerce and necessary and proper powers. It regulates commercial entities and forms a part of a regulatory scheme that lies within the core of Congress's authority.

**A.** Plaintiffs' merits argument relies almost exclusively on a misreading of the Supreme Court's decision in *National Federation of Independent Business v.*

*Sebelius* (*NFIB*), 567 U.S. 519 (2012). Plaintiffs do not dispute that Congress holds authority to regulate commercial activity. Nor do they dispute that their businesses conduct commercial transactions. Instead, they claim that *NFIB* requires Congress to regulate commercial activity directly and prohibits it from regulating the class of "business entit[ies]" that currently and apparently uniformly engage in that activity. Resp. 10–12.

Nothing in *NFIB* justifies plaintiffs' artificial distinction between regulating economic activity and regulating the entities that engage in that activity. In *NFIB*, the Supreme Court's concern was not that Congress framed the insurance mandate as regulating a class rather than an activity, but rather that the mandate regulated individuals "whose commercial inactivity rather than activity is [their] defining feature." *NFIB*, 567 U.S. at 556–57 (opinion of Roberts, C.J.).

The CTA regulates corporate entities whose defining feature is commercial activity, not inactivity. Indeed, plaintiffs and their amici claim to represent hundreds of thousands of entities subject to the CTA yet fail to identify a single one that refrains from commercial activity. The CTA's connection to commerce thus does not depend on "prophesied future activity" that is "years, or even decades, away." *NFIB*, 567 U.S. at 557–58 (opinion of Roberts, C.J.). Instead, the reporting requirements generally apply to "corporation[s]" and "similar entit[ies]" that are currently doing business in the United States, 31 U.S.C. § 5336(a)(11)(A)—covering businesses operating for years before the requirements came into effect, *see id.*

§ 5336(b)(1)(B), and requiring both initial reports and reports of changes in ownership, *see id*. § 5336(b)(1)(C)-(D).

On its face, the Act makes clear that it regulates commercial activity. The Act combats money laundering, the financing of terrorism, and other illicit transactions, Pub. L. No. 116-283, div. F, § 6002(2), 134 Stat. 4547, 4547 (2021), by preventing criminals from evading detection by shielding their identities from law enforcement. *Id*. § 6402(3), 134 Stat. at 4604. The Supreme Court has repeatedly recognized Congress's authority to regulate "economic enterprise[s]," *United States v. Lopez*, 514 U.S. 549, 561 (1995), and to enact laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000). The reporting requirements at issue here, which target "reporting compan[ies]" in service of a larger effort to investigate and prevent harmful economic transactions, fall squarely within that authority. 31 U.S.C. § 5336(a)(11)(A).

That Congress proceeded by regulating the entities that engage in commercial transactions is entirely natural and does not render the CTA any less commercial. Plaintiffs' contrary argument is equivalent to saying that although Congress can regulate banks, regulations that might apply to an entity registered as a bank before it has served its first customer are regulations of inactivity and thus invalid—as applied not only to that bank but throughout the financial system.

Plaintiffs similarly fail to grapple with the "very high bar" governing facial challenges, *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), a point in our stay

motion that goes entirely unaddressed. *See* Mot. 11–12. Plaintiffs cannot "establish[] that no set of circumstances exists under which the [CTA] would be valid," *NetChoice*, 603 U.S. at 723 (quotation marks omitted). Doing so would require ignoring all of the circumstances, including plaintiffs' own, in which the statute applies to commercial actors. That is fatal to plaintiffs' likelihood of success.

**B.** The CTA is also authorized by the Necessary and Proper Clause because it effectuates other federal powers, including Congress's tax and foreign-affairs powers and the President's law-enforcement and national-security powers. Plaintiffs do not dispute that Congress has validly enacted prohibitions on tax fraud, terrorist financing, and other financial crimes. Nor do plaintiffs contest that the reporting requirements are "rationally related to the implementation" of those concededly valid prohibitions. *United States v. Comstock*, 560 U.S. 126, 134 (2010).

Instead, plaintiffs renew their mistaken reliance on *NFIB*. Resp. 15. In that case, the Supreme Court understood Congress to be claiming the "extraordinary" authority "to compel citizens" to engage in commercial activity. *NFIB*, 567 U.S. at 560, 554 (opinion of Roberts, C.J.). But nothing about the CTA is similarly extraordinary. "Regulation requiring the submission of information" is a "familiar" legislative response to enforcement challenges. *Electric Bond & Share Co. v. Securities & Exch. Comm'n*, 303 U.S. 419, 437 (1938). Congress has accordingly established numerous reporting requirements for businesses, from securities reporting, 15 U.S.C. § 78a *et seq.*, to individual and corporate tax returns, 26 U.S.C.

