Nos. 24-40792

# In the United States Court of Appeals for the Fifth Circuit

---

TEXAS TOP COP SHOP, INC. ET AL.,

*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, Attorney General of the United States, ET AL.,

*Defendants-Appellants.*

---

On Interlocutory Appeal from the United States District Court for the Eastern District of Texas No. 4:24-cv-478
Hon. Amos L. Mazzant

---

***AMICUS CURIAE* BRIEF OF COMPETITIVE ENTERPRISE INSTITUTE IN OPPOSITION TO DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

---

Devin Watkins
  *Counsel of record*
Dan Greenberg
COMPETITIVE ENTERPRISE INSTITUTE
1310 L Street NW, 7th Floor
Washington, DC 20005
(202) 331-1010
devin.watkins@cei.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for *amicus curiae* Competitive Enterprise Institute certifies that the following listed persons and entities have an interest in the outcome of this case:

**Plaintiffs-Appellees**

Texas Top Cop Shop, Inc.; Russell Straayer; Mustardseed Livestock, L.L.C.; Libertarian Party of Mississippi; National Federation of Independent Business, Inc.; Data Comm for Business, Incorporated

**Counsel for Plaintiffs-Appellees**

Caleb Kruckenberg; Center for Individual Rights; John Clay Sullivan; SL Law, P.L.L.C.; Andrew M. Grossman; Baker & Hostetler LLP

**Defendants-Appellants**

Merrick Garland, U.S. Attorney General; U.S. Treasury Department; Andrea Gacki, Director of the Financial Crimes Enforcement Network; FinCEN; Janet Yellen, Secretary of the U.S. Department of Treasury

**U.S. Department of Justice Counsel for Defendants-Appellants**

Daniel Tenny; Steven H. Hazel; Faith E. Lowry; Sophia Shams; Brian M. Boynton; Damien Diggs

**Amicus Curiae**

Eagle Forum Education & Legal Defense Fund; Americans for Prosperity Foundation; Competitive Enterprise Institute

**Counsel for Amicus Curiae**

Andrew L. Schlafly; Michael Pepson; Devin Watkins; Dan Greenberg

Undersigned counsel further certifies that *amicus curiae* Competitive Enterprise Institute is a non-profit corporation that does not have a parent corporation and that no publicly held corporation holds 10 percent or more of its stock.

These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*/s/ Devin Watkins*
Devin Watkins

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... ii

TABLE OF CONTENTS ................................................................... iv

TABLE OF AUTHORITIES ................................................................. v

INTEREST OF *AMICUS CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT .............................................................. 1

ARGUMENT ..................................................................................... 2

I.    Irreparable Burden: Ending Corporate Anonymity Is a Bell That Cannot Be Unrung ............................................................ 2

II.    The Government Is Likely to Lose On the Merits ........................ 6

    A. There Are Three Problems With the Government's Commerce Clause Arguments ................................................................. 7

    B. The Government's "Kitchen Sink" Argument Highlights Its Lack of Authority ................................................................. 11

CONCLUSION ................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Found. v. Bonta,* 594 U.S. 595 (2021) .............. 3

*Gonzales v. Raich,* 545 U.S. 1 (2005). ....................................................... 8

*NAACP v. Alamba,* 357 U.S. 449 (1958). .................................................. 5

*NFIB v. Sebelius,* 567 U.S. 519 (2012). ..................................................... 9

# INTEREST OF *AMICUS CURIAE*[1]

The Competitive Enterprise Institute is a nonprofit organization headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since its founding in 1984, the institute has focused on raising public understanding of the problems of overregulation. It has done so through policy analysis, commentary, and litigation.

# SUMMARY OF ARGUMENT

The Corporate Transparency Act (CTA) significantly undermines corporate anonymity. The Supreme Court has recognized that such compelled disclosure causes irreparable harm, because courts will be unable to unring the bell of compelled disclosure.

The potential for unauthorized leaks, such as the 2015 data breach from the Office of Personnel Management, demonstrates the government's inability to guarantee the security of sensitive information. The repercussions of such disclosures can be devastating, exposing individuals and entities to harassment and intimidation.

---

[1] No counsel for any party to this appeal has authored this Amicus Brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this Brief.

Overbroad disclosure requirements risk deterring corporate and organizational activities, stifling freedom of association, and chilling free speech, particularly for advocacy groups like Plaintiff the Libertarian Party of Mississippi.

The CTA exceeds Congress's constitutional authority, violating principles established under the Commerce Clause. The government's broad interpretation of economic activity is contrary to *Gonzales v. Raich* (2005). The harms the government asserts are based on predicted future behavior, which is an approach that the Supreme Court rejected in *NFIB v. Sebelius* (2012).

The risk of substantial harm and lack of any plausible argument for the measure's constitutionality justify affirming the district court's preliminary injunction.

