No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.*,
*Plaintiffs-Appellees*,

v.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,
*Defendants-Appellants*.

On Emergency Motion for Stay Pending Appeal

## *AMICUS CURIAE* BRIEF OF THE BUCKEYE INSTITUTE IN SUPPORT OF PLAINTIFFS-APPELLEES AND DENIAL OF THE MOTION TO STAY

Robert Alt
  *Counsel of Record*
Jay R. Carson
David C. Tryon
Alex M. Certo
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, OH 43215
(614) 224-4422
Robert@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

*Texas Top Cop Shop, Inc., et al. v. Garland, et al.*
No. 24-40792

The undersigned counsel of record for amicus The Buckeye Institute certifies that The Buckeye Institute is an Ohio nonprofit organization. Pursuant to Fed. R. App. 29(a)(4)(E), The Buckeye Institute has authored this brief in whole. Counsel is not aware of any person or entity as described in the fourth sentence of Rule 28.2.1 that have an interest in the outcome of this case other than those listed in the parties' certificates. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

    /s/ *Robert Alt*
    Robert Alt
    *Attorney of record for*
    *The Buckeye Institute*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(a)(4)(A) and 26.1 of the Federal Rules of Appellate Procedure, *amicus* states that it is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3); as such, it has no parent corporation, issues no stock, and thus no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

CORPORATE DISCLOSURE STATEMENT ........................................................ii

TABLE OF AUTHORITIES................................................................................iv

INTEREST OF *AMICUS CURIAE* ......................................................................1

SUMMARY OF THE ARGUMENT.......................................................................1

ARGUMENT .........................................................................................................3

   I.    The First Amendment Does Not Limit the Protection of Anonymous Association to Nonprofit or Political Entities ....................................................3

   II.   There are Legitimate Reasons for Corporate Anonymity ...............................7

CONCLUSION ....................................................................................................12

CERTIFICATE OF COMPLIANCE ....................................................................13

CERTIFICATE OF SERVICE..............................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) .................................................................................... 2, 5, 6

*City of Norwood v. Horney*,
 853 N.E.2d 1115 (Ohio 2006) ............................................................................ 11

*Dayton Bd. of Educ. v. Brinkman*,
 439 U.S. 1358 (1978 ............................................................................................ 4

*Elrod v. Burns*,
 427 U.S. 347 (1976) ............................................................................................ 4

*Gibson v. Fla. Legislative Investigation Comm'n*,
 372 U.S. 539 (1963) ............................................................................................ 4

*Kelo v. City of New London, Conn.*,
 545 U.S. 469 (2005) .......................................................................................... 11

*Louisiana ex rel. Gremillion v. NAACP*,
 366 U.S. 293 (1961) ............................................................................................ 4

*Louisiana v. Becerra*,
 20 F.4th 260 (5th Cir. 2021) ............................................................................... 3

*NAACP v. Alabama*,
 357 U.S. 449 (1958) ........................................................................................ 2, 5

*Nat'l Org. for Marriage, Inc. v. United States*,
 24 F. Supp. 3d 518 (E.D. Va. 2014) ................................................................. 11

*Texas v. United States*,
 787 F.3d 733 (5th Cir. 2015) ........................................................................... 3, 7

*Washington v. Trump*,
 847 F.3d 1151 (9th Cir. 2017) ............................................................................ 4

**Statutes**

Tex. Gov't. Code Ann. §2206.001 .......................................................................... 11

**Other Authorities**

Amanda Lubin, *How Walt Disney World is Fueling Jobs and Economic Prosperity*, Orlando Economic Partnership (May 9, 2024) .................................. 10

Daniel Ganninger, *How Walt Disney Secretly Bought the Land for Walt Disney World*, Medium (May 2, 2024) .......................................................... 9, 10

EJ Dickson, *How a Small-Town Bakery in Ohio Became a Lightning Rod in the Culture Wars*, Rolling Stone (July 18, 2019) .................................................. 8

*Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax returns*, NPR (Jan. 30, 2024) ............................................................................ 12

Isaac O'Bannon, *IRS Exposes Confidential Data on 120,000 Taxpayers on Open Website*, CPA Practice Advisor (Sep. 02, 2022) .......................................... 11

William Moon, *Anonymous Companies*, 71 Duke L.J. 1425 (2022) .................... 7, 8

**Regulations**

Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498 (Sept. 30, 2022) ................................................................................ 6

## INTEREST OF *AMICUS CURIAE*[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute works to restrain governmental overreach at all levels of government. In fulfillment of that purpose, The Buckeye Institute files lawsuits and submits amicus briefs.

