# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 24-40792

TEXAS TOP COP SHOP, INC., *ET AL.*,

PLAINTIFFS-APPELLEES,

V.

MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *ET AL.*,

DEFENDANTS-APPELLANTS.

---

## PLAINTIFFS-APPELLEES' EMERGENCY PETITION FOR REHEARING EN BANC

### DECISION ON PETITION REQUESTED BY JAN. 6, 2025

---

ON INTERLOCUTORY APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
4:24-CV-478
HON. AMOS L. MAZZANT

---

December 24, 2024

CALEB KRUCKENBERG
TODD GAZIANO
CHRISTIAN CLASE
Center for Individual Rights
1100 Conn. Ave. N.W., Suite 625
Washington D.C. 20036

ANDREW M. GROSSMAN
Baker Hostetler
Washington Square, 1050 Conn.
Ave. N.W., Suite 1100
Washington D.C. 20036
Counsel for Plaintiffs-Appellees

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees and Counsel:**

Texas Top Cop Shop, Inc.,
Russell Straayer
Mustardseed Livestock, LLC,
Libertarian Party of Mississippi
National Federation of Independent Business, Inc.,
Data Comm for Business, Inc.
Elizabeth Milito

Caleb Kruckenberg
Todd Gaziano
Christian Clase
Center for Individual Rights
1100 Connecticut Avenue, NW Suite 625
Washington, D.C. 20036

Andrew Grossman
Baker Hostetler
1050 Connecticut Ave, NW Suite 1100
Washington, D.C. 20036

John Clay Sullivan
S|L Law PLLC
610 Uptown Boulevard, Suite 2000

Cedar Hil, TX 75104

**Defendants-Appellants and Counsel**

United States Department of Treasury
Financial Crimes Enforcement Network
Janet Yellen, United States Secretary of Treasury
Andrea Gacki, Director of Financial Crimes Enforcement Network
Merrick Garland, United States Attorney General

Faith Lowry
Stuart Robinson
Daniel Bentele Hahs Tenny
Steven H. Hazel
Sophia Shams
U.S. Department of Justice
950 Penn. Ave., N.W.
Washington D.C. 20530

*Amici* **and Counsel**

**The State of Texas**
Christina Cella
Office of the Texas Attorney General
300 W. 15th Street, Sixth Floor
Austin, TX 78701

**Eagle Forum Education and Legal Defense Fund**
Andrew L. Schlafly
Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931

**Private Investor Coalition, Incorporated**
John C. Neiman, Jr., Esq.
Direct: 205-254-1000
Email: jneiman@maynardnexsen.com
Fax: 205-254-1999

Maynard Nexsen, P.C., Suite 1700
1901 6th Avenue, N.
Birmingham, AL 35203

**Community Associations Institute**
Gregg Sandler Weinberg
Direct: 713-840-1666
Email: gweinberg@rmwbh.com
Roberts Markel Weinberg Butler Hailey, P.C.
57th Floor
2800 Post Oak Boulevard
Houston, TX 77056

**Competitive Enterprise Institute**
Charles Devin Watkins
Direct: 503-753-8104
Email: devin.watkins@cei.org
Competitive Enterprise Institute
7th Floor
1310 L Street, N.W.
Washington, DC 20005

**The Buckeye Institute**
Robert Alt
Direct: 614-224-4422
Email: robert@buckeyeinstitute.org
Buckeye Institute
Suite 1300
88 E. Broad Street
Columbus, OH 43215

**Americans for Prosperity Foundation**
Michael David Pepson
Direct: 571-329-4529
Email: mpepson@afphq.org]
Americans for Prosperity Foundation, Suite 1000
4201 Wilson Boulevard
Arlington, VA 22203

**S Corporation Association**
John C. Neiman, Jr., Esq.
Direct: 205-254-1000
(see above)

**Thomas Zawistowski**
Walter M. Weber
Direct: 202-546-8890
Email: wmweber@aclj-dc.org
Fax: 202-544-5172
American Center for Law & Justice
201 Maryland Avenue, N.E.
Washington, DC 20002-5703

**National Association of Wholesaler-Distributors**
Grady Block
Direct: 303-292-2021
Email: gblock@mslegal.org
Fax: 877-349-7074
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227

**The Small Business Association of Michigan**
Stephen J. Van Stempvoort
Direct: 616-831-1700
Email: vanstempvoorts@millerjohnson.com
Miller Johnson
Suite 1100
45 Ottawa Avenue, S.W.
Grand Rapids, MI 49503

**Pacific Legal Foundation**
Joshua Martin Robbins
Direct: 202-945-9524
Email: jrobbins@pacificlegal.org
Pacific Legal Foundation, Suite 1000
3100 Clarendon Boulevard

Arlington, VA 22201

**We the People Convention**
Walter M. Weber
Direct: 202-546-8890
(see above)

**Job Creators Network Foundation**
Grady Block
Direct: 303-292-2021
(see above)

**Chaldean American Chamber of Commerce**
Stephen J. Van Stempvoort
Direct: 616-831-1700
(see above)

**Hamilton Lincoln Law Institute**
Neville S. Hedley
Direct: 312-342-6008
Email: ned.hedley@hlli.org
Hamilton Lincoln Law Institute, Suite 300
1629 K Street, N.W.
Washington, DC 20006

**Liberty Justice Center**
Reilly Stephens
Direct: 512-481-4400
Email: rstephens@ljc.org
Liberty Justice Center
Suite 1-250
7500 Rialto Boulevard
Austin, TX 78735

**New Civil Liberties Alliance**
Sheng Tao Li
Direct: 202-869-5210
Email: sheng.li@ncla.legal

New Civil Liberties Alliance
Suite 300
4250 N. Fairfax Drive
Ballston, VA 22203

**Advancing American Freedom**
John Marc Wheat, General Counsel
Direct: 202-780-4848
Email: mwheat@advancingamericanfreedom.com
Advancing American Freedom, Incorporated
Suite 930
801 Pennsylvania Ave., N.W.
Washington, DC 20004

**National Retail Federation**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
Email: bbartlett@seyfarth.com
Fax: 404-892-7056
Seyfarth Shaw, L.L.P.
Suite 2500
1075 Peachtree Street, N.E.
Atlanta, GA 30309-3962

**National Association of Convenience Stores**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
(see above)

**Restaurant Law Center**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
(see above)

**Associated General Contractors of America, Incorporated**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
Email: murphy.foster@bswllp.com

Fax: 225-387-5397
Breazeale, Sachse & Wilson, L.L.P.
23rd Floor
301 Main Street
1 American Place
Baton Rouge, LA 70801

**Associated General Contractors of New York State, LLC**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
(see above)

**Business Council of New York State, Incorporated**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
(see above)

**State of West Virginia**
Michael Ray Williams
Direct: 304-558-2021
Email: michael.r.williams@wvago.gov
Fax: 304-558-0140
Office of the Attorney General for the State of West Virginia
Building 1, Room 26E
1900 Kanawha Boulevard, E.
State Capitol
Charleston, WV 25305-0000

**State of Kansas**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**State of South Carolina**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**22 Other States**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**Project for Privacy and Surveillance Accountability, Incorporated**
Gene C. Schaerr
Direct: 202-787-1060
Email: gschaerr@schaerr-jaffe.com
Fax: 202-776-0136
Schaerr Jaffe, L.L.P.
Suite 900
1717 K Street, N.W.
Washington, DC 20006

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Counsel for Plaintiffs-Appellees

# TABLE OF CONTENTS

Contents

CERTIFICATE OF INTERESTED PERSONS..........................................ii

TABLE OF CONTENTS ...............................................................x

INTRODUCTION AND RULE 40(b)(2) STATEMENT...........................1

STATEMENT OF THE CASE .....................................................3

    A.   LEGAL BACKGROUND.............................................3

    B.   THE CTA'S BURDEN ON THE PUBLIC AND PETITIONERS ....................................................4

    C.   PROCEEDINGS BELOW ...........................................5

ARGUMENT.........................................................................8

    I.   THE PANEL DECISION CONFLICTS WITH THE SUPREME COURT'S DECISION IN *NFIB*...................9

    II.   THE PANEL'S HEAVY-HANDED WEIGHING OF THE EQUITIES IN THE GOVERNMENT'S FAVOR WARRANTS REHEARING .........................................13

    A.  THE PANEL IMPROPERLY DISCOUNTED, OR IGNORED, SERIOUS HARMS TO PLAINTIFFS AND THE PUBLIC .............................................13

        1.   The Panel Waved Away Nonrecoverable Compliance Costs...14

        2.   The Panel Improperly Refused To Weigh Plaintiffs' Constitutional Injuries...............................................15

        3.   The Stay Threatens This Court's Jurisdiction Over Plaintiffs' Remaining Claims ........................................17

        4.   The Panel Also Ignored the Interests of Millions of Other Entities Subject to the CTA .......................................17

    B.  THE PANEL DECISION IMPROPERLY CREDITED THE GOVERNMENT'S CLAIMED HARMS ...............................18

CONCLUSION ....................................................................20

ATTACHMENT A (Panel Opinion)
ATTACHMENT B (District Court Stay Denial)
ATTACHMENT C (District Court Preliminary Injunction Opinion)

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

A divided panel of this Court stayed the district court's injunction of a shockingly unconstitutional statute that will, within days, injure tens of millions of Americans by forcing them to incur unrecoverable costs while it violates their Tenth, First, and Fourth Amendment rights.

The Corporate Transparency Act (CTA) requires corporate entities, merely because they exist, to report personal information on their "beneficial owners" to the federal government. The government defends the CTA as an exercise of the Commerce Clause power. But that runs headfirst into *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), which rejected the notion that the Commerce Clause reaches inactivity. The CTA's reporting mandate regulates no activity but only (in the government's words) "the anonymous existence" of entities. On that basis, the district court preliminarily enjoined the CTA's January 1, 2025, initial reporting deadline.

The panel majority stayed the injunction. In plain conflict with *NFIB*'s rejection of the proposition that Congress may regulate today based on even inevitable "future activity," 567 U.S. at 557, it reasoned that the CTA is likely a proper exercise of the commerce power because

it regulates entities with the "ability and propensity to engage in commercial activity." Panel Op. at 4. The majority credited the government's claim of irreparable injury based solely on its interest in immediately enforcing a statute (*id.* at 6), notwithstanding that the deadline was established by regulation, with the statute allowing up to another year. The panel also discounted to nothing the nonrecoverable costs of CTA compliance, Plaintiffs' constitutional injuries, and potential mootness of their constitutional claims. *See id.* at 5-6. And it deferred to the government's assertion of the public interest based on the "urgent" need to implement a first-of-its-kind reporting requirement that the government already delayed for nearly three years. *Id.* at 6-7.

Rehearing en banc is needed because the panel decision conflicts with *NFIB* and to answer a question of exceptional importance:

Do the equities support reinstatement of the CTA's initial reporting deadline, which was set by regulation subject to stay under 5 U.S.C. 706, and which will impose unrecoverable compliance costs, threatens constitutional violations and mooting additional constitutional claims, and will only slightly accelerate the reporting of information that the government put off for years?

## STATEMENT OF THE CASE

### A.    Legal Background

The CTA mandates that any "reporting company" reports its "beneficial ownership information" to the Financial Crimes Enforcement Network (FinCEN). 31 U.S.C. § 5336(b)(1)(A).

A "reporting company" is an entity "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* at § 5336(a)(11). The CTA exempts large companies (those employing more than 20 people and generating more than $5,000,000 per year in gross revenue), publicly traded companies, most businesses involved in finance, and many nonprofits. *Id.* at § (a)(11)(B).

Reporting companies are required to identify, and provide photo identification of, their "beneficial owners," which includes every natural person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of

the ownership interests of the entity[.]" *Id.* at §§ (a)(1), (a)(3), (b)(1). Entities must update this information if it changes. *Id.* at §§ (a)(2), (b)(1)(D). Violations of the reporting mandate are subject to substantial civil and criminal penalties. *Id.* at § (h)(3).

FinCEN's "Reporting Rule" requires preexisting reporting companies to report their beneficial ownership information by January 1, 2025. 31 CFR § 1010.380(a)(1).

## B. The CTA's Burden on the Public and Petitioners

As FinCEN recognized, the CTA and Reporting Rule "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. 59498, 59550 (Sept. 30, 2022). "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59585. Compliance in the first year alone would take 126.3 million hours and impose costs of $22.7 billion. *Id.* at 59585-86.

Petitioners are among those affected. *See* ECF No. 6-2 at ¶¶ 3-4 (Schneider Decl.); ECF No. 6-3 at ¶ 4 (Data Comm Decl.); ECF No. 6-4 at ¶¶ 2-3 (Straayer Decl.); ECF No. 6-5 at ¶¶ 3-6 (Goulart Decl.); ECF No. 6-6 at ¶¶ 3-4 (Lewis Decl.). One plaintiff, the National Federation of

Independent Business, Inc., is a membership organization with nearly 300,000 member businesses. ECF No. 6-7 at ¶¶ 4, 6 (Milito Decl.). While NFIB is exempt from the CTA, most of its members, including plaintiffs Texas Top Cop Shop, Inc. and Data Com For Business, Inc., must comply. *Id.* at ¶ 4.

### C.  Proceedings Below

Because the CTA's reporting scheme was not effective until January 1, 2024, Petitioners sued in May 2024, alleging that the CTA and Reporting Rule violate the Tenth Amendment, burden associational rights in violation of the First Amendment, and violate the Fourth Amendment by compelling disclosure of private information. ECF No. 1. They quickly moved for a preliminary injunction of all enforcement of the CTA and Reporting Rule. ECF Nos. 6, 6-1. In response, the government argued that Plaintiffs' motion was *premature* because "[t]he parties [] have more than six months to resolve this case through dispositive motions before any injury could be deemed imminent." ECF No. 18, at 8.

On December 3, 2024, the district court preliminarily enjoined the CTA and Reporting Rule and stayed the Rule's "compliance deadline" under APA § 705. ECF No. 30 at 79. It determined that the "CTA is likely

unconstitutional as outside of Congress's power. Because the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons." *Id.* At the same time, Plaintiffs "met their burden to show that they will suffer unrecoverable compliance costs absent emergency relief, they have met their burden to show that the CTA and Reporting Rule threaten substantial, imminent, non-speculative, and irreparable harm" and "because the CTA and Reporting Rule substantially threaten their constitutional rights." *Id.* at 31-32.

The government waited over a week to seek a stay from the district court. *See* Order, ECF No. 36. The district court denied the motion as "any interest the Government has in preserving its efforts in furtherance of the CTA are superseded by the CTA's grave constitutional flaws." Attachment C at 8-9.

Meanwhile, the parties fully briefed the government's stay request in this Court, with amicus filings from twenty-five separate organizations *and* twenty-five state governments supporting Plaintiffs' position.

On December 23, 2024, a divided three-judge panel of this Court granted the government's stay request in an unpublished order. Judges

Stewart and Higginson elected to grant the stay in full, and thus *reinstated* the January 1st compliance deadline. Attachment A. First, they reasoned that, the government made a "substantial case" on the merits because the "CTA requires certain corporate entities to report their beneficial ownership interest in order to target illicit financial activity." Panel Op. at 3. In this, the CTA "regulates anonymous ownership and operation of businesses," which "'are part of an economic class of activities that have a substantial effect on interstate commerce.'" *Id.* (quoting *Gonzales v. Raich*, 545 U.S. 1, 17 (2005)).

Second, the panel majority concluded that the delay "of a statute proposed and passed by the people's representatives necessarily inflicts irreparable harm." *Id.* at 6.

Third, the panel concluded the "balance of the equities" weighed in favor of stay because the harm to the plaintiffs, although unrecoverable, was "minimal" in terms of costs. *Id.* The panel declined to consider Plaintiffs' claimed constitutional injuries, *id.* at n. 6, and ignored the potential mootness of their constitutional claims.

Finally, the majority concluded that the equities merited a stay, because the injunction of a requirement that has never gone into force

and that the government itself delayed for years, "would undermine our ability to push other countries to reform their anti-money laundering and counterterrorism regimes and to address the most fundamental gap in our own regime." *Id.* at 6-7.

Judge Haynes, dissenting in part, would have denied a "temporary stay" as to Plaintiffs, including NFIB's members, and granted a "temporary stay…pending decision on the merits panel" as to non-parties." *Id.* at 2 n. 1.

## ARGUMENT

En banc rehearing is warranted when a "panel decision conflicts with" a decision of this Court "and the full court's consideration is therefore necessary to secure or maintain uniformity of the court's decision," "a decision of the United States Supreme Court," or "the proceeding involves one or more questions of exceptional importance." *See* Fed. R. App. P. 40(b)(2)(A)-(D).[1]

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation

---

[1] "The Fed. R. App. P. covering rehearings en banc do apply to interlocutory order of this Court issued pursuant to Fed. R. App. P. 8." 5th Cir. R. 40, I.O.P.

omitted). For a stay pending review, this Court considers four factors: (1) whether the requester makes a "strong showing" that it's likely to succeed on the merits; (2) whether the requester will be irreparably injured without a stay; (3) whether other interested parties will be irreparably injured by a stay; and (4) where the public interest lies. *Id.* at 426. "The first two factors are the most critical." *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020).

In granting the government's motion for a stay, the panel erred in at least three significant respects, each of which justifies this Court's en banc attention.

## I. The Panel Decision Conflicts with the Supreme Court's Decision in *NFIB*.

As the district court correctly held, the CTA is unlawful because it exceeds the federal government's limited, enumerated powers.

The CTA's unprecedented scope crosses a line long reserved for the states by regulating a business entity's *status* instead of its *actions*. In *NFIB v. Sebelius*, the Supreme Court rejected a Commerce Clause justification for the Affordable Care Act's individual mandate, holding that it "compel[led] individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects

interstate commerce." 567 U.S. at 552 (emphasis in original). The CTA suffers the same defect—it "compels" reporting companies to file beneficial ownership reports with the Federal Government "on the ground that their failure to do so affects interstate commerce." *See id.* The district court correctly concluded that "construing the Commerce Clause to permit Congress to regulate companies precisely because the Government does not know who substantially benefits from their ownership would similarly 'open a new and potentially vast domain to congressional authority.'" Attachment C at 44 (quoting *NFIB*, 567 U.S. at 552).

That the CTA regulates no activity is apparent on its face. It defines a class of "reporting companies," 31 U.S.C. § 5336(a)(11), and then requires them, based on their mere existence, to file reports, *id.* § 5336(b)(1)(A). The CTA does not, as the panel majority asserted (at 4), "regulate activity."

In regulating inactivity based on mere existence, the CTA's reporting mandate is indistinguishable from the ACA's insurance mandate. The insurance mandate compelled the uninsured to purchase health insurance, which the government justified "on the ground that

their failure to do so affects interstate commerce." 567 U.S. at 551. Specifically, the ACA required "*individuals who are not exempt* and do not receive health insurance through a third party" to purchase "'minimum essential' health insurance coverage." *Id.* (citing 26 U.S.C. § 5000A) (emphasis added). Likewise, the CTA requires entities to disclose beneficial-ownership information to the federal government, on the ground that their failure to do so affects interstate commerce. *See* Panel Op. at 4 (reasoning as much). But *NFIB* squarely rejects the proposition that Congress may "justify federal regulation by pointing to the effect of inaction on commerce." 567 U.S. at 552.

*NFIB* also forecloses the panel's view (at 4) that it is enough that the CTA regulates businesses with the "ability and propensity to engage in commercial activity." That conflicts with *NFIB*'s rejection of the "proposition that Congress may dictate the conduct of an individual today because of prophesied future activity." *Id.* at 557. After all, it was taken as given that every individual would "engage in a health care transaction" at some point, but "that does not authorize Congress to direct them" into action. *Id.* "Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *Id.*

That applies specifically in this context: "Every State in this country has enacted laws regulating corporate governance," but *federal* power reaches only "transactions" that implicate federal interests. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89-90 (1987).

At bottom, the panel erroneously accepted the government's vague assertion that Congress may exercise plenary authority, irrespective of the limits of its enumerated powers, in any field it has legitimately entered. If that were so, then Congress's longstanding regulation in the healthcare field would have supported the ACA's insurance mandate. Of course, it did not.

Finally, the panel's view (at 5) that Plaintiffs' facial challenge to the CTA falls short because it targets at least some "corporations engaged in business operations affecting interstate commerce" is badly mistaken. The CTA's defect is that it does not regulate any activity whatsoever, and that is true as to every single application of the statute. That Congress might have the power to enact an entirely different statute regulating the activities of some of the entities that are subject to the CTA is irrelevant. After all, Alfonso Lopez was to be paid $40 for delivering the gun he had in his possession. *See United States v. Lopez*, 2 F.3d 1342,

1345 (5th Cir. 1993). That was undoubtedly commerce, but it was not what the statute under which he was charged regulated, which is why that transaction could not save the statute. *See* 514 U.S. 549 (1995).

## II. The Panel's Heavy-Handed Weighing of the Equities in the Government's Favor Warrants Rehearing

The panel put a brick on the scale in favor of the government when weighing the equities. That not only conflicts with the precedents of this Court, but, given the CTA's widespread impact and the disruption caused by the panel's late-breaking stay, it also raises an important question in itself. The panel's approach, if applied in other cases, would almost always result in the government being able to press unlawful actions into effect—even when doing so violates rights and threatens to destroy courts' jurisdiction to decide serious constitutional claims.

### A. The Panel Improperly Discounted, or Ignored, Serious Harms to Plaintiffs and the Public

The panel dismissed the severe, nationwide, and irreparable harm caused by the CTA as nothing more than a requirement that the plaintiffs incur a "minimal" investment of "about $85 worth of time." Panel Op. at 6. That conclusion conflicts with binding precedent, factual stipulations entered into by the government, and the government's own estimates. As

Petitioners argued before, they will face non-recoupable compliance costs, and also deprivation of constitutional rights and potential mootness of their legal claims if they must comply with the CTA. Finally, the extraordinary burdens created by the panel's last-minute order are of compelling national interest.

