No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

TEXAS TOP COP SHOP, INCORPORATED; RUSSELL STRAAYER;
MUSTARDSEED LIVESTOCK, L.L.C.; LIBERTARIAN PARTY OF
MISSISSIPPI; NATIONAL FEDERATION OF INDEPENDENT BUSINESS,
INC.; DATA COMM FOR BUSINESS, INCORPORATED,

Plaintiffs-Appellees,

v.

PAMELA BONDI, *U.S. Attorney General*; TREASURY DEPARTMENT;
DIRECTOR FINCEN ANDREA GACKI, *Director of the Financial Crimes Enforcement
Network*; FINANCIAL CRIMES ENFORCEMENT NETWORK;
SCOTT BESSENT, *Secretary, U.S. Department of Treasury*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Texas

———————————

## BRIEF FOR APPELLANTS

———————————

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

ABE McGLOTHIN, JR.
  *Acting United States Attorney*

DANIEL TENNY
MAXWELL A. BALDI
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2495*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for March 25, 2025.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iv

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE ....................................................................... 2

    A.    Statutory and Regulatory Background ......................................... 2

    B.    Prior Proceedings ...................................................................... 10

SUMMARY OF ARGUMENT ..................................................................... 13

STANDARD OF REVIEW ........................................................................... 15

ARGUMENT ................................................................................................ 15

I.    Plaintiffs are unlikely to succeed on the merits. ................................. 15

    A.    The CTA falls within Congress's power to impose regulations to serve a broader commercial regulatory scheme. ....................... 18

    B.    The CTA is necessary and proper to the execution of Congress's tax, foreign affairs, and foreign commerce powers. ................... 31

    C.    Plaintiffs rely on hypothetical applications that would not be sufficient to sustain their facial challenge. ................................ 36

II.    The equitable factors overwhelmingly favor the government. ............ 39

III.    At a minimum, plaintiffs are not entitled to nationwide relief. ......... 42

CONCLUSION ............................................................................................ 48

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ............................................................... 45, 47

*Atlantic Cleaners & Dyers, Inc. v. United States*,
   286 U.S. 427 (1932) ............................................................................ 35

*Board of Trs. of the State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ............................................................................ 36

*Bowen v. Kendrick*,
   483 U.S. 1304 (1987) .......................................................................... 39

*Braidwood Mgmt., Inc. v. Becerra*,
   104 F.4th 930 (5th Cir. 2024),
   *cert. granted*, No. 24-316, 2025 WL 65913 (U.S. Jan. 10, 2025) ....................... 42-43, 45

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................................ 44

*California v. Texas*,
   593 U.S. 659 (2021) ............................................................................ 43

*California Bankers Ass'n v. Shultz*,
   416 U.S. 21 (1974) .............................................................................. 2

*Community Ass'ns Inst. v. Yellen*,
   No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) ............................. 48

*CTS Corp. v. Dynamics Corp. of Am.*,
   481 U.S. 69 (1987) ............................................................................. 29

*Cuomo v. Clearing House Ass'n*,
   557 U.S. 519 (2009) ........................................................................... 29

*Deanda v. Becerra*,
   96 F.4th 750 (5th Cir. 2024) .................................................................. 42

iv

*DHS v. New York,*
140 S. Ct. 599 (2020) ............................................................ 45

*Electric Bond & Share Co. v. SEC,*
303 U.S. 419 (1938) ............................................................. 27

*Farhy v. Comm'r,*
100 F.4th 223 (D.C. Cir. 2024) ............................................ 32

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................................. 47

*Firestone v. Yellen,*
No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024) .................................. 48

*Garner v. U.S. Dep't of Labor,*
221 F.3d 822 (5th Cir. 2000) ................................................ 33

*Gill v. Whitford,*
585 U.S. 48 (2018) ............................................................... 43

*Gonzales v. Raich,*
545 U.S. 1 (2005) ........................................... 16, 17, 24, 25, 37, 38

*Groome Res. Ltd. v. Parish of Jefferson,*
234 F.3d 192 (5th Cir. 2000) .......................... 17, 18, 26, 28, 38

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ............................................................. 43

*Helvering v. Mitchell,*
303 U.S. 391 (1938) ............................................................. 31

*Hodel v. Virginia Surface Min. & Reclamation Ass'n,*
452 U.S. 264 (1981) ............................................................. 23

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ................................................................ 33

*Kennedy v. Mendoza-Martinez,*
372 U.S. 144 (1963) ............................................................. 33

*Labrador v. Poe ex rel. Poe,*
144 S. Ct. 921 (2024) ................................................................ 45

*Legal Tender Cases,*
79 U.S. (12 Wall.) 457 (1870) .................................................. 31

*Louisiana v. Becerra,*
20 F.4th 260 (5th Cir. 2021) ............................................. 45, 46

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) .................................................. 42

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) .............................. 17, 18-19, 29, 30

*McHenry v. Texas Top Cop Shop, Inc.,*
No. 24A653, 604 U.S. ----, 2025 WL 272062 (U.S. Jan. 23, 2025) .......... 12, 12-13, 13

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ................................................................ 38

*Nevada Dep't of Human Res. v. Hibbs,*
538 U.S. 721 (2003) ................................................................ 36

*NFIB v. Sebelius,*
567 U.S. 519 (2012) ............................................ 15, 18, 26, 27

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................ 39

*NLRB v. Jones & Laughlin Steel Corp.,*
301 U.S. 1 (1937) ................................................................... 15

*North Am. Co. v. SEC,*
327 U.S. 686 (1946) ................................................................ 30

*Perez v. United States,*
402 U.S. 146 (1971) ................................................................ 24

*Restaurant Law Ctr. v. U.S. Dep't of Labor,*
66 F.4th 593 (5th Cir. 2023) .................................................... 42

*Roy v. City of Monroe*,
  950 F.3d 245 (5th Cir. 2020) ...................................................................... 36

*Sabri v. United States*,
  541 U.S. 600 (2004) ................................................................................... 36

*Smith v. U.S. Dep't of the Treasury*,
  No. 6:24-cv-336, --- F. Supp. 3d ----, 2025 WL 41924 (E.D. Tex. Jan. 7, 2025) ...... 13

*Sonzinsky v. United States*,
  300 U.S. 506 (1937) ................................................................................... 31

*Texas v. United States*,
  No. 23-40653, --- F.4th ----, 2025 WL 227244 (5th Cir. Jan. 17, 2025)...............45-46

*Texas Top Cop Shop, Inc. v. Garland*,
  No. 24-40792, 2024 WL 5203138 (5th Cir. Dec. 23, 2024) ........................... 11-12, 12

*Texas Top Cop Shop, Inc. v. Garland*,
  No. 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024) ........................................ 12

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ................................................................................... 44

*Ullmann v. United States*,
  350 U.S. 422 (1956) ................................................................................... 33

*United States v. Comstock*,
  560 U.S. 126 (2010) ................................................................. 17, 19, 22, 31

*United States v. Curtiss-Wright Export Corp.*,
  299 U.S. 304 (1936) ................................................................................... 35

*United States v. Daniels*,
  247 F.3d 598 (5th Cir. 2001) ...................................................................... 20

*United States v. Darby*,
  312 U.S. 100 (1941) ................................................................................... 19

*United States v. Dodge*,
  61 F.3d 142 (2d Cir. 1995)........................................................................... 33

*United States v. Gresham,*
  118 F.3d 258 (5th Cir. 1997) .................................................................. 33

*United States v. Ho,*
  311 F.3d 589 (5th Cir. 2002) .................................................................. 24

*United States v. Kahriger,*
  345 U.S. 22 (1953), *overruled in part by*
  *Marchetti v. United States,*
  390 U.S. 39 (1968) ................................................................................. 31

*United States v. Kennedy,*
  707 F.3d 558 (5th Cir. 2013) .................................................................. 20

*United States v. Lopez,*
  514 U.S. 549 (1995) ....................................................................16, 17, 25

*United States v. Matthews,*
  478 F.2d 715 (5th Cir. 1971) .................................................................. 31

*United States v. Morrison,*
  529 U.S. 598 (2000) .......................................................................... 17, 25

*United States v. Rahimi,*
  602 U.S. 680 (2024) .......................................................................... 36, 37

*United States v. Ross,*
  458 F.2d 1144 (5th Cir. 1972) ................................................................ 33

*United States v. Roush,*
  466 F.3d 380 (5th Cir. 2006) .................................................................. 20

*United States v. Salerno,*
  481 U.S. 739 (1987) .......................................................................... 14, 36

*United States v. Simpson,*
  741 F.3d 539 (5th Cir. 2014) .................................................................. 20

*United States v. Texas,*
  599 U.S. 670 (2023) ................................................................................ 45

*Valentine v. Collier*,
956 F.3d 797 (5th Cir. 2020) ............................................................ 39

*Virginia ex rel. Cuccinelli v. Sebelius,*
728 F. Supp. 2d 768 (E.D. Va. 2010),
*vacated,* 656 F.3d 253 (4th Cir. 2011) ............................................. 36

*Walters v. National Ass'n of Radiation Survivors,*
468 U.S. 1323 (1984) ......................................................................... 39

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2009) ....................................................... 14, 36, 37, 38

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ............................................................................. 43

*Wickard v. Filburn,*
317 U.S. 111 (1942) ................................................................ 16, 17, 37

*Women's Med. Ctr. of Nw. Hous. v. Bell,*
248 F.3d 411 (5th Cir. 2001) ........................................................... 15

**U.S. Constitution:**

Art. I, § 8, cl. 1 ..................................................................................... 31

Art. I, § 8, cl. 3 .............................................................................. 15, 35

Art. I, § 8, cl. 18 ............................................................................ 16, 35

Art. II, § 1, cl. 1 ................................................................................... 35

Art. II, § 3 ............................................................................................ 35

**Statutes:**

Administrative Procedure Act:
5 U.S.C. § 702 .................................................................................. 1, 44
5 U.S.C. § 705 ...................................................................................... 44

