# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 24-40792

TEXAS TOP COP SHOP, INCORPORATED; RUSSELL STRAAYER;
MUSTARDSEED LIVESTOCK, L.L.C.; LIBERTARIAN PARTY OF
MISSISSIPPI; NATIONAL FEDERATION OF INDEPENDENT
BUSINESS, INCORPORATED; DATA COMM FOR BUSINESS,
INCORPORATED,

PLAINTIFFS-APPELLEES,

V.

PAMELA BONDI, U.S. ATTORNEY GENERAL OF THE UNITED
STATES; TREASURY DEPARTMENT; DIRECTOR FINCEN ANDREA
GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT
NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK;
SCOTT BESSENT, SECRETARY, U.S. DEPARTMENT OF
TREASURY,

DEFENDANTS-APPELLANTS.

---

## PLAINTIFFS-APPELLEES' BRIEF-IN-CHIEF

ON INTERLOCUTORY APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
4:24-CV-478
HON. AMOS L. MAZZANT
February 25, 2025

CALEB KRUCKENBERG          Center for Individual Rights
TODD F. GAZIANO            1100 Conn. Ave. N.W., Suite 625
CHRISTIAN CLASE            Washington D.C. 20036
                           (cont'd)

JOHN C. SULLIVAN
S|L Law PLLC610 Uptown
Blvd, Suite 2000
Cedar Hill TX 75104

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
Baker Hostetler
Washington Square, 1050 Conn.
Ave. N.W., Suite 1100
Washington D.C. 20036

Counsel for Plaintiffs-Appellees

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees and Counsel:**

Texas Top Cop Shop, Inc.,
Russell Straayer
Mustardseed Livestock, LLC,
Libertarian Party of Mississippi
National Federation of Independent Business, Inc.,
Data Comm for Business, Inc.
Elizabeth Milito

Caleb Kruckenberg
Todd Gaziano
Christian Clase
Center for Individual Rights
1100 Connecticut Avenue, NW Suite 625
Washington, D.C. 20036

Andrew Grossman
Kristin Shapiro
Baker Hostetler
1050 Connecticut Ave, NW Suite 1100
Washington, D.C. 20036

John Clay Sullivan
S|L Law PLLC

610 Uptown Boulevard, Suite 2000
Cedar Hil, TX 75104

**Defendants-Appellants and Counsel**

United States Department of Treasury
Financial Crimes Enforcement Network
Pamela Bondi, United States Attorney General
David Lebryk, Acting Secretary of Treasury
Scott Bessent, United States Secretary of Trasury
Janet Yellen, United States Secretary of Treasury
Andrea Gacki, Director of Financial Crimes Enforcement Network
James R. McHenry III, Acting U.S. Attorney General
Merrick Garland, United States Attorney General

Faith Lowry
Stuart Robinson
Daniel Bentele Hahs Tenny
Steven H. Hazel
Sophia Shams
Steven Andrew Myers
Daniel Bentele Hahs Tenny
Maxwell A. Baldi

U.S. Department of Justice
950 Penn. Ave., N.W.
Washington D.C. 20530

***Amici* and Counsel**

**The State of Texas**
Christina Cella
Office of the Texas Attorney General
300 W. 15th Street, Sixth Floor
Austin, TX 78701

**Eagle Forum Education and Legal Defense Fund**
Andrew L. Schlafly

Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931

**Private Investor Coalition, Incorporated**
John C. Neiman, Jr., Esq.
Direct: 205-254-1000
Email: jneiman@maynardnexsen.com
Fax: 205-254-1999
Maynard Nexsen, P.C., Suite 1700
1901 6th Avenue, N.
Birmingham, AL 35203

**Community Associations Institute**
Gregg Sandler Weinberg
Direct: 713-840-1666
Email: gweinberg@rmwbh.com
Roberts Markel Weinberg Butler Hailey, P.C.
57th Floor
2800 Post Oak Boulevard
Houston, TX 77056

**Competitive Enterprise Institute**
Charles Devin Watkins
Direct: 503-753-8104
Email: devin.watkins@cei.org
Competitive Enterprise Institute
7th Floor
1310 L Street, N.W.
Washington, DC 20005

**The Buckeye Institute**
Robert Alt
Direct: 614-224-4422
Email: robert@buckeyeinstitute.org
Buckeye Institute
Suite 1300
88 E. Broad Street

Columbus, OH 43215

**Americans for Prosperity Foundation**
Michael David Pepson
Direct: 571-329-4529
Email: mpepson@afphq.org]
Americans for Prosperity Foundation, Suite 1000
4201 Wilson Boulevard
Arlington, VA 22203

**S Corporation Association**
John C. Neiman, Jr., Esq.
Direct: 205-254-1000
(see above)

**Thomas Zawistowski**
Walter M. Weber
Direct: 202-546-8890
Email: wmweber@aclj-dc.org
Fax: 202-544-5172
American Center for Law & Justice
201 Maryland Avenue, N.E.
Washington, DC 20002-5703

**National Association of Wholesaler-Distributors**
Grady Block
Direct: 303-292-2021
Email: gblock@mslegal.org
Fax: 877-349-7074
Mountain States Legal Foundation
2596 S. Lewis Way
Lakewood, CO 80227

**The Small Business Association of Michigan**
Stephen J. Van Stempvoort
Direct: 616-831-1700
Email: vanstempvoorts@millerjohnson.com
Miller Johnson

Suite 1100
45 Ottawa Avenue, S.W.
Grand Rapids, MI 49503

**Pacific Legal Foundation**
Joshua Martin Robbins
Direct: 202-945-9524
Email: jrobbins@pacificlegal.org
Pacific Legal Foundation, Suite 1000
3100 Clarendon Boulevard
Arlington, VA 22201

**We the People Convention**
Walter M. Weber
Direct: 202-546-8890
(see above)

**Job Creators Network Foundation**
Grady Block
Direct: 303-292-2021
(see above)

**Chaldean American Chamber of Commerce**
Stephen J. Van Stempvoort
Direct: 616-831-1700
(see above)

**Hamilton Lincoln Law Institute**
Neville S. Hedley
Direct: 312-342-6008
Email: ned.hedley@hlli.org
Hamilton Lincoln Law Institute, Suite 300
1629 K Street, N.W.
Washington, DC 20006

**Liberty Justice Center**
Reilly Stephens
Direct: 512-481-4400

Email: rstephens@ljc.org
Liberty Justice Center
Suite 1-250
7500 Rialto Boulevard
Austin, TX 78735

**New Civil Liberties Alliance**
Sheng Tao Li
Direct: 202-869-5210
Email: sheng.li@ncla.legal
New Civil Liberties Alliance
Suite 300
4250 N. Fairfax Drive
Ballston, VA 22203

**Advancing American Freedom**
John Marc Wheat, General Counsel
Direct: 202-780-4848
Email: mwheat@advancingamericanfreedom.com
Advancing American Freedom, Incorporated
Suite 930
801 Pennsylvania Ave., N.W.
Washington, DC 20004

**National Retail Federation**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
Email: bbartlett@seyfarth.com
Fax: 404-892-7056
Seyfarth Shaw, L.L.P.
Suite 2500
1075 Peachtree Street, N.E.
Atlanta, GA 30309-3962

**National Association of Convenience Stores**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
(see above)

**Restaurant Law Center**
Brett Christopher Bartlett, Esq.
Direct: 404-888-1875
(see above)

**Associated General Contractors of America, Incorporated**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
Email: murphy.foster@bswllp.com
Fax: 225-387-5397
Breazeale, Sachse & Wilson, L.L.P.
23rd Floor
301 Main Street
1 American Place
Baton Rouge, LA 70801

**Associated General Contractors of New York State, LLC**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
(see above)

**Business Council of New York State, Incorporated**
Murphy J. Foster, III, Esq.
Direct: 225-387-4000
(see above)

**State of West Virginia**
Michael Ray Williams
Direct: 304-558-2021
Email: michael.r.williams@wvago.gov
Fax: 304-558-0140
Office of the Attorney General for the State of West Virginia
Building 1, Room 26E
1900 Kanawha Boulevard, E.
State Capitol
Charleston, WV 25305-0000

**State of Kansas**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**State of South Carolina**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**22 Other States**
Michael Ray Williams
Direct: 304-558-2021
(see above)

**Project for Privacy and Surveillance Accountability, Incorporated**
Gene C. Schaerr
Direct: 202-787-1060
Email: gschaerr@schaerr-jaffe.com
Fax: 202-776-0136
Schaerr Jaffe, L.L.P.
Suite 900
1717 K Street, N.W.
Washington, DC 20006

**Transparency International U.S.**
Scott Andrew Greytak
Direct: 614-668-0258
Email: greytak.1@gmail.com
Transparency International U.S.
Suite 800
1100 13th Street, N.W.
Washington, DC 20010

**Foundation of Defense of Democracies**
Scott Andrew Greytak
(see above)

**Nate Sibley**
Scott Andrew Greytak
(see above)

**John A. Cassara**
Scott Andrew Greytak
(see above)

**Debra LaPrevotte**
Scott Andrew Greytak
(see above)

**Albert Torres**
Scott Andrew Greytak
(see above)

**Senator Sheldon Whitehouse**
Kristen Paige Miller, Attorney
Direct: 202-701-1782
Email: kmiller@democracyforward.org
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Sarah Goetz
Direct: 202-383-0794
Email: sgoetz@democracyforward.org
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

Robin F. Thurston
Direct: 202-448-9090
Email: rthurston@democracyforward.org
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

**Senator Ron Wyden**
Kristen Paige Miller, Attorney
(see above)
Sarah Goetz
(see above)
Robin F. Thurston
(see above)

**Senator Elizabeth Warren**
Kristen Paige Miller, Attorney
(see above)
Sarah Goetz
(see above)
Robin F. Thurston
(see above)

**Senator Jack Reed**
Kristen Paige Miller, Attorney
(see above)
Sarah Goetz
(see above)
Robin F. Thurston
(see above)

**Representative Maxine Waters**
Kristen Paige Miller, Attorney
(see above)
Sarah Goetz
(see above)
Robin F. Thurston
(see above)

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Counsel for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees request that this Court hold oral argument in this case as scheduled. Given the complex issues, substantial nationwide importance of the issues presented, and potential ramifications of this case, oral argument would benefit the Court in its resolution of this matter.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................... iii

