No. 24-40792

———————◆———————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————◆———————

TEXAS TOP COP SHOP, INCORPORATED; RUSSELL STRAAYER; MUSTARDSEED
LIVESTOCK, L.L.C.; LIBERTARIAN PARTY OF MISSISSIPPI; NATIONAL FEDERATION OF
INDEPENDENT BUSINESS, INCORPORATED; DATA COMM FOR BUSINESS,
INCORPORATED,
*Plaintiffs-Appellees*,

v.

PAMELA BONDI, U.S. ATTORNEY GENERAL; TREASURY DEPARTMENT; DIRECTOR
FINCEN ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT
NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK; SCOTT BESSENT,
SECRETARY, U.S. DEPARTMENT OF TREASURY,
*Defendants-Appellants*.

———————◆———————

On Appeal from the U.S. District Court for the Eastern District of Texas

———————◆———————

## AMICUS CURIAE BRIEF OF THE BUCKEYE INSTITUTE
## IN SUPPORT OF PLAINTIFFS-APPELLEES
## AND AFFIRMANCE

———————◆———————

Robert Alt
  *Counsel of Record*
Jay R. Carson
David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, OH 43215
(614) 224-4422
Robert@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

# CERTIFICATE OF INTERESTED PERSONS

*Texas Top Cop Shop, Inc., et al. v. Bondi, et al.*
No. 24-40792

The undersigned counsel of record for amicus The Buckeye Institute certifies that The Buckeye Institute is an Ohio nonprofit organization. Pursuant to Fed. R. App. 29(a)(4)(E), The Buckeye Institute has authored this brief in whole. Counsel is not aware of any person or entity as described in the fourth sentence of Rule 28.2.1 that have an interest in the outcome of this case other than those listed in the parties' certificates. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

 */s/ Robert Alt*
Robert Alt
*Counsel of record for*
*The Buckeye Institute*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 29(a)(4)(A) and 26.1 of the Federal Rules of Appellate Procedure, *amicus* states that it is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3); as such, it has no parent corporation, issues no stock, and thus no publicly held corporation owns more than ten percent of its stock.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

CORPORATE DISCLOSURE STATEMENT.......................................................ii

TABLE OF AUTHORITIES.................................................................................iv

INTEREST OF AMICUS CURIAE.......................................................................1

SUMMARY OF THE ARGUMENT......................................................................1

ARGUMENT ........................................................................................................3

   I.   Enforcing the CTA will result in irreparable harm in the deprivation of First Amendment rights for tens of millions of Americans ...........................3

   II.   The First Amendment does not limit the protection of anonymous association to nonprofit or political entities....................................................6

   III.   There are legitimate reasons for corporate anonymity..................................11

CONCLUSION ...................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*American Communications Ass'n v. Douds*,
339 U.S. 382 (1950) ...................................................................9

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ...............................................2, 7, 8, 9, 10

*Casa de Maryland, Inc. v. Trump*,
No. PWG-19-2715, 2019 WL 7565389 (D. Md. Nov. 14, 2019) ........................6

*City of Norwood v. Horney*,
853 N.E.2d 1115 (Ohio 2006) .............................................15

*Elrod v. Burns*,
427 U.S. 347, 373 (1976) ...................................................5

*Gibson* v. *Fla. Legislative Investigation Comm'n*,
372 U.S. 539 (1963) .............................................................7

*Kelo v. City of New London, Conn.*,
545 U.S. 469 (2005) ...........................................................14

*Louisiana ex rel. Gremillion* v. *NAACP*,
366 U.S. 293 (1961) .............................................................7

*Maryland v. King*,
567 U.S. 1301 (2012) ...........................................................5

*NAACP v. Alabama*,
357 U.S. 449 (1958) ................................................2, 7, 8, 9

*Nat'l Org. for Marriage, Inc. v. United States*,
24 F. Supp. 3d 518 (E.D. Va. 2014) .................................10

*Texas Top Cop Shop, Inc. v. Garland*,
No. 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024) .................5

*White v. Carlucci*,
862 F.2d 1209 (5th Cir. 1989) ...........................................4

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S.7 (2008) ...................................................................................3

**Statutes**

Tex. Government Code Ann. §2206.001 ...............................................15

**Other Authorities**

Amanda Lubin, *How Walt Disney World is Fueling Jobs and Economic
  Prosperity*, Orlando Economic Partnership (May 9, 2024) ................14

Daniel Ganninger, *How Walt Disney Secretly Bought the Land for Walt
  Disney World*, Medium (Jan. 19, 2025) ......................................13, 14

