No. 24-40792

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

TEXAS TOP COP SHOP, INC., et al.,

*Plaintiffs-Appellees,*

v.

PAMELA BONDI, ATTORNEY GENERAL OF THE UNITED
STATES, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Texas, Sherman Division
(No. 4:24-cv-478, Hon. Amos L. Mazzant)

---

**BRIEF OF AMICI CURIAE ASSOCIATED GENERAL CONTRACTORS
OF AMERICA, INC., ASSOCIATED GENERAL CONTRACTORS OF
NEW YORK STATE, LLC, THE BUSINESS COUNCIL OF
NEW YORK STATE, INC., NATIONAL ROOFING CONTRACTORS
ASSOCIATION, SHEET METAL AND AIR CONDITIONING
CONTRACTORS' NATIONAL ASSOCIATION, AND NATIONAL
ELECTRICAL CONTRACTORS ASSOCIATION IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

Murphy J. Foster, III
Breazeale, Sachse & Wilson, L.L.P.
One American Place
301 Main Street, Suite 2300
Baton Rouge, Louisiana 70801
Telephone: (225) 381-8015
Facsimile: (225) 381-8029
murphy.foster@bswllp.com

AND

Joel M. Howard, III
Charles G. Carluccio
Couch White, LLP
540 Broadway, P.O. Box 22222
Albany, New York 12201
Telephone: (518) 426-4600
Facsimile: (518) 426-0376
jhoward@couchwhite.com
ccarluccio@couchwhite.com

February 28, 2025
*Attorneys for Amici Curiae*
*Associated General Contractors of America, Inc., Associated General Contractors*
*of New York State, LLC, The Business Council of New York State, Inc., National*
*Roofing Contractors Association, Sheet Metal and Air Conditioning Contractors'*
*National Association, and National Electrical Contractors Association*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... iv

CERTIFICATE OF INTERESTED PERSONS ...................................... v

INTEREST OF THE AMICI CURIAE ................................................... 1

PRELIMINARY STATEMENT ............................................................. 5

LEGAL ARGUMENT ........................................................................... 7

    I. Initial and Ongoing Compliance Costs ........................................ 7

    II. Disproportionate Burden on Small Businesses ......................... 12

CONCLUSION .................................................................................... 14

CERTIFICATE OF COMPLIANCE ................................................... 16

CERTIFICATE OF SERVICE ............................................................. 17

# **TABLE OF AUTHORITIES**

<u>CASES:</u>

*Rest. Law Ctr. v. United States DOL*, 66 F.4th 593 (5th Cir. 2023) ......................... 8

<u>STATUTES:</u>

Federal Civil Penalties Inflation Adjustment Act of 1990 ...................................... 11

FRAP Rule 28.2.1 ............................................................................................... v

FRAP Rule 29 ...................................................................................................... 16

FRAP Rule 32 ...................................................................................................... 16

31 C.F.R. § 1010.380 .......................................................................................... 6

87 Fed. Reg. 59550 ............................................................................................. 7

31 U.S.C. § 5336 ............................................................................................. 5, 6

## **CERTIFICATE OF INTERESTED PERSONS**

*Amici curiae* Associated General Contractors of America, Inc., Associated General Contractors of New York State, LLC, The Business Council of New York State, Inc., National Roofing Contractors Association, Sheet Metal and Air Conditioning Contractors' National Association, and National Electrical Contractors Association submit this certificate of interested persons to fully disclose all those with an interest in this brief and provide the required information as to their corporate status and affiliations.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of FRAP Rule 28.2.1 have an interest in the outcome of this case, in addition to those listed in the briefs of the parties. These representations are made in order that the judges of this Court may evaluate potential disqualification or recusal.

A.    *Amicus Curiae* Associated General Contractors of America, Inc. has no parent corporation, but it does have two subsidiary corporations: Project Modeling, LLC and ConsensusDocs, LLC.  No publicly traded company owns 10% or more of Associated General Contractors of America, Inc. or its subsidiaries.

B.    *Amicus Curiae* Associated General Contractors of New York State, LLC is a private, non-profit trade association that is the New York State affiliate of

v

the Associated General Contractors of America, Inc. No publicly traded company owns 10% or more of Associated General Contractors of New York State, LLC.

C.    *Amicus Curiae* The Business Council of New York State, Inc. has no parent corporation and no publicly traded company owns 10% or more of The Business Council of New York State, Inc.

D.    *Amicus Curiae* National Roofing Contractors Association has no parent corporation and no publicly traded company owns 10% or more of National Roofing Contractors Association.

