No. 24-40792

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., ET AL.,

Plaintiffs-Appellees,

V.

PAMELA BONDI, *U.S. Attorney General*, ET AL.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas (No. 4:24-CV-478)
(The Honorable Amos L. Mazzant, presiding)

## BRIEF FOR *AMICI CURIAE* THE PRIVATE INVESTOR COALITION, INC., AND S CORPORATION ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES

John C. Neiman, Jr.
C. William Courtney
 *Counsel of Record*
MAYNARD NEXSEN PC
1901 Sixth Ave. N,
Ste. 1700
Birmingham, AL 35203
Telephone: (205) 254-1000
jneiman@maynardnexsen.com

**Attorneys for Amici Curiae The Private Investor Coalition, Inc. and S Corporation Association**

# Supplemental Statement of Interested Persons

Pursuant to Fifth Circuit Rules 28.2.1 and 29.2, the undersigned counsel of record for Amici certifies that the following additional persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici:**

1. The Private Investor Coalition, Inc.
2. S Corporation Association

**Counsel:**

1. Maynard Nexsen P.C.
2. C. William Courtney
3. John C. Neiman, Jr.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Amici are non-profit organizations that provide compliance resources for private investors and closely held corporations. No party to this filing has a parent corporation, and no publicly held corporation owns 10% or more of the stock of any parties to this filing.

/s/ *John C. Neiman, Jr.*
John C. Neiman Jr.
Attorney of record for *Amici Curiae*

# TABLE OF CONTENTS

Supplemental Statement of Interested Persons ........................................ i

Table of Authorities ................................................................. iii

Statement of Interest of Amici ....................................................... 1

Argument ............................................................................ 3

    I.    The CTA's reporting requirements exceed Congress's enumerated powers and violate the Fourth Amendment. .......... 4

    II.   The plaintiffs' constitutional rights outweigh the Government's interest in rushing the implementation of the CTA's reporting requirements. ........................................... 15

    III.  The scope of the preliminary injunction is proper under the Administrative Procedure Act. ........................................... 23

Conclusion .......................................................................... 25

Certificate of Compliance ........................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Brown v. Texas,*
443 U.S. 47 (1979) .............................................................. 13

*Career Colleges & Schools of Texas v. United States Department of Education,*
98 F.4th 220 (5th Cir. 2024) ............................................ 24

*Cort v. Ash,*
422 U.S. 66 (1975) ............................................................... 7

*CTS Corp. v. Dynamics Corp. of America,*
481 U.S. 69 (1987) ............................................................... 7

*Deerfield Medical Center v. City of Deerfield Beach,*
661 F.2d 328 (5th Cir. 1981) ........................................... 19

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
561 U.S. 477 (2010) ............................................................. 8

*Gonzales v. Raich,*
545 U.S. 1 (2005) ................................................................. 7

*Katzenbach v. McClung,*
379 U.S. 294 (1964) ............................................................. 7

*Louisiana v. Biden,*
55 F.4th 1017 (5th Cir. 2022) .......................................... 22

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) ........................................ 12

*N.L.R.B. v. Noel Canning,*
573 U.S. 513 (2014) ............................................................. 9

*National Federation of Independent Business v. Sebelius,*
567 U.S. 519 (2012) .................................................... 3, 6, 7

*National Small Business United v. Yellen*,
    721 F. Supp. 3d 1260 (N.D. Ala. 2024) ........................................5, 6

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................11

*Smith v. U.S. Department of Treasury*,
    No. 6:24-cv-00336-JDK,
    2025 WL 41924 (E.D. Tex. Jan. 7, 2025) ........................................5

*Texas Top Cop Shop, Inc. v. Garland*,
    No. 24-40792,
    2024 WL 520313 (5th Cir. Dec. 23, 2024) (per curiam) ................19

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ..................................................16, 17

*United States v. Lopez*,
    514 U.S. 549 (1995) ..........................................................................6

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020) ........................................................16

*Veronia Sch. Dist. 47J v. Acton*,
    515 U.S. 646 (1995) ......................................................................15

*Wickard v. Filburn*,
    317 U.S. 111 (1942) ........................................................................7

