No. 24-40792

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

PAMELA BONDI, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Texas, Sherman Division
No. 4:24-cv-478

**BRIEF FOR THE SECRETARIES OF STATE OF IDAHO, ALABAMA, INDIANA, IOWA, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, NEW HAMPSHIRE, NORTH DAKOTA, OHIO, SOUTH DAKOTA, TENNESSEE, AND WEST VIRGINIA, AND THE UTAH DIVISION OF CORPORATIONS AND COMMERCIAL CODE, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

Idaho Office of the Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
michael.zarian@ag.idaho.gov
doug.werth@labor.idaho.gov

ALAN M. HURST
  *Solicitor General*

MICHAEL A. ZARIAN
  *Deputy Solicitor General*

DOUGLAS A. WERTH
  *Deputy Attorney General*

*Counsel for Amici*

## R<small>ULE</small> 28.2.1 S<small>TATEMENT</small>

Case No. 24-40792

*Texas Top Cop Shop, Inc., et al. v. Pamela Bondi, et al.*

The Secretaries of State of Idaho, Alabama, Indiana, Iowa, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, South Dakota, Tennessee, and West Virginia, and the Utah Division of Corporations and Commercial Code, as governmental *amici curiae*, need not furnish a certificate of interested persons under Fifth Circuit Rule 28.2.1.

/s/ *Alan M. Hurst*
Alan M. Hurst

# TABLE OF CONTENTS

RULE 28.2.1 STATEMENT ..................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ............................................. 1

ARGUMENT .......................................................................................................... 2

   I. The Federal Government May Not Force States to Help Implement the CTA. ................................................................................................. 2

   II. States Should Be Left to Regulate Corporate Law Without Federal Intrusion. ........................................................................................... 10

CONCLUSION .................................................................................................... 12

# Table of Authorities

**Cases**

*Bond v. United States*,
  564 U.S. 211 (2011) ................................................................................................3

*Burks v. Lasker*,
  441 U.S. 471 (1979) ..............................................................................................10

*City of El Cenizo, Texas v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ..................................................................................4

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) ................................................................................................10

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ..............................................................................................11

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ................................................................................................3

*Hay v. Waldron*,
  834 F.2d 481 (5th Cir. 1987) ..................................................................................2

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ................................................................................10

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ..................................................................................................2

*Missouri v. Jenkins*,
  495 U.S. 33 (1990) ..................................................................................................9

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ................................................................................. 1, 2, 4, 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ....................................................................................... 10, 11

*New York v. United States*,
  505 U.S. 144 (1992) ................................................................................................5

*Printz v. United States*,
  521 U.S. 898 (1997) ................................................................................................4

*S. Dakota v. Dole*,
  483 U.S. 203 (1987) ......................................................................................... 6, 12

*Sturges v. Crowninshield*,
  17 U.S. 122 (1819) ..................................................................................................3

*Texas Top Cop Shop, Inc. v. Garland*,
  2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) .................................................. 3, 10, 11

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ............................................................................... 4

*Voeller v. Neilston Warehouse Co.*,
  311 U.S. 531 (1941) ........................................................................................ 3, 9

**STATUTES**

31 U.S.C. § 5336 ................................................................................................ 1, 4, 5

Idaho Code § 30-25-201 ......................................................................................... 11

Idaho Code § 30-29-201 ......................................................................................... 11

Idaho Code § 30-29-202 ......................................................................................... 11

Utah Code § 13-1a-1 ................................................................................................. 1

**OTHER AUTHORITIES**

87 Fed. Reg. 59498 (2022) ........................................................................... 5, 6, 7, 11

Frank LaRose, Ohio Secretary of State, Comment Letter on Proposed Rule to
  Beneficial Ownership Reporting Requirements (Feb. 7, 2022) ........................... 6

Gary Lawson, *A Truism with Attitude: The Tenth Amendment in Constitutional Context*,
  83 Notre Dame L. Rev. 469 (2008) ...................................................................... 4

Holli Sullivan, Indiana Secretary of State, Comment Letter on Proposed Rule to
  Beneficial Ownership Reporting Requirements (Feb. 7, 2022) ........................... 6

Monthly Roundup of Beneficial Ownership Reporting Outreach Activities and
  Preview of Upcoming Events, FinCEN (July 12, 2024) .................................. 1, 7

National Defense Authorization Act, Pub. L. 116-283, § 6402,
  134 Stat. 3388 (2021) ........................................................................................... 9

William Cary, *Federalism and Corporate Law: Reflections Upon Delaware*,
  83 Yale L.J. 663 (1974) ...................................................................................... 11

### INTRODUCTION AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are 17 State secretaries of state[2] who have been compelled to help the Financial Crimes Enforcement Network (FinCEN) implement the Corporate Transparency Act (CTA). 31 U.S.C. § 5336. *Amici* were not given a choice whether to lend assistance; rather, the responsibility has been foisted upon them by the CTA, which demands that all state agencies "cooperate with and provide information" to FinCEN as it administers the CTA. *Id.* § 5336(d)(2). This cooperation has imposed substantial costs on *amici*, including the cost of fielding thousands of calls from constituent business owners about the CTA and sending multiple mass emails with updates on CTA litigation.

