No. 24-40792

IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TEXAS TOP COP SHOP, INC., *et al.,*
*Plaintiffs–Appellees,*

V.

PAMELA BONDI, U.S. ATTORNEY GENERAL
OF THE UNITED STATES, *et al.,*
*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court for the Eastern
District of Texas, Sherman Division No. 4:24-CV-478,
The Honorable Amos L. Mazzant, Judge Presiding

*AMICI CURIAE* BRIEF OF
THOMAS ZAWISTOWSKI AND WE THE PEOPLE CONVENTION
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE

WALTER M. WEBER
  *Counsel of Record*
JAY A. SEKULOW
STUART ROTH
JORDAN SEKULOW*
LAURA HERNANDEZ*
AMERICAN CENTER FOR LAW &
  JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309

Dated: March 4, 2025    *Counsel for Thomas Zawistowski and
  We the People Convention*

*Not active Fifth Circuit Bar Members

## CERTIFICATE OF INTERESTED PERSONS

The case number here is No. 24-40792, *Texas Top Cop Shop v. Bondi*. Amicus, We the People Convention, is a non-profit corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock. Amicus, Thomas Zawistowski, is a natural person.

Pursuant to Circuit Rule 28.2.1, undersigned counsel of record certifies that the parties' and amici's list of persons and entities having an interest in the outcome of this case is complete, to the best of the undersigned counsel's knowledge, with the following additions:

1.  Amici Curiae Thomas Zawistowski and We the People Convention

2.  Walter M. Weber, counsel for Amici Curiae

3.  Jay Alan Sekulow, counsel for Amici Curiae

4.  Stuart Roth, counsel for Amici Curiae

5.  Jordan Sekulow, counsel for Amici Curiae, and

6.  Laura Hernandez, counsel for Amici Curiae.

These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

/s/ Walter M. Weber
Walter M. Weber

# TABLE OF CONTENTS *Page*

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

TABLE OF CONTENTS ....................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF *AMICI* ....................................................................................... 1

ARGUMENT........................................................................................................ 3

    I.     The Corporate Identity Shield for Beneficial Owners of Nonprofit Political Advocacy Corporations Has Never Been More Indispensable........................................................................... 5

    II.    The CTA Burdens the First Amendment Right to Political Association. ....................................................................................... 9

    III.   The CTA is not Narrowly Tailored. .................................................11

CONCLUSION ...................................................................................................13

CERTIFICATE OF SERVICE............................................................................14

CERTIFICATE OF COMPLIANCE...................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                    ***Page(s)***

*Americans For Prosperity Found. v. Bonta*, 594 U.S. 595 (2021) ................. 3, 9-11

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971) .................................................... 9-10

*Citizens United v. FEC*, 558 U.S. 310 (2010) ...................................................... 3, 4

*Dr. A. v. Hochul*, 142 S. Ct. 552 (2021)……………………………………..…….3

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ........................................................ 6

*Linchpins of Liberty v. United States of America*, Case No. 1:13-cv-
   00777 (D.D.C. 2017) ............................................................................................ 2

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .................................. 4

*NAACP v. Button*, 371 U.S. 408 (1963) ...............................................................10

*NRA of America v. Vullo*, 602 U.S. 175 (2024) ..................................................... 5

*Talley v. California*, 362 U.S. 60 (1960) ..............................................................10

**Statutes**

National Defense Authorization Act for Fiscal Year 2021 ("NDAA"),
   Pub. L. No. 116-283, Div F, Title LXIV, § 6402, 134 Stat. 4604 §
   5336 ......................................................................................................................11

31 U.S.C. §§ 5336(a)(11)(B)(i)-(xxiii) ..................................................................12

**Other Authorities**

163 Cong. Rec. S3468-69, No. 101 (2017) ............................................................. 9

87 Fed. Reg. 59,503 (Sept. 30, 2022) .....................................................................11

Bank Policy Institute, *The Truth About Account Closures*
(Dec. 13, 2024), https://bpi.com/wp-content/uploads/2024/12/The-
Truth-About-Account-Closures.pdf ...........................................................5, 8

Zack Budryk, *Oversight Panel Presses FEMA Administrator on
Hurricane Relief Discrimination Allegations,* THE HILL
(Nov. 19, 2024), https://thehill.com/policy/energy-
environment/4998801-fema-administrator-grilled-hurricane-
milton-trump-campaign-signs/. .......................................................... 5

