# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

TEXAS TOP COP SHOP, INCORPORATED; RUSSELL STRAAYER;
MUSTARDSEED LIVESTOCK, L.L.C.; LIBERTARIAN PARTY OF
MISSISSIPPI; NATIONAL FEDERATION OF INDEPENDENT BUSINESS,
INCORPORATED; DATA COMM FOR BUSINESS, INCORPORATED,

Plaintiffs-Appellees,

v.

PAMELA BONDI, *U.S. Attorney General*; TREASURY DEPARTMENT;
DIRECTOR FINCEN ANDREA GACKI, *Director of the Financial Crimes Enforcement
Network*; FINANCIAL CRIMES ENFORCEMENT NETWORK;
SCOTT BESSENT, *Secretary, U.S. Department of Treasury*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Texas

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

ABE McGLOTHIN, JR.
  *Acting United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
MAXWELL A. BALDI
SOPHIA SHAMS
  *Attorneys, Appellate Staff
  Civil Division, Room 7217
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-2498*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES

INTRODUCTION AND SUMMARY .......................................................................... 1

ARGUMENT ...................................................................................................... 3

I.     The Corporate Transparency Act Is a Valid Exercise of Congress's
Enumerated Powers .......................................................................................... 3

       A.     The CTA Is Authorized by the Commerce Clause ......................... 3

       B.     The CTA Is Authorized by the Necessary and Proper
Clause .............................................................................................. 10

II.     The Remaining Factors Counsel Against a Preliminary Injunction .................. 13

III.     At a Minimum, Plaintiffs Are Not Entitled to Universal Relief ......................... 17

CONCLUSION .................................................................................................. 21

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Americans for Prosperity Found. v. Bonta,*
   594 U.S. 595 (2021) ................................................................. 15

*Burroughs v. United States,*
   290 U.S. 534 (1934) ................................................................. 11

*California Bankers Ass'n v. Shultz,*
   416 U.S. 21 (1974) ................................................................ 16-17

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.,*
   98 F.4th 220 (5th Cir. 2024) ................................................... 19

*Community Ass'ns Inst. v. U.S. Dep't of Treasury,*
   No. 1:24-cv-1597 (MSN/LRV), 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) ...... 17

*CTS Corp. v. Dynamics Corp. of Am.,*
   481 U.S. 69 (1987) ................................................................... 8

*Firestone v. U.S. Dep't of Treasury,*
   No. 3:24-cv-1034-SI, 2024 WL 4250192 (D. Or. Sept. 20, 2024) ...................... 16-17

*Groome Res. Ltd. v. Parish of Jefferson,*
   234 F.3d 192 (5th Cir. 2000) ..................................................... 7

*Interstate Commerce Comm'n v. Brimson,*
   154 U.S. 447 (1894) ................................................................. 10

*Katzenbach v. McClung,*
   379 U.S. 294 (1964) ................................................................. 9

*McCulloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ........................................... 7, 11, 13

*McHenry v. Texas Top Cop Shop,*
   145 S. Ct. 1 (2025) ................................................................. 2

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................................................. 1

*NAACP v. Alabama ex rel. Patterson,*
   357 U.S. 449 (1958) ................................................................. 15

*National Fed'n of Indep. Bus. v. Sebelius,*
 567 U.S. 519 (2012) ............................................................ 3, 4, 5, 6, 13

*NLRB v. Unoco Apparel, Inc.,*
 508 F.2d 1368 (5th Cir. 1975) ............................................................ 17

*Sabri v. United States,*
 541 U.S. 600 (2004) ............................................................ 9

*Santa Fe Indus. v. Green,*
 430 U.S. 462 (1977) ............................................................ 8

*Scripps-Howard Radio, Inc. v. FCC,*
 316 U.S. 4 (1942) ............................................................ 18

*Small Bus. Ass'n of Mich. v. U.S. Dep't of Treasury,*
 No. 1:24-cv-314, 2025 WL 704287 (W.D. Mich. Mar. 3, 2025) .............................. 16

*Texas Top Cop Shop, Inc. v. Garland,*
 No. 24-40792, 2024 WL 5203138 (5th Cir. Dec. 23, 2024),
 *stay vacated,* No. 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024) ............ 1-2, 4

*Texas v. United States,*
 126 F.4th 392 (5th Cir. 2025) ............................................................ 19-20

*Thunder Basin Coal Co. v. Reich,*
 510 U.S. 200 (1994) ............................................................ 18

*United States v. Arnold,*
 740 F.3d 1032 (5th Cir. 2014) ............................................................ 16

*United States v. Comstock,*
 560 U.S. 126 (2010) ............................................................ 7, 11, 13