§§ 6012, 6031-6060.  The CTA thus embodies a far more modest exercise of federal power than creating a national bank, establishing a federal prison system, or enacting significant portions of the federal penal code—all of which the Supreme Court has sustained under the Necessary and Proper Clause.  *See Comstock*, 560 U.S. at 136.

For similar reasons, plaintiffs err in suggesting that the government's reliance on the Necessary and Proper Clause allows for "no limiting principle."  Response 15.  Legislation enacted pursuant to the Clause must effectuate a power vested in the federal government, *see Comstock*, 560 U.S. at 133–34; preserve "the structure of government established by the Constitution," *NFIB*, 567 U.S. at 559 (opinion of Roberts, C.J.); and comport with other constitutional provisions, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).  That the CTA comports with those constraints does not suggest that the same would be true of every hypothetical congressional enactment.

Plaintiffs do not appear to dispute that Congress can establish reporting requirements to facilitate tax collection but maintain that there is no "tax to which the CTA connects."  Resp. 16.  But Congress determined that the reporting requirements will increase deterrence and detection of "serious tax fraud" in many different areas, including the evasion of individual and corporate income taxes.  § 6402(3), (8), 134 Stat. at 4604–05.  And while plaintiffs warn that if Congress can require corporate ownership reporting, it could also compel reports regarding individuals' "assets," Resp. 16, Congress already directs many individuals and businesses to disclose

5

information about their assets on their tax returns. Plaintiffs' other examples misunderstand the limits on the government's position. Upholding the government's ability to require the disclosure of the beneficial owners of corporations does not imply that the government could require the disclosure of "friends and romances" or any other information with a less evident connection to the exercise of Congress's enumerated powers. *Id.*

Plaintiffs attempt to downplay the government's foreign-policy and national-security interests, Resp. 17, but Congress explained that anonymous transactions threaten national-security interests, including by facilitating terrorist financing, and the Executive Branch has agreed with that assessment. *See* § 6402(5)(B), (D), 134 Stat. at 4604; 87 Fed. Reg. 59,498, 59,498 (Sept. 30, 2022). Plaintiffs provide no persuasive basis to second-guess that determination.

**C.** Finally, plaintiffs' cursory references to the First and Fourth Amendment fail. The district court did not resolve those claims, and plaintiffs have failed to develop them in this Court. They are in any event meritless. The CTA fits comfortably within the category of reasonable reporting requirements that have long been understood as raising no First or Fourth Amendment concerns. Congress and States regularly enact such reporting requirements; the Supreme Court has rejected a Fourth Amendment challenge to a requirement that is similar to the CTA in many respects; *see California Bankers Ass'n v. Shultz,* 416 U.S. 21, 59-68 (1974), and plaintiffs cite no authority casting doubt on such requirements.

## II. The remaining factors favor a stay.

**A.** As the district court's order denying a stay pending appeal illustrates, the court's analysis of the equities was entirely dependent on its flawed assessment of the merits. The court acknowledged that "when a statute is enjoined, the Government necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." Dkt. No. 40 at 7 (quoting *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024)) (alterations omitted). It further recognized that the government's efforts to increase compliance with the CTA were "significant" and "in service of a laudable end," and that there is no "reason to suggest that the Government could completely remediate any harm as a result of the injunction." *Id.* at 8. The court justified its conclusion that the equitable factors support an injunction based solely on its erroneous view that an injunction was necessary to vindicate constitutional limits. Nothing about the district court's assessment of the equities thus justifies denying a stay, especially given the government's strong likelihood of success on the merits as discussed above.

Plaintiffs, for their part, fail to establish any meaningful injury that would result from a stay. They continue to refuse to quantify their compliance costs, or even to assert that they are substantial. They instead rely primarily on asserted constitutional rights, focusing their attention on claims under the First and Fourth Amendments that have never been credited by any court. *See Firestone v. Yellen*,

7

No. 3:24-cv-1034-SI, 2024 WL 4250192, at *9–11 (D. Or. Sept. 20, 2024); *Community Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597 (MSN/LRV), 2024 WL 4571412, at *8–9 (E.D. Va. Oct. 24, 2024). They further urge that a stay would moot these claims, which is inaccurate given that the CTA's reporting requirements are ongoing, and in any event would not be the sort of harm that could justify an injunction.