## ARGUMENT

I. **Irreparable Burden: Ending Corporate Anonymity Is a Bell That Cannot Be Unrung**

The Corporate Transparency Act effectively destroys corporate anonymity. The government itself acknowledges that the "CTA thus effectively prohibits many anonymous economic transactions." Defendants-Appellants' Emergency Motion for Stay Pending Appeal 9.

This mandated loss of anonymity imposes grave and irreparable harm, not only upon the plaintiffs but also upon countless private corporations impacted.

The Supreme Court has long recognized that forced disclosure of private information causes irreparable harm. In *Maness v. Meyers* (1975), the Court noted that compelled disclosure of private information causes "irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released." *Maness v. Meyers,* 419 U.S. 449, 460 (1975) . Once corporations have disclosed information, the harm to anonymity is permanent and irreversible. Because the Court cannot order people to forget what they now know, there is little this Court can do to reverse that breach of anonymity.

Even when the government pledges to protect disclosed information, the reality is that unauthorized leaks are disturbingly common. For instance, in *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021), although donor data was supposed to be disclosed only to the government, thousands of the organization's donors were disclosed on the government's website. *Id.* at 604. Although the breach was unintentional, that disclosure underscores the inherent

vulnerability of sensitive data to unauthorized disclosure once it has been collected. Similarly, the 2015 breach of the Office of Personnel Management's database, which exposed the private information of millions of federal employees, further demonstrates the government's inability to guarantee the privacy of even its own employees' records.

The consequences of disclosure can be devastating. In *AFPF*, the organization received "threats, harassing calls, intimidating and obscene emails, and even pornographic letters." *Id*. Allowing disclosure of private information about corporate control would enable such harassment campaigns to intimidate companies into changing policies. Another inherent possibility is creating a chilling effect on corporate operations, because businesses may alter policies or self-censor to avoid such intimidation.

Furthermore, it is reasonable to anticipate that the First Amendment associative rights of many organizations will be harmed through disclosure of their identity, at least with respect to expressive associations like Plaintiff the Libertarian Party of Mississippi. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on

freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved." *NAACP v. Alamba*, 357 U.S. 449, 462 (1958).

Moreover, the Act's broad application even includes many churches which are not classified as 501(c)(3) organizations and therefore do not qualify for exemptions. Such disclosures could deter religious participation, suppress dissenting voices, and stifle the free exercise of religion. The same applies to media companies, whose disclosure of ownership could have a chilling effect on their editorial independence when writing critical stories about the government. The dangers of junking anonymity are extensive and profound.

The potential harm of the CTA is magnified by its scope. The Act applies to nearly every private company in the United States, including small businesses, religious institutions, and advocacy organizations.

The burdens imposed by the Act extend beyond privacy concerns to include substantial financial and administrative costs. The aggregate costs in time and money that compliance with this statute requires deserve consideration. It is a massive drain on the resources of small businesses all over the country. Relatively large businesses will likely

find such compliance burdens to be comparatively bearable; relatively small businesses will not. This can lead to a destructive, anti-competition, anti-consumer dynamic that ultimately diminishes the number of market participants.

This Court should consider the extensive and irreversible consequences of the CTA and weigh them against any purported governmental interests. The harms—both individual and collective—are too great to ignore. Accordingly, the Court should act to protect the rights of the plaintiffs and other similarly situated entities by preliminarily enjoining the enforcement of the CTA.

## II. The Government Is Likely to Lose On the Merits

The government is likely to lose on the merits. Its Commerce Clause arguments are directly contrary to Supreme Court precedent. The government's Commerce Clause argument is, in effect, a retread of its failed argument in *NFIB v. Sebelius* (2012); furthermore, its commerce power analysis relies on a definition of "economic" that has been foreclosed in *Gonzales v. Raich* (2005). Furthermore, the government's other arguments don't even appear to be a serious attempt to justify the statute. This Court should not permit assertions

of authority that have failed in the past to continue causing harm until litigation concludes.

### A. There Are Three Problems With the Government's Commerce Clause Arguments

*First*, the government conflates what corporations could do with what they actually do. The government describes corporations as "entities authorized to engage in various economic transactions, such as '[m]ak[ing] contracts,' 'borrow[ing] money,' 'incur[ring] liabilities,' and transferring 'real or personal property.'" Defendant-Appellant's Emergency Motion for Stay Pending Appeal 9. While many corporations are capable of these activities, they are hardly activities inherent in all corporations. These distinctions are relevant because the statute applies even to businesses that engage in none of these transactions.

Similarly, the government erroneously argues that every corporation is "by its nature, commercial." *Id*. at 11. For many corporations, the government's claim is demonstrably false. For instance, many churches are incorporated entities that have no commercial purpose whatsoever. Treating all corporations as inherently commercial ignores the diversity of corporate purposes and structures.