## SUMMARY OF THE ARGUMENT

The stay of an injunction pending appeal is no small matter, which is especially true where the district court has enjoined a statute that is constitutionally suspect for multiple reasons. In this case, the district court enjoined enforcement of the Corporate Transparency Act ("CTA") because it likely exceeded Congress's authority to regulate under the Commerce Clause. The district court thus did not need to reach the plaintiffs' other constitutional arguments. But those additional arguments should not be discounted in weighing whether to stay the district court's injunction. The CTA's beneficial ownership information ("BOI") disclosure

---

[1] Pursuant to Rule 29, The Buckeye Institute states that no counsel for any party has authored this brief in whole or in part and no person other than the *amicus* has made any monetary contribution to this brief's preparation or submission.

1

requirements apply to commercial, for-profit entities and are little different from California's nonprofit membership and donor information reporting requirements struck down by the Supreme Court of the United States in *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ("*AFPF*") and *NAACP v. Alabama,* 357 U.S. 449 (1958). Although those cases involved reporting by nonprofit corporations, the privacy interests in protecting donors from harassment by the public or the government itself, are similar to the privacy interests of owners or investors in for-profit ventures.

Holders of beneficial interests in for-profit entities have legitimate reasons for preserving anonymity. The government seems to assume that the only reasons for corporate anonymity are nefarious. This view overlooks many circumstances where businesses engage in perfectly legal conduct that members of the public—or the government—might find offensive, immoral, or politically undesirable. Further, the disclosure of deep-pocketed beneficial owners could easily make otherwise modest businesses targets of litigation. Setting aside political controversy, corporate anonymity decreases friction in the operation of markets and facilitates business opportunities that could not otherwise exist, which is consistent with a fundamental precept of business law: Corporations have separate personhood from their owners.

To the extent that the government assures the approximately 32 million private entities that their data will remain protected from improper disclosure, the

government's record on safeguarding such information is not encouraging. Moreover, the Framers designed the First Amendment's associational freedom to protect citizens' right to associate *from* the government. Assurances that the government will protect the information it gathers offer little solace when citizens seek to keep their associations confidential from government itself.

## ARGUMENT

### I. The First Amendment Does Not Limit the Protection of Anonymous Association to Nonprofit or Political Entities.

Because the district court granted its injunction based upon Congress's lack of authority, it did not reach the First Amendment freedom of association question raised by the Plaintiffs. But that does not mean that the Court should overlook the serious First Amendment implications of staying the injunction and allowing the CTA's sweeping mandate to take effect. In deciding whether to grant a stay pending appeal, the Court must consider not only the showing on the merits below, but "whether issuance of the stay will substantially injure the other parties interested in the proceeding; and where the public interest lies.'" *Texas v. United States*, 787 F.3d 733, 746–47 (5th Cir. 2015). Rigorous analysis is always required in determining whether to stay an injunction of the future enforcement of a statute that has not yet taken effect and is "especially" needed "because preserving the status quo 'is an important' equitable consideration in the stay decision. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (quoting *Dayton Bd. of Educ. v. Brinkman*, 439 U.S.

1358, 1359 (1978)). Because the "deprivation of constitutional rights 'unquestionably constitutes irreparable injury,'" *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), the analysis should be all the more rigorous when the stay implicates enumerated constitutional rights.

Here, the CTA's disclosure requirements substantially curtail citizens' well-established right to associate anonymously. Indeed, First Amendment jurisprudence makes clear that a key aspect of associational freedom is the right to be free from reporting one's associations to the government. Since *NAACP,* the U.S. Supreme Court has consistently applied exacting scrutiny to forced disclosures that threaten freedom of association. To meet this burden, the government must "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest," *Gibson v. Fla. Legislative Investigation Comm'n*, 372 U.S. 539, 546 (1963), and any such compelled disclosure must be "narrowly drawn," *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961) (citation omitted).

The Supreme Court recently reaffirmed this commitment to anonymous association in *AFPF*, through which the Court struck down California's requirement that nonprofit organizations provide certain donor information to the state's Attorney General. The purported reason for the disclosure in *AFPF*, like here, was a vaguely

defined interest in fraud prevention and the misuse of corporate entities. *See AFPF*, 594 U.S. at 612.

The Court held that the disclosure requirements were not sufficiently narrowly tailored to justify an intrusion on donors' and organizations' associational privacy rights, noting "that '[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action.'" *Id.* at 606–07 (quoting *NAACP,* 357 U.S. 449, 462 (1958)). The *AFPF* decision echoed the *NAACP* Court's holding that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and noting "the vital relationship between freedom to associate and privacy in one's associations ...." *Id.* (quoting *NAACP*, 357 U.S. at 460, 462). "Because NAACP members faced a risk of reprisals if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest 'sufficient to justify the deterrent effect' of disclosure, [the Court] concluded that the State's demand violated the First Amendment." *Id.* at 607 (citation omitted). Significantly, the Court's concern in both *AFPF* and *NAACP* implicated disclosure of the association to the government itself, not merely the risk that the information might eventually be disclosed to the public.