### 1. The Panel Waved Away Nonrecoverable Compliance Costs

"An irreparable harm is one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (citation and quotation marks omitted). The "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

First, the district court correctly found that Plaintiffs will suffer irreparable harm because they must expend nonrecoverable resources to comply with the CTA on January 1. Not only have the plaintiffs each averred that they would need to spend time and effort to make the required filings, but they would also need to incur legal expenses, and below the "Government stipulated that the Plaintiffs would have testified

to the same." Attachment C at 24. These "nonrecoverable compliance" costs constitute irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 597.

The panel, however, dismissed (at 6) these costs as "minimal," without citing the binding decision in *Rest. Law Ctr.*, or even acknowledging the factual record before the Court. The district court noted, for instance, that "the Court and the Government need not accept Plaintiffs' sworn word for it—FinCEN itself concedes that reporting companies will incur compliance costs of the same sort that Plaintiffs describe in their Declarations as a result of the CTA and Reporting Rule." Attachment C at 26. "It is ironic that the Government suggests that Plaintiffs must plead their compliance costs with greater specificity. … The Government seeks to hold the Plaintiffs to a standard that the law does not require." *Id*.

### 2. The Panel Improperly Refused To Weigh Plaintiffs' Constitutional Injuries

The panel refused (at 6) to consider Plaintiffs' injuries from violations of their First and Fourth Amendment rights because the district court did not resolve those claims in its assessment of the merits. The district court did, however, assess them on the equities and determined that they weighed in Plaintiff's favor as to irreparable injury.

*See* Attachment C at 74 ("Due to the fast-approaching deadline for reporting companies to file BOI reports, the Court cannot render a meaningful decision on the merits before Plaintiffs suffer the very harm they seek to avoid."). The panel's unreasoned assumption that Plaintiffs' constitutional claims were speculative conflicts with longstanding precedent that the *merits* of a claim are separate from potential harms. *See Texas v. Yellen*, 105 F.4th 755, 764 (5th Cir. 2024) ("We consider the 'nature and source of the claim asserted,' not the merits of whether the plaintiff's legal theory is correct.") (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). No authority supports the panel's illogical view that a court may dismiss out of hand a party's well-pleaded constitutional injuries proffered as supporting irreparable harm merely because it was unnecessary to consider them in determining that that party had a likelihood of success on a different legal theory. To the contrary, circuit case law recognizes that, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People Inc.*, 91 F.4th at 340–41 (citation omitted). The panel's contrary position is unsupportable.

### 3. The Stay Threatens This Court's Jurisdiction Over Plaintiffs' Remaining Claims

The panel simply ignored their argument that forcing their compliance with the CTA risks mooting Plaintiffs' First and Fourth Amendment claims because it would compel them to make the disclosures that form the basis of these claims. Circuit precedent recognizes that the most important function of a preliminary injunction is "to preserve the court's ability to render a meaningful decision on the merits." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). The district court recognized that very concern in granting the injunction in the first place. *See* Attachment C at 74. The panel's refusal to consider this impact of a stay, however, is of a piece with its across-the-board discounting of the plaintiffs' equities.

### 4. The Panel Also Ignored the Interests of Millions of Other Entities Subject to the CTA

The panel had nothing to say about the practical consequences of *suddenly reinstating* the compliance deadline with just days left to comply, disregarding an obvious consideration that was elaborated upon in amicus briefs by half the states and dozens of major industry groups. Tens of millions of business entities are subject to the CTA's reporting mandate, and the injunction and its effect have been widely publicized

by the media and FinCEN itself. The panel's decision to bring the CTA back into force with just a few business days remaining in the middle of the holiday season will harm many, as those responsible for reporting scramble to understand and fulfill obligations that the government informed them only weeks ago had been postponed.

## B. The Panel Decision Improperly Credited the Government's Claimed Harms

The government cannot be deprived of the benefits of a law that is not yet effective. Conflating the CTA's hoped-for benefits with entitlements, the panel insisted (at 6) that whatever the dire practical consequences of suddenly reinstating the CTA, "the public's urgent interest in combatting financial crime and protecting our country's national security" sufficed. Indeed, the panel claimed that "equity favors a stay" because a mere delay in implementation "would undermine or ability to push other countries to reform their anti-money laundering and counterterrorism regimes and to address the most fundamental gap in our own regime." *Id.* But the district court's injunction could not "disrupt" anything because it merely delayed an *upcoming* effective date and thereby *preserved* the status quo.

In any event, the panel's conclusions are belied by the government's own delay in implementing the CTA's reporting requirement. The CTA was enacted in 2021 and directed FinCEN to promulgate implementing regulations within a year that would require compliance within two years of becoming effective. 31 U.S.C. § 5336(b)(5), (b)(1)(B). Under ordinary rulemaking timelines, FinCEN could have required compliance as early as mid-2021 or, based on when the agency began accepting filings, as late as **January 1, 2026**. *See* 87 Fed. Reg. at 59511.

The agency chose to delay the compliance deadline for over three years based on its weighing of "the benefit to law enforcement and national security agencies" against "the burdens imposed on reporting companies." *Id*. Even then it left the door open to providing further "extensions to the filing periods for initial, updated, or corrected reports." *Id*.; *see also* 88 Fed. Reg. 83499, 83500 (Nov. 30, 2023) (justifying 90-day extension of related CTA reporting deadline based on compliance burdens). This outright contradicts the panel's assumption that a relatively short delay while the courts resolve the CTA's constitutionality would cause any serious harm.

The CTA's timing provisions also vitiate the panel's claim (at 5–6) that the injunction causes the government irreparable injury by preventing it from "effectuating" a statute. The statute doesn't require the reporting mandate to kick in for another year. 87 Fed. Reg. at 59498. The earlier deadline was FinCEN's choice, not Congress's, and staying the deadline set by the Reporting Rule—as the district court did, and which the panel overlooked—does not implicate any governmental interest in effectuating statutes.

The majority ultimately lost sight of the principle that the "historical purpose of a preliminary injunction…is to maintain the status quo pending litigation." *Louisiana v. United States Dep't of Educ.*, No. 24-30399, 2024 U.S. App. LEXIS 17886, at *6 (5th Cir. July 17, 2024) (unpublished). That weighs heavily in favor an injunction that preserves the status quo by delaying the implementation date of a novel measure. *Id.*

## CONCLUSION

This Court should grant *en banc* rehearing of this matter, vacate the panel order, and deny the government stay motion.

December 24, 2024

Respectfully,

*/s/ Caleb Kruckenberg*

**Caleb Kruckenberg**
**Todd Gaziano**
Christian Clase
CENTER FOR INDIVIDUAL RIGHTS
1100 Conn. Ave. N.W., Suite 625
Washington, D.C., 20036
(202) 833-8401
kruckenberg@cir-usa.org
clase@cir-usa.org

Andrew M. Grossman
BAKER HOSTETLER
Washington Square, 1050 Conn. Ave.
N.W., Suite 1100
Washington D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

21

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Federal Rule of Appellate Procedure 40(d)(3)(A). It is printed in Century Schoolbook, a proportionately spaced font, and includes 3852 words, excluding items enumerated in Rule 32(f). I relied on my word processor, Microsoft Word, to obtain the count.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**

## CERTIFICATE OF SERVICE

I hereby certify that, on December 24, 2024, this document was electronically filed using the Court's CM/ECF system, which sent notification of such filing to all counsel of record.


Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**

# ATTACHMENT A

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2024

Lyle W. Cayce
Clerk

No. 24-40792

---

TEXAS TOP COP SHOP, INCORPORATED; RUSSELL STRAAYER; MUSTARDSEED LIVESTOCK, L.L.C.; LIBERTARIAN PARTY OF MISSISSIPPI; NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INCORPORATED; DATA COMM FOR BUSINESS, INCORPORATED,

*Plaintiffs—Appellees*,

*versus*

MERRICK GARLAND, *U.S. Attorney General*; TREASURY DEPARTMENT; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK; JANET YELLEN, *Secretary, U.S. Department of Treasury*,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:24-CV-478

---

UNPUBLISHED ORDER

No. 24-40792

Before Stewart, Haynes, and Higginson, *Circuit Judges*.[1]

Per Curiam:

The Corporate Transparency Act ("CTA") obliges certain nonexempt companies to report the identity of their beneficial owners and applicants for incorporation. 31 U.S.C. § 5336. On December 3, 2024—less than one month before the crucial January 1, 2025 reporting deadline—the district court granted Plaintiffs-Appellees' (the "Businesses") motion for a preliminary injunction and entered a nationwide injunction enjoining the CTA and the corresponding Reporting Rule. *Id.*; 31 C.F.R. § 1010.380. The district court concluded that both are unconstitutional and issued nationwide injunctions against each, despite no party requesting it do so and despite every other court to have considered this issue tailoring relief to the parties before it or denying relief altogether.[2]

The government, Defendants-Appellants, filed an emergency motion with this court seeking a stay. Because the government has met its burden under *Nken v. Holder*, 556 U.S. 418 (2009), we GRANT its motion for a temporary stay of the district court's order and injunction pending appeal.

---

[1] Judge Haynes joins in part and disagrees in part. She agrees for an expedited appeal and agrees that a national injunction is not appropriate here, so she would grant a temporary stay of the preliminary injunction pending the decision of the merits panel regarding whether to deny a stay pending appeal as to the non-parties. However, she would deny the temporary stay as to the parties (while, of course, deferring to the merits panel on this point as well), including the members of NFIB, as long as their identities are disclosed to the government.

[2] Three other district courts have assessed the CTA's constitutionality. Two held that the CTA is likely constitutional and denied motions for preliminary injunctions. *Firestone v. Yellen*, 2024 WL 4250192, at *10 (D. Ore. Sept. 20, 2024); *Cmty. Ass'ns Inst. v. Yellen*, 2024 WL 4571412, at *14 (E.D. Va. Oct. 24, 2024)). One held that it is unconstitutional, but only issued an injunction that covered the plaintiffs in that case. *Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260, 1289 (N.D. Ala. 2024).

No. 24-40792

When deciding a motion to stay pending appeal, we consider four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (internal quotation marks omitted).

On the first factor, the government has made a strong showing that it is likely to succeed on the merits in defending CTA's constitutionality.[3] When Congress passed the bipartisan statute in 2021, it used its "broad authority under the Commerce Clause" to regulate economic activity. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012). As stated, the CTA requires certain corporate entities to report their beneficial ownership interest in order to target illicit financial activity. *See* 31 U.S.C. § 5336. In doing so, it regulates anonymous ownership and operation of businesses. Those "are part of an economic class of activities that have a substantial effect on interstate commerce." *See Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (internal quotation marks omitted). Thus, a reporting requirement for entities engaged in these economic activities falls within "more than a century of [the Supreme] Court's Commerce Clause jurisprudence." *See id.* at 29 n.38.

---

[3] At minimum, the government has made a "substantial case" on the merits. *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981) ("On motions for stay pending appeal the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay.")

No. 24-40792

The Businesses misapply *Sebelius* to the present case when they contend otherwise. In the context of the Affordable Care Act's health insurance mandate, the Supreme Court concluded that Congress was attempting to regulate individuals "whose commercial inactivity rather than activity is [their] defining feature." 567 U.S. at 556–57 (2012). The CTA, however, established reporting requirements for corporate entities whose "defining feature" is their ability and propensity to engage in commercial activity. *See id.* None of the Businesses have claimed that they do not engage in commercial activity, or economic activity more broadly. And although some corporate entities might abstain from economic activity, the CTA excludes many of those from its definition of a "reporting company," thereby absolving them of the Act's reporting obligations. 31 U.S.C. § 5336(a)(11)(B). The CTA also allows the federal government to exempt any other "entity or class of entities" for which reporting would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id.* § 5336(a)(11)(B)(xxiv). While these exemptions might not sweep in every single dormant corporate entity, they strongly support the government's argument that the CTA regulates the ownership and operation of businesses by imposing modest disclosure requirements to a facilitate a regulatory scheme aimed at combatting financial crimes. Because Congress only needs a "rational basis" to conclude that a regulated activity "substantially affects interstate commerce," enacting the CTA was within its commerce power. *See Raich*, 545 U.S. at 16–17, 19.[4]

---

[4] The government also argues that the CTA is necessary and proper for executing Congress's foreign commerce powers, tax powers, and foreign affairs interests, as well as the President's law-enforcement and national-security powers. We pretermit discussion of these arguments here because the government's Commerce Clause analysis satisfies its burden under the first *Nken* factor.

No. 24-40792

Independently, the government has made a strong showing against the Businesses' facial challenge to the CTA.[5] The Supreme Court has been clear that a successful facial "challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In other words, "[t]he fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*; *see also United States v. Rahimi*, 602 U.S. 680, 701 (2024) (confirming that, when assessing facial challenges, courts must "consider the circumstances in which [the statute is] most likely to be constitutional" instead of "focus[ing] on hypothetical scenarios where [the statute] might raise constitutional concerns."). Here, the CTA at least operates constitutionally when it requires that corporations engaged in business operations affecting interstate commerce disclose their beneficial owner and applicant information to the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). *See Raich*, 545 U.S. at 17. Thus, the statute is likely constitutional on its face. *See Salerno*, 481 U.S. at 745.

Moving on, the government satisfies the second *Nken* factor because a last-minute injunction of a statute proposed and passed by the people's representatives necessarily inflicts irreparable harm. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012). Indeed, "any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it

---

[5] Notably, the district court skipped over the Businesses' as-applied challenge and only assessed the CTA's facial validity. In doing so, it erroneously departed from what it acknowledged is the normal rule that "we generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).

No. 24-40792

suffers a form of irreparable injury." *Id.* (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977)).

Similarly, the government has satisfied the third and fourth *Nken* factors by showing that "that the balance of the equities weighs heavily in favor of granting the stay." *See Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A June 1981). To start, the harm that a stay would cause the Businesses is minimal. FinCEN estimated that a typical, simple company would spend about ninety minutes (or about $85 worth of time) to complete and file CTA's required report, which may be filed for free. 87 Fed. Reg. 59498, 59589–90 (Sept. 30, 2022). The Businesses neither contend that they have more complex structures that would require more time or money, nor state their potential costs with any particularity.[6]

When balancing this harm against the public's urgent interest in combatting financial crime and protecting our country's national security, equity favors a stay. As the government explains, and the district court recognizes, a last-minute nationwide preliminary injunction would undermine our ability to push other countries to reform their anti-money

---

[6] Because the district court has not yet addressed the CTA's constitutionality as applied to the Businesses' First and Fourth Amendment claims, any additional harm that they allege they face from the CTA infringing those rights is immaterial to our stay analysis. *See Nken*, 556 U.S. at 434; *Google v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016) ("[I]nvocation of [constitutional injury] cannot substitute for the presence of an imminent, non-speculative irreparable injury.").

No. 24-40792

laundering and counterterrorism regimes and to address the most fundamental gap in our own regime.[7]

Accordingly, the government has demonstrated that a stay is warranted. *See Nken*, 556 U.S. at 434.

IT IS ORDERED that the government's emergency motion for a stay pending appeal is GRANTED. IT IS FURTHER ORDERED that this appeal is EXPEDITED to the next available oral argument panel.

---

[7] The Businesses warn that lifting the district court's injunction days before the compliance deadline would place an undue burden on them. They fail to note, however, that they only filed suit in May 2024 and the district court's preliminary injunction has only been in place for less than three weeks as compared to the nearly four years that the Businesses have had to prepare since Congress enacted the CTA, as well as the year since FinCEN announced the reporting deadline.

# ATTACHMENT B

# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:24-CV-478 |
| | § | Judge Mazzant |
| MERRICK GARLAND, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendants' Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35). Having considered the Motion, the pleadings, and the applicable law, the Court concludes that the Motion should be **DENIED.**

## BACKGROUND

On May 28, 2024, Plaintiffs filed suit against Defendants, various representatives of the Federal Government and Government entities (collectively, "the Government"), seeking a declaratory judgment that the Corporate Transparency Act ("CTA") and its implementing regulations (the "Reporting Rule") are unconstitutional and an injunction against their enforcement (Dkt. #1). On June 3, 2024, Plaintiffs sought a preliminary injunction against the CTA and Reporting Rule (Dkt. #6). The Government filed a Response (Dkt. #18), Plaintiffs replied (Dkt. #19), and on October 9, 2024, the Court held a hearing on the matter. On December 3, 2024, the Court entered an Order enjoining enforcement of the CTA and Reporting Rule nationwide (Dkt. #30). The Government appealed (Dkt. #32). The Court amended its Order to correct a

minor error that did not impact the Court's analysis or holding (Dkt. #33). The Government filed an Amended Notice of Appeal (Dkt. #34).

At 8:05 p.m. CST on December 11, 2024, the Government filed the instant Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35). In the Motion, the Government asserted that if the Court did not grant a stay of its Order enjoining the CTA and Reporting Rule by December 12 or 13, 2024, the Government would move for a stay of the Order in the Fifth Circuit Court of Appeals (Dkt. #35 at p. 1). Because Plaintiffs had not yet had an opportunity to file a response, the Court Ordered Plaintiffs to respond to the Government's Motion by December 16, 2024, at 12:00 p.m. CST (Dkt. #36). On December 13, 2024, the Government filed a Motion to stay the Court's Order enjoining enforcement of the CTA and Reporting Rule in the Fifth Circuit Court of Appeals. Defendants-Appellants' Emergency Motion for Stay Pending Appeal, *Texas Top Cop Shop v. Garland*, No. 24-40792 (5th Cir. Dec. 13, 2024), ECF No. 21. On December 16, 2024, at 8:08 a.m. CST, Plaintiffs timely filed their Response in Opposition to the Government's Motion to Stay Preliminary Injunction (Dkt. #37). On December 17, 2024, the Government filed its Reply (Dkt. #38). The Court now takes up the Government's Motion (Dkt. #35).

## LEGAL STANDARD

"A stay pending appeal is extraordinary relief for which [the movant] bear[s] a heavy burden." *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 372 (5th Cir. 2023) (internal quotations omitted). "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotations omitted). A stay is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the

circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34 (internal quotations omitted).  Where "there is even a fair possibility that the stay . . . will work damage to someone else[,]" the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis v. N. Am. Co.*, 299 U.S. at 248, 255 (1936); *see Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) (internal quotations omitted) ("'A stay is not a matter of right, even if irreparable injury might otherwise result.' It is instead an exercise of judicial discretion, and the 'party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.'").

In determining whether to grant a stay, district courts must consider four factors (known in the Fifth Circuit as the "*Nken* factors"): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Plaquemines Par.*, 84 F.4th at 373 (quoting *Nken*, 556 U.S. at 434). The Supreme Court and Fifth Circuit alike have made clear that "'[t]he first two factors . . . are the most critical.'" *Id.* (quoting *Nken*, 556 U.S. at 434). In articulating this standard, the Fifth Circuit has stated that it is "important[]" to recall that:

> on motions for stay pending appeal the movant need not always show a "probability" of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities ***weighs heavily*** in favor of granting the stay.

*Id.* (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. Unit A 1981)). With these principles in mind, the Court addresses each factor in turn.

## ANALYSIS

### I. Likelihood of Success on the Merits

As the Court has acknowledged, this case involves a novel constitutional question of first impression in the Fifth Circuit (Dkt. #33 at p. 3). Though Plaintiffs brought an array of challenges against the CTA and Reporting Rule, to date, the Court has only addressed Plaintiffs' argument that the CTA exceeds Congress's enumerated powers (Dkt. #33 at p. 79). As discussed in detail by the Court's Order enjoining the CTA and Reporting Rule (Dkt. #33), both are likely unconstitutional; Plaintiffs have thus carried their burden to show a substantial likelihood of success on the merits. The Government has not.

The Government urges that the Court reconsider its conclusion on the merits but reiterates arguments that the Court has already rejected. For example, in the context of the Commerce Clause, the Government has still not articulated what *activity* the CTA regulates (*See* Dkt. #35 at p. 6). Similarly, in the context of the Necessary and Proper clause, the Government has yet to offer a viable argument that the CTA derives from one of Congress's enumerated powers and is a proper exercise of that power, as it must (*See* Dkt. #35). *See United States v. Comstock*, 560 U.S. 126, 147 (2010). Broadly, the Government has not offered any tenable explanation for how the CTA and Reporting Rule align with our dual system of government. The Government also argues that the Court did not apply the proper standard for a facial challenge (Dkt. #35 at p. 6). But at this juncture, there appears "no set of circumstances" under our written Constitution in which Congress would have the power to enact the CTA. *See United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Government further argues that the Court erred in "not giv[ing] sufficient weight" to Congress's findings (Dkt. #35 at p. 7). But the Government does not cite any authority for the notion that Congress's findings alone may authorize it to legislate however it so wishes. In fact,

4

countless cases discussing Congress's constitutional limits provide the exact opposite. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 614 (2000) ("[T]he existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation.") (quoting *United States v. Lopez*, 514 U.S. 549, 557 n.2 ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not make it so.")). The Court gave Congress its due deference but acted as it must to fulfill its judicial responsibility.

Further, while the Government contends that the Court erred simply because it disagreed with the reasoning in *Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024) and *Cmty. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024), the Government overlooks the reasoning in *Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024) ("*NSBU v. Yellen*"). The Court believes that the reasoning in *NSBU v. Yellen* is persuasive and correct. This disagreement among the district courts is not enough to suggest that this Court erred.