Anti-Money Laundering Act of 2020,
  Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021) .......................................... 3
    § 6002(2), 134 Stat. at 4547................................................................. 6, 22
    § 6002(5), 134 Stat. at 4547-48....................................................... 6, 21, 22
    § 6002(5)(A), 134 Stat. at 4547................................................................ 22
    § 6402(2), 134 Stat. at 4604.......................................................... 3, 19, 21
    § 6402(3), 134 Stat. at 4604................................................. 3, 5, 19, 32, 34
    § 6402(4), 134 Stat. at 4604.................................................................... 4
    § 6402(5), 134 Stat. at 4604.................................................. 6, 21, 34, 35
    § 6402(5)-(6), 134 Stat. at 4604-05....................................................... 31
    § 6402(5)(D), 134 Stat. at 4604............................................................. 40
    § 6402(5)(E), 134 Stat. at 4604........................................................ 6, 34
    § 6402(6)(A), 134 Stat. at 4605....................................................... 6, 34
    § 6402(8), 134 Stat. at 4605................................................................. 21
    § 6402(8)(C), 134 Stat. at 4605................................................... 7, 32, 33

Bank Secrecy Act,
  31 U.S.C. § 5311 *et seq.* .................................................................. 2, 27
    12 U.S.C. § 1829b............................................................................... 2
    12 U.S.C. § 1829b(a)(2)...................................................................... 3
    12 U.S.C. § 1951................................................................................ 3
    12 U.S.C. § 1951-1960......................................................................... 2
    31 U.S.C. § 310(b)(2)(C)(i).................................................................. 3
    31 U.S.C. § 5311-5314........................................................................ 2
    31 U.S.C. § 5316-5336........................................................................ 2

Corporate Transparency Act:
  31 U.S.C. § 5336(a)(1)......................................................................... 7
  31 U.S.C. § 5336(a)(2)......................................................................... 7
  31 U.S.C. § 5336(a)(3)(A)...................................................................... 7
  31 U.S.C. § 5336(a)(3)(B)...................................................................... 7
  31 U.S.C. § 5336(a)(11)(A)................................................................. 1, 8
  31 U.S.C. § 5336(a)(11)(B)..................................................................... 8
  31 U.S.C. § 5336(a)(11)(B)(xix)............................................................... 8
  31 U.S.C. § 5336(a)(11)(B)(xxiii)............................................................. 8
  31 U.S.C. § 5336(a)(11)(B)(xxiv).............................................................. 9
  31 U.S.C. § 5336(b)............................................................................ 1
  31 U.S.C. § 5336(b)(1)(A)..................................................................... 8
  31 U.S.C. § 5336(b)(1)(D)................................................................... 7-8
  31 U.S.C. § 5336(b)(2)(A)..................................................................... 7
  31 U.S.C. § 5336(b)(5)........................................................................ 9

31 U.S.C. § 5336(c)(2) .................................................................... 22
31 U.S.C. § 5336(c)(2)(B)(i)(I) ........................................................ 9
31 U.S.C. § 5336(c)(2)(B)(i)(II) ...................................................... 9
31 U.S.C. § 5336(c)(5)(B) ....................................................6, 32, 33
31 U.S.C. § 5336(h) ......................................................................... 8
31 U.S.C. § 5336(h)(3)(C) ............................................................... 8

Currency and Foreign Reporting Act of 1970,
    Pub. L. No. 91-508, 84 Stat. 1114 ................................................ 2

Fair Housing Amendments Act of 1988,
    42 U.S.C. § 3604(f)(3)(B) .......................................................... 28

Fair Labor Standards Act,
    29 U.S.C. § 201 *et seq.* ............................................................. 30

Federal Trade Commission Act,
    15 U.S.C. § 45 ........................................................................... 30

Occupational Safety and Health Act,
    29 U.S.C. § 651 *et seq.* ............................................................ 30

Sarbanes-Oxley Act,
    15 U.S.C. § 7241 ....................................................................... 30

Securities Exchange Act,
    15 U.S.C. § 78a *et seq.* ............................................................ 30

Sherman Act,
    15 U.S.C. § 1 *et seq.* ............................................................... 30

Title VII,
    42 U.S.C. § 2000e *et seq.* ........................................................ 30

8 U.S.C. § 1324a .............................................................................. 27

18 U.S.C. § 1001 .............................................................................. 2

18 U.S.C. § 1341 .............................................................................. 2

18 U.S.C. § 1343 .............................................................................. 2

18 U.S.C. § 1956 ...................................................................... 2, 18

18 U.S.C. § 1957 ...................................................................... 2, 18

18 U.S.C. § 2339C ................................................................... 2, 18

26 U.S.C. § 6012 .......................................................................... 27

26 U.S.C. § 7201 ..................................................................... 2, 18

28 U.S.C. § 1292(a)(1) .................................................................. 1

28 U.S.C. § 1331 ............................................................................ 1

52 U.S.C. § 30104 ....................................................................... 28

Del. Code Ann. tit. 8, § 122 .................................................... 22, 23

**Regulations:**

31 C.F.R. § 1010.380(a)(1)(i)(A) .............................................. 10

31 C.F.R. § 1010.380(a)(1)(i)(B) .............................................. 10

31 C.F.R. § 1010.380(a)(1)(iii) ................................................... 9

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .......................................................... 1

Fed. R. Civ. P. 23 ....................................................................... 44

**Legislative Materials:**

H.R. Rep. No. 79-1980 (1946) ................................................. 44

H.R. Rep. No. 116-227 (2019) .......................................... 3, 19, 21

**Other Authorities:**

*Beneficial Ownership Information Reporting Requirements*,
   87 Fed. Reg. 59,498 (Sept. 30, 2022) (codified at 31 C.F.R. § 1010.380,
   *amended by Beneficial Ownership Information Reporting Deadline Extension for*
   *Reporting Companies Created or Registered in 2024*,
   88 Fed. Reg. 83,499 (Nov. 30, 2023)) ................................................. 2, 3, 4, 5, 6, 7, 20,
                                                                                                    25, 33, 34, 40, 41

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
131 Harv. L. Rev. 417 (2017) ........................................................................................ 44

1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of*
   *Corporations* (5th ed. 2020) ........................................................................................ 23, 26

Steven M. D'Antuono, Acting Deputy Assistant Dir., Criminal Investigative
   Div., FBI, *Combatting Illicit Financing by Anonymous Shell Companies: Statement*
   *Before the Senate Banking, Housing, and Urban Affairs Committee* (May 21, 2019),
   https://perma.cc/Y9TN-G4UV ...................................................................................... 4, 20

Fin. Action Task Force, *Anti-Money Laundering and Counter-Terrorist*
   *Financing Measures: United States Mutual Evaluation Report* (Dec. 2016),
   https://perma.cc/5W5D-GVLE .................................................................................... 34

Carol A. Jones, *Fletcher Cyclopedia of the Law of Corporations* (rev. ed. 2015):
   Vol. 1A ................................................................................................................................ 23
   Vol. 6 .................................................................................................................................. 23

U.S. Dep't of the Treasury:
   *National Money Laundering Risk Assessment* (2018),
      https://perma.cc/K5G9-XWZG ............................................................................. 2
   *National Strategy for Combating Terrorist and Other Illicit Financing* (2020),
      https://perma.cc/C48C-AGBC ............................................................................. 4, 33

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331 for this action under 5 U.S.C. § 702. ROA.15. The district court granted plaintiffs' motion for a preliminary injunction on December 3, 2024, and it entered an amended order on December 5, 2024. ROA.443, 526. The government filed a timely notice of appeal on December 5, 2024. ROA.527; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

For decades, criminals have evaded criminal prohibitions on money laundering, terrorist financing, and other financial wrongdoing by using anonymous shell companies to conduct illicit transactions. To address these impediments to law enforcement and threats to national security, Congress passed the Corporate Transparency Act (CTA), which generally requires "corporation[s], limited liability compan[ies], [and] other similar entit[ies]" to report certain basic information about their owners to the Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). 31 U.S.C. § 5336(a)(11)(A), (b).

The question presented is whether the district court erred in entering a nationwide preliminary injunction prohibiting the government from enforcing the CTA and a nationwide stay of an implementing regulation promulgated by FinCEN.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

This case arises from the federal government's efforts to combat financial crime and protect national security.

1.  Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, financing terrorism, *see id.* § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and other harmful economic activities, *see, e.g.*, 18 U.S.C. §§ 1001, 1341, 1343 (prohibiting false statements and various forms of fraud).  According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year.  *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 & n.363 (Sept. 30, 2022) (citing U.S. Dep't of the Treasury, *National Money Laundering Risk Assessment* 2 (2018), https://perma.cc/K5G9-XWZG).

Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement.  The Bank Secrecy Act,[1] for example, requires that banks keep records regarding account owners and submit reports regarding certain transactions. *See* 31 U.S.C. § 5311 *et seq.*  Congress determined that these requirements would "have a high degree of usefulness in criminal, tax, or regulatory investigations or

_____

[1] Parts of the Currency and Foreign Reporting Act of 1970, Pub. L. No. 91-508, 84 Stat. 1114, its amendments, and other statutes, are referred to as the Bank Secrecy Act, codified at 12 U.S.C. §§ 1829b, 1951-1960, and 31 U.S.C. §§ 5311-5314, 5316-5336.

proceedings," *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (quoting

12 U.S.C. §§ 1829b(a)(2), 1951), and it directed the Financial Crimes Enforcement

Network (FinCEN) to use the reported information to "identify possible criminal

activity to appropriate Federal, State, local, Tribal, and foreign law enforcement

agencies," 31 U.S.C. § 310(b)(2)(C)(i).

Despite these efforts, there remained a significant gap in the government's

ability to detect and prosecute financial crime. Under state law, "corporations, limited

liability companies, [and] other similar entities" are generally not required to report

"information about the[ir] beneficial owners." Anti-Money Laundering Act of 2020,

Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547, 4604 (2021). "A person

forming a corporation or limited liability company within the United States" thus

"typically provides less information at the time of incorporation than is needed to

obtain a bank account or driver's license." H.R. Rep. No. 116-227, at 2 (2019). That

practice enables "malign actors" to "conceal their ownership of corporations" and

then use those anonymous corporations to engage in "money laundering," "the

financing of terrorism," and "serious tax fraud." § 6402(3), 134 Stat. at 4604.