STATEMENT REGARDING ORAL ARGUMENT ............................... xiii

TABLE OF CONTENTS ........................................................ xiv

COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...................................................................... xix

INTRODUCTION ................................................................. 1

COUNTERSTATEMENT OF THE CASE ................................... 4

    A.   LEGAL BACKGROUND ............................................ 4

    B. THE CTA'S BURDEN ON THE PUBLIC AND PLAINTIFFS ..... 8

    C. PROCEEDINGS BELOW ............................................ 11

ARGUMENT ..................................................................... 17

    I. THE CTA IS LIKELY UNCONSTITUTIONAL ............................ 18

    A.  *NFIB V. SEBELIUS* FORECLOSES THE GOVERNMENT'S COMMERCE CLAUSE RATIONALIZATION ............................................ 18

        1.   The CTA Applies Upon An Entity's *Creation* ......................... 19

        2.   The Federal Government's Power Does Not Arise At the Moment of Incorporation ............................................ 22

        3.   The CTA Is Not Part of a Broader Regulatory Scheme Over Economic Transactions ............................................... 26

        4.   The CTA Would Cross a Line Held Since the Founding ......... 29

    B.  THE GOVERNMENT'S RATIONALIZATION THAT THE CTA'S MANDATE IS NECESSARY & PROPER TO A GRAB BAG OF OTHER POWERS FAILS ... 31

        1.   The CTA Is Not Necessary to Collect Revenue ........................ 32

        2.   The CTA Is Not Necessary and Proper to Execute Congress's Implied Foreign Affairs Power. ..................................... 36

        3.   The Government's Passing Nod to Other Powers Also Fails .. 39

    C.  A STATUTE THAT EXCEEDS CONGRESS'S POWERS IS NECESSARILY FACIALLY INVALID .................................................. 40

II. THE EQUITABLE FACTORS WEIGH HEAVILY IN FAVOR OF POSTPONING THE REPORTING RULE ......................................... 43

A. THE GOVERNMENT'S CLAIMS OF INJURY ARE OVERBLOWN ............. 45

B. THE INJUNCTION REMAINS NECESSARY TO PREVENT IRREPARABLE INJURY TO PLAINTIFFS ..................................................... 49

    1.   Plaintiffs Face Nonrecoverable Compliance Costs .................. 50

    2.   Plaintiffs Face the Irreparable Loss of Constitutional Rights 53

    3.   The Injunction Also Preserves Judicial Review ...................... 56

D.   THE SCOPE OF THE INJUNCTION IS APPROPRIATE .......................... 60

CONCLUSION ......................................................................... 67

# TABLE OF AUTHORITIES

## CASES

*Airlines for Am. v. DOT*, 110 F.4th 672 (5th Cir. 2024)..........................64

*Americans for Prosperity v. Bonta*, 594 U.S. 595 (2021)........................55

*Beame v. Friends of Earth*, 434 U.S. 1310 (1977) ...................................48

*Bond v. United States*, 572 U.S. 844 (2014) ................................36, 38, 39

*Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024)............49, 53, 58

*BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ..............24

*Calumet Shreveport Ref., L.L.C. v. United States EPA*, U.S. App. LEXIS 17368 (5th Cir. Jan. 27, 2023).....................................................................64

*City of L.A. v. Patel*, 576 U.S. 409 (2015) ..............................................56

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ...............23, 29

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194 (3d Cir. 2024) ....................................................................57

*Electric Bond & Share Co. v. SEC*, 303 U.S. 419 (1938) ........................28

*Elrod v. Burns*, 427 U.S. 347 (1976) ..................................................54, 55

*FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024) ..................66

*Gonzales v. Raich*, 545 U.S. 1 (2005) ................................................26, 27

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023)................................62

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999).................................................................................................61

*Harrison v. Young*, 48 F.4th 331 (5th Cir. 2022) ...................................17

*Kansas v. United States*, 124 F.4th 529 (8th Cir. 2024) ..................46, 47

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) 58

*Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022)..................................59

*McCulloch v. Maryland*, 4 Wheat. 316 (1819).........................................31

*McHenry v. Texas Top Cop Shop, Incorporated, et al.*, No. 24A653 (2025) ......................................................................................................................14

*MCR Oil Tools, L.L.C. v. United States DOT*, No. 24-60230, 2024 U.S. App. LEXIS 14297 (5th Cir. June 12, 2024).........................................64

*Meis v. Sanitas Serv. Corp.*, 511 F.2d 655 (5th Cir. 1975).....................57

*Missouri v. Holland*, 252 U.S. 416 (1920)..............................................38

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ..............54, 55

*Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024) ............................................................................25, 35, 37, 38, 39

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) ................................................... 1, 2, 18, 20, 21, 24, 30, 31, 39, 41

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................... 44, 64

*Rest. Law Ctr. v. United States DOL*, 66 F.4th 593 (5th Cir. 2023) ........................................................................... 50, 51, 52

*Sampson v. Murray*, 415 U.S. 61 (1974) ................................................... 63

*Santa Fe Indus. v. Green*, 430 U.S. 462 (1977) ........................................ 25

*Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4 (1942) .................... 62, 64

*Smith v. United States Dep't of the Treasury*, No. 6:24-cv-336, 2025 U.S. Dist. LEXIS 2321 (E.D. Tex. Jan. 7, 2025) ........................... 14, 15, 38

*Sonzinsky v. United States*, 300 U.S. 506 (1937) ...................................... 33

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024) ............................... 56

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ........................................... 58

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................... 67

*Texas v. United States EPA*, 829 F.3d 405 (5th Cir. 2016) ..................... 65

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) .......... 36

*United States v. Dodge*, 61 F.3d 142 (2d Cir. 1995) ............................... 34

*United States v. Kahriger*, 345 U.S. 22 (1953) ...................................... 33

*United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993) ............................. 42

*United States v. Lopez*, 514 U.S. 549 (1995) .................................... 31, 41

*United States v. Matthews*, 438 F.2d 715 (5th Cir. 1971) ..................... 33

*United States v. Morrison*, 529 U.S. 598 (2000) .................................... 21

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................. 54, 67

*Wickard v. Filburn*, 317 U.S. 111 (1942) .............................................. 41

*Zivotofsky v. Kerry*, 576 U.S. 1 (2015) ................................................. 36

## STATUTES

26 U.S.C. § 951 ........................................................................................ 34

31 U.S.C. § 5336 ......................................... 4, 5, 6, 7, 19, 24, 37, 55, 56

42 U.S.C. § 3604 ....................................................................................... 27

5 U.S.C. § 702 .......................................................................................... 50

5 U.S.C. § 705 ...................................................................................... 4, 62

## OTHER AUTHORITIES

Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L.J. 1037 (1986) ................... 23

Aziz Z. Huq, *Standing for the Structural Constitution*, 99 Va. L. Rev. 1435 (Nov. 2013) ............................................................................. 42

Gillian E. Metzger, *Facial Challenge and Federalism*, 105 Colum. L. Rev. 873 (Apr. 2005) ............................................................. 42

Jonathan Mitchell, *The Writ of Erasure Fallacy*, 104 Va. L. Rev. 933 (Sept. 2018) ........................................................................ 61

Matthew D. Adler and Michael C. Dorf, *Constitutional Existence Conditions and Judicial Review*, 89 Va. L. Rev. 1105 (Oct. 2003)...... 43

Michael E. Rosman, *Facial Challenges and the Commerce Clause: Rethinking* Lopez *and* Morrison, 4 Faulkner L. Rev. 1 (2012)............ 41

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (Sept. 2020) ...................................................................... 61, 63

## COUNTERSTATEMENT OF THE ISSUES PRESENTED FOR REVIEW

I.      Whether Plaintiffs are likely to succeed in their claim that Congress has no authority to regulate a state-created corporate entity through the Corporate Transparency Act based on an entity's mere ability and propensity to engage in commercial activities.

II.     Whether the public interest favors a postponement of the Act's compliance deadline, when the government has no interest in its unlawful mandates, but the irreparable harm to Plaintiffs is both severe and imminent.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court should affirm the district court's preliminary injunction and immediately reinstate its postponement of the Corporate Transparency Act's initial compliance date. The district court enjoined the CTA's reporting deadline because this statute relies on the same faulty constitutional justification condemned by the Supreme Court in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012), and because allowing it to take effect would irreparably injure the rights of the plaintiffs, including the National Federation of Independent Business and its roughly 300,000 members, as well as tens of millions other business entities subject to its sweeping mandate. Indeed, this panel already concluded that the CTA's mandate should be postponed "to preserve the constitutional status quo while the merits panel considers the parties' weighty substantive arguments." ECF No. 160 at 2. Once again, however, Plaintiffs, along with roughly 32 million other affected entities, face a looming compliance deadline of **March 21, 2025**. This Court should therefore affirm the district court's injunction immediately.

The government's present insistence that it be allowed to demand universal compliance with the CTA's unlawful mandate should be

rejected. On the merits, the government insists that Congress' power under the Commerce Clause allows federal regulation of any "entities with the ability and propensity to engage in commercial activities." Gov. Br. at 12. Indeed, the government theorizes that Congress' power to regulate extends to any entity with such potential future conduct, under an amalgamation of measures that become "necessary and proper to carry out the commerce power, the foreign affairs power, the taxing power, and the foreign commerce power." Gov. Br. at 14. This argument parallels the government's failed argument that Congress's Commerce Clause power, even when coupled with the Necessary and Proper Clause, authorized imposing an insurance requirement on individuals merely because they could "engage in a health care transaction in the future." *See NFIB*, 567 U.S. at 557. As the district court held, regulation based on mere "existence," whether people or entities, is "exactly what the Supreme Court rejected." Supp.ROA.46. The government's fallback merits arguments are equally untenable.

The equities are also not close. The district court's preliminary injunction served to preserve the status quo against imposition of a never-before-implemented reporting regime. It prevented irreparable

injury to Plaintiffs in the forms of compliance costs and injury to their rights under the First and Fourth Amendments—claims the district court did not yet reach. It similarly preserved the district court's jurisdiction to decide all of those claims, which could otherwise be mooted if Plaintiffs are forced to submit to the CTA's unlawful mandate.

By contrast, the preliminary injunction, which merely delayed the CTA's compliance date, threatened no meaningful injury to the government. Both before and throughout this litigation, the government has shown that its interests in fully implementing the CTA ought to give way to practical considerations. Indeed, the regulatory burdens association with the CTA were the government's own justification for pushing back the compliance deadline **for more than three years** from the earliest possible date, forgoing the same putative benefits that the government now contends threaten it with irreparable injury. And even now, the agency assures the public that its March 21, 2025, deadline may be delayed further, should compliance prove too complex. Such half-hearted goals don't outweigh the certain harms Plaintiffs face.