EJ Dickson, *How a Small-Town Bakery in Ohio Became a Lightning Rod in
  the Culture Wars*, Rolling Stone (July 18, 2019)................................12

Isaac O'Bannon, *IRS Exposes Confidential Data on 120,000 Taxpayers on
  Open Website*, CPA Practice Advisor (Sep. 02, 2022) .......................10

William Moon, *Anonymous Companies*, 71 Duke L.J. 1425 (2022) ......................11

**Regulations**

Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg.
  59498 (Sept. 30, 2022) ...........................................................................9

## INTEREST OF AMICUS CURIAE[1]

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute works to restrain governmental overreach at all levels of government. The Buckeye Institute files lawsuits and submits amicus briefs to fulfill its purpose. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

## SUMMARY OF THE ARGUMENT

Vacating a preliminary injunction is no small matter. This is especially true when the district court enjoined a statute that is constitutionally suspect for multiple reasons. In this case, the district court enjoined enforcement of the Corporate Transparency Act ("CTA") because it likely exceeds Congress's authority to regulate under the Commerce Clause. But while the district court did not need to reach the Plaintiffs' other constitutional arguments to grant the injunction, those additional arguments should be considered now. The deprivation of a constitutional right—any

_____

[1] Pursuant to Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief.

constitutional right, even briefly—constitutes irreparable harm. This Court should thus give significant weight to the CTA's First Amendment implications.

Further, the axiomatic purpose of a preliminary injunction is to preserve the status quo. Three years have passed since the CTA's enactment and the government has been content to delay its enforcement. If the nation can withstand three years between enactment and proposed enforcement, it can muddle through the time necessary for the district court to enter a final decision on the merits.

The CTA's beneficial ownership information ("BOI") disclosure requirements apply to commercial, for-profit entities and are little different from California's nonprofit donor information reporting requirements struck down by the Supreme Court of the United States in *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ("*AFPF*"), and *NAACP v. Alabama,* 357 U.S. 449 (1958). Although those cases involved reporting by nonprofit corporations, the privacy interests in protecting donors from harassment by the public or the government itself are like the privacy interests of owners or investors in for-profit ventures.

To the extent that the government would seek to assure the approximately 32 million private entities that their data will remain protected from improper disclosure, the government's record on safeguarding such information is not encouraging. Moreover, the Framers designed the First Amendment's associational freedom to protect citizens' right to associate *from* the government's prying eyes.

Assurances that the government will protect the information it gathers offer little solace when citizens seek to keep their associations confidential from the government itself.

Holders of beneficial interests in for-profit entities have legitimate reasons for preserving their anonymity. The government seems to assume that the only reasons for corporate anonymity are nefarious ones. This view overlooks the many circumstances where businesses engage in perfectly legal conduct that members of the public—or the government—might find offensive, immoral, or politically undesirable. And setting aside political controversy, corporate anonymity decreases friction in the operation of free markets and provides business opportunities that could not otherwise exist.

## ARGUMENT

### I. Enforcing the CTA will result in irreparable harm in the deprivation of First Amendment rights for tens of millions of Americans.

Rule 65 conditions courts' weighty power to enjoin legislation on a commensurately heavy burden on plaintiffs: At the trial court level, the party seeking to enjoin enforcement of a federal statute must show—by clear and convincing evidence—that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). And although a Rule 65

proceeding is expedited, it carries the hallmarks of a trial, typically including comprehensive briefing, the presentation of evidence, and oral arguments. The trial court's treatment of this case below—which spanned six months, included oversized motions, notices of supplemental authority, and an in-person hearing—is an example of the expedited but thorough process a district court should follow when weighing whether to enjoin enforcement of a federal statute. This process gave both the parties and the court ample time to ensure that if the court was going to take the extraordinary step of enjoining the CTA's enforcement, it did so on a full record with the opportunity to carefully consider the arguments and evidence submitted. The district court's decision to grant the injunction is thus entitled to substantial deference and may be reversed on appeal "only by a showing of abuse of discretion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