E.    *Amicus Curiae* Sheet Metal and Air Conditioning Contractors' National Association has no parent corporation and no publicly traded company owns 10% or more of Sheet Metal and Air Conditioning Contractors' National Association.

F.    *Amicus Curiae* National Electrical Contractors Association has no parent corporation and no publicly traded company owns 10% or more of National Electrical Contractors Association

G.    The above-listed *amici curiae* are represented by Murphy J. Foster, III, Esq. of Breazeale, Sachse & Wilson, L.L.P. and Joel M. Howard, III, Esq. and Charles G. Carluccio, Esq. of Couch White, LLP.

*/s/ Murphy J. Foster, III*
Murphy J. Foster, III
Breazeale, Sachse & Wilson, L.L.P.
One American Place
301 Main Street, Suite 2300
Baton Rouge, Louisiana 70801
Telephone: (225) 381-8015
Facsimile: (225) 381-8029
murphy.foster@bswllp.com

AND

Joel M. Howard, III
Charles G. Carluccio
Couch White, LLP
540 Broadway, P.O. Box 22222
Albany, New York 12201-2222
Telephone: (518) 426-4600
Facsimile: (518) 426-0376
jhoward@couchwhite.com
ccarluccio@couchwhite.com

*Counsel for Amicus Curiae
Associated General Contractors of
America, Inc., Associated General
Contractors of New York State, LLC,
The Business Council of New York
State, Inc., National Roofing
Contractors Association, Sheet Metal
and Air Conditioning Contractors'
National Association, and National
Electrical Contractors Association*

## INTEREST OF THE AMICI CURIAE[1]

Associated General Contractors of America, Inc. ("AGC of America") is the nation's largest and most diverse trade association in the commercial construction industry, now representing more than 28,000 member companies, which includes general contractors, specialty contractors, and service providers and suppliers to the industry through a nationwide network of chapters in all 50 states, the District of Columbia, and Puerto Rico. AGC of America represents both union and open-shop employers engaged in building, heavy, civil, industrial, utility, and other construction for both public and private property owners and developers. AGC of America works to ensure the continued success of the commercial construction industry by advocating for federal, state, and local measures that support the industry; by providing education and training for member firms; and by connecting member firms with resources needed to be successful businesses and responsible

---

[1] This brief was not authored in whole or in part by counsel for a party, and no other than *amici curiae* or their counsel made a monetary contribution to the preparation or submission of the brief. The *amici curiae* and its counsel have not represented the parties to this appeal in another proceeding involving similar issues. Associated General Contractors of America, Inc. has, however, along with other business groups coordinated by the National Federation of Independent Business Legal Center, jointly filed an *amicus* brief in the Eleventh Circuit in support of small business plaintiffs in the *National Small Business Association* case, arguing that the CTA is unconstitutional because it regulates beyond Congress's legislative powers.

corporate citizens. AGC of America represents the interest of its members in matters before Congress, the Executive Branch, and the courts.

Associated General Contractors of New York State, LLC ("AGC NYS") is a chapter of AGC of America, which represents over 28,000 general contractors, subcontractors, and specialty contractors in the construction industry. AGC NYS is a private, non-profit trade association representing approximately 250 construction managers and general contractors, running the gamut, from massive entities to local "Mom-and-Pop" businesses, as well as 85 subcontractors and 300 associate members conducting business throughout the State of New York.

AGC NYS members are responsible for performing the majority of New York State's private-and-public-sector contracts for the construction of highways, buildings, and heavy industrial and municipal utility facilities.

AGC of America's activities for its members encompass government representation, legal advocacy, education, workforce development, and training relating to the construction industry. As part of its legal advocacy, AGC of America regularly participates as *amicus curiae* in both state and federal jurisdictions throughout the country in support of its members and affiliates where the issues for consideration are of national and statewide significance to the construction industry. This is such a case, as the Government Appellants' appeal of the Amended Memorandum Opinion and Order of the United States District Court for the Eastern

District of Texas, Sherman Division, should be denied as it will create administrative chaos and uncertainty on construction contractors and subcontractors in the United States, to the detriment of the construction workforce, public owners, and taxpayers alike.

The Business Council of New York State, Inc. ("TBC") is the leading business organization in New York State, representing the interests of large and small firms throughout the state. TBC's membership is made up of more than 3,000 member companies, local chambers of commerce, and professional and trade associations. Though 76 percent of TBC's members are small businesses, it also represents some of the largest and most important corporations in the world. Combined, TBC members employ more than 1.2 million New Yorkers.