**STATUTES**

12 U.S.C. § 3401 ................................................................................21

26 U.S.C. § 6103 ................................................................................21

31 U.S.C. § 5336 ...........................................................................6, 17

5 U.S.C. § 552a ..................................................................................21

5 U.S.C. § 705 ....................................................................................23

iv

**REGULATIONS AND ADMINISTRATIVE MATERIALS**

Anti-Money Laundering Regulations for Residential Real Estate Transfers,
89 Fed. Reg. 12,424 (Feb. 16, 2024)...........................................9, 10

Beneficial Ownership Information Reporting Requirements,
87 Fed. Reg. 59,498 (Sept. 30, 2022) ..................................11, 13, 17

Financial Crimes Enforcement Network,
*Beneficial Ownership Information Frequently Asked Questions* (Dec. 2024 update)...........................................................20

Financial Crimes Enforcement Network,
*FinCEN Not Issuing Fines or Penalties in Connection with Beneficial Ownership Information Reporting Deadlines* (Feb. 27, 2025)................................................................................18

Financial Crimes Enforcement Network,
*READOUT: FinCEN Deputy Director's Travel to Houston, TX Area for Beneficial Ownership Outreach Events with Members of Congress* (Aug. 15, 2024)...............................................20

Financial Crimes Enforcement Network,
*Small Entity Compliance Guide* (Dec. 2024)..................................14

**CONGRESSIONAL CORRESPONDENCE**

Letter from Lisa McClain et al. to Janet Yellen et al., Nov. 5, 2024 .....17

Amici are associations that represent the interests of thousands of law-abiding people whose sensitive personal information will be added to a criminal law-enforcement database under FinCEN's Reporting Rule, even though the Government does not have any suspicion that they have committed crimes. Many of Amici's members—in reliance on various court orders and FinCEN's deadline extensions—have not yet filed Beneficial Ownership Information ("BOI") reports. Amici have a strong interest in ensuring that the District Court's injunction is maintained.

The first Amicus on this brief, The Private Investor Coalition, Inc., is a coalition of dozens of single-family offices and many more individual investors and business owners who share a common interest in public-policy issues impacting the single-family-office community. It monitors legislative and regulatory developments in Washington and serves as the primary resource for timely information and guidance related to compli-

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amici curiae or their counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

ance topics specific to single-family offices. Each year, The Private Investor Coalition's members form numerous LLCs, corporations, and other entities. Those members will therefore be subject to the Corporate Transparency Act's reporting requirements, whether or not these entities and individuals ever engage in commercial transactions and even though they are not suspected of wrongdoing.

The second Amicus on this brief, S Corporation Association, represents companies organized as S corporations and the trade associations that have them as members, acting as the "eyes and ears" for America's S corporation community in Washington. Its mission is to protect America's individually and family-owned businesses from excessive taxes and government mandates while working to ensure that America's most popular corporate structure remains competitive in the Twenty-First Century. Many of the Association's members will be required to report sensitive personal information to FinCEN, whether or not they engage in commercial transactions and even though they are not suspected of wrongdoing.

**ARGUMENT**

This case is less about corporate entities than it is about the real people who form them. On the Government's telling, the Corporate Transparency Act's reporting requirements are focused on people "using anonymous shell companies to conduct illicit transactions." Br. of Appellants at 1. But no one suspects the people who own and control Amici's members of criminal activity, and the CTA's information-collection regime is indifferent to any actual transactions Amici's members may engage in. Why, then, may these people—along with almost every person who forms a corporate entity in the United States—be compelled to submit sensitive personal information to a criminal law-enforcement database? In a nation founded on principles of limited government and individual liberty, there is no good answer.

The Government can attempt to justify the CTA's dragnet approach only by resorting to a theory of governmental power that the Supreme Court rejected for "fundamentally changing the relation between the citizen and the Federal Government." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 555 (2012). The Government argues that Congress's power

reaches entities and real people who are not engaged in regulated conduct, simply because their information might be helpful or convenient to the Government in prosecuting those who are engaged in the regulated conduct. And it presses that argument with hardly a glance at the Fourth Amendment's limits on the government's ability to demand evidence from the innocent.

The Court should reject the Government's reckless constitutional arguments and affirm the District Court. The plaintiffs are likely to succeed on the merits of both their Commerce Clause and Fourth Amendment challenges. The equities favor the plaintiffs. And the District Court adhered to circuit precedent when it fashioned a remedy.