The CTA violates the Tenth Amendment's anti-commandeering doctrine by forging this mandatory "partnership" between FinCEN and secretaries of state.[3] "The Federal Government may not command the States' officers . . . to administer or enforce a federal regulatory program," yet that's exactly what the CTA does. *Murphy v. NCAA*, 584 U.S. 453, 473 (2018) (cleaned up). It's easy to see why Congress chose to enlist States' help—the CTA is a federal government foray into the regulation of corporate

---

[1] Pursuant to Rule 29(a), *amici* state that all parties have given consent to file this amicus brief. No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to fund the preparation or submission of this brief.

[2] As used in this brief, "secretary of state" includes the Utah Division of Corporations and Commercial Code. 31 U.S.C. § 5336(e)(2)(A)(i) (imposing duties on the "secretary of a State or a similar office in each State"); Utah Code § 13-1a-1.

[3] Monthly Roundup of Beneficial Ownership Reporting Outreach Activities and Preview of Upcoming Events, FinCEN (July 12, 2024), https://tinyurl.com/5b96sz79.

governance, a traditionally State-run domain, and States possess the information, relationships, and expertise the CTA needs to succeed. But the fact that the federal government so sorely needs State assistance is not a license to conscript it. Instead, that fact should have been a red flag to Congress that it lacked Article I authority to enact the CTA to begin with, as the district court in this case correctly concluded.

The federalism harms and ongoing State costs inflicted by the CTA's violation of the anti-commandeering doctrine are yet another reason why the public interest weighs in favor of affirming the injunction against the CTA. *See Hay v. Waldron*, 834 F.2d 481, 485 (5th Cir. 1987) (injunctive relief must "reflect a sensitivity towards principles of federalism"). Regulation of corporations should be left to the States, who are best situated to determine for themselves whether to require citizens to disclose beneficial ownership information.

**ARGUMENT**

**I.　The Federal Government May Not Force States to Help Implement the CTA.**

The Tenth Amendment may be "merely declaratory," *McCulloch v. Maryland*, 17 U.S. 316, 363 (1819), but the principle it declares is the cornerstone of our Nation's federalist system. Briefly stated, the Amendment makes clear that "[t]he Constitution confers on Congress not plenary legislative power but only certain enumerated powers," and "all other legislative power is reserved for the States." *Murphy v. NCAA*, 584 U.S. 453, 471 (2018). In this way, "[t]he principles of limited national powers and state

sovereignty are intertwined"—"action that exceeds the National Government's enumerated powers undermines the sovereign interests of States." *Bond v. United States*, 564 U.S. 211, 225 (2011).

The district court in this case therefore correctly recognized that it "safeguard[s] the promises of the Tenth Amendment" to enjoin the CTA's requirement that beneficial owners of corporations report their personal information. *Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220, at *17 (E.D. Tex. Dec. 5, 2024). That requirement cannot be justified by any enumerated power of Congress, so States—whose "exclusive province" it is to regulate corporate law, *Voeller v. Neilston Warehouse Co.*, 311 U.S. 531, 535 (1941)—must retain the authority to decide for themselves what information to request of corporate owners. *See Sturges v. Crowninshield*, 17 U.S. 122, 193 (1819) ("[T]he powers retained by the States . . . remain, after the adoption of the constitution, what they were before, except so far as they may be abridged by that instrument.").

But there's another aspect of the CTA that transgresses the Tenth Amendment's guarantee—the CTA's conscription of secretaries of state to help implement the Act violates the Tenth Amendment's anti-commandeering doctrine.

"It is well established that the Tenth Amendment bars Congress from commanding the States' officers . . . to administer or enforce a federal regulatory program." *Haaland v. Brackeen*, 599 U.S. 255, 281 (2023) (cleaned up). The anti-commandeering doctrine is the product of "a fundamental structural decision" by the Founders to "withhold from Congress the power to issue orders directly to the States."