Consent Order, *Linchpins of Liberty v. United States*, No. 1:13-cv-
00777 (D.D.C. Dec. 11, 2017), ECF No. 143 .................................... 2

Allysia Finley, *Debanking and the Return of
Operation Choke Point,* WALL ST. J. (Dec. 15, 2024), https://www.
wsj.com/opinion/debanking-and-the-return-of-operation-choke-
point-finance-money-government-8d507083 ................................5, 8

Letter from House Judiciary Committee to Merrick Garland (May 11,
2022), *available at* https://judiciary.house.gov/sites/evo-
subsites/republicans-judiciary.house.gov/files/2022-05/2022-05-
11-JDJ-MJ-to-Garland-re-threat-tags_Redacted.pdf.................................... 5, 7

Office of the Attorney General Memorandum, Re: Partnership Among
Federal, State, Local, Tribal, and Territorial Law Enforcement to
Address Threats Against School Administrators, Board Members,
Teachers, and Staff, (Oct. 4, 2021),
https://www.justice.gov/ag/page/file/1438986/download ................................. 7

Ewan Palmer, *FBI Under Pressure for Targeting Catholics in Leaked
Document,* NEWSWEEK, (Feb. 10, 2023),
https://www.newsweek.com/fbi-memo-catholics-radical-
traditional-leaked-1780379. ............................................................ 6

Luke Rosiak, *How The Biden Administration Used A Counter-Terrorism Grant To Fund Anti-Conservative Propaganda*, DAILYWIRE (Jan. 17, 2024), https://www.dailywire.com/news/how-the-biden-administration-used-a-counter-terrorism-grant-to-fund-anti-conservative-propaganda ...................................................................................... 8

Michael Stratford, *The Looming Battle over 'Debanking,'* POLITICO (July 3, 2024), https://www.politico.com/newsletters/morning-money/2024/07/03/the-looming-battle-over-debanking-00166402.................... 8

TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REVIEW OF SELECTED CRITERIA USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW (Sept. 28, 2017), *available at* https://web.archive.org/web/20180225112702/https://www.treasury.gov/tigta/auditreports/2017reports/201710054fr.pdf. ..................................... 5

## INTEREST OF *AMICI*[1]

Amici, We the People Convention (WTPC) and its President, Tom Zawistowski, are dedicated to limited constitutional governance and to protecting individual liberty, freedom, and prosperity. Amici "recruit, educate, and motivate citizens at the grassroots level to perform their constitutionally defined role in the governance of their townships, municipalities, counties, as well as in our state and nation, by providing opportunities, knowledge, and training." Mr. Zawistowski is a "beneficial owner" of WTPC as that term is defined by the Corporate Transparency Act (CTA).

WTPC is a nonprofit corporation registered in the State of Ohio. Although WTPC is eligible for tax exempt status under I.R.C. § 501c, WTPC is not exempt from reporting under the Corporate Transparency Act (CTA) because it has not filed for such status. President Mr. Zawistowski decided not to obtain tax exempt status because of his personal experience of IRS misconduct in 2011-2012 when he was executive director of Portage County Tea Party (PCTP) and the President of the Ohio Liberty Coalition (OLC). The IRS illegally delayed the PCTP's and the OLC's

---

[1] All parties consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), amici curiae state that no counsel for a party other than amici authored this brief in whole or in part, and no counsel or party other than amici made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae or its counsel made a monetary contribution to its preparation or submission.

1

applications for tax exempt status and made demands for disclosure of information

protected by the First Amendment right of political association. After nearly

eighteen (18) months of delay, PCTP withdrew its application, and the PCTP and

the OLC eventually sued the IRS with the OLC acting as a lead plaintiff in two

successful federal lawsuits against the IRS. Complaint, *Linchpins of Liberty v.

United States of America*, No. 1:13-cv-00777 (D.D.C. May 29, 2013).

Represented by the American Center for Law and Justice, PCTP entered into

a consent decree with the IRS in which the IRS admitted that,

> its treatment of Plaintiff [PCTP and others] during the tax-exempt
>
> determinations process, including screening its application based on its
>
> names or policy positions, subjecting the application to heightened
>
> scrutiny and inordinate delays, and demanding of Plaintiff some
>
> information that TIGTA [Treasury Inspector General for Tax
>
> Administration] determined was unnecessary to the agency's
>
> determination of its tax-exempt status, was wrong.

Consent Order, at 11, *Linchpins of Liberty v. United States*, No. 1:13-cv-00777

(D.D.C. Dec. 11, 2017), ECF No. 143.