*United States v. Darby,*
 312 U.S. 100 (1941) ............................................................ 7

*United States v. Kahriger,*
 345 U.S. 22 (1953) ............................................................ 10

*United States v. Lopez*
 514 U.S. 549 (1995) ............................................................ 6

*United States v. Morrison,*
 529 U.S. 598 (2000) ............................................................ 6

*United States v. O'Brien,*
    391 U.S. 367 (1968) ................................................... 10

*United States v. Rahimi,*
    602 U.S. 680 (2024) ..................................................... 9

*United States v. Raines,*
    362 U.S. 17 (1960) ..................................................... 10

*United States v. Salerno,*
    481 U.S. 739 (1987) ..................................................... 8

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................... 19

*Valentine v. Collier,*
    956 F.3d 797 (5th Cir. 2020) ...................................... 14

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023), *cert. granted,*
    144 S. Ct. 1390 (2024) ............................................... 19

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................... 21

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ..................................................... 7

**U.S. Constitution:**

Amend. X ..................................................................... 7

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 701(b)(1)(A) ........................................... 18
    5 U.S.C. § 705 ................................................ 17, 18, 19, 20
    5 U.S.C. § 706 ......................................................... 19

Anti-Money Laundering Act of 2020,
    Pub. L. No. 116-283, div. F, 134 Stat. 4547 (2021):
        § 6402(3), 134 Stat. at 4604 (2021) .................5, 11, 12
        § 6402(5)(E), 134 Stat. at 4604 (2021) ...................... 13

18 U.S.C. § 2339C ................................................................ 13

22 U.S.C. § 2798 ................................................................. 13

31 U.S.C. § 5336(a)(3) .......................................................... 16

31 U.S.C. § 5336(a)(11)(A) ...................................................... 4

31 U.S.C. § 5336(a)(11)(A)(ii) ................................................. 12

31 U.S.C. § 5336(a)(11)(B)(xix) ............................................ 9, 16

31 U.S.C. § 5336(a)(11)(B)(xxiii) .............................................. 5

31 U.S.C. § 5336(b)(1) .......................................................... 4

31 U.S.C. § 5336(b)(1)(B) ....................................................... 4

31 U.S.C. § 5336(b)(1)(C)-(D) ................................................... 4

31 U.S.C. § 5336(b)(1)(D) ...................................................... 17

31 U.S.C. § 5336(b)(2) ......................................................... 16

31 U.S.C. § 5336(c)(5)(B) ...................................................... 11

**Legislative Material:**

H.R. Rep. No. 79-1980 (1946) ................................................. 19

**Other Authorities:**

87 Fed. Reg. 59,498 (Sept. 30, 2022) ......................................... 12

FinCEN, *FinCEN Not Issuing Fines or Penalties in Connection with Beneficial Ownership Information Reporting Deadlines* (Feb. 27, 2025), https://perma.cc/632R-ZH9Q ...... 14

U.S. Dep't of the Treasury, *Treasury Department Announces Suspension of Enforcement of Corporate Transparency Act Against U.S. Citizens and Domestic Reporting Companies* (Mar. 2, 2025), https://perma.cc/LYL5-YJEB .................... 2, 15

**INTRODUCTION AND SUMMARY**

Plaintiffs identify no proper basis for any injunction against an Act of Congress, much less a universal injunction. On the merits, plaintiffs rely on a case holding that Congress may not regulate a class of individuals defined by their inactivity, but the statute at issue here addresses a class of entities defined by their incorporation or registration, which enables them to engage in commercial activity and signifies their propensity to do so. Because the Corporate Transparency Act (CTA) regulates business entities in order to prevent certain anonymous economic transactions, it falls well within Congress's commerce power. At a minimum, plaintiffs come nowhere near showing that the statute has no constitutional applications, as would be required to support their facial challenge. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Indeed, plaintiffs claim to represent hundreds of thousands of reporting companies yet still have not identified any non-hypothetical covered entity that refrains from commercial activity.

Plaintiffs likewise offer no persuasive response to the government's invocation of the Necessary and Proper Clause. Congress's determination that the CTA effectuates the federal government's tax, foreign affairs, and national security powers is subject to a deferential standard of review, and it readily withstands that review. The motions panel therefore correctly concluded that the government has a "strong" likelihood of successfully "defending [the] CTA's constitutionality." *Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5203138, at *1-2 (5th Cir. Dec. 23, 2024)

(per curiam), *stay vacated,* No. 24-40792, 2024 WL 5224138, at *1 (5th Cir. Dec. 26, 2024). That conclusion is consistent with the Supreme Court's stay order: Eight justices joined that order, and even the sole dissenter, Justice Jackson, made clear that the dissent related to non-merits factors by stating that denial of the stay was warranted "[h]owever likely the Government's success on the merits may be." *McHenry v. Texas Top Cop Shop*, 145 S. Ct. 1, 1 (2025) (Jackson, J., dissenting from the grant of stay).