Plaintiffs also assert harms based on the proximity of the compliance deadline, but that argument ignores salient facts. Plaintiffs waited three and a half years after the CTA's enactment to initiate this suit, and as plaintiffs themselves recognize, "a substantial period of delay militates against an injunction." Resp. 25 (quotation marks omitted). This stay motion is being adjudicated shortly before the January 1, 2025, reporting deadline not because the government took days to file a stay motion, but because plaintiffs took years to file suit.

Plaintiffs acknowledge that the injunction has compelled the government to inform the public that companies are not currently required to comply with the statute. Resp. 21. They do not dispute that this notification slows the pace of reporting and will continue to do so as long as the injunction remains in effect. The suggestion that the government should have "been forthcoming about its plan to seek a stay," *id.*, tacitly concedes that a stay is necessary to prevent harm to the government.

Plaintiffs are also wrong to suggest that the government argued in district

8

court that the preliminary-injunction motion was "*premature*." Resp. 6 (plaintiffs' emphasis). What the government actually said was that a preliminary injunction would be inappropriate given how long plaintiffs waited to file this litigation, and that "regardless of their delay, Plaintiffs have not demonstrated that a preliminary injunction [wa]s necessary" to preserve the court's ability to render a decision on the merits given that at the time, six months remained before the compliance deadline in which the parties could have resolved the case through dispositive motions. Dkt. No. 18, at 8. The government withdrew that argument at the motions hearing, Resp. Ex. A, at 37, but in any event the relevant point throughout has been that these emergency proceedings would not be necessary if plaintiffs had filed their lawsuit earlier. Plaintiffs have provided no explanation for their failure to do so.

**B.** At a minimum, the injunction should be stayed insofar as it extends beyond the plaintiffs who have identified themselves. Although plaintiffs acknowledge that the district court must exercise equitable discretion in crafting an injunction, Resp. 25, they offer no response to the inherent unfairness of allowing absent parties to benefit from a favorable ruling when they would not be bound by an unfavorable one. Mot. 17–21. Even if plaintiffs were correct that the district court had authority—based on inherent authority or the Administrative Procedure Act—to issue nationwide relief, the district court's exercise of that authority here would be a clear abuse of discretion.

9

Plaintiffs' only defense of nationwide relief misunderstands the government's argument. The government argued in district court, as it has argued here, that relief to "NFIB's members who have not even been named or disclosed … would be effective nationwide relief." Resp. Ex. A, at 54. That was not a concession that such relief would be appropriate, as the district court later recognized. Dkt. No. 40, at 6. Rather, it was a contention that the same problems that arise from nationwide injunctions also arise from injunctions extending to members of organizations that have not identified themselves. And although plaintiffs suggest that the government "argued that even an injunction limited to NFIB's membership 'would totally frustrate the goals and aims of the CTA and its compliance standards,' *because of inconsistent application*." Resp. 25-26 (quoting Response Ex. A, at 54) (emphasis added), the government's argument did not relate to unfairness of requiring some parties to report and not others but instead related to the need for as comprehensive reporting as possible. *See* Resp. Ex. A, at 54 ("to be effective, there has to be participation").

There is therefore no basis for relief beyond the identified plaintiffs and NFIB members, much less relief beyond the parties altogether, particularly now that the district court has clarified that the government made no relevant concession. In its recent denial of the stay, the district court stated that broad relief was appropriate on the facts and circumstances of this case, without explaining why, and it suggested in a footnote that uniformity was necessary to

provide certainty to corporations about their compliance obligations. Dkt. No. 40, at 5 n.1, 6. But companies presumably know whether they have identified themselves in connection with this case and whether they are NFIB members. Even if universal relief might be appropriate under some circumstances, it was an abuse of discretion to provide it here.

## CONCLUSION

For the foregoing reasons and those given in our motion, the district court's order should be stayed pending appeal. In the alternative, the injunction should be narrowed to the companies that have been specifically identified in the district court or, at a minimum, to the members of NFIB.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

DAMIEN DIGGS
  *United States Attorney*

DANIEL TENNY
SOPHIA SHAMS

 *s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*
  *Steven.h.hazel@usdoj.gov*

December 2024

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,548 words.  This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 365 in Times New Roman 14-point font, a proportionally spaced typeface.

                                         *s/Steven H. Hazel*
                                         Steven Hazel

# CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                            *s/ Steven H. Hazel*
                                            Steven H. Hazel