*Second*, the government incorrectly claims these activities constitute "economic activities" falling within its authority under the Commerce Clause. The government's broad definition of "economic activities" cannot be reconciled with the Supreme Court's definition of that concept in *Gonzales v. Raich* (2005). After describing the "activities by the [Controlled Substances Act as] quintessentially economic," the Supreme Court defined "economic" under the Commerce Clause as: " 'Economics' refers to 'the production, distribution, and consumption of commodities.' " *Gonzales v. Raich*, 545 U.S. 1, 26 (2005). Establishing a new business, registering a business, or just owning some shares does not meet the Supreme Court's definition of economic activity in *Raich;* it therefore cannot be considered economic activity under binding precedent.

*Third*, no corporation engages in such activities at the moment of creation or registration. To the extent that the government argues that corporations will engage in such activities in the future, this species of argument has already been rejected by the Supreme Court in *NFIB v. Sebelius* (2012): "The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds no

support in our precedent." *NFIB v. Sebelius*, 567 U.S. 519, 557 (2012). The government must wait until a corporation engages in regulable activities before asserting its authority; it cannot preemptively regulate based on prophesized future behavior.

    These deficiencies are particularly evident in the case of the Libertarian Party of Mississippi, one of the Plaintiffs. This nonprofit advocacy membership organization operates solely within Mississippi. Its activities consist of accepting donations and using that money to advocate its views; it operates in a way that is not too dissimilar from a church. There is nothing inherently commercial or economic about Plaintiffs' activities, and there is no basis for the federal government to regulate Plaintiffs' private internal affairs.

    Of course it is true that some entities may engage in economic activities that are potentially regulable by the federal government. But in order to stay within constitutional bounds, the government must enact a statute that targets those activities. The Corporate Transparency Act fails to do so. It is not, as the government claims, "plainly constitutional as applied to" such Plaintiffs, and that is because

9

its breadth prevents it from being validly enacted under federal authority.

Citizens are obligated to follow statutes that Congress has the authority to enact and that are signed into law. Because the Corporate Transparency Act exceeds Congress's authority, it was never validly enacted. When a statute is fundamentally flawed in its enactment, no application of the statute can be valid.

The government's attempt to invoke the Foreign Commerce Clause fares no better. This statute regulates local businesses at the moment of their creation or merely because they exist, with no required connection to foreign commerce. The government has provided no explanation of how the statute is relevant to foreign trade (just as it failed to explain how the statute is relevant to interstate commerce). Consequently, the government's reliance on the Foreign Commerce Clause is equally misplaced.

These deficiencies make it clear that the government's Commerce Clause arguments cannot support success on the merits.

## B. The Government's "Kitchen Sink" Argument Highlights Its Lack of Authority

The government asserts that numerous additional powers—some of them quite vaguely described—justify the Corporate Transparency Act. Such assertions only serve to highlight the lack of legitimate authority to enact the statute at issue. For instance, the government argues that the Act is needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." Defendants-Appellants' Emergency Motion for Stay Pending Appeal 13.

These so-called "international standards" are not part of a treaty ratified under the Treaty Clause of the Constitution. Instead, they are recommendations developed by the U.S. Department of State and other allies that could be modified at any time. Such recommendations are absolutely irrelevant to Congress's scope of authority under any enumerated power.

Even if these recommendations had been formalized as part of an international treaty, they would not suffice to authorize this federal regulation. The Treaty Clause was designed to be "exercised principally on external objects, as war, peace, negotiation, and foreign commerce."

11

The Federalist No. 45. As James Madison explained during the ratification debates, the Treaty Clause was designed for "the regulation of intercourse with foreign nations" and other "external" matters. 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution 378 (Jonathan Elliot ed., 1836). Likewise, Thomas Jefferson noted that "the Constitution must have intended to comprehend only those subjects which are usually regulated by treaty, and cannot otherwise be regulated." Thomas Jefferson, A Manual of Parliamentary Practice 310 (Samuel Harrison Smith ed., 1801).

The government's reliance on these international standards does nothing to establish a legitimate basis for the Corporate Transparency Act under the Constitution.

Similarly, the government's resort to the tax power is accompanied only by vague and mysterious claims. The government does little more to show that this statute is needed than providing a set of unfounded assertions along with a citation that Treasury officials can access the information. Much more would have to be provided to demonstrate necessity.

Indeed, the government's argument that it doesn't need to show "a direct connection between a statute and a single specific enumerated power" only illuminates the absence of any such connection to any such power.

## CONCLUSION

For the foregoing reason, this Court should affirm the district court's preliminary injunction.

Dated: December 19, 2024                    Respectfully submitted.

/s/ Devin Watkins
Devin Watkins
  *Counsel of record*
Dan Greenberg
COMPETITIVE ENTERPRISE INSTITUTE
1310 L St. NW, 7th Floor
Washington, D.C. 20005
(202) 331-1010
Devin.Watkins@cei.org
Dan.Greenberg@cei.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(A) because it contains 2110 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

*/s/ Devin Watkins*
Devin Watkins

## CERTIFICATE OF SERVICE

I, Charles Devin Watkins, hereby certify that this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Devin Watkins*
Devin Watkins