The *AFPF* Court emphasized that "[n]arrow tailoring is crucial where First

5

Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *AFPF*, 94 U.S. at 609 (citations omitted). As its text and breadth make clear, the CTA is anything but narrowly tailored. By the government's own reckoning, it will require nearly 32 million private entities to provide significant personal information on its beneficial owners. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59584 (Sept. 30, 2022). The rationale for this disclosure is that shell companies can be used in money laundering transactions. Of course, many money launderers operate without shell companies. And there is no indication in the CTA or the government's filings that a significant number of American small businesses are money laundering fronts. The CTA thus presents the same "dramatic mismatch" between the interests that the government "seeks to promote and the disclosure regime that [it] has implemented in service of that end." *AFPF*, 594 U.S. at 612–13. Indeed, the CTA's scale and intrusiveness dwarf the impact of the rule struck down in AFPF, which affected 60,000 reporting entities. *See id*.

Allowing the government to enforce the CTA's reporting requirements would significantly alter the status quo and create substantial constitutional harm—harm that should weigh in this Court's balance of the equities against the emergency motion for a stay.

**II. There are Legitimate Reasons for Corporate Anonymity.**

Setting aside the constitutional question, the Court must address whether "issuance of the stay will substantially injure the other parties interested in the proceeding; and where the public interest lies." *Texas*, 787 F.3d at 746–47. Even if the Plaintiffs' injuries were not constitutional in nature, granting a stay pending appeal would still injure the millions of reporting entities and run contrary to the public interest. The government's apparent predicate that beneficial owners' ability to act anonymously through "shell corporations" is an unalloyed evil thus merits examination here.

Scholars have documented what common sense and experience teach: There are innumerable entirely legitimate reasons why a beneficial owner of a corporate entity might want to keep his, her, or its beneficial ownership anonymous. In his article, *Anonymous Companies*, 71 Duke L.J. 1425 (2022), Professor William Moon documented some of those reasons. First, for-profit corporations often face the same political and reputational risks as nonprofits that advocate for specific policies. Professor Moon notes that "privacy is sought out by those who want to invest in promising and innovative business ventures but seek protection from potential threats of violence or backlash. Privacy interests are particularly strong among commercial enterprises that operate in morally contestable industries, including reproductive health care, firearm sales, gene-editing technology, cannabis, and

pornography." *Id.* at 1449. He points to abortion providers in Louisiana as an example, "where anti-abortion regulations have driven out all but a handful of abortion-care providers." *Id.* (noting that providers have been "targeted at private offices, hospitals, and disturbingly, their children's daycare centers."). One might imagine similar action against a private company that provided transportation to out-of-state abortion providers. These privacy concerns are broad and not limited to one philosophy or political affiliation. For example, beneficial owners of companies that sell firearms and ammunition wholly legally may nonetheless have good reason for wishing to keep their ownership interest anonymous.

But it is not only businesses engaged in controversial issues that have good reason for wanting to keep their owner's identities anonymous. Consider the case of Gibson's Bakery in Oberlin, Ohio. Gibson's existed for over 130 in this small college town, selling pastries to students and Oberlin College itself. When one of Gibson's employees stopped an African American student from shoplifting, the event became a flashpoint for race relations, with the College and students charging the bakery and its owners with systemic racism. The owners, who were publicly known, faced significant threats and harassment for months afterward. *See* EJ Dickson, *How a Small-Town Bakery in Ohio Became a Lightning Rod in the Culture Wars*, Rolling Stone (July 18, 2019), https://tinyurl.com/57snputt. While the owners eventually obtained a substantial judgment against Oberlin College for defamation and tortious

interference related to the false racially-charged smears, the lesson for businesses servicing colleges and students is clear. In a politically-charged climate, any small business—even one that engages in something as noncontroversial and mundane as selling baked goods—and its owners—can quite suddenly find themselves in a political firestorm.

There are other purely commercial reasons why a beneficial owner might want to operate through shell companies. In fact, without such companies and the ability to keep the beneficial owner's identity private, some business development would be impossible. Land developers face particularly daunting costs when attempting to acquire multiple parcels to consolidate for large industrial, commercial, or even residential projects, which provide real and substantial benefits to previously undeveloped, under-utilized areas. These projects are in the public interest and can be undermined by land speculation should the plans become public before the purchase.