The Government finally submits that the Court erred in enjoining the CTA and Reporting Rule nationwide (Dkt. #35 at pp. 7–8). Once more, the Court stands behind its Order (Dkt. #33). The Government is right to point out the concerns with nationwide injunctions (*See* Dkt. #35 at p. 7). The Court acknowledges those concerns. The Court enjoined enforcement of the CTA and Reporting Rule nationwide because it appears appropriate under the law and the facts of this case.[1] The Government's Reply argues that "Defendants did not concede that [nationwide] relief was

---

[1] Ironically, the Declaration the Government filed in support of its Motion shows why anything short of nationwide relief would be impracticable. Though, of course, the scope of an injunction does not turn on practicalities alone. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Declaration of Andrea Gacki states that "[r]eporting companies must clearly understand and have certainty about their compliance obligations for a reporting regime to be effective" (Dkt. #35-1 at p. 9). After all, the AMLA sought "to establish *uniform* beneficial ownership information reporting requirements." Pub. L. No. 116-283, div. F. 134 Stat. 4547, § 6002(5) (2021) (emphasis added).

necessary or appropriate" (Dkt. #38 at p. 1). The Court agrees, which is why the Court did not categorize the Government's statement that enjoining enforcement of the CTA and Reporting Rule only against Plaintiffs, including NFIB's members, was "'effectively' a form of nationwide relief" as a concession (Dkt. #38 at p. 1–2; Dkt. #33 at p. 75). This does not change the practical effect of Plaintiffs' request, nor does it persuade the Court that the scope of the injunction is inappropriate under the facts and circumstances of this case.

As the Court has decided, the merits favored Plaintiffs when the Court issued its injunction. Today is no different. The Government has not "made a strong showing that [it] is likely to succeed on the merits." *See Plaquemines Par.*, 84 F.4th at 373. Accordingly, the first *Nken* factor weighs against issuance of a stay.

## II.    The Equities

Turning to the remaining factors (the "equities"), the Court determines that a stay is not warranted. As the Court has concluded and as precedent indicates, the public interest lies in protecting the public from laws that are likely unconstitutional, and Plaintiffs will face irreparable harm if the Court were to grant a stay (which would effectively nullify its prior Order) (*See* Dkt. #33). Thus, the third and fourth *Nken* factors weigh against issuance of a stay.

Accordingly, the Court turns to the Second *Nken* factor—the risk of the Government suffering irreparable harm (the only remaining factor). *Plaquemines Par.*, 84 F.4th at 373. The Government contends that the burdens that it has undertaken to achieve compliance with the CTA constitute irreparable injury if the Court does not permit the CTA and Reporting Rule to become effective once again by issuing a stay. The Government advances two broad arguments under this factor. First, the Government argues that an injunction against laws "enacted by representatives of [the] people" constitutes irreparable harm (Dkt. #35 at p. 3) (internal quotation omitted).

Indeed, as the Fifth Circuit has stated, "[w]hen a statute is enjoined, the [Government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024).

Second, the Government argues that "the injunction would significantly disrupt FinCEN's implementation of the CTA, and FinCEN would not be able to fully remediate that disruption even if the injunction were lifted at the conclusion of the appeal" (Dkt. #35 at p. 3). In support of this point, the Government notes that FinCEN has engaged in nationwide media outreach in an attempt to achieve compliance with the CTA and it has expended $4.3 million dollars to date in furtherance of those efforts (Dkt. #35 at p. 4). The Government also argues that the injunction would "prevent the United States from fulfilling international standards for countering money laundering and terrorist financing" (Dkt. #35 at p. 5). That is a familiar argument that the Court addressed in its Order (*See* Dkt. #33 at pp. 56–65).

But for the first time in the life of this case, the Government has offered more than a threadbare claim that the CTA helps the United States comply with international standards. The Declaration of Andrea Gacki, the Director of FinCEN, which the Government attached as an exhibit to its Motion to Stay states:

> The United States is currently preparing for its upcoming Financial Action Task Force ("FATF") mutual evaluation, with its written technical submission currently due mid-2025. The United States is a founding member of FATF, which is the leading international, inter-governmental task force whose purpose is the development and promotion of international standards and the effective implementation of legal, regulatory, and operational measures to combat money laundering, terrorist financing, the financing of proliferation, and other related threats to the integrity of the international financial system. Among other things, FATF has established standards on transparency and BOI [(Beneficial Ownership Information)] of legal persons, intended to deter and prevent the misuse of corporate vehicles.

(Dkt. #35-1 at pp. 9–10). The Declaration also states that FATF rated the United States "non-compliant" with FATF's "requirements" (Dkt. #35-1 at p. 10). According to Andrea Gacki's Declaration, the injunction "risks causing the United States to receive negative ratings on related portions of an upcoming FATF evaluation" (Dkt. #35-1 at p. 10). A lower rating, according to the Declaration, could result in the United States being "added to the FATF grey list, a public list of countries with significant failings in their AML/CFT [(anti-money laundering and countering the financing of terrorism)] regimes" (Dkt. #35-1 at p. 10). That, the Declaration argues, "would undermine the United States' ability to push other countries to make reforms to their AML/CFT regimes . . ." (Dkt. #35-1 at p. 10). Finally, the Declaration notes that, for "nearly a decade," FATF has identified the lack of BOI reporting as the "most fundamental gap" in the United States's AML/CFT regime (Dkt. #35-1 at p. 10). Though Plaintiffs did not stipulate to the factual contentions in the Declaration, their Response does not dispute those statements.

The efforts that FinCEN has made to increase compliance with the CTA since the Reporting Rule have gone into effect appear to be significant by their terms and, of course, in service of a laudable end. FinCEN has been collecting BOI reports since January 1, 2024 (Dkt. #35-1 at p. 5). And while Plaintiffs have not provided the Court with any reason to suggest that the Government could completely remediate any harm as a result of the injunction, the law is clear that "it is always in the public interest to prevent a violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Moreover, irreparable injury is not dispositive in deciding whether to grant a stay. *Ind. State Police Pension Tr.*, 556 U.S at 961. Accordingly, any interest the

Government has in preserving its efforts in furtherance of the CTA are superseded by the CTA's grave constitutional flaws. Thus, on balance, the factors do not favor issuance of a stay.

Notwithstanding this four-factor analysis, the Court is mindful of the Fifth Circuit's statement in *Ruiz v. Estelle* that, at this stage, the movant "need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities ***weighs heavily*** in favor of granting the stay." *Plaquemines Par.*, 84 F.4th at 373 (quoting *Ruiz*, 650 F.2d at 565). This case, no doubt, presents a serious legal question. Given the Court's prior reasoning (Dkt. #33), it does not appear that the Government has a "substantial case on the merits," at least as to Plaintiffs' enumerated powers challenge. But even assuming *arguendo* that the Government does have a substantial case on the merits, the equities here do not "weigh heavily" in favor of granting a stay. *See id.* Accordingly, the Court will not stay its Order enjoining enforcement of the CTA and Reporting Rule (Dkt. #33).

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Stay Preliminary Injunction Pending Appeal (Dkt. #35) is hereby **DENIED.**

**IT IS SO ORDERED.**

 **SIGNED this 17th day of December, 2024.**


_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

# ATTACHMENT C

# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| TEXAS TOP COP SHOP, INC., ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:24-CV-478 |
| | § | Judge Mazzant |
| MERRICK GARLAND, ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants.* | § | |

## AMENDED MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Dkt. #6). Through it, Plaintiffs seek to enjoin the Government from enforcing the Corporate Transparency Act and its Implementing Regulations. Having considered the Motion, the arguments of counsel, and the applicable law, the Court concludes that the Motion should be **GRANTED.**

"Great nations, like great men, should keep their word." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142 (1960) (Black, J., dissenting). Ours is a written Constitution. The promises it makes to the People and the States alike are not hidden. The Court must enforce them. "The powers of the legislature are defined, and limited: and . . . those limits may not be mistaken, or forgotten, the [C]onstitution is written." *Marbury v. Madison*, 5 U.S. 137, 176 (1803). While the Court defers to Congress on matters of policy, interpretation of the Constitution is an area where Congress enjoys no authority. *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) ("[I]t is not for [the Court] to substitute [its] view of . . . policy for the legislation which has been passed by Congress."); *Marbury*, 5 U.S. at 177. Legislative ingenuity, dispatched to meet

today's problems, is not measured by any other standard than our written Constitution. Modern problems may well warrant modern solutions, but modernity does not grant Congress a roving license to legislate outside the boundaries of our timeless, written Constitution. *See, e.g.*, *Louisiana v. Biden*, 55 F.4th 1017, 1032 (5th Cir. 2022) ("The Constitution is not abrogated[, even] in a pandemic."). The Constitution must stand firm.

In the matter before the Court, Plaintiffs challenge an unprecedented law known as the Corporate Transparency Act ("CTA"). It represents Congress's attempt to combat bad actors' ability to cloak their criminal activities in a veil of corporate anonymity. At its most rudimentary level, the CTA regulates companies that are registered to do business under a State's laws and requires those companies to report their ownership, including detailed, personal information about their owners, to the Federal Government on pain of severe penalties. Though seemingly benign, this federal mandate marks a drastic two-fold departure from history. First, it represents a Federal attempt to monitor companies created under state law—a matter our federalist system has left almost exclusively to the several States. Second, the CTA ends a feature of corporate formation as designed by various States—anonymity. For good reason, Plaintiffs fear this flanking, quasi-Orwellian statute and its implications on our dual system of government. As a result, Plaintiffs contend that the CTA violates the promises our Constitution makes to the People and the States. Despite attempting to reconcile the CTA with the Constitution at every turn, the Government is unable to provide the Court with any tenable theory that the CTA falls within Congress's power. And even in the face of the deference the Court must give Congress, the CTA appears likely unconstitutional. Accordingly, the CTA and its Implementing Regulations must be enjoined.

# BACKGROUND

## I.    The Corporate Transparency Act

This case begins and ends with the CTA. The constitutionality of the CTA and its accompanying regulations is an issue of first impression in the Fifth Circuit. Thus, this case necessitates a robust explanation of the CTA. In January of 2021, Congress passed the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 ("NDAA"). Pub. L. No. 116-283. Congress included the Anti-Money Laundering Act of 2020 ("AMLA") in the NDAA. Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021).

The AMLA's stated purposes are many. First, through the AMLA, Congress sought "to improve coordination and information sharing among the agencies tasked with administering anti-money laundering . . . requirements." *Id.* § 6002(1). Second, in passing the AMLA, Congress sought "to modernize anti-money laundering and countering the financing of terrorism laws." *Id.* 6002(2). Third, the AMLA seeks "to encourage technological innovation and the adoption of new technology by financial institutions to more effectively counter money laundering and the financing of terrorism." *Id.* § 6002(3). Fourth, Congress designed the AMLA to "reinforce that the anti-money laundering" and terrorism financing "policies, procedures, and controls of financial institutions shall be risk-based." *Id.* § 6002(4). Fifth, and most importantly as it relates to the CTA, Congress intended the AMLA "to establish uniform beneficial ownership information reporting requirements" to further four ends: (1) "transparency . . . concerning corporate structures and insight into the flow of illicit funds through those structures"; (2) "discourag[ing] the use of shell corporations[1] as a tool to disguise and move illicit funds"; (3) "assist[ing] national security,

---

[1] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners." 87 Fed. Reg. at 59

intelligence, and law enforcement with the pursuit of crimes"; and (4) "protect[ing] the national security of the United States." *Id.* § 6002(5). The sixth and final stated purpose of the AMLA is to "establish a secure, nonpublic database at FinCEN² for beneficial ownership information." *Id.* § 6002(6).

Nestled between the 1,482 pages of the NDAA lays the CTA. 134 Stat. at 4604–625 (codified as amended at 31 U.S.C. § 5336). In short, the CTA requires a vast array of companies to disclose otherwise private stakeholder information to FinCEN. *See* 31 U.S.C. § 5336(b)(1). Congress compels these disclosures to control financial crime. Indeed, the CTA says as much. *See* NDAA § 6402. Because text reigns supreme in statutory interpretation, rather than summarize the CTA's purpose, it is wiser to grasp the CTA's objectives from its plain text. *See Carter v. United States*, 530 U.S. 255, 271 (2000). The CTA provides that "it is the sense of Congress" that:

(1) more than 2,000,000 corporations and limited liability companies are being formed under the laws of the States each year;

(2) most or all States do not require information about the beneficial owners of the corporations, limited liability companies, or other similar entities formed under the laws of the State;

(3) malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, including money laundering, the financing of terrorism, proliferation financing, serious tax fraud, human and drug trafficking, counterfeiting, piracy, securities fraud, financial fraud, and acts of foreign corruption, harming the national security interests of the United States and the allies of the United States;

(4) money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection,

---

501. Thus, according to Congress, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement." *Id.*

² "FinCEN" is an abbreviation for the enforcement arm of the Department of the Treasury called the "Financial Crimes Enforcement Network."

and may layer such structures, much like Russian nesting "Matryoshka" dolls, across various secretive jurisdictions such that each time an investigator obtains ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process;

(5) Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to—

    A.  set a clear, federal standard for incorporation practices;

    B.  protect vital United States national security interests;

    C.  protect interstate and foreign commerce;

    D.  better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and

    E.  bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.

(6) beneficial ownership information collected under the amendments made by this title is sensitive information and will be directly available only to authorized government authorities, subject to effective safeguards and controls to—

    A.  facilitate important national security, intelligence, and law enforcement activities; and

    B.  confirm beneficial ownership information provided to financial institutions to facilitate the compliance of the financial institutions with anti-money laundering, countering the financing of terrorism, and customer due diligence requirements under applicable law.

NDAA § 6402.

In service of these admirable ends, the CTA regulates "reporting companies." 31 U.S.C. § 5336(b). Under the CTA, a "reporting company" is a "corporation, limited liability company, or other similar entity that is created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe or formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state

5

or a similar office under the law of a State or Indian Tribe." *Id.* § 5336(a)(11). The CTA's text excludes from the definition of "reporting companies" several types of entities, including but not limited to political organizations as defined in Section 527(e)(1) of the Internal Revenue Code. *See id.* § 5336(a)(11)(B). These reporting companies must "submit to FinCEN a report" that "identif[ies] each beneficial owner of . . . the reporting company . . . by full legal name, date of birth, current . . . residential or business street address, and [a] unique identifying number from an acceptable identification document or FinCEN identifier." *Id.* § 5336(b)(2).[3]

The CTA defines the term "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, exercises substantial control over the entity; or owns or controls not less than [twenty-five] percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A). The CTA excepts from "beneficial owner" status those who are minors, persons acting on behalf of another individual such as agents and custodians, employees, those whose only interest in the company is through a right of inheritance, and creditors. *Id.* § 5336(a)(3)(B). In turn, an "acceptable identification document" is a nonexpired: (1) United States Passport; (2) identification document issued by a State, local government, or Indian Tribe for purposes of identification; (3) driver's license issued by a State; or (4) a passport issued by a foreign government, if the individual in question does not have any of the previous forms of identification. *Id.* § 5336(a)(1). The term "unique identifying number" refers to "the unique identifying number from an acceptable identification document"—i.e., a passport number or the like. *Id.* § 5336(a)(13). Finally, while the CTA itself does not define "substantial control," the final rule implementing the CTA, (the "Reporting Rule") does. Under the Reporting

---

[3] Reporting companies can file BOI reports for free through FinCEN's website.

Rule, "substantial control" means: (1) serving as a "senior officer of the reporting company"; (2) having authority to hire and fire senior officers, the majority of the board of directors, or a similar body; or (3) directing, determining, or having substantial influence over "important decisions made by the reporting company." 31 C.F.R. § 1010.380(d)(1).  Further, "any other form of substantial control over the reporting company" constitutes "substantial control," under the Reporting Rule, be it direct or indirect. *Id.* § 1010.380(d)(1)(i)(D), (d)(1)(ii).

The CTA delegates authority to the Secretary of the Treasury to establish an effective date for filing and updating beneficial ownership information reports and to promulgate regulations regarding these reports. *Id.* § 5336(b)(1). Pursuant to that authority, FinCEN's regulations state that "any domestic reporting company created before January 1, 2024, and any entity that became a foreign reporting company before January 1, 2024[,] shall file a report not later than January 1, 2025." Reports of Beneficial Ownership Information, 31 C.F.R. § 1010.380(a)(1)(iii) (2024). The remainder of FinCEN's regulations give teeth to the CTA as codified. *Compare* 31 U.S.C. § 5336 *with* 31 C.F.R. §1010.380.

Under the Reporting Rule, the content of a reporting company's beneficial owner report must include the legal name of the company, that company's trade names, the address of its principal place of business or primary location in the United States, the State, Tribal, or foreign jurisdiction of the company's formation, and the company's Internal Revenue Services Taxpayer Identification Number. 31 C.F.R. § 1010.380(b)(1)(i). Further, the report must include the full legal name of each beneficial owner of the company, their date of birth, their business or residential address, their unique identifying number from an approved identification document, and a

photograph of that document. *Id.* § 1010.380(b)(1)(ii). Covered entities have a continuing obligation to update their beneficial owner reports. *Id.* § 1010.380(b)(3).

FinCEN "shall . . . maintain[]" this information for at least five years after "the date on which the reporting company terminates." 31 U.S.C. § 5336(c)(1). The CTA permits FinCEN to disclose any beneficial ownership information upon request from state, local, federal, or international law enforcement entities. 31 U.S.C. § 5336(c)(2). The CTA also mandates that FinCEN take certain precautions with the beneficial ownership information to avoid inappropriate disclosure of that information.  31 U.S.C. § 5336(c)(2)(C).

Failure to comply with the CTA is fraught with peril. The CTA makes it illegal to: (1) "willfully provide, or attempt to provide, false or fraudulent beneficial ownership information"; and (2) "willfully fail to report complete or updated beneficial ownership information." 31 U.S.C. § 5336(h)(1). Any individual who is guilty of violating either provision is civilly liable and may be fined up to $500 a day for each day that "the violation continues or has not been remedied." *Id.* § 5336(h)(3)(A)(i). Further, any individual who is guilty of violating either provision may be incarcerated for up to two years and fined up to $10,000. *Id.* § 5336(h)(3)(A)(ii). The CTA also proscribes unauthorized disclosure of beneficial ownership information and subjects any person who knowingly discloses such information without authorization to criminal and civil penalties. *Id.* §§ 5336(h)(2), (h)(3)(B).

According to FinCEN, the CTA "will have a significant economic impact on a substantial number of small entities." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59550 (Sept. 30, 2022). "FinCEN estimates that there will be approximately 32.6

million existing reporting companies[,] and 5 million new reporting companies formed each year."

*Id.* at 59585. Further,

> [a]ssuming that all reporting companies are small businesses, the burden hours for filing BOI [(beneficial ownership information)] reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35 million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after.

*Id.* at 59585–86. Per company, "FinCEN estimates it would cost . . . approximately $85.14– $2,614.87 each to prepare and submit an initial report for the first year that the BOI reporting requirements are in effect." *Id.* at 59586. Finally, "FinCEN estimates it would cost approximately $37.84–$560.81 for entities to file updated BOI reports." *Id.* According to FinCEN, these estimates include "professional expertise that will be sought out to comply with the reporting requirements" such as lawyers and accountants. *Id.*

## II.  The Parties

There are six plaintiffs in this case, comprised of one private individual and five entities. First, Texas Top Cop Shop, Inc. ("TTCS") is a family-run, Texas corporation that maintains its principal place of business and all of its operations in Conroe, Texas (Dkt. #1 at p. 5). Since 2017, TTCS has sold equipment to first responders out of its single storefront in Conroe (Dkt. #1 at p. 16). In addition, TTCS is a licensed dealer of firearms (Dkt. #1 at p. 16). TTCS does not transact any business through the internet, nor does it sell its merchandise outside of Texas (Dkt. #1 at p. 16). Only four employees, including the owners, work at TTCS (Dkt. #1 at p. 16). Though TTCS has determined on its own that it is a reporting company under the CTA, to date, it has not filed a beneficial ownership report with FinCEN (Dkt. #1 at p. 17).

The second plaintiff, Data Comm for Business, Inc. ("Data Comm"), is a Delaware corporation that operates in both Illinois and Texas (Dkt. #1 at p. 17). It is also registered with the Illinois Secretary of State to engage in business as a foreign corporation (Dkt. #1 at p. 17).  Data Comm provides small business, individuals, utility companies, and federal agencies with "technical support, information technology, and communications products" (Dkt. #1 at p. 17). It employs ten individuals (Dkt. #1 at p. 18). Like TTCS, while Data Comm has determined that it is a reporting company subject to the CTA's disclosure requirements, it has yet to file a beneficial ownership report with FinCEN (Dkt. #1 at p. 18). Further, Data Comm advocates for the repeal of the CTA as a corporation to protect the privacy of its beneficial owners (Dkt. #1 at p. 18).

The third plaintiff, Russel Straayer ("Straayer"), is an individual who resides in Conroe, Texas and is closely tied to Data Comm—the company for which he serves as Chief Executive Officer (Dkt. #1 at pp. 18–19). He has determined that he is a beneficial owner of Data Comm, though he is not the only beneficial owner of Data Comm (Dkt. #1 at p. 19). Straayer claims that he is a beneficial owner of additional reporting companies not involved in this case (Dkt. #1 at p. 19). Though Straayer is an outspoken opponent of the CTA, one of the reporting companies of which Straayer is a beneficial owner "does not wish to be associated with" his position against the CTA (Dkt. #1 at p. 19). Straayer has not filed a report with FinCEN (Dkt. #1 at p. 19).

The fourth plaintiff is Mustardseed Livestock, LLC ("Mustardseed") (Dkt. #1 at. p. 19). Mustardseed is a Wyoming limited liability company that has operated as a small dairy farm exclusively in Lingle, Wyoming since 2020 (Dkt. #1 at p. 19). It does not transact interstate business (Dkt. #1 at p. 20). While it generally produces dairy products for its own use, it "occasionally sells surplus raw milk" to Wyoming customers (Dkt. #1 at p. 20). In 2023,

Mustardseed's gross income from surplus milk sales did not exceed $30,000, and its projected income from all of its offerings will not exceed $50,000 (Dkt. #1 at p. 20). Though it has determined that it is a reporting company under the CTA, to date, it has not filed a beneficial ownership report (Dkt. #1 at p. 20). Like Data Comm, Mustardseed advocates for the repeal of the CTA as a corporate entity in to protect its beneficial owners' privacy (Dkt. #1 at p. 20).