Congress and the Executive Branch have identified "[t]his lack of

transparency" as "a primary obstacle to tackling financial crime in the modern era."

H.R. Rep. No. 116-227, at 10. When investigators trace illicit funds to a corporation,

they often cannot identify the corporation's owners from available sources because

ownership records "do not exist." 87 Fed. Reg. at 59,504. Instead, investigators must

pursue "human source information, grand jury subpoenas, surveillance operations, witness interviews, search warrants, and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies."[2]  *Id.* (quotation marks omitted).  The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious."  *Id.* at 59,505 (quoting Steven M. D'Antuono, Acting Deputy Assistant Dir., Criminal Investigative Div., FBI, *Combatting Illicit Financing by Anonymous Shell Companies: Statement Before the Senate Banking, Housing, and Urban Affairs Committee* (May 21, 2019), https://perma.cc/Y9TN-G4UV).  And because criminals may "layer" multiple shell companies "like Russian nesting 'Matryoshka' dolls," even the most thorough investigation may not yield results.  § 6402(4), 134 Stat. at 4604.

While shell companies have legitimate uses, criminals also routinely use them to exploit this enforcement gap.  Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies."  87 Fed. Reg. at 59,503 (quoting U.S. Dep't of the Treasury, *National Strategy for Combating Terrorist and Other Illicit Financing* 14 (2020), https://perma.cc/C48C-AGBC).  Likewise, drug traffickers "commonly use shell and

---

[2] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners."  87 Fed. Reg. at 59,501 (footnote omitted).  Thus, shell companies "can be used to conduct financial transactions while concealing [the] true beneficial owners' involvement."  *Id.*

front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." *Id.* And more broadly, the absence of company-ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice for those wishing to create shell companies" and a "weak link in the integrity of the global financial system." *Id.* at 59,506.

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national-security and foreign-policy interests. For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the [g]overnment of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions." 87 Fed. Reg. at 59,498. The government of Iran has likewise deployed shell companies "to obfuscate the source of funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502.

For similar reasons, criminals can use the government's lack of information about the ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." § 6402(3), 134 Stat. at 4604. Indeed, a "[Department of the] Treasury study based on a statistically significant sample of adjudicated [Internal Revenue Service] cases from 2016-2019 found [that] legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503 (quotation marks omitted). Likewise, because the

United States did not collect ownership information, it had fallen out of compliance with international standards for preventing money laundering and countering terrorism financing. § 6402(5)(E), 134 Stat. at 4604; *see* 87 Fed. Reg. at 59,506.

2. To address this enforcement gap, Congress enacted ownership reporting requirements. The Anti-Money Laundering Act of 2020 adopts various provisions designed to "modernize" federal "anti-money laundering and countering the financing of terrorism laws." § 6002(2), 134 Stat. at 4547. Among those provisions is the CTA, which "establish[es] uniform beneficial ownership information reporting requirements." § 6002(5), 134 Stat. at 4547.

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and to "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." § 6402(5), 134 Stat. at 4604. Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities," § 6402(6)(A), 134 Stat. at 4605; assist in improving "tax administration," 31 U.S.C. § 5336(c)(5)(B); and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," § 6402(5)(E), 134 Stat. at 4604. And Congress described the reported information as "highly useful to national security, intelligence, and law

enforcement agencies and Federal functional regulators." § 6402(8)(C), 134 Stat. at 4605.

The CTA accordingly requires that certain businesses report information about their beneficial owners and applicants to FinCEN. A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (establishing certain exceptions). And an "applicant" is an individual who files documents to register the corporate entity. *See id.* § 5336(a)(2). For each applicant and beneficial owner, a covered business must report the individual's legal name, date of birth, residential or business address, and driver's license number or other "unique identifying number." *Id.* § 5336(a)(1), (b)(2)(A). FinCEN estimated that a typical, simple company would spend about 90 minutes (or the equivalent of about $85's worth of time) to complete and file the statute's required report, which may be filed for free. 87 Fed. Reg. at 59,573, 59,589.

In addition to providing that covered businesses file reports when they first become subject to the CTA, the statute also requires that those businesses submit updated reports when ownership information changes. In particular, when "there is a change with respect to any" ownership information, a covered business must "submit to FinCEN a report that updates the information relating to the change." 31 U.S.C.

§ 5336(b)(1)(D).  A person who willfully violates either the initial or ongoing reporting requirements is subject to civil and criminal penalties.  *See id.* § 5336(h).  *But see id.* § 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]."  31 U.S.C. § 5336(b)(1)(A).  That term generally includes any "corporation, limited liability company, or other similar entity that is" either "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe," or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe."  *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements various categories of businesses the provision of whose information to FinCEN would not significantly facilitate the detection and prosecution of financial crime.  The CTA excludes banks, public accounting firms, and other businesses already subject to reporting or recordkeeping requirements.  *See* 31 U.S.C. § 5336(a)(11)(B).  It excludes certain domestically owned entities no longer engaged in business, which the statute generally defines in terms of whether an entity is "not engaged in active business" or "otherwise hold[ing] any kind or type of assets."  *Id.* § 5336(a)(11)(B)(xxiii).  It also excludes certain trusts, political organizations, and non-profits.  *See id.* § 5336(a)(11)(B)(xix).  And it allows the government to exempt any other "entity or class of entities" for which "requiring beneficial ownership information" would not "serve the public

interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, . . . or other crimes." *Id.* § 5336(a)(11)(B)(xxiv).

Consistent with Congress's purposes, the CTA generally contemplates that reported information will be used to facilitate the investigation and prosecution of financial crimes. For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity." 31 U.S.C. § 5336(c)(2)(B)(i)(I). FinCEN may also share the same information with state and local law-enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i)(II).

The CTA directs FinCEN to implement certain aspects of the statute by regulation, *see* 31 U.S.C. § 5336(b)(5), and FinCEN accordingly issued a final rule implementing the CTA's reporting requirements in September 2022, *see* 87 Fed. Reg. 59,498 (codified at 31 C.F.R. § 1010.380, *amended by Beneficial Ownership Information Reporting Deadline Extension for Reporting Companies Created or Registered in 2024*, 88 Fed. Reg. 83,499 (Nov. 30, 2023)). As relevant here, the rule, as amended, established the deadlines by which covered entities were required to comply with the statute. For businesses created or registered before 2024, the rule required compliance by January 1, 2025. 31 C.F.R. § 1010.380(a)(1)(iii). For businesses created or registered during 2024, the rule required compliance within 90 days of formation.

*Id.* § 1010.380(a)(1)(i)(A).  And for businesses created or registered after 2024, the rule required compliance within 30 days of formation.  *Id.* § 1010.380(a)(1)(i)(B).  As discussed below, however, the requirements are not currently in force.  *See infra* p. 13.

## B.     Prior Proceedings

1. Three years after the CTA's enactment and two years after FinCEN's announcement of the January 1, 2025, reporting deadline, plaintiffs sued to facially challenge the constitutionality of the law.  ROA.10-42.  Plaintiffs are four companies subject to the CTA's reporting requirements, a beneficial owner of one of those companies, and one organization, the National Federation of Independent Business (NFIB), which sues on behalf of its corporate members.  ROA.14-15.  Although they all actively engage in commerce, plaintiffs argued that the CTA's reporting requirements are facially invalid because the statute exceeds Congress's enumerated powers.  ROA.34-36.  They also claimed that the law violates their First and Fourth Amendment rights.  ROA.36-39. Plaintiffs further alleged that the law's reporting requirements will subject them to "compliance costs."  ROA.25-34.  Plaintiffs accordingly requested that the CTA be preliminary enjoined as applied to them, and that the reporting requirement be vacated.  ROA.125.

The district court held that the CTA is facially unconstitutional.  It concluded that enacting the CTA does not fall within Congress's Commerce Clause power because the law "regulate[s] an entity's existence" rather than any preexisting activity.

ROA.489-492 (emphasis omitted).[3]  The court further held that the CTA would not fall within Congress's authority even if corporate existence was considered an activity. While the court recognized that "it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, . . . would substantially impact interstate commerce," it ultimately concluded that "Congress's commerce power cannot reach this far" because corporate law and practice is primarily a creature of state law.  ROA.492-499.  For similar reasons, the court concluded that the CTA was not necessary and proper for executing Congress's foreign commerce powers, tax powers, or foreign affairs interests.  ROA.499-519.

Even though plaintiffs had not requested such relief, the district court also concluded that NFIB's large membership meant that meaningful relief could not be rendered "without, in effect, enjoining the CTA and Reporting Rule nationwide." ROA.523.  The district court accordingly granted plaintiffs' motion for a preliminary injunction and issued a nationwide injunction.  ROA.525-526.  And it further stayed the January 1, 2025, compliance deadline under § 705 of the Administrative Procedure Act (APA).  ROA.525-526.

2.  The government immediately appealed and sought a stay pending appeal, which a motions panel of this Court granted on December 23, 2024.  *Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5203138 (5th Cir. Dec. 23, 2024)

---

[3] The district court amended its order to correct a typographical error. ROA.520 n.10.  All citations are to the order as amended.

(per curiam).  The motions panel concluded that "the government has made a strong showing" that the CTA falls within Congress's "broad authority under the Commerce Clause" to regulate economic activity.  *Id.* at *1 (quotation marks omitted).  And it further held that "the government has made a strong showing against the [plaintiffs'] facial challenge to the CTA."  *Id.* at *2.  Lastly, it recognized that the CTA's role in preventing financial crime and protecting national security outweighs the "minimal" harm to plaintiffs in this case.  *Id.*  To allow entities subject to the CTA's requirements an opportunity to report following the stay of the preliminary injunction, FinCEN delayed the January 1, 2025, reporting deadline to January 13, 2025.  Shortly after the plaintiffs sought rehearing en banc, the merits panel vacated the stay order and expedited the case.  *Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5224138, at *1 (5th Cir. Dec. 26, 2024).