Finally, the government's complaints about the scope of the injunction are misplaced. The court below entered a nationwide

injunction after the government suggested that it would be infeasible to provide relief solely for Plaintiffs, including NFIB's members, and that such relief would be the equivalent of a nationwide injunction. That was a sound exercise of the district court's equitable discretion, warranted by the facts, and independently justified as "appropriate process to postpone the effective date," 5 U.S.C. § 705, of the CTA's implementing regulation.

The district court's preliminary injunction should be affirmed.

## COUNTERSTATEMENT OF THE CASE

### A. LEGAL BACKGROUND

Enacted in January 2021, the CTA generally mandates that any "reporting company" report its "beneficial ownership information" to FinCEN. 31 U.S.C. § 5336 (b)(1)(A). The statute does not impose this mandate directly but instead provides that it will come into force pursuant to "regulations prescribed by the Secretary of the Treasury" setting initial compliance dates. *Id*. at § 5336 (b)(1).

A "reporting company" is an entity "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document

4

with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* at § 5336 (a)(11). The CTA exempts companies employing more than 20 people and generating more than $5,000,000 per year in gross revenue, publicly traded companies, most financial businesses, and many nonprofits. *Id.* at § 5336(a)(11)(B).

But the CTA covers far more than just the tens of millions of small entities that operate as commercial businesses. The definition covers countless homeowners' associations, neighborhood pool clubs, personal LLCs that own a single private home, innumerable private and family trusts, and a vast number of charitable organizations and nonprofits that had no need to secure federal tax-exempt recognition because they do not rely heavily on tax-preferred donations. *See, e.g.*, Amicus Curiae Brief of the Community Associations Institute, ECF No. 104, at 1 ("CAI's more than 49,000 members include homeowners, board members, association managers, community management firms, and other professionals who provide services to community associations … serving more than 75.5 million homeowners who live in more than 365,000 community associations in the United States."). Many of these entities have never engaged in any business transactions after their formation or only engage

in incidental, localized activity for the betterment of family members or the community.

The "beneficial ownership information" (BOI) that companies must report to FinCEN consists of the identities of their "beneficial owners" and, for each beneficial owner, a full legal name, date of birth, current address, and "acceptable" photo identification. *Id*. at §§ 5336 (b)(2), (a)(1). The term "beneficial owner" is defined broadly, to include every natural person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id*. at § 5336 (a)(3). Companies that have filed reports must file updates when their BOI changes. *Id*. at §§ 5336(a)(2), (b)(1)(D). Violations of the reporting mandate are subject to substantial civil and criminal penalties. *Id*. at § 5336(h)(3).

FinCEN must disclose BOI information when requested "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity" or "from a State, local, or Tribal law enforcement agency," if authorized by a court. *Id*. at § 5336 (c)(2)(B). The CTA also authorizes the Treasury to permit

disclosure "to financial institutions and regulatory agencies." *Id.* at § 5336 (c)(2)(C).

As noted, the CTA directs FinCEN to bring its reporting mandate into force through regulations. It requires that regulations be promulgated within a year of its enactment and set an "effective date" that, in turn, affects the Act's compliance deadlines. *Id.* at § 5336 (b)(5). Companies in existence prior to the effective date "shall … submit" reports to FinCEN "not later than 2 years after the effective date." *Id.* at § 5336 (b)(1)(B). And companies formed after the effective date must file BOI reports at the time of formation. *Id.* at § 5336 (b)(1)(C). Notwithstanding those provisions, the CTA leaves it entirely to "FinCEN to determine the effective date." 86 Fed. Reg. 69920, 69945 (December 8, 2021).

FinCEN issued its implementing regulations, known as the "Reporting Rule," on September 30, 2022—missing the statutory deadline by over nine months. *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59498. The Rule set an effective date more than a year in the future, on January 1, 2024. *Id.* at 59498. And it provided that existing companies would have to comply with the

reporting mandate an additional year after that, on January 1 2025—a full year short of the two-year maximum allowed by the statute. *Id*. at 59592.

FinCEN justified the years-long delay in reporting—beyond the year or so timeline that would have been feasible under ordinary rulemaking procedures—based on a number of "practical factors," including "allowing reporting companies, and small businesses in particular, sufficient time to receive notice of and comply with the new rules." *Id*. at 59547. It similarly cited "the burdens imposed on reporting companies to identify beneficial ownership information" to justify the additional year before reporting would begin for existing companies. *Id*. at 59511. It repeated essentially the same rationale—the need to allow "entities additional time to understand the new reporting obligation and collect the necessary information" when it subsequently extended the reporting deadline for newly formed entities just weeks before it was due to come into force. 88 Fed. Reg. 83499, 83500 (Nov. 30, 2023).

## B. THE CTA'S BURDEN ON THE PUBLIC AND PLAINTIFFS

As FinCEN recognized, the CTA and Reporting Rule "will have a significant economic impact on a substantial number of small entities."

87 Fed. Reg. at 59550. "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59585. Compliance in the first year alone would take 126.3 million hours and impose costs of $22.7 billion. *Id.* at 59585-86. The estimated burden hours include filing initial reports, reviewing information and complying with ongoing duties to update them when information changes. *Id.* at 59581. FinCEN also recognized that small entities would face different regulatory burdens depending on the complexity of their "beneficial ownership structure." *Id.* at 59574, 59576.

The time and expense of compliance was not the CTA's only burden. "Many … commenters expressed concerns that the proposed regulations … would create privacy and security concerns with respect to personally identifiable information." 87 Fed. Reg. at 59509. FinCEN acknowledged "the privacy concerns associated with disclosure and retention of identity information." *Id.* at 59520. But it did nothing about them, instead pointing to "statutory restrictions on the sharing of BOI," and FinCEN's duty "to promulgate appropriate protocols for protecting the security and confidentiality of that information." *Id.*

Plaintiffs are among those directly regulated by the Reporting Rule. One plaintiff, the National Federation of Independent Business, Inc., is a membership organization with nearly 300,000 member businesses. Supp.ROA.77. While NFIB is exempt from the CTA, most of its members, including plaintiffs Texas Top Cop Shop, Inc. and Data Com For Business, Inc., must comply. *Id.* As the district court observed, "Every individual Plaintiff filed a Declaration in which they swore that they would incur these costs should the CTA and Reporting Rule remain in force. Similarly, NFIB filed a Declaration in which it swore that if the CTA and Reporting Rule are not enjoined, its members would incur compliance costs and legal expenses associated with fulfilling its obligations under the CTA and Reporting Rule. The Government stipulated that the Plaintiffs would have testified to the same at the Court's October 9 hearing should they have testified." Supp.ROA.27.

Plaintiffs' injuries go beyond the costs of compliance. For instance, the Libertarian Party of Mississippi is an existing political organization that must comply with the CTA. Supp.ROA.14. It receives donations from individuals and entities, which it uses to promote political candidates for state office and policies affecting Mississippi residents. *Id.* Under its

bylaws, no individual owns the entity or its assets, but it is controlled by its members, officers, delegates, volunteers, and major donors. *Id.* Its bylaws authorize MSLP to make expenditures only with the authorization of its executive committee, or at the direction of 2/3 of its voting delegates, which are registered members of the state party. *Id.* Thus, its beneficial owners include these key party members and donors. *See id.* MSLP objects to disclosing this information to FinCEN on both First and Fourth Amendment grounds. *Id.*

To date, none of the plaintiffs have filed BOI reports.

## C. PROCEEDINGS BELOW

The Reporting Rule took effect at the start of 2024, and Plaintiffs sued in May, more than 7 months in advance of the Rule's reporting deadline for existing companies. (1-ER-7). They alleged that the CTA and Reporting Rule exceed the scope of enumerated federal powers, burden associational rights in violation of the First Amendment, and violate the Fourth Amendment by compelling disclosure of private information. They quickly moved for a preliminary injunction of enforcement of the CTA and Reporting Rule. (1-ER-8). At a hearing on Plaintiffs' motion, Plaintiffs proposed, as an alternative to a nationwide injunction, a

limited injunction extending only to Plaintiffs and NFIB's members. The government, however, argued that relief would infeasibly "frustrate the goals and aims of the CTA" and amount to "effective nationwide relief." Supp. ROA.84.

On December 3, 2024, the district court enjoined the CTA and Reporting Rule and stayed the Rule's "compliance deadline" under APA § 705. Supp.ROA.82. It determined that the "CTA is likely unconstitutional as outside of Congress's power. Because the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons." *Id.* At the same time, the court held, the plaintiffs "have met their burden to show that the CTA and Reporting Rule threaten substantial, imminent, non-speculative, and irreparable harm" "[b]ecause Plaintiffs . . .will suffer unrecoverable compliance costs absent emergency relief," and "because the CTA and Reporting Rule substantially threaten their constitutional rights." *Id.*

Over a week later, the government sought a stay of the injunction— first from the district court and then, two days later, from a motions panel of this Court. (1-ER-11). The district court denied the request as "any interest the Government has in preserving its efforts in furtherance of

the CTA are superseded by the CTA's grave constitutional flaws." (1-ER-32).

A divided motions panel of this Court, however, entered a stay and expedited the appeal, causing it to be immediately assigned to a merits panel. ECF. No. 140.[1] Having sought and obtained a stay on the basis that any delay in the reporting deadline would injure the government and public interest, the government announced just hours later that it was extending the reporting deadline to January 13, 2025. *See* FinCEN, Beneficial Ownership Information, fincen.gov, https://www.fincen.gov/boi [Updated Dec. 25, 2024].

On December 26, 2024, the merits panel sua sponte vacated the stay "to preserve the constitutional status quo while the merits panel considers the parties' weighty substantive arguments." ECF No. 160. The panel also set an expedited briefing schedule and scheduled oral argument. *Id*; ECF No. 165. That argument is now set for April 1, 2025.

---

[1] Judge Haynes, dissenting in part, would have denied a "temporary stay" as to Plaintiffs, including NFIB's members, and granted a "temporary stay…pending decision on the merits panel" as to non-parties. *Id*. at 4a n.1.