The government fails to address the Plaintiffs' likelihood of success on the merits of their First Amendment associational rights argument. Because the trial court held that the CTA exceeded Congress's powers under the Commerce Clause, it did not reach the First Amendment argument. But just because the trial court did not need to reach those issues does not mean that the government is excused from the burden of addressing them now. In light of the Supreme Court's recent decision in *AFPF*—reaffirming the First Amendment right to associate freely and anonymously recognized in *NAACP*—and the long-standing recognition that even a

brief deprivation of First Amendment rights constitutes irreparable harm, the Court should examine the First Amendment question when considering the Plaintiff's likelihood of the success on the merits and the potential substantial injury to other parties. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Likewise, examining on appeal the potential irreparable harms that might result from the enforcement of an unconstitutional act protects litigants who have already shouldered the burdens necessary to obtain an injunction. This Court's motion panel's reliance on *Maryland v. King*, 567 U.S. 1301 (2012), holding that irreparable harm exists any time a court enjoins a statute's enforcement was misplaced. *King* arose out of a criminal defendant's appeal of the denial of a motion to suppress DNA evidence collected under a Maryland law that allowed collection of DNA samples from arrestees charged with, but not yet convicted of, certain crimes. *Id.* at 1301. Although Chief Justice Roberts articulated the state's interest in enforcing a statute broadly, he noted that the injunction prohibited Maryland from *continuing* to collect DNA from arrestees, "a tool used widely throughout the country and one that has been upheld by two Courts of Appeals and another state high court," which had proven efficacious in identifying violent offenders. *Id*. at 1303–04. Rather than reversing an ongoing practice that had already been held to be constitutional, the injunction here preserves the status quo, *see Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5224138, at *1 (5th Cir. Dec. 26, 2024)

(vacating motions panel's stay), protecting Americans against what two federal courts have already identified as irreparable constitutional harm. The government suffers no harm because, if it ultimately prevails, it can begin the new enforcement regime—one that it has already waited three years since legislative enactment to implement. *See Casa de Maryland, Inc. v. Trump*, No. PWG-19-2715, 2019 WL 7565389 *2–*3 (D. Md. Nov. 14, 2019) (requiring the government to continue the current enforcement regime "instead of switching to one that is likely 'not in accordance with law,' does not constitute irreparable harm").

Considering the lengthy delays in implementation, the disruption of the status quo, and the substantial constitutional and other injuries that the CTA would exact on 32 million small businesses across the country, it is the Plaintiffs, and millions of other Americans—not the government—who face irreparable harm.

## II. The First Amendment does not limit the protection of anonymous association to nonprofit or political entities.

Because the district court based its decision solely on Congress's lack of authority, it did not reach the First Amendment freedom of association question raised by the Plaintiffs. But overruling that injunction threatens serious harm to the associational freedom of tens of millions of Americans.

The Plaintiffs' First Amendment arguments are compelling. The CTA's disclosure requirements substantially curtail citizens' well-established right to associate anonymously. Indeed, the right to be free from reporting one's associations

to the government is a key aspect of associational freedom. Since *NAACP,* the U.S. Supreme Court has consistently applied exacting scrutiny to forced disclosures that threaten freedom of association. To meet this burden, the government must "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest," *Gibson v. Fla. Legislative Investigation Comm'n*, 372 U.S. 539, 546 (1963), and any such compelled disclosure must be "narrowly drawn," *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293 (1961) (citation omitted).

The Supreme Court reaffirmed this commitment to anonymous association in *AFPF*, striking down California's requirement that nonprofit corporations provide certain donor information to the state's Attorney General. The state's rationale for disclosure in *AFPF*, like here, was a vaguely defined interest in fraud prevention and the misuse of corporate entities. *AFPF*, 594 U.S. at 612.

The Court held that the disclosure requirements were not sufficiently narrowly tailored to justify an intrusion on donors' and corporations' associational privacy rights, noting "that '[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action.'" *Id.* at 606–07 (quoting *NAACP,* 357 U.S. at 462). The *AFPF* decision echoed the *NAACP* Court's holding that "[e]ffective advocacy of both public and private points of view,

particularly controversial ones, is undeniably enhanced by group association," and noting "the vital relationship between freedom to associate and privacy in one's associations . . . ." *Id.* (quoting *NAACP*, 357 U.S. at 460, 462). "Because NAACP members faced a risk of reprisals if their affiliation with the organization became known—and because Alabama had demonstrated no offsetting interest 'sufficient to justify the deterrent effect' of disclosure, [the Court] concluded that the State's demand violated the First Amendment." *Id.* at 607 (citation omitted).

The commercial nature of the entities subject to the CTA presents no meaningful distinction in the associational privacy analysis. As the *NAACP* Court emphasized, "it is immaterial whether the beliefs sought to be advanced by an association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP*, 357 U.S. at 460–461. Nor do the Plaintiffs have to show that the government will abuse its access to their personal information. "In the domain of [ ] indispensable liberties," such as speech, press, or association, the "abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *Id.* at 461. Significantly, the Court's concern in both *AFPF* and *NAACP* implicated disclosure of the association to the government itself, not merely the risk that the information might eventually be disclosed to the public. The "practical effect 'of discouraging'" the exercise of a constitutional right

is harm in and of itself. *Id.* (quoting *American Communications Ass'n v. Douds*, 339 U.S. 382, 393 (1950)).