TBC serves as an advocate for employers in the state's political and policy-making arenas, working for a healthier business climate, economic growth, and jobs. TBC also helps its members cut costs and provides important benefits to their employees with group insurance programs that offer competitive costs and high-quality service. TBC's team also serves as an information resource center for its members, providing an array of news and updates, webinars, seminars, networking, and individualized regulatory and legislative assistance.

National Roofing Contractors Association ("NRCA") is one of the construction industry's most respected trade associations, the voice of roofing

3

professionals, and the leading authority in the roofing industry for information, education, technology, and advocacy. Since 1886, the NRCA has been the home for generations of entrepreneurial craftsmen and enterprises who shelter and protect America's families and businesses and each other.

The NRCA's nearly 4,000 members represent all segments of the roofing industry, including contractors, manufacturers, distributors, architects, consultants, engineers, building owners, and city, state, and government agencies. NRCA members are typically small, privately held companies with the average member employing 45 people and attaining sales of $4.5 million per year. The U.S. roofing industry is an essential $100 billion sector with nearly one million employees that provides critical materials and services to ensure home and business safety.

Sheet Metal and Air Conditioning Contractors' National Association ("SMACNA") is the leading association for sheet metal and HVAC contractors in the construction industry. SMACNA has 3,500 members nationwide with chapters in every state as well as international chapters in Canada, Brazil, and Australia. SMACNA members are union employers who complete projects for public and private owners & developers.

SMACNA works to ensure the success of the HVAC industry through advocacy work at local, state, and federal levels. SMACNA is heavily engaged in labor matters and supports harmonious labor relations in the industry. In addition,

4

SMACNA is a standards setting body and it is the leading developer of HVAC and architectural construction standards in the world. SMACNA's construction standards are used on all of the most complex construction projects in the United States.

National Electrical Contractors Association ("NECA") is a national trade association and the leading voice of the $240 billion electrical contracting industry that brings power, light, and communication technology to buildings and communities across the United States. NECA contractors are the technical professionals responsible for the most innovative and safest electrical construction in the United States. NECA collectively represents over 4,000 electrical contractor members served by 117 local chapters across the country.

Founded in 1901, NECA continues to build on a legacy of protecting the public and making innovation possible. NECA contractors strive to be solution-providers for their customers, and their industry expertise benefits everyone working on an electrical construction project.

## PRELIMINARY STATEMENT

On January 1, 2021, Congress enacted the Corporate Transparency Act ("CTA"), 31 U.S.C. § 5336, which was a federal attempt to regulate in an area of traditional state control. The CTA mandated that any "reporting company" file with the Financial Crimes Enforcement Network ("FinCEN") reports of all its "beneficial

ownership information." 31 U.S.C. § 5336(b)(1)(A). The CTA defines the term "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise, exercises substantial control over the entity." 31 U.S.C. § 5336(a)(3)(A). While the CTA itself does not define "substantial control," the final rule implementing the CTA, the "Reporting Rule," does under 31 C.F.R. § 1010.380(d)(1).

Plaintiffs-Appellees herein commenced an action in the United States District Court for the Eastern District of Texas, Sherman Division (the "District Court"), seeking an injunction prohibiting Defendants-Appellants from enforcing the CTA and its accompanying Reporting Rule and also seeking a declaratory judgment invalidating the CTA and the Reporting Rule.

On or about December 5, 2024, the District Court granted Plaintiffs-Appellees' motion for a preliminary injunction (the "Amended Memorandum Opinion and Order"). Defendants-Appellants now appeal the Amended Memorandum Opinion and Order.

While the CTA aims to combat money laundering and financial crimes, its compliance requirements place ongoing financial and administrative burdens on affected businesses, particularly small and mid-sized companies. This *amicus* brief outlines the direct and indirect costs of compliance, the legal risks involved, and the broader impact on corporate operations. For the reasons explained below, the Court

should affirm the District Court's preliminary injunction and immediately reinstate its postponement of the CTA Reporting Deadline.

## **LEGAL ARGUMENT**

### I.    **Initial and Ongoing Compliance Costs**

In their moving papers, Defendants-Appellants significantly downplay the costs associated with complying with the CTA and claim such costs are "minimal." To the contrary, as FinCEN recognized, the CTA and its Reporting Rule "will have a significant economic impact on a substantial number of small entities." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59550. Specifically, "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id*. at 59585. "Assuming that all reporting companies are small businesses, the burden hours for filing [beneficial ownership information] reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35 million in the years after. FinCEN estimates that the total cost of filing [beneficial ownership information] ("BOI") reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id*. at 59585-86. These costs arise for filing initial reports, reviewing information, and complying with ongoing duties to update them when information changes. *Id*.