## I. The CTA's reporting requirements exceed Congress's enumerated powers and violate the Fourth Amendment.

The District Court concluded correctly that the plaintiffs are likely to succeed on the merits. The plaintiffs' Commerce Clause challenge to the CTA is likely to succeed because the CTA does not regulate economic activity, but instead the mere potential of economic activity. The plaintiffs are also likely to succeed in their Fourth Amendment challenge, because the CTA collects sensitive personal information for the purpose of criminal law enforcement without a warrant. The Court must evaluate

the Fourth Amendment as part of its consideration of the Government's argument under the Necessary and Proper Clause.

1. Three District Courts have explained in detail why the CTA exceeds Congress's enumerated powers—in the 79-page opinion in this case, in the 34-page opinion issued last month by the Eastern District of Texas in *Smith v. U.S. Department of Treasury*, ___ F. Supp. 3d ____, No. 6:24-cv-336-JDK, 2025 WL 41924 (E.D. Tex. Jan. 7, 2025), and in the 53-page opinion issued last March by the Northern District of Alabama, *National Small Business United v. Yellen*, 721 F. Supp. 3d 1260 (N.D. Ala. 2024). The Government's position on this issue has evolved over the course of those cases. The fact that it is *still* grasping for a theory to sustain the CTA shows that none exists.

The Government's current line is that the CTA passes Commerce Clause muster because it "regulates a core economic activity: the ownership and operation of a business." Br. of Appellants at 18. But the CTA does not in fact target the act of owning or operating businesses. The triggering act for regulation is instead, in the statute's words, "creat[ing]" or "regist[ering]" a corporate entity—whether or not it will ever engage in business or any other form of commerce—by submitting documents to

a state or local official such as a Secretary of State. 31 U.S.C. § 5336(a)(11). That act is not commercial: as the Northern District of Alabama explained in its opinion, "the Government concedes that 'submitting documents to a Secretary of State' does not 'implicate the Commerce Clause.'" *Nat'l Small Bus. United,* 721 F. Supp. 3d at 1282 (alterations adopted). The CTA, moreover, "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the" act of incorporation "in question affects interstate commerce." *United States v. Lopez*, 514 U.S. 549, 561 (1995).

At times, the Government takes an even more aggressive course and argues that the Commerce Clause allows regulation not of commercial activity itself, but of entities that, as a class, have the "ability and propensity" to engage in commercial activity. Br. of Appellants at 13, 26–27. That argument is foreclosed by *National Federation of Independent Business v. Sebelius*. There, the Supreme Court rejected "[t]he proposition that Congress may dictate the conduct of an individual today because of prophesied future activity." 567 U.S. at 557. The Commerce Clause supports congressional enactments when they regulate actual economic activity, not the "ability and propensity" for it. *See Gonzales v. Raich*, 545

U.S. 1, 7 (2005) (cannabis "cultivat[ion]"); *Katzenbach v. McClung*, 379 U.S. 294, 297 (1964) (restaurants' "refus[al] to serve"); *Wickard v. Filburn*, 317 U.S. 111, 118 (1942) (wheat "production"). On the Government's theory, Congress could pass a statute requiring disclosures not only from reporting companies, but from every *individual person* in the United States—because every individual person, too, has the "ability and propensity" to engage in commercial transactions. The Supreme Court has already observed "how far that logic would carry us from the notion of a government of limited powers" and rejected the Government's theory. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 552.

The Government's suggestion that Congress may regulate corporate actors as such—without regard to their actual corporate activity—flies in the face of America's entire experience with corporate law. "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). Because "[c]orporations are creatures of state law," it has been understood from the beginnings of American corporate law that "state law will govern the internal affairs of the corporation." *Cort v. Ash*, 422 U.S. 66, 84 (1975). The Commerce

Clause may empower Congress to regulate the commercial *activity* of corporations. But the direct regulation of corporate *existence*—including corporate ownership (as distinct from, for example, securities offerings)—has always been a matter of state law.

"'Perhaps the most telling indication of [a] severe constitutional problem . . . is the lack of historical precedent for'" a law. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting)). The Government is unable to point to a single historical example of federal regulation of a corporation's mere existence or ownership, including beneficial ownership. The Government does assert that "Congress's long and extensive history of regulating commercial enterprises" supports the CTA. Br. of Appellants at 30. But each example it cites involves the regulation of corporate activity, such as "anti-competitive conduct," payment of a "minimum wage," "workplace health and safety standards," "discrimination," or "the issuance of securities." *Id.* "[W]e interpret the Constitution in light of . . . our whole experience as a Nation" and "look to the actual practice of Government to inform our interpretation." *N.L.R.B. v. Noel Canning*, 573 U.S.