3

*Murphy*, 584 U.S. at 470. No enumerated power enables Congress to obligate States to implement federal laws. *Id.* at 471 (such authority is "conspicuously absent from the list of powers given to Congress"). That includes the Necessary and Proper Clause, since a law that "violates the principle of state sovereignty . . . is not a law *proper* for carrying into Execution" any other power. *Printz v. United States*, 521 U.S. 898, 924 (1997) (cleaned up) (emphasis in original).[4] When Congress ignores the limits of its commandeering authority, it erodes the States' "residuary and inviolable sovereignty." *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)).

The CTA "dragoon[s]" States "into administering federal law" precisely as the anti-commandeering doctrine prohibits. *Printz*, 521 U.S. at 928. On its face, it commands state agencies to "cooperate with and provide information requested by FinCEN for purposes of maintaining an accurate, complete, and highly useful database for beneficial ownership information." 31 U.S.C. § 5336(d)(2). But States have "the right . . . to refrain from assisting with federal efforts" to implement federal law, and Congress cannot "*require* [States'] cooperation without running afoul of the Tenth Amendment." *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (emphasis in original); *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("[T]he Tenth

---

[4] *See* Gary Lawson, *A Truism with Attitude: The Tenth Amendment in Constitutional Context*, 83 Notre Dame L. Rev. 469 (2008) (explaining the federalism constraints of the Necessary and Proper Clause).

Amendment prevents Congress from compelling Texas municipalities to cooperate in immigration enforcement").

To be sure, the CTA also authorizes funds to be appropriated to pay States' "reasonable costs relating to compliance with the [CTA's] requirements." 31 U.S.C. § 5336(j). It's unclear whether those funds will ever be appropriated, when the funds might reach the States, or what amount States might receive. When secretaries of state recommended in comments to FinCEN's beneficial ownership information rule that there should be "a mechanism for reimbursing the states for [their] substantial costs"—lest the statute become an "unfunded mandate"—FinCEN simply committed to "continue to review the suggestion[]." 87 Fed. Reg. 59498, 59555–56 (2022). To this day, *amici* have never received nor been promised any funding from FinCEN in connection with their efforts to cooperate in implementing the CTA.

But the constitutional violation is not cured even if state agencies are eventually compensated for their mandatory cooperation. While certain duties that the CTA contemplates secretaries of state will take are optional conditions entitling them to funds—like periodically notifying filers of their requirements as reporting companies, providing filers with a copy of the reporting company form, or providing an online link to the reporting company form, 31 U.S.C. § 5336(e)(2)(A)—the obligation to cooperate and provide information is compulsory. That alone renders the Act unconstitutional, for the anti-commandeering doctrine is absolute. *New York v. United States*, 505 U.S. 144, 178 (1992) (a violation cannot be justified even by a "particularly strong federal interest").

5

Reframing the obligation as a Spending Clause condition would be futile too. *S. Dakota v. Dole*, 483 U.S. 203, 211 (1987) (Spending Clause legislation cannot be "coercive").

The commands to cooperate and provide information may sound benign, but *amici* have long been aware—and have now experienced firsthand—that the commands are anything but.

Secretaries of state warned FinCEN of the costs that the CTA would force them to incur in their comments to the agency's beneficial ownership information rule. They explained that, after incurring "significant" costs to track down beneficial owners (whose contact information States often don't have) and mail them notice of their reporting obligations, citizens would "perceiv[e]" the reporting requirement as "a state-level regulation." 87 Fed. Reg. at 59555. Secretaries of state would become "front line customer service for beneficial owner questions."[5] Their staff would have to "spend a considerable amount of additional time responding to CTA compliance questions," which would often ask for "legal advice" that staff cannot answer, "likely lead[ing] to frustration." 87 Fed. Reg. at 59555–56. "[A]dditional staff" would be needed, and costs would be incurred "even if [these] calls [were] redirected to FinCEN." *Id.* In all, one State estimated that sending notices and fielding calls would cost it $1.34 million. *Id.*

---

[5] Frank LaRose, Ohio Secretary of State, Comment Letter on Proposed Rule to Beneficial Ownership Reporting Requirements (Feb. 7, 2022), https://tinyurl.com/hrxnybwp; Holli Sullivan, Indiana Secretary of State, Comment Letter on Proposed Rule to Beneficial Ownership Reporting Requirements (Feb. 7, 2022), https://tinyurl.com/yu8aanku.