Amici have reason to believe that the CTA will be similarly deployed to target

nonprofit corporations with disfavored political views that do not qualify for one of

2

the CTA's exemptions. Affirming the district court's preliminary injunction is crucial to avoiding the severe chilling effect on First Amendment associational freedoms from the CTA's enforcement. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Dr. A. v. Hochul*, 142 S. Ct. 552, 555 (2021) (citations omitted); *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (holding that "the risk of a chilling effect on association" justified plaintiffs' facial challenge). Amici therefore offer this brief to show that the CTA's disclosure requirements violate the First Amendment right to freedom of association.

## ARGUMENT

Nonprofit political advocacy groups have a First Amendment right to preserve the anonymity of their beneficial owners. Political advocacy "from a corporation," no less than an individual, "is indispensable to decision-making in a democracy." *Citizens United v. FEC*, 558 U.S. 310, 349 (2010). Because corporate political advocacy can be more effective than advocacy by the individuals who form the entity, the identity-shielding aspect of the corporate form is important. Governments have often used disclosure requirements to target corporations with political views that depart from prevailing orthodoxy. "Compelled disclosure of affiliation with groups engaged in advocacy" can be as powerful a restraint on freedom of

3

association as requiring "identifying arm-bands." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). As Justice Harlan trenchantly observed, "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* The threat to First Amendment associational rights from compelled disclosure parallels the threat experienced by NAACP members in the civil rights era. *Id.* (noting that disclosure of the identity of NAACP members exposed members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility); *see also Citizens United*, 558 U.S. at 483 (Thomas, J., concurring and dissenting in part) ("Of course . . . disclosure requirements . . . enable private citizens and elected officials to implement political strategies *specifically calculated* to . . . prevent the lawful, peaceful exercise of First Amendment rights.").

## I.  The Corporate Identity Shield for Beneficial Owners of Nonprofit Political Advocacy Corporations Has Never Been More Indispensable.

Since the IRS targeting scandal,[2] governmental retaliation against those with disfavored political views has increased dramatically. Through debanking,[3] denial of hurricane relief assistance,[4] meritless investigations,[5] and designating certain

---

[2] A report from the Treasury Department's Inspector General found that from 2004 to 2013, the IRS used both conservative and liberal keywords to choose targets for further scrutiny. TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REVIEW OF SELECTED CRITERIA USED TO IDENTIFY TAX-EXEMPT APPLICATIONS FOR REVIEW (Sept. 28, 2017), *available at* https://web.archive.org/web/20180225112702/https://www.treasury.gov/tigta/auditreports/2017reports/201710054fr.pdf.

[3] Debanking is the closure of private or corporate bank accounts at government instigation often because of the holder's political views. *See, e.g., NRA of America v. Vullo*, 602 U.S. 175 (2024). For example, Operation Choke Point which operated between 2013-2017 under the Obama Administration cut off banking access to politically disfavored businesses such as firearm dealers, payday lenders and pawn shops. *See* Allysia Finley, *Debanking and the Return of Operation Choke Point,* WALL ST. J. (Dec. 15, 2024), https://www.wsj.com/opinion/debanking-and-the-return-of-operation-choke-point-finance-money-government-8d507083. *See generally* Bank Policy Institute, *The Truth About Account Closures* (Dec. 13, 2024), https://bpi.com/wp-content/uploads/2024/12/The-Truth-About-Account-Closures.pdf (describing a "secret enforcement regime" by which a bank examiner's "mandate that a bank designate a client as 'high risk' generally forces the bank to close the account.")

[4] In the aftermath of Hurricane Milton, a Federal Emergency Management Agency employee was fired for telling employees to refuse disaster relief to certain Florida homes with Trump political yard signs. Zack Budryk, *Oversight Panel Presses FEMA Administrator on Hurricane Relief Discrimination Allegations,* THE HILL (Nov. 19, 2024), https://thehill.com/policy/energy-environment/4998801-fema-administrator-grilled-hurricane-milton-trump-campaign-signs/.

[5] *See* Letter from House Judiciary Committee to Merrick Garland (May 11, 2022), *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2022-05/2022-05-11-JDJ-MJ-to-Garland-re-threat-tags_Redacted.pdf (describing FBI investigations of parents who merely expressed political views opposing such things as mask mandates).