On the equities, plaintiffs have no response to the numerous authorities recognizing that the government suffers irreparable harm whenever a court enjoins implementation of an Act of Congress. The government's recent announcement that it will "issu[e] a proposed rulemaking that will narrow the scope of the [reporting requirements] to foreign reporting companies only" and that it will not "enforce any penalties or fines against U.S. citizens or domestic reporting companies or their beneficial owners" underscores that an injunction is not warranted. Department of Treasury, *Treasury Department Announces Suspension of Enforcement of Corporate Transparency Act Against U.S. Citizens and Domestic Reporting Companies* (Mar. 2, 2025), https://perma.cc/73RD-HT6R. The government's efforts to implement the CTA in a calibrated way do not justify plaintiffs' request for an injunction stripping the government of authority to implement the statute at all. And on the scope of relief, plaintiffs offer no sound basis for providing relief to non-parties and to unidentified members of the associational plaintiff. The preliminary injunction should be vacated.

# ARGUMENT

## I.   The Corporate Transparency Act Is a Valid Exercise of Congress's Enumerated Powers.

The CTA is authorized by Congress's commerce and necessary and proper powers.  It regulates commercial entities and forms a part of a regulatory scheme that lies within the core of Congress's authority.

### A.   The CTA Is Authorized by the Commerce Clause

**1.**  Plaintiffs' merits argument relies almost exclusively on a misreading of the Supreme Court's decision in *National Federation of Independent Business v. Sebelius* (NFIB), 567 U.S. 519 (2012).  Plaintiffs do not dispute that Congress has the power to regulate economic activity.  Nor do they dispute that their businesses conduct commercial transactions.  Instead, they claim (Br. 1) that *NFIB* requires Congress to regulate economic activity directly and prohibits it from regulating a class of "business entities" that currently and apparently uniformly engage in that activity.

Nothing in *NFIB* justifies plaintiffs' artificial distinction between regulating economic activity and regulating the entities that engage in that activity.  In *NFIB*, the Supreme Court's concern was not that Congress framed the insurance mandate as regulating a class instead of an activity.  Rather, the Court emphasized that "[t]he mandate primarily affect[ed] healthy, often young adults who [we]re less likely to need significant health care."  567 U.S. at 556 (opinion of Roberts, C.J.).  "If the individual

mandate [was] targeted at a class, it [wa]s a class whose commercial inactivity rather than activity [wa]s its defining feature." *Id.*

The CTA, by contrast, regulates entities whose "'defining feature' is their ability and propensity to engage in commercial activity." *Texas Top Cop Shop, Inc. v. Garland*, No. 24-40792, 2024 WL 5203138, at *2 (5th Cir. Dec. 23, 2024). Plaintiffs claim to represent hundreds of thousands of reporting companies yet fail to identify a single one that refrains from commercial activity. And it is difficult to imagine why anyone would create a business entity that engages in no business, or why even the basic steps of setting up such an entity would be done without engaging in any commerce. The CTA's connection to commerce thus does not depend on "prophesied future activity" that is "years, or even decades, away." *NFIB*, 567 U.S. at 557-58 (opinion of Roberts, C.J.). Instead, the reporting requirements generally apply to "corporation[s]" and "similar entit[ies]" that are currently doing business in the United States, 31 U.S.C. § 5336(a)(11)(A)—covering businesses operating for years before the requirements came into effect, *see id.* § 5336(b)(1)(B), and requiring both initial reports and reports of changes in ownership, *see id.* § 5336(b)(1)(C)-(D).

On its face, the CTA makes clear that it targets economic activity, namely, the ownership and operation of "reporting companies." 31 U.S.C. § 5336(b)(1). Plaintiffs argue (Br. 19) that "ownership of an entity is no[t] . . . an activity." But forming and operating a business entity is an economic activity; such entities hold legal authority to engage in economic activity in their own names; and Congress regulated those entities

precisely because they can be used to conduct transactions anonymously. *See* Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, div. F, § 6402(3), 134 Stat. 4547, 4604 (2021). The statute requires those who choose to form or maintain certain businesses to report information to the government, while exempting entities that meet the statutory criteria for inactive businesses. *See* 31 U.S.C. § 5336(a)(11)(B)(xxiii). That is a regulation of economic activity.