Consider, for example, the development of the Walt Disney World theme park in Orlando. When Disney began acquiring land in central Florida, prices were as low as $107/acre, with sellers often eager to unload "useless swampland." Daniel Ganninger, *How Walt Disney Secretly Bought the Land for Walt Disney World*, Medium (May 2, 2024), https://medium.com/knowledge-stew/how-walt-disney-secretly-bought-the-land-for-walt-disney-world-21d24de723e9. It took the Disney

9

enterprise nearly a year to acquire the necessary land for its planned resort. Overall, the investment made by Disney to open the Walt Disney World resort was reported to be approximately $400 million. Once the plans to acquire land and construct the park became known, however, speculation drove up the price of land in the area to as much as $80,000/acre. It is estimated that, if prevented from acquiring the necessary land in confidence without disclosure of its identity, the land alone for Disney World would have cost shareholders over $2.2 billion, which would have exceeded the total market capitalization of the entire company at the time. *Id.*

Fortunately for the Orlando area, the State of Florida, and—even—the global image of the United States through one of its most recognized and valuable brands, Walt Disney and his attorney, Paul Helliwell, did not have to rely upon magic or wishing stars because they were able to set up acquisition companies including Florida Ranch Lands, Reedy Creek Ranch Corporation, and Latin-American Development and Management Corporation to shield the identity of the prominent party acquiring land tracts at wholesale rates. Had the buyer's identity become known, it is likely that the veritable institution that is Disney World would not exist, along with its 80,000 jobs. Amanda Lubin, *How Walt Disney World is Fueling Jobs and Economic Prosperity*, Orlando Economic Partnership (May 9, 2024), https://news.orlando.org/blog/how-walt-disney-world-is-fueling-jobs-and-economic-prosperity/. Employees not only benefit the community with wages

derived from the park's operation, but they inject life into the area as residents, volunteers, and inspiration for children and adults alike.[2]

The government might well argue that unlawful dissemination of BOI collected under the CTA is unlikely and point to the Act's provisions prohibiting unauthorized disclosure of BOI and imposing significant penalties for doing so. But similar prohibitions have frequently proved to be ineffective. *See Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 520-21 (E.D. Va. 2014) (Tax exempt organization's unredacted Schedule B was published by the Huffington Post after the IRS released it to a competing policy advocacy group in violation of federal law); Isaac O'Bannon, *IRS Exposes Confidential Data on 120,000 Taxpayers on Open Website*, CPA Practice Advisor (Sep. 02, 2022), https://tinyurl.com/3pjzwxud. More recently, a federal contractor claiming to have "acted out of a sincere, if misguided, belief [that he] was serving the public interest," was convicted of illegally releasing President Trump's tax returns to a media outlet. *Ex-IRS contractor sentenced to 5 years in prison for leaking Trump's tax returns*, NPR

---

[2] The absence of the ability to engage in confidential acquisitions because of mandatory disclosure likely would have the perverse effect of encouraging companies to lobby governments to increase economic development takings. *See, e.g., Kelo v. City of New London, Conn.,* 545 U.S. 469 (2005). But numerous states (appropriately) prohibit economic development takings undertaken by governments on behalf of private entities, either by state constitutional or statutory law. *See, e.g., City of Norwood v. Horney*, 853 N.E.2d 1115 (Ohio 2006); Tex. Gov't. Code Ann. §2206.001(prohibiting the use of eminent domain for economic development).

(Jan. 30, 2024), https://www.npr.org/2024/01/30/1227826718/ex-irs-contractor-sentenced-to-5-years-in-prison-for-leaking-trumps-tax-records. Prohibitions are insufficient to address the chilling effect that these policies have on protected association, not only because of the history of ineffective- and non-enforcement, but also because the requirement to disclose information to government itself has a chilling effect. Indeed, one does not need the imagination of Walt Disney to conjure up a scenario where the government might abuse its power to disadvantage a certain corporation for political reasons.

## CONCLUSION

For the foregoing reasons, the Emergency Motion for Stay should be denied.

Respectfully submitted,

 /s/ Robert Alt
Robert Alt
   *Counsel of Record*
Jay R. Carson
David C. Tryon
Alex M. Certo
The Buckeye Institute
88 East Broad Street, Suite 1300
Columbus, OH 43215
(614) 224-4422
Robert@BuckeyeInstitute.org

December 20, 2024

**CERTIFICATE OF COMPLIANCE**

Excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,600 words.

This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman.

  /s/ *Robert Alt*
Robert Alt
*Attorney of record for*
*The Buckeye Institute*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing amicus brief was served on all counsel of record via the Court's electronic filing system this 20th day of December 2024.

Respectfully submitted,

 /s/ *Robert Alt*
Robert Alt
*Attorney of record for*
*The Buckeye Institute*