The fifth plaintiff is the Libertarian Party of Mississippi ("MSLP") (Dkt. #1 at p. 21). MSLP dubs itself a "political organization," though it notes that it is not classified as such under § 527 of the Internal Revenue Code (Dkt. #1 at pp. 21–22). Therefore, by its own admission, it is a reporting company under the CTA (Dkt. #1 at pp. 21–22). MSLP is organized under Mississippi law and is registered with the Mississippi Secretary of State as a nonprofit corporation (Dkt. #1 at pp. 21, 23). It has no physical office (Dkt. #1 at p. 22). Instead, it relies on its members to conduct its activities (Dkt. #1 at p. 22). The members of MSLP "seek to advance the platform of the National Libertarian Party within the State of Mississippi" (Dkt. #1 at p. 21). Thus, MSLP and its members advocate for a plethora of positions on political issues and ideals (Dkt. #1 at p. 21). One such issue is the CTA, which MSLP advocates against (Dkt. #1 at p. 22). Because it operates as a political organization, individuals and entities alike donate to MSLP (Dkt. #1 at p. 22). In turn, MSLP uses those donations to promote its political agendas (Dkt. #1 at p. 22). MSLP has "less than $20,000 in assets," which are the product of donations used only for political expenditures (Dkt. #1 at p. 22). None of these expenditures promote activities out of the state of Mississippi, and MSLP does not engage in any economic activity outside of Mississippi (Dkt. #1 at p. 23). Like its co-plaintiffs, MSLP has not filed a beneficial owner report with FinCEN (Dkt. #1 at p. 23).

The sixth and final Plaintiff—the National Federation of Independent Business ("NFIB")—is distinct from its co-plaintiffs in that it is an organization suing on behalf of its members, who are not a party to this lawsuit (Dkt. #1 at p. 24). NFIB is a tax-exempt organization under § 501(c) of the Internal Revenue Code (Dkt. #1 at p. 24). Thus, the CTA does not compel it to file a report with FinCEN (Dkt. #1 at p. 24). Approximately 300,000 members comprise NFIB (Dkt. #1 at p. 24). TTCS and Data Comm—both of which are plaintiffs here—are members of NFIB (Dkt. #1 at p. 24). NFIB also notes that its members include companies like Grazing Systems Supply, Inc. ("Grazing Systems Supply") a Louisiana corporation with its principal place of business in Batesville, Indiana (Dkt. #1 at p. 24). Grazing Systems Supply is a family-run agricultural supply business with five employees that must comply with the CTA (Dkt. #1 at p. 24). NFIB and its members advocate against the CTA, and NFIB has publicly argued for its repeal on behalf of its members (Dkt. #1 at p. 24).

None of the five individual Plaintiffs here have filed beneficial ownership reports with FinCEN (Dkt. #1 at pp. 17–24). Further, each Plaintiff claims that if enforcement of the CTA is not enjoined, Plaintiffs' obligations under the CTA would compel them to incur compliance costs and would violate their constitutional rights (Dkt. #1 at pp. 17–24).

Defendants are comprised of several United States representatives and the governmental entities that they serve. First, Defendant Merrick Garland is the United States Attorney General who Plaintiffs sue in his official capacity, as he is responsible for the administration and enforcement of United States federal criminal law, including the CTA (Dkt. #1 at p. 6). Second, Defendant Janet L. Yellen is the United States Secretary of the Treasury, who Plaintiffs sue in her official capacity as the head of the U.S. Department of the Treasury (Dkt. #1 at p. 6). Plaintiffs also

sue Defendant U.S. Department of the Treasury, an agency under the Executive Branch that administers and enforces the CTA and its accompanying regulations (Dkt. #1 at p. 6). Fourth, Defendant Andrea Gacki is the Director of FinCEN, who Plaintiffs sue in her official capacity as the head of FinCEN (Dkt. #1 at p. 6). Finally, Plaintiffs sue Defendant FinCEN as a bureau of a federal agency that administers and enforces the CTA and its implementing regulations (Dkt. #1 at p. 6). Collectively, the Court refers to Defendants as "the Government."

### III.    Procedural History

On May 28, 2024, Plaintiffs initiated this lawsuit seeking a declaratory judgement that the CTA is unconstitutional and an injunction against its enforcement (Dkt. #1). On June 3, 2024, Plaintiffs moved the Court to enter a preliminary injunction against enforcement of the CTA and Reporting Rule (Dkt. #6). On June 26, 2024, Defendants responded, opposing the issuance of any injunctive relief (Dkt. #18). Plaintiffs replied, maintaining that a preliminary injunction is warranted (Dkt. #19). On September 24, 2024, Defendants notified the Court of supplemental persuasive authority: *Firestone v. Yellen*, No. 3:24-cv-1034-SI, 2024 WL 4250192, (D. Or. Sept. 20, 2024) (Dkt. #22). After the Court set this matter for a hearing, the parties jointly filed stipulations that negated the need to call witnesses at the hearing (Dkt. #24). On October 9, 2024, the Court heard the arguments of counsel. Finally, on October 24, 2024, Defendants notified the Court of further supplemental persuasive authority: *Cmty. Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E. D. Va. Oct. 24, 2024) (Dkt. #27).

### LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must

establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable harm absent injunctive relief; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not harm the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction . . . should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "is not required to prove his case in full at a preliminary injunction hearing." *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision of whether to grant a preliminary injunction lies within the sound discretion of the district court. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

Plaintiffs challenge the CTA on several grounds. Namely, Plaintiffs assert that the CTA is unconstitutional both facially and as applied because: (1) the CTA intrudes upon States' rights under the Ninth and Tenth Amendments; (2) the CTA compels speech and burdens Plaintiffs' right of association under the First Amendment; and (3) the CTA violates the Fourth Amendment by compelling disclosure of private information (Dkt. #1 at pp. 25–31). For each of these reasons, independently and collectively, Plaintiffs assert that FinCEN's Reporting Rule, which implements the CTA, is also unconstitutional and should be set aside under § 706 of the Administrative Procedure Act ("APA") (Dkt. #1 at p. 31).

Whether the CTA and the Reporting Rule are absolutely unconstitutional is a question for another day. Today, it is enough for the Court to determine whether Plaintiffs have demonstrated a substantial likelihood of success on the merits of any of their claims, in addition to satisfying the

three additional elements necessary for a preliminary injunction. *See Nichols*, 532 F.3d at 372. Before the Court can reach the merits of Plaintiffs' arguments, it must dispense with two threshold matters. Namely, the Court must perform a dual-pronged standing inquiry. First, it must assess whether the individual Plaintiffs have standing. Second, the Court must ensure that NFIB has associational standing to participate in this litigation on behalf of its members.

## I.    Standing

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020). Though Defendants do not contest that Plaintiffs have standing, "it is well established that [the Court] has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Here, Plaintiffs consist of both individuals and an association. While an individual's standing is an independent legal inquiry, whether an organization has standing hinges in part on whether its members alone would have standing. *See Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 939 F.3d 533, 536 (5th Cir. 2019). Because two of the individual Plaintiffs here are members of NFIB, the associational standing inquiry builds off of the individual standing assessment to some extent. Thus, the Court first asks whether each individual Plaintiff has standing. Then, the Court will assess whether NFIB has standing. For the reasons that follow, the Court concludes that every Plaintiff has standing.

### A.    Individual Standing

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1993). Article III of the United States Constitution mandates that federal courts may only hear "Cases" and "Controversies." U.S. CONST. art. III, § 2. "The doctrine of standing gives meaning to these

constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Thus, Article III standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). A matter is only justiciable if a plaintiff establishes every element of standing. *See id.*

To establish standing, an individual plaintiff must satisfy the "familiar three-part test" under Article III. *Gill v. Whitford*, 585 U.S. 48, 65 (2018). The plaintiff must have: "'(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Career Colls. & Schs. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (quoting *Gill*, 585 U.S. at 65); *Summers*, 555 U.S. at 493. These requirements "constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (quoting *Lujan*, 504 U.S. at 560)). The party invoking federal jurisdiction carries the burden of establishing that they have standing. *Id.* at 561. And because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 562. A court may only issue a preliminary injunction if the plaintiff makes a "clear showing that the plaintiff is entitled to such relief." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (quoting *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017)). Thus, at this stage, "[P]laintiffs must make a 'clear showing' of standing to maintain the injunction." *Id.* Plaintiffs have met that burden here.

1.    ***Injury in Fact***

The first element of standing is an injury in fact. *Gill*, 585 U.S. at 65. An alleged injury must meet three requirements to constitute an injury in fact. First, the injury must be "'concrete,' meaning that it must be real and not abstract." *FDA*, 602 U.S. at 381 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). Second, the injury must be "particularized." *Lujan*, 504 U.S. at 560, n.1. That is, "the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *FDA*, 602 U.S. at 381 (quoting *id.*). To demonstrate, the Supreme Court has noted that "[a]n injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take a few common examples." *Id.* Third and finally, the injury must be "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S., 398, 420–22 (2013)). In cases such as this one, "when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

With this in mind, a plaintiff may challenge a federal statute before it has been enforced if they can "demonstrate a realistic danger of sustaining a direct injury [from the federal statute's] enforcement." *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 298, 298 (1979). This rule makes sense, as certainly, Article III's standing requirements do not require a plaintiff to "expose himself to actual arrest or prosecution to be entitled to challenge" the statute. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Thus, in cases involving pre-enforcement challenges, a plaintiff satisfies the injury-in-fact requirement if they "'intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder.'" *Paxton v. Dettelbach*, 105 F.4th 708, 711 (5th Cir. 2024) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Independently, "'an increased regulatory burden typically satisfies the injury[-]in[-]fact requirement.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015)). As the Fifth Circuit has recognized, where a "new Rule requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," the injury-in-fact requirement is satisfied. *Career Colls. & Schs. of Tex.*, 98 F.4th at 234 (internal citation omitted). This too makes sense, as "these are precisely the types of concrete injuries that [the Fifth Circuit] has consistently deemed adequate to provide standing in regulatory challenges." *Id.*

Here, each of the five individual Plaintiffs have met their burden to satisfy the injury-in-fact requirement for two reasons. *First*, Plaintiffs' Complaint and Declarations show that they "intend to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute." *See Susan B. Anthony List*, 573 U.S. at 159. Specifically, each individual Plaintiff has not filed a beneficial ownership information report with FinCEN and refuses to file such a report absent a judicial declaration that they must comply with the CTA (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). Plaintiffs recognize that the CTA compels them to tender a BOI report to FinCEN (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). Nonetheless, Plaintiffs refuse to do so because they contend that the CTA violates their rights under the First, Fourth, Ninth, and Tenth Amendments to the United States Constitution. (*See* Dkt. #6 at pp. 17, 18, 19, 21, 24; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4; Dkt. #6-7). The parties agree that Plaintiffs' intended course of action subjects Plaintiffs to criminal and civil liability under the CTA (*See* Dkt. #6 at p. 2; Dkt. #18 at p. 5). And "there is no doubt that the CTA will be applied

with its full force." *NSBU v. Yellen*, 721 F. Supp. 3d 1260, 1271 (N.D. Ala. 2024). It is axiomatic that the Government does not defend the CTA in this litigation simply for the sake of litigating—the CTA and its implementing regulations would be aspirational were it not for its robust penalty provisions. *See* 31 U.S.C. § 5336(h). Thus, "the [P]laintiffs' fear of prosecution [is] not imaginary or wholly speculative." *See Susan B. Anthony List*, 573 U.S. at 160.[4] Accordingly, Plaintiffs have clearly established an injury in fact sufficient to satisfy this prong of the standing inquiry.

 *Second*, the CTA's enforcement would require Plaintiffs to incur increased regulatory burdens, which alone are sufficient to confer standing. *See Contender Farms L.L.P.*, 779 F.3d at 266. The CTA and Reporting Rule, by FinCEN's own admission, will cause reporting companies to incur at least some compliance costs. "FinCEN estimates that it will cost the majority of the 32.6 million domestic and foreign reporting companies that are estimated to exist as of the January 2024 effective date approximately $85 apiece to prepare and submit an initial [beneficial owner information] report." 87 Fed. Reg. at 59550, 59562. FinCEN also estimates that it will take approximately twenty minutes to read a beneficial ownership report form and understand it, thirty minutes to collect information about a company's beneficial owners, and twenty minutes to fill out and file the report, resulting in a seventy-minute endeavor. *Id.* at 59569.[5] FinCEN acknowledges, however, that the more complex the reporting company's structure, the greater the costs. According to FinCEN, more complicated reporting companies may take at least 650 minutes to file a report and incur approximately $2,614.87 in compliance costs. *Id.* at 59473. Here, Plaintiffs confirm that they will incur such compliance costs, among others, if the CTA and Reporting Rule

---

[4] Straayer, as the only Plaintiff who is a natural person, also faces the CTA's criminal penalty provisions. *See* 31 U.S.C. § 5336(h).

[5] But the Court notes that as a practical matter, it takes far longer than seventy minutes simply to read the CTA and Reporting Rule alone.

are not enjoined (Dkt. #6 at p. 9). These costs are "precisely the types of concrete injuries that [the Fifth Circuit] has consistently deemed adequate to provide standing in regulatory challenges." *See Career Colls. & Schs. of Tex.*, 98 F.4th at 234. Thus, Plaintiffs have satisfied the injury-in-fact requirement because of the increased regulatory burden that the CTA and Reporting Rule imposes on Plaintiffs. *See id.*

### 2.   *Causation & Redressability*

The second and third elements of standing—causation and redressability—"are often 'flip sides of the same coin.'" *FDA*, 602 U.S. at 380–81 (quoting *Spring Commc'ns Co. v. APCC Servs., Inc.*, 544 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* In cases such as this one, where Plaintiffs sue the Government seeking relief from one of its regulations, these two elements are "easy to establish." *Id.* at 382 (citing *Lujan*, 504 U.S. at 561–62; *Susan B. Anthony List*, 573 U.S. at 162–63). Indeed, "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy the . . . causation requirement[]." *Id.* Because the Government's statute (the CTA) and regulation (the Reporting Rule) aggrieve Plaintiffs, and because the Court's relief may redress Plaintiffs' alleged injuries, Plaintiffs have satisfied Article III's causation and redressability requirements. *See id.* Accordingly, the individual Plaintiffs here have standing to bring the instant lawsuit.

### B.   Associational Standing

Having determined that the individual Plaintiffs in this lawsuit have standing, the Court now turns to the issue of whether NFIB has associational standing such that it may partake in this litigation on behalf of its members. As both the Supreme Court and Fifth Circuit have recognized, an association (such as NFIB) has standing to sue on behalf of its members when three elements

are satisfied. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). First, the association's members must "independently meet" Article III's standing requirements. *Hunt*, 432 U.S. at 343. Second, the interests the association "seeks to protect [must be] germane to the organization's purpose[.]" *Id.* Third, "neither the claim asserted nor the relief requested [may] require[] the participation of individual members in the lawsuit." *Id.* Here, all three elements are satisfied.

*First*, NFIB's members appear to independently satisfy Article III's standing requirements. Just like the individual Plaintiffs that filed this lawsuit, NFIB's members—among whom are TTCS and Data Comm—are reporting companies that fall subject to the CTA and Reporting Rule (Dkt. #6-7). One additional example is Grazing Systems Supply, which is a reporting company (Dkt. #6-7 at p. 2). Just like the individual Plaintiffs discussed above, *see supra* Section I.A, NFIB's members will incur compliance costs to comply with the CTA (Dkt. #6-7 at p. 2). Similarly, their grievance is against the CTA and the Reporting Rule, which are Government regulations (Dkt. #6-7). Thus, NFIB's members individually satisfy Article III's standing requirements. *See Hunt*, 432 U.S. at 343; *Ctr. for Biological Diversity*, 937 F.3d at 536; *FDA*, 602 U.S. at 382.

*Second*, the interests that NFIB seeks to protect through its participation in this litigation are certainly germane to NFIB's purpose. *See Hunt*, 432 U.S. at 343. NFIB's purpose, in large part, is to "advocate[] for small businesses" (*See* Dkt. #6 at p. 9). Accordingly, "NFIB and its members oppose the CTA, and NFIB has advocated publicly for its repeal on behalf of its members that must comply with the Act and its implementing regulations" (Dkt. #6-7 at p. 2; Dkt. #6-7, Exhibit A). The precise interest that NFIB seeks to protect through its participation in this litigation is to ensure its members do not need to comply with the CTA and the Reporting Rule—which NFIB

and its members contend is unconstitutional (*See* Dkt. #6-7 at p. 2; Dkt. #6-7, Exhibit A). That is pertinent to NFIB's purpose, especially as FinCEN notes the CTA will impact small businesses. *See* 87 Fed. Reg. at 59550. Thus, the second prong of associational standing is satisfied here. *See Hunt*, 432 U.S. at 343; *see also Assoc. of Am. Physicians & Surgeons, Inc.*, 627 F.3d 547, 551 n.2 (5th Cir. 2010) (noting that the germaneness prong is low and requires only a "mere pertinence" between the litigation at issue and the organization's purpose).

*Third* and finally, the Court asks whether the claim asserted, or the relief requested, would require NFIB's individual members to participate in the lawsuit. *See Hunt*, 432 U.S. at 343. This concern is not constitutional, but prudential. *Assoc. of Am. Physicians & Surgeons*, 627 F.3d at 550 (citing *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)). This final element concerns "matters of administrative convenience and efficiency." *Brown Grp.*, 517 U.S. at 555. In determine whether this prong of the standing analysis is satisfied, courts "examin[e] both the relief requested and the claims asserted." *Assoc. of Am. Physicians & Surgeons*, 627 F.3d at 551. While "'an association's action for damages running solely to its members would be barred for want of the association's standing to sue,'" where the association seeks declaratory or injunctive relief, the third prong is usually satisfied. *Id.* (quoting *Brown Grp.*, 517 U.S. at 546). Here, because NFIB seeks the equitable remedies of injunctive and declaratory relief, there is no need for its individual members to participate in the lawsuit. *See id.* Accordingly, NFIB has satisfied its burden to meet Article III's standing requirements. Thus, the Court may safely continue to the merits of the case.

## II.    Plaintiffs' Challenges to the Corporate Transparency Act and Reporting Rule

The Court now turns to the question of whether it should issue a preliminary injunction. The answer to that question turns on whether Plaintiffs have carried their burden to prove: (1) that

the CTA and Reporting Rule substantially threaten Plaintiffs with irreparable harm; (2) a substantial likelihood of success on the merits of any of their challenges; (3) that the threatened harm outweighs any damage the injunction might have on the Government; and (4) that preliminary injunctive relief will not harm the public. *See Nichols*, 532 F.3d at 372. The Government disputes that Plaintiffs have carried their burden to satisfy each element (Dkt. #5 at pp. 7, 10, 29). The Court addresses each element seriatim.

### A.    Substantial Threat of Irreparable Harm

Plaintiffs must demonstrate that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Irreparable harm is "'harm for which there is no adequate remedy at law.'" *Louisiana v. Biden*, 55 F.4th 1017, 1033–34 (5th Cir. 2022) (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)). In the Fifth Circuit, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). That makes sense, as compliance costs may constitute irreparable injury "where they cannot be recovered in the ordinary course of litigation' *Rest. Law Ctr.*, 66 F.4th at 597. Such is the case in regulatory challenges and suits against the United States (like this one) because the federal government "generally enjoy[s] sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Thus, as the Fifth Circuit has recognized time over, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Rest. Law Ctr.*, 66 F.4th at 597 (quoting *Louisiana v. Biden*, 55 F.4th at 1034 (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016)) (emphasis in original). To constitute irreparable harm, however, such compliance costs "must be more than 'speculative." *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Instead,

plaintiffs must have "'more than an unfounded fear'" of incurring such costs. *Id.* (quoting *Texas v. EPA*, 829 F.3d at 433). Separately, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012))).

Here, Plaintiffs allege that the CTA and Reporting Rule, if not enjoined, will irreparably harm them in two ways. First, Plaintiffs contend simply that, absent an injunction, they will be forced to comply with the CTA and the Reporting Rule (Dkt. #6 at p. 29). As a result, Plaintiffs would have to "expend resources" and "spend time and effort to make the required filings" (Dkt. #6 at p. 29). In furtherance of their compliance efforts, Plaintiffs aver that they would also incur legal expenses (Dkt. #6 at p. 29). Every individual Plaintiff filed a Declaration in which they swore that they would incur these costs should the CTA and Reporting Rule remain in force (*See* Dkt. #6-2 at p. 2; Dkt. #6-3 at p. 2; Dkt. #6-4 at p. 2; Dkt. #6-5 at p. 2; Dkt. #6-6 at p. 4). Similarly, NFIB filed a Declaration in which it swore that if the CTA and Reporting rule are not enjoined, its members would incur compliance costs and legal expenses associated with fulfilling its obligations under the CTA and Reporting Rule (Dkt. #6-7 at p. 2). The Government stipulated that the Plaintiffs would have testified to the same at the Court's October 9 hearing should they have testified (Dkt. #24).

The second manner that the CTA and Reporting Rule allegedly threaten Plaintiffs with irreparable harm is that the CTA and Reporting Rule violate their rights under the First, Fourth, Ninth, and Tenth Amendments to the Constitution (Dkt. #6 at p. 29). To Plaintiffs, "the mere

24

'threat'" of "revealing protected information on pain of criminal punishment" constitutes irreparable harm (Dkt. #6 at p. 29) (quoting *Book People, Inc.*, 91 F.4th at 341).

The Government sees it quite differently. According to it, neither of Plaintiffs' bases for irreparable harm are sufficient.[6] First, the Government contends that Plaintiffs cannot establish irreparable harm due to compliance costs (Dkt. #18 at p. 19). It argues that "the evidence Plaintiffs cite in support [of the compliance costs they would incur under the CTA and Reporting Rule] is wholly conclusory, consisting of a single statement in the non-associational Plaintiffs' declarations," it argues (Dkt. #18 at p. 19). Second, the Government submits that any compliance costs Plaintiffs would incur are *de minimis* (Dkt. #18 at p. 19). In support, the Government notes that Plaintiffs, by their own admissions, have already determined that they are reporting companies subject to the CTA and Reporting Rule (Dkt. #18 at p. 19). The beneficial ownership report form is free, and the information the Plaintiffs would have to disclose is, in the Plaintiffs' own words, "readily available," the Government argues (Dkt. #18 at p. 19). In essence, because the Government believes that the reporting process is simple, any costs Plaintiffs incur are *de minimis*, militating against a finding that Plaintiffs have proved they will suffer irreparable harm, so the argument goes (*See* Dkt. #18 at p. 19).