The government applied to the Supreme Court for a stay of the preliminary injunction.  Application for Stay at 1, 36-38, *McHenry v. Texas Top Cop Shop, Inc.*, No. 24A653 (U.S. Dec. 31, 2024).  The Supreme Court stayed the district court's order in its entirety pending the disposition of this appeal and of any petition for writ of certiorari filed in this case.  *McHenry v. Texas Top Cop Shop, Inc.*, No. 24A653, 604 U.S. ----, 2025 WL 272062, at *1 (U.S. Jan. 23, 2025).  Justice Gorsuch concurred in the order and indicated that he would also have granted certiorari before judgment, as the government had suggested the Court may wish to do, "to resolve definitively the question whether a district court may issue universal injunctive relief."  *Id.*

(Gorsuch, J., concurring in the grant of stay). Justice Jackson dissented, stating that "[h]owever likely the Government's success on the merits may be, … emergency relief is not appropriate because the applicant has failed to demonstrate sufficient exigency to justify [the Court's] intervention." *Id.* (Jackson, J., dissenting from the grant of stay).

The reporting requirements are currently not in effect, however, because the effective date of the implementing rule has been stayed nationwide in another action. *See Smith v. U.S. Dep't of the Treasury*, No. 6:24-cv-336, --- F. Supp. 3d ----, 2025 WL 41924, at *14 (E.D. Tex. Jan. 7, 2025). The government appealed from that order and has sought a stay pending appeal from the district court.

## SUMMARY OF ARGUMENT

I. The preliminary injunction should be reversed.

A. The government is likely to succeed on the merits because Congress acted well within its enumerated powers when it enacted the CTA. Congress has broad power under the Commerce Clause not only to regulate interstate commerce directly but also to regulate purely local activity as part of a broader regulatory scheme. It exercised that power to require basic disclosure of beneficial ownership from certain entities with the ability and propensity to engage in commercial activities. Congress determined that the CTA would enable the federal government to better combat financial crime, and the district court had no basis to disregard that legislative judgment.

Congress also determined that the CTA would assist in carrying out U.S. foreign policy, in facilitating tax enforcement, and in regulating foreign commerce. The CTA is necessary and proper to carry out the commerce power, the foreign affairs power, the taxing power, and the foreign commerce power.

B.  Plaintiffs chose to mount a facial challenge to the CTA.  To prevail, they must show "that no set of circumstances exists under which the law would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or the law lacks "a plainly legitimate sweep," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2009).  The district court failed to follow that clear test.  Rather than looking for any set of circumstances in which the law would be valid, it hypothesized a corporation that engages in no commerce whatsoever and used that theoretical entity to hold the CTA facially invalid.  That erroneous analysis cannot sustain a facial challenge, especially in a case like this where the law is plainly constitutional as applied to the named plaintiffs.

II.  The balance of the equities favors the government.  The government estimated that most businesses subject to the reporting requirement face the equivalent of $85 in compliance costs under the CTA, and plaintiffs have made no showing that the burden will be any more significant for them.  This burden does not justify an injunction, particularly when weighed against the CTA's role in helping the government protect national security and prevent financial crime.

III. If nothing else, this Court should vacate the nationwide relief that the district court *sua sponte* granted to plaintiffs and remand with instructions to craft a party-specific decree. Courts generally lack authority to order relief that extends beyond that necessary to redress the parties' injuries. When, as here, the plaintiffs expressly declined to seek nationwide relief, such broad relief must be vacated.

## STANDARD OF REVIEW

This Court reviews the district court's "ultimate decision whether to grant or deny a preliminary injunction" for "abuse of discretion," but any legal conclusions supporting that decision are reviewed "*de novo.*" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001).

## ARGUMENT

### I. Plaintiffs are unlikely to succeed on the merits.

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "[T]he power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement'; to adopt measures 'to promote its growth and insure its safety'; [and] 'to foster, protect, control and restrain.'" *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937) (citations omitted). It is thus "well established" that "Congress has broad authority" under the Commerce Clause. *NFIB v. Sebelius*, 567 U.S. 519, 549 (2012) (lead opinion).

"The commerce power is not confined in its exercise to the regulation of commerce among the [S]tates" itself. *Wickard v. Filburn*, 317 U.S. 111, 124 (1942) (quotation marks omitted). Congress may also regulate the "channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce," and even "activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *accord id.* at 34 (Scalia, J., concurring in the judgment). This third category allows Congress to regulate activities that may not themselves be commerce but that serve a broader economic regulatory scheme. *Id.* at 19 (majority opinion). Thus, Congress has the power to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. And "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (quotation marks omitted). In reviewing such a determination, a court's "task . . . is a modest one." *Id.* at 22. A court "need not determine whether [the regulated] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)).

Buttressing Congress's Commerce Clause authority, the Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other enumerated powers and the powers vested in the Executive Branch, U.S. Const. art. I, § 8, cl. 18, also "grants Congress

broad authority to enact federal legislation," *United States v. Comstock*, 560 U.S. 126, 133 (2010). While the federal government is one of enumerated powers, "'a government, entrusted with such' powers 'must also be entrusted with ample means for their execution.'" *Id.* (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 408 (1819)). "Accordingly, the Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive', to the authority's 'beneficial exercise.'" *Id.* at 133-34 (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 413, 418). It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134.

A law thus falls within Congress's commerce powers if the regulated activity consists of "any sort of economic enterprise, however broadly one might define those terms." *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 205 (5th Cir. 2000) (quoting *Lopez*, 514 U.S. at 561). In assessing the breadth of Congress's authority, the Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000)—such as regulations addressing the intrastate farming of wheat, *Wickard*, 317 U.S. at 127-29 (1942), and the intrastate manufacture and possession of marijuana for personal use, *Raich*, 545 U.S. at 15—and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561—such as prohibitions on possessing firearms in school zones and on gender-motivated violence, *id.*; *Morrison*, 529 U.S. at 613. The

Court has also drawn a distinction between regulations of existing commercial activity and regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage. *NFIB*, 567 U.S. at 553 (lead opinion); *id.* at 652 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting).

### A. The CTA falls within Congress's power to impose regulations to serve a broader commercial regulatory scheme.

1. The CTA's reporting requirements fall comfortably within Congress's powers under the Commerce and Necessary and Proper Clauses. Congress may regulate both "'economic enterprise'" itself and any activity that "exists as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Groome Res.*, 234 F.3d at 205 (quoting *Lopez*, 514 U.S. at 561). Here, the CTA regulates a core economic activity: the ownership and operation of a business. The CTA is a critical component of a broader regulatory scheme to combat financial crimes, such as money laundering, *see* 18 U.S.C. §§ 1956, 1957, financing terrorism, *see id.* § 2339C, and evading taxes, *see* 26 U.S.C. § 7201. Plaintiffs do not dispute that Congress holds authority to prohibit such harmful forms of economic activity, nor do they dispute that Congress may adopt measures to effectuate those prohibitions. Plaintiffs maintain, however, that the CTA is not a permissible means of advancing the legislature's concededly valid ends. Yet as the Supreme Court has recognized since the time of Chief Justice Marshall, if "the end be legitimate," *McCulloch*, 17 U.S.

(4 Wheat.) at 421, Congress's authority is at its apogee when it determines what means to deploy to achieve that end, *see Comstock*, 560 U.S. at 133-34; *United States v. Darby*, 312 U.S. 100, 121 (1941).

The CTA represents a particularly appropriate means for accomplishing Congress's legitimate ends. The statute's reporting requirements serve economic interests by enabling investigators to trace the flow of illicit funds and thus to enforce valid prohibitions on financial crime. And by regulating businesses who have affirmatively indicated an intent to conduct commercial transactions, the statute falls well within the established scope of Congress's authority.

2. The CTA effectuates Congress's broader regulatory scheme combatting financial crimes. For decades, criminals have used anonymous corporations to evade criminal prohibitions on money laundering, terrorism financing, tax fraud, and other economic crimes. But state law generally does not require "corporations, limited liability companies, [and] other similar entities" to report "information about the[ir] beneficial owners." § 6402(2), 134 Stat. at 4604. This has allowed "malign actors" to "conceal their ownership of corporations" and use them to conduct illicit transactions without detection. § 6402(3), 134 Stat. at 4604.

The elected Branches have identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era." H.R. Rep. No. 116-227, at 10. When investigators trace illicit funds to a corporation or similar entity, they often find that corporate-ownership records are not "attainable because they do not exist."

87 Fed. Reg. at 59,504.   And even when ownership information can be obtained,

recovering that information typically "requires human source information, grand jury

subpoenas, surveillance operations, witness interviews, . . . and foreign legal assistance

requests to get behind the outward facing structure of the[] shell companies."   *Id.*

(quotation marks omitted).   The "strategic use" of such companies by criminals thus

"makes investigations exponentially more difficult and laborious."   *Id.* at 59,505

(quoting D'Antuono, *supra*).

Many criminals, both foreign and domestic, seek to exploit this enforcement

gap.   For instance, federal prosecutors observe that "large-scale schemes that generate

substantial proceeds for perpetrators and smaller white-collar cases alike routinely

involve shell companies."   87 Fed. Reg. at 59,503 (quotation marks omitted).

Likewise, drug traffickers "commonly use shell and front companies to commingle

illicit drug proceeds with legitimate revenue of front companies, thereby enabling the

[drug traffickers] to launder their drug proceeds."   *Id.*   This Court's cases provide

many additional examples of circumstances in which criminals have used shell

companies to perpetrate and conceal illicit activity.   *See, e.g.*, *United States v. Simpson*,

741 F.3d 539, 548 (5th Cir. 2014) (conspiracy to commit mail and wire fraud);

*United States v. Kennedy*, 707 F.3d 558, 562 (5th Cir. 2013) (mortgage fraud);

*United States v. Daniels*, 247 F.3d 598, 601 (5th Cir. 2001) (bankruptcy fraud); *see also*

*United States v. Roush*, 466 F.3d 380, 387 (5th Cir. 2006) (use of shell companies to

facilitate tax evasion justifies "sophisticated means" sentencing enhancement).