Five days later, the government applied for a stay from the Supreme Court. This prompted yet another flurry of amicus filings from dozens of organizations, a majority of State Governments, and numerous Members of Congress, all supporting Plaintiffs.

Meanwhile, in other litigation, yet another district court concluded that the CTA was likely unconstitutional and preliminarily enjoined the Reporting Rule. *See Smith v. United States Dep't of the Treasury*, No. 6:24-cv-336, 2025 U.S. Dist. LEXIS 2321, at *39 (E.D. Tex. Jan. 7, 2025).

On January 23, 2025, the Supreme Court granted the government's stay request in a per curiam order that did not explain its reasoning. *See McHenry v. Texas Top Cop Shop, Incorporated, et al.*, No. 24A653, at 1 (2025). Specifically, the Court ordered that the "December 5, 2024 amended order of the United States District Court for the Eastern District of Texas, case No. 4:24–cv–478, is stayed pending the disposition of the appeal in the United States Court of Appeals for the Fifth Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgement of this Court." *Id.*

Despite the Supreme Court ruling, the government did not immediately reinstate the CTA's then-lapsed reporting deadline. Instead, FinCEN announced that the Reporting Rule's deadline remained stayed because of the *Smith* court's injunction. *See* fincen.gov/boi [updated January 24, 2025]. The government then waited until February 5, 2025, to file a notice of appeal in *Smith*. *See* FinCEN Notice, FIN-2025-CTA1, at 2 (Feb. 18, 2025) *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN-BOI-Notice-Deadline-Extension-508FINAL.pdf.

On February 18, 2025, the *Smith* court stayed its preliminary injunction in light of the Supreme Court's decision in this case. *See id.* at 1. That day FinCEN issued a formal notice that the CTA's "reporting requirements" "are once again back in effect" and providing a new deadline, 30 calendar days after February 19, 2025. *Id.* "For the vast majority of reporting companies, the new deadline to file an initial, updated, and/ or corrected BOI report is now March 21, 2025." *Id.*

FinCEN provided a curious caveat, "FinCEN will provide an update before [March, 21st] of any further modification of this deadline,

recognizing that reporting companies may need additional time to comply

with their BOI reporting obligations once this update is provided." *Id.*

# ARGUMENT

For a preliminary injunction, "a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).

This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Id.*

The government cannot carry its burden of showing the district court's preliminary injunction was an abuse of its discretion. Instead, the district court correctly held that the CTA and Reporting Rule are likely unconstitutional. And the equities cut hard against the government's push to implement a first-of-its-kind reporting regime. The unlikely benefits of the reporting regime hardly outweigh the practical and constitutional injuries it will inflict on the public.

# I. THE CTA IS LIKELY UNCONSTITUTIONAL

The CTA's reporting mandate is unlawful because it exceeds the federal government's limited, enumerated powers. The district court correctly concluded Plaintiffs were likely to succeed in their challenge.

## A. *NFIB v. Sebelius* Forecloses the Government's Commerce Clause Rationalization

The CTA's unprecedented scope crosses a line long reserved for the states by regulating an entity's *status* instead of its *actions*. In *NFIB v. Sebelius*, the Supreme Court rejected a Commerce Clause justification for the Affordable Care Act's individual mandate, holding that it "compel[led] individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce." 567 U.S. at 552 (emphasis in original). The CTA suffers the same defect: it "compels" reporting companies to file beneficial ownership reports with the federal government "on the ground that their failure to do so affects interstate commerce." *See id.* The district court correctly concluded that "construing the Commerce Clause to permit Congress to regulate companies precisely because the Government does not know who substantially benefits from their ownership would similarly 'open a

new and potentially vast domain to congressional authority.'" Supp.ROA.47 (quoting *NFIB*, 567 U.S. at 552).

### 1. The CTA Applies Upon An Entity's *Creation*

That the CTA regulates no activity is apparent on its face. It defines a class of "reporting companies," 31 U.S.C. § 5336(a)(11), and then requires them, based on their mere existence, to file reports, *id.* § 5336(b)(1)(A). The government admits as much, conceding that the CTA does not regulate "interstate commerce directly," but "entities *with the ability and propensity* to engage in commercial activities." Gov. Br. at 13 (empasis added). It does not regulate or prohibit any transaction, does not require that anyone "engage in commercial transactions," and does not even refer to or describe any transaction, which is why the government is unable to quote any statutory language doing so. *See* Gov. Br. at 14–15. In any event, ownership of an entity is no more an activity than is ownership of a wallet; such ownership might lead to financial transactions but is not itself commercial activity. The statute regulates entities based on their existence, not any activity that they undertake.

In regulating inactivity based on mere existence, the CTA's reporting mandate is indistinguishable from the ACA's insurance

mandate. The insurance mandate compelled the uninsured to purchase health insurance, which the government justified "on the ground that their failure to do so affects interstate commerce." 567 U.S. at 551. Specifically, the ACA required "*individuals who are not exempt* and do not receive health insurance through a third party" to purchase "'minimum essential' health insurance coverage." 567 U.S. at 551. (citing 26 U.S.C. § 5000A) (emphasis added). Likewise, the CTA requires non-exempt entities to disclose beneficial-ownership information to the federal government, on the government's belief that failure to disclose that information impedes the government from "trac[ing] the flow of illicit funds" and "enforc[ing] valid prohibitions on financial crime." Gov. Br. at 19; *see also id.* at 19–20 (explaining that the CTA addresses an "enforcement gap" caused by entities not "report[in] information about beneficial owners") (cleaned up). But *NFIB* squarely rejects the proposition that Congress may "justify federal regulation by pointing to the effect of inaction on commerce." 567 U.S. at 552; *see also id.* at 657 (joint dissent).

The government points out (at 6, 21) that Congress made "findings" regarding the CTA's potential use to "protect interstate and foreign

commerce," but it made even more of them in support of the ACA's insurance mandate. 42 U.S.C. § 18091. No matter: under *NFIB*, it is irrelevant that inactivity may affect interstate commerce because it is not, in itself, commerce regulable as such. *See United States v. Morrison*, 529 U.S. 598, 614 (2000) ("Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.").

*NFIB* also forecloses the government's argument that "[b]y regulating ongoing corporate conduct, the CTA regulates economic activity," because it applies to "entities authorized to partake in various economic transaction." Gov. Br. at 23. That argument runs headfirst into *NFIB's* rejection of the "proposition that Congress may dictate the conduct of an individual today because of prophesied future activity." 567 U.S. at 557. After all, it was taken as given that *every* individual would "engage in a health care transaction" at some point, but "that does not authorize Congress to direct them" into action. *Id.* "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *Id.* But the government's whole theory is that the CTA

applies merely because entities have "the ability and propensity to engage in commercial transaction," not because they are doing so. *See* Gov. Br. at 23.

## 2. The Federal Government's Power Does Not Arise At the Moment of Incorporation

Then there is the government's astounding claim (at 23) that "[i]ncorporation … is the affirmative act that brings an entity into the class of economic activities that Congress can regulate." This is nothing less than an assertion of plenary authority over the conduct (economic in nature or not) or inaction of every entity in existence, from neighborhood swim clubs and homeowners' associations to LLCs holding family homes. This claim also makes no sense: entities have the ability to engage in economic activities no more or less than individuals—that's "corporate personhood." Incorporation is no more entry into a "class of economic activities" than birth. A corporation, like any other person, may engage in economic activities, but its mere existence as a consequence of being formed is not itself economic activity.

The government's claim is further belied by our nation's long history of refusing to federalize the consequences or practice of incorporation. "Throughout the history of American law, the definition

and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 Ohio St. L.J. 1037, 1037-1038 (1986). "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). "Every State in this country has enacted laws regulating corporate governance," but federal power reaches only "transactions" that implicate constitutionally enumerated federal interests. *Id.* at 89-90.

The government's argument on this point is confused. Even as it insists that incorporation alone subjects an entity to economic regulation by Congress, it denies that the CTA "regulate[s] incorporation itself but rather is triggered by a corporation's status as a commercial entity." Gov. Br. at 23. Its denial is at odds with the statute. The CTA applies to existing entities irrespective of the presence or absence of any commercial activity, and no matter how many years or decades ago they

were formed. *See* 31 U.S.C. § 5336(a)(11). It applies to entities that sell no goods or services. It applies to non-profit entities, even if they have no assets, and even if they engage in *no activity*, commercial or otherwise. *See* 87 Fed. Reg. at 59542 (explaining that "nonprofits ... that did not qualify for tax-exempt status under section 501(c)" must still file reports, regardless of their activities).

But what of the government's suggestion that the "affirmative act" of "incorporation" constitutes economic activity? That once again fails *NFIB*'s requirement of "preexisting economic activity." 567 U.S. at 557. Creating a business entity by filing paperwork with a state registrar isn't economic activity. It is just a preparatory step for entities that the government thinks "will predictably engage in particular transactions," which is an inadequate basis for federal regulation. *NFIB*, 567 U.S. at 557; *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (federal vaccine mandate "likely exceeds the federal government's authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power"), *aff'd* 142 S.Ct. 661 (2022). Even if registration were an economic activity in itself,

that would not support regulation of longstanding entities like Plaintiff-Appellees that were formed years prior to the CTA's enactment.[2]

Foundering on the CTA's text, the government also relies on a straw man, dismissing what it says is "Plaintiffs' and the district court's argument that Congress through its enumerated powers may not legislate in areas also regulated by States." Gov. Br. at 22. Like any good fallacy it has the appearance of some truth: Congress may regulate *within* its enumerated powers. But a new federal intrusion into traditional state affairs, especially one so long after the founding, provides compelling evidence that Congress has exceeded its powers. This is why the Supreme Court has repeatedly warned against novel federal intrusions into corporate law. *See Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly

---

[2] The government has admitted in other litigation that the mere act of registering with a state is not sufficient. *See Nat'l Small Bus. United v. Yellen*, 721 F. Supp. 3d 1260, 1281 (N.D. Ala. 2024) ("The Government wisely … concedes that '[i]t is the activities of these entities, not the mere fact that they submitted documents to a Secretary of State, that implicates the Commerce Clause and permits Congress to exercise its authority.'").

where established state policies of corporate regulation would be overridden.").