The *AFPF* Court emphasized that "[n]arrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'[b]ecause First Amendment freedoms need breathing space to survive.'" *AFPF*, 594 U.S. at 609 (citations omitted). As its text and breadth make clear, the CTA is anything but narrowly tailored. By the government's own reckoning, it will require nearly 32 million private entities to provide significant personal information on their respective beneficial owners. See Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59584 (Sept. 30, 2022). The rationale for this disclosure is that shell companies can be used in money laundering transactions. Of course, many money launderers operate without shell companies. And there is no indication in the CTA or the government's filings that a significant number of American small businesses are money laundering fronts. The CTA thus presents a "dramatic mismatch" between the interests that the government "seeks to promote and the disclosure regime that [it] has implemented in service of that end." *AFPF*, 594 U.S. at 612–13. Indeed, the CTA's scale and intrusiveness dwarf the impact of the rule struck down in *AFPF*, which affected only 60,000 reporting entities. *See id.*

Allowing the government to enforce the CTA's reporting requirements will alter the status quo and create substantial constitutional harm—harm that should weigh in this Court's balance of the equities against the government.

The government might argue that unlawful dissemination of BOI is unlikely, pointing to the Act's prohibition of unauthorized disclosure of BOI and significant penalties for doing so. But similar prohibitions have frequently proved to be ineffective. *See Nat'l Org. for Marriage, Inc. v. United States*, 24 F. Supp. 3d 518, 520–21 (E.D. Va. 2014) (tax exempt organization's unredacted Schedule B was published by the Huffington Post after the IRS released it to a competing policy advocacy group in violation of federal law); Isaac O'Bannon, *IRS Exposes Confidential Data on 120,000 Taxpayers on Open Website*, CPA Practice Advisor (Sep. 02, 2022), https://tinyurl.com/3pjzwxud. Prohibitions are insufficient to address the chilling effect that these policies have on protected association, not only because of the history of ineffective- and non-enforcement but also because the requirement to disclose information to the government itself "creates an unnecessary risk of chilling." *See AFPF*, 594 U.S. at 616 ("It is irrelevant, moreover, that some donors might not mind—or might even prefer—the disclosure of their identities to the State."). The CTA's collection of information presents the proverbial bell that cannot be unrung.

**III. There are legitimate reasons for corporate anonymity.**

Even if the Plaintiffs' potential injuries were not constitutional in nature, vacating the injunction would still injure the millions of reporting entities and run contrary to the public interest. The government's predicate that beneficial owners' ability to act anonymously through "shell corporations" must be eradicated merits more rigorous examination.

Scholars have documented what common sense and experience teach: There are a multitude of entirely legitimate reasons why a beneficial owner of a corporate entity might want to keep his, hers, or its beneficial ownership anonymous. In his article, *Anonymous Companies*, 71 Duke L.J. 1425 (2022), Professor William Moon documented just some of the legitimate reasons why owners of beneficial interests might prefer to remain anonymous. First, for-profit corporations often face the same political and reputational risks as nonprofits that advocate for specific policies. Professor Moon notes that

> privacy is sought out by those who want to invest in promising and innovative business ventures but seek protection from potential threats of violence or backlash. Privacy interests are particularly strong among commercial enterprises that operate in morally contestable industries, including reproductive health care, firearm sales, gene-editing technology, cannabis, and pornography.

*Id.* at 1449. He points to abortion providers in Louisiana as an example, "where anti-abortion regulations have driven out all but a handful of abortion-care providers." *Id.* (noting that providers have been "targeted at private offices, hospitals, and

disturbingly, their children's daycare centers"). One might imagine similar action against a private company that provided transportation to out-of-state abortion providers. These privacy concerns are broad-based and are not limited to one philosophy or political affiliation. For example, beneficial owners of companies that sell firearms and ammunition—legal products—may have good reason for wishing to keep their ownership interest anonymous.