Were the Court to reverse the Amended Memorandum Opinion and Order, it would require all businesses, including the members of *amici curiae* herein, to comply with the CTA and the Reporting Rules. These costs would be nonrecoverable if the CTA were to later be deemed unconstitutional. As the Court is aware, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

If the CTA is later found to be unconstitutional, another nonrecoverable harm associated with granting the Defendants-Appellants' appeal pending a decision on the merits of Plaintiffs-Appellees' constitutional challenge is the data submitted to FinCEN itself. As AGC of America noted in its comment letter to FinCEN during the rulemaking process[2], while AGC of America expects FinCEN to take precautions to ensure that its database of BOI is secure, any database—especially one that can be accessed by nearly 18,000 distinct jurisdictions—will face security vulnerabilities. In recent years, high profile breaches of sensitive federal databases, such as the 2015 exfiltration of personnel files from the Office of Personnel Management, the 2020 "SolarWinds" hack of multiple federal Department and Agencies, and the high profile—and unlawful—release of thousands of Suspicious

---

[2] https://www.regulations.gov/comment/FINCEN-2021-0005-0404

Activity Reports from FinCEN itself[3], reinforce the view that no database is fully secure, and that the BOI database will become a prime target of hackers and/or government employees "blinded by [their] own apparent sense of self-righteousness[4]" as the Department of Justice said in its sentencing motion of Natalie Mayflower Sours Edwards, who unlawfully disclosed the Suspicious Activity Reports collected by FinCEN.

In addition to these nonrecoverable costs, the administrative burden created by the CTA and the impending deadline to file will create institutional chaos. Complying with the CTA is not as simple as providing readily accessible information as Defendants-Appellants suggest. Businesses subject to the CTA must file an initial BOI and continually update FinCEN on any changes to ownership or control. These obligations result in ongoing costs, including administrative and filing costs, legal and consulting fees, and record-keeping expenses. While FinCEN does not currently charge a filing fee, businesses must allocate internal resources or hire compliance professionals to ensure proper data collection, reporting, and verification. Many companies must engage attorneys or compliance specialists to interpret CTA requirements, avoid penalties, and ensure accurate filings. Small businesses without dedicated legal teams face **higher relative compliance costs**.

---

[3]https://www.fincen.gov/news/news-releases/statement-fincen-regarding-unlawfully-disclosed-suspicious-activity-reports
[4] https://www.documentcloud.org/documents/20694929-82-main/

Additionally, continuous tracking of ownership changes is necessary, as any modifications must be reported within **30 days**. Businesses must establish internal monitoring procedures to ensure timely compliance.

As described above, there is also considerable ambiguity with regard to the identification of "beneficial owners" and the analysis requires expertise from both attorneys and accountants. This determination takes time and money and is a significant undertaking for all of the estimated 32.6 million small entities like Plaintiffs-Appellees and the members of *amici curiae* herein. This fact is even acknowledged by FinCEN, who recognizes that entities face different regulatory burdens depending on their beneficial ownership structure, with "simple," "intermediate," and "complex" structures facing differing obligations; with the burden on each filer to file initial reports as $85.14, $1,350.00, and $2,614.87, respectively; and the burden to update the reports for each filer as $37.84, $299.33, and $560.81, respectively.

The implications for non-compliance must also be addressed. The willful failure to report complete or updated beneficial ownership information to FinCEN, or the willful provision of or attempt to provide false or fraudulent beneficial ownership information, may result in civil and criminal penalties. When the CTA was passed, it provided for civil penalties of up to $500 for each day that the violation continues. As of 2024, the civil penalty has been adjusted to up to $591 per day to

account for inflation and will continue to be adjusted for inflation each year pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990. In addition, the CTA also provides for criminal penalties of imprisonment for up to two years and/or a fine of up to $10,000.

Both individuals and corporate entities can be held liable for willful violations including actually filing (or attempting to file) false information with FinCEN, providing the filer with false information to report, or willfully failing to report complete or updated beneficial ownership information.

Individuals who may be subject to civil and/or criminal penalties include individuals who willfully file a false or fraudulent beneficial ownership report on a company's behalf, senior officers of an entity that fails to file a required beneficial ownership information report, and individuals who willfully cause a reporting company's failure to submit complete or updated beneficial ownership information to FinCEN.