513, 557 (2014) (internal quotation marks omitted). Until the CTA, Congress never used the Commerce Clause to regulate corporate existence or ownership, matters left solely to state law. The meaning of the Commerce Clause is reflected by that long understanding; the novel theory underlying the CTA is not faithful to the text.

FinCEN itself admitted in a recent rulemaking that the CTA's reporting requirements have nothing to do with actual economic activity. In justifying its rule on Residential Real Estate Transfers—which was not premised on the CTA—FinCEN distinguished that rule from the CTA and acknowledged that the CTA's "ability and propensity" approach marks a different and more expansive view of congressional power than what our constitutional order normally envisions:

> *In contrast to the beneficial ownership requirements outlined in the CTA*, this proposed rule is a tailored reporting requirement that would capture a particular class of *activity* that Treasury deems high-risk and that warrants reporting on a *transaction-specific* basis.

Anti-Money Laundering Regulations for Residential Real Estate Transfers, 89 Fed. Reg. 12,424, 12,424 (Feb. 16, 2024) (emphasis added). FinCEN further explained that the Residential Real Estate Transfer rule

was needed because the CTA's reporting requirements are triggered by an entity's existence, not its conduct:

> While beneficial ownership information collected under the CTA may be available, that information concerns *the ownership composition* of a given entity *at a given point in time*. As such reporting does not dynamically extend to include information *on the market transactions* of the beneficially owned legal entity, it *would not alert law enforcement officials focused on reducing money laundering that any [transaction] had been conducted.*

*Id.* at 12,447 (emphasis added).

As FinCEN's statements acknowledge, the CTA does not target commercial activity or commercial information. It targets "entit[ies]" and their "owner[s]" instead. *Id.* Likewise, the CTA does not collect this sensitive personal information for the purposes of regulating "transactions." *Id.* It instead does so, by FinCEN's admission, for criminal "law enforcement" purposes—purposes that are unjustified as to the overwhelming majority of law-abiding citizens forced to comply with this statute. *Id.* These considerations take the CTA outside the Commerce power.

2. It also is telling that the Government avoids addressing the CTA's incompatibility with the Fourth Amendment, which is striking in light of FinCEN's statements that it is gathering beneficial-ownership

information for criminal "law enforcement" purposes. Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498, 59,504 (Sept. 30, 2022). To be sure, the District Court had no reason to "assess Plaintiffs' . . . challenge[ ] under the . . . Fourth Amendment[ ]" because it "determined that the CTA is not justified by the Commerce Clause nor the Necessary and Proper Clause." ROA.437. But the Government's argument that this Court should sustain the CTA under the Necessary and Proper Clause puts the Fourth Amendment problem in full view.

"[T]he Necessary and Proper Clause" is "the last, best hope of those who defend ultra vires congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). And the amalgamation of powers that the Government cites to support the CTA's reporting requirements reflects the impossibility of its task. The Government now contends that the CTA's reporting requirements are within the ambit of the Necessary and Proper Clause because Congress determined—among other things—that the requirements "would be highly useful in enabling investigators to detect financial crimes," that they would secure "national security interests" by helping counteract "the financing of terrorism," that they would help "restrict harmful forms of foreign commerce" like "terrorist financing and

other financial crimes," and that they would "effectuate[ ] the President's executive Power . . . by facilitating law enforcement efforts." Br. of Appellants at 32–35 (internal quotation marks omitted).

Even if the Court accepts the argument that the CTA's reporting requirements are "necessary" to effectuate the scattershot list of law-enforcement powers in the Government's brief, it may uphold the CTA under the Necessary and Proper Clause only if the reporting requirements are also "proper." And that analysis will require the Court to contend with the plaintiffs' Fourth Amendment arguments. As Chief Justice Marshall stated 200 years ago, federal regulation is not proper for purposes of the Necessary and Proper Clause if the regulation is "prohibited" by the Constitution or otherwise inconsistent with its "letter and spirit." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).