In response, FinCEN downplayed these concerns and delayed addressing them. It acknowledged that States would incur "costs in connection with the implementation of the rule," but minimized the costs as "indirect" rather than "direct," and committed only to "continue to review" cost-minimizing suggestions. 87 Fed. Reg. at 59556, 59562. It reiterated that "[a] coordinated effort with state . . . authorities [would] be crucial to ensuring proper implementation" of the CTA and reminded States of their obligation to cooperate by citing to the cooperation provision of the statute. 87 Fed. Reg. at 59548, 59556 & n.245 (noting that FinCEN "intend[ed] to coordinate closely with state . . . authorities")

FinCEN continued to emphasize the need for State cooperation as it began implementing the CTA. On April 23, 2024, during a virtual meeting with the National Associations of Secretaries of State, FinCEN gave a presentation on the CTA's beneficial ownership reporting requirements. It expressed that it was "pleased with [its] partnership with Secretaries of State" and "appreciate[d] state efforts to help communicate the reporting requirements to business[es]," then encouraged secretaries of state to be "proactive and comprehensive" in communicating the requirements to constituents. In July 2024, FinCEN once again touted its "partnership with secretaries of state" that had enabled it to increase "outreach" efforts.[6]

---

[6] Monthly Roundup of Beneficial Ownership Reporting Outreach Activities and Preview of Upcoming Events, FinCEN (July 12, 2024), https://tinyurl.com/5b96sz79.

7

As predicted, *amici* were forced to expend significant resources to cooperate in implementing the CTA. In particular, as the deadline to file approached and as injunctions were put in place, stayed, and reinstated at the end of 2024, the call volume exploded at *amici*'s offices. For example, Idaho's Secretary of State saw a 75% increase in call volume above ordinary call levels on December 26 and December 30—resulting in more than 200 additional calls per day about the CTA. Staff had to become familiar with the status of the injunction in this case to respond to frustrated constituents. To preempt some of these calls, the Idaho Secretary of State sent out three mass emails explaining each update to business' reporting obligations. The same thing happened again on February 21 and February 24—another mass email and more than 250 calls per day.

The anti-commandeering doctrine is meant to prevent exactly this sort of harm. When the federal government requires States to implement federal law, it "shift[s] the costs of regulation to the States," distorts "political accountability" by redirecting the ire of regulated citizens at their state representatives fielding calls, and undermines the "structural protections of liberty" inherent in federalism. *Murphy*, 584 U.S. at 473–74 (cleaned up). If the federal government wants States' help communicating with business owners or assembling information, it can "appropriate the funds needed to administer the program" and attempt to induce States to assist with conditional payment. *Id.* But it may not compel a "partnership" by commanding States to cooperate.

\* \* \*

The anti-commandeering violation is not simply a discrete defect in the CTA that can be easily excised from the statute. Rather, it is symptomatic of the larger federalism problem raised by the plaintiffs in this case. The federal government has exceeded its authority by intruding into the sphere of corporate governance regulation, and now finds itself without its bearings trying to "set a clear, Federal standard" in a field that is ordinarily "within the exclusive province of the state." National Defense Authorization Act, Pub. L. 116-283, § 6402, 134 Stat. 3388, 4604 (2021) (first quote); *Voeller*, 311 U.S. at 535 (second quote). The federal government lacks the relationships, information, and expertise it needs to regulate in this space, and citizens are already inclined to turn to State governments for assistance with corporate compliance. Indeed, it's likely the CTA would not have been enacted at all without a provision requiring State cooperation.

But the federal government's response should not have been to trudge ahead and conscript the States to help them. Its response should have been to reassess why it's in such dire need of State assistance, which might have led it to ask whether it has the authority to regulate corporate governance in the first place. The answer is that it lacks that authority, for the reasons the district court explained below.

The Court should therefore affirm the district court's preliminary injunction. "[O]ne of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). The costs imposed on *amici* and the violation of the anti-commandeering doctrine are yet another way in which the CTA distorts the

proper balance of federalism, so an injunction against the CTA would serve the public interest. *See Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220, at *34 ("[I]t is always in the public interest to prevent a violation of a party's constitutional rights") (quoting *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)).

## II. States Should Be Left to Regulate Corporate Law Without Federal Intrusion.

Enjoining the CTA will restore States to their proper role as the sole regulator of corporate functions. "Corporations are creatures of state law," *Burks v. Lasker*, 441 U.S. 471, 478 (1979) (cleaned up), and "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). *Amici* are the chief administrators of corporate regulation in their States, and—as the CTA experience has shown—are closer to and more familiar with corporate owners than "distant federal bureaucra[ts]." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012). As a result, *amici* (along with their States' legislatures) are able to craft policies best suited to the needs of their constituents.