5

groups as terrorists or extremists,[6] the government has intimidated and silenced those with disfavored views. This misconduct is so pervasive that there is a perpetual "reasonable probability" that those with unpopular political views will be targeted if their identities are disclosed. *John Doe No. 1 v. Reed*, 561 U.S. 186, 201 (2010) (noting that parties may be exempt from disclosure requirements if they can show "a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties").

As with the CTA, the government's actions are sometimes undertaken for the ostensible purpose of combating terrorism. For example, in response to a letter from the National School Boards Association ("NSBA") requesting that President Biden invoke the PATRIOT Act against parents allegedly involved in domestic terrorism at school board meetings, then-Attorney General Garland issued a Memorandum directing the DOJ to combat a "disturbing spike in harassment, intimidation, and threats of violence against school administrators, board members, teachers, and

---

[6] In January 2023, a leaked FBI document warned that "radical traditionalist" Catholics pose an extremist threat. Ewan Palmer, *FBI Under Pressure for Targeting Catholics in Leaked Document,* NEWSWEEK, (Feb. 10, 2023), https://www.newsweek.com/fbi-memo-catholics-radical-traditional-leaked-1780379.

staff."[7] There were no credible reports of any such "disturbing spike."[8] Yet, promptly acting upon Attorney General Garland's Memorandum, the FBI designated its National Threat Operations Center to receive tips about "terrorist" activity by parents at school board meetings.[9] Additionally, the FBI's Counterterrorism Division and Criminal Division announced the creation of a new threat tag—EDUOFFICIALS—and directed all FBI personnel to apply it to school board-related threats.[10] FBI agents then targeted innocent parents and state officials, whose only "offense" was to oppose the prevailing orthodoxy in public schools on COVID masks and vaccine mandates.[11]

Similarly, the Department of Homeland Security used $700,000 of funding from a grant program intended to combat terrorism to pay activists to create blogs

---

[7] *See* Office of the Attorney General Memorandum, Re: Partnership Among Federal, State, Local, Tribal, and Territorial Law Enforcement to Address Threats Against School Administrators, Board Members, Teachers, and Staff, (Oct. 4, 2021), https://www.justice.gov/ag/page/file/1438986/download.

[8] Letter from House Judiciary Committee to Attorney General Merrick Garland, *supra* note 5.

[9] *See id.* (citing documented FBI investigations into 1) a member of Moms for Liberty, a conservative political advocacy group; 2) a father who opposed mask mandates and was anonymously reported to be an "insurrectionist" and 3) Republican state officials whom a Democrat official had reported to the FBI for "incit[ing] violence" by expressing public displeasure with school districts' vaccine mandates.).

[10] *Id.*

[11] *Id.*

and run podcasts criticizing Donald Trump and censoring or attacking conservative viewpoints under the guise of "media literacy."[12]

Given this toxic environment, the need for the anonymity of beneficial owners of nonprofit political advocacy corporations has never been greater. Indeed, the Financial Crimes Enforcement Network (FinCEN), the federal agency responsible for enforcement of the CTA, has been a principal actor in the debanking scandal[13] that is now the focus of state legislative action.[14]

The CTA's legislative history belies any assumption that the CTA's disclosure requirements would not be used to target beneficial owners of disfavored political advocacy groups. One of the co-sponsors of the predecessor CTA, Senator Sheldon Whitehouse, publicly expressed the hope that the CTA would be used to compel disclosures of the identities of political donors. In a 2017 speech on the Senate floor, he explained that a beneficial ownership reporting regime could assist in stopping the "unprecedented dark money flow into our elections from anonymous dark money organizations, groups that we allow to hide the identities of their big

---

[12] Luke Rosiak, *How The Biden Administration Used A Counter-Terrorism Grant To Fund Anti-Conservative Propaganda*, DAILYWIRE (Jan. 17, 2024), https://www.dailywire.com/news/how-the-biden-administration-used-a-counter-terrorism-grant-to-fund-anti-conservative-propaganda.
[13] *See* Allysia Finley, *supra* note 3. *See generally* Bank Policy Institute, *supra* note 3.
[14] Michael Stratford, *The Looming Battle over 'Debanking,'* POLITICO (July 3, 2024), https://www.politico.com/newsletters/morning-money/2024/07/03/the-looming-battle-over-debanking-00166402.

donors," such as "American dark money emperors, like the Koch brothers."[15] Faulting "the Citizens United decision" for allowing "big money to flow through dark money channels," Senator Whitehouse hoped that requiring disclosures of "beneficial ownership" information was the antidote to anonymous political donations.[16] By tracking "the actual owners of companies," law enforcement could stop entities from "funneling money into our elections through faceless shell companies" and allow the government to determine "the identities behind big political spending."[17]

Given this history and context, the CTA imposes a severe burden on First Amendment associational freedoms.