Plaintiffs' arguments ignore the obvious connection between business entities and the commerce they conduct. According to plaintiffs (Br. 22), there is no relevant difference between the CTA and a hypothetical statute regulating "individuals" at "birth" on the theory that they may someday conduct financial transactions. But the CTA regulates artificial entities, not individuals. And as the activities of the plaintiff businesses themselves illustrate, the central purpose of most of the artificial entities covered by the statute is to engage in economic activity. Recognizing Congress's authority to regulate such entities, including through disclosure of who owns or controls them, would not transform the Commerce Clause into "a general license to regulate an individual from cradle to grave." *NFIB*, 567 U.S. at 557 (opinion of Roberts, C.J.).

That Congress proceeded through limited regulation (by requiring only certain disclosures) of entities that engage in commercial transactions rather than by regulating those transactions directly is entirely natural, less burdensome, and does not render the CTA any less commercial. Plaintiffs' contrary argument is equivalent to

saying that although Congress can regulate banks, regulations that might apply to an entity registered as a bank before it has served its first customer are regulations of inactivity and thus invalid—as applied not only to that bank but to all banks throughout the financial system, including those already engaged in business. The Supreme Court's decisions provide no support for that extraordinary result and instead confirm Congress's authority to regulate "economic enterprise[s]," *United States v. Lopez*, 514 U.S. 549, 561 (1995), and to enact laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000).

The stark contrast between this case and *NFIB* is further illustrated by plaintiffs' own statements. In *NFIB*, the Court explained that the Commerce Clause grants Congress "the power to regulate commerce, not to compel it." 567 U.S. at 555 (opinion of Roberts, C.J.) (emphases omitted). Before *NFIB*, "Congress ha[d] never attempted to rely on [the commerce] power to compel individuals not engaged in commerce to purchase an unwanted product." *Id.* at 549. By contrast, plaintiffs acknowledge that the CTA "does not require that anyone 'engage in commercial transactions.'" Br. 19. Instead, the statute requires business entities to provide information to the government—and that, too, only because other entities or individuals have chosen to form or maintain the business entity that is required to report.

Plaintiffs similarly fail to reconcile their position with this Court's precedent. They incorrectly depict the Court's decision in *Groome Resources Ltd. v. Parish of Jefferson*,

234 F.3d 192 (5th Cir. 2000), as upholding under the Commerce Clause a direct federal regulation of "specific commercial transactions." Br. 28 (emphasis omitted). In fact, the Court sustained a Fair Housing Act provision requiring local governments to grant zoning accommodations because that provision indirectly "affected the commercial transaction of purchasing a home." *Groome*, 234 F.3d at 205. The CTA, which regulates business entities in service of Congress's larger efforts to prevent certain harmful economic transactions, bears at least as close a connection to commerce.

**2.** Plaintiffs fare no better in asserting (Br. 30) that the CTA improperly "intrude[s]" on states' regulation of corporations. That assertion is legally flawed and factually incorrect. As a legal matter, any authority "specifically enumerated . . . in Article I" is "[v]irtually by definition" not a power "reserved to the States." *United States v. Comstock*, 560 U.S. 126, 144 (2010) (quoting U.S. Const. amend. X). The Supreme Court has repeatedly confirmed Congress's authority to legislate in areas that were previously subject only to state regulation, such as civil commitment, *see id.* at 130, 135, minimum-wage and maximum-hour requirements, *see United States v. Darby*, 312 U.S. 100, 105 (1941), home-grown wheat, *see Wickard v. Filburn*, 317 U.S. 111, 113-14 (1942), and chartering corporations, *see McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 409 (1819).

Regardless, the CTA leaves state oversight of entity formation undisturbed. The statute "adds nothing to, nor detracts in any way from, the registration process

under State law." ROA.406. Nor does the statute preempt or otherwise override any aspect of the incorporation processes created by states. Instead, the CTA continues the long congressional practice of enacting statutes—from securities registration requirements to auditing and disclosure requirements for public companies—that regulate business entities established under state law. *See* Opening Br. 30 (collecting examples). Those federal statutes have never been understood as interfering with state laws regarding entity formation.

The absence of support for plaintiffs' position is highlighted by their mistaken reliance on two Supreme Court cases. *See* Br. 25-29 (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987); *Santa Fe Indus. v. Green*, 430 U.S. 462 (1977)). As the government previously explained (Opening Br. 29), *CTS Corp.* recites the uncontroversial proposition that states have "authority to regulate domestic corporations," and nowhere suggests that such authority is exclusive, *CTS Corp.*, 481 U.S. at 89. And *Santa Fe* recognizes federal authority to regulate corporations where Congress legislates "expressly." 430 U.S. at 479 (quotation marks omitted). The CTA is such legislation.