But the Fifth Circuit rejected both arguments wholesale just last year, characterizing them as "meritless." *See Rest. Law Ctr.*, 66 F.4th at 598. To demonstrate irreparable harm, Plaintiffs need not plead a specific dollar amount representing the total amount of compliance costs they

---

[6] Initially, the Government also argued that "Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief" (Dkt. #18 at p. 18). Accordingly, the Government suggested that Plaintiffs did not demonstrate the necessity of a preliminary injunction because there was enough time for the Court to resolve the case through dispositive motions (Dkt. #18 at p. 18). The Government advanced this argument when it filed its Response in late June of 2024. The Court's schedule, however, prevented it from being able to have a hearing prior to October of 2024. As a result, the Government abandoned this argument at the Court's October 9 hearing.

might incur. *Id.* at 600. "Stringently insisting on a precise dollar figure reflects an exactitude that our law does not require." *Id.* Thus, it is enough that each Plaintiff swore in their Declarations that they will incur compliance costs and legal costs should they have to comply with the CTA and Reporting Rule. *See id.* Further, the Government's assertion that NFIB—the associational Plaintiff in this matter—did not discuss compliance costs in its Declaration is demonstrably false and does not change this conclusion (*See* Dkt. #18 at p. 19). NFIB swore that its members would incur compliance costs should the CTA and Reporting Rule remain in force (*See* Dkt. #6-7 at p. 2). This too is sufficient. *See id.*

Moreover, the Court and the Government need not accept Plaintiffs' sworn word for it—FinCEN itself concedes that reporting companies will incur compliance costs of the same sort that Plaintiffs describe in their Declarations as a result of the CTA and Reporting Rule. *See* 87 Fed. Reg. at 59585–86 ("FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after."). This concession bolsters the Plaintiffs' belief that they will suffer irreparable harm. *See Rest. Law Ctr.*, 66 F. 4th at 600. It is ironic that the Government suggests that Plaintiffs must plead their compliance costs with greater specificity. Indeed, the Government itself only provides "estimates" in the form of broad ranges of compliance costs. *See* 87 Fed. Reg. at 59585–86. The Government seeks to hold the Plaintiffs to a standard that the law does not require. That Plaintiffs' Declarations do not include a specific dollar figure in no way reduces their showing of irreparable harm. *See id.*

The Court also disagrees with the Government's position that it would, in essence, be too easy for the Plaintiffs to comply with the CTA and Reporting Rule for their obligations to constitute irreparable harm. In support of its position that any harm Plaintiffs would incur is *de minimis*, the

Government directs the Court to the Northern District of Texas case, *Second Amend. Found., Inc. v. ATF* (Dkt. #18 at p. 19) (citing No. 3:21-cv-0116, 2023 U.S. Dist. LEXIS 202589, at *48–49 (N.D. Tex. Nov. 13, 2023)). That case does nothing to suggest that the costs Plaintiffs face here are, in fact, *de minimis*. There, the Court noted that the record "simply [did] not illustrate the nature of [the plaintiff's] compliance costs, let alone that they [were] not more than *de minimis*." *Id.* Having no evidence to suggest that the regulation at issue there would actually force the plaintiff to suffer compliance costs, the district court concluded that the plaintiff did not show irreparable harm. *See id.* There, consistent with Fifth Circuit precedent, the district court did not define the contours of "*de minimis.*" *See id.*; *Rest. Law Ctr.*, 66 F.4th at 599–600 (declining to define a specific dollar amount for what constitutes more than *de minimis* compliance costs). Here, the record contains sufficient evidence to show that the compliance costs Plaintiffs face exceed some *de minimis* value.

The Court declines the Government's invitation to make a bright-line value judgement as to what quantum of pecuniary injury constitutes "more than *de minimis*" compliance costs. *See Louisiana v. Biden*, 55 F.4th at 1035. To be sure, the Plaintiffs' alleged compliance costs must be "more than *de minimis*" to rise to the level of irreparable harm. *Id.* But it would be inconsistent with precedent to define a specific dollar figure. The key inquiry here is "not so much the magnitude but the irreparability that counts." *Texas v. EPA*, 829 F.3d at 433–34. And in any event, deprivations of constitutional rights come a few dollars at a time. Setting a bright-line rule thus makes little sense in this context. Plus, FinCEN acknowledges that companies *will* incur compliance costs like those that Plaintiffs allege. *See* 87 Fed. Reg. at 59585–86. The Government

does not dispute that Plaintiffs cannot recover these costs (*See* Dkt. #18 at p. 19). *See also Wages & White Lion Invs.*, 16 F.4th at 1142. Thus, the Government's argument on this point is unavailing.

Next, the Government claims that compliance is not a heavy lift for the Plaintiffs (Dkt. #18 at p. 19). But that is not the standard. To reiterate, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Rest. Law Ctr.*, 66 F.4th at 597 (quoting *Louisiana v. Biden*, 55 F.4th at 1034 (citing *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))) (emphasis in original). There is nothing in these facts or at law to suggest that the Court should treat this as an abnormal case not subject to this general rule. The compliance costs Plaintiff alleges are unrecoverable and more than *de minimis*. *See Rest. Law Ctr.*, 66 F.4th at 599–600. The costs are far more than speculative, as FinCEN itself acknowledges, and the Government wisely does not dispute. *See* 87 Fed. Reg. 59585–86. Thus, Plaintiffs have met their burden to show that, absent injunctive relief, they will suffer irreparable harm.

Despite having determined that Plaintiffs have met their burden to show impending irreparable harm in the form of compliance costs, for the avoidance of doubt, the Court will address Plaintiffs' second theory of irreparable harm. Plaintiffs alternatively alleged that they will suffer irreparable harm because the CTA and Reporting Rule putatively violate their constitutional rights (Dkt. #6 at p. 29). To the Government, however, an alleged constitutional violation alone will not suffice (Dkt. #18 at p. 19). The Government notes, "'the invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative injury.'" (Dkt. #18 at p. 19) (quoting *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016)). Hence, the Government argues, it would be improper to hold that Plaintiffs would suffer "irreparable harm solely [based on Plaintiffs'] allegation that [their] constitutional rights have been violated" (Dkt. #18 at p. 19).

In support, the Government cites two opinions. First, it points the Court to *Castro v. City of Grand Prairie*, an unpublished case (Dkt. #18 at p. 19) (citing No. 3:21-CV-885, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021)). There, a *pro se* plaintiff sought a temporary restraining order ("TRO") and brought claims under 42 U.S.C. § 1983. *Castro*, 2021 WL 1530303, at *1. The plaintiff, a candidate for political office, alleged that the city of Garland violated his rights under the First Amendment and Equal Protection Clause when a county sheriff threatened to remove the plaintiff's campaign signs across the county. *Id.* He further alleged that the city violated his rights when a county official removed his campaign signs that were placed on private property. *Id.* The district court denied emergency relief for two reasons. First, the plaintiff's "TRO Application consist[ed] of one page of conclusory assertions, and his Complaint [was] devoid of any allegations that would satisfy the requirements for liability under section 1983." *Id.* at *2. Second and as a result of his "conclusory" allegations, Plaintiff failed to prove that he faced a substantial threat of irreparable harm. *Id.*

The Government also relies on *Sheffield v. Bush* for the same proposition (Dkt. #18 at p. 19) (citing 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022)). There, two homeowners challenged an order issued by the Texas General Land Office that impacted the homeowners' property. *Id.* at 595. The homeowners sought a preliminary injunction against the order's enforcement and a declaratory judgment that the order amounted to an unconstitutional taking that also violated both the Fourth Amendment and the Due Process Clause. *Id.* The court denied the plaintiffs' motion for preliminary injunction for what appear to be two principal reasons, at least as relevant here. First, the court was "not yet convinced" that plaintiffs had shown a constitutional violation. *Id.* at 609. Second, the court found that "an allegation" of a constitutional violation, "taken alone," was not

sufficient to establish an irreparable injury. *Id.* In reaching this conclusion, the court recognized that in *Elrod v. Burns*, the Supreme Court held that "'the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The court noted that the Fifth Circuit had yet to apply *Elrod* to cases "outside of the First Amendment context." *Id.* (internal citation omitted).

But neither of these cases suggest that Plaintiff has not met their burden here. Whereas the court in *Castro* determined that the plaintiff had not shown irreparable harm because his allegations were "conclusory," that is not the case here. Rather, the record before the Court contains sufficient facts to indicate the CTA and the Reporting Rule may violate the Constitution. *Cf. Castro*, 2021 WL 1530303, at *2. The Court does not detect a deficiency in Plaintiffs' pleadings.

The Government's reliance on *Sheffield* is no more persuasive. First, the First Amendment is at issue in this case (*See* Dkt. #6 at pp. 19–25). Second, it appears that the Fifth Circuit *has* applied *Elrod*—or, at minimum, its undergirding principles—at least once outside of the context of the First Amendment. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (1981) (applying *Elrod* in the context of the right to privacy). There is no reason it should not apply here. Any other conclusion would render the Fifth Circuit's well-established position that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary" a nullity. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995)); *see also Book People, Inc.*, 91 F.4th at 340. Thus, "upon a showing that an 'alleged' fundamental right 'is either threated or in fact being impaired,' a movant is substantially threatened with irreparable injury that 'cannot be

undone by monetary relief.'" *Mock v. Garland*, 697 F. Supp. 3d 564, 577 (N.D. Tex. 2023), *appeal dismissed as moot sub nom. Watterson v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 23-11157, 2024 WL 3935446 (5th Cir. Aug. 26, 2024) (quoting *Opulent Life Church*, 697 F.3d at 295–97; *Deerfield Med. Ctr.*, 661 F.2d at 338).

Here, Plaintiffs claim that the CTA violates three fundamental rights. First, the right to be free from laws that Congress does not have authority to enact (Dkt. #6 at pp. 9–19). Second, Plaintiffs allege the CTA and Reporting Rule violate their rights under the First Amendment (Dkt. #6 at pp. 19–25). And third, Plaintiffs contend that the CTA and Reporting Rule violate their rights under the Fourth Amendment (Dkt. #6 at pp. 25–27). The invocation of these rights is not a "'substitute for the presence of an imminent, non-speculative injury'" as the Government points out (Dkt. #18 at p. 19) (quoting *Google, Inc.*, 822 F.3d at 228). But Plaintiffs must comply with the CTA and Reporting Rule by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii). The Government does not protest that impending deadline. And if Plaintiffs must comply with an unconstitutional law, the bell has been rung. Absent injunctive relief, come January 2, 2025, Plaintiffs would have disclosed the information they seek to keep private under the First and Fourth Amendments and surrendered to a law that they contend exceeds Congress's powers. That damage "cannot be undone by monetary relief." *See Deerfield Med. Ctr.*, 661 F.2d at 338. That harm is irreparable.

Because Plaintiffs have met their burden to show that they will suffer unrecoverable compliance costs absent emergency relief, they have met their burden to show that the CTA and Reporting Rule threaten substantial, imminent, non-speculative, and irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 598; *Texas v. EPA*, 829 F.3d at 433. Independent of the specter of compliance costs on the horizon, Plaintiffs have met their burden to show the threat of irreparable harm

because the CTA and Reporting Rule substantially threaten their constitutional rights. *See Deerfield Md. Ctr.*, 661 F.2d at 338; *Book People, Inc.*, 91 F.4th at 340.

### B.    Likelihood of Success on the Merits

The Court turns next to the merits of the case and asks whether Plaintiffs have carried their burden to show a substantial likelihood of success on the merits. In making this determination, the Court must carefully measure the CTA and the Reporting Rule against our written Constitution in an effort to resolve this matter of first impression in the Fifth Circuit. This inquiry requires extensive analysis and begins with a discussion of the type of challenges the Plaintiffs bring against the CTA and Reporting Rule.

Plaintiffs mount two types of attacks against the CTA. Plaintiffs contend that the CTA and Reporting Rule are unconstitutional both facially and as applied. "A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffel*, 415 U.S. at 474). Challenges of these sort against legislative acts are "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As-applied challenges are narrower and less burdensome. An as-applied attack requires the Court to decide "whether a statute is administered unconstitutionally against a particular plaintiff." *Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 774 (N.D. Tex. 2018), *aff'd sub nom. Does 1-7 v. Abbott*, 945 F.3d 307 (5th Cir. 2019).

In cases such as this one, where "a litigant brings both as-applied and facial challenges, courts generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019). However, this general rule might change in the context of enumerated powers challenges. "By their very nature, almost all constitutional

challenges to specific exercises of enumerated powers, particularly the Commerce Clause, are facial." *Virginia ex rel. Cuccinelli v. Sebelius,* 728 F. Supp. 2d 768, 774 (E.D. Va. 2010), *vacated*, 656 F.3d 253 (4th Cir. 2011). "'When a federal statute is challenged as going beyond Congress's enumerated powers, under [Supreme Court] precedent, the Court first asks whether the statute is constitutional *on its face*.'" *Id.* (citing *Nevada Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting) (citing *United States v. Morrison*, 529 U.S. 598 (2000); *City of Boerne v. Flores*, 521 U.S. 507 (1997); *United States v. Lopez*, 514 U.S. 549 (1995) (emphasis in original)). If the statute survives that challenge, "the [C]ourt may . . . proceed to analyze whether the statute (constitutional on its face) can be validly applied to the litigant[s]." *Nevada Dept. of Human Res.*, 538 U.S. at 743 (Scalia, J., dissenting). Here, the first issue before the Court is whether Congress has the power to enact the CTA. Only if Congress had the authority to pass the CTA does it make sense for the Court to take up Plaintiff's as-applied challenge and their attacks on the CTA under the First and Fourth Amendments. Thus, in keeping with that logic, the Court takes up the facial attacks first, starting with Plaintiffs' enumerated powers challenge under the Tenth Amendment.

### 1. *Whether Congress Exceeded its Authority in Passing the CTA*

This issue invites a return to first principles. Since our nascency, it has been "universally admitted" that our Government is "one of enumerated powers." *M'Culloch v. Maryland*, 17 U.S. 316, 405 (1819). Congress's powers are express and defined in our Constitution. U.S. CONST. art. I, § 8. Thus, Congress may only exercise those powers the Constitution expressly vests it with. *Id.* The States and the people retain the remainder. U.S. CONST. amend. X. "The enumeration of [these] powers is also a limitation of powers, because 'the enumeration presupposes something not enumerated.'" *NFIB v. Sebelius*, 567 U.S. 519, 534 (2012). "The Constitution's express conferral of some powers makes clear that it does not grant others." *Id.* Vast as Congress's powers may be,

"it still must show that a constitutional grant of power authorizes its actions." *Id.* at 535 (citing *United States v. Comstock*, 560 U.S. 126 (2010)).  Thus, the Federal Government is not equipped with a federal police power to regulate all aspects of public life. *United States v. Morrison*, 529 U.S. 598, 618–19 (2000). That power belongs to the states alone. *See Sebelius*, 567 U.S. at 535. This principle of federalism, rudimentary in our system, "protects the liberty of the individual from arbitrary power." *Bond v. United States*, 564 U.S. 211, 222 (2011).

Obvious as these notions are, more than two centuries ago, Chief Justice Marshall observed that "the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, so long as our system shall exist." *M'Culloch*, 17 U.S.  at 405. He was right. Some two-hundred and four years later, Plaintiffs' challenge to the CTA poses yet another iteration of this question. As our system has evolved, and the powers that the Government wields have ebbed and flowed, parties have turned to the judiciary to safeguard the promises of the Tenth Amendment. Plaintiffs call upon the Court to do so once more.

But a plea to the Court should not be misconstrued as an invitation for judicial activism. Assessing the constitutionality of a legislative act requires the Court to bear in mind its "limited role in policing th[e] boundaries" of the Government's power. *Sebelius*, 567 U.S. at 534. The Court does not wade into the treacherous waters of policy-making. Neither will the Court opine as to whether legislative action constitutes good governance or sound judgment. For these matters are "entrusted to the Nation's elected leaders." *Id.* at 532. Instead, the Court need only assess "whether Congress has the power under the Constitution to enact the challenged provisions." *Id.* Modest as this function is, judicial deference to a co-equal branch does not render the judicial function a nullity, nor does it gift Congress unbridled discretion to enact whatever legislation it

chooses. History is marked with occasions where Congress's good-faith exercise of its power has strayed too far, and where courts, acting in their unique and exclusive province, have restored the balance by striking down a law as beyond Congress's authority. Though our Constitution excludes the Court from governance and policy-making, the Court embarks alone on matters of legality and constitutionalism. "It is emphatically the province and duty of the judicial department to say what the law is," and sometimes, what the law cannot be. *Marbury*, 5 U.S. at 177. And if Congress lacks the power to enact a given law, that law is no law at all. *See id.* at 175–76.

Plaintiffs contend that the CTA simply cannot be a valid exercise of Congress's enumerated powers. The Government disagrees. It suggests that two provisions of the Constitution authorize the CTA: the Commerce Clause and the Necessary and Proper Clause. If the CTA is authorized by either, then the Court must reject Plaintiffs' facial attack under the Tenth Amendment as a failure to show that their challenge is likely to succeed on the merits. *See Salerno*, 481 U.S. at 745. The Court measures the CTA against each proffered Clause in turn.

**The Commerce Clause**

The Constitution vests Congress with the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several states." U.S. CONST. art. I, § 8, cl. 3. Chief Justice Marshall, writing for the Supreme Court in 1824, first defined commerce, stating:

> [c]ommerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse.

*Gibbons v. Ogden*, 22 U.S. 1, 189 (1824). The Commerce Clause "is the power to regulate; that is, to prescribe the rule by which commerce is governed." *Id.* at 196. While the breadth of Congress's Commerce Power has waxed and waned over the years, ultimately resulting in Congress having

"broad" authority to regulate commerce, that power is not limitless. *See Lopez*, 514 U.S. at 557. The Supreme Court has cautioned that the Commerce Clause "must be considered in light of our dual system" and "may not be extended so as to . . . create a completely centralized government." *Id.* (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Against this backdrop, the Supreme Court has identified "three broad categories of activity that Congress may regulate under its commerce power." *Id.* at 558. They are: (1) "the channels of interstate commerce," (2) "the instrumentalities of interstate commerce" and "persons or things in interstate commerce," and (3) "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). The Government incorrectly contends that each category independently authorizes the CTA (*See* Dkt. #18 at pp. 15–19).

<blockquote>

a.    *The CTA does not regulate channels of, or instrumentalities in, commerce.*

</blockquote>

The Court begins with the first two categories and handles them together. The Government argues that the Commerce Clause authorizes the CTA because "it regulates the channels of, and entities in interstate commerce" (Dkt. #18 at p. 29). In support of this theory, the Government cites *American Power & Light Co. v. SEC*, arguing that "Congress, of course, has undoubted power under the Commerce Clause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils" (Dkt. #18 at p. 29) (quoting 329 U.S. 90, 99 (1946)). The Government also relies upon *North American Co. v. SEC* for the same proposition (Dkt. #18 at p. 29) (citing 327 U.S. 686 (1946)). It notes that the Supreme Court has said, "'to the extent that corporate business is transacted through such channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare,' and 'it may prescribe appropriate regulations and determine the conditions

under which the business may be pursued'" (Dkt. #18 at p. 29) (quoting *Am. Power & Light Co.*, 329 U.S. at 99–100). Because some reporting companies use the "channels of interstate commerce, including telecommunications and electronic bank routing systems," the Government may regulate all reporting companies, so the argument goes (Dkt. #18 at p. 29). Further, the Government claims that Congress's commerce power permits it to regulate directly "those entities who seek to misuse those channels to commit economic crimes" (Dkt. #18 at p. 29).

These arguments misinterpret the scope of Congress's power to regulate channels of and instrumentalities in interstate commerce. The Supreme Court and Fifth Circuit alike define the "channels of interstate commerce" as "the interstate transportation routes through which persons and goods move." *United States v. Bailey*, 115 F.3d 1222, 1226 (5th Cir. 1997) (internal citations omitted); *Morrison*, 529 U.S. at 613 n.5. "This category extends beyond the regulation of highways, railroads, air routes, navigable rivers, fiber-optic cables and the like." *Groome Res. Ltd. v. Par. of Jefferson*, 234 F.3d 192, 203 (5th Cir. 2000) (internal citations omitted). The Supreme Court affirmed that Congress may regulate in this category to "prohibit discrimination in public accommodations" and noted that Congress has used the Commerce Clause "to prevent illicit goods from traveling through the channels of commerce." *Id.* (citing *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 256 (1964)).

In contrast, the term "instrumentalities in interstate commerce," is understood to refer to the "planes, trains, and automobiles" of commerce, "along with the persons associated with them." *Hobby Lobby Distillers Ass'n v. ATF*, No. 4:23-CV-1221-P, 2024 WIL 3347841, at *13 (N.D. Tex. July 10, 2024) (citing *United States v. Ballinger*, 395 F.3d 1219, 1226 (11th Cir. 2005) (the instrumentalities of commerce are generally held to be the people and things themselves moving

in commerce, and the people who make commerce possible)); *Lopez*, 514 U.S. at 558 (defining "instrumentalities of interstate commerce" as "persons or things in interstate commerce"); *Bailey*, 225 F.3d at 1227 (defining "instrumentalities" as "persons or things moving in commerce . . . includ[ing] regulation or protection pertaining to instrumentalities or things as they move in interstate commerce") (internal citations omitted).