Recognizing this enforcement gap as a hinderance to the government's efforts to combat financial crime, Congress determined that "the collection of beneficial ownership information" is "needed" to "better enable . . . law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity." § 6402(5), (8), 134 Stat. at 4604, 05. Congress emphasized that "beneficial ownership information reporting requirements" would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and would "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes." § 6002(5), 134 Stat. at 4547-48. And Congress described the reported information as "highly useful" to "national security, intelligence, and law enforcement agencies and Federal functional regulators." § 6402(8), 134 Stat. at 4605.

These findings rest on an extensive legislative record. "[R]eports and testimony by officials from the Department of Justice, the Department of Homeland Security, the Department of the Treasury, and the Government Accountability Office" demonstrated that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information." H.R. Rep. No. 116-227, at 2. "[T]he leading international antimoney laundering standard-setting body"—of which the United States is a founding member—similarly identified the lack of "'timely access to adequate, accurate and current beneficial ownership information' as a fundamental gap in United States efforts to combat money laundering and terrorist finance." *Id.*

Congress accordingly enacted the Anti-Money Laundering Act of 2020, which aims "to modernize" federal "anti-money laundering and countering the financing of terrorism" legislation. § 6002(2), 134 Stat. at 4547. Among these modernization efforts is the CTA, which "establish[es] uniform beneficial ownership information reporting requirements." § 6002(5), 134 Stat. at 4547. In particular, the statute requires corporate entities—that is, those entities that have been formed to engage in commercial transactions in their own name, *see, e.g.*, Del. Code Ann. tit. 8, § 122—to disclose the identities of the individuals who created the entities and have authority to direct their operations. Consistent with Congress's purposes, the statute contemplates that the reported information will be used for law enforcement and related activities. *See* 31 U.S.C. § 5336(c)(2).

The CTA thus effectuates concededly legitimate prohibitions on harmful forms of economic activity. The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations, which aids in the detection and prosecution of financial crimes. § 6002(5)(A), 134 Stat. at 4547. The CTA is therefore "rationally related to the implementation" of valid prohibitions, *Comstock*, 560 U.S. at 134, and it falls within the established scope of Congress's authority under both the Commerce and Necessary and Proper Clauses. The district court even recognized that "it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce." ROA.498. But it still chose to

substitute its judgment for Congress's, even though it was obligated to "defer to a congressional finding that a regulated activity affects interstate commerce." *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 276 (1981).

3. By regulating ongoing corporate conduct, the CTA regulates economic activity. The statute imposes reporting requirements on corporations, which are entities authorized to partake in various economic transactions, such as "[m]ak[ing] contracts," "borrow[ing] money," "incur[ring] liabilities," and transferring "real or personal property." Del. Code Ann. tit. 8, § 122; *see also* 6 Carol A. Jones, *Fletcher Cyclopedia of the Law of Corporations* § 2478, at 259-60 (rev. ed. 2015). In every State, a corporation may be formed to conduct any lawful business, and in many they have that power by default. 1A Jones, *supra*, § 139.10, at 243-44; 1 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 4:1, at 101-02 (5th ed. 2020). Incorporation, thus, is the affirmative act that brings an entity into the class of economic activities that Congress can regulate. The CTA does not regulate incorporation itself but rather is triggered by a corporation's status as a commercial entity. *Accord* ROA.488.

That would be true even in the hypothetical case, not presented here, of a corporate entity that does not itself participate in commerce. Even if such a corporation could exist—which is not at all clear given the various requirements associated with creating and maintaining a corporate form—there should be no dispute that the overwhelming majority of the statute's applications are to

corporations that participate in commercial activity, including plaintiffs in this case. ROA.159-160 (Texas Top Cop Shop "sells uniforms and equipment" and "is a licensed dealer of firearms"); ROA.162 (Data Comm "provides technical support, information technology, and communications products and services to other small businesses and individuals"); ROA.173 (Mustardseed sells "raw milk directly to customers"); ROA.178 (the Mississippi State Libertarian Party "receives donations"). The theoretical possibility that the CTA might also sweep in a corporation that chooses not to engage in commerce does not disqualify the law as a valid exercise of Congress's power to regulate commerce. *See Perez v. United States*, 402 U.S. 146, 154 (1971) ("Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class.")

Courts have "never required Congress to legislate with scientific exactitude." *Raich*, 545 U.S. at 17. Nor must a statute contain a jurisdictional hook or even rely on express legislative findings. *See United States v. Ho*, 311 F.3d 589, 603-04 (5th Cir. 2002). To the contrary, "when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Raich*, 545 U.S. at 17 (quotation marks omitted). That is especially so where, as here, the "'total incidence' of a practice"—the operation of entities that may engage in commercial activity while hiding the identities of their

beneficial owners—"poses a threat to a national market." *Id.* (quotation marks

omitted); *see also* 87 Fed. Reg. at 59,501.

4. The CTA bears no resemblance to the enactments that the Supreme Court

has held to exceed Congress's authority. The CTA is unlike the laws at issue in *Lopez*

and *Morrison*, which had no connection to commerce. In *Lopez*, the Supreme Court

observed that the challenged provision "ha[d] nothing to do with 'commerce' or any

sort of economic enterprise." 514 U.S. at 561. And in *Morrison*, the Court reasoned

that "[g]ender-motivated crimes of violence are not, in any sense of the phrase,

economic activity." 529 U.S. at 613. To connect those laws with commerce, the

Court would have needed "to pile inference upon inference in a manner that would

bid fair to convert congressional authority under the Commerce Clause to a general

police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.

No such series of inferences is necessary with the CTA. It is hardly a jump to

say that a law regulating corporate entities in order to curb financial crimes is

connected to commerce. And unlike this case, neither *Lopez* nor *Morrison* "involved

the power of Congress to exert control over intrastate activities in connection with a

more comprehensive scheme of regulation; *Lopez* expressly disclaimed that it was such

a case, and *Morrison* did not even discuss the possibility that it was." *Raich*, 545 U.S. at

39 (Scalia, J., concurring in the judgment) (citation omitted). "[T]he explicit economic

nature of" owning and operating a company "presents a very different situation than

cases challenging non-economic and non-commercial regulatory acts." *Groome Res.*,
234 F.3d at 211.

The reporting requirements also stand in stark contrast to the statutory
provision at issue in *NFIB*. That provision "requir[ed] that individuals purchase
health insurance." *NFIB*, 567 U.S. at 548 (lead opinion). In declining to uphold that
provision under the Commerce Clause, the Court emphasized that the insurance
requirement "primarily affects healthy, often young adults who are less likely to need
significant health care" and thus targets "a class whose commercial inactivity rather
than activity is its defining feature." *Id.* at 556; *see also id.* at 652-53 (Scalia, Kennedy,
Thomas, and Alito, JJ., dissenting) ("If Congress can reach out and command even
those furthest removed from an interstate market to participate in the market, then the
Commerce Clause becomes a font of unlimited power . . . ."). As the district court
recognized, the Court's primary concern in *NFIB* was that Congress was seeking to
compel economic activity by regulating inactivity. ROA.487 (citing *NFIB,* 567 U.S. at
552 (lead opinion)).

That concern is absent here. To start, the CTA's regulation of anonymous
corporate operation is not "akin to a person simply being alive in their natural state."
ROA.489. Unlike the class of uninsured individuals in *NFIB*, the CTA regulates a
class of entities—primarily active, for-profit businesses—whose defining feature is
their authority and high propensity to conduct commercial transactions. *See, e.g.,*
1 Cox & Hazen, *supra*, § 1.1, at 2 ("A business corporation is a legal device for

carrying on a business enterprise for profit . . . .").  Recognizing Congress's authority

to regulate such entities, including through disclosure of who owns or controls them,

would not transform the Commerce Clause into "a general license to regulate an

individual from cradle to grave."  *NFIB*, 567 U.S. at 557 (lead opinion).  Indeed,

plaintiffs have failed to identify a single entity that does not engage in commercial

activity but that would be subject to the CTA's reporting requirements.  What's more,

the CTA does not compel any sort of commercial activity; it merely imposes reporting

requirements on companies with the propensity to engage in commercial activity or

use the instrumentalities of interstate commerce.

The district court failed to consider these key differences when it erroneously

concluded that the CTA's regulation of anonymous corporate operation is "exactly

what the Supreme Court rejected in *NFIB*."  ROA.489.  The CTA in no way

resembles the type of unprecedented "extraordinary" power at issue in *NFIB*.  *NFIB*,

567 U.S. at 560 (lead opinion).  To the contrary, the Supreme Court has recognized

that "[r]egulation requiring the submission of information" is a "familiar category" of

federal legislation.  *Electric Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938).

Examples include laws requiring taxpayers to file tax returns, 26 U.S.C. § 6012; banks

to report information about certain transactions, *see* 31 U.S.C. § 5311 *et seq.*; employers

to collect and make available information about new employees' eligibility to work,

*see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures,

*see* 52 U.S.C. § 30104. The CTA's reporting requirements thus represent a conventional legislative response to enforcement challenges.

This Court's decision in *Groome Resources* is particularly instructive. That decision considered a provision of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3604(f)(3)(B), under which Congress exercised its power under the Commerce Clause to "define[] housing discrimination to include a refusal to make reasonable accommodations for handicapped individuals." *Groome Res.*, 234 F.3d at 195. After a local government failed to grant a group home for Alzheimer's patients a reasonable accommodation from a zoning requirement, its operator sued under this provision. Rejecting the parish's Commerce Clause challenge, this Court recognized that "[a] denial of reasonable accommodations affects a disabled individual's ability to buy, sell, or rent housing" and thus "directly interferes with a commercial transaction." *Id.* at 205-06; *see also id.* at 207-08 (explaining that the "failure to grant a reasonable accommodation to the home is an act of discrimination against the disabled that frustrated an interstate commercial transaction, and affected a commercial endeavor"); *id.* at 215 ("We do not need to pile 'inference upon inference' to see that by refusing to reasonably accommodate the disabled by discriminatory zoning laws, there will be less opportunity for handicapped individuals to buy, sell, or rent homes."). Thus, even though a local government's refusal to grant a zoning variance is not itself a commercial act, the Court held that its impact upon commercial

activity was sufficiently plain that it fell within Congress's Commerce Clause authority. The same result should follow here.