### 3. The CTA Is Not Part of a Broader Regulatory Scheme Over Economic Transactions

*NFIB* also disposes of the government's defense (at 19-20) of the CTA as part of a "broader regulatory scheme." To be sure, Congress may, under the Commerce Clause together with the Necessary and Proper Clause, "regulate purely intrastate activity that is not itself 'commercial'" where failure to do so would "undercut the regulation of the interstate market *in that commodity*." *Gonzales v. Raich*, 545 U.S. 1, 18 (2005) (emphasis added). But, as *NFIB* holds, that logic does not extend to the regulation of inactivity, which would be anything but "incidental" to the exercise of the Commerce power and therefore not a "proper" means of executing it. *NFIB*, 567 U.S. at 560; *see also id.* at 657 (joint dissent).

The premise of the government's argument is also wrong. Unlike prohibiting home non-commercial intrastate cultivation of marijuana, which facilitated the interstate-commerce ban in *Raich*, the CTA is in no way integral to any direct regulation of interstate commerce. Confirming as much is FinCEN's years-long delay in implementing the CTA's reporting requirement, which is at odds with the claim that inability to

mandate that reporting would "frustrate" regulation of any "interstate market in that commodity." *See Raich*, 545 U.S. at 18-19. Indeed, the government cannot explain how the CTA's reporting mandate is integral to any provision of the principal statutory scheme it identifies (at 22), the Anti-Money Laundering Act. That's because the Act is not an integrated whole but an omnibus that pulled together disparate legislative proposals. *See generally* CRS Report R47255, at 1 ("AMLA spans 59 provisions, including a distinct title known as the Corporate Transparency Act.").

The government's reliance on *Groome Resources, Ltd. v. Parish of Jefferson*, demonstrates the hole in its reasoning. In *Groome Resources* this Court rejected a Commerce Clause challenge to 42 U.S.C. § 3604(f)(2),(3)(B)'s requirement for making reasonable accommodations for disabilities "in the terms, conditions, or privileges of sale or rental" of a dwelling, "or in the provision of services or facilities in connection with such dwelling." *See* 234 F.3d at 205. The government highlights that this Court treated the statute's prohibition on discrimination as being economic in nature; the "failure to grant a reasonable accommodation to the home is an act of discrimination against the disabled that frustrated

an interstate commercial transaction, and affected a commercial endeavor[.]" Gov. Br. at 28 (quoting *Groome Resources*, 234 F.3d at 207-08). But this Court further explained that the statute applied only to *specific commercial transactions*. "As all American homeowners can attest, it is a transparently commercial action to buy, sell, or rent a house." *See Groome Resources*, 234 F.3d at 206. It is "quite literally a 'commercial transaction,'" and in the "instant case" under review, "not only are we faced with a commercial transaction, but an interstate commercial transaction." *Id.*

*Groome Resources* lends no support to the government because the CTA applies independently of any commercial transactions. While Congress can regulate such *transactions*, an entity's mere *status* is not commerce.

There is also no support for the government's suggestion (at 27) that a different set of constitutional principles applies to reporting requirements. *Electric Bond & Share Co. v. SEC*, upheld a direct regulation of interstate commerce that forbade public utility holding companies from "use of the mails and the instrumentalities of interstate commerce" unless they registered and filed reports with the Securities

and Exchange Commission. 303 U.S. 419, 427 (1938); *id.* at 428 n.3 (reciting provisions). This scheme regulated activity, unlike the CTA. The government touts *Electric Bond*'s observation that "requiring the submission of information" is a "familiar category" of regulation, *id.* at 437, but nowhere does the case suggest that such requirements may be untethered from the exercise of an enumerated power, as is the CTA.

### 4. The CTA Would Cross a Line Held Since the Founding

Finally, the government disputes (at 29–30) the district court's conclusion that the CTA marks an unprecedented incursion into a domain that has been, until now, the exclusive province of the states. But "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp.*, 481 U.S. at 89.

By piggybacking on entity formation, the CTA interposes federal regulation into the formation of business entities by states, displacing the states from their exclusive role. The mere formation and existence of entities has never been considered to be federally regulable commerce, and to interpret the commerce power so broadly "has the potential to obliterate distinctions between national and local spheres of interest and

power by permitting the Federal Government to set policy in the most sensitive areas of traditional state concern, areas which otherwise would lie outside its reach." *NFIB*, 567 U.S. at 676 (joint dissent) (quotation marks omitted).

The government's arguments to the contrary (at 29–30) tiptoe past the CTA's novelty in regulating state-chartered entities *qua* entities, effectively adding new provisions to states' corporate laws. That *McCulloch* sanctioned the federal government's ability to charter an entity itself does not justify the CTA's layering new requirements atop those that states impose on their entities for being entities. That the federal government may be able to preempt aspects of state corporate laws involving (literal) interstate commerce does not mean it can intrude on states' core authority to regulate the existence of their corporations. And that the federal government may regulate a corporation's business activities says nothing about whether it can regulate them for merely *being*.

The government could just as easily argue that Congress's power to regulate an individual's commercial activities means it can regulate his or her noncommercial activities or inactivity. It would be equally wrong.

*See United States v. Lopez*, 514 U.S. 549, 577 (1995) ("Were the Federal Government to take over the regulation of entire areas of traditional state concern … the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory.").

### B. The Government's Rationalization that the CTA's Mandate is Necessary & Proper To a Grab Bag of Other Powers Fails

As a fallback to its interstate commerce argument, the government (at 31–35) contends that the CTA is a necessary and proper measure to implement Congress's taxing, foreign affairs, and foreign commerce powers. The Necessary and Proper Clause authorizes measures "which are appropriate, which are plainly adapted to [carrying into execution an enumerated power], which are … consist[ent] with the letter and spirit of the constitution." *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819). The measure must be "derivative of, and in service to" a congressional regulation issued pursuant to an enumerated power. *NFIB*, 567 U.S. at 560. Here, the CTA is not "derivative of, and in service to" a tax or regulation of foreign commerce or affairs, nor is it "plainly adapted" and "appropriate" to execute any such law.

### 1. The CTA Is Not Necessary to Collect Revenue

To start with, the CTA does not fall within Congress's taxing power, as augmented by the Necessary and Proper Clause. The government does not even attempt to explain how the CTA's reporting requirements are "plainly adapted" to tax collection.

The government (at 32) cites the general congressional finding that "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, including … serious tax fraud." CTA § 6402(3), 134 Stat. 4604. But CTA reports are to be collected and maintained in a database by FinCEN, not the IRS. IRS officers, along with other federal law enforcement officials, merely may "obtain access to beneficial ownership information" should they wish. CTA § 6503(c)(5), 134 Stat. 4614. Moreover, the government fails to identify any tax to which the CTA connects. As the district court observed, the government cannot cite a single case upholding a regulatory measure on these grounds "when the statute at issue does not, in some way, generate some revenue." Supp.ROA.74.

The government notes (at 31) that the Supreme Court and this Court have upheld "registration requirements designed to facilitate the collection of taxes," citing *Sonzinsky v. United States*, 300 U.S. 506 (1937), and *United States v. Kahriger*, 345 U.S. 22, 31 (1953). *Sonzinsky* upheld a special tax and an IRS registration requirement on dealers of firearms. 300 U.S. at 511. *Kahriger* upheld a special tax and an IRS registration requirement on persons engaged in the business of accepting wagers. 345 U.S. at 23. As the district court recognized, neither case suggests "that Congress may legislate in an unbridled manner simply because it might make some tax, someday, easier to collect." Supp.ROA.74.

The government further cites (at 32) *United States v. Matthews*, 438 F.2d 715 (5th Cir. 1971), for the proposition that it need not identify any tax as to which the CTA facilitates collection. But as the district court explained, *Matthews* "says just the opposite." Supp.ROA.72. Following *Sonzinsky*, this Court in *Matthews* upheld a firearms registration requirement that was specifically "designed to aid the collection of tax on any future transfer of the registered item." *Id.* at 717; *see also United States v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) (explaining that

registration requirement "aid[s] enforcement of the transfer tax provision in § 5811"); *United States v. Dodge*, 61 F.3d 142, 145 (2d Cir. 1995) (similar). Absolutely nothing in *Matthews* justifies upholding a measure, like the CTA, that is not plainly adapted to collecting any tax.

The government also notes (at 32) that the Internal Revenue Code requires certain persons to file "information returns" relating to certain reportable transactions. For example, businesses receiving mortgage interest must report a taxpayer's mortgage interest amount on a Form 1098, which is plainly adapted to facilitating income tax collection by ensuring appropriate mortgage-interest deductions. Similarly, Form 5741 requires information reports regarding controlled foreign corporations, which is plainly adapted to facilitating collection of the tax on U.S. shareholders of controlled foreign corporations, *see* 26 U.S.C. §§ 951 *et seq*. Unlike these information returns, the information collected by the CTA is not tailored to collect any tax and it is not even submitted to the IRS as a matter of course.

The stark distinction between the registration requirements at issue in *Sonzinsky* and *Kahriger* and the CTA underscores the CTA's fundamental infirmity. *See Nat'l Small Bus. United*, 721 F. Supp. 3d at

1288 ("[T]he cases relied on by the Government illustrate that providing access to the CTA's database for tax administration purposes is not enough to establish a sufficiently close relationship here."). As the district court explained, "[t]he CTA is not 'derivative of' the taxing power simply because the Government points to some potential tax purpose the CTA might serve someday." Supp.ROA.75. "To hold otherwise would be to unleash a slippery slope that could wreak havoc on the structure of our government." *Id.*

It is difficult to imagine, if the CTA passes muster, what information the government could not demand citizens to disclose: their assets, roommates, friends and romances, travel, and more—all might someday prove "highly useful" to the tax collector. Gov. Br. 32 (quotation marks omitted); *see also Nat'l Small Bus. United*, 721 F. Supp. 3d at 1289 ("All Congress would have to do to craft a constitutional law is simply impose a disclosure requirement and give tax officials access to the information."). Yet, as with the information demanded by the CTA, none of these are in service of any particular tax. And the power to compel such disclosure is by no means an "incidental" one—to the point that it violates the Fourth Amendment.

### 2. The CTA Is Not Necessary and Proper to Execute Congress's Implied Foreign Affairs Power.

As an initial matter, it is clear that the CTA does not fall within the foreign affairs power directly. The "powers of external sovereignty" are truly international, including the power "to declare and wage war, to conclude peace, to make treaties, [and] to maintain diplomatic relations with other sovereignties." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316, 318 (1936). This Court has made clear that the foreign affairs power does not enlarge federal power over domestic matters. The "Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015). Thus, when confronted with a statutory reading of an international treaty that threatened to "dramatically intrude[] upon traditional state criminal jurisdiction," the Supreme Court unanimously adopted a narrow interpretation to avoid such constitutional doubt. *See Bond v. United States*, 572 U.S. 844, 857, 859–60 (2014).