But it is not only businesses engaged in "controversial" issues that have good reason for wanting to keep their owner's identities anonymous. Consider the case of Gibson's Bakery in Oberlin, Ohio. Gibson's existed for over 130 years in the small Ohio college town, selling pastries to students and Oberlin College itself. When one of Gibson's employees stopped an African American student who was shoplifting from the store, the event became a flashpoint for race relations, with the College and students charging the bakery and its owners with engaging in systemic racism. The owners, who were publicly known, faced significant threats and harassment for months. *See* EJ Dickson, *How a Small-Town Bakery in Ohio Became a Lightning Rod in the Culture Wars*, Rolling Stone (July 18, 2019), https://tinyurl.com/57snputt. While the owners eventually obtained a substantial judgment against Oberlin College for defamation and tortious interference related to its false racially charged smears, the lesson for businesses is clear: In a politically charged climate, any business—even one that engages in something as non-controversial and mundane as

selling doughnuts—and its owners can suddenly find themselves in a political firestorm. Business owners have good reason to keep their ownership interests anonymous.

There are other, purely commercial reasons why a beneficial owner might want to operate through shell companies. Without such companies and the ability to keep the beneficial owner's identity private, some types of business development would be impossible. Land developers face particularly daunting costs when attempting to acquire multiple parcels to consolidate for large industrial, commercial, or even residential projects, which provide benefits to previously undeveloped, under-utilized areas. These projects are in the public interest and can be undermined by land speculation should the plans become publicly known before the purchase.

Consider, for example, the development of the Walt Disney World theme park in Orlando, Florida. When Disney began acquiring land in central Florida, land prices were as low as $107/acre, with sellers often eager to unload "useless swampland." Daniel Ganninger, *How Walt Disney Secretly Bought the Land for Walt Disney World*, Medium (Jan. 19, 2025), https://tinyurl.com/bdcrddap. It took the Disney enterprise nearly a year to acquire the necessary land for its planned resort. Overall, the reported investment made by Disney to open the Walt Disney World resort was approximately $400 million. Once the plans to acquire land and construct

the park became known, however, speculation drove up the price of land in the area to as much as $80,000 per acre. It is estimated that, if prevented from acquiring the necessary land in confidence without disclosure of its identity, the land alone for Disney World would have cost its shareholders over $2.2 billion. *Id.* This would have exceeded the total market capitalization of the entire company at the time.

Fortunately for the Orlando area, the State of Florida, and, in many ways, the global image of the United States through one of its most recognized and valuable brands, Walt Disney and his attorney, Paul Helliwell, did not have to wish upon a star to acquire the needed real estate because they were able to set up a number of acquisition companies including Florida Ranch Lands, Reedy Creek Ranch Corporation, and Latin-American Development and Management Corporation to shield the identity of the party acquiring land tracts wholesale. Had the buyer's identity become known, it is likely that the veritable institution that is Disney World would not exist, along with its 80,000 jobs. Amanda Lubin, *How Walt Disney World is Fueling Jobs and Economic Prosperity*, Orlando Economic Partnership (May 9, 2024), https://tinyurl.com/y7yksdf8.

The inability to engage in confidential acquisitions because of mandatory disclosure would likely have the perverse effect of encouraging companies to lobby governments to increase economic development takings. *See, e.g., Kelo v. City of New London, Conn.,* 545 U.S. 469 (2005). But numerous states—appropriately—

prohibit economic development takings undertaken by governments on behalf of private entities, either by state constitutional or statutory law. *See, e.g., City of Norwood v. Horney*, 853 N.E.2d 1115 (Ohio 2006); see also Tex. Government Code Ann. §2206.001 (prohibiting the use of eminent domain for economic development). Accordingly, in the absence of anonymous acquisition, development would either occur via compulsory transactions or not at all, rather than through mutually beneficial exchange.

Furthermore, government guarantees that it will safeguard the information and not abuse its access to BOI offer little comfort. One does not need the imagination of Walt Disney to conjure up a scenario where the federal government or a state government with access to confidential BOI might abuse its power to disadvantage a corporation for political reasons.

## CONCLUSION

For all the above reasons, the Court should examine the entire case—especially the CTA's impact on the First Amendment—and affirm the preliminary injunction.

Respectfully submitted,
 */s/* Robert Alt
Robert Alt
  *Counsel of Record*
Jay R. Carson
David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, OH 43215
(614) 224-4422
Robert@BuckeyeInstitute.org

*Attorneys for Amicus Curiae*

February 25, 2025

**CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Fed. R. App. Rule 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,392 words.

This document complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type-style requirements of Fed. R. App. R. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman.

    /s/ Robert Alt
Robert Alt
*Counsel of record for*
*The Buckeye Institute*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the above amicus brief was served on all counsel of record via the Court's electronic filing system this 25th day of February 2025.

Respectfully submitted,

 /s/ Robert Alt
Robert Alt
*Counsel of record for*
*The Buckeye Institute*