Accordingly, the public interest strongly favors this Court affirming and reinstating the universal preliminary injunction due to the significant administrative burden, nonrecoverable costs, and the potentially significant financial and criminal penalties associated with the implementation of the CTA. Forcing the public to comply with the CTA, even temporarily, comes with immediate and irreparable harm to millions of businesses, particularly small businesses, forcing them to expend

considerable resources on compliance efforts with uncertain legal outcomes. These costs, including legal fees and the time invested in gathering and verifying information, are nonrecoverable, representing a significant waste of resources if the CTA is eventually overturned. Furthermore, the substantial daily penalties for non-compliance create a chilling effect, potentially stifling economic activity and disproportionately affecting vulnerable businesses. Forcing businesses to comply with an uncertain and challenged law will undermine public confidence and hinder the ability of businesses to plan effectively, thus harming the overall economic climate. The public interest is served by affirming the District Court's universal preliminary injunction and maintaining the status quo until the CTA's constitutionality is decided, preventing the unnecessary expenditure of resources and mitigating the potential for widespread harm.

## II.   <u>Disproportionate Burden on Small Businesses</u>

The CTA exempts large publicly traded companies and certain regulated entities but applies to most small and mid-sized businesses. These companies bear a disproportionate burden due to limited resources, unanticipated financial strain, and barriers to business growth. Unlike large corporations with dedicated compliance departments, small businesses must divert time and money away from core operations to ensure CTA compliance. Many small businesses were unprepared for the CTA's requirements, leading to unexpected legal and administrative

expenses. Furthermore, ongoing compliance costs may discourage new business formations and deter investment in smaller enterprises.

Lastly, the CTA has introduced new complexities in corporate transactions, including delays in mergers and acquisitions, banking and financing hurdles, and operational disruptions. Buyers and investors now require proof of CTA compliance before proceeding with deals, adding another layer of due diligence. Financial institutions may request CTA compliance documentation before extending credit or opening accounts, potentially delaying access to capital. Additionally, businesses undergoing frequent ownership or control changes must continuously update their filings, leading to administrative inefficiencies.

While the CTA purports to serve an important policy objective, its compliance framework imposes significant and ongoing costs on businesses. The burdens of continuous reporting, legal risks, and administrative expenses disproportionately impact small and mid-sized businesses, potentially hindering economic growth and business efficiency. Companies must adopt proactive compliance strategies, including implementing tracking systems, engaging legal counsel, and ensuring timely reporting, to mitigate the risks associated with CTA compliance.

## **CONCLUSION**

Respectfully, given the foregoing, this Court should affirm the District Court's universal preliminary injunction.

Dated:     February 28, 2025          Respectfully submitted,
                Baton Rouge, Louisiana

BREAZEALE, SACHSE &
WILSON, L.L.P

*/s/ Murphy J. Foster, III*
Murphy J. Foster, III
One American Place
301 Main Street, Suite 2300
Baton Rouge, Louisiana 70801
Telephone: (225) 381-8015
Facsimile: (225) 381-8029
murphy.foster@bswllp.com

AND

COUCH WHITE, LLP

*/s/ Charles G. Carluccio*
Joel M. Howard, III
Charles G. Carluccio
540 Broadway, P.O. Box 22222
Albany, New York 12201-2222
Telephone: (518) 426-4600
Facsimile: (518) 426-0376
jhoward@couchwhite.com
ccarluccio@couchwhite.com

*Counsel for Amicus Curiae*
*Associated General Contractors of*
*America, Inc., Associated General*

*Contractors of New York State, LLC,*
*The Business Council of*
*New York State, Inc., National*
*Roofing Contractors Association,*
*Sheet Metal and Air Conditioning*
*Contractors' National Association,*
*and National Electrical Contractors*
*Association*

## CERTIFICATE OF COMPLIANCE

This brief contains 2,727 words.  The brief complies with the typeface and type-style requirements of FRAP 29(a)(5) and 32(a)(7)(B) because it was prepared using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ Murphy J. Foster, III*
Murphy J. Foster, III

Dated:  February 28, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the above Brief of Amicus of Associated General Contractors of America, Inc., Associated General Contractors of New York State, LLC, The Business Council of New York State, Inc., National Roofing Contractors Association, Sheet Metal and Air Conditioning Contractors' National Association, and National Electrical Contractors Association in support of Plaintiffs-Appellees' opposition to Defendants-Appellants' Appeal of the Amended Memorandum Opinion and Order with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the Appellate CM/ECF system. Participants in the case are registered CM/ECF users who will be served by the CM/ECF system.

*/s/ Murphy J. Foster, III*
Murphy J. Foster, III

Dated: February 28, 2025

5227669.v2