Because the CTA is not consistent with the Fourth Amendment, it is not a proper means to effectuate any governmental power. The CTA works a paradigmatic Fourth Amendment violation by requiring individuals to disclose sensitive personal information to the Government for criminal law-enforcement purposes without a warrant, probable cause, or even reasonable suspicion, under threat of imprisonment. *See Brown*

*v. Texas*, 443 U.S. 47, 49, 52 (1979). FinCEN's own statements establish as much.

FinCEN has not been coy about the fact that the CTA is designed to obtain information for criminal investigations and prosecutions while working an end-run around the warrant requirement. FinCEN's then-Director testified to Congress that the CTA was needed because identifying beneficial owners "often requires," among other things, "grand jury subpoenas, surveillance operations," and—critically—"search warrants," which he complained "takes an enormous amount of time" and "wastes resources." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,504. But what he referred to as "waste[ ]" is the process the Fourth Amendment mandates to protect personal liberty—requiring the Government to invest the "time" and "resources" needed to obtain warrants, and to have, at the very least, reasonable suspicion that wrong-doing has occurred before it forces citizens to disclose private information for criminal law-enforcement purposes. *Id.* The CTA casts all that aside for the sake of administrative ease.

Nor has FinCEN been shy about the fact that its information-gathering regime is backed by the threat of imprisonment. FinCEN announced that if "an individual who qualifies as a beneficial owner or a company applicant . . . refuse[s] to provide information" to a reporting company knowing that the entity "would not be able to provide complete beneficial ownership information to FinCEN without it," then FinCEN will consider that person "subject to civil and/or criminal penalties" under the CTA. Financial Crimes Enforcement Network, *Small Entity Compliance Guide* 15 (Dec. 2024), https://www.fincen.gov/sites/default/files/shared/BOI_Small_Compliance_Guide.v1.1-FINAL.pdf. The CTA cannot survive Fourth Amendment scrutiny.

The Government does not address the Fourth Amendment in its brief. The closest it comes are assertions that the Supreme Court has upheld other registration requirements under the Necessary and Proper Clause, and that there is nothing extraordinary about a law "requiring the submission of information." Br. of Appellants at 27–28, 31–32 (internal quotation marks omitted). But none of the precedents cited by the Government requires disclosure, as the CTA does, of information that is

to be used for the express purposes of *criminal investigation and prose-cution.* "Where a search is undertaken by law enforcement officials to dis-cover evidence of criminal wrongdoing," the special-needs exception to the Fourth Amendment does not apply, and "reasonableness generally requires the obtaining of a judicial warrant." *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). The CTA and the Reporting Rule violate the Fourth Amendment, and the Government's arguments for reversal put the issue squarely before the Court.

## II. The plaintiffs' constitutional rights outweigh the Government's interest in rushing the implementation of the CTA's reporting requirements.

The District Court correctly concluded that the balance of the equities favors the plaintiffs. The Government significantly overstates the weight of its interests. And it completely ignores the significant weight that must be afforded to the plaintiffs' Fourth Amendment rights. If the Court agrees that the CTA is likely unconstitutional, the equities do not present an obstacle to affirming the District Court.

1. To start, the Government is wrong when it asserts that "any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."

Br. of Appellants at 39 (alteration adopted) (internal quotation marks omitted). To be sure, this Court finds irreparable harm when "'a *State* is enjoined'" from effectuating a democratically enacted statute. *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (emphasis added) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But the Government alters that quotation to include "a [government]," not merely a State. Br. of Appellants at 39 (internal quotation marks omitted). That extension of the rule makes no sense.

The fact that the *federal* Government is prevented from enforcing *federal* law by a *federal* court does not establish irreparable injury. The rule that an injunction against the enforcement of state law gives rise to irreparable injury reflects principles of comity and federalism. But those concerns are absent when a federal court enjoins enforcement of federal law. As this Court has recognized, the federal government cannot "demonstrate[ ] that it will be irreparably injured" by simply claiming that a federal court's "injunction" against a federal law "offends separation of powers and federalism." *Texas v. United States*, 787 F.3d 733, 767 (5th Cir. 2015) (internal quotation marks omitted). In federal cases about federal law, "it is the resolution of the case on the merits, not whether

the injunction is stayed pending appeal, that will affect those principles."
*Id.* at 768.