For example, Idaho seeks to foster a flourishing business community by making it as simple and inexpensive as possible to form and maintain a business. Creating a corporation or LLC is as easy as completing a brief form and paying $100.[7] Filing amendments and annual reports is free. And Idaho law affords owners a great degree

---

[7] *See* Forms, Idaho Secretary of State, https://tinyurl.com/bd7bvz2z (navigation page for Idaho business entity formation).

10

of anonymity—owners and shareholders of business entities need not be named during the application process or later. Idaho Code §§ 30-25-201, 30-29-201, 30-29-202.

Idaho has tailored its approach to corporate law to the needs of its citizens—something "more local and more accountable" State governments can do more effectively than the federal government when it comes to "facets of governing that touch on citizens' daily lives." *Sebelius*, 567 U.S. at 536. Other States will undoubtedly take other approaches as they respond to "the diverse needs of a heterogenous society," seek "innovation and experimentation in government," and "compet[e] for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991); *see* William Cary, *Federalism and Corporate Law: Reflections Upon Delaware*, 83 Yale L.J. 663 (1974). This is a feature, not a bug, of our federalist system.

The CTA's imposition of a federal standard for disclosure of corporate ownership subverts that diversity and local adaptation in favor of a one-size-fits-all approach that does not actually fit all. In *amici*'s experience, it certainly does not fit the needs of their constituents. The CTA is expensive to comply with, intrudes into citizens' reasonable expectation of privacy, and threatens a "chilling effect[] on incorporation practices." 87 Fed. Reg. at 59557; *see Texas Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220, at *9 (explaining compliance costs).

While the federal government's anti–money laundering aims may be noble, the means it has chosen trespass on States' turf. States regulate corporate law, and must have the final say on whether their citizens will be required to report all beneficial

11

corporate ownership. If a money-laundering solution must come at a nationwide, federal level, Congress may consider enacting Spending Clause legislation to entice States to impose disclosure requirements. *E.g.*, *Dole*, 483 U.S. at 205. But it lacks the power to set a federal corporate law standard directly under Article I. *See id.* at 209–10.

## Conclusion

The Court should put an end to the federal government's ongoing mandatory "partnership" with *amici* and other secretaries of state, and should return the power to regulate corporations to the States by affirming the district court's preliminary injunction.

Dated: March 4, 2025                                      Respectfully submitted,

PHIL MCGRANE
Idaho Secretary of State

Idaho Office of the Attorney General                      /s/ *Alan M. Hurst*
700 W. Jefferson St.                                      ALAN M. HURST
Suite 210                                                 Solicitor General
Boise, ID 83720
(208) 334-2400                                            MICHAEL A. ZARIAN
alan.hurst@ag.idaho.gov                                   Deputy Solicitor General

DOUGLAS A. WERTH
Deputy Attorney General

*Counsel for Amici*

12

**ADDITIONAL SECRETARY OF STATE SIGNATORIES**

DIEGO MORALES
Indiana Secretary of State

CHRISTI JACOBSEN
Montana Secretary of State

MICHAEL G. ADAMS
Kentucky Secretary of State

DAVID M. SCANLAN
New Hampshire Secretary of State

NANCY LANDRY
Louisiana Secretary of State

MICHAEL HOWE
North Dakota Secretary of State

MICHAEL WATSON
Mississippi Secretary of State

MONAE L. JOHNSON
South Dakota Secretary of State

DENNY HOSKINS
Missouri Secretary of State

TRE HARGETT
Tennessee Secretary of State

KRIS WARNER
West Virginia Secretary of State

WES ALLEN
Alabama Secretary of State
*By counsel*
Steve Marshall
Alabama Attorney General
Office of Alabama Attorney General
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300

ROBERT B. EVNEN
Nebraska Secretary of State
*By counsel*
Zachary A. Viglianco
Acting Solicitor General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
zachary.viglianco@nebraska.gov

PAUL D. PATE
Iowa Secretary of State
*By counsel*
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

FRANK LaROSE
Ohio Secretary of State
*By counsel*
Elliot Gaiser
Solicitor General
30 E. Broad Street, 17th Floor
Columbus, OH 43215
(614) 728-7511
thomas.gaiser@ohioago.gov

ADAM WATSON
Director of the Division of Corporations
and Commercial Code of the
Utah Department of Commerce
*By counsel*
Kevin McLean
Assistant Attorney General

## CERTIFICATE OF SERVICE

On March 4, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of SentinelOne and is free of viruses.

/s/ *Alan M. Hurst*

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,956 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Garamond) using Microsoft Word, version 2501 (the same program used to calculate the word count).

/s/ *Alan M. Hurst*