## II.    The CTA Burdens the First Amendment Right to Political Association.

The CTA is a compelled disclosure regime that broadly sweeps in associations protected by the First Amendment. When it comes to "'a person's beliefs and associations,' '[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution.'" *Americans For Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (quoting *Baird*

---

[15] 163 Cong. Rec. S3468, No. 101 (2017).

[16] *Id.*

[17] *Id.* at S3469.

*v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)). It is immaterial that the beneficial owner information required by the CTA disclosure requirements may not be disclosed to the public. Assurances of confidentiality do not eliminate the burden on political association rights. *Id.* at 616. Fear of reprisal chills "peaceful discussions of public matters of importance." *Talley v. California*, 362 U.S. 60, 65 (1960). In stripping the anonymity of beneficial owners, the CTA burdens the First Amendment right to political association.

The CTA must therefore survive exacting scrutiny. *Bonta*, 594 U.S. at 611. The government must demonstrate that there is "a substantial relation between the disclosure requirements and a sufficiently important governmental interest." *Id.* Moreover, the disclosure requirement must be narrowly tailored to the interest it promotes. Even where the government asserts weighty interests, and the burden on associational rights is modest, the government must still "regulate . . . with narrow specificity." *Id.* at 610 (quoting *NAACP v. Button*, 371 U.S. 408, 433 (1963)).

*Bonta* rejected the argument that narrow tailoring is required only for laws that impose severe burdens on First Amendment associational rights, emphasizing that "a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored. This requirement makes sense. Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—

'[b]ecause First Amendment freedoms need breathing space to survive.'" 594 U.S. at 609 (emphasis added)(quotations omitted).

### III.    The CTA is not Narrowly Tailored.

The government's brief filed with the Eleventh Circuit shows that the CTA is not narrowly tailored. The CTA's principal objective is to combat money laundering and the financing of terrorism. The Act enhances "critical national security, intelligence, and law enforcement efforts" to detect and prosecute financial crime. National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, Div F, Title LXIV, § 6402, 134 Stat. 4604. The government admits that the primary targets of the CTA are "active, for-profit businesses with an especially close connection to commerce." Appellant's Br. at 12, No. 24-10736 (11th Cir. 2024), ECF No. 18 [hereinafter "Appellant's Br."]. Thus, the CTA "regulates a class of entities—primarily active, for-profit businesses—whose defining feature is their authority and propensity to conduct commercial transactions." Appellant's Br. at 23.

As the government explained further, one reason for this focus is that federal prosecutors observe that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." 87 Fed. Reg. 59,503 (Sept. 30, 2022) (quotation marks omitted). Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug

proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." Appellant's Br. at 19. Presumably out of recognition that nonprofit entities are not closely connected to commerce, the CTA exempts nonprofit organizations with tax exempt status under IRC 501c. 31 U.S.C. §§ 5336(a)(11)(B)(i)-(xxiii). As the government explained, "Congress exempted from the reporting requirements various categories of businesses the provision of whose information to FinCEN would not significantly facilitate the detection and prosecution of financial crime." Appellant's Br. at 8 (emphasis added). This amounts to a concession that nonprofit entities devoted to political advocacy are not likely involved in the type of financial crimes that the CTA targets. The CTA thus accomplished nothing by refusing to include all nonprofit political advocacy entities in its long list of exemptions. The CTA is unconstitutional because it is not narrowly tailored.

12

**CONCLUSION**

Amici respectfully ask this Court to affirm the district court's preliminary injunction.

Respectfully Submitted,

/s/ Walter M. Weber
WALTER M. WEBER
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2025, I electronically filed a copy of the foregoing *Amicus Curiae* Brief using the ECF System which will send notification of that filing to all counsel of record in this litigation. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 4, 2025

/s/ Walter M. Weber
Walter M. Weber
*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with type-volume limitation of Fed. R. App. Pro. 32(a)(7)(B). The brief contains 2,519 words, excluding the parts of the brief exempted by Fed. R. App. Pro. 32(f). This brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word processing software in 14-pt Times New Roman font.

Dated: March 4, 2025

/s/ Walter M. Weber
Walter M. Weber
*Counsel for Amici Curiae*