**3.** At a minimum, plaintiffs fall short of the high bar for a facial challenge: establishing that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs contest (Br. 41) the applicability of that standard to claims that Congress exceeded its enumerated powers, but their argument conflicts with the Supreme Court's decision in *Sabri v. United States*,

541 U.S. 600 (2004).  In rejecting a facial enumerated-powers challenge to a federal bribery statute, the Court applied "the demanding standard set out in [*Salerno*]."  *Id.* at 604.  The Court emphasized that facial challenges "depar[t] from the norms of adjudication in federal courts," "invite judgments on fact-poor records," and "carr[y] too much promise of 'premature interpretation of statutes.'"  *Id.* at 609 (alteration omitted).

"Rather than consider the circumstances in which [the CTA is] most likely to be constitutional," plaintiffs "focu[s] on hypothetical scenarios where [the statute] might raise constitutional concerns."  *United States v. Rahimi*, 602 U.S. 680, 701 (2024).  Many of plaintiffs' hypotheticals disregard the CTA's exceptions, which exclude from the reporting requirements numerous categories of entities, including many charitable organizations and non-profit groups.  31 U.S.C. § 5336(a)(11)(B)(xix).  Specifically, plaintiffs claim (Br. 5) that the reporting requirements apply to "homeowners' associations, neighborhood pool clubs, personal LLCs that own a single private home, innumerable private and family trusts, and a vast number of charitable organizations and nonprofits."  Even putting aside that the entities plaintiffs mention all or almost all engage in commercial activity, any claim that Congress lacks the power to require disclosure by those entities should be resolved in suits brought by those entities.  *See, e.g.*, *Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (addressing an as-applied challenge to a federal civil rights law brought by "a family-owned restaurant").  Plaintiffs, who are indisputably engaged in commercial activity, *see* Opening Br. 37, may not "attack

the statute on the ground that . . . it might also be taken as applying to other persons or other situations in which its application might be unconstitutional," *United States v. Raines*, 362 U.S. 17, 21-22 (1960).

**B.     The CTA Is Authorized by the Necessary and Proper Clause**

Plaintiffs similarly fail to refute the central premises underlying the government's invocation of the Necessary and Proper Clause.  Plaintiffs accept (Br. 31) that, as a general matter, the Clause empowers Congress to implement an enumerated power through a reporting requirement.  Plaintiffs thus do not dispute that Congress may implement the commerce power by requiring individuals to provide evidence in agency proceedings, *see Interstate Commerce Comm'n v. Brimson*, 154 U.S. 447, 473-80 (1894), that it may implement the taxing power by requiring taxpayers to file annual tax returns, *see United States v. Kahriger*, 345 U.S. 22, 31-32 (1953), or that it may implement the power to raise armies by requiring men to register under the Selective Service System, *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Instead, plaintiffs urge (Br. 29) that, unlike the reporting requirements that the Supreme Court upheld in prior decisions, the CTA is "untethered from the exercise of an[y] enumerated power."  In general, however, the "closeness of the relationship" between the means of implementing a power and the underlying power is a matter "for congressional determination."  *Burroughs v. United States*, 290 U.S. 534, 548 (1934). A court should ask only whether the statute "represent[s] a rational means for

implementing" a granted power. *Comstock*, 560 U.S. at 143. The CTA easily satisfies that deferential test.

In particular, plaintiffs fail to reconcile their claim (Br. 26) that the CTA "is in no way integral" to any broader program of commercial regulation with Congress's express findings. Congress found that "malign actors seek to conceal their ownership" of corporations and similar entities "to facilitate" activities such as "money laundering," "human and drug trafficking," "securities fraud," and "financial fraud." § 6402(3), 134 Stat. at 4604. Plaintiffs do not dispute that the Commerce Clause authorizes Congress to prohibit those activities. And given Congress's express findings, plaintiffs cannot seriously dispute that the CTA is "useful" and "convenient" for effectuating those prohibitions. *McCulloch*, 17 U.S. (4 Wheat.) at 413.

Equally unavailing is plaintiffs' contention (Br. 32-34) that the CTA lacks an adequate link to Congress's taxing power. Plaintiffs emphasize (Br. 32) that CTA reports are collected by the Financial Crimes Enforcement Network (FinCEN) rather than the Internal Revenue Service (IRS). But the Act provides that "[o]fficers and employees of the Department of the Treasury," which includes the IRS, "may obtain access to beneficial ownership information for tax administration purposes." 31 U.S.C. § 5336(c)(5)(B). Plaintiffs also err in arguing (Br. 32) that a law effectuates the taxing power only if it, "in some way, generate[s] some revenue." The CTA does generate revenue by countering "serious tax fraud." § 6402(3), 134 Stat. at 4604.