While the Government begins its argument with an assumption—that the CTA regulates companies that use channels or instrumentalities in interstate commerce—the Court starts the inquiry, as always, with the statute's text. *See Germain*, 503 U.S. at 254. The CTA regulates "reporting companies," which the Act defines as an entity "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). As a result of having so registered, the CTA requires those companies to divulge their beneficial ownership information to FinCEN on pain of civil and criminal punishment. *Id.* §§ 5336(b)(1)-(2)(A); 5336(h). The District Court for the Northern District of Alabama, faced with this definition, held that the CTA does not regulate, by its text, a channel or instrumentality of commerce. *NSBU v. Yellen*, 721 F. Supp. 3d at 1278.

The Court agrees with its sister court. "The word 'commerce' or references to any channel or instrumentality of commerce, are nowhere to be found in the CTA." *Id.* And when examining the CTA's language, the Court "must presume that Congress 'says in a statute what it means and means in a statute what it says.'" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). Companies, generally, do not fit into either

category; they are not a "channel" or "instrumentality" of commerce. *See Lopez*, 514 U.S. at 558–59 (collecting cases indicating that channels and instrumentalities of commerce are the pathways of commerce and the items moving in commerce); *Ballinger*, 395 F.3d at 1226 (same). If they were, then Congress could regulate any company, in any way, all the time. There is no limiting principle in that, and precedent does not support acceptance of such a capacious construction of the words "channel" and "instrumentality." *See Lopez*, 514 U.S. at 558–59.

Though the CTA does not directly regulate channels or instrumentalities of commerce, the Government contends that Supreme Court precedent extends Congress's ability to regulate in this realm to companies *that use* channels and instrumentalities of commerce (*See* Dkt. #18 at p. 29). Indeed, it is "well-settled" that Congress can invoke its commerce power to regulate "those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral, or economic nature." *United States v. Orito*, 413, U.S. 129, 144 (1973). But this grant of power, too, does not write Congress a blank regulatory check. In *American Power & Light Co. v. SEC*, two public utility holding companies challenged the Public Utility Holding Act as outside of Congress's commerce power. 329 U.S. at 96–97. The Public Utility Holding Act authorized the SEC to require registered holding companies to "ensure" that the company's corporate structure "did not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders." *Id.* at 97. The Supreme Court upheld the Act, largely because Congressed aimed at "solely to public utility holding company systems that use[d] channels of interstate commerce." *Id.* at 100. But Congress did not include such an express aim in the CTA; it does not only regulate those companies that use channels or instrumentalities. *See* 31 U.S.C. § 5336. Instead, it assumes that every company *does*

use channels and instrumentalities of interstate commerce without a jurisdictional hook of any kind that would limit the CTA's reach to only those companies who do use those channels or instrumentalities. *See id.* As the district court in *NSBU v. Yellen* observed, that theory exceeds the boundaries of the Commerce Clause. *See* 721 F. Supp. 3d at 1280. Accordingly, the Government must seek to justify the CTA through a different avenue.

b.      *The CTA does not regulate an activity—it creates one.*

Because the CTA does not regulate the channels or instrumentalities of commerce, it may only be sustained under the third category of Congress's commerce power. That is, it must regulate an activity, which, in the aggregate, substantially impacts interstate commerce. *See Raich*, 545 U.S. at 16–17. This is the Government's last hope to justify the CTA as a bare exercise of Congress's power under the Commerce Clause. But before launching into this inquiry under Congress's third category of commerce power, there is a threshold issue which has, at times, foreclosed Congress's ability to legislate under the umbrella of this third category. In *NFIB v. Sebelius*, the Supreme Court drew attention to this initial hurdle. Simply put, legislation under the Commerce Clause must *regulate* an *existing* activity—not compel activity. *See Sebelius*, 567 U.S. at 551–53. "The power to *regulate* commerce presupposes the existence of commercial activity to be regulated. If the power to regulate something included the power to create it, many provisions in the Constitution would be superfluous." *Id.* at 551 (emphasis in original).

Concomitant with this rule is nuance. At issue in *Sebelius* was the Affordable Care Act's individual mandate provision, which forced individuals to purchase health insurance to provide a minimum baseline of coverage. *Id.* at 530–31. In assessing whether Congress, under the Commerce Clause, had the power to enforce the individual mandate, the Supreme Court noted that all of its precedent "ha[d] one thing in common: They uniformly describe the power as reaching

40

'activity.'" *Id.* at 551 (citing *Lopez*, 514 U.S. at 560 ("where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained"); *Perez v. United States*, 402 U.S. 146, 154 (1971) ("where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class") (emphasis in original); *Wickard v. Filburn*, 317 U.S. 111, 125 (1942) ("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."); *Jones & Laughlin Steel*, 301 U.S. at 37 ("Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens or obstructions, Congress cannot be denied the power to exercise that control")). Thus, for Congress to properly exercise its power to "regulate commerce," it cannot force one to engage in an activity for the sole purpose of having something to regulate. *See id.* at 554.

The Supreme Court rejected the Government's theory that the Commerce Clause empowered Congress to enact the individual mandate precisely because it did not regulate a pre-existing activity—it created one of its own. *Id.* at 552. Rather than regulating a commercial activity, the Supreme Court reasoned, the individual mandate "compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." *Id.* (emphasis in original). But this, the Constitution does not permit. Any other holding "would effectively override" the Commerce Clause's limitations "by establishing that individuals may be regulated under the Commerce Clause whenever enough of them are not doing something the Government would have them do." *Id.* at 553.

Like the individual mandate, this is where the Government's proffered Commerce Clause justification of the CTA begins to unravel. Initially, Plaintiffs, consistent with separate litigation against the CTA occurring across the Nation, argued that the CTA "regulates the act of registration under state law" (Dkt. #15 at p. 15). *See, e.g.*, *Cmty. Assn's Inst. v. Yellen*, No. 1:23-CV-1597 (MSN/LRV), 2024 WL 4571412, at * 7 (E.D. Va. Oct. 24, 2024). But at the Court's October 9 hearing, Plaintiffs abandoned that characterization. Instead, Plaintiffs suggested that the CTA does not regulate an activity at all, but rather that the CTA regulates, on an ongoing basis, reporting companies and beneficial owners. In its Response, the Government did not articulate what, precisely, the activity is that Congress strives to regulate through the CTA (*See* Dkt. #18). The Government's Response does, however, tacitly dispute Plaintiffs' initial position, arguing that "the CTA does not purport to override or preempt any state-law incorporation provisions" (Dkt. #18 at p. 27). Still, this does not answer the narrow question, what is the "activity" the CTA regulates? Once more, the Court's hearing provided clarity. There, the Government stated that "the conduct that the CTA regulates is the anonymous existence and operation of corporations." The Government takes a substantially similar position in litigation involving enumerated powers challenges to the CTA in courts across the country. *See, e.g.*, *id.* ("The [G]overnment argues that the 'CTA does not, and does not purport to regulate corporate entity-formation . . . . Rather, the CTA governs the conduct of a covered entity *as an ongoing concern*.'") (emphasis in original).

The Court agrees with the Government's framing of the issue. That the CTA changes, in any way, the process of registration under any state law is a non sequitur. It adds nothing to, nor detracts in any way from, the registration process under State law. *See generally* 31 U.S.C. § 5336. Instead, it uses the act of registration as a triggering event for the CTA's applicability. *Id.*

42

§ 5336(a)(11). Thus, the Court agrees that the CTA does not regulate the act of registration, consistent with the District Court for the Eastern District of Virginia. *See Cmty. Ass'ns Inst.*, 2024 WL 4571412, at * 7. But that framing is fatal to the Government's position.

At first blush, "The anonymous existence and operation of corporations" might appear as an "activity." After all, "operation" is an action. *See Operation*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "operation" as "the state or condition of functioning or being in action."). But the CTA, by its text, does not appear to regulate operation at all. It does not forbid a company from doing anything except insofar as it forbids a reporting company's failure to file an updated BOI report. *See* 31 U.S.C. § 5336. Instead, by its text, it seems to only regulate an entity's *existence*, simply because reporting companies are, by their nature, anonymous. *See id.* And "anonymous existence" is not an activity at all. It is a state of being. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL NEW DICTIONARY (3d ed. 1986) (defining "existence" as "the state or fact of having being" and "the manner of being that is common to every mode of being."). It is the natural, idle state that any entity formed by registering with a secretary of state necessarily takes on by virtue of its registration. It is akin to a person simply being alive in their natural state, indistinguishable from an individual choosing to refrain from purchasing health insurance. That is not an activity. And the regulation of this natural state of being seems to be exactly what the Supreme Court rejected in *NFIB v. Sebelius*. *See* 567 U.S. at 552. So, the question arises: why would Congress seek to regulate the anonymous state of being that reporting companies assume as a consequence of their registration? The AMLA answers this question plainly:

> money launderers and others involved in commercial activity intentionally conduct transactions through corporate structures in order to evade detection, and may layer such structures, much like Russian nesting "Matryoshka" dolls, across various secretive jurisdictions such that each time an investigator obtains

> ownership records for a domestic or foreign entity, the newly identified entity is yet another corporate entity, necessitating a repeat of the same process.

NDAA § 6402. And absent something akin to the CTA, the Government claims that it faces great difficulty in enforcing its financial crimes laws. *See id.* In other words, the CTA is a law enforcement tool—not an instrument calibrated to protect commerce; an exercise of police power, rather than a regulation of an activity which might impair commerce among the several states.

This the Commerce Clause will not tolerate. In rejecting a Commerce Clause justification for the individual mandate in *NFIB v. Sebelius*, the Supreme Court held that it "compel[led] individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." 567 U.S. at 552 (emphasis in original). Here, analogous language explains the CTA. The CTA "compels" reporting companies to file a beneficial ownership report with the Federal Government—an act that no state's registration laws require—"on the ground that their failure to do so affects interstate commerce." *Id.* The Government argues just this, though in fewer words, in its Response (*See* Dkt. #15 at p. 25). But the Court need not reach the traditional aggregate effects inquiry because the CTA does not regulate an activity within the meaning of the Commerce Clause. *See NFIB v. Sebelius*, 567 U.S. at 552. Indeed, "[c]onstruing the Commerce Clause to permit Congress to regulate individuals precisely *because* they are doing nothing would open a new and potentially vast domain to congressional authority." 567 U.S. at 552 (emphasis in original). In the same vein, construing the Commerce Clause to permit Congress to regulate companies precisely because the Government does not know who substantially benefits from their ownership would similarly "open a new and potentially vast domain to congressional authority." *See id.* "Allowing Congress to justify federal regulation by pointing to the effect of" the Government's lack of information about beneficial

44

owners on commerce would bring countless decisions a [company] could *potentially* make within the scope of federal regulation—and under the Government's theory—empower Congress to make those decisions for [it]." *See id* (emphasis in original). That cannot be so.

To be sure, as the Government points out, "[v]arious economic crimes are made easier to commit, and harder to discover[], through the formation of corporate entities that may conduct economic transactions in their own names without disclosure of beneficial ownership information" (Dkt. #18 at p. 22). The notion that one may use a company to veil their illicit financial crimes is unassailable. But the Commerce Clause does not justify regulating all companies based on nothing more than the fear that a reporting company *might* shelter a financial criminal. "The proposition that Congress may dictate the conduct of an individual today because of prophesied future activity finds little support in [Supreme Court] precedent." *Id.* at 557. The Commerce Clause does not furnish Congress with police power or a "general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *See id.* It stands to reason then, that the Commerce Clause does not bless Congress with carte blanche to regulate all companies in perpetuity simply because they *might* engage in commerce, or one *might* use them to conceal criminal activity. *See id.* Any decision affirming the propriety of the Government's tenuous use of the Commerce Clause here would require the Court to "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the state." *See Lopez*, 514 U.S. at 567. The Court will not interpret the Commerce Clause in such a lax manner. *See id.*

Perhaps this is why Congress has never before sought to regulate financial crimes in this way. But that alone raises judicial eyebrows at the constitutionality of the CTA. "[S]ometimes 'the

most telling indication of a severe constitutional problem . . . is the lack of historical precedent' for Congress's action." *NFIB v. Sebelius*, 567 U.S. at 549 (quoting *Free Enters. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (cleaned up)). When faced with legislative acts that deviate from the historical status quo, courts, at the very least, must "'pause to consider the implications of the Government's arguments.'" *Id.* at 549–50 (quoting *Lopez*, 514 U.S. at 564). In taking that pause, it appears that sanctioning the CTA under the Commerce Clause would be to rubber-stamp a "new form of federal power." *See id.* But that power threatens the very fabric our system of federalism. *See id.* Because the CTA does not regulate a pre-existing activity, but instead compels a new one, the CTA exceeds Congress's commerce power. That should be the end of the matter. But, for the avoidance of doubt, assuming *arguendo* that the "the anonymous existence and operation of corporations" constitutes an "activity" for purposes of the Commerce Clause, the CTA still lays beyond Congress's commerce power.

     c.    *Even if anonymous corporate existence and operation is an activity regulable under the Commerce Clause, the CTA fails to pass muster.*

Congress may not invoke the substantial effects doctrine to regulate future activities or no activity at all. Thus, the Court need not perform further analysis under the third category of commerce power—activities that, in the aggregate, substantially impact interstate commerce—to hold that, at this stage, Plaintiffs have satisfied their burden to show that the CTA falls outside the scope of the Commerce Clause. *See Raich*, 545 U.S. at 16–17. But to give the Government every benefit of the doubt, as the Court must, the Court no less will analyze whether Congress may regulate "anonymous corporate existence and operation" under this third category.

In its attempt to justify the CTA, the Government principally relies on *Gonzalez v. Raich*, arguing that "Congress may 'regulate activities that substantially affect interstate commerce'"

(Dkt. #18 at p. 20) (quoting 545 U.S. at 16–17). The Government continues to contend that when Congress legislates pursuant to its commerce power under this third category, it may "'regulate purely local activities that have a substantial effect on interstate commerce'" (Dkt. #18 at p. 20) (quoting *Raich*, 545 U.S. at 17). The Government suggests that the Court, in analyzing a legislative act's propriety in this category, need only determine "whether a 'rational basis' exists" for concluding that the regulated activity, taken in the aggregate, substantially impacts interstate commerce (Dkt. #18 at pp. 20–21) (quoting *Raich*, 545 U.S. at 22). But a close reading of *Raich* and its predecessors reveal that while the Government articulates the right standard, the CTA still fails constitutional scrutiny.

In *United States v. Lopez*, the Supreme Court aptly summarized the sum of Commerce Clause jurisprudence, which bears repeating as none of the Court's Commerce Clause cases "can be viewed in isolation." *Raich*, 545 U.S. at 15; *see Lopez*, 514 U.S. at 553–562. In *Jones & Laughlin Steel Corp.*, the Supreme Court addressed a challenge to the National Labor Relations Act, which regulated intrastate employment practices. 301 U.S. at 31–34. The Court held that Congress has the power to regulate those intrastate activities that "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." *Lopez*, 514 U.S. at 555 (citing *Jones & Laughlin Steel Corp.*, 301 U.S. at 37). Thereafter, the Court upheld the Fair Labor Standards act in the face of a challenge under the Commerce Clause and stated:

> The power of Congress over interstate commerce is not confined to the regulation of commerce among the states. It extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce.

*Id.* (quoting *United States v. Darby*, 312 U.S. 100, 118 (1941) (citing *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942) (Congress's power under the Commerce Clause "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.")).

Subsequently, in the landmark case of *Wickard v. Filburn*, the Supreme Court interpreted the Commerce Clause to permit Congress to regulate the production and consumption of homegrown wheat—an intrastate, non-economic endeavor. *Id.* at 556 (citing *Wickard*, 317 U.S. at 128–29. The Court observed, consistent with its holdings in *Darby*, *Jones*, and *Wrightwood*:

> Even if [the wheat farmer's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as "direct" or "indirect."

*Id.* (quoting *Wickard*, 317 U.S. at 125). The Supreme Court stressed that even though a single wheat farmer, growing wheat for himself, may have a "trivial" impact on the market for wheat, that reality alone was not "'enough to remove him from the scope of federal regulation where . . . his contribution, taken together with that of many others similarly situated, is far from trivial.'" *Id.* (quoting *Wickard*, 317 U.S. at 127–28).

These cases, the Supreme Court declared, "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." At that time, the limits the Court relied on in interpreting the contours of the Commerce Clause were the "dual system of government" and a well-founded, constitutionally rooted fear of creating a "completely centralized government." *Id.*

Enter *Lopez*. At issue in *Lopez* was the Gun-Free School Zones Act of 1990, through which Congress criminalized as a matter of federal law the knowing possession of a firearm in a school zone." *Id.* at 551. The Supreme Court struck down the Act as outside of Congress's power under the Commerce Clause. *Id.* In so holding, the Court first observed that the statute did not "contain[] a jurisdictional element which would ensure, through a case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 561. The Court also noted that because the statute was not part of a "larger regulation of economic activity[] in which the regulatory scheme would be undercut unless the intrastate activity were regulated," it could not stand under *Jones & Laughlin Steel Corp.*'s progeny. *Id.* at 561. But the Court in *Lopez* did not explicitly appear to require such a regulatory regime in all inquiries under the aggregate effects theory of Congress's commerce power. *See id.*

Further, the Supreme Court determined that there existed no rational basis for Congress to conclude that possession of a firearm in a school zone substantially impacted interstate commerce. *Id.* at 564–65. The Government argued that such a rational basis existed for two principal reasons. First, the Government submitted that "possession of a firearm in a school zone may result in violent crime" and "the costs of violent crime" are spread through the population through insurance. *Id.* at 564. Second, it argued that "the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment." *Id.* Consequently, the Government argued, the possession of firearms in school zones would result in a "less productive citizenry" that would impact the national economy. *Id.* The Supreme Court rejected these arguments as devoid of any limiting principle that would bulwark congressional

attempts to legislate in the realm of criminal law and education—arenas where States maintain sovereign status and historically legislate on such matters. *See id.*

The Supreme Court crystalized this framework further in *United States v. Morrison*, in which the Court considered the constitutionality of a provision of the Violence Against Women Act, which provided a civil remedy for victims of gender-motivated violence. 529 U.S. at 601–02. The Court struck down the provision as outside of Congress's commerce power, determining that the statute regulated a noneconomic activity (gender-motivated violence) without a jurisdictional hook that would tie gender-motivated violence to interstate commerce. *Id.* at 613. Additionally, the potential impact that gender-motivated violence might have on interstate commerce was far too attenuated to pass constitutional muster under an aggregate effects analysis. *Id.* at 615. Once more, upholding the statute would have invited Congress to invade the province of the States to exercise their police power as they see fit. *Id.* at 617–18. The Court did not analyze whether the statute's absence would undercut a regulatory regime.

In *Gonzales v. Raich*, the Supreme Court returned to the framework it espoused in *Lopez* and *Morrison*, further clarifying it. *Raich* concerned a challenge to the Controlled Substances Act ("CSA") "to the extent it prevent[ed] [plaintiffs] from possessing, obtaining, or manufacturing cannabis for their personal medicinal use" as was legal under California law. 545 U.S. at 7. Specifically, the plaintiffs argued that the "CSA's categorical prohibition of the manufacture and possession of marijuana as applied to the intrastate manufacture and possession of marijuana for medical purposes pursuant to California law exceeds Congress's authority under the Commerce Clause." *Id.* at 15. The Court upheld the CSA, determining that the Commerce Clause permitted Congress to reach local, intrastate production and consumption of marijuana because it is a

"fungible commodity for which there is an established, albeit illegal, interstate market." *Id.* at 17. Thus, "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." *Id.* Further, it concluded that Congress's attempt to regulate the national (illicit) market for marijuana would have been hampered, if not fully undercut, if the Commerce Clause did not reach intrastate possession and consumption of marijuana. *Id.* at 19.

Given this precedent, two principal rules emerge, one relating to when Congress can regulate economic activity, the other relating to when Congress may regulate non-economic activity. First, Congress may regulate intrastate activity if the statute facially regulates an economic activity and the Court determines that a "rational basis" exists for Congress to conclude that that activity, aggregated with all its iterations "substantially affects interstate commerce." *Id.* at 22; *Lopez*, 514 U.S. at 557. Second, "while thus far in our Nation's history [the Supreme Court has] upheld . . . regulation of intrastate activity only where that activity is economic in nature," Congress may still regulate non-economic activity. *Taylor v. United States*, 579 U.S. 301, 306 (quoting *Morrison*, 529 U.S. at 613). Congress may do so if: (1) the Court concludes there is a rational basis for Congress to determine that the regulation of the activity substantially impacts interstate commerce; (2) the regulation serves a comprehensive regulatory regime; and (3) regulation of that non-economic activity is necessary to preserve that broader regulatory regime. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610; *see also NSBU v. Yellen*, 721 F. Supp. 3d at 1280–81. In this non-economic category of regulation, the Court also looks to whether the statute contains a jurisdictional hook, and whether Congress provided any findings regarding the impact the activity might have on commerce. *See Lopez*, 514 U.S. at 561–63; *Morrison*, 529 U.S.

51

614. In both inquiries, courts must consider the Commerce Clause through the lens of our dual system of government and cannot extend its reach to embrace activities that "would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Lopez*, 514 U.S. at 557 (internal quotations omitted).