5. The district court erred in assuming that corporate regulation is a power reserved to the States. ROA.497-498, 506, 511. The district court found support for that assumption in a single citation to a case that concerned whether a state corporate law was preempted by a federal corporate regulation—it had nothing to say about the constitutionality of federal corporate regulations. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 78 (1987). And the quote the district court relied on also does not concern the constitutionality of federal corporate law but rather conflicting state laws that regulate corporate activity and thus potentially implicate the dormant Commerce Clause. *Id.* at 89. If anything, then, *CTS Corp.* recognizes that corporate laws implicate commerce concerns.

Plaintiffs' and the district court's argument that Congress through its enumerated powers may not legislate in areas also regulated by States is contrary to longstanding precedent. Indeed, in *McCulloch*, the Supreme Court rejected a similar argument that Congress's creation of the Bank of the United States improperly intruded upon the States' "power of creating a corporation." 17 U.S. (4 Wheat.) at 409. While Congress's Commerce Clause power is broad enough to allow it to expressly preempt state corporation laws, *see, e.g., Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 535-36 (2009) (preemption of state "visitorial powers" over nationally chartered banks), the CTA's effect is much more modest than that permissible

exercise of congressional authority: it does not displace state laws, it merely imposes a reporting requirement on economic entities.

Nor is the CTA the first instance of federal corporate regulation. Congress's long and extensive history of regulating commercial enterprises makes clear that corporate regulation is not limited to the States. Among other examples, federal law forbids anti-competitive conduct, *see* 15 U.S.C. § 1 *et seq.* (Sherman Act); sets minimum wage and maximum hour requirements, *see* 29 U.S.C. § 201 *et seq.* (Fair Labor Standards Act); establishes workplace health and safety standards, *see id.* § 651 *et seq.* (Occupational Safety and Health Act); bars employment discrimination, 42 U.S.C. § 2000e *et seq.*, (Title VII); forbids unfair business practices, *see* 15 U.S.C. § 45 (Federal Trade Commission Act); restricts the issuance of securities and requires often-extensive reporting, *see id.* § 78a *et seq.* (Securities Exchange Act); and implements auditing and disclosure requirements for public companies, *see id.* § 7241 (Sarbanes-Oxley Act). All of these laws regulate businesses and thus recognize the well-established understanding of federal corporate regulation as an appropriate means for executing Congress's express powers. *See McCulloch*, 17 U.S. (4 Wheat.) at 411 (finding "[n]o sufficient reason" for "why [the power of creating a corporation] may not pass as incidental to those powers which are expressly given, if it be a direct mode of executing them"); *see also North Am. Co. v. SEC*, 327 U.S. 686, 706 (1946) (identifying additional examples of federal regulation of corporations and recognizing congressional authority to regulate "a corporation's financial practices, its business

structure[,] or its security portfolio").  The CTA merely continues Congress's longstanding practice of corporate regulation.

### B.  The CTA is necessary and proper to the execution of Congress's tax, foreign affairs, and foreign commerce powers.

The CTA is also necessary and proper for carrying into execution other powers.  The Necessary and Proper Clause does not require a direct connection between a statute and "a single specific enumerated power."  *Comstock*, 560 U.S. at 147.  Rather, the Necessary and Proper Clause authorizes laws that effectuate the "aggregate" of multiple powers.  *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 535 (1870).  In enacting the CTA, Congress therefore did not rely on any single power in isolation.  Instead, it understood that the statute was "needed" to implement Congress's own commerce, foreign affairs, and taxing powers, as well as the Executive's law-enforcement and foreign-affairs powers.  § 6402(5)-(6), 134 Stat. at 4604-05.

1.  As part of the authority to "lay and collect Taxes," U.S. Const. art. I, § 8, cl. 1, Congress may enact legislation designed to facilitate tax collection, *see Helvering v. Mitchell*, 303 U.S. 391, 399 (1938).  Thus, the Supreme Court has upheld under the Necessary and Proper Clause registration requirements designed to facilitate the collection of taxes.  *See Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (taxation-and-registration scheme for firearms dealers); *United States v. Kahriger*, 345 U.S. 22, 31-32 (1953) (taxation-and-registration scheme for gambling businesses), *overruled in part on other grounds by Marchetti v. United States*, 390 U.S. 39 (1968).  This Court has also

found that the constitutionality of a registration requirement does not depend on the existence of any "concurrent tax." *United States v. Matthews*, 478 F.2d 715, 717 (5th Cir. 1971). Here, Congress employed the same power because it determined that the lack of ownership information allows criminals to obscure their income and assets and thus "facilitate[s] . . . serious tax fraud." § 6402(3), 134 Stat. at 4604. Congress therefore found that the reporting requirements would be "highly useful" in enabling investigators to detect financial crimes such as tax fraud, *see* § 6402(8)(C), 134 Stat. at 4605, and in improving "tax administration" generally, 31 U.S.C. § 5336(c)(5)(B).

The district court failed to appreciate the full scope of Congress's tax power. According to the court, Congress's tax power is limited only to regulations generating revenue. ROA.516-517. Because the "CTA does not impose any tax" and is not attached to a specific underlying tax, the district court concluded that it cannot be justified under Congress's tax power. ROA.516-517. That approach, if accepted, would call into question a variety of laws that Congress has enacted to aid in its tax powers—including "dozens of provisions across the Internal Revenue Code that require taxpayers and other third parties to file certain information returns . . . even if no taxes are owed in connection with the requisite information." *Farhy v. Comm'r*, 100 F.4th 223, 228 (D.C. Cir. 2024).

The CTA is no more an extension of Congress's power than a tax information return. Congress concluded that reporting requirements would be "highly useful" to collecting taxes because they will reduce the anonymous transactions often used to

conceal tax evasion. *See* § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5336(c)(5)(B). This is not just Congress's say-so—a 2020 study by the Department of the Treasury examined Internal Revenue Service cases from 2016-2019 and found that "legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." *National Strategy for Combating Terrorist and Other Illicit Financing*, *supra*, at 13-14; 87 Fed. Reg. at 59,503. The collection of minimal information from covered entities is thus "part of the web of regulation aiding enforcement," *United States v. Gresham*, 118 F.3d 258, 262 (5th Cir. 1997) (quoting *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972)). It "bears a sufficient nexus to the overall taxing scheme" because it "assists the government in collecting revenues." *United States v. Dodge*, 61 F.3d 142, 145 (2d Cir. 1995). The district court's contrary conclusion unduly narrows Congress's constitutional authority.

2. In addition to facilitating tax collection, the CTA also aids the enforcement of prohibitions designed to advance U.S. foreign-policy objectives and protect national-security interests. As the Supreme Court has explained, "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963), as well as national-security policy, *Ullmann v. United States*, 350 U.S. 422, 436 (1956). The already strong presumption of constitutionality, *Garner v. U.S. Dep't of Labor*, 221 F.3d 822, 826 (5th Cir. 2000), is heightened where a statute "implicates sensitive and

weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).

In this case, Congress found that the absence of ownership reporting requirements facilitates "the financing of terrorism," "piracy," and "proliferation financing" (that is, financing for the spread of nuclear, chemical, and biological weapons), and thus "harm[s] the national security interests of the United States." § 6402(3), 134 Stat. at 4604. Congress also found that the new reporting requirements were needed to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards." § 6402(5)(E), 134 Stat. at 4604. Those standards are part of a longstanding multilateral effort to strengthen the global financial system and encourage international cooperation on financial crime. *See* 87 Fed. Reg. at 59,499, 59,506; *see also* Fin. Action Task Force, *Anti-Money Laundering and Counter-Terrorist Financing Measures: United States Mutual Evaluation Report* 226 (Dec. 2016), https://perma.cc/5W5D-GVLE (report of intergovernmental organization noting that the United States has "generally unsatisfactory measures for ensuring that there is adequate, accurate and updated information on [beneficial ownership] which can be obtained or accessed by competent authorities in a timely manner"). Congress therefore assessed that the CTA "is needed" to "protect vital Unite[d] States national security interests" and "facilitate important national security" activities." § 6402(5), 6(A), 134 Stat. at 4604-05.

3.  For similar reasons, the CTA also effectuates Congress's power "[t]o regulate Commerce with foreign Nations."   U.S. Const. art. I, § 8, cl. 3.   Federal prohibitions on terrorist financing and other financial crimes rest in part on the legislature's authority to restrict harmful forms of foreign commerce.  *See Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 434 (1932) (Congress's power to regulate foreign commerce "may be broader than" its power over interstate commerce).   Congress accordingly recognized that the CTA is "needed" to "protect . . . foreign commerce." § 6402(5), 134 Stat. at 4604.

4.  Finally, the Necessary and Proper Clause empowers Congress to carry into execution not only its own powers but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."   U.S. Const. art. I, § 8, cl. 18.  The CTA effectuates the President's "executive Power," *id.* art. II, § 1, cl. 1, and his duty to "take Care that the Laws be faithfully executed," *id.* art. II, § 3, by facilitating "law enforcement efforts," § 6402(5), 134 Stat. at 4604.   The CTA also facilitates the President's powers over foreign policy and national security, *see, e.g.*, *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936), by enabling the gathering of "intelligence," the protection of "national security," and the prevention of "terrorism," § 6402(5), 134 Stat. at 4604.

These powers underscore Congress's authority to enact the CTA.

### C. Plaintiffs rely on hypothetical applications that would not be sufficient to sustain their facial challenge.

The district court's facial-challenge analysis is directly contrary to Fifth Circuit and Supreme Court precedent. It is blackletter law that a court should ordinarily address an as-applied challenge before a facial challenge, *see, e.g.*, *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484-85 (1989); *Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020), and that both challenges necessarily fail if the statute may be constitutionally applied to the plaintiff, *see, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 693 (2024). The district court ignored both of those requirements.[4] *See* ROA.479.