The CTA clearly regulates a matter of "internal affairs" and not foreign affairs. *See Curtiss-Wright*, 299 U.S. at 316. The CTA applies exclusively to entities that register with domestic officers or agencies: "a secretary of state or a similar office under the law of a State or Indian

Tribe." *See* 31 U.S.C. § 5336(a)(11); Supp.ROA.62-63 ("The CTA, by its very language, does not regulate any issue of foreign affairs. It regulates a domestic issue: anonymous existence of companies registered to do business in a U.S. state and their potential conduct."); *Nat'l Small Bus. United*, 721 F. Supp. 3d at 1276 (similar).

The CTA also is not necessary or proper for carrying into execution any congressional regulation of foreign affairs. The government fails to cite a single congressional regulation of foreign affairs that the CTA is necessary to support. The government instead cites Congress's general findings that "collecting ownership information would 'better enable critical national security, intelligence, and law enforcement efforts to counter' … 'illicit activity." Gov. Br. 6, 21, 34 (citing CTA § 6402(5), 134 Stat. 4604). But, as the district court explained, "[t]he Government has not provided any support—and there appears to be no support—for the proposition that Congress may legislate in arenas traditionally controlled by the states simply because it has made findings that make passing mention to an international impact." Supp.ROA.68.

The government's argument that the CTA is because it brings the United States into compliance with "international standards" fares even

worse. Gov. Br. 6, 34, 40 (quotation marks omitted). This argument turns *Missouri v. Holland*, 252 U.S. 416 (1920), on its head. In *Holland*, the Supreme Court held that Congress may pass legislation pursuant to a valid treaty even if the legislation otherwise would not fall within an enumerated power. *See id.* at 432; *see Bond*, 572 U.S. at 855 (construing statute narrowly to avoid addressing whether *Holland* was correctly decided). Now, according to the government, a valid treaty is not even necessary; Congress need merely declare that the legislation is necessary to comply with an "international standard." *See Nat'l Small Bus. United*, 721 F. Supp. 3d at 1276 ("Compliance with international standards may be good policy, but it is not enough to make the CTA 'necessary' or 'proper.'"). But "the Necessary and Proper Clause does not give Congress unlimited authority to impose federal standards on matters of state concern just because a state's law differs from the standards set by foreign nations." *Smith*, 2025 WL 41924, at *11.

The government finally "seems to argue that regulation of purely internal affairs may be necessary and proper … if foreign actors (or enough foreign actors) participate in those internal affairs to illicit ends," based on the foreign affairs power and national-security policy. *See Nat'l*

*Small Bus. United*, 721 F. Supp. 3d at 1275. Not only is there no support for that position, the government's argument has no limiting principle. If the CTA's sweeping reporting mandate is necessary and proper to exercise Congress's foreign affairs power or national-security policy, then there is no limit to the information that the government could demand its citizens to report. That is fatal, because the Clause is confined to "incidental powers" and "does not license the exercise of any great substantive and independent powers beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (cleaned up). In short, a possible international effect of a domestic statute is not a magic escape valve for all limits on federal authority. *See Bond*, 572 U.S. at 883 (Scalia, J., concurring).

### 3. The Government's Passing Nod to Other Powers Also Fails

The CTA does not effectuate the foreign commerce power for the same reason it does not effectuate the power to regulate interstate commerce: the constitutional language "regulate commerce," on its own or in combination with the Necessary and Proper Clause, does not reach inactivity. *See supra* § I.A.3.

Finally, the government's vague suggestion (at 35) that the CTA is supported by the President's "executive Power" and his duty to "take Care that the Laws be faithfully executed," bespeaks desperation. The government offers no authority for the proposition that the President's "executive Power" or his duty under the Take Care Clause independently can support the CTA in the absence of the CTA falling within one of Congress's enumerated powers, and undersigned counsel is aware of none.

## C. A Statute that Exceeds Congress's Powers Is Necessarily Facially Invalid

Finally, the government's view that Plaintiffs' facial challenge to the CTA falls short because the CTA targets at least some entities that are "engaged in business operations affecting interstate commerce" is mistaken. Gov. Br. at 37. The CTA's defect is that it does not regulate any activity whatsoever, and that is true as to every single application of the statute. That Congress could enact an entirely different statute regulating the activities of some of the entities that are subject to the CTA is irrelevant.

Moreover, even statutes that regulate a class of activities, some of which are undoubtably economic, are not evaluated under a wooden

standard requiring a challenger to "establish that no set of circumstances exists under which the Act would be valid." *See* Gov. Br. at 14 (citation omitted). That's because the Supreme Court has effectively eliminated "as applied" challenges to this category of enumerated powers claims, instead considering them as a type of overbreadth challenge. *See* Michael E. Rosman, *Facial Challenges and the Commerce Clause: Rethinking* Lopez *and* Morrison, 4 Faulkner L. Rev. 1, 29 (2012). Consider how the Supreme Court resolved *Wickard v. Filburn*, 317 U.S. 111 (1942), "perhaps the most far reaching example of Commerce Clause authority over intrastate activity." *Lopez*, 514 U.S. at 560. There, "the Court famously upheld a federal penalty imposed on a farmer for growing wheat for consumption on his own farm." *NFIB*, 567 U.S. at 552. "The Court rejected the farmer's argument that growing wheat for home consumption was beyond the reach of the commerce power" because "the farmer's decision to grow wheat for his own use allowed him to avoid purchasing wheat in the market," and "when considered in the aggregate along with similar decisions of others, [it] would have had a substantial effect on the interstate market for wheat." *Id.*; *see also Wickard*, 317 U.S. at 125 ("[E]ven if appellee's activity be local and though it may not be

regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce"). In other words, when looking to whether Congress acted within its enumerated power, this Court evaluates the entire "class of activity" under other principles, and any individual's activity is not relevant.

This means, however, that those engaged in some commerce are also free to show that the entire class regulation is unconstitutional. After all, Alfonso Lopez was to be paid $40 for delivering the gun he had in his possession. *See United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993). That was undoubtedly commerce, but the statute under which he was charged regulated possession of a gun in a school zone, which is why that transaction could not save the statute. *See* 514 U.S. 549 (1995); Aziz Z. Huq, *Standing for the Structural Constitution*, 99 Va. L. Rev. 1435, 1456 (Nov. 2013) ("[B]oth *Lopez* and *Morrison*, yielded facial invalidations of the statutes being challenged. In neither case did the Court even entertain the possibility of disaggregating the challenged provision into valid rules and invalid rules."); Gillian E. Metzger, *Facial Challenge and Federalism*, 105 Colum. L. Rev. 873, 907-908 (Apr. 2005)

(similar); Matthew D. Adler and Michael C. Dorf, *Constitutional Existence Conditions and Judicial Review*, 89 Va. L. Rev. 1105, 1154 (Oct. 2003) (describing the Commerce Clause as an "existence condition" for federal power, which requires facial consideration). The government's attack on Plaintiffs' facial challenge is misplaced.

\* \* \*

At bottom, the government's arguments boil down to a vague assertion that Congress may exercise plenary authority, irrespective of the limits of its enumerated powers, in any field it has legitimately entered. If that were so, then Congress's longstanding regulation in the healthcare field would have supported the ACA's insurance mandate. The district court correctly recognized that the CTA suffers the same defects as the ACA.

## II. THE EQUITABLE FACTORS WEIGH HEAVILY IN FAVOR OF POSTPONING THE REPORTING RULE

The extraordinary path that this litigation has taken through the courts proves, if nothing else, the stakes of forcing tens of millions of people to comply with the CTA in confusing and confused circumstances. Complying with the CTA comes with serious regulatory burdens, threatens protected associational rights, intrudes into constitutionally

protected areas, and, most fundamentally, is an unlawful expansion of federal power into local affairs. In staying the district court's injunction, the Supreme Court did not address the merits, or any other issues in its order, instead tasking this Court with prompt resolution of this matter. And now, nearly two months after the original deadline that the government went to such extraordinary lengths to preserve, the government seems leery of its prize, hesitatingly insisting that immediate compliance is necessary, despite its chaotic consequences.

This Court should reject the government's request. For the second time this panel must decide whether the district court's preliminary injunction is necessary "to preserve the constitutional status quo while the merits panel considers the parties' weighty substantive arguments." ECF No. 160, at 2. Nothing has changed. The government's interest in immediately implementing a deadline it has repeatedly extended remains weak, at best. Once again, though, the plaintiffs, and tens of millions of others, face a looming and unlawful compliance deadline.

In weighing the propriety of an injunction, the "inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "These factors merge

when the Government is the opposing party." *Id.* Thus, because the district court correctly recognized the CTA's underlying constitutional defect, the only remaining question is whether, on balance, the public's interest in its own forced compliance with an invalid law in the hopes of an unlikely law-enforcement benefit, outweighs the practical costs, and constitutional injuries it will inflict on Plaintiffs, including the hundreds of thousands of NFIB's members. Asking that question answers it: The district court correctly enjoined the CTA's compliance date.

### A. The Government's Claims of Injury Are Overblown

Start with the government's pretense to a sudden need to implement the CTA now. The government tepidly insists that "[e]njoining the CTA would hinder the government's efforts to counter … serious harms" related to criminal activity, because of "the statute's utility in combatting money laundering and other criminal activity." Gov. Br. at 39, 41.

Even if one fully credits these putative benefits, there is a significant difference between the government's interest in preserving an *extant* law and implementing one not yet in force. Recently the Eighth Circuit explained how to analyze the government's claims of irreparable

harm in similar circumstances. Noting that a proponent or opponent of an injunction must demonstrate *their own* irreparable harm, that Court has refused to credit future harms to third parties created by impending regulatory changes. *See Kansas v. United States*, 124 F.4th 529, 533-34 (8th Cir. 2024). This rule applies equally to the regulated public and the government as litigant. *Id.* Thus, the Eighth Circuit refused to credit a federal administrative agency's "alleged irreparable harm to third parties—individuals who enrolled in health-insurance plans under [a challenged] final rule." *Id.* at 534. This was further justified because "those health-insurance plans have not yet gone into effect." *Id.* In other words, the loss of the purported downstream benefits of a challenged rule not yet in force were not cognizable injuries to the government warranting court intervention, "even if we assume, without deciding, that the agency has shown a likelihood of success on the merits of its appeal." *See id.* at 533.