The Government's reliance on its law-enforcement interest is likewise overstated. The text and structure of the CTA show that Congress did not share the Government's urgency in collecting BOI reports. In enacting the CTA, Congress called for a reporting deadline of "not later than 2 years after the effective date of the regulations" for existing entities. 31 U.S.C. § 5336(b)(1)(B). Those regulations became effective on January 1, 2024. *See* Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498. In Congress's view, therefore, the need to gather beneficial-ownership information was not so pressing as to necessitate a deadline earlier than January 1, 2026. Accordingly, 44 Members of Congress recently urged FinCEN to push back the BOI filing deadline, citing the CTA's two-year timeframe to explain that "[a] delay of the . . . filing deadline" would be "in line with Congressional intent." Letter from Lisa McClain et al. to Janet Yellen et al., Nov. 5, 2024, https://perma.cc/Y59V-PUPU. The timeline established by Congress allows ample room to liti-

gate the serious constitutional questions presented by the CTA. The Government's law-enforcement interest does not justify cutting that time short.

FinCEN's actions since the Government and the plaintiffs filed their opening briefs confirm that the preliminary injunction does not irreparably harm the Government's law-enforcement interests. On February 27, "FinCEN announced that it will not issue any fines or penalties or take any other enforcement actions against any companies based on any failure to file or update beneficial ownership information (BOI) reports pursuant to the Corporate Transparency Act by the current deadlines." Financial Crimes Enforcement Network, *FinCEN Not Issuing Fines or Penalties in Connection with Beneficial Ownership Information Reporting Deadlines* (Feb. 27, 2025), https://fincen.gov/news/news-releases/fincen-not-issuing-fines-or-penalties-connection-beneficial-ownership. Instead, sometime before March 21, "FinCEN intends to issue an interim final rule that extends BOI reporting deadlines." *Id.* FinCEN's representations to this Court that "[e]njoining the CTA would hinder the government's efforts to counter" "threat[s] . . . to national security" and serious "financial crimes" cannot be taken seriously in light of FinCEN's

completely voluntary decision to delay implementation of the CTA yet again. Br. of Appellants at 40–41 (internal quotation marks omitted).

2. On the other side of the ledger, failing to enjoin the CTA will expose the plaintiffs to a significant Fourth Amendment injury. The Government's brief makes no mention of the privacy harms associated with the compelled disclosures. The motions panel's now-vacated stay order similarly brushed these privacy incursions aside as "immaterial." *Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5203138, at *6 n.6 (5th Cir. Dec. 23, 2024) (per curiam). But the CTA's invasion of Amici's privacy rights amounts to "irreparable injury," because "once an infringement has occurred it cannot be undone." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). And the plaintiffs raised Fourth Amendment arguments that were at least as strong as their Commerce Clause challenge. *See supra* at 10–15. It would be a cruel irony if the plaintiffs' successful Commerce Clause challenge caused their also-weighty Fourth Amendment interests to drop out of the picture.

Ultimately, the CTA's regulatory target is not the conduct of commercial entities, but instead the privacy of the *people* who own reporting

entities. The Government has been forthright about that reality. FinCEN has said that the law seeks to "support[] law enforcement efforts" by "requir[ing] many small businesses to report basic information to the Federal government about *the real people* who ultimately own or control them." Financial Crimes Enforcement Network, *READOUT: FinCEN Deputy Director's Travel to Houston, TX Area for Beneficial Ownership Outreach Events with Members of Congress* (Aug. 15, 2024), https://www.fincen.gov/news/news-releases/readout-fincen-deputy-directors-travel-houston-tx-area-beneficial-ownership (emphasis added). Defending the CTA in the Eleventh Circuit, the Government asserted that the statute is specifically designed to "identify *the human beings* behind the corporate form." Reply Br. for U.S., *Nat'l Small Business United v. Yellen*, No. 24-10736, 2024 WL 2890219, at *4 (June 3, 2024) (emphasis added). FinCEN is relentless in that aim, even interpreting the CTA to require information about the minor beneficiaries of trusts and the spouses of beneficial owners. Financial Crimes Enforcement Network, *Beneficial Ownership Information Frequently Asked Questions* 25–26, 28 (Dec. 2024 update), https://www.fincen.gov/sites/default/files/shared/BOI-FAQs-QA-508C.pdf.