Plaintiffs also identify no sound reason for disregarding Congress's determination that the CTA effectuates foreign-affairs and national-security powers vested in both Congress and the President. Plaintiffs contend that "[t]he CTA applies exclusively to entities that register with domestic officers or agencies" and that the statute "regulates a domestic issue: anonymous existence of companies registered to do business in a U.S. state." Br. 36-37 (quotation marks omitted). It is true that the statute does not apply extraterritorially, but the relevant point is that the statute expressly encompasses foreign companies operating in the United States by defining a "reporting company" to include any corporation or similar entity that is "formed *under the law of a foreign country* and registered to do business in the United States." 31 U.S.C. § 5336(a)(11)(A)(ii) (emphasis added). Plaintiffs provide no basis for disputing that foreign actors often register shell companies in the United States in order to facilitate financial crimes. *See* 87 Fed. Reg. 59,498, 59,498, 59,502-03 (Sept. 30, 2022) (providing examples, including instances in which Iranian nationals used shell companies to evade sanctions). That is an international issue, not simply a domestic one.

Plaintiffs' other arguments regarding foreign affairs and national security similarly miss the mark. Although plaintiffs depict (Br. 38) as insubstantial Congress's objective of "bring[ing] the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," § 6402(5)(E), 134 Stat. at 4604, that objective reflects a legislative judgment that international

coordination can play an important role in curbing financial crime, *see id.* And although plaintiffs claim that "the government fails to cite a single congressional regulation of foreign affairs" effectuated by the CTA, our opening brief contains multiple examples, including prohibitions on terrorism financing and provisions authorizing economic sanctions, Opening Br. 18, 37, *see also* 18 U.S.C. § 2339C (prohibiting terrorism financing); 22 U.S.C. § 2798 (authorizing certain economic sanctions).

Finally, plaintiffs assert (Br. 35, 39) that "the government's argument has no limiting principle" and that, "if the CTA passes muster," the government could require citizens to disclose "their assets, roommates, friends and romances, travel, and more." That concern is unfounded. To fall within the Necessary and Proper Clause, legislation must effectuate a power vested in the federal government, *see Comstock*, 560 U.S. at 133-34; preserve "the structure of government established by the Constitution," *NFIB*, 567 U.S. at 559 (opinion of Roberts, C.J.); and comport with other constitutional provisions, *see McCulloch*, 17 U.S. (4 Wheat.) at 421. Not all requirements may satisfy those tests, but the corporate reporting requirements at issue here certainly do.

## II.  The Remaining Factors Counsel Against a Preliminary Injunction

The balance of harms and public interest favor the government. "[A]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Valentine v.*

*Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam) (quotation marks omitted). The inherent harm of blocking a constitutional enactment provides a sufficient basis to deny preliminary relief, and it cannot be overcome by whatever burden plaintiffs may face in complying with a validly enacted Act of Congress. Plaintiffs' contrary argument rests (Br. 44, 58-60) on the mistaken premise that they are likely to succeed on the merits; as they are not, they have no basis to obtain preliminary relief.

As a matter of policy, the Treasury Department continues to assess how best to implement the CTA. After the Supreme Court granted the government's stay application, the Department announced that it "intends to issue an interim final rule that extends BOI reporting deadlines, recognizing the need to provide new guidance and clarity as quickly as possible, while ensuring that BOI that is highly useful to important national security, intelligence, and law enforcement activities is reported." FinCEN, *FinCEN Not Issuing Fines or Penalties in Connection with Beneficial Ownership Information Reporting Deadlines* (Feb. 27, 2025), https://perma.cc/632R-ZH9Q. Shortly thereafter, the Department further announced that "not only will it not enforce any penalties or fines associated with the . . . reporting rule under the existing regulatory deadlines, but it will further not enforce any penalties or fines against U.S. citizens or domestic reporting companies or their beneficial owners after the forthcoming rule changes take effect." U.S. Dep't of the Treasury, *Treasury Department Announces Suspension of Enforcement of Corporate Transparency Act Against U.S. Citizens and Domestic Reporting Companies* (Mar. 2, 2025), https://perma.cc/LYL5-YJEB. The Department

explained that it intends to propose to narrow "the scope of the rule to foreign reporting companies only" and that this change is designed to "support[] hard-working American taxpayers and small businesses and ensur[e] that the rule is appropriately tailored to advance the public interest." *Id.* These developments further undermine plaintiffs' equities in seeking injunctive relief.