Against this backdrop, the first question is whether the activity of "anonymous corporate existence and operation" constitutes an *economic* activity. Unlike possession of a firearm in a school-zone, *Lopez*, 514 U.S. at 561, or gender motivated violence, *Morrison*, 529 U.S. at 614, the anonymous existence and operation of corporations appears to have at least something to do with commerce. But not to the same extent as *Wickard* and *Raich*, both of which involved fungible commodities and actual markets for that good. *See Wickard*, 317 U.S. at 129; *Raich*, 545 U.S. at 19. Nonetheless, it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce. *See Raich*, 545 U.S. at 22; *Lopez*, 514 U.S. at 557. But, when considered in light of our dual system of government, Congress's commerce power cannot reach this far. If the Court were to sanction such an extension of legislative power today, then there is no telling how Congress would control companies tomorrow. The fact that a company is a company does not knight Congress with some supreme power to regulate them in all aspects—especially through the CTA, which does not facially regulate commerce. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1285. This is especially true when such regulations are generally entrusted to the States. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987) ("No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations."). Even when measured against *Wickard*, "the most far-reaching example of Commerce Clause authority over

interstate activity," the CTA fails. *See Lopez*, 514 U.S. at 560. There is no fungible good at issue in the CTA. *See* 31 U.S.C. § 5336. And unlike *Wickard*, the CTA does not aim to regulate some issue of supply and demand. *Compare id. with Wickard*, 317 U.S. at 127–28. The CTA regulates reporting companies, simply because they are registered entities, and compels the disclosure of information for a law enforcement purpose. *See* 31 U.S.C. § 5336. No such regulation has been sustained under the Commerce Clause. The Court sees no reason to expand centuries of precedent such that this case should yield a different result.[7] Upholding the CTA would require the Court to rubber-stamp what appears to be a substantial expansion of commerce power. This, the Court will not do.

**The Necessary and Proper Clause**

Having established that the Commerce Clause does not justify the CTA, the Court turns to the final arrow in the Government's quiver: the Necessary and Proper Clause—its "last, best hope." *See Printz v. United States*, 521 U.S. 898, 923 (1997). If the Necessary and Proper Clause does not authorize the CTA, then Plaintiffs have shown a substantial likelihood of success on the merits on their enumerated powers challenge, warranting issuance of injunctive relief.

Though our Constitution is written, and though our Government is of enumerated powers, "a government entrusted with such powers must also be entrusted with ample means for their execution." *Comstock*, 560 U.S. at 133 (internal quotations omitted). The Framers knew this. As a result, the Necessary and Proper Clause appears written in our Constitution, vesting Congress with the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution

---

[7] The Court sees no need to conduct an additional, alternative analysis assuming that the CTA regulates a non-economic activity, which would require the Court to analyze whether the CTA has a jurisdictional hook, Congress's findings in the CTA related to commerce, and whether the CTA is part of a comprehensive regulatory regime that might be undermined absent the CTA. *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610; *see also NSBU v. Yellen*, 721 F. Supp. 3d at 1280–81. Still, it is worth noting that the CTA is devoid of any jurisdictional hook that would ensure its sweep would only apply to companies engaged in interstate commerce. *See* 31 U.S.C. § 5336; *NSBU v. Yellen*, 721 F. Supp. 3d at 1286.

[Congress's enumerated] Powers, and all other powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. This power gives the Legislative Branch "the authority to enact provisions 'incidental to [an] enumerated power, and conducive to its beneficial exercise.'" *NFIB v. Sebelius*, 567 U.S. at 559 (quoting *M'Culloch*, 17 U.S. at 418). While the Supreme Court has defined the contours of the Necessary and Proper Clause such that Congress may "legislate on that vast mass of incidental powers which must be involved in the [C]onstitution, it does not license the exercise of any 'great substantive and independent powers' beyond those specifically enumerated." *Id.* (quoting *M'Culloch*, 17 U.S. at 418). Indeed, courts are "responsibl[e] to declare unconstitutional those laws that undermine the structure of government established by the Constitution" as any such law does not constitute "proper means for carrying into execution Congress's enumerated powers." *Sebelius*, 567 U.S. at 559 (internal quotations omitted) (cleaned up).

To be effective, Congress must invoke the Necessary and Proper Clause in tandem with an enumerated power. Thus, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, [the Court] look[s] to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock*, 560 U.S. at 134 (citing *Sbari v. United States*, 541 U.S. 600, 605 (2004)). This "means-end rationality" is not a high bar. As Chief Justice Marshall declared in an oft-quoted passage: "[l]et the end be legitimate, let it be within the scope of the [C]onstitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the [C]onstitution, are constitutional." *McCulloch*, 17 U.S. at 421. Thus, the Court has upheld statutes that are "convenient," "useful,"

or "conducive" to an enumerated power's "beneficial exercise." *Sebelius*, 567 U.S. at 559 (internal citations omitted). But this standard is a bar, no less. Deference given to Congress, once more, cannot become an abandonment of the judicial responsibility to strike down *ultra vires* congressional actions as "'mere[] acts of usurpation' which 'deserve to be treated as such." *Id.* (quoting *Printz*, 521 U.S. at 924).

Within this framework, the Government urges the Court to take one of three avenues to arrive at the conclusion that the CTA is within the reach of Congress's powers. Behind door number one: the Necessary and Proper Clause in service of Congress's power to regulate commerce (Dkt. #18 at p. 29). Behind door number two: The Necessary and Proper Clause in conjunction with Congress's power to regulate foreign affairs and further its national security interests (Dkt. #18 at p. 30–31). And behind the third door: the Necessary and Proper Clause in tandem with Congress's authority to lay and collect taxes (Dkt. #18 at p. 32). The Court opens each door in turn but shuts them all. The CTA finds no constitutional solace behind any door.

a.    *The Commerce Clause and the Necessary and Proper Clause*

The Court begins with Congress's power under the Commerce Clause and can dispose of it easily. As discussed, "the Constitution grants Congress to '*regulate* [c]ommerce.'" *NFIB v. Sebelius*, 567 U.S. at 549 (quoting U.S. CONST. Art. I., § 8, cl. 3) (emphasis in original). That regulatory power presumes the existence of a prerequisite activity. *Id.* Just as the Government's justification of the CTA as a raw exercise of commerce power would result in a severe expansion of Congress's power, the Government's logic under the Necessary and Proper Clause would justify a mandatory disclosure requirement "to solve almost any problem." *See id.* at 543. Requiring companies to disclose otherwise private information to the Government simply because those companies exist in their natural state does not derive from Congress's raw commerce power.

*See id.* at 560; *Comstock*, 560 U.S. at 134. It is "in no way an authority that is 'narrow in scope' or 'incidental' to the exercise of the commerce power. *See NFIB v. Sebelius*, 567 U.S. at 561 (citing *Comstock*, 560 U.S. at 148; *M'Culloch*, 17 U.S. at 418). The Court declines to authorize it as a necessary and proper use of Congress's commerce power precisely because to do so would be to ignore the crux of the Necessary and Proper Clause, which is not an exercise of any "great substantive and independent power." *See* 17 U.S. at 411.

The Government suggests that Congress's power under the Necessary and Proper Clause is even greater because the CTA covers *foreign* commerce (*See* Dkt. #18 at p. 29). That argument is not persuasive. While the Constitution grants Congress the power to "regulate [c]ommerce with foreign Nations," U.S. CONST. Art. I., § 8, cl. 3., that power is still regulatory in nature as a matter of the Constitution's plaint text. Thus, though "the 'founders intended the scope of the foreign commerce power to be . . . greater' than the interstate commerce power," that the CTA impacts foreign reporting companies as well as domestic ones does nothing to mollify the grave constitutional concern that the CTA does not regulate an activity at all (Dkt. #18 at p. 29) (quoting *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979)). *See NFIB v. Sebelius*, 567 U.S. at 561 (citing *Comstock*, 560 U.S. at 148; *McCulloch*, 17 U.S. at 418). Thus, the CTA cannot be upheld as a necessary and proper component of Congress's commerce power.

     *b.*     *Foreign Affairs Power and the Necessary and Proper Clause*

Next, the Court assesses whether the CTA falls within the scope of Congress's power to regulate foreign affairs as modified by the Necessary and Proper Clause. The Government proclaims that Congress has the authority to pass the CTA because it has "'broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs'" and pertaining to national security (Dkt. #18 at p. 30) (quoting *Kennedy v. Martinez*, 372 U.S. 144, 160

(1963)). Directing the Court to a slew of immigration-related cases, the Government asserts that the CTA is valid under the Necessary and Proper Clause because Congress may legislate to protect the Nation's national security interests and in furtherance of the President's power to execute the law (Dkt. #18 at pp. 30–31).

In further support, the Government leans on Congress's findings enumerated in the NDAA, which discuss the CTA's impact on foreign actors. As the Government notes, two of Congress's findings are salient to this inquiry (Dkt. #18 at p. 30). First:

> Malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, . . . harming the national security interests of the United States and the allies of the United States[.]

NDAA § 6402(3). Second, the Government calls attention to Congress's determination that:

> Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to . . . protect vital United States national security interests; better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards.

NDAA § 6402(5) (cleaned up). According to the Government, the sum of these findings, Congress's foreign affairs powers, and the Necessary and Proper Clause bring the CTA within Congress's regulatory wingspan.

Plaintiffs, for their part, argue that the CTA is a "purely domestic statute, affecting only entities that are registered to do business domestically, and only requires that these entities file a report with the [F]ederal [G]overnment" (Dkt. #6 at p. 12). Plaintiffs also note that the CTA does not purport to serve a treaty or international agreement (Dkt. #6 at p. 12). Further, Plaintiffs argue

that, should the Court accept the "incidental" connection to international affairs the Government relies upon to make its argument, then the Court would run headlong into the warning the Supreme Court issued in *United States v. Bond*, through which the Court cautioned against allowing an alleged exercise of foreign affairs power to trammel upon states' police power. (Dkt. #6 at p. 12) (citing 572 U.S. 844 (2014)). As set forth below, Plaintiffs are correct.

The Court begins its analysis by determining whether the inquiry before it is truly one of foreign affairs. Only then can the Court turn to the authority the Government relies upon in its Response. Once more, first principles appear an appropriate place to begin. "Matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald*, 468 U.S. 222, 242 (1984) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). That principle makes sense as these matters involve "decisions of a kind for which the Judiciary has neither the aptitude, facilities, nor responsibility and which have been long held to belong in the domain of political power." *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948). But as with each inquiry performed in this case, the Court's "deference in matters of policy cannot, however, become abdications in matters of law." *NFIB v. Sebelius*, 567 U.S. at 538.

Congress's foreign affairs powers are not express in Article I of the Constitution, other than the clauses stating that Congress may "regulate commerce with foreign nations," "Establish an uniform Rule of Naturalization," "declare war," "raise and support armies," "provide and maintain a navy," and "make rules for the [G]overnment and regulation of the land and naval forces." U.S. CONST. art. I., § 8, cls. 3, 4, 11, 12, 13, 14. No less, "[a]lthough there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation

of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of our Nation. *Perez v. Brownell*, 356 U.S. 44, 57 (1958), *overruled on other grounds by Afroyim v. Rusk*, 387 U.S. 253 (1967). But that power is far from plenary and does not extend to purely domestic matters. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 315–16 (1936). Further, as the District Court for the Northern District of Alabama observed in analyzing Congress's foreign affairs power as applied to the CTA, the precise contours of Congress's foreign affairs power need not be defined to determine that the CTA is in no way connected to whatever authority over foreign affairs Congress might have. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1273. This is because the CTA regulates internal matters—not foreign ones, negating an inquiry into a potential political question involving the CTA.

In matters involving foreign affairs, the Government is not limited by the Constitution's enumerated powers. *See id.* (citing *Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16). Indeed, the Supreme Court has made clear that "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect to our internal affairs." *Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16. This principle drove the Supreme Court to uphold a statute which gave the president the power to declare an embargo on foreign arms. *See id.* at 329. Here, that principle demands the Court answer the threshold question of whether the subject of the CTA's regulation—the anonymous existence and operation of reporting companies—is an internal (domestic) or external (foreign) matter. *See id.*

The CTA's text provides an answer. The CTA, by its very language, does not regulate any issue of foreign affairs. It regulates a domestic issue: anonymous existence of companies registered

to do business in a U.S. state and their potential conduct. *See* 31 U.S.C. § 5336. It bears repeating, a reporting company subject to the CTA is an entity that is either: (1) "created by the filing of a document with a secretary of state or similar office *under the law of a State or Indian Tribe*"; or (2) "formed under the law of a foreign country *and registered to do business in the United States* by the filing of a document with a secretary of state or a similar office *under the laws of a State or Indian Tribe*." *Id.* § 5336(a)(11) (emphasis added). These entities, though special under the CTA as reporting companies, remain "creatures of state law." *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977); *Cort v. Ash*, 422 U.S. 66, 84 (1975), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979); *see Standard Oil Co. of Tex. v. United States*, 307 F.2d 120, 127 (5th Cir. 1962); *NSBU v. Yellen*, 721 F. Supp. 3d at 1273. As the Court has already noted, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *NSBU v. Yellen*, 721 F. Supp. 3d at 1273 (quoting *CTS Corp.*, 481 U.S. at 89). History confirms that our Founding Fathers believed just the same. *Id.* ("Although the Founders 'were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy, they were more reluctant . . . to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose' to leave incorporation to the States.") (quoting Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L. J. 1037, 1041 (1986)) (cleaned up). Thus, here, Congress is bound by our written Constitution and the enumerated powers with which it provides Congress. *See Curtiss-Wright Exp. Corp.*, 299 U.S. at 315–16.

There is scant, if any, history or precedent to suggest that whatever foreign affairs powers Congress might possess under the Necessary and Proper Clause can reach the domestic issue of entities registered to do business under state law. The authority the Government does provide does nothing to bolster its argument. *Kennedy v. Mendoza-Martinez* involved the constitutionality of a statute that functioned to divest an American of his citizenship as a consequence for draft-dodging, which the Supreme Court struck down as failing to provide sufficient safeguards to comport with due process requirements. *See* 372 U.S. 144, 146 (1963). The Court did not grapple with Congress's power to enact those statutes, which facially appear to derive from Congress's enumerated power over citizenship. *See* U.S. CONST. art. I, § 8, cl. 4.

*Hernandez v. Mesa*, another case that the Government relies upon, involved a cross-border shooting. 589 U.S. 93, 96 (2020). There, the Court declined to create a damages remedy for a cross-border shooting by extending its prior precedent, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), which permitted a victim of unlawful arrest and search to assert a claim under the Fourth Amendment for damages in the absence of a statute authorizing this type of claim. *Id.* at 96. The Supreme Court defined a cross-border shooting as, "by definition an international incident." *Id.* at 104. That is very different than the monitoring of domestic entities, which is what the CTA does. *See* 31 U.S.C. § 5336. At any rate, *Hernandez* did not contemplate Congress's power to legislate, though it reaffirmed the notion that courts should not intrude upon matters of foreign relations. *See Hernandez*, 589 U.S. at 104.

Next, the Government cites *United States v. Di Re*, a case involving the constitutionality of a search of an individual convicted of possessing counterfeit gasoline coupons in violation of the Second War Powers Act of 1942—a matter inapplicable to this case. 332 U.S. 581, 582–83 (1948).

The Government relies on it, however, not as analogous, but in conjunction with *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), to say that a legislative act of Congress is presumed constitutional, and that that presumption is "heightened" where it involves matters of national security and foreign affairs (Dkt. #18 at p. 30). The Court does not dispute that premise. Instead, the Court notes that a heightened presumption does not apply simply because the Government says so. Neither does *Holder* suggest that it applies to the CTA, which the Court has already determined regulates a domestic matter. *Holder* involved constitutional challenges for vagueness and under the First Amendment to a statute criminalizing the provision of material support to terrorist organizations and delegating to the Secretary of State the authority to designate an entity a "foreign terrorist organization." *See* 561 U.S. at 7–9. There is no dispute that that the Court is not equipped to determine what constitutes a foreign terrorist organization. *See id.* at 33–34. But this case does not contemplate that question any more than it considers a foreign issue. The Court need not apply a heightened presumption to the CTA and Reporting Rule.

The final case the Government relies upon is *Curtiss Wright Exp. Corp.*, 299 U.S. at 318, to support its position that Congress may pass legislation that furthers its foreign affairs powers, as well as the President's (Dkt. #18 at p. 31). That case, as already established, removes the CTA from an inquiry under Congress's necessary and proper foreign affairs power as the CTA does not regulate a foreign issue. *See Curtiss Wright Exp. Corp.*, 299 U.S. at 299. Thus, the Court turns to the ultimate question of whether the CTA can be justified by Congress's power to regulate foreign affairs when the CTA only regulates a local matter. It cannot.

On this point, Plaintiffs direct the Court to *Bond v. United States*, a Supreme Court case that is not directly on point, but is helpful in analyzing the limiting principle of Congress's implied

power over foreign affairs (Dkt. #6 at p. 11–12) (citing 572 U.S. 844 (2014)). *See also NSBU v. Yellen*, 721 F. Supp. 3d at 1275 (applying *Bond* in the same context). Plaintiff suggests that *Bond* limits the scope of international legislation to exclude domestic issues (*See* Dkt. #6 at p. 11). The facts of *Bond* are these: First, in 1997, the United States ratified the International Convention on Chemical Weapons pursuant to the Federal Government's power to make treaties—an enumerated power. 572 U.S. at 848. Subsequently, in accordance with the United States's obligations under the treaty, Congress enacted the Chemical Weapons Convention Implementation Act of 1998, which "ma[d]e it a federal crime for a person to use or possess any chemical weapon, and . . . punishe[d] violators with severe penalties." *Id.* Thereafter, a microbiologist from Pennsylvania discovered that her husband had an extramarital affair with her close friend, resulting in the friend's pregnancy. *Id.* at 852. Seeking revenge, the microbiologist took several chemicals from her employer, a chemical manufacturer, and dispersed them on her friend's car door, mailbox, and doorknobs. *Id.* The friend suffered a "minor chemical burn on her thumb." *Id.* For this, the Government charged the microbiologist with violating the Chemical Weapons Convention Implementation Act. *Id.* at 852–53. After pleading guilty, the microbiologist appealed, arguing that the Implementation Act exceeded Congress's enumerated powers. *Id.*

The Supreme Court overturned her conviction and held that the Chemical Weapons Act did not "reach purely local crimes." *Id.* at 860, 866. In arriving at its holding, the Court relied on fundamental federalist principles, remarking that "[b]ecause our constitutional structure leaves local criminal activity primarily to the States, [the Court has] generally declined to read federal law as intruding on that responsibility" absent a clear indication from Congress. *Id.* at 848. The Court

also rejected an argument that the prosecution was a necessary and proper means of executing the National Government's enumerated power to make treaties. *Id.* at 855.

As the district court in *NSBU v. Yellen* correctly observed, *Bond* involved a matter of statutory interpretation, not constitutional interpretation. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1275. The Government attempts to distinguish *Bond* on this basis (Dkt. #18 at p. 31). But no less, *Bond*'s principle that foreign affairs powers generally may not reach local issues remains true and applicable to this case. The Government seeks to justify the CTA as reaching the local issue of companies who register to do business with a particular state. *See* 31 U.S.C. § 5336. Affirming the constitutionality of the CTA on the basis of foreign affairs would permit Congress to reach into the states and regulate whatever it wants simply by pointing to some vague nexus between the statute at issue and a potential foreign actor. That theory stretches the fabric of our dual system of government too thin to pass constitutional muster. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1275.

If the CTA is not a raw exercise of Congress's foreign affairs power, then the Government's only hope is the Necessary and Proper Clause. Once more, "in determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute," the inquiry centers on "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally *enumerated* power." *Comstock*, 560 U.S. at 134 (emphasis added). The Government has yet to identify a single enumerated foreign affairs power that shares a nexus with the CTA. It notes that Congress believes the CTA is necessary to "'bring the United States into compliance with international anti-money laundering and countering financing of terrorism standards'" (Dkt. #18 at p. 30) (quoting NDAA § 6402(5)). But at the Court's hearing on October 9, the Court asked the Government whether the CTA was

64

linked to a treaty. The Government responded in the negative. And the Court pressed the parties on which "international standards" the CTA would help the United States to comply with. Once more, no party could offer an answer. In *Bond*, the Court declined to apply a law passed pursuant to a treaty to a purely domestic issue. *See Bond*, 572 U.S. 855. Here, there is no treaty. *See* 31 U.S.C. § 5336. And while there is a passing reference to an "international standard" Congress may strive to comply with, Congressional findings alone are insufficient to bring the CTA within Congress's necessary and proper power. The Government has not provided any authority to the contrary. There is simply no enumerated power the Government can identify that would justify the CTA, barring the Court from affirming the CTA as justified by the Necessary and Proper Clause. *See Comstock*, 560 U.S. at 134.

The Government has not provided any support—and there appears to be no support—for the proposition that Congress may legislate in arenas traditionally controlled by the states simply because it has made findings that make passing mention to an international impact. *See NSBU v. Yellen*, 721 F. Supp. 3d at 1275. And while Congress's findings in the NDAA include reference to "national security," "foreign affairs," and "international standards," Congress cannot invoke its foreign affairs powers to regulate a domestic issue simply because it waves the magic wand of *ipse dixit*. "Compliance with international standards may be good policy, but it is not enough to make the CTA 'necessary' or 'proper.' " *Id.* at 1276. There does not appear to be a single enumerated, foreign affairs power to which the CTA can legitimately be linked. That is fatal to the Government's argument on this point. *See Comstock*, 560 U.S. at 134. Thus, the Court must turn to the Government's final argument that the CTA is within Congress's enumerated powers.

c.    *Taxing Power and the Necessary and Proper Clause*

Backed into the corner with one remaining card up its sleeve, the Government's final argument is that the CTA is a valid exercise of Congress's power to lay and collect taxes, as expanded by the Necessary and Proper Clause (*See* Dkt. #18 at p. 33). The Constitution confers upon Congress the power to "lay and collect taxes." U.S. CONST. art. I, § 8, cl. 8. The Government wisely concedes that the CTA—in no way, shape, or form—is a tax (Dkt. #18 at p. 33).[8] Instead, it argues that because the CTA is "in aid of a revenue purpose," that is, it helps to "facilitate tax collection," the CTA is constitutional as an exercise of Congress's power to enact laws necessary and proper to enforce its taxing scheme (Dkt. #18 at p. 32) (internal citations omitted). The Court disagrees. As the Sections below demonstrate, this final card does not arm the Government's hand with a royal flush to conquer Plaintiffs' arguments.