A facial challenge succeeds only if the plaintiff establishes "that no set of circumstances exists under which the law would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or the law lacks "a plainly legitimate sweep," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2009)). *See also Sabri v. United States*, 541 U.S. 600, 604, 609 (2004) (applying this test to an enumerated-powers challenge). The Supreme Court has imposed this demanding standard because "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a

---

[4] The district court asserted that facial attacks should be evaluated first in a challenge to Congress's "specific exercise[] of enumerated powers," but in support of that idea it cited only a since-vacated decision of the Eastern District of Virginia and a dissent. *See* ROA.479 (quoting *Virginia ex rel. Cuccinelli v. Sebelius,* 728 F. Supp. 2d 768, 774 (E.D. Va. 2010), *vacated*, 656 F.3d 253 (4th Cir. 2011)) (citing *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 743 (2003) (Scalia, J., dissenting)).

manner consistent with the Constitution." *Washington State Grange*, 552 U.S. at 450-51. The district court took precisely the opposite approach. "Rather than consider the circumstances in which [the act] was most likely to be constitutional, the [court] instead focused on hypothetical scenarios where [the act] might raise constitutional concerns. That error left the [court] slaying a straw man." *Rahimi*, 602 U.S. at 701 (citations omitted). By focusing on the chimerical possibility of a corporation that engages in no commerce whatsoever, the district court ignored that the law validly applies to plaintiffs themselves and to every entity plaintiffs have identified.

The CTA complies with the Constitution as applied to entities such as plaintiffs that are engaged in business affecting interstate commerce. Data Comm sells IT services. ROA.162. Texas Top Cop Shop operates a merchant business selling products including firearms. ROA.159-160. Mustardseed engages in exactly the type of commercial activity that the Supreme Court held Congress could regulate in *Wickard*. *Compare* ROA.173 ("Mustardseed consumes most of its production on its own property, but it occasionally sells surplus raw milk directly to customers in Wyoming."), *with Wickard*, 317 U.S. at 114 (explaining that the plaintiff operated a small farm that sold some surplus wheat while using the rest of its crop for personal consumption, fodder, and seed). Even the Libertarian Party of Mississippi holds assets and expends donated money. ROA.178. Congress acts well within the outer bounds of its Commerce Clause authority when it regulates businesses engaging in "quintessentially economic" conduct. *See Raich*, 545 U.S. at 25.

Moreover, plaintiffs have also neglected to offer any concrete example of the factual circumstance upon which their argument appears to be premised, namely the statute's application to a company with no substantial connection to commerce. Reliance on the hypothetical possibility that the law *could* apply to a company with no connection to commerce is the kind of "'speculation' about the law's coverage and its future enforcement" that the Supreme Court has warned against. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quoting *Washington State Grange*, 552 U.S. at 450). Plaintiffs' facial challenge thus fails without regard to whether the statute would be constitutional as applied to such hypothetical entities—though the Supreme Court's case law makes clear that it would, *see Raich*, 545 U.S. at 17 (noting that courts have "never required Congress to legislate with scientific exactitude").

Plaintiffs thus fail to surmount the "very high bar" for a facial challenge. *See Moody*, 603 U.S. at 723. Not only have plaintiffs failed to establish that the statute is unconstitutional as applied to them, but they have also neglected to offer any concrete example of the supposed constitutional problem that they posit, namely the statute's application to a corporation (or similar entity) with no substantial connection to commerce. That alone should preclude their challenge. *Cf. Groome Res.*, 234 F.3d at 206 (rejecting Commerce Clause challenge because "[the plaintiff] exists as a for-profit entity providing rental housing to its clients and is, thus, itself a commercial actor").

## II. The equitable factors overwhelmingly favor the government.

The district court's order threatens significant and irreparable harm to the government and public, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), which greatly outweighs any claimed injury to plaintiffs. The Supreme Court recognized, in granting a stay, that the statute should be allowed to remain in effect while litigation proceeds.

1. There is a traditionally strong "presumption of constitutionality which attaches to every Act of Congress." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers) (quoting *Walters v. National Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, C.J., in chambers)). As this Court has recognized, "any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam) (cleaned up). That is especially true here given that the CTA is a bipartisan effort by Congress to target financial crime and protect national security. The district court properly recognized the statute's utility in combatting money laundering and other criminal activity. *See* ROA.491 ("The notion that one may use a company to veil their illicit financial crimes is unassailable."). And the common-sense notion that anonymous transactions jeopardize law-enforcement efforts was well documented in statutory findings and the legislative history. *Supra* pp. 3-7. Moreover, the court recognized that "the Government has an interest in ferreting out financial crime, protecting foreign

39

commerce and national security, and bringing the United States's money laundering laws into compliance with international standards." ROA.519-520.

FinCEN has provided specific examples to illustrate the threat that the use of "shell or front companies" poses to "national security." 87 Fed. Reg. at 59,498. For instance, the "Iranian government" has used "shell companies" "to obfuscate the source of [its] funds and hide its involvement in efforts to generate revenue." *Id.* at 59,502. In one case, "the Department of Justice charged 10 Iranian nationals with running a nearly 20-year-long scheme to evade U.S. sanctions on the Government of Iran by disguising more than $300 million worth of transactions—including the purchase of two $25 million oil tankers—on Iran's behalf through front companies in California" and other jurisdictions. *Id.* at 59,503. Such "sanctions evasion" poses "a significant threat to the national security of the United States and its partners." *Id.* at 59,498.

In addition, the CTA facilitates the prevention, detection, and prosecution of financial crimes. Congress found that the statute's reporting requirements are "needed" "to counter money laundering . . . and other illicit activity." § 6402(5)(D), 134 Stat. at 4604. FinCEN has similarly observed that "a lack of uniform beneficial ownership information reporting requirements . . . hinders the ability of . . . law enforcement to swiftly investigate . . . entities created and used to hide ownership for illicit purposes." 87 Fed. Reg. at 59,498.

Again, FinCEN has provided specific examples that illustrate how criminals use shell companies to conceal their crimes. *See* 87 Fed. Reg. at 59,499. In one case, a group of individuals stole "$24 million of COVID-19 relief money by using synthetic identities and shell companies they had created years earlier to commit other bank fraud." *Id.* In another, the government "investigated the alleged misappropriation of more than $4.5 billion in funds" that "were allegedly laundered through a series of complex transactions and shell companies with bank accounts located in the United States and abroad." *Id.* at 59,503.

Enjoining the CTA would hinder the government's efforts to counter these serious harms.

2. Balanced against these concrete and serious harms to the government's law-enforcement efforts is plaintiffs' alleged compliance costs. The district court described those injuries as "concrete," ROA.520, but did not dispute that they are minimal. FinCEN estimated that a typical, simple company would spend about 90 minutes (or the equivalent of about $85's worth of time) to complete and file the statute's required report, which may be filed for free. 87 Fed. Reg. at 59,573, 55,589. The plaintiff corporations do not contend that they have more complex structures that would require greater time or money; they merely offer general statements that "compliance costs" would be incurred. ROA.160, 163, 172, 174, 179. Plaintiffs also do not meaningfully detail their compliance costs; in fact, they admit that the basic information required under the CTA is "readily available." ROA.167.

To be cognizable as irreparable harm, "alleged compliance costs must be 'more than de minimis.'" *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 600 (5th Cir. 2023); *see also Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (explaining that, only after plaintiffs show more than de minimis harm, does the inquiry turn "not so much the magnitude but the irreparability" of the harm (quotation marks omitted)). Here, plaintiffs' compliance costs—which equate for each company to roughly one-fifth of the fee to file this action—do not outweigh the substantial harms imposed on the United States when an act of Congress is enjoined.

## III. At a minimum, plaintiffs are not entitled to nationwide relief.

1. Neither in their complaint nor in their motion for a preliminary injunction did plaintiffs seek injunctive relief that would benefit non-parties. *Cf.* ROA.41 (failing to detail scope of relief sought); ROA.125 (same); ROA.152-153 (alleging only that plaintiffs will be harmed absent interim relief). Rather, they expressly declined to seek nationwide relief. *See* ROA.585-586 ("[F]or the preliminary injunction the only request we're making is with respect to the Plaintiffs."). Nevertheless, the district court entered both an injunction and a § 705 stay with nationwide effect. By itself, the district court's grant of relief beyond what plaintiffs sought provides grounds to vacate the order. *See Deanda v. Becerra*, 96 F.4th 750, 768 (5th Cir. 2024) (a district court abuses its discretion in granting nationwide vacatur when plaintiff neither brought an APA claim nor sought vacatur of a regulation); *Braidwood Mgmt., Inc. v.*

*Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) (same), *cert. granted*, No. 24-316, 2025 WL 65913 (U.S. Jan. 10, 2025).

Compounding its error, the district court purported to enjoin the CTA itself. The district court stated: "[T]he CTA, 31 U.S.C. § 5336[,] is hereby enjoined." ROA.525. It had no power to enter such an order. "Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may . . . purport to enjoin challenged 'laws themselves.'" *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citation omitted); *see California v. Texas*, 593 U.S. 659, 672 (2021) ("Remedies . . . do not simply operate 'on legal rules in the abstract.'" (citation omitted)).

2. Even if plaintiffs had properly sought nationwide relief, the district court's acquiescence in that request would run contrary to Article III and fundamental equitable principles, which provide that relief should be limited to the parties. Article III authorizes courts to entertain suits only by a plaintiff who has suffered a concrete injury and to grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quotation marks omitted).

Principles of equity reinforce that constitutional limitation. A federal court's authority is generally confined to the relief "traditionally accorded by courts of equity" in 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999). And it is a longstanding equitable principle that, at most, injunctive relief may

"be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, "courts of equity" historically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring); *see generally* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017).

Those principles are buttressed here by the APA's text and history. Section 705 explicitly incorporates limitations on non-party relief by permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Its legislative history likewise makes clear that Congress intended § 705 relief to be "equitable" and used only "to prevent irreparable injury," H.R. Rep. No. 79-1980, at 43 (1946), and that "[s]uch relief would normally, if not always, be limited to the parties complainant," *id.* And the APA explicitly reinforces that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702. The APA therefore requires courts to decline to enter nationwide relief, however styled, where other remedies would fully redress plaintiffs' injuries.

Nationwide relief also creates well-catalogued legal and practical problems. It circumvents the procedural rules governing class actions, which are designed to determine when absent parties' rights may be affected—favorably or unfavorably—by litigation. Fed. R. Civ. P. 23. It enables forum shopping and empowers a single district judge to effectively nullify the decisions of all other lower courts by barring

application of a challenged policy in any district nationwide.  *DHS v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay).  And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets."  *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also United States v. Texas*, 599 U.S. 670, 702-04 (2023) (Gorsuch, J., concurring in the judgment).

In line with those principles, the Supreme Court recently stayed a universal injunction based on five Justices' explicit conclusion that such injunctions are likely impermissible.  *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).  And on a separate occasion, three Justices recently admonished that "universal relief … strains our separation of powers" and advised that if "party-specific relief can adequately protect the plaintiff's interests," then "an appellate court should not hesitate to hold that broader relief is an abuse of discretion."  *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment).  This Court has also recognized that universal "injunctions are not 'required or even the norm,' and [that] several justices on the Supreme Court have viewed them with conspicuous skepticism," along with "[s]cholars and judges from our sister circuits."  *Braidwood Mgmt.*, 104 F.4th at 953-54 (footnote omitted) (quoting *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam)); *see Texas v. United States*, No. 23-40653, --- F.4th

----, 2025 WL 227244, at *18 (5th Cir. Jan. 17, 2025) (tailoring injunction's scope so as to redress only harm to plaintiff that demonstrated injury).

3. The district court's nationwide injunction in this case is improper. The government argued that granting widespread relief to all of NFIB's members when they did not appear before the court would be inappropriate and akin to a nationwide injunction. The district court took that argument as a license to hold that nationwide relief was warranted.

Such broad relief goes beyond the ordinary and historical practice of granting only that relief which is necessary for the parties in the case. NFIB's 300,000 members pale in comparison to the estimated 32.6 million corporations that would be subject to the CTA's reporting requirements. And even though respondents are all domestic persons, the court's injunction encompasses foreign persons, precluding the government from enforcing the CTA against U.S. entities formed by foreign citizens and against foreign entities that register to do business in the United States. The district court's nationwide injunction thus sweeps beyond the broadest possible definition of the parties in this case and disregards other pending challenges to the CTA, some of which have disagreed with the district court here. *See Louisiana v. Becerra*, 20 F.4th at 263 (granting a stay with respect to an injunction's application to non-parties in part because "[o]ther courts are considering these same issues, with several courts already and inconsistently ruling"). At a minimum, the injunction should be narrowed to NFIB members at the time of the district court's decision.

But even the injunction's application to NFIB's members would go beyond the proper scope of relief. Equitable principles preclude granting relief to any member who has not been identified in district court and agreed to be bound by the judgment. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 401-02 (2024) (Thomas, J., concurring) (noting that "[u]niversal injunctions" as a means of granting relief to an entire association's members are "legally and historically dubious" (quotation marks omitted)). Restricting this type of broad relief would also promote longstanding equitable principles that a party has one opportunity for relief and that the effect of any judgment should be bidirectional. *Cf. Arizona*, 40 F.4th at 397 (Sutton, C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

Only two of NFIB's members appear as named plaintiffs and only four submitted statements in this case. Extending relief to NFIB's absent members opens the door to improper duplication of individual members' claims as a member of NFIB could also be a member of another organization representing business interests, such as a small business association. Such a result would improperly provide individual members of multiple organizations repeated bites at the apple as they would obtain relief so long as one organization's suit succeeds, even if many others' suits fail. That scheme—embraced by the district court—undermines basic principles of preclusion and perpetuates the unfair asymmetry those precepts seek to guard against. Indeed, given that NFIB has not identified all of its members, it is unclear

whether one or more of its members have been plaintiffs in litigation challenging the

CTA in which courts have concluded that the CTA is likely constitutional.

*See Firestone v. Yellen*, No. 3:24-cv-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024);

*Community Ass'ns Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct.

24, 2024).

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

ERIC D. McARTHUR[*]
  *Deputy Assistant Attorney General*
ABE McGLOTHIN, JR.
  *Acting United States Attorney*

DANIEL TENNY

 /s/ Maxwell A. Baldi
MAXWELL A. BALDI
SOPHIA SHAMS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-0211*
  *maxwell.baldi@usdoj.gov*

February 2025

---

[*] The Acting Assistant Attorney General is recused in this case.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,725 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI

**ADDENDUM**

# TABLE OF CONTENTS

31 U.S.C. § 5336 (excerpts) ................................................................. A1

**31 U.S.C. § 5336**

**§ 5336. Beneficial ownership information reporting requirements**

**(a) Definitions.**--In this section:

. . . .

**(2) Applicant.**--The term "applicant" means any individual who--

**(A)** files an application to form a corporation, limited liability company, or other similar entity under the laws of a State or Indian Tribe; or

**(B)** registers or files an application to register a corporation, limited liability company, or other similar entity formed under the laws of a foreign country to do business in the United States by filing a document with the secretary of state or similar office under the laws of a State or Indian Tribe.

**(3) Beneficial owner.**--The term "beneficial owner"--

**(A)** means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise--

**(i)** exercises substantial control over the entity; or

**(ii)** owns or controls not less than 25 percent of the ownership interests of the entity; and

. . . .

**(11) Reporting company.**--The term "reporting company"--

**(A)** means a corporation, limited liability company, or other similar entity that is--

**(i)** created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or

**(ii)** formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe; and

**(B)** does not include--

**(xix)** any--

**(I)** organization that is described in section 501(c) of the Internal Revenue Code of 1986 (determined without regard to section 508(a) of such Code)

and exempt from tax under section 501(a) of such Code, except that in the case of any such organization that loses an exemption from tax, such organization shall be considered to be continued to be described in this subclause for the 180-day period beginning on the date of the loss of such tax-exempt status;

**(II)** political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code; or

**(III)** trust described in paragraph (1) or (2) of section 4947(a) of such Code;

. . . .

**(xxiii)** any corporation, limited liability company, or other similar entity--

**(I)** in existence for over 1 year;

**(II)** that is not engaged in active business;

**(III)** that is not owned, directly or indirectly, by a foreign person;

**(IV)** that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest); and

**(V)** that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity;

**(xxiv)** any entity or class of entities that the Secretary of the Treasury, with the written concurrence of the Attorney General and the Secretary of Homeland Security, has, by regulation, determined should be exempt from the requirements of subsection (b) because requiring beneficial ownership information from the entity or class of entities--

**(I)** would not serve the public interest; and

**(II)** would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes.

. . . .

**(b) Beneficial ownership information reporting.**--

**(1) Reporting.**—

**(A) In general.--**In accordance with regulations prescribed by the Secretary of the Treasury, each reporting company shall submit to FinCEN a report that contains the information described in paragraph (2).

**(B) Reporting of existing entities.**--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered before the effective date of the regulations prescribed under this subsection shall, in a timely manner, and not later than 2 years after the effective date of the regulations prescribed under this subsection, submit to FinCEN a report that contains the information described in paragraph (2).

**(C) Reporting at time of formation or registration.**--In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN a report that contains the information described in paragraph (2).

**(D) Updated reporting for changes in beneficial ownership.**--In accordance with regulations prescribed by the Secretary of the Treasury, a reporting company shall, in a timely manner, and not later than 1 year after the date on which there is a change with respect to any information described in paragraph (2), submit to FinCEN a report that updates the information relating to the change.

. . . .

**(2) Required information.**--

**(A) In general.**--In accordance with regulations prescribed by the Secretary of the Treasury, a report delivered under paragraph (1) shall, except as provided in subparagraph (B), identify each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by--

**(i)** full legal name;

**(ii)** date of birth;

**(iii)** current, as of the date on which the report is delivered, residential or business street address; and

**(iv)(I)** unique identifying number from an acceptable identification document; or

**(II)** FinCEN identifier in accordance with requirements in paragraph (3).

. . . .

**(c) Retention and disclosure of beneficial ownership information by FinCEN.--**

> **(1) Retention of information.**--Beneficial ownership information required under subsection (b) relating to each reporting company shall be maintained by FinCEN for not fewer than 5 years after the date on which the reporting company terminates.

> **(2) Disclosure.--**

. . . .

>> **(B) Scope of disclosure by FinCEN.**--FinCEN may disclose beneficial ownership information reported pursuant to this section only upon receipt of--

>> **(i)** a request, through appropriate protocols--

>>> **(I)** from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity; or

>>> **(II)** from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation;

>> **(ii)** a request from a Federal agency on behalf of a law enforcement agency, prosecutor, or judge of another country, including a foreign central authority or competent authority (or like designation), under an international treaty, agreement, convention, or official request made by law enforcement, judicial, or prosecutorial authorities in trusted foreign countries when no treaty, agreement, or convention is available--

>>> **(I)** issued in response to a request for assistance in an investigation or prosecution by such foreign country; and

>>> **(II)** that--

>>>> **(aa)** requires compliance with the disclosure and use provisions of the treaty, agreement, or convention, publicly disclosing any beneficial ownership information received; or

>>>> **(bb)** limits the use of the information for any purpose other than the authorized investigation or national security or intelligence activity;

>> **(iii)** a request made by a financial institution subject to customer due diligence requirements, with the consent of the reporting company, to facilitate the

compliance of the financial institution with customer due diligence requirements under applicable law; or

**(iv)** a request made by a Federal functional regulator or other appropriate regulatory agency consistent with the requirements of subparagraph (C).

**(C) Form and manner of disclosure to financial institutions and regulatory agencies.**--The Secretary of the Treasury shall, by regulation, prescribe the form and manner in which information shall be provided to a financial institution under subparagraph (B)(iii), which regulation shall include that the information shall also be available to a Federal functional regulator or other appropriate regulatory agency, as determined by the Secretary, if the agency--

**(i)** is authorized by law to assess, supervise, enforce, or otherwise determine the compliance of the financial institution with the requirements described in that subparagraph;

**(ii)** uses the information solely for the purpose of conducting the assessment, supervision, or authorized investigation or activity described in clause (i); and

**(iii)** enters into an agreement with the Secretary providing for appropriate protocols governing the safekeeping of the information.

. . . .