The same reasoning undermines the government's alleged harm here. The potential delay of the CTA's anti-crime benefits neither causes direct harm to the government, nor has any immediate result, since, even now, the deadline is not yet effective. But even once it becomes effective,

the CTA's law enforcement benefits come only from third-party access to its databases. The government cannot claim the loss of these hoped-for third-party benefits as real "injuries." *See Kansas*, 124 F.4th at 533-34.

The government's own delays in implementing the CTA's reporting mandate suggest that it too understands that any benefits from the reporting deadline must give way to practical concerns.

Start with how the agency treated the CTA's reporting deadline long before this litigation. No provision of the CTA or any other law blocked FinCEN from expeditiously bringing the mandate into force within a year, by January 1, 2022, at the latest, if it determined that the benefits to national security, foreign policy, and the other interests the government now cites warranted that. Instead, FinCEN set an effective date for the Reporting Rule of January 1, 2024, and then allowed an additional year—which the statute did not require it to do—for existing companies to file their initial reports. *See* 87 Fed. Reg. at 59592.

The *agency* therefore chose to delay the compliance deadline for **over three years**. It did so based on its weighing of "the benefit to law enforcement and national security agencies" against "the burdens imposed on reporting companies." *Id*. at 59511. And even then it left the

door open to providing further "extensions to the filing periods for initial, updated, or corrected reports." *Id.*; *see also* 88 Fed. Reg. at 83500 (justifying 90-day extension of related CTA reporting deadline based on compliance burdens).

Now consider the government's conduct throughout this litigation. *See Beame v. Friends of Earth*, 434 U.S. 1310, 1313 (1977) ("The applicants' delay in filing their petition and seeking a stay vitiates much of the force of their allegations of irreparable harm") (Marshall, J., in chambers). It waited over a week to seek a stay in the first instance. Then, when the motions panel initially granted its request, it proceeded almost immediately to extend the CTA's reporting deadline by two weeks. Then, after taking the extraordinary step of filing an emergency application with the Supreme Court on the eve of the January 1st deadline, and then obtaining such urgent relief on January 23rd, it then waited until February 5, 2025, to file a notice of appeal in *Smith*. *See* FinCEN Notice, FIN-2025-CTA1, at 2. It thus wasn't until February 18, 2025, that FinCEN set its March 21, 2025, deadline. *See id.*

In addition to the government's relaxed pace, FinCEN also publicly teases that "further modification of this deadline," could be likely,

"recognizing that reporting companies may need additional time to comply with their BOI reporting obligations once this update is provided." *Id.* These are not the actions of a party suffering harm at every moment that passes.

## B. The Injunction Remains Necessary to Prevent Irreparable Injury to Plaintiffs

Even as it constructs dubious claims of injury for itself, the government largely overlooks the obvious irreparable injuries that the CTA imposes. A valid objective, such as prevention of crime, is surely no justification for an unconstitutional statute. Forcing the public to comply with such a law, even temporarily, comes at serious irreparable costs. For the CTA, those include not only non-recoupable compliance costs, but also deprivation of constitutional rights and potential mootness of their legal claims. And then, there is the continued confusion, and economically destructive uncertainty concerning whether the CTA's deadline will truly be reinstated. The district court's preliminary injunction was, and still is, necessary to prevent these harms.

"An irreparable harm is one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (citation omitted). Indeed the APA only affords relief "other than money

damages." 5 U.S.C. § 702. Thus, the "nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

### 1. Plaintiffs Face Immediate Nonrecoverable Compliance Costs

Plaintiffs now face substantial nonrecoverable costs that they have been ordered to incur prior to FinCEN's March 21st deadline. They include not only filing the required reports, but incurring the cost of legal services related to reviewing relevant filings. That is more than just filing the relevant form—includes verifying the information is comprehensive and accurate, particularly for complex business arrangements, and consistent with the complicated and confusing statutory and regulatory terms. Indeed, CTA compliance "is a tall task," involving 11 steps, each of which "takes considerable time and attention." Amicus Curiae Brief of the National Retail Federation, *et. al.*, ECF No. 87, at 9-10. Even FinCEN recognizes that the cost of compliance can extend into the thousands of dollars and will total, in the first year alone, tens of billions of dollars. 87 Fed. Reg. at 59574, 59576, 59581. Plaintiffs' ownership structures run

the gamut of complexity, and all face the prospect of non-recoupable compliance costs. Supp.ROA.26.

The government's flippant view that these unrecoverable financial injuries might be "minimal" for some of the plaintiffs, is easily refuted. Never contesting that the harm is, indeed "irreparable," the government just claims that a "typical, simple company would spend about 90 minutes (or the equivalent of about $85's worth of time) to complete and file the statute's required report, which may be filed for free." Gov. Br. at 41. Thus, it concludes, these concededly irreparable costs are no "more than de minimis," and thus inadequate to merit a preliminary injunction. *Id.* at 42 (quoting *Rest. Law Ctr.*, 66 F.4th at 598).

This Court already rejected the same argument as "meritless" in the same case the government now tries to hide behind. *See Rest. Law Ctr.*, 66 F.4th at 598. That case also involved a preliminary challenge to a federal regulation, and the plaintiffs had argued they suffered irreparable injuries from unrecoverable compliance costs. *Id.* at 597. The plaintiffs "point[ed] out that the Department concedes that some businesses will incur ongoing costs to comply with the rule," and "produced uncontested evidence that ... project precisely those kinds of

ongoing management costs." *Id.* at 597-98. Even though "Plaintiffs did not convert each allegation of harm into a specific dollar amount," they had amply shown irreparable harm. *Id.* at 599-600.

It is no wonder then that the district court didn't fall for this argument. The district court noted, for instance, that "the Court and the Government need not accept Plaintiffs' sworn word for it—FinCEN itself concedes that reporting companies will incur compliance costs of the same sort that Plaintiffs describe in their Declarations as a result of the CTA and Reporting Rule." Supp.ROA.29; *see also* 87 Fed. Reg. at 59585–86 ("FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after."). "It is ironic that the Government suggests that Plaintiffs must plead their compliance costs with greater specificity. … The Government seeks to hold the Plaintiffs to a standard that the law does not require." Supp.ROA.29. These "nonrecoverable compliance" costs constitute irreparable harm, and are much more than de minimis in these circumstances. *See Rest. Law Ctr.*, 66 F.4th at 597.

### 2. Plaintiffs Face the Irreparable Loss of Constitutional Rights

There are other irreparable injuries though: Compliance will infringe Plaintiffs' constitutional rights, including their First Amendment associational rights, which also causes them irreparable harm. When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *See Book People Inc.*, 91 F.4th at 341 (quotation marks omitted). And when a law or regulation even "threatens" First Amendment rights, a plaintiff suffers an irreparable injury. *Id.*

Above and beyond their enumerated powers claim, Plaintiffs also face the prospect of additional constitutional injury. As they pleaded in their complaint, the CTA restricts associational rights protected by the First Amendment, because it forces entities to disclose the identities of individuals associated with the entity's expressive activities, and violates the Fourth Amendment, because it mandates invasive disclosures on pain of criminal punishment without any particularized suspicion or precompliance review from a neutral party.

Because the district court ruled in Plaintiffs' favor on their enumerated powers claim, it was unnecessary to reach these other

grounds. At this stage of litigation, this Court must presume that injury arises from Plaintiffs' other well-pled claims. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . ."). After all, removing these injuries from the calculation without ever touching on their merits would allow the government to violate the public's rights at will merely because the CTA *also* exceeded the federal government's enumerated powers.

These constitutional injuries are serious. The injury to Plaintiffs' associational rights under the First Amendment posed by the CTA's forced disclosure of their anonymous membership is plainly irreparable and one of substantial gravity. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action."). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.). And even when

a law or regulation merely "threaten[s]" First Amendment rights, a plaintiff suffers an irreparable injury. *See id.* at 373–74.

Plaintiffs are all entities or individuals with First Amendment interests in maintaining anonymity of their membership. *See Americans for Prosperity v. Bonta*, 594 U.S. 595, 605-08 (2021) (plurality op.). Indeed, one plaintiff is a local political party that advocates positions on a wide range of public issues, including the protection of constitutional rights threatened by the CTA. *See* Supp.ROA.14. Other plaintiffs have also been engaged in advocacy targeted at the CTA itself, using their corporate form. *See* Supp.ROA.13-15. Nevertheless, under its expansive definition of beneficial ownership, the CTA compels them to disclose to FinCEN, and potentially to state and local law enforcement and federal regulators, key personnel, such as their directors, officers, influential members, or even donors. *See* 31 U.S.C. § 5336 (a)(3)(A); Supp.ROA.14.

The First Amendment guarantees their right to refuse to disclose this information. *See Americans for Prosperity*, 594 U.S. at 610 (law mandating that charitable organizations disclose the names and addresses of donors who had contributed more than $5,000 in a tax year violated the First Amendment); *NAACP*, 357 U.S. at 462. Yet the CTA's

imminent deadline threatens Plaintiffs with the prospect of criminal punishment as a consequence of exercising their First Amendment rights, without consideration of their claim by any court.

Then there is the Fourth Amendment injury caused by the CTA's requirement that reporting companies disclose beneficial ownership information with no precompliance process and no individualized suspicion. *See City of L.A. v. Patel*, 576 U.S. 409, 421 (2015). Indeed, the Act itself recognizes the privacy interest in BOI, providing that it "shall be confidential and may not be disclosed" by FinCEN except in carefully limited ways. *See* 31 U.S.C. § 5336 (c)(2)(A). And the CTA's disclosure requirements are significantly more intrusive than blanket disclosure of hotels' guest lists, as was at issue in *Patel*, 576 U.S. at 419.

### 3. The Injunction Also Preserves Judicial Review

Lastly, the CTA should be enjoined to protect judicial review of all of Plaintiffs' claims. The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). "The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy." *Del. State Sportsmen's Ass'n*

*v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 200 (3d Cir. 2024). The Third Circuit recently concluded that "the most compelling reason to grant a preliminary injunction is to preserve the court's power to render a meaningful decision after a trial on the merits." *Id.* at 201 (citation omitted, collecting cases); *see also Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975) ("the purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits").

The status quo now threatens the ability of any court to fairly adjudicate Plaintiffs' remaining claims against the CTA. Plaintiffs now face an impermissible conundrum, between complying with the March 21st deadline and, among other things, potentially compromising their abilities to challenge the CTA on First and Fourth Amendment grounds. Plaintiffs' First and Fourth Amendment claims both assert constitutional protection from *disclosure* of protected information. The district court's injunction, which still allowed any non-objecting entities to file voluntarily, ensured that Plaintiffs will not be forced to submit their information anyway and potentially moot their other constitutional objections. This Court should affirm that injunction immediately, and

thus help protect Plaintiffs' ability to fairly assert their First and Fourth Amendment rights.

## C. The Government's Weighing of the Equities Fails

Even as it hints at future extensions of its latest March 21st deadline, the government still insists that any delay of the CTA's compliance deadline is improper from this or any other court. In its estimation, the "plaintiffs' compliance costs—which equate for each company to roughly one-fifth of the fee to file this action—do not outweigh the substantial harms imposed on the United States when an act of Congress is enjoined." Gov. Br. at 40. Every part of the government's argument is wrong.

First, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Whatever legitimate interest the government might have in a challenged law or regulation, "neither [the government] nor the public has any interest in enforcing a regulation that violates federal law." *Book People, Inc.*, 91 F.4th at 341 (cleaned up). If a plaintiff is likely to succeed

in showing that a law or regulation is invalid, then the public interest accords with an injunction. *See id.*

Never challenging that Plaintiffs do, indeed, face irreparable harms absent the district court's injunction, the government's argument is simply that the district court abused its discretion by weighing things incorrectly. *See* Gov. Br. at 39-41. But there is no comparison—the public has *no* interest in the CTA's unlawful mandates.

Second, as discussed, the factual record belies the government's efforts to diminish the nonrecoverable compliance costs associated with the CTA as de minimis, even when it admits that, *at the very least each plaintiff must incur nonrecoverable costs "of about $85's worth of time,"* to comply with the CTA. Gov. Br. at 41. This Court's precedents require far less justification to stop government action: "Under our precedent, it is sufficient to show that even under the Government's best theory of the case," the challenges are "likely" to suffer "more than de minimis harm," "at which point it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up).

Third, the government has ignored both the constitutional injuries caused by the CTA and Reporting Rule and the concerns about mooting the plaintiffs' other claims, in its calculation of the equities. The government's interest in eventually implementing the CTA cannot outweigh even the most unrealistically small calculations of the regulatory burden it can conjure. But even if it could, the constitutional injuries vastly outweigh such interest. *See id.*

## D.    The Scope of the Injunction Is Appropriate

As a parting shot, the government claims that the district court "had no power" to issue its preliminary injunction and related stay of the Reporting Rule. Gov. Br. at 43. It outlandishly claims that the only proper beneficiaries of preliminary relief are the named plaintiffs themselves and only those two NFIB members who have so far been identified in court filings. Gov. Br. at 43. 47.

The government's crabbed view of equitable jurisdiction finds no support in precedent, and relies on a distortion of the district court's preliminary injunction. While the district court did enter an injunction, it also entered an utterly unremarkable postponement of the Reporting Rule's deadlines pursuant to Section 705 of the APA. The injunction was

an appropriate exercise of the district court's discretion in the circumstances of this litigation, but even were it not, the Section 705 stay serves the same purpose. This Court should therefore reinstate that injunction as soon as possible.

"[T]he Administrative Procedure Act instructs a reviewing court to 'hold unlawful and set aside' agency rules and orders that it deems unlawful or unconstitutional." Jonathan Mitchell, *The Writ of Erasure Fallacy*, 104 Va. L. Rev. 933, 1012 (Sept. 2018) (citing 5 U.S.C. § 706). "Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA … go[es] further by empowering the judiciary to act directly against the challenged agency action." *Id.* at 1013. "That the *effect* of the judgment is to set aside a rule universally does not create a *standing* problem." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1181 (Sept. 2020). Whether or not that accords with traditional equity practice, Congress undoubtedly has the power to confer that authority on the courts, *see Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 329 (1999) (noting that this Court "leaves any substantial expansion of past [equity] practice to Congress"), and it did so. The APA therefore avoids the "question of

whether a district court, after holding that a law violates the Constitution, may nonetheless enjoin the government from enforcing that law against non-parties to the litigation" as a matter of its inherent authority. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Kavanaugh, J., concurring).

Section 705 is one step *further* removed from this debate because it sets out the specific relief at issue in this case. It provides: "to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

That power tracked then-prevailing equity practice. Four years before the APA's enactment, *Scripps-Howard Radio, Inc. v. FCC*, held that the "power to stay the execution" of an agency rule "in order to preserve the status quo pending appeal" "has always been held" to be a "part of its traditional equipment for the administration of justice." 316 U.S. 4, 9 (1942). The case involved a radio broadcaster's challenge to an FCC order applicable to a nonparty competitor. *Id.* at 5–6. No matter: "an appellate court should be able to prevent irreparable injury to the parties

or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong." *Id.* at 9. Thus, the power to enter a stay "pending the outcome of an appeal," the Court concluded, "is part of its traditional equipment for the administration of justice." *Id.* at 9.

In turn, the "relevant legislative history" of Section 705, "indicates that it was primarily intended to reflect existing law under the *Scripps-Howard* doctrine." *Sampson v. Murray*, 415 U.S. 61, 69 n.15 (1974). Just so:

> Section 705 was intended to authorize reviewing courts to 'maintain the status quo' pending judicial review, a power that Representative Walter described as but a statutory codification of what 'has generally been regarded as an essential and inherent right of the court.' There is no question that this judicial power to preserve the status quo was understood to encompass the power to suspend a rule on a wholesale basis: as the Senate Judiciary Committee explained, section [705] 'authorizes courts to postpone the effective dates of administrative judgments or rules in cases in which, as by subjection to criminal penalties, parties could otherwise have no real opportunity to seek judicial review except at their peril.'

Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. at 1159 (citations omitted).

Importantly, in these circumstances the Court isn't trying to bind parties beyond its jurisdiction, it is merely *staying the hand of an agency as a litigant*. "If the administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made." *Scripps-Howard*, 316 U.S. at 10. In other words, "the relief sought here would simply suspend administrative alteration of the status quo." *Nken*, 556 U.S. at 430 n. 1.

Judicial postponements of administrative rules have been a common feature of administrative practice since agencies began issuing rules. This Court has granted such stays routinely. *E.g.*, *MCR Oil Tools, L.L.C. v. United States DOT*, No. 24-60230, 2024 U.S. App. LEXIS 14297, at *18 (5th Cir. June 12, 2024); *Marin Audubon Soc'y*, 121 F.4th at 919, *Airlines for Am. v. DOT*, 110 F.4th 672, 674, 677 (5th Cir. 2024); *Calumet Shreveport Ref., L.L.C. v. United States EPA*, Nos. 22-60266, 22-60425, 22-60433, 22-60434, 2023 U.S. App. LEXIS 17368, at *7, *12-13 (5th Cir. Jan. 27, 2023). This is hardly a new development in this Court's practice, either. *See, e.g.*, *Texas v. United States EPA*, 829 F.3d 405, 435 (5th Cir.

2016) (collecting cases and "stay[ing a] Final Rule in its entirety pending the outcome of this petition for review"). The government's arguments ask this Court to cast aside all of this precedent.

Practical considerations likewise determined the scope of the injunction entered by the district court. Having already determined that Plaintiffs, including the roughly 300,000 members of NFIB, met their burden of demonstrating the unconstitutionality of the CTA, delaying the *regulatory* compliance date was the only logical solution. And practical considerations likewise determined the scope of the injunction: "At the Court's hearing, Plaintiffs suggested that they sought an injunction on behalf of only the Plaintiffs before the Court, including the approximately 300,000 members of NFIB. The Government responded that if the Court were to enjoin the CTA and Reporting Rule, the scope of which included NFIB's members, then the Court would, in practical effect, enter a nationwide injunction. The Court agrees with the Government's point. A nationwide injunction is appropriate in this case." Supp.ROA.77-78.

The government attack (at 46-47) on the district court's application of well-established principles of associational standing flies in the face of precedent. The government points to no decision of any court *requiring* a

district court to limit preliminary relief only to members of an association suing on their behalf who are "identified in the district court" by name, "at the time of the district court's decision," as it now insists the district court should have done. *See id.* In fact, the government fails to give an example of a district court issuing such limited relief as an exercise of its discretion. *See id.*

Instead, the government attacks the notion of associational standing itself, relying on Justice Thomas' concurring opinion in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 401-02 (2024). Gov. Br. at 47. To be sure, writing only for himself, Justice Thomas argued that the Court's "third-party standing doctrine is mistaken," and so, as a corollary, he argued that a court has no equitable jurisdiction over an association's members either. *See id.* at 398, 401-02. That view is not the law, as Justice Thomas acknowledged. *See id.* Instead, Justice Thomas opined that "[i]n an appropriate case, [the Court] should explain just how the Constitution permits associational standing." *Id.* at 398-99.

Whatever the merits of Justice Thomas' arguments, the Court's binding decisions provide no support for the government's position in this case. The Supreme Court has long held that "an association may have

standing solely as the representative of its members" and seek relief that "will inure to the benefit of those members." *Warth*, 422 U.S. at 511, 515. It is enough that a plaintiff organization "establish[] that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). This Court should reject the government's invitation to ignore these rules.

## CONCLUSION

The district court's preliminary injunction should be affirmed.

February 25, 2025

Respectfully,
*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
**Todd F. Gaziano**
**Christian Clase**
Center for Individual Rights
1100 Conn. Ave. N.W., Suite 625
Washington D.C. 20036

**John C. Sullivan**
S|L Law PLLC
610 Uptown Blvd, Suite 2000
Cedar Hill TX 75104

**Andrew M. Grossman**
**Kristin A. Shapiro**
Baker Hostetler
Washington Square, 1050 Conn. Ave.
N.W., Suite 1100
Washington D.C. 20036

Counsel for Plaintiffs-Appellees

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Federal Rule of Appellate Procedure 32. It is printed in Century Schoolbook, a proportionately spaced font, and includes 12945 words, excluding items enumerated in Rule 32(f). I relied on my word processor, Microsoft Word, to obtain the count.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 25, 2025, this document was electronically filed using the Court's CM/ECF system, which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**