The real people targeted by the CTA face unprecedented privacy risks. Other kinds of personal information that people give the Government are protected by the Privacy Act of 1974, which generally precludes the Government from using information collected for one reason for incompatible purposes. *See* 5 U.S.C. § 552a. Personal information given to federally regulated financial institutions is likewise protected under the Right to Financial Privacy Act of 1978, which generally requires the Government to obtain a warrant, subpoena, or other form of process before it can access a citizen's personal information without their consent. *See* 12 U.S.C. § 3401 *et seq*. Tax information collected by the Government is protected under the Internal Revenue Code, which generally requires a court order before the IRS may share information with non-tax enforcement agencies. *See* 26 U.S.C. § 6103.

The CTA provides no similar panoply of protections. If Amici's members and millions of other citizens and businesses are forced to hand over private information for a criminal-investigation database, the privacy bell will be incapable of being un-rung. The Court should give significant weight to the plaintiffs' Fourth Amendment rights in its analysis of the equities.

The plaintiffs' non-privacy interests also support the District Court's injunction. The only interest of the plaintiffs that the Government acknowledges in its brief is the "$85's worth of time" that "FinCEN estimated that a typical, simple company would spend . . . to complete and file" a BOI report. Br. of Appellants at 41. The Government brushes that interest aside as "minimal." *Id.* Of course, the Government ignores the reality that, taking the affected individuals as a whole, "FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. at 59,585–86. A $22.7 billion price tag could only be deemed "minimal" in the Government's eyes. Br. of Appellants at 41.

The plaintiffs' compliance costs are sufficient to support the injunction. "[W]hen determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) (alteration adopted) (internal quotation marks omitted). Under this Court's precedents, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Id.*

### III. The scope of the preliminary injunction is proper under the Administrative Procedure Act.

As a last-ditch effort, the government argues that—even if the Court agrees with the plaintiffs that the CTA is likely unconstitutional—FinCEN may enforce the Reporting Rule against anyone who did not sue separately to protect their own constitutional rights. See Br. of Appellants at 42–48. But the review provisions of the Administrative Procedure Act guard against that kind of patchwork regulatory enforcement. The District Court followed circuit precedent interpreting the Administrative Procedure Act when it crafted the scope of the preliminary injunction.

Section 705 of the Administrative Procedure Act gives courts the power to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is pending review. 5 U.S.C. § 705. The plaintiffs consistently asked the District Court to exercise that power. The plaintiffs pleaded a claim challenging the Reporting Rule under the Administrative Procedure Act. ROA.40. They sought in their complaint "an injunction prohibiting Defendants from enforcing the Corporate Transparency Act and the Reporting Rule pursuant to" Section 705 of the Administrative Procedure Act. ROA.41. The plaintiffs likewise

asked the District Court in their motion for a preliminary injunction to "enjoin the rule" pursuant to the Administrative Procedure Act. ROA.152. And the District Court did rely on Section 705 to grant the plaintiffs' motion. ROA.525.

The District Court's broad remedy was a proper exercise of its power under the Administrative Procedure Act. This Court has already rejected the argument that Section 705 relief must be limited to the parties. Instead, it "conclude[d] that the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. denied in relevant part sub nom. Dep't of Educ. v. Career Colleges & Sch. of Tex.*, No. 24-413, 604 U.S. ___, 2025 WL 65914 (Jan. 10, 2025). Therefore, when a plaintiff shows that he is entitled to preliminary relief because a challenged administrative rule is unlawful, a district court must "postpone the effective date . . . of the Rule pending final judgment" by "enter[ing a] preliminary injunction." *Id.* at 256. The District Court simply followed circuit precedent

when it granted a universal remedy under the Administrative Procedure Act.

**CONCLUSION**

This Court should affirm.

Respectfully submitted,

<u>s/ John C. Neiman, Jr.</u>
John C. Neiman, Jr.
C. William Courtney
*Counsel of Record*
MAYNARD NEXSEN PC
1901 Sixth Ave. N,
Ste. 1700
Birmingham, Alabama 35203
T: (205) 254-1000
jneiman@maynardnexsen.com
wcourtney@maynardnexsen.com

*Counsel for Amici Curiae*

March 4, 2025

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the font and word limitations of Rules 27(d) and 32(a)(7). According to the word count function in Microsoft Word, the pertinent parts of this document contain 4,591 words. This document uses Century Schoolbook font in 14-point type.

s/ John C. Neiman, Jr.
OF COUNSEL