Plaintiffs fail to advance their equitable arguments by asserting (Br. 53) an "additional constitutional injury" because the CTA purportedly violates the First and Fourth Amendments. The district court did not reach plaintiffs' First and Fourth Amendment claims. Nor do plaintiffs discuss those claims in the merits section of their brief. Plaintiffs' assertions of "constitutional injury" based on those claims (Br. 53) thus are not properly before this Court.

In any event, plaintiffs' First and Fourth Amendment claims lack merit. As to the First Amendment, plaintiffs rely on decisions applying First Amendment scrutiny to laws compelling political or charitable groups to disclose their members or donors to the government. Br. 54-56 (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). Unlike the statutes at issue in those cases, however, the CTA requires disclosure only of beneficial owners and applicants, not of members or donors. *See* 31 U.S.C. § 5336(a)(3), (b)(2). Congress also exempted many political and non-profit groups from the statute's requirements. *See id.* § 5336(a)(11)(B)(xix). Plaintiffs cite no case in which this Court has held that ordinary businesses—such as Texas Top Cop Shop (a

firearms dealer), Data Comm (an information-technology company), or Mustardseed (a company that runs a dairy farm)—have a First Amendment right to operate anonymously. *Cf. United States v. Arnold*, 740 F.3d 1032, 1034 (5th Cir. 2014) (rejecting a First Amendment challenge to a registration requirement and noting the absence of "any decisions striking a registration requirement as being compelled speech in violation of the First Amendment").

For similar reasons, the CTA accords with the Fourth Amendment. Even assuming for the sake of argument that the Act's reporting requirement is a "search," it complies with the Fourth Amendment because it is reasonable. The CTA requires the reporting of only limited information; was enacted to promote law enforcement and national security interests; and contains safeguards designed to protect any relevant privacy interests.[1] *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 59-60 (1974) ("[R]eporting requirements are by no means per se violations of the Fourth Amendment.").

---

[1] Notwithstanding the rulings of every other court to address the issue, a district court outside this circuit recently concluded that the CTA is inconsistent with the Fourth Amendment. *See Small Bus. Ass'n of Mich. v. U.S. Dep't of Treasury*, No. 1:24-cv-314, 2025 WL 704287, at *1 (W.D. Mich. Mar. 3, 2025). For the reasons given in the government's briefing in that case, that conclusion is incorrect. *See Firestone v. U.S. Dep't of Treasury*, No. 3:24-cv-1034-SI, 2024 WL 4250192, at *10 (D. Or. Sept. 20, 2024) (recognizing, in denying a motion for a preliminary injunction, that a Fourth Amendment challenge to the CTA is unlikely to succeed); *Community Ass'ns Inst. v. U.S. Dep't of Treasury*, No. 1:24-cv-1597 (MSN/LRV), 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) (same).

Plaintiffs are on no firmer ground in urging (Br. 56) that a preliminary injunction is needed to "preserve judicial review." Even if plaintiffs comply with the CTA—notwithstanding recent and forthcoming regulatory actions by the Treasury Department—that compliance would not moot this case, as the statute imposes continuing obligations. 31 U.S.C. § 5336(b)(1)(D) (obligation to report updated beneficial ownership information); *see NLRB v. Unoco Apparel, Inc.*, 508 F.2d 1368, 1371 (5th Cir. 1975) (compliance with continuing obligation does not moot challenge to obligation).

## III.   At a Minimum, Plaintiffs Are Not Entitled to Universal Relief

**A.** The district court's remedy included two main components. First, the court issued a universal injunction which purported to enjoin the CTA itself and prohibited the statute's enforcement even against non-parties. ROA.525-526. Second, invoking a provision of the Administrative Procedure Act (APA), 5 U.S.C. § 705, the court stayed the compliance deadline set by FinCEN's Reporting Rule. ROA.525-526.

Plaintiffs do not meaningfully defend the universal scope of the injunction, which they did not even seek. *See* Opening Br. 41-46 (explaining why nationwide injunctions are improper). Plaintiffs instead focus (Br. 61-65) on the stay under Section 705. But Section 705 did not empower the district court to issue a universal stay of the compliance deadline. That Section provides remedies for *agency* errors (*e.g.*, regulations that exceed the agency's statutory powers, not *congressional* errors (*e.g.*, statutes that exceed Congress's enumerated powers). Section 705's text refers to

"agency action," 5 U.S.C. § 705, and the APA defines "agency" to exclude Congress, *id.* § 701(b)(1)(A).  Plaintiffs concede that Section 705's purpose is to enable courts to grant interim relief when "the *administrative agency* has committed errors of law."  Br. 64 (emphasis added) (quoting *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1942)).  Section 705's structure leads to the same conclusion.  That Section reflects that either a "reviewing court" or the "agency" itself may "postpone the effective date" of agency action.  5 U.S.C. § 705.  But plaintiffs do not suggest that Section 705 empowers an agency to hold an Act of Congress unconstitutional and to postpone the effective date of an implementing regulation based on that conclusion.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994) ("[A]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies[.]").

In this case, the district court did not hold that FinCEN's Reporting Rule, standing alone, was legally invalid—for example, that it was arbitrary and capricious or issued without proper procedure.  Instead, the court determined that "[t]he CTA is likely unconstitutional as outside of Congress's power" and that "[b]ecause the Reporting Rule implements the CTA, it is likely unconstitutional for the same reasons."  ROA.442-443.  For the reasons discussed above, however, Section 705 does not provide a remedy for that type of claim.

Regardless, even when Section 705 applies, it authorizes a court to "postpone the effective date of an agency action" only when "necessary to prevent irreparable

injury." 5 U.S.C. § 705.  Even assuming that "preliminary relief under Section 705" could properly not be "party-restricted" in some circumstances, *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), that proposition by no means requires that Section 705 relief must always be universal, *i.e.*, that Section 705 forbids relief limited to the parties before the court, *see* H.R. Rep. No. 79-1980, at 43 (1946) (indicating Congress's expectation that relief under Section 705 "would normally, if not always, be limited to the parties complainant").[2]  This Court has recognized that injunctions can (and normally should be) party-restricted, and plaintiffs identify no sound basis for treating Section 705 stays differently.  *See Texas v. United States*, 126 F.4th 392, 420-21 (5th Cir. 2025) (emphasizing that "equitable remedies . . . should not provide more relief than 'necessary to give the prevailing party the relief to which [it] is entitled'" and narrowing the scope of a universal injunction).

Here, plaintiffs have not explained why granting relief to non-parties is "necessary" to "prevent irreparable injury" to plaintiffs.  5 U.S.C. § 705.  An injunction applicable only to plaintiffs would be sufficient for that purpose, so no stay

---

[2] The proposition that relief under Section 705 of the APA need not be party-specific hinges on the assumption that 5 U.S.C. § 706 authorizes courts to vacate agency rules, and that such vacatur has universal effect.  *See Career Colls.*, 98 F.4th at 255.  It is the federal government's view, however, that the APA does not authorize universal vacatur of regulations at all.  *Accord United States v. Texas*, 599 U.S. 670, 693-99 (2023) (Gorsuch, J., concurring in the judgment); *VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (suggesting rules may be vacated in part), *cert. granted*, 144 S. Ct. 1390 (2024).

under Section 705, much less a universal one, was necessary to protect plaintiffs' rights. Instead, plaintiffs assert (Br. 65) that "practical considerations" supported the universal scope of the remedy, but they fail to explain what practical considerations would support providing relief to roughly 32 million existing reporting companies to redress irreparable injury to the six respondents. They also suggest (Br. 65) that the government conceded in district court that universal relief was necessary to protect plaintiff National Federation of Independent Business's (NFIB) 300,000 members. But the district court itself acknowledged that the government "did not concede that nationwide relief was necessary or appropriate." ROA.578-579. Rather, the government's point, as discussed below, was that relief beyond the plaintiffs and identified members of NFIB was too broad.

**B.** The district court also erred by granting relief to NFIB members not identified in the complaint. Plaintiffs claim (Br. 66-67) that the government's position is inconsistent with Supreme Court precedent on associational standing. But the cited cases address only an association's standing to sue at the outset of the case, not the appropriate scope of relief at the end of the case. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 510-14 (1975). Plaintiffs do not meaningfully grapple with the government's arguments (Opening Br. 47-48) that awarding relief to absent and unidentified members of NFIB would violate Article III, circumvent rules limiting class actions, and lead to asymmetrical results.

## CONCLUSION

For the foregoing reasons and those given in our opening brief, the preliminary injunction should be vacated.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

ABE McGLOTHIN, JR.
*Acting United States Attorney*

DANIEL TENNY

/s/ *Steven H. Hazel*
STEVEN H. HAZEL
MAXWELL A. BALDI
SOPHIA SHAMS
*Attorneys, Appellate Staff*
*Civil Division, Room 7217*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2498*
*Steven.H.Hazel@usdoj.gov*

March 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,011 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Steven H. Hazel*
STEVEN H. HAZEL