The Government notes that "Congress determined that the lack of beneficial ownership information allows criminals to obscure their income and assets and thus 'facilitates . . . serious tax fraud'" (Dkt. #18 at p. 32) (quoting NDAA § 6402(3)). Because Congress determined that the CTA's mandated beneficial ownership reports "would be 'highly useful' in detecting tax fraud and improving 'tax administration' generally," the CTA is a valid exercise of Congress's power to legislate in furtherance of and adjacent to its tax scheme under the Necessary and Proper Clause, so the argument goes (Dkt. #18 at p. 32) (quoting 31 U.S.C. §§ 5336(a)(11)(xxiv)(ii), (c)(5)(B)). Plaintiffs, in contrast, contend that the Government's hypothesis would result in a "'substantial

---

[8] The "essential feature" of a tax is that it "produces at least some revenue for the Government." *Sebelius*, 567 U.S. at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n.4 (1953)). On its face, the CTA does not create any revenue for the Government whatsoever. *See generally* 31 U.S.C. § 5336. Thus, the Government cannot reasonably seek to justify passage of the CTA through a contrary argument. Neither does the Government contend that the CTA's penalty provisions render the CTA a valid exercise of Congress's taxing power (*See* Dkt. #18 at p. 32). *See also NSBU v. Yellen*, 2024 WL 899372, at *20.

expansion of federal authority'" that breaks the boundaries of Congress's taxing and necessary and proper powers (Dkt. #6 at p. 17) (quoting *NSBU v. Yellen*, 2024 WL 899372, at *21)). The Court agrees with Plaintiffs.

The Court first turns to the four cases the Government cites in furtherance of its arguments on this point. But the authority the Government relies upon does little to justify the CTA as an act "derivative" of its power to lay and collect taxes such that the Necessary and Proper Clause can bridge the gap to constitutionality (*See* Dkt. #18 at p. 32). *Comstock*, 560 U.S. at 147. First comes *Sonzinsky v. United States*, which the Government cites for the proposition that Congress may legislate "in aid of a revenue purpose" (*See* Dkt. #18 at p. 32) (citing 300 U.S. 506, 513 (1937)). There, the Supreme Court upheld a law that imposed a special tax and registration requirement on dealers of firearms as authorized by Congress's taxing power. *Sonzinsky*, 300 U.S. at 511. True enough, the Supreme Court stated in dicta that *those* "registration provisions . . . [were] obviously in aid of a revenue purpose." *Id.* at 513. But it did not determine for the ages, as the Government suggests, that Congress can pass any regulation it wishes, so long as Congress can point to a "revenue purpose" it might serve. *See id.* Instead, *that* special excise tax—*which the statute created*—"on its face" was a taxing measure, with a consequential deterrent effect on the keeping of the particular type of firearm at issue in that case. *Id.* The Supreme Court held that a taxing measure is not outside of Congress's taxing power simply because it carries a consequential, deterrent effect. *Id.* And in coming to that determination, the Supreme Court did not consider the Necessary and Proper Clause. *See id.*

Second, the Government cites *Helvering v. Mitchell* for the same proposition, though that case too says nothing about the Necessary and Proper Clause (Dkt. #18 at p. 32) (citing 303 U.S.

391, 399 (1938)). *Helvering* involved the Revenue Act of 1928 as it related to deficiencies on income tax returns. 303 U.S. at 392. The Act provided that if an individual's tax returns were deficient due to fraud, then that individual must pay half of the amount of the deficiency (in addition to the deficiency). *Id.* The question before the Supreme Court was whether this provision imposed a criminal penalty such that payment on the deficiency would be barred by double jeopardy. *Id.* at 398–400. The Supreme Court answered in the negative and held that the provision was a tax. *Id.* at 402. Thus, as in *Sonzinsky*, a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure. *Id.* at 399–400. Like *Sonzinksy*, *Helvering* does not purport to suggest that Congress may legislate however it wants because such legislation might deter tax fraud. *See id.*

Next, the Government relies upon *CIC Servs., LLC v. IRS* and *California Bankers Ass'n v. Shultz* for the proposition that "Congress has given the 'IRS broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes'" (Dkt. #18 at p. 32) (quoting *CIC Servs., LLC*, 593 U.S. 209, 212 (2021)) (citing *California Bankers Ass'n*, 416 U.S. 21, 26 (1974)). Indeed, the Supreme Court in *CIC Servs., LLC* did say just that. 593 U.S. at 212. But once more, the context of that case does not render it dispositive on the CTA's constitutionality. There, plaintiffs challenged under the APA the enforcement of an IRS notice that would require taxpayers and material advisors to report information about a particular type of transaction. *Id.* at 213–15. The issue before the Court was whether the "Anti-Injunction Act bar[red] [the plaintiffs'] suit" under the APA. *Id.* at 216. The answer to that question does little to answer the one that now captivates the Court, other than to say that "information gathering . . . is a phase of tax administration that occurs before assessment or collection." *See CIC Servs., LLC,*

593 U.S. at 216 (internal quotations omitted). Therefore, information gathering is separate and apart from a tax itself. *See id.*; *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 8 (2015).

*California Bankers Ass'n v. Shultz*, which also does not concern the Necessary and Proper Clause, also does little to advance the Government's argument. At issue in *Shultz* was the constitutionality of the Bank Secrecy Act of 1970. 416 U.S. at 25. Part of that Act required "financial institutions to maintain records of the identities of their customers, to make microfilm copies of certain checks drawn on them, and to keep records of certain other items." *Id.* at 29. The Supreme Court noted that the purpose of these provisions was to compel the maintenance of reports that "have a high degree of usefulness in criminal, tax, or regulatory investigations proceedings." *Id.* at 26. The Court did not address the Bank Secrecy Act's propriety under Congress's taxing power, but instead entertained challenges under the First, Fourth, and Fifth Amendments to the Constitution. *See id.* at 49–78. Again, this does not assist the Court in assessing the CTA as an ancillary exercise of Congress's taxing power.

The Government finally turns to *United States v. Matthews* for the proposition that a regulation need not be paired with a concurrent tax to be a valid exercise of Congress's power to lay taxes (Dkt. #18 at p. 32) (citing 438 F.2d 715, 717 (5th Cir. 1971)). But *Matthews* says just the opposite. The line to which the Government refers fully states that "[i]f the registration requirement was not offensive when coupled with a concurrent tax, it is not offensive when designed to aid the collection of tax on any future transfer of the registered item." *Matthews*, 438 F.2d at 717. To clarify the context in which this line appears, in *Matthews*, an individual had been convicted of unlawful possession of a firearm not registered to him in a national registry, as required under the Gun Control Act of 1968. *Matthews*, 438 F.2d at 715. He argued that the statute under

which he was convicted was not constitutional because it was not an "appropriate and necessary aid to the reasonable enforcement of a valid revenue measure." *Id.* at 716. To him, such a challenge made sense because the statute under which he was convicted did not carry with it a tax. *Id.* The Court disagreed, noting that there was, in fact, a tax levied against individuals who kept such firearms. *See id.* at 717. Once more, just as in *Helvering* and *Sonzinsky*, that case suggests that a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure. *See id.* at 716.

Even going beyond the authority the Government cites in its Response, precedent is consistent with these modest holdings. *See, e.g.*, *United States v. Doremus*, 249 U.S. 86, 92 (1919) (upholding Harrison Narcotic Drug Act that taxed sale of drugs to authorized individuals and stating that "[t]he Act may not be declared unconstitutional because its effect may be to accomplish another purpose *as well as* the raising of revenue") (emphasis added); *United States v. Kahriger*, 345 U.S. 22 (1953), *overruled on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968) (upholding Gambler's Occupational Tax provision of the Revenue Act of 1951 "which lev[ies] a tax on persons engaged in the business of accepting wagers and require[s] such persons to register with the Collector of Internal Revenue"); *United States v. Bolatete*, 977 F.3d 1022, 1034 (11th Cir. 2020) (National Firearms Act and the criminal penalty for violating it are justified by Congress's taxing power because a regulatory penalty, coupled with an underlying tax, has long been accepted as within the province of Congress's power to lay and collect taxes).

*In toto*, these cases stand for far humbler a proposition than the Government suggests: a tax, which necessarily generates revenue, is not unconstitutional simply because it may carry a regulatory, deterrent effect on conduct—even where the tax requires some form of registration.

The Government has not provided the Court with a single case that suggests Congress's taxing power, even when coupled with the Necessary and Proper Clause, can be used to regulate when the statute at issue does not, in some way, generate some revenue. Had the Government cited *United States v. Kahriger*, it may have parroted what the Supreme Court said in dicta:

> Nor do we find the registration requirements of the wagering tax offensive. All that is required is the filing of names, addresses, and places of business. This is quite general in tax returns. Such data is intimately related to the collection of the tax and are "obviously supportable as in aid of a revenue purpose."

345 U.S. at 515 (quoting *Sonzinsky*, 300 U.S. at 506). But even that would not persuade the Court that the CTA falls within the purview of its power to tax or do what is necessary and proper to give effect to its enumerated powers. The judiciary operates on the basis of *stare decisis*, not *stare dicta*. *Kahriger*, like *Sonzinsky*, does not purport to suggest that Congress may legislate in an unbridled manner simply because it might make some tax, someday, easier to collect. In each of the cases discussed above, the challenged statute imposed a tax and had some regulatory provision or consequence. The CTA does not impose any tax, whatsoever. *See* 31 U.S.C. § 5336.

While a tax that generates revenue is not unconstitutional simply because it carries with it some regulatory measure, the inverse is not true. *Cf. Matthews*, 438 F.2d at 717. In other words, a regulation is not constitutional simply because it carries with it an incidental tax benefit. This is the category that the CTA falls under. The cases above all have one thing in common: the regulation being attacked is attached to an underlying tax. The same is not true of the CTA. *See* 31 U.S.C. § 5336. And what little connection the Government suggests the CTA has with the at-large taxing system imposed upon Americans is tenuous at best.

As Justice Frankfurter said:

> When oblique use is made of the taxing power as to matters which substantively are not within the powers delegated to Congress, the Court cannot shut its eyes to what is obviously, because designedly, an attempt to control conduct which the Constitution left to the States, merely because Congress wrapped the legislation in the verbal cellophane of a revenue measure.

*Kahriger*, 345 U.S. at 37 (Frankfurter, J. dissenting). And so, in the context of the Government's argument here, that Congress "sense[d]" that the CTA would be "highly useful" in detecting tax fraud and would "improve" tax administration in general do not render the CTA constitutionally valid. Thus, the cellophane that wraps the CTA is thin. Precedent indicates that "prior cases upholding laws under [the Necessary and Proper Clause] involved exercises of authority *derivative of, and in service to*, a granted power." *NFIB v. Sebelius*, 567 U.S. at 560 (emphasis added). The CTA is not "derivative of" the taxing power simply because the Government points to some potential tax purpose the CTA might serve someday. *See id.*; *cf. Helvering*, 303 U.S. at 392. Though it may be "in service to" taxation as a general matter, because the CTA does not derive from the taxing power, it is neither tightly linked,[9] nor rationally related to Congress's power to lay and collect taxes. *See Comstock*, 560 U.S. at 134.

To hold otherwise would be to unleash a slippery slope that could wreak havoc on the structure of our government. "It would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials to access that data." *NSBU v. Yellen*, 721 F. Supp. 3d at 1289 (quoting *NFIB v. Sebelius*, 567 U.S. at 560)). While the Government disputes Plaintiff's assertion that the

---

[9] "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *Comstock*, 560 U.S. at 150 (Kennedy, J. concurring).

Necessary and Proper Clause "does not provide an independent source of power," its position stands in stark contrast to the Supreme Court's interpretation that it must be "narrow in scope," or "incidental" to an enumerated power (Dkt. #18 at p. 32). *Comstock*, 560 U.S. at 148.

Having determined that the CTA is not justified by the Commerce Clause nor the Necessary and Proper Clause in conjunction with some enumerated power, the Court concludes that Plaintiffs have met their burden to show a substantial likelihood of success on the merits of their Tenth Amendment Challenge. Thus, the Court need not assess Plaintiffs' as-applied challenges or their challenges under the First and Fourth Amendments. Thus, the Court must now determine whether the equities favor issuance of an injunction. They do.

### C.    Balance of Equities

The final step in the inquiry calls upon the Court to determine whether the balance of equities favors issuance of an injunction (the third and fourth factors). *Nichols*, 532 F.3d at 372. The third element is whether the harm posed by the CTA and Reporting Rule outweighs any damage injunctive relief might inflict on the Government. *See Nichols*, 532 F.3d at 372. The fourth is that injunctive relief will not harm public interest. *See id.* Where, as here, the Government is the defendant, these elements merge. *Nken v. Holder*, 556 U.S. 418, 420 (2009). On these facts, the Court determines that the threatened injury to Plaintiffs outweighs any potential harm to Defendants. Without an injunction, Plaintiffs will almost certainly incur substantial, incompensable monetary costs and constitutional harm.

"When a statute is enjoined, the [Government] necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Book People, Inc.*, 91 F.4th at 341. Certainly, the Court acknowledges that the Government seeks to serve admirable ends through the CTA and the Reporting Rule. Obviously, the Government has an interest in ferreting out financial

crime, protecting foreign commerce and national security, and bringing the United States's money laundering laws into compliance with international standards (whatever those standards may be). *See* 134 Stat. at 6402. The Government argues that, balancing these interests against the "speculative" nature of the harm that Plaintiffs face, the Government's interests should win the day (Dkt. #18 at p. 39). Not so. Plaintiffs' injuries are concrete. And "neither [the Government] nor the public has any interest in enforcing a regulation that violates federal law." *Id.* (internal quotations omitted). No matter how laudable its goals, Congress's actions must abide by our Constitution. This is in the public's best interest. *See id.* Indeed, "it is always in the public interest to prevent a violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 60 F.3d 448, 458 n.9 (5th Cir. 2014) (cleaned up). Because the CTA and Reporting Rule likely do not[10] pass muster under the Constitution, it is in the public's best interest to prevent the Government from enforcing the CTA and Reporting Rule. Due to the fast-approaching deadline for reporting companies to file BOI reports, the Court cannot render a meaningful decision on the merits before Plaintiffs suffer the very harm they seek to avoid. A preliminary injunction will preserve the constitutional status quo. Thus, the balance of equities favors issuance of an injunction.

Accordingly, the Court determines that the Plaintiffs have satisfied all elements required for the issuance of a preliminary injunction against the CTA and the Reporting Rule.

### D.    Scope of Injunction

Finally, given that an injunction is appropriate, the Court must determine its scope. Plaintiffs seek injunctive relief on behalf of the individual Plaintiffs, as well as all of NFIB's

---

[10] The word "not" was added as an amendment to fix a typographical error. The Court's analysis and holding are unchanged.

members (*See* Dkt. #6). The Government characterizes Plaintiffs' request as one for a "nationwide injunction" (Dkt. #18 at p. 17). At the Court's hearing, Plaintiffs suggested that they sought an injunction on behalf of only the Plaintiffs before the Court, including the approximately 300,000 members of NFIB. The Government responded that if the Court were to enjoin the CTA and Reporting Rule, the scope of which included NFIB's members, then the Court would, in practical effect, enter a nationwide injunction. The Court agrees with the Government's point. A nationwide injunction is appropriate in this case.

A preliminary injunction is an "extraordinary equitable remedy." *Currier*, 760 F.3d at 452. The Constitution vests district courts with "the judicial power of the United States." U.S. CONST. art. III, § 1. "That power is not limited to the district wherein the [C]ourt sits but extends across the country. It is not beyond the power of a court, in the appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (upholding nationwide injunction in immigration context) (citing *Earth Island v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2006) (upholding nationwide injunction after concluding it was "compelled" by the text of Section 706 of the APA), *aff'd in part and rev'd on other grounds by Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *Chevron Chem. Co. v. Voluntary Purchasing Grps.*, 659 F.2d 695, 705–06 (5th Cir. 1981) (instructing district court to enter nationwide injunction); *Hodgson v. First Fed. Sav. & Loan Ass'n*, 455 F.2d 818, 826 (5th Cir. 1972) ("[C]ourts should not be loathed to issue injunctions of general applicability . . . 'the injunctive processes are a means of effective general compliance with national policy as expressed by Congress, a public policy judges must too carry out—actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium'" (quoting *Mitchell v. Pidcock*, 299 F.3d 281, 287 (5th Cir. 1962))).

But simply because the Court may issue a nationwide injunction does not mean it should in all cases. As the Supreme Court has held, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the Plaintiffs in the class." *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979). The relief the Court fashions "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* at 702. The Fifth Circuit has approved nationwide injunctions in cases involving immigration and the APA. *See, e.g.*, *Texas v. United States*, 809 F.3d at 187–88; *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 955 n.122 (5th Cir. 2024). It has also held that it is appropriate for a district court to enter a nationwide injunction when a plaintiff challenges a federal regulation under the APA. *See, e.g.*, *Career Colls. & Schs. of Tex.*, 98 F.4th at 255 (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.")); *Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022); *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998).

Nonetheless, the Government highlights the controversy regarding nationwide injunctions (*See* Dkt. #18 at p. 40). Nationwide relief is a subject of ongoing debate. *See, e.g.*, *Texas v. United States*, 515 F. Supp. 3d 627, 637–38 (S.D. Tex. 2021) (collecting authority on both sides). One concern is that nationwide injunctions curtail the percolation of legal debate among lower courts. *See Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021); *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 260 (4th Cir. 2020). Thus, the Government urges the Court to tailor relief only to the parties before it because at this very moment, the Eleventh Circuit is considering the constitutionality of

the CTA and Reporting Rule. *See NSBU v. Yellen*, No. 24-10736 (11th Cir.). But this Court's decision will not trench upon the Eleventh Circuit's authority to render a decision, nor will it stop further consideration of the constitutionality of the CTA.

The Court determines that the injunction should apply nationwide. Both the CTA and the Reporting Rule apply nationwide, to "approximately 32.6 million existing reporting companies." *See* 87 Fed. Reg. at 59585. NFIB's membership extends across the country. And, as the Government states, the Court cannot provide Plaintiffs with meaningful relief without, in effect, enjoining the CTA and Reporting Rule nationwide. The extent of the constitutional violation Plaintiffs have shown is best served through a nationwide injunction. *See Califano*, 442 U.S. at 705; *Career Colls. & Schs. of Tex.*, 98 F.4th at 256. Given the extent of the violation, the injunction should apply nationwide.

Plaintiffs also urge the Court to enjoin the Reporting Rule under § 706 of the APA (Dkt. #6 at p. 28), which instructs courts to "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right[s]." 5 U.S.C. § 706(2)(B). Such vacatur is the "default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023).[11] But § 706 is not the proper vehicle to protect Plaintiffs from irreparable harm at this juncture. The Court has determined that the CTA and Reporting Rule are *likely* unconstitutional for purposes of a preliminary injunction. It has not made an affirmative finding that the CTA and Reporting Rule are contrary to law or that they amount to a violation of the Constitution. Thus, the Court determines that the Government should

---

[11] The Government recognizes that the Fifth Circuit has held that § 706(2) of the APA requires vacatur in certain instances (Dkt. #18 at p. 40). Nonetheless, the Government contends that § 706(2) is "merely a rule of decision directing the reviewing court to disregard unlawful action in resolving the case before it" rather than a rule that "dictate[s] a[] particular remedy" (Dkt. #18 at p. 40). For this proposition, the Government relies on secondary authority. But this Court is bound by Fifth Circuit precedent to the contrary. *See, e.g.*, *Career Colls. & Schs. of Tex.*, 98 F.4th at 255. Nonetheless, the Court does not set aside the Reporting Rule under § 706 as, at this preliminary stage, the Court has not determined that the Reporting Rule is *actually* unconstitutional.

be enjoined from enforcing the Reporting Rule and the January 1, 2025, compliance deadline under the Reporting Rule should be stayed under § 705 of the APA.

Under § 705 of the APA, "the reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status or rights pending conclusion of the review proceedings" to "the extent necessary to prevent irreparable injury." 5 U.S.C. 705. *See also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) ("We have the power to stay the agency's action 'to the extent necessary to prevent irreparable injury.'" (quoting § 705)). The Fifth Circuit has interpreted this provision of the APA as akin to a preliminary injunction. *See Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1135 (citing *Nken*, 556 U.S. at 426). Thus, the Court may grant relief under § 705 using the same four-pronged test as the Court uses for a traditional preliminary injunction. *Id.* at 1136. Having determined that Plaintiffs have satisfied each of the four elements for a preliminary injunction, a stay of the Reporting Rule's compliance deadline pending further order of the Court is appropriate. Just as the injunction against enforcement of the CTA should apply nationwide, a stay of the Reporting Rule should apply nationwide. "Nothing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited" to the parties before the Court. *Career Colls. & Schs. of Tex.*, 98 F.4th at 255. "Instead . . . the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' unlawful agency action." A stay, coupled with an injunction against enforcement of the CTA and Reporting Rule, will maintain the status quo and protect the parties from irreparable harm.

**CONCLUSION**

Plaintiffs have satisfied all prerequisites for a preliminary injunction. The Court has authority to issue the injunction Plaintiffs seek under Federal Rule of Civil Procedure 65(d). The CTA is likely unconstitutional as outside of Congress's power. Because the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons. The Court has not addressed the issue of the CTA's constitutionality as applied to these Plaintiffs or Plaintiffs' challenges under the First and Fourth Amendments. Having determined that Plaintiffs have carried their burden, the Court **GRANTS** Plaintiff's Motion for a Preliminary Injunction. Therefore, the CTA, 31 U.S.C. § 5336 is hereby enjoined. Enforcement of the Reporting Rule, 31 C.F.R. 1010.380 is also hereby enjoined, and the compliance deadline is stayed under § 705 of the APA. Neither may be enforced, and reporting companies need not comply with the CTA's January 1, 2025, BOI reporting deadline pending further order of the Court.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The Fifth Circuit has held that district courts have discretion to "require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). After considering the facts and circumstances of this case, the Court finds that security is unnecessary and exercises its discretion to not require Plaintiffs to post security.

It is therefore **ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Dkt. #6) is

hereby **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED this 5th